CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 22 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case Number 1:06CR00001-JPJ |
| vs. |  |
| CARLOS DAVID CARO, | DEATH-PENALTY CASE |
| Defendant. |  |

---

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF
## PURSUANT TO 28 U.S.C. § 2255

█████████████

---

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

INTRODUCTION............................................................................................................... 7

STATEMENT OF THE CASE........................................................................................... 8

    A. Procedural Overview............................................................................................ 8

    B. Background Information, Offense and Trial ....................................................... 9

JURISDICTION ............................................................................................................... 15

STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT........................ 15

    A.    The *Brady* Test Regarding the Government's Failure to Disclose  Evidence ............................... 16

    B.    The *Strickland* Standard for Ineffective Assistance of Counsel .......................... 17

GROUNDS FOR RELIEF: PRETRIAL ......................................................................... 20

CLAIM ONE: THE GOVERNMENT VIOLATED MR. CARO'S FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE. ......................... 20

    A.    The Benavidez Assault and Disproportionate Plea Agreements......................... 20

    B.    A Tactical Advantage for the Government and Prejudice to Mr. Caro................. 24

CLAIM TWO: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE DEATH-CERTIFICATION STAGE OF THE CASE..................... 26

    A.    What is the Death-Certification Process? ............................................................ 26

    B.    The Sixth Amendment Right to Counsel Applies at the Death-Certification  Stage ...................... 28

    C.    Duties of Counsel at Death-Certification Stage................................................... 30

        1.    Duty to Investigate............................................................................................ 31

        2.    Duty to Argue Mitigating Facts ....................................................................... 32

    D.    Counsel's Deficient Performance ........................................................................ 33

        1.    Deficient Performance of Duty to Investigate ................................................. 33

        2.    Deficient Performance of Duty to Argue Mitigating  Evidence ....................... 35

    E.    Prejudice to Mr. Caro........................................................................................... 38

i

**GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE** ................................................. 38

CLAIM THREE: MR. CARO'S RIGHT TO A FAIR TRIAL WAS INFRINGED BY JUROR MISCONDUCT, IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS ........................... 38

A.   Juror Deceit in *Voir Dire* ........................................................................................ 39

1.   Juror # 62 ......................................................................................................... 40

2.   Juror # 32 ......................................................................................................... 41

B.   Juror Predetermining Decision Before Hearing the Evidence ..................................... 42

CLAIM FOUR: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE. .................................. 43

A.   Trial Counsel Failed to Develop a Cohesive Theory of Defense ................................. 43

B.   Trial Counsel Failed to Adequately Investigate and Impeach the  Government's Only Purported Eyewitness, Sean Bullock ......................................................................................... 46

C.   Trial Counsel Failed to Adequately Investigate and Present Evidence of the  BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request  to be Placed in Mr. Caro's Cell .................. 53

D.   Trial Counsel Failed to Adequately Investigate and Present Evidence In  Support of Self-Defense, Second-Degree Murder, or Manslaughter ......................................................................... 57

E.   Counsel's Deficiencies Both Individually and Cumulatively Prejudiced Mr.  Caro ....................... 61

CLAIM FIVE: BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING DEFENSE COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ................................................................................................................ 62

**GROUNDS FOR RELIEF: PENALTY PHASE** ............................................................... 65

CLAIM SIX: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE PENALTY PHASE ......................................... 65

A.   Trial Counsel Failed to Challenge the Government's Deliberate and Tactical  Delay of Mr. Caro's Indictment ......................................................................................................... 65

B.   Trial Counsel Failed to Adequately Investigate, Develop, and Present a  Compelling Mitigation Story about Mr. Caro's Life ................................................................................ 66

1.   Factual Background ........................................................................................... 66

a)   Pretrial Preparation .................................................................................. 66

b)   Trial ......................................................................................................... 82

2.    Counsel's Performance was Deficient ................................................................ 87

   a)    Counsel never developed a reasoned and cohesive mitigation theme for trial ...................... 89

   b)    Counsel failed to appropriately request, adequately develop, and present testimony of mental-health experts ........................................................................................................... 90

   c)    Counsel's failure to obtain a mental-health expert to explain the effects of Mr. Caro's childhood trauma was unreasonable ................................................................................. 98

   d)    Counsel's failure to present testimony of Mr. Caro's brothers: Jose and Noe .................... 100

   e)    The limited mitigation case that counsel presented was undermined by counsel's own argument to the jury and by counsel's introduction of a witness who previously recorded a statement that was used against her and other witnesses ........................................................ 104

      (1)    Opening and closing statements .......................................................................... 104

      (2)    Witnesses who were undermined on cross- examination .......................................... 106

3.    Counsel's deficient performance prejudiced Mr. Caro ........................................... 109

C.    Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful Adversarial Testing ............................................................................................................ 113

D.    Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's Ability to Control Improper Inmate Communications, and failed to Subject the Government's Evidence to Meaningful Adversarial Testing ................................................................................. 116

E.    Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning Prison Culture and Statements of Remorse .............................................................................. 118

F.    Trial Counsel Failed to Adequately Investigate Mr. Caro's Underlying Conviction for Conspiracy to Commit Murder and Failed to File a Collateral Challenge to that Unconstitutional Conviction ..... 119

   1.    Mr. Caro's Prior Counsel Failed to Advise Him that a Guilty Plea for Conspiracy to Murder in the Benavidez Assault Could and Likely Would be Used Against Him by the Government as an Aggravating Circumstance in the Sandoval Case ......................................................... 119

   2.    Trial Counsel Could Have Timely Challenged the Prior Conviction and Sentence, But Failed To Do So ................................................................................................................. 124

   3.    Trial Counsel's Failure to Investigate and Challenge the Prior Conviction in the Benavidez Assault Prejudiced Mr. Caro .................................................................................. 126

   4.    This Court Should Stay Its Decision in This Case Pending Its Decision on the § 2255 Motion filed in Case No. 2:03- cr-10115-JPJ ............................................................................ 127

G.    Trial Counsel Failed to Present *Skipper* Evidence To Rebut Aggravating Evidence ................... 128

   1.    Evidence of Circumstances Surrounding Guilty Plea in the Benavidez Assault ...................... 128

   2.    Evidence that the BOP Considered Mr. Caro a "Good Inmate," Appropriate for Housing at USP-Marion or ADX-Florence .................................................................................. 129

   3.    Mr. Caro's Concern for the Well-Being of Others ................................................... 131

H.    Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell.................132

I.    Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instances of Violence By Persons Other than Mr. Caro ......................................................................................133

J.    Trial Counsel Failed to Object to the Government's Improper Arguments Made During Closing Statement ............................................................................................................................................136

   1.    The Government Improperly Argued to the Jury that It  Should Control Mr. Caro by Imposing the Death Penalty ...................................................................................................................................137

   2.    The Government Improperly Argued to the Jury that  Unless Mr. Caro Received the Death Penalty There Would  Be No Punishment for the Death of Roberto Sandoval ...............................137

   3.    The Government Violated the Eighth Amendment and  the Rule in *Caldwell v. Mississippi* by minimizing the  jury's responsibility .............................................................................................138

   4.    Defense Counsel Was Ineffective for Failing to Object to  the Prosecutor's Unconstitutional and Prejudicial  Statements.......................................................................................................139

K.    Trial Counsel Failed to Accept the Invited Excuse of a Frequently Sleeping Juror, and the Court Violated Mr. Caro's Fifth and Fourteenth Amendment Due-Process Rights and Sixth Amendment Jury Trial Right by Failing to Excuse the Juror.............................................................................................141

L.    Counsel's Deficiencies, Both Individually and Cumulatively, Prejudiced Mr. Caro ...................146

CLAIM SEVEN:  BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND PRESENTING MISLEADING PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ........................................147

A.    The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and Its Predecessor Prison, USP-Marion, for More than Three Years. .......148

B.    The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro was Not a Gang Leader at USP-Lee....153

C.    The Government's Failure to Produce Material Exculpatory Evidence Considered Cumulatively Violated Mr. Caro's Constitutional Rights .......................................................................................155

D.    Mr. Caro's Death Sentence, Which Relied on Incomplete,  Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment............157

CLAIM EIGHT: THE GOVERNMENT VIOLATED THE EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, BY MINIMZING THE JURY'S RESPONSIBILITY........157

**GROUNDS FOR RELIEF: DIRECT APPEAL ........................................................................159**

CLAIM NINE: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE FOURTEENTH AMENDMENT OF THE CONSTITUTION. .........................................................159

A.    Appellate Counsel Failed to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Sufficiently and Beyond a Reasonable Doubt, in Violation of Mr. Caro's Fifth, Sixth, Eight, and Fourteenth Amendments ........................... 159

B.    Appellate Counsel Failed to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty ................................................................................. 162

C.    Appellate Counsel Failed to Raise a Meritorious Argument Regarding Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Mr. Caro .................. 168

D.    Appellate Counsel Failed to Raise the Claim that the Government Violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi* by Minimizing the Jury's Responsibility .......... 170

E.    Appellate Counsel Failed to Raise Systemic Challenges to the Death Penalty ............................ 170

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES** ............................................................... **170**

CLAIM TEN: THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A) ............................................................................................................ 170

CLAIM ELEVEN: THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING CASES IN WHICH THE FEDERAL DEATH-PENALTY IS IMPOSED FROM THOSE IN WHICH IT IS NOT IMPOSED RENDERS THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL. ......... 179

CLAIM TWELVE: THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.  THIS COURT SHOULD VACATE MR. CARO'S SENTENCE ON THIS BASIS ALONE ................................ 185

CLAIM THIRTEEN:  MR. CARO'S DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT ......................... 188

CLAIM FOURTEEN: THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF MR. CARO'S TRIAL VIOLATED INTERNATIONAL LAW ................................................... 189

CLAIM FIFTEEN:  THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE STATUTE UNCONSTITUTIONAL ......................... 191

**GROUND FOR RELIEF: CUMULATIVE ERROR** ....................................................... **194**

CLAIM SIXTEEN: MR. CARO'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE ................. 194

**PRAYER FOR RELIEF**............................................................................................................195

**CERTIFICATION**..................................................................................................................196

COMES NOW Defendant CARLOS DAVID CARO, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rules 2 and 3 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court vacate the judgment entered against him, grant him a new trial, and/or vacate, set aside, or correct his sentence.

## INTRODUCTION

There is an ancient parable about a group of blind men and an elephant. They each touched the elephant to learn what it was like. After each man felt a part of the elephant, the king asked, "Tell me, what sort of thing is an elephant?" The men avowed that the elephant was either like a wall (side), tree (leg), snake (trunk), spear (tusk) or a rope (tail). Without seeing the entire elephant, no one knew what it was. The jurors in this case were much like the blind men. Because they were not shown the entire elephant, they did not "see" all that was necessary to understand either Mr. Caro or the offense, and thus there can be no confidence in their conclusions.

The evidence that the jury never saw, or heard, was significant. The jury never learned that Mr. Caro suffers from an organic brain impairment and has the reasoning ability of a 10-year-old child. The jury never learned that the government's only eye-witness, Sean Bullock, had a cellmate at the time of the offense and that had he been called to testify would have stated that neither he nor Mr. Bullock saw the offense because they were playing cards at the time. The jury never heard from an expert on prison culture, whose testimony would have allowed them to perceive and understand the

7

offense within its cultural context. The jury never learned that, contrary to the government's innuendos, Mr. Caro was not a leader of any gang. Finally, the jury never learned that the Bureau of Prisons ("BOP") not only has the authority and ability to house inmates in highly secure and restrictive facilities for extended periods of time, but that, contrary to the government's assertions, the BOP was doing so at the time of Mr. Caro's trial.

Both parties were responsible for the jury not "seeing" the entire story. The government withheld critical documents that would have impeached its witnesses. Defense counsel failed to conduct a thorough investigation, overlooking a key witness and impeachment evidence. Defense counsel also failed to develop and present a meaningful defense and mitigation story that incorporated all of the relevant facts, including Mr. Caro's brain impairment.

Without this evidence, Mr. Caro could not and did not receive a fair and reliable trial.

### STATEMENT OF THE CASE

**A. Procedural Overview**

Carlos Caro (Reg. No. 37786-079) is currently confined at the United States Penitentiary ("USP") in Terre Haute, Indiana. He challenges his conviction and sentence, including his death sentence, imposed by the Honorable James P. Jones, District Court Judge for the Western District of Virginia at Abingdon. (Case No. 1:06-cr-00001-JPJ (W.D. Va.).) Mr. Caro pled not guilty and was convicted after a jury trial. He was represented at trial by Stephen J. Kalista and James A. Simmons.

The Fourth Circuit affirmed his conviction and sentence on appeal. *United States v. Caro*, 597 F.3d 608, *reh'g denied*, 614 F.3d 101 (4th Cir. 2010). On January 9, 2012, the United States Supreme Court denied his petition for a writ of certiorari. *Caro v. United States*, 132 S. Ct. 996 (2012).

This Court, pursuant to 18 U.S.C. § 3599, appointed the Federal Public Defender's Offices in the District of Arizona and the Western District of Virginia to represent Mr. Caro in this action. (Order, 05/11/2011, Dkt. 768.)[1] That order became effective upon the Supreme Court's denial of Mr. Caro's petition for a writ of certiorari.

This is the first motion that Mr. Caro has filed challenging the conviction and sentence in this matter.

**B. Background Information, Offense and Trial**

On August 29, 2003, Mr. Caro was placed in the Special Housing Unit (SHU) at USP-Lee after he and another inmate Juan Moreno-Marquez assaulted a third inmate, Ricardo Benavidez (the "Benavidez assault"). Five other inmates were implicated in the Benavidez assault and all seven were placed in the SHU. According to the government, all seven inmates were members of the same gang, the Texas Syndicate. The BOP determined that the victim, Mr. Benavidez, was the leader of the gang.

Several months later, on December 16, 2003, the SHU officers attempted to place inmate Roberto Sandoval, also a member of the same gang, into Mr. Caro's cell. Mr. Caro refused to take a cellmate, and the officer placed Mr. Sandoval in a nearby cell

---

[1] All citations to the docket refer to the docket in this matter. Where another case docket is referenced, counsel will indicate the case number in that citation.

instead. Contrary to standard operating procedures, the officer did not write up a disciplinary report regarding the refusal or communicate the refusal to the next shift. When the next shift officers arrived, Mr. Sandoval, ignoring Mr. Caro's recent refusal, asked to be put in Mr. Caro's cell. This time Mr. Caro did not refuse, and Mr. Sandoval was placed into Mr. Caro's cell.

During the evening of the next day, December 17, 2007, Mr. Caro called an officer over to his cell, where the officer saw the body of Mr. Sandoval lying on the ground. Mr. Sandoval, who had an orange towel wrapped around his neck, was dragged by the officers into the hallway. Attempts to revive Mr. Sandoval failed, and the medical examiner determined the cause of death as strangulation. Mr. Caro was interviewed by Douglas Fender, an FBI agent, who testified that Mr. Caro told him that he had killed Mr. Sandoval over breakfast. Agent Fender testified that he began to question Mr. Caro further because he did not believe the killing was related to a breakfast tray, but rather that the killing had something to do with the gang. Mr. Caro stopped the interview at that point. Mr. Caro also made other statements indicating that he had killed Mr. Sandoval because Mr. Sandoval had disrespected him.

The government did not immediately pursue prosecution of the Sandoval homicide, but did pursue prosecution of Mr. Caro and the other six defendants for the Benavidez assault. While there had been two "knife-men" who attacked Mr. Benavidez, Mr. Caro and Mr. Moreno-Marquez, the government believed that one of the other codefendants, Francisco Tijerina, had planned the attack in an effort to become the leader of the gang. All seven defendants were charged with conspiracy to commit murder, as

10

well as possession of weapons. In the end, the government focused its efforts on Mr. Caro. The government offered the other defendants—including Mr. Moreno-Marquez, the other knife-man who was a career offender, and Mr. Tijerina, the inmate who had planned the attack in order to gain power—plea agreements that allowed them to plead to the lesser charge of possession with a weapon, while the government required Mr. Caro to plead to conspiracy to commit murder. The six defendants received sentences between 24 and 57 months, while Mr. Caro received a sentence of 327 months.

It was not until about two months after Mr. Caro was sentenced in the Benavidez assault, and over one year after the death of Mr. Sandoval, that the government contacted this Court about prosecution of Mr. Caro in this capital case. On January 27, 2005, the Court appointed two counsel to represent Mr. Caro, Mr. Simmons and Mr.Kalista. The Department of Justice ("DOJ") scheduled its death certification hearing for June 6, 2005, during which time the defense had the opportunity to argue that it should not seek death for Mr. Caro. During March and April, counsel sought and secured funding for a mitigation specialist and fact investigator in order to assist counsel in preparing for the meeting, but little was done. Counsel appeared at the hearing, but did not prepare anything for submission in writing to the Review Committee.

The United States Attorney General certified the case for death in October, and on January 3, 2006, a grand jury returned an indictment for first-degree murder, alleging statutory aggravators based on three prior drug convictions and premeditation (the premeditation aggravator was later dropped). On January 11, 2006, the government filed a Notice of Intent to Seek Death Penalty that included two non-statutory aggravators,

11

victim impact and future dangerousness.

Voir dire began on January 22, 2007, and lasted for four days. The jury trial began on January 29, 2007, and also lasted four days, for a total of approximately 13 hours—which included opening statements, closing arguments, all evidence, and deliberations. The government's theory at trial was that Mr. Caro had waited until Mr. Sandoval turned his back, then snuck up behind and ambushed him and strangled him with a towel. The government presented one purported eyewitness, inmate Sean Bullock, who had been housed in the cell immediately across from Mr. Sandoval. Mr. Bullock testified that he had seen Mr. Caro standing behind Mr. Bullock strangling him. The government presented Mr. Caro's statement, in which he stated that he had killed Mr. Sandoval over breakfast and disrespect. The government argued that Mr. Sandoval asked to go into Mr. Caro's cell because a new busload of inmates was coming in and he did not want to be celled with a new inmate.

Defense counsel did not call any witnesses at trial. Defense counsel conceded that Mr. Caro had killed Mr. Sandoval, but argued that the killing was not premeditated. Rather, it was the result of two men in a small cell having a heated argument that escalated into a "killing of hot blood." They argued that Mr. Caro was guilty only of second-degree murder or voluntary manslaughter. They questioned why Mr. Caro refused a cellmate and why Mr. Sandoval wanted to go into Mr. Caro's cell, but did not provide any answers. They argued that the jury should look at the offense within the context of prison culture, but did not present any expert on the subject. Defense counsel also pointed out that Mr. Sandoval had two injuries, which might indicate two separate

12

physical altercations.   Defense counsel cross-examined Mr. Bullock, but failed to impeach him with testimony from Mr. Bullock's cellmate, who, if called, would have testified that he and Mr. Bullock were playing cards at the time of Mr. Sandoval's death and did not hear or see anything until the officers dragged Mr. Sandoval's body into the hallway.

The jury found Mr. Caro guilty of first-degree murder. The penalty stage of trial began on February 5 and lasted for six days. The government presented 13 witnesses: one victim witness, the daughter of Roberto Sandoval, and 12 witnesses who testified about various aspects of future dangerousness.  The government introduced evidence that Mr. Caro had been a leader of the gang when he was housed at the Federal Corrections Institute ("FCI") in Oakdale, Louisiana, and might still be a leader, that he had assaulted Mr. Benavidez, and that he previously had sent out coded letters.  While none of Mr. Caro's letters had contained threats or orders to kill, the government introduced evidence that another inmate who was a member of the Aryan Brotherhood gang had once sent a coded letter from a BOP prison that resulted in a murder.  The government argued that the BOP could not securely house Mr. Caro, and that even if he was sent to the BOP's most secure facility, Administrative Maximum Facility ("ADX") Florence, BOP policies would require them to move Mr. Caro back into open population in three years, even if he remained dangerous.

Defense counsel presented eight witnesses: one witness testified generally about BOP security conditions; one witness testified that Mr. Caro was dangerous, but that the BOP could securely house him; and the remaining six witnesses, who were members of

13

Mr. Caro's extended family and a teacher, testified briefly about Mr. Caro. Defense counsel did not present any mental health evidence, even though they knew that Mr. Caro suffered from a brain impairment which left him with the reasoning ability of a 10-year-old. They did not rebut the proposition that Mr. Caro had been and might still be a gang leader. They did not rebut testimony about the ability of ADX-Florence to house inmates for extended periods of time in part because they were unable to obtain the relevant information despite their efforts through discovery. The jury unanimously found that the government had proven beyond a reasonable doubt that Mr. Caro was likely to commit acts of violence against inmates or staff in the federal prison in the future, that he had not express remorse for the death of Mr. Sandoval, and that he caused significant impact on the victim's family. The jury sentenced Mr. Caro to death.

Had the jury been allowed to "see the entire elephant," they would have heard a story much different from that presented at trial:

- The jury would have heard that Mr. Caro's initial refusal to take a cellmate could have been an attempt to avoid retribution for the Benavidez assault.

- The jury would have heard that Mr. Sandoval's subsequent request to be housed with Mr. Caro after an earlier refusal, when interpreted through the eyes of prison culture, was a violation of prison etiquette that could have been interpreted as aggressive conduct by Mr. Sandoval.

- The jury would have heard impeaching evidence from Mr. Bullock's cellmate, Joseph Bland, contradicting Mr. Bullock's testimony and effectively eliminating the government's foundation for a finding of premeditation.

14

- The jury would have heard that the BOP's conclusion that Mr. Caro had been a gang leader in the past was premised on faulty assumptions, and that grand jury and BOP internal documents (never disclosed to the defense) at the time of Mr. Caro's trial reflected that the BOP never believed Mr. Caro was a gang leader at USP-Lee and, to the contrary, believed he might be in bad standing with the gang.

- The jury would have heard that, contrary to testimony presented by the government, ADX-Florence, at the time of Mr. Caro's trial, had at least 43 inmates who had been there more than five years.

- Finally, the jury would have heard that Mr. Caro suffered from a brain impairment, which left him with the reasoning ability of a 10-year old.

These and many other parts of the case would have supported a conviction for a lesser crime, such as second-degree murder or voluntary homicide, or even an acquittal based on self-defense, and a sentence less than death.

## JURISDICTION

This Court has jurisdiction to hear this Motion and to provide the relief requested herein pursuant to 28 U.S.C. § 2255, 28 U.S.C. § 2241, and the Rules Governing Section 2255 Proceedings for the United States District Courts (hereinafter "Section 2255 Rules").

## STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT

In accordance with Section 2255 Rule 2, this Motion sets forth the facts and grounds entitling Mr. Caro to relief. While the motion contains some legal argument and citations, these arguments and citations are not intended as comprehensive legal analyses

15

of the claims.  With regard to Mr. Caro's allegations of *Brady* and *Strickland* violations, the following general principles are set forth below:

## A.     The *Brady* Test Regarding the Government's Failure to Disclose Evidence

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or punishment, irrespective of the good or bad faith of the prosecution."  These rights have been recognized both in federal cases under the Fifth Amendment and state cases brought under the Fourteenth Amendment.  *See Brady*, 373 U.S. at 86 (holding that suppression of exculpatory evidence was a violation of the defendant's Fourteenth Amendment rights); *United States v. Agurs*, 427 U.S. 97, 107 (1976) (analyzing a *Brady* claim in a federal prosecution under both the Fifth and Fourteenth Amendments).

A *Brady* claim lies when the requested evidence is (1) favorable to the defense; (2) material; and (3) within the possession or control of the government or its agents, and was not disclosed.  *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).  Evidence is deemed "material" if "there is a reasonable possibility that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A reasonable possibility is a possibility sufficient to undermine the confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Finally, the fact that the government, in the form of any of its departments that were involved in Mr. Caro's prosecution, had in its possession the exculpatory

information is sufficient to support Mr. Caro's claims. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*") (emphasis added); *United States v. Andrews*, 824 F. Supp. 1273, 1289-90 (N.D. Ill. 1993) (prosecution team responsible under *Brady* for exculpatory and impeachment information known to the BOP, and the prosecution's failure to disclose the impeaching material "deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges.") (internal citations omitted); *see also Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977) (holding prosecution responsible for information known to government agent who testified for the prosecution).

**B.    The *Strickland* Standard for Ineffective Assistance of Counsel**

The Supreme Court outlined the standard for determining when counsel has provided ineffective assistance in *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). As described by the Court, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relief on as having produced a just result." *Id.* at 686. Under *Strickland*, counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Effective assistance of counsel is ultimately concerned with the fundamental right to a fair trial—"a trial whose result is reliable." *Id.* at 687.

17

The inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney. *Id.* at 687. Although defense counsel has broad discretion when making strategic decisions, those decisions must be both reasonable and informed. *Id.* at 691. When assessing counsel's performance, this Court should look to guides such as the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. *See Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009); *Strickland*, 466 U.S. at 688-89 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . "); *Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007) (noting that ABA Guidelines "may be of some relevance in determining what constitutes reasonable performance in a capital trial"). The court can also consider the opinion of a standard of care expert when assessing the reasonableness of counsel's actions or inactions. *See, e.g.*, *Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008) (noting that petitioner presented an "expert on the practice of criminal law"); *Johnson v. United States*, 860 F. Supp. 2d 663, 690 (N.D. Iowa 2012) (discussing testimony from evidentiary hearing of experts, including "a *Strickland* expert"); *Bell v. King*, No. 7:04CV00752, 2006 WL 938730, at *4 (W.D. Va. Apr. 11, 2006) (noting that courts consider "legal expert testimony regarding attorney standard of care when evaluating ineffective assistance claims").

Prejudice, the second prong, exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

18

*Strickland*, 466 U.S. at 694.    A reviewing court must evaluate "the totality of the evidence before the judge or jury." *Id.* at 695. The prejudice analysis does not depend on whether the outcome of the proceeding would have been different. *Id.* at 694. Rather, prejudice is shown by "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694.

In assessing prejudice during the penalty phase of a capital case, the Court should determine whether "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. That is, where "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

The *Strickland* standard is also applied when considering counsel's performance on direct appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In assessing prejudice on appeal, the presumption of effective assistance of counsel will generally be overcome if the issues counsel failed to present are stronger than the issues that were presented. *Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000). Counsel has provided the declaration of Larry Hammond, which sets forth the standard of care for the attorneys involved in this case.

19

Mr. Caro incorporates by reference all information provided in Mr. Hammond's declaration.

**GROUNDS FOR RELIEF: PRETRIAL**

**CLAIM ONE: THE GOVERNMENT VIOLATED MR. CARO'S FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE.**

The government did not notify the Court of its intention to prosecute Mr. Caro for the murder of Mr. Sandoval until December 30, 2004—over one year after the death of Mr. Sandoval and two months after Mr. Caro was sentenced in another criminal case before this Court. *United States v. Caro*, No. 2:03-cr-10115-JPJ (W.D. Va.) (the "Benavidez assault"). One reason for this delay appears to have been the government's interest in convicting and sentencing Mr. Caro to the longest possible sentence in the Benavidez assault—Mr. Caro's only prior conviction for a crime of violence—so it could set up the Sandoval case for death, including the argument that the only effective punishment available in this capital case was death, as Mr. Caro already was serving a de facto life sentence.

**A.     The Benavidez Assault and Disproportionate Plea Agreements**

On August 29, 2003, inmate Ricardo Benavidez was attacked and received multiple stab wounds at United States Penitentiary ("USP")-Lee. Seven inmates, including Mr. Caro, were implicated in the stabbing and charged with conspiracy to

commit murder and possession of weapons. (Case No. 2:03-cr-10115-JPJ, Indictment, 01/03/2006, Dkt. 2.) Two of the defendants, Mr. Caro and another inmate named Juan Moreno-Marquez, were equally involved in the stabbing. The other five defendants had been armed and standing close by at the time of the offense.

Less than two months later, the Special Investigative Services ("SIS") intelligence officer at USP-Lee, testified under oath before a grand jury about a gang called the Texas Syndicate. (Grand Jury Tr. 10/22/2003, attached as Sealed Ex. 28.) The officer testified that the victim, Ricardo Benavidez, had been the leader of the Texas Syndicate at USP-Lee prior to his assault, but that the current leader of the gang was an inmate by the name of Francisco Tijerina. (Sealed Ex. 28 at 15.) When a juror asked "why the [gang] would attack their own leader," the officer testified that he believed that inmate Tijerina wanted to "assume the leadership role of the Texas Syndicate" as USP-Lee. (Sealed Ex. 28 at 18.)[2]

The SIS Officer also concluded that all seven of the inmates conspired in the crime, but that the "attack was planned by inmate Tijerina . . . in an attempt to gain control of the Texas Syndicate Leadership" at USP-Lee. (BOP Memorandum from ███ ███ with attached SIS Report (Case No. 2:03-cr-10115-JPJ), 10/08/2004, attached as Sealed Ex. 51 at 12.)

There is no mention or implication anywhere that Mr. Caro was, at any time, the leader of the Texas Syndicate at USP-Lee.

---

[2] Inmates Benavidez and Tijerina were released from prison subsequent to the Sandoval offense. Mr. Benavidez is now deceased.

21

On November 19, 2003, the government charged the seven inmates with conspiracy to commit the murder of Ricardo Benavidez and possession of weapons. Inexplicably, six of the seven inmates were allowed to plead to the lesser possession of a weapon charge, including both Mr. Moreno-Marquez and Mr. Tijerina. (Docket, Case No. 2:03-cr-10115-JPJ.)

The government, however, required Mr. Caro to plead to the most serious charge, conspiracy to commit murder. Mr. Moreno-Marquez, who had been the other knife-man and was a career offender, was given a deal to plead to possession of a weapon, but his deal was contingent on Mr. Caro pleading guilty to conspiracy to commit murder. (Plea Agreement of Moreno-Marquez (Case No. 2:03-cr-10115-JPJ), 06/02/2004, attached as ██████ Ex. 53 at 2.) Mr. Caro received no benefit from the deal, and ultimately was sentenced to 327 months, consecutive to the 30-year sentence he was already serving. A three level reduction for acceptance of responsibility had no practical impact. (Presentence Report (Case No. 2:03-cr-10115-JPJ), 09/30/2004, attached as Sealed Ex. 50; Judgment, 11/01/2004 Dkt. 168). Co-defendant Tijerina, who the government believed planned the attack, received a sentence of 30 months, while Mr. Moreno-Marquez, the other knife-man, was sentenced to 57 months. (Docket, Case No. 2:03-cr-10115-JPJ.)

To convince the Court to accept these disparate plea agreements between Mr. Caro and Mr. Moreno-Marquez, the government changed its story depending on the particular proceeding before the Court. For example, during Mr. Moreno-Marquez's change of plea hearing, the government told the Court that the evidence would show:

this defendant, Moreno-Marquez, participated in an assault on a fellow inmate by the name of Ricardo Benavidez, and during the assault defendant Moreno-Marquez and his co-defendant, Mr. Caro, were observed to be in possession of homemade knives which they were using for the assault. The evidence would include the testimony of a Bureau of Prisons employee who witnessed the assault and witnessed the defendant, Moreno-Marquez, using a homemade knife in the course of the assault, as well as a videotape showing the defendant participating in the assault. In addition, the evidence would include the results of DNA testing that established that the victim's blood was on the clothing of both this defendant and his co-defendant . . . .

(Transcript of Moreno-Marquez Change of Plea Hearing (Case No. 2:03-cr-10115-JPJ), 08/03/2004, attached as ▮▮▮ Ex. 54 at 13.)

At the time of Mr. Moreno-Marquez's sentencing, the Court questioned why it should impose such a low sentence after imposing such a "very lengthy term of imprisonment for attempted murder" to Mr. Caro the previous day. (Transcript of Moreno-Marquez Sentencing Hearing, Case No. 2:03-cr-10115-JPJ, 06/30/2008, Dkt. 184, attached as ▮▮▮ Ex. 55 at 5.) The government's response was vastly different from that at the previous change of plea hearing. There was no mention of the BOP eyewitness or the DNA evidence. While acknowledging that there was a video, that video now was not "of high quality." The government also referred to the problem of uncooperative victims in prison cases, and that Mr. Caro "appeared to be the most culpable of all of the defendants." (*Id.* at 6.) Upon information and belief, the government never informed the Court of its belief that codefendant Tijerina had planned the assault.

The government, at the time of Mr. Caro's sentencing in the Benavidez assault, also apparently failed to inform the Probation Office and the Court of the Sandoval

23

homicide, as it is not referenced in either the Presentence Report or the transcript of the sentencing hearing. (Sealed Ex. 50; Transcript of Caro Sentencing Hearing (Case No. 2:03-cr-10115-JPJ), 11/01/2004, attached as ▮ Ex. 52). While the government mentions a "lengthy criminal history involving drugs," and the probation office references a 1993 arrest for possession of marijuana where there was no prosecution, not a single reference is made to the Sandoval homicide. (Sealed Ex. 50 at 8; ▮ Ex. 52 at 4.)

## B.    A Tactical Advantage for the Government and Prejudice to Mr. Caro

The above facts lead to the conclusion that the government delayed prosecution of this case until after it had negotiated its disproportionate plea agreement in the Benavidez assault and sentenced Mr. Caro to the maximum possible sentence. By so delaying, the government gained a tremendous advantage during the penalty phase of Mr. Caro's capital case. By waiting, the government could argue that given Mr. Caro's punishment in the Benavidez assault, a punishment less than death in this case would be "no punishment" and that a death judgment was necessary to "control" Carlos Caro. *See* Claim Six-J. This argument was prejudicial to Mr. Caro. As noted by Juror # 33, the "single most important factor in [his] decision for the death penalty was that Carlos Caro was already serving a sentence that amounted to life in prison, so giving him a life sentence would have been, in effect, giving him no punishment for the homicide. That was not acceptable." (Declaration of Juror # 33, 11/20/2012, attached as ▮ Ex. 30 (hereinafter "Juror # 33 Decl.").)

24

Mr. Caro was also prejudiced by the fact that his capital counsel were not appointed until after the Benavidez case was over. Had capital counsel been appointed earlier, before Mr. Caro pled guilty, they could have worked closely together with Mr. Dene, Mr. Caro's counsel in the Benavidez case, and collectively advised Mr. Caro to go to trial on the Benavidez assault.

Conduct like the government's here has been deemed by the Supreme Court to be an outright violation of the Fifth Amendment. In *United States v. Marion*, 404 U.S. 307, 324-25 (1971), the government conceded and the Supreme Court agreed that tactical delay for the purpose of prejudicing a defense in a non-capital case constituted a violation of the Fifth Amendment. This principle has remained a feature of Fifth Amendment jurisprudence and has in fact been expanded by the Fourth Circuit. *See Howell v. Barker*, 904 F.2d 889, 895-896 (4th Cir. 1990) (holding that provided that pre-indictment delay was proven to have actual prejudice, then the defendant need not show an illicit government motive as a condition for relief); s*ee also United States v. Automated Med. Labs.*, 770 F.2d 399, 403-04 (4th Cir. 1985).

The above circumstances and evidence show that the government tactically delayed its prosecution of Caro, made misrepresentations to the Court, and withheld information from the probation office and Court, all for the purpose of obtaining a plea agreement that did not reflect the relative culpability of the defendants in the Benavidez assault. These acts and omissions prejudiced Mr. Caro in his capital defense efforts. Under *Howell* and *Marion*, Mr. Caro is entitled to relief.

**CLAIM TWO:    MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE DEATH-CERTIFICATION STAGE OF THE CASE.**

The death certification process is the first step in a federal capital prosecution at which the defense can persuade the government not to seek the death penalty.  A binding plea agreement that takes the death penalty off the table must be approved by the United States Attorney General through this proceeding, making it a critical stage in the prosecution of a capital offense.  Mr. Caro's counsel failed to adequately investigate mitigating evidence before the death certification hearing and failed to submit any written argument in favor of taking the death penalty out of the equation.  This performance fell below the competent representation reasonable defense counsel is expected to provide in a capital case, and as a result of this deficient performance, Mr. Caro was prejudiced by losing any meaningful opportunity to negotiate a plea agreement for life.

## A.    What is the Death-Certification Process?

The death certification process is a procedure mandated by the United States Attorney General, in which *all* cases punishable by death must be reviewed by the Attorney General's Review Committee on Capital Cases (also called the "Capital Review Committee").  After considering the recommendation of the Capital Review Committee, the recommendation of the U.S. Attorney prosecuting the case, and materials submitted by the defense in mitigation, the Attorney General makes the final decision on whether the government may seek the death penalty.  *United States Attorneys' Manual* ("*USAM*")

§§ 9-10.040-.050 (2006).[3]  The United States Attorney may not enter a binding plea agreement not to seek the death penalty unless authorized to do so by the Attorney General. *Id.*, § 9-10.100.  Thus, any chance of negotiating a binding plea agreement that removes the death penalty from consideration requires that the Attorney General be persuaded to waive the death penalty.

Before the U.S. Attorney makes a decision and recommendation to the Attorney General, the *USAM* required, at the time of Mr. Caro's case, the U.S. Attorney to give the defense a reasonable opportunity to present any facts, including any mitigating factors, for the U.S. Attorney to consider.  If the U.S. Attorney then decides not to seek the death penalty, he submits a "Death Penalty Evaluation form" with a brief statement of the reasons for not seeking the death penalty. If he wishes to recommend the death penalty, he must still complete the "Death Penalty Evaluation Form" and a prosecution memorandum explaining the case, including any impact on the victim's family, and including the mitigation material submitted by defense counsel.  *McGriff*, 427 F. Supp. 2d at 257; *see also United States v. Lopez-Matias*, 522 F.3d 150, 155 (1st Cir. 2008).

After the Capital Review Committee reviews the material and makes a recommendation, the Attorney General makes the final decision.  A final decision to authorize the death penalty cannot be made if the defendant has not been afforded an opportunity to present mitigating evidence and argument.  U.S. Dep't of Justice, *USAM*

---

[3] The *USAM* has been updated in 2007 and in 2011, but the basic process described above was part of the protocol in and before 2006. *See, e.g., United States v. McGriff*, 427 F. Supp. 2d 253, 257-58 (E.D.N.Y 2006).

27

§ 9-10.120 (2011). The U.S. Attorney cannot file a "Notice of Intent to Seek the Death Penalty" until the Attorney General authorizes seeking the death penalty. There is also a procedure for the defendant to request reconsideration and withdrawal of a notice of intention to seek the death penalty. *Id.* at § 9-10.150(c); *McGriff*, 427 F. Supp. 2d at 258.

**B.    The Sixth Amendment Right to Counsel Applies at the Death-Certification Stage**

The Sixth Amendment to the United States Constitution guarantees effective assistance of counsel at critical stages of a criminal proceeding. A critical stage is "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218, 226 (1967). For purposes of determining effective assistance of counsel, the defense's mitigation presentation to the Attorney General/Department of Justice at the "death certification" determination is such a critical stage. *United States v. Peña-Gonzalez*, 62 F. Supp. 2d 358, 363 (D.P.R. 1999). Failure to provide competent representation at this stage is ineffective assistance of counsel in violation of the Sixth Amendment right to counsel. *Id.*; *Basciano v. Martinez*, No. 07-cv-00421-NGG, 2007 WL 2119908, at *11 (E.D.N.Y. May 25, 2007) (noting that non-contact attorney visits, without appropriate justification, violate the Sixth Amendment right to counsel at a time when it was "of the utmost importance that [defendant] be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him") (*quoting United States v. Basciano*, 369 F. Supp. 2d 344, 352 (E.D.N.Y. 2005)); *United States v. Baquedano*, No. 10-20338, 2011 WL 1743742, at *2 (E.D. Mich.

28

May 5, 2011) ("[F]or defense counsel to short circuit the DOJ mitigation process that could result in a death penalty declination would amount to ineffective assistance of counsel.").

These lower court decisions are supported, indeed mandated, by United States Supreme Court decisions requiring effective assistance of counsel during plea negotiations. "[W]e have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010) (*citing Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). In the plea context, the Court has recognized that, given the overwhelming percentage of criminal matters resolved through plea bargaining, "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012).

The death certification process is a special opportunity early in the plea negotiation process for defense counsel to persuade the U.S. Attorney and the Attorney General that the death penalty is not an appropriate penalty for this particular defendant in this particular case. As discussed previously, only the Attorney General can authorize a binding plea agreement that takes the death penalty off the table.

In a capital case, defense counsel has an ongoing "obligation to take *all steps* that may be appropriate in the exercise of professional judgment . . . to achieve an *agreed-upon disposition*." Am. Bar Ass'n, ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases (2003) ("ABA Guidelines"), No. 10.9.1 (2003) (emphasis added). The commentary to that Guideline refers to the formalized process

adopted by the federal government for defendants to present mitigating evidence and to explain why the death penalty would not be appropriate in the particular case. Failing to avail oneself of this opportunity to argue for a sentence less than death clearly falls below the standard of care required of attorneys in capital cases, as will be discussed more fully below.

In discussing whether counsel's performance during the plea agreement prejudiced a defendant, the Supreme Court has noted that "*any amount* of additional jail time has Sixth Amendment significance." *Lafler v. Cooper*, 132 S. Ct. 1376, 1386 (2012) (*quoting Glover v. United States*, 531 U.S. 198, 203 (2001)) (brackets omitted) (emphasis added). Likewise, in *Padilla*, the Court found it "critical" for counsel to inform non-citizen clients about the risk of deportation as a consequence of a conviction (whether by plea or otherwise). Failure to do so constituted ineffective assistance of counsel. The Court noted that its decision was compelled by the severity of deportation, which is equivalent to banishment or exile. *Padilla*, 130 S. Ct. at 1486. If extra jail time and deportation have constitutional significance, then certainly loss of life at the hands of the government has even greater constitutional significance, mandating effective assistance of counsel at the death certification stage of a capital case.

## C.    Duties of Counsel at Death-Certification Stage

Once counsel is appointed in a capital case, "an all-important first step for defense counsel is to prepare a mitigation package to submit to the local United States Attorney who has the first call on whether to seek the death penalty." *United States v. Baquedano*,

No. 10-20338, 2011 WL 1743742, at *1 (E.D. Mich. May 5, 2011). The mitigation package will usually include interviews with friends and family, school and work records, and any other best evidence supporting defendant's position that the death penalty not be sought. *Id.* Preparation of an effective mitigation package requires "significant time and effort" by defense counsel and by mitigation specialists on the defense team. *Id.* "Capital cases have specific standards regarding the . . . precise requirements as to what must be accomplished by learned counsel to dissuade the Attorney General from seeking the death penalty." *United States v. Colon-Miranda*, 985 F. Supp. 31, 33 (D.P.R. 1997). "In presenting the case that a sentence of death is not justified, defense counsel must carefully investigate and argue the mitigating factors listed in 18 U.S.C. § 3592 . . . . " *Id.* at 34; *United States v. Peña-Gonzalez*, 62 F. Supp. 2d 358, 361 (D.P.R. 1999).

### 1.    Duty to Investigate

The contours of the duty to investigate mitigating evidence are well-established. At every stage, counsel must conduct a "thorough and independent investigation," not only of issues related to guilt but also related to penalty. ABA Guidelines No. 10.7. Because of the extraordinary penalty applicable to capital cases, defense counsel in a capital case "must . . . make extraordinary efforts on behalf of the accused." Am. Bar Ass'n, *ABA Standards for Criminal Justice* No. 4-1.2 cmt. (3d ed. 1993).

Counsel may not "sit idly by, thinking that investigation would be futile." *Voyles v. Watkins*, 489 F. Supp. 901, 910 (N.D. Miss. 1980). Failure to investigate and present mitigating evidence at the penalty phase of trial based on the belief that it would not do any good constitutes ineffective assistance of counsel. *See Austin v. Bell*, 126 F.3d 843,

849 (6th Cir. 1997).

The mitigation investigation should begin as quickly as possible. "[I]mmediately upon counsel's entry into the case, appropriate member(s) of the defense team should meet with the client" to discuss the case, explore the existence of potential sources of information regarding mitigating factors, and obtain necessary releases for securing confidential records. ABA Guidelines No. 10.7, cmt. (2003). Because of the personal nature of much mitigating information, a mitigation specialist "who has the skills to help the client cope with the emotional impact of such painful disclosures . . . is invaluable" to this part of the investigation. *Id.*

Mitigation evidence includes "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant." *Id.* Developing and preparing this evidence "requires extensive and generally unparalleled investigation into personal and family history . . . [beginning] with the moment of conception." *Id.* At a minimum, counsel must explore medical history (including substance use/abuse, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); family and social history; educational history, learning disabilities, and related limitations; employment and training history, including barriers to employability; and prior juvenile and adult correctional experience. *Id.*

### 2.    Duty to Argue Mitigating Facts

All of the mitigating evidence in the world can do no good if it is not presented effectively to the U.S. Attorney and Attorney General. This requires submission of a package of written argument and supporting documentation displaying the best evidence

in support of defendant's position that the death penalty ought not to be sought. *United States v. Baquedano*, No. 10-20338, 2011 WL 1743742, at *1 (E.D. Mich. May 5, 2011).

## D.    Counsel's Deficient Performance

Trial counsel's performance at the death certification stage fell below reasonable standards of care in many ways. The defense team was dilatory in conducting a mitigation investigation and failed to make any written submission to the U.S. Attorney or to the Attorney General.

### 1.    Deficient Performance of Duty to Investigate

Although appointed on the case on January 25, 2005 (Appointment Order of Stephen J. Kalista, No. 2:05-mc-00001-JPJ, 01/27/05, Dkt. 4; Appointment Order of James Simmons, No. 2:05-mc-00001-JPJ, 01/27/05, Dkt. 5), trial counsel made no effort to get approval and funding for a mitigation specialist until nearly two months later, March 22, 2005. (Ex Parte and Sealed Mot. for Authorization for Expert Servs., No. 2:05-mc-00001-JPJ, 03/22/2005, Dkt. 9)   The Court approved the request the very next day. (Sealed Order, No. 2:05-mc-00001-JPJ, 03/23/2005, Dkt. 9.)   Counsel did not request funding for an investigator until April 13, 2005 (Ex Parte and Sealed Mot. For Appointment of Investigator, No. 2:05-mc-00001-JPJ, 04/13/05, Dkt. 14), and the Court granted that motion the same day as well (Sealed Order, No. 2:05-mc-00001-JPJ, 04/13/2005, Dkt. 15).  Given the importance of an investigator and mitigation specialist to developing the kind of evidence needed to persuade the Attorney General not to seek the death penalty, the delay in seeking an investigator and mitigation specialist was not

33

professionally reasonable. (Declaration of Larry Hammond, 01/08/2013, attached as Ex. 4 ¶¶ 31, 39-42.)

From the time the mitigation specialist was appointed, she spent approximately 50 hours on the case, all during April 2005. (Invoice of Norton & Moody, Inc., 05/02/2005.) She spent one day traveling to the prison, where she met with Mr. Caro and spent two days traveling to Texas, where she met with Mr. Caro's wife and a few associates; this accounted for 31 hours of her time. (*Id.*) Likewise, the investigator interviewed Mr. Caro for approximately 1.5 hours on or about April 28, 2005. (Invoice of Advanced Private Investigations, LLP, 05/06/2005.) In May, the investigator determined the whereabouts of several inmates on the BOP locator, including co-defendants in the prior case arising out of an assault at USP-Lee and inmates involved in a prior alleged incident at FCI Oakdale. He took notes on Mr. Caro's BOP file that had been provided to counsel in pre-indictment discovery and attempted contacts with USP-Lee. (Invoice of Advanced Private Investigations, LLP, 06/02/2005.) He spent approximately 40 hours prior to the DOJ meeting. This was the extent of the mitigation investigation conducted before the death certification administrative hearing. No mental health experts were consulted or evaluated Mr. Caro before the certification hearing. This falls well below the professional expectations for mitigation investigation in a capital case.

A proper mitigation investigation would have revealed Caro's frontal lobe brain damage and numerous other mitigating factors that are discussed at length elsewhere in this petition, including the domestic abuse Mr. Caro experienced and witnessed at the hands of his father, his educational and developmental delays, and the violent prison

34

culture where Mr. Caro lived. Counsel's failure to properly investigate and discover these mitigating factors fell below the standard of competence owed to a defendant in a capital case.

### 2. Deficient Performance of Duty to Argue Mitigating Evidence

Counsel made no written submission to the Capital Review Committee. (Declaration of Stephen J. Kalista, 12/29/2012, attached as Ex. 5, ¶ 6 (hereinafter "Kalista Decl."); Declaration of James Simmons, 12/29/2012, attached as Ex. 9 (hereinafter "Simmons Decl.").) As previously discussed, preparation of an effective mitigation package is the first step required of defense counsel in a capital case. Counsel had four months to prepare for the certification hearing. That amount of time has been considered "objectively reasonable" notice for the defense to prepare for a capital case in the context of prosecutors filing their notice of intent to seek the death penalty at trial. *See, e.g., United States v. Le*, 311 F. Supp. 2d 527, 534-35 (E.D. Va. 2004) (113 days was considered reasonable notice). The standard of care in death penalty cases, however, suggests that more time to prepare a case would be valuable. (*See* Hammond Decl. ¶ 40.)

Regardless, trial counsel did not have a complete appreciation for the death certification process. E-mail correspondence between trial counsel Kalista and trial counsel Simmons reflects a casual attitude towards the process. On March 24, 2005, Kalista queried whether an investigator was even needed pre-authorization, asking what there would be for a fact investigator to do before they got discovery or had more information. (Email to Simmons from Kalista, 03/24/2005.) On April 25, 2005, Mr.

35

Kalista talks about possibly getting together with Mr. Simmons to brainstorm about the DOJ meeting and what to present. "Right now, I don't see us having or presenting anything much about Caro personally, but perhaps present some general arguments: one might be simply citing the cases supplied to us by McNally concerning the cases authorized/not authorized by Ashcroft, and the other might be a plea of sending him to ATX [sic] Colorado and put him in a box there (although the recent inmate killing there may have some negative effect.)" (Email to Simmons from Kalista, 04/25/2005.)

On May 25, 2005, in response to an inquiry from Assistant U.S. Attorney Anthony Giorno as to whether they were making a written mitigation submission, Mr. Kalista replied that they did not plan at that time to send a written submission. Mr. Simmons responded that he agreed they might not want to submit anything in writing, adding "I think the authorization is just a formality." (Email to Kalista from Simmons, 05/25/2005.) Mr. Simmons was in another trial at the time, and indicated he would get ready for the DOJ hearing once trial was over. He remained in trial until the evening of June 1, 2005, at which time they planned to meet in Washington, D.C., on Sunday evening, June 5, or Monday morning, June 6, before the 1:00 p.m. hearing the afternoon of June 6, 2005. (Email to Kalista from Simmons, 05/27/2005; Email to Kalista from Simmons, 05/29/2005; Email to Kalista from Simmons, 06/02/2005.)

Even if counsel had been unable to obtain all of the mitigating background documentation on Mr. Caro, they certainly had other information they could have submitted a written document outlining evidence that the death penalty was not generally sought for inmate homicides, and in the few cases that were authorized, one-fourth

36

subsequently received plea agreements for life. Another factor that counsel could and should have presented in writing is the effect of prison culture as mitigation for the crime itself. They could have also presented in writing the argument that confinement in a maximum security facility like the one in Colorado is very punitive. Counsel could and should have argued that the BOP was negligent for placing Mr. Sandoval in Mr. Caro's cell after Mr. Caro declined him the first time, particularly since Mr. Caro was in the SHU because of a prior incident involving within-gang violence.

Finally, letters from Mr. Caro's family members, particularly his daughter, could have been introduced to show that the family would be devastated by Mr. Caro's execution. This argument and the ones above were easily available to counsel to present, with documentation and with relatively minimal effort, but they failed to do so. By appearing in person only, they failed to memorialize their arguments in an organized fashion and failed to provide anything tangible for the Capital Review Committee to pass along to the Attorney General.

"As with other effective presentations in capital cases, the *importance of a written* as well as an oral *presentation should not be understated.*" (Hammond Decl. ¶ 41.) By considering the death certification process a formality, failing to vigorously pursue mitigation investigation during the four months before the hearing, and failing to submit any written argument or evidence in mitigation, counsel failed to perform as reasonable defense counsel in a capital case. (Hammond Decl. ¶ 39.)

37

### E.     Prejudice to Mr. Caro

Under Attorney General Ashcroft, the death penalty was *not* authorized in 78.3% of eligible cases.  In cases involving BOP inmate homicides, 29 defendants were not authorized for the death penalty, compared to 12 that had been authorized.  While it is impossible to know with certainty that competent representation would have resulted in the Attorney General deciding not to authorize the death penalty, the statistics were significantly in Mr. Caro's favor until the death penalty was authorized.  Even after that point, 25% of the BOP-inmate-homicide defendants who had been authorized for the death penalty were able to negotiate a plea agreement taking death off the table, meaning that the Attorney General withdrew a previous death notice.  By failing to adequately investigate and argue mitigating factors before the death certification hearing, or even presenting written evidence to the Attorney General after the death authorization, counsel deprived Mr. Caro of any opportunity to resolve the matter without the government seeking the death penalty.

## GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE

## CLAIM THREE: MR. CARO'S RIGHT TO A FAIR TRIAL WAS INFRINGED BY JUROR MISCONDUCT, IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS.

Two jurors provided factually inaccurate answers about their attitudes towards the death penalty and/or their ability to follow the instructions of the Court at the penalty phase of the trial, thereby violating Mr. Caro's Fifth Amendment right to due process and Sixth Amendment right to an impartial jury.

## A.    Juror Deceit in *Voir Dire*

Among the rights guaranteed by the Sixth Amendment is the right to trial "by an impartial jury" in criminal prosecutions. U.S. Const. amend. VI.   Due process also demands that the defendant, if provided a jury, must be provided a jury that is impartial. *Morgan v. Illinois*, 504 U.S. 719, 727-29 (1992).   The defendant is entitled through *voir dire* to ask relevant questions to determine if a juror is biased.  *Id.* at 735-36.  When a juror's answer to a material question is false, whether intentionally or inadvertently, a defendant may be entitled to a new trial.  The Supreme Court has identified a two-part test for determining when a new trial is required under these circumstances:   the defendant must show that (1)  a juror failed to honestly answer a material question, and (2) if the correct answer had been given, the defendant would have a valid basis to challenge the juror for cause.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  That same test has been adopted in the Fourth Circuit for habeas review of criminal cases. *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002).

Two jurors in the present case gave inaccurate answers on their juror questionnaires, indicating that they could be fair and impartial and could consider a sentence other than death for a defendant convicted of a capital crime.  In fact, statements they provided after trial about their beliefs reveal that they believed the death penalty should automatically be imposed if a defendant is clearly guilty of premeditated first-degree murder.  A juror who will automatically vote for the death penalty in every case is not impartial.   Such jurors will not consider evidence of aggravating and mitigating circumstances as required by law. *Morgan*, 504 U.S. at 729.  Failure to remove such a

39

juror for cause is constitutional error. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*

### 1.    Juror # 62

In her juror questionnaire, Juror # 62 indicated that she neither favored nor opposed the death penalty and that "sometimes its [sic] deserved," and "each case is individual." (Questionnaire of Juror # 62, attached as ███ Ex. 44, at 26.) She further answered that she would <u>not</u> "always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances." (Juror Questionnaire, attached as ███ Ex. 44, at 27.) In a subsequent affidavit, this same juror said "It was obvious from the evidence that Carlos Caro was guilty of first-degree murder. I am now, and was at the time of the trial, strongly in favor of the death penalty in cases where evidence of guilt is obvious. There is nothing that the defense offered, or could have offered, that would have changed my mind about the sentence because Mr. Caro committed the crime." (Declaration of Juror # 62, 11/19/2012, attached as ███ Ex. 32 (hereinafter "Juror # 62 Decl.").)

"Neither favoring nor opposing the death penalty" is a far cry from being "strongly in favor of the death penalty in cases where guilt is obvious." Combined with her statement that nothing the defense could have offered would have changed her mind about the sentence, it becomes clear that this juror, in fact, automatically favored the death penalty for defendants who are obviously guilty of premeditated first-degree murder. Even though she stated that she could follow the Court's instructions, by definition, she could not perform her duties in accordance with the law. *Morgan,* 504

U.S. at 735 (jurors who are "unalterably in favor of . . . the death penalty in every case— by definition are ones who cannot perform their duties in accordance with the law, their protestations to the contrary notwithstanding."). Even though Juror # 62 may have believed that she was fair and could follow the Court's instructions, her statements that the death penalty is warranted whenever someone is obviously guilty of premeditated murder and that nothing could change her mind about that, reveal that she was not qualified to serve on a capital jury. *Id.* Her inaccurate answers to *voir dire* questions meet the first prong of the *McDonough* test, even if her inaccuracies were not deliberate concealment. *Jones*, 311 F.3d at 310. Whether deliberate or not, her answers were factually untrue.

The second prong of the test, that correct answers to the question would subject her to dismissal for cause, is equally clear. A juror who would automatically impose the death penalty for premeditated first-degree murder is not an impartial juror, and Mr. Caro would have been entitled to excuse Juror # 62 for cause on those grounds. Failure to excuse her would have been constitutional error. *Morgan*, 504 U.S. at 729. This establishes prejudice as a matter of law, entitling Mr. Caro to a new sentencing trial.

### 2. Juror # 32

Juror # 32 acknowledged being strongly in favor of the death penalty on his juror questionnaire. However, he said he felt it should only be used in clear cut cases, and he said he would not always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense. He also said he would be able to follow the judge's instructions. (Questionnaire of Juror # 32, attached as ███ Ex. 38, at 26-27.)

After trial, however, he stated that the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and once he reached that conclusion, he had made up his mind about the death penalty, noting that the Bible states "An eye for an eye." After trial he also said nothing the defense could have offered would have changed his mind.

As with Juror # 62, Juror # 32 may have believed that he was impartial and capable of following the court's instructions, but his belief that the death penalty should apply if guilt is conclusive, without being willing to consider any mitigating evidence to change his mind, belies his claim. In actuality, Juror # 32 was an automatic death penalty juror for defendants "conclusively" guilty of premeditated first-degree murder. His claim to be able to follow the Court's instructions was inaccurate and misleading, whether deliberately or through honest mistake. Either way, the inaccurate answer establishes the first prong of the *McDonough* test. That failure to strike an automatic death penalty juror is constitutional error and satisfies the second prong. Juror # 32's misleading answers to *voir dire* resulted in the seating of a clearly unqualified juror, biased in favor of the death penalty, which is constitutionally impermissible.

**B.    Juror Predetermining Decision Before Hearing the Evidence**

Juror #32 indicated after trial that he decided to vote for the death penalty as soon as he knew in his mind that Mr. Caro was conclusively guilty. He reached this determination during the guilt phase of the trial, even before jury deliberations began on guilt or innocence. Having decided that the death penalty was the only appropriate punishment in this case, Juror # 32 did not think any evidence would or could change his

mind. Having predetermined his decision on sentencing, even before the sentencing phase evidence was presented, he cannot be considered an impartial juror in the cause. *Morgan*, 504 U.S. at 727 ("A juror who has formed an opinion cannot be impartial.") (citation omitted).

One who pre-determines the case, before hearing the evidence, cannot be impartial. By making up his mind about the penalty before hearing anything about the mitigating factors, he could not follow the Court's instructions and consider the evidence of aggravating and mitigating factors as the law requires. Because this juror was biased, not impartial, and failed to follow the Court's instructions, Mr. Caro was denied his constitutional right to an impartial jury. *Id.* at 729.

**CLAIM FOUR: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE.**

**A.    Trial Counsel Failed to Develop a Cohesive Theory of Defense**

The need to formulate a defense theory is so critical that there is a separate Guideline for that exact principle: "As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guidelines No. 10.10.1; *see also* Hammond Decl. ¶ 27. An integrated defense theory should be formulated "well before trial" and is necessary because of the uniqueness of the bifurcated proceedings in a capital case. *Id.*

43

cmt.

As a standard-of-care expert in death penalty defense explains, "several key principles should have dominated the defense effort from the outset: (1) defense themes must be developed on an ongoing basis; (2) those themes must permeate all aspects of the defense work in the case; and (3) the investigation essential to the development of defense themes must commence immediately and inevitably will require time and resources." (Hammond Decl. ¶27.)

In this case, counsel failed to develop a compelling theme that would be presented during Mr. Caro's guilt/innocence phase of trial. Counsel's opening statement lacked a persuasive theory of defense and failed to integrate any potential story that would be brought out during the penalty phase. (Tr. 01/29/2007 at 28-46.) The story that counsel told the jury was that Mr. Caro acted out of passion, rather than premeditation, because of the small confined cell in which Mr. Caro and Mr. Sandoval were housed. (*Id.* at 37-39). Counsel also stressed how both men were in a gang (*id.* at 31) and that prison life was violent (*Id.* at 31-32.) Based on this theory, counsel asked the jury to convict Mr. Caro of second-degree murder because "this was a case of a pot boiling over." (*Id.* at 43.) Counsel, however, admitted to the jury that "there may not be, apparently, any report of a problem between Mr. Sandoval and [Mr.] Caro" (*id.* at 42). Counsel failed to present a single defense witness in support of their theory.

Counsel's failure to develop and present a compelling story to the jury from the outset of trial deprived Mr. Caro his right to a fair trial. Instead of using the facts gathered from the investigation to create a reasonable defense, the jury was left with

44

evidence that would only support a conviction of first-degree murder. As discussed below, had counsel conducted adequate investigation and consulted with appropriate experts, they would have been able to present a compelling story for conviction of a lesser-included offense.

Based on evidence that was available to counsel, or that could have been available to counsel with the proper experts, defense counsel could have presented the following explanation of Mr. Caro's actions (supported by evidence as discussed in this motion) at the guilt/innocence phase at trial:

Mr. Caro is a member of a dangerous prison gang known as the Texas Syndicate. Less than three months before Mr. Sandoval's death, Mr. Caro had assaulted the leader of this gang. After an assault like this comes the real fear of retribution for assaulting a gang leader. Mr. Caro was protected while single-celled in the SHU, but that protection vanished when the BOP negligently placed another gang member into his cell. Moreover, this was a gang member who was slightly larger than Mr. Caro and whose placement in the SHU resulted from his possession of a weapon. Mr. Caro tried to prevent Mr. Sandoval from coming into this cell by refusing a cellmate. It worked once, and Mr. Sandoval was placed in another cell by himself. However, Mr. Sandoval would not give up, and, in an act that was considered aggressive by prison culture, tried to get into Mr. Caro's cell the very next shift. This time Mr. Caro did not object and the officers placed Mr. Sandoval in the cell with Mr. Caro.

Things were quiet until the next day. No one knows what happened in that cell, or what motivated the killing. No one heard or saw anything. While Sean Bullock, the

45

government's only purported eyewitness, will testify that he saw Mr. Caro behind Mr. Sandoval strangling him with a towel, Mr. Bullock's cellmate will testify that he and Mr. Bullock were playing cards at the time and that neither or them saw or heard anything until the officers pulled Mr. Sandoval out of the cell. Moreover, Mr. Bullock's story has changed. He told one story during his first interview with the government. He told another story to the grand jury. And, now he tells yet a third story that is not supported by and is contradicted by the testimony of the prison officers.

While we do not know what happened in that cell, we do know that Mr. Caro suffers from a brain impairment and anxiety disorder. Under calm circumstances, he has the reasoning abilities of a 10-year-old child, and he gets by. Under stress, his judgment leaves him and, although he is an adult man, he thinks and responds as a child would. These circumstances do not support a finding of premeditation.

**B.      Trial Counsel Failed to Adequately Investigate and Impeach the Government's Only Purported Eyewitness, Sean Bullock**

The only purported eyewitness in this entire case was an inmate by the name of Sean Bullock—a.k.a. Derek Taylor, Big Man, Kenneth Taylor, and Tyrone Harris. (Tr. 01/30/2007 at 81.) Mr. Bullock was housed in cell 146 of the SHU at USP-Lee immediately across from cell 123, which housed Mr. Caro and Mr. Sandoval. Mr. Bullock had a cellmate by the name of Joseph Bland at the time of this incident, but the jury never heard from Mr. Bland at trial. Had Mr. Bland testified, he would have contradicted Mr. Bullock's testimony. He would have testified that instead of standing by the cell door, Mr. Bullock was sitting at the bed with Mr. Bland playing cards at the

time of the offense, and that neither he nor Mr. Bullock saw or heard anything and were "completely unaware of the incident until inmate Sandoval was removed from the cell." (Declaration of Joseph Bland, 04/20/2012, attached as Ex. 2 (hereinafter "Bland Decl.").)

On December 20, 2006, the government sent defense counsel a copy of Mr. Bullock's grand jury testimony, in which Mr. Bullock clearly stated that he had a cellmate at the time of the incident. (Letter to Kalista from Giorno, 12/29/2006; Grand Jury Tr. 02/19/2004, attached as Sealed Ex. 26, at 18.) Yet, defense counsel made no attempts to identify or interview the cellmate. And, while defense counsel may have been misled by the government's earlier misrepresentations in this case, *see* Claim 5, *infra,* to the point that they overlooked information in the logs that should have prompted further investigation, at the very least they should have recognized the existence of a cellmate when they received the grand jury testimony.

Defense counsel's failure to investigate this witness was not a strategic call or impossibility; it was an oversight. (Kalista Decl.¶ 21.) At the time of trial, Mr. Bland was still housed at USP-Lee. (BOP Assignment History Report for Joseph Bland.) Defense counsel missed this significant fact.

Equally puzzling is why defense counsel said nothing at trial during the examination of Mr. Bullock. Mr. Bullock testified at trial that he had a cellmate the day before the offense. (Tr. 01/30/2007 at 71.) Later, he testified that immediately after the offense, he did not report anything to the correctional officers or "tell [his] cellie." (*Id.* at 75.) At this point, defense counsel should have objected, asked for a side-bar and requested a short continuance so they could interview the cellmate. Yet, they did

47

nothing, missing the import of Mr. Bullock's testimony.

During re-cross, the defense asked Mr. Bullock the name of his cellmate, but did not pursue the issue when Mr. Bullock responded that he couldn't recall who it was, but that he thought he was with him only one day. (*Id.* at 114-15.) Defense counsel made no effort to go back to either the SHU logs, the prosecution, or the BOP to gather more information about the identity of Mr. Bullock's cellmate.

Not only did the defense miss this critical witness, but they also failed to follow up on or to effectively impeach Mr. Bullock with the information they did have. For example, the government questioned Mr. Bullock and other inmates for the first time on December 22, 2003, five days after the incident. (Mass Interview Form ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, attached as Sealed Ex. 25.) At that time, Mr. Bullock stated that "[i]t seems like I saw some tussling. This whole thing happened about 45 minutes before Caro told the Officer." (Mass Interview Form ▮▮▮▮▮▮▮▮▮▮▮▮ attached as Sealed Ex. 25.) He was interviewed again on January 20, 2004 at the prison with the prosecutor and various unknown prison officers. (Tr. 01/30/2007 at 66-67.) No notes or reports were ever produced regarding this meeting in spite of counsel's prior request for witness statements pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3500. (Motion for Production of Witness Statements, 01/27/2006, Dkt. 22.)

Mr. Bullock testified before the grand jury on February 19, 2004. Much of Mr. Bullock's testimony to the grand jury, however, changed by the time he reached trial. Other testimony was flatly contradicted by other evidence introduced at trial. For example:

- Mr. Bullock told the grand jury that the officer who attempted to place Mr. Sandoval in Mr. Caro's cell the first time told Mr. Caro his refusal to take a cellmate would result in an "incident report." (Tr. 02/19/2004 at 11.) At trial, Officer Gilley testified about his interactions with Mr. Caro and his refusal to take a cellmate. (Tr. 01/29/2007 at 96-111.) Contrary to Mr. Bullock's testimony, Mr. Gilley said nothing about threatening to write up an incident report for Mr. Caro. In fact, Mr. Gilley stated that he did not write up an incident report because "[i]t's a real minor infraction as far as the rules and regulations of the prison," and in his discretion he chose not to do so. (Tr. 01/29/2007 at 103.) Defense counsel failed to point out this inconsistency at trial.

- Mr. Bullock told the grand jury that the offense occurred about four or five hours after Mr. Sandoval was placed in cell 123. At trial, he corrected his prior inaccurate testimony, and now stated that the offense did not occur until the following day. (*Compare* Grand Jury Tr. 02/19/2004 at 15-16 *with* Tr. 01/30/2007 at 72.) Defense counsel never impeached Mr. Bullock with this inconsistency.

- Mr. Bullock testified at trial that the officers came back to Mr. Caro's cell and asked if he would take a cellmate because "a bus was coming in, inmates. They said they needed space, they needed room." (Tr. 01/30/2007 at 70-71.) The guard who placed Mr. Sandoval in the cell, Brian Laster, however never mentioned anything about a bus. (Tr. 01/29/2007 at 115.) At trial, Mr. Laster was specifically asked what he said to Mr. Caro. He answered, "I asked him if it was all right if Mr. Sandoval moved in with him. He was requesting to move in and cellmate with him." (Tr. 01/29/2007 at 116.) Contrary to Mr. Bullock's testimony, Mr. Laster made no mention of a bus to Mr. Caro. And, in truth, there was no shortage of space in the SHU on December 16, 2003, even after the bus arrived. (*Compare* Tr. 01/29/2007 at 98-99 (SHU capacity of "approximately 220" per Officer Gilley) *with* SHU Running Count Log Book, showing only 161 inmates on the SHU after the bus arrived on 12/16/2003.) Defense counsel never impeached Mr. Bullock with this inconsistency.

- Mr. Bullock told the grand jury that Mr. Caro was behind Mr. Sandoval with "something around his neck, hands up around his neck." Mr. Bullock said nothing about an orange towel. At trial, Mr. Bullock never mentioned anything about hands around Mr. Sandoval's neck, but rather testified he saw Mr. Caro choke Mr. Sandoval with an orange towel. (*Compare* Tr. 02/19/2004 at 17 *with* Tr. 01/30/2007 at 74.) Defense counsel never impeached Mr. Bullock with this inconsistency.

- Mr. Bullock told the grand jury that the guard who first noticed that Mr. Sandoval was on the ground "grabbed his walkie-talkie and ran." (Tr. 02/19/2004 at 20.) The video of the SHU hallway after the offense, however, shows Officer Teters

49

looking into cell 123 and then calmly walking down the hallway. Mr. Teters did not run, or even jog. (Tr. 01/30/2007, Trial Exhibit Video 01.) Defense counsel did not impeach Mr. Bullock with this inconsistency.

- At trial, when asked to describe what he saw, Mr. Bullock got confused. He initially said that he "seen out of [his] rear view," and that Mr. Caro "like go forward, like down out of the view of the mirror." He quickly then corrected himself and stated, "I mean out of the glass, so I was looking forward." (Tr. 01/30/2007 at 74.) Again, defense counsel never impeached Mr. Bullock with this telling misstatement.

There is a saying, "the devil is in the details." Mr. Bullock's "details" were all over the board. He got the day wrong, the weapon wrong, the statements made by Officer Gilley wrong, the statements made by Officer Laster wrong, the response by Officer Teters wrong, and, initially, his own viewpoint wrong. In light of these errors regarding the specific details of the offense, his testimony is highly suspect. His contention that he saw Mr. Caro choke Mr. Sandoval with an orange towel was based on information that was available to all of the inmates housed near cell 123, as the officers dragged Mr. Sandoval's body with an orange towel around his neck into the hallway for all to see. This fact was never brought out during his cross-examination, or argued in closing. Such performance fell below the standard of care, as counsel "must be able to challenge zealously the prosecution's evidence . . . through effective cross-examination." ABA Guidelines No. 1.1 cmt.

Mr. Bullock testified at trial that the government did not offer him any deal in exchange for his testimony. Mr. Bullock, however, clearly was more than a disinterested witness. After he testified before the grand jury on February 19, 2004, he heard nothing from the government for some time. So, on April 5, 2005, he wrote a letter to the Court

50

in an attempt to find out the trial date, publically stating that he had testified before a grand jury, but could remember neither the name of the U.S. Attorney nor the case number. (Def. Trial Ex. 5, Letter to the Court from Bullock, 04/05/2005.) After testifying at Mr. Caro's trial, Mr. Bullock, who was facing a mandatory life sentence, received an illegal reduction to his sentence in 2009, purportedly due to changes in the crack cocaine guidelines; he now will be released in less than seven years, on October 14, 2019. In his case, the government initially agreed to the illegal reduction, but then after sentencing, claimed to have made a mistake and filed a late motion for reconsideration. Mr. Bullock conceded that he had been facing a mandatory life sentence and that his sentence had been a mistake, but argued that the court lacked authority to correct the mistake. The court denied the motion, agreeing with the defense that it lacked jurisdiction to correct the sentence, but in a 16-page order noted that the Fourth Circuit had not addressed this issue. In spite of the fact that this was an issue of first impression for the circuit, the government did not appeal.

Counsel's failure to investigate evidence that would have impeached the only and key eyewitness in the case, and their failure to then effectively impeach Mr. Bullock with existing evidence constitutes ineffective assistance of counsel. *See, e.g.*, *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) (explaining that counsel has a duty to "investigate possible methods for impeaching prosecution witnesses"); *United States v. Mason*, 481 F. App'x. 815, 818-19 (4th Cir. 2012) (unpublished opinion) (remanding case for further proceedings because defendant's *Strickland* claim that trial counsel was ineffective for failing "to investigate evidence that would have impeached the

51

government's key witness" arguably had merit).

Counsel had no reason for failing to interview Mr. Bland, the cellmate of the only purported eyewitness in the case (Kalista Decl. ¶ 21), or meaningfully impeach Mr. Bullock during trial regarding all of the known inconsistencies and false testimony. Counsel's failure to investigate the cellmate of the government's snitch fell below the standard of care. *See* ABA Guidelines No. 10.7 cmt. ("Counsel should investigate all sources of possible impeachment of defense and prosecution witnesses."); (Hammond Decl. ¶34.)

Counsel's deficient performance prejudiced Mr. Caro. As the only purported eyewitness to the offense, Mr. Bullock's testimony was critical for the government. Mr. Bullock's testimony was the only evidence that supported the government's proposition that Mr. Caro ambushed Mr. Sandoval from behind. The government repeated this theme throughout the trial to support both premeditation and a death sentence. (Tr. 01/29/2007 at 15 ("snuck up behind"); *id.* at 15 (waited until he turned his back and "snuck up behind"); *id.* at 16 (this was a "sneak attack"); *id.* at 21 ("sneaks up behind"); *id.* at 26 ("sneaking up behind"); Tr. 02/1/2007 at 13 (saw Caro behind Sandoval); *id.* at 18 ("ambushed" Mr. Sandoval and "came up from behind"); *id.* at 45 ("from behind with a towel"); *id.* at 49 ("comes up behind him"); *id.* at 49 (had his back turned to him and "came up behind him"); Tr. 02/05/2007 at 19 ("snuck up behind him"); *id.* at 46 ("ambushed him from behind"); Tr. 02/13/07 at 88 ("snuck up behind him").)

Testimony from Mr. Bland stating that he and Mr. Bullock were playing cards at the time of the offense, and neither saw nor heard anything until the officers pulled Mr.

52

Sandoval's body into the hallway, as well as a meaningful cross-examination of Mr. Bullock exposing his inconsistent and false statements, would have made a difference. Juror # 47 stated that "[i]f another inmate had testified that Sean Bullock was playing cards at the time of Sandoval's death and didn't see what happened, that would have made a difference." (Declaration of Juror # 47, 11/13/2012, attached as ▆▆ Ex. 31 (hereinafter "Juror # 47 Decl.").) Similarly, Juror # 79 reported that "[t]he inmate eyewitness account of the murder was essential to my decision." (Declaration of Juror # 79, 11/20/2012, attached as ▆▆ Ex. 33 (hereinafter "Juror # 79 Decl.").)

**C.    Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell**

Common sense dictates that Mr. Sandoval should not have been placed in Mr. Caro's cell. As recognized by a grand juror hearing the evidence before issuing an indictment in this case:

> GRAND JUROR: One other question. Based upon the, the history of Mr. Caro and the fact that he had stabbed another person numerous times, why would anybody be put in the cell with this, this person? That is, that is the burning question.

> THE WITNESS: It–that–it is not unusual to house two people in a jail cell in the special housing unit just due to the availability of space.

> GRAND JUROR: But this guy is violent.

> THE WITNESS: Right.

> GRAND JUROR: He had already stabbed somebody numerous times. I don't understand why they would put anybody in the cell with him.

THE WITNESS: Right.

(Grand Jury Tr. 01/03/2006, attached as Sealed Ex. 27 at 20-21.)

Policy considerations also dictate that the BOP should not have placed Mr. Sandoval in Mr. Caro's cell. Had the officials at USP-Lee followed sound correctional practices they would not have done so. (Declaration of Mark A. Bezy, 01/01/2013, attached as Ex. 1, ¶¶ 13-15, (hereinafter "Bezy Decl.").)[4]

Prior to Mr. Sandoval's death, the BOP knew that both Mr. Caro and Mr. Sandoval are members of the same gang, the Texas Syndicate, and that there was internal fighting within the Texas Syndicate at that time. (Tr. 01/29/2007 at 67, 70; Sealed Ex. 28 at 5, 15-19, 25.) There had been two prior inmate-on-inmate assaults, in July 2003 and August 2003, in which both the perpetrators and victims were believed to be members of the Texas Syndicate. (Sealed Ex. 28 at 13-17; Sealed Ex. 51 at 2-3.)

In the August assault, the BOP believed the victim, Ricardo Benavidez, had been the leader of the Texas Syndicate and that Mr. Caro, who was one of the assailants, had thus hit the leader of not just any gang, but the Texas Syndicate. The BOP had designated the Texas Syndicate as a "Disruptive Group," one of the five most dangerous prison gangs. (Tr. 02/05/2007 at 92-96.) Based on these circumstances, the BOP should have anticipated that Mr. Caro likely would be targeted for retribution. For this reason, and until the BOP understood the reasons behind the two inmate-on-inmate assaults and

---

[4] Mark Bezy worked for the Bureau of Prison for over 28 years and is knowledgeable about both Bureau of Prison's facilities and procedures, and also prison culture.

the reason for the turmoil within the Texas Syndicate, the officers should have housed Mr. Caro in a single cell. (Bezy Decl. ¶¶ 13-15.)

The BOP reached this same conclusion after it completed its investigation of the August 2003 assault, in which they recommended that Mr. Caro be separated from other Texas Syndicate gang members. (Sealed Ex. 51 at 12.) This was the appropriate recommendation, but based on the red flags and their unanswered questions, the BOP should have immediately implemented this recommendation while the investigation was ongoing, and not waited until after the report was issued 14 months after the assault. (Bezy Decl. ¶ 15.)

Before assigning a cellmate to Mr. Caro, the officers in the SHU should have contacted the Special Investigative Services ("SIS"), which is responsible for investigating gang activities within USP-Lee. The SIS officers also should have communicated to the SHU immediately after the August 2003 assault that Mr. Caro was to be single celled (as they did after the death of Mr. Sandoval). (Internal BOP Mem., 12/19/2003; Bezy Decl. ¶ 14.)

Trial counsel's failure to retain and present testimony of a prison culture expert to provide an alternate explanation to counter the government's evidence constitutes ineffective assistance. ABA Guidelines 4.1 cmt. (stressing the need for experts as part of the team in defending capital client); (Hammond Decl. ¶ 35.) Counsel recognized the need to present this type of information to the jury. During opening statement, counsel explained that prison has "its own set of rules and its own set of values" and that "respect has a great deal more significance . . . than it may have out on the streets." (Tr.

55

01/29/2007 at 30-31.) But counsel's statements were nothing more than lip service, and the defense presented no evidence to support those theories.

Had counsel consulted with a prison culture expert, they would have learned that Mr. Caro's initial refusal to take a cellmate should have been a red flag for the officers at the SHU. When an inmate refuses a cellmate, it is important for the BOP to determine the reason for the refusal. Here, in light of the potential for retribution, it was not surprising that Mr. Caro refused a cellmate. Unfortunately, the BOP made no attempt to understand the reason for his refusal. Not only did they not attempt to understand the reason for the refusal, the officer who witnessed the refusal did not document this refusal in the SHU log book, as required by standard operating procedures, and did not communicate this fact to the next shift. Thus, when Mr. Sandoval requested to be put into a cell where the inmate had just refused a cellmate, the second-shift correctional officer had no reason to question the specific request.

Counsel also would have discovered that Mr. Sandoval's subsequent request to be placed in Mr. Caro's cell—after Mr. Caro's refusal—was more than a benign request. This request was disrespectful of Mr. Caro's earlier refusal and revealed a potentially improper motive to get into Mr. Caro's cell. It would not have been unreasonable, viewing the conduct within the culture of prison, for the jury to interpret this request as an aggressive challenge to Mr. Caro. (Bezy Decl. ¶ 17.)

Finally, Mr. Sandoval was placed in the SHU because he had been caught possessing a weapon. Possession of weapons by inmates indicates tension within the prison. As explained by a former warden at various federal correctional facilities,

56

"Inmates want to do peaceful time. If inmates are arming up, the prison needs to find out the source of the tension and address it." (Bezy Decl. ¶ 18.) The SHU officers should have considered Mr. Sandoval's possession of a weapon when they were deciding whether to place Mr. Sandoval in Mr. Caro's cell.

This information is important not because it shifts the blame for Mr. Sandoval's death to the BOP. Rather, an understanding of prison culture could have explained the significance of Mr. Sandoval's possession of a weapon and request to be placed with Mr. Caro. Counsel moved for the introduction of the fact that Mr. Sandoval was placed in the SHU because he possessed a weapon, but the Court denied the motion on the ground that counsel had not laid a proper foundation for its introduction. (Tr. 01/29/07 at 4-5) Had counsel retained a prison culture expert, such evidence would have laid the foundation for introduction of Mr. Sandoval's possession of a weapon prior to his placement in the SHU. It also could have shown that Mr. Caro was attempting to prevent an altercation by rejecting the offer to have a cellmate. Finally, it would have supported a claim of self-defense and negated a finding of premeditation.

Counsel's failure to present this type of evidence to the jury prejudiced Mr. Caro. There is a reasonable probability that testimony from a prison culture expert would have made a difference in the outcome of Mr. Caro's trial.

**D.    Trial Counsel Failed to Adequately Investigate and Present Evidence In Support of Self-Defense, Second-Degree Murder, or Manslaughter**

This case had sufficient evidence for a prima facie case of self-defense based on circumstances at the prison during the previous five months, Mr. Sandoval's conduct,

57

prison culture, and Mr. Caro's brain impairment and anxiety disorder. Counsel's failure to adequately investigate and present a viable defense fell below the reasonable standard of care. *See* ABA Guidelines No. 1.1 cmt. ("[D]efense counsel may need to investigate possible affirmative defenses—ranging from absolute defenses to liability (e.g., self-defense or insanity) to partial defenses that might bar a death sentence (e.g., guilt of a lesser-included offense).").

As described in Claim Four-C, *supra*, there had been two inmate-on-inmate serious assaults among members of the Texas Syndicate within the five months preceding Mr. Sandoval's death. Mr. Caro was believed to have assaulted the leader of the gang. The government knew that Mr. Caro might be facing "a cold dose of revenge by Inmate Benavidez." (Sealed Ex. 28, at 27.) Under prevailing professional norms, "it is important for defense counsel to thoroughly investigate whether any prison-related homicide is most properly understood as deserving of an instruction on lesser included offenses and/or on self-defense." (Hammond Decl. ¶ 33)

During the morning of December 16, 2003, Roberto Sandoval was caught with a weapon, a six-inch long shank of hardened yellow plastic. He was placed in the SHU as punishment. Because Mr. Sandoval and Mr. Caro were believed to be "affiliated with the same gang," Officer Dustin Watts assigned Mr. Sandoval to Mr. Caro's cell. (Tr. 01/29/2007 at 70.) Mr. Caro refused the placement, stating that he did not want a cellmate. (Tr. 01/29/2007 at 101.) The guard placed Mr. Sandoval in a different cell but failed to write up Mr. Caro's refusal in any of the prison logs and failed to communicate the refusal to the next shift of correctional officers. When the new shift arrived, Officer

58

Laster knew nothing of Mr. Caro's prior refusal and placed Mr. Sandoval in Mr. Caro's cell at the request of Mr. Sandoval.

Mr. Sandoval's request to be placed in Mr. Caro's cell after Mr. Caro refused him was not an innocent or coincidental request. As explained by a prison culture expert, refusal to take a cellmate is significant. Even if there was a doubt as to why Mr. Caro refused a cellmate, the proper and respectful course of action for Mr. Sandoval, who was standing outside Mr. Caro's cell door when he refused a cellmate would have been to not press the matter with another request. (Bezy Decl. ¶ 17.) Viewed in the light of prison culture, Mr. Sandoval's later request to be celled with Mr. Caro was not benign, but indicated an intense desire to get inside Mr. Caro's cell, even at the risk of offending Mr. Caro.

Mr. Caro's callous statements in the SHU after the offense do not negate this story of self-defense. In the environment of the SHU, it was crucial that Mr. Caro not appear weak, especially in light of recent events. After the death of Mr. Sandoval, Mr. Caro was being closely watched and scrutinized not only by correctional officers, but also by all of the other inmates on the SHU, including a large number of gang members. Any sign of weakness or remorse would have invited future attacks. (Bezy Decl. ¶ 19.) The best way to stop the strife that had been going on for the last few months was to appear strong.[5]

---

[5] All of these events must be viewed in light of Mr. Caro's brain impairment. Under the best circumstances, when things are calm, Mr. Caro has the reasoning ability of a 10-year-old child. *See infra* Claim Six B-1. Under the chaotic conditions at that time at USP-Lee, Mr. Caro, who suffered from an anxiety disorder or top of brain impairment and facing a possible challenge by Mr. Sandoval, would have had a difficult time quickly processing information and navigating the troubled waters around him.

When preparing for trial, counsel should "carefully consider whether the jury could come to appreciate that an inmate-on-inmate homicide involves mental state and unique stresses warranting a finding of second-degree homicide, manslaughter, or in some cases an acquittal based on self-defense." (Hammond Decl. ¶ 33.)  In this case, however, trial counsel failed to investigate and present this critical evidence to the jury. Trial counsel, with the help of an expert, would have had sufficient evidence to support the self-defense instruction they initially provided to the Court.  Counsel started this trial with the question, "Why did Sandoval want in the cell with Caro?"  (Tr. 01/29/2007 at 46.)  They repeated in again in closing.  (Tr. 02/13/2007 at 63.)  Yet, counsel never presented available evidence that would have answered this question.  In fact, defense counsel stated that they never considered a defense of self-defense. (Kalista Decl. ¶ 11.)

Some of the evidence that would have supported this defense actually came out at trial.  For example, the jury heard from the government that Mr. Caro was a member of the same gang as Roberto Sandoval (Tr. 01/29/2007 at 21), that he had been convicted of the Benavidez assault (Tr. 02/13/2007 at 23), and that Mr. Sandoval asked to go into Mr. Caro's cell after Mr. Caro refused to take a cellmate (Tr. 01/29/2007 at 19).  Because trial counsel never consulted with a prison culture expert, however, they were unable to appreciate the significance of these and other facts.  As a result, the jury was deprived of understanding and "seeing" how these disparate pieces of evidence came together.

The jury never heard evidence regarding prison culture that would have explained the significance of Mr. Sandoval's decision to ignore Mr. Caro's previous refusal of a cellmate.  (Bezy Dec. ¶ 17.)  The jury never heard prison culture evidence explaining

60

why Mr. Caro's statements after the homicide were bravado necessary to protect himself from future attacks. (Bezy Dec. ¶ 19.) Instead, the jury only heard the government's argument that these were the statements of a remorseless killer. Having failed to lay this foundation and show relevance, counsel also was precluded from introducing evidence that Mr. Sandoval was sent to the SHU for possession of a weapon. (Tr. 02/12/2007 at 158-59.)

Trial counsel's failure to investigate prison culture and present this evidence to the jury was deficient and prejudiced Mr. Caro. Had the jury heard this evidence, there is a reasonable probability that a juror would have concluded that Mr. Caro acted in response to a real or perceived threat, and not with premeditation. Indeed, at least one juror indicated that knowing Mr. Sandoval was sent to the SHU because he possessed a shank would have affected that juror's decision. (Juror # 47 Decl.)

### E.   Counsel's Deficiencies Both Individually and Cumulatively Prejudiced Mr. Caro

Even if a single deficiency in counsel's performance does not result in prejudice, the cumulative impact of all failures resulted in Mr. Caro having an unfair trial. By failing to provide evidentiary support to defense arguments, failing to adequately challenge the veracity of the essential and damaging eye witness testimony, and by failing to elucidate to the jury the unique nature of prison life, trial counsel prejudiced Mr. Caro by leaving the jury with only evidence to consider that supported the prosecution's theory of premeditated murder, and no basis on which to consider self-defense or manslaughter theories. Further, by asserting arguments at the outset of trial

61

regarding the nature of the offense and circumstances in which it occurred, which they then failed to provide evidentiary support for, trial counsel undermined their own credibility. Had counsel presented evidence at trial and effectively cross-examined Mr. Bullock, the jury would have heard a quite different story that could have been the difference between a conviction for first-degree murder or a lesser-included offense. *See* Sealed Juror # 47 Decl. (declaring that it would have made a difference if another inmate testified that Bullock "didn't see what happened" and if "Sandoval was sent to the SHU because he had a shank"); Sealed Juror # 79 Decl. (stating that "inmate eye witness account of the murder was essential to my decision"). The failure to present this evidence undermines confidence in the verdict, and Mr. Caro is entitled to a new trial.

## CLAIM FIVE: BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING DEFENSE COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

The government knew almost three years before trial, when Mr. Bullock testified before a grand jury on February 19, 2004, that he had a cellmate at the time of the offense. (Grand Jury Tr. 02/19/2004, attached as Sealed Ex. 26, at 18.) Yet, in subsequent communications with defense counsel, they misrepresented this fact to the defense.

Early in the case, defense counsel requested "a list of all inmates with their prison numbers in the SHU on December 16 and December 17, 2003, showing the specific cells in which they were housed." (Mot. for Issuance of Subpoena Duces Tecum, 03/27/2006, Dkt. 72.) The Court granted that request. (Oral Order, 03/30/2006, Dkt. 76.) The

62

government "complied" by stating that it had no such per se list of inmates in the SHU on December 16-17, 2003, and instead provided "records from which this information might be gleaned." (Letter to Kalista from Giorno, 06/08/2006; Daily Log and Roster, 12/20/2003.) The government then disclosed the SHU daily logs for Dec. 17-20 and a SHU roster for December 20, 2003, which did not reveal the requested information. (*Id.*). The roster did show the names of the inmates and their cell locations, but for December 20, 2003, three days after the offense, instead of for December 16-17, 2003. The December 20 roster indicated that Mr. Bullock was the only inmate in cell 146, and did not show the presence of Mr. Bland, who had been moved from cell 146 on December 19. (Assignment History Report, 08/06/2012.) Had the government provided a roster for December 17, 2003, it presumably would have shown the existence of both Mr. Bullock and Mr. Bland in cell 146.

The SHU daily logs for December 17- 20, 2006, showed only that Mr. Bland was moved from cell 146 on December 19, 2006, two days after the offense, to another range and cell. (Daily Log, 12/20/2003.) These records did not reflect the fact that Mr. Bland was in cell 146 on December 16 and 17. Had the daily log for December 16 been produced, it would have shown that Mr. Bland was moved into cell 146 on December 16. The government, however, did not produce this document in response to the discovery request.

One month before trial, the government produced a copy of Mr. Bullock's grand jury testimony. (Letter to Kalista from Giorno, 12/28/2006.) In that same letter, the government provided the report of Mr. Bullock's first interview—his "mass interview"

63

form. The government asserted that this interview was "done as part of a mass interview of *all of the inmates on the SHU. Copies of all the interviews conducted at that time are attached.*" (*Id.* (emphasis added).) The government provided mass interview reports for at least 43 SHU inmates, including Mr. Bullock, but did not include an interview report for Mr. Bland.

While, on the eve of trial, the government finally disclosed the existence of the cell mate through a couple passing references in Mr. Bullock's grand jury testimony, the government never overtly corrected the misconception. Lulled by these misrepresentations by the government, defense counsel was rendered ineffective and failed to appreciate that Mr. Bullock had a cellmate until trial.

The evidence was "material to the preparation of the defense" under Federal Rule of Criminal Procedure 16 and was exculpatory under *Brady*. The evidence had been ordered by the court, and was responsive to Mr. Caro's Motion for Discovery (Dkt. 18) and Motion for Exculpatory Evidence (Dkt. 19). The government should have provided this information sooner, especially since the disclosure did not pose any potential harm to Mr. Bland. *See, e.g., United States v. Rittweger*, 524 F.3d 171, 182 (2d Cir. 2008) (holding that the government should have disclosed the *Brady* material before the eve of trial, "particularly when earlier discovery would not have had the potential to harm the witness"). The government also should have corrected the misperception it had created. Yet, it did neither. This failure by the government undermines confidence in the outcome reached by the jury.

**GROUNDS FOR RELIEF: PENALTY PHASE**

**CLAIM SIX: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE PENALTY PHASE.**

**A.      Trial Counsel Failed to Challenge the Government's Deliberate and Tactical Delay of Mr. Caro's Indictment**

Mr. Caro incorporates herein the facts and law stated in Claim One, *supra.* The government ensured that Mr. Caro was convicted of the Benavidez assault before indicting him for offense in the instant case. Trial counsel failed to raise this meritorious claim and pursue a pretrial remedy that would prevent the government from either seeking the death penalty or arguing facts related to the Benavidez assault as an aggravating factor in support of a death sentence. Counsel has a duty to not only investigate but to challenge aggravating circumstances. ABA Guidelines No. 10.7 cmt. (noting that counsel "must also investigate prior convictions . . . that could be used as aggravating circumstances"). Counsel also "must raise every legal claim that may ultimately prove meritorious." *Id.* Indeed, "[b]ecause of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case." ABA Guidelines No. 10.7 cmt. As explained in Claim One, the challenge to the government's conduct in delaying the indictment in this case would have proved meritorious.

Counsel's failure to raise this meritorious claim before trial prejudiced Mr. Caro. As the government informed trial counsel before the DOJ certification hearing, Mr. Caro was permitted any time up until trial to offer facts or circumstances to the Attorney

General that would make imposition of the death penalty inappropriate. (Letter to Kalista from Giorno, 03/14/2005.) If counsel could have prevented the government from using the Benavidez assault as support for seeking death, then there is a reasonable probably that Mr. Caro would not have been sentenced to death—either because death would not have been authorized or because the jury would not have voted for death.

**B.    Trial Counsel Failed to Adequately Investigate, Develop, and Present a Compelling Mitigation Story about Mr. Caro's Life**

### 1.    Factual Background

#### a)    Pretrial Preparation

In late March 2005, two months after being appointed pre-indictment to represent Mr. Caro, Mr. Kalista and Mr. Simmons asked the court to appoint Lee Norton, Ph.D., M.S.W., L.C.S.W., as a mitigation specialist to begin work on the case. (Ex Parte and Sealed Mot. for Authorization for Expert Servs., No. 2:05-mc-00001-JPJ, Mar. 22, 2005, Dtk. 9) They told the court that a mitigation specialist was necessary to "effectively represent the Defendant at this stage of the proceedings and to provide reasons to the [Attorney General's Death Penalty Review] Committee why the government should not seek the death penalty." (*Id.* ¶ 3.) Dr. Norton explained that in preparation for the Committee meeting scheduled for June 6, 2005, she would need to collect critical records, interview relatives and other potential mitigation witnesses, and "spend a significant amount of time with Mr. Caro." (Aff. of Lee Norton, Ph.D., L.C.S.W., No. 2:05-mc-00001-JPJ, 03/22/2005, Dkt. 9-2, ¶ 12.) The court granted the motion the

66

following day, and ordered that Dr. Norton's fees and expenses not exceed $7,500, or 75 hours. (Sealed Order, No. 2:05-mc-00001-JPJ, 03/23/2005, Dkt. 10.)[6]

The following month, Mr. Kalista and Mr. Simmons asked the court to appoint D.A. Mullikin as a fact investigator for the defense, noting that they only needed $2,500, or 50 hours (at $50/hour). (Ex Parte and Sealed Mot. for Appointment of Investigator, No. 2:05-mc-00001-JPJ, 04/13/2005, Dkt. 14.) They requested Mr. Mullikin's assistance to "help locate and interview individuals who may have mitigating information helpful to the Defendant at this stage of the proceedings." (*Id.* ¶ 3.) That same day, the court granted the motion and ordered that consistent with counsel's request, Mr. Mullikin's fees not exceed $2,500). (Sealed Order, No. 2:05-mc-00001-JPJ, 04/13/2005, Dkt. 15.) Dr. Norton only spent a total of fifty hours on the case, which was all performed in April 2005. (Invoice of Norton & Moody, Inc., 05/02/2005.) Mr. Mullikin spent less than fifty hours on the case in the entire year of 2005. (Invoice of Advanced Private Investigations, LLC, 05/06/2005; Invoice of Advanced Private Investigations, LLC, 06/02/2005; Invoice of Advanced Private Investigations, LLC, 07/15/2005; Invoice of Advanced Private Investigations, LLC, 09/06/2005.)

As discussed in Claim Two *supra*, counsel did little to prepare for the meeting with the Death Penalty Review Committee. Counsel had indicated before that meeting that they would not have much to present about Mr. Caro "personally." (Email to

---

[6] While the Motion requested up to $10,000 in expenses (at $100/hour), Dr. Norton's supporting affidavit indicated that she could conduct a "preliminary investigation[]" in 75-100 hours. (Aff. of Lee Norton, Ph.D., L.C.S.W., No. 2:05-mc-00001-JPJ, 03/22/2005, Dkt. 9-2, ¶ 12.)

Simmons from Kalista, 04/25/2005.)   Before the meeting, Mr. Simmons asked his cocounsel Mr. Kalista, who practiced in this jurisdiction, how much time he expected they would have to prepare for trial if an indictment was returned.  (Email to Kalista from Simmons, 05/03/2005.)  Mr. Kalista advised him that the Court would likely set a trial six months—or, maybe "as much as 9  mo[nth]s"—after the indictment.  (Email to Simmons from Kalista, 05/03/2005.)[7]  Even though both counsel were aware, and in fact expected, this case to be set for trial quickly, they did not take advantage of their pre-indictment appointment to investigate and develop a defense.  In fact, Mr. Simmons indicated that he planned to wait to hear from DOJ regarding death certification before doing more extensive work on the case.  (Email to Kalista from Simmons, 07/15/2005.)

Four months after the meeting with the DOJ, the U.S. Attorney informed defense counsel that the case had been certified as a death penalty case.  (Email to Simmons from Kalista, 10/11/2005.)  At that time, Mr. Kalista indicated that he spoke with Mr. Giorno and discussed a potential trial date; Mr. Kalista indicated that the summer of 2006 was not "too early."  (*Id.*)  On January 3, 2006, Mr. Caro was indicted for first-degree murder (Indictment, 01/03/2006, Dkt. 2), and one week later he was provided notice of the government's intent to seek the death penalty (Notice of Intent to Seek the Death Penalty, 01/11/2006, Dkt. 8).  The court set the trial to begin on July 31, 2006.  (Tr. 01/23/2006 at 7.)

---

[7] "It is inconceivable that an appropriate investigation into [critical mitigating] issues could be accomplished in as little as six months." (Hammond Decl. ¶ 28.)

68

The attorneys began to prepare a budget in anticipation of the indictment. (Email to Kalista from Simmons, 11/19/2005.) They were aware that they would need experts to assist them in defending Mr. Caro. (Aff. of Lee Norton, Ph.D., L.C.S.W., Dkt. 33, ¶ 2.) Indeed, before their budget was even approved, they requested expert services of mitigation specialist Dr. Norton (Ex Parte and Sealed Mot. for Authorization for Expert Services of Mitigation Specialist, 01/30/2006, Dkt. 25), as well expert services of James Aiken and Mark Cunningham for the purpose of beginning a "risk evaluation" of Mr. Caro's ability to evaluate alternatives to a death sentence (Ex Parte and Sealed Mot. for Authorization for Expert Services, 02/03/2006, Dkt. 27, ¶3).[8]

While the budget was pending, Mr. Kalista began seeking out referrals from local associations for a forensic neuropsychologist. (Email to Doris Nevin, Ph.D., from Kalista, 01/24/2006; Email to Nancy Davis from Kalista, 01/24/2006.) He happened upon a psychologist who had recently relocated to Tennessee, D. Malcolm Spica, Ph.D. (Email to Kalista from Spica, 01/26/2006; Email from Simmons to Kalista, 01/31/2006.)[9] Without committing to Dr. Spica, Mr. Kalista kept him in mind to work on the case. (Email to Spica from Kalista, 03/04/2006.)

After submitting the initial proposed budget (*see* Tr. 01/23/2006 at 12), Magistrate Judge Sargent emailed counsel with questions. In particular, she questioned whether

---

[8] Defense counsel first contacted James Aiken on December 2, 2005. (Letter to Aiken from Simmons, dated 12/02/2005.) Defense counsel appears to have first contacted Mark Cunningham in April 2005. (Letter to Cunningham from Kalista, 04/04/2005.)

[9] Mr. Kalista's file indicates that he conducted internet research and found a source called, "20 Questions (and answers) about Traumatic Brain Injury." (www.brainsource.com/TwentyQ.htm, printed 01/24/2006.)

69

counsel had lined up mental health experts and if they knew a cost of the evaluations to be performed, and asked if a social historian and gang expert were lined up. (Email to Kalista and Simmons from Sargent, 02/04/2006.)[10] In their initial budget, counsel only requested $30,000 for mental health experts and stated, "We may need to use a neuro-psychologist and a psychiatrist." (Proposed Budget Ex Parte and Under Seal, 01/23/2006, Dkt. 15.) Further, counsel focused on "issues such as competency, criminal responsibility, impaired capacity, disturbance, and other mental health related factors." (*Id.*) Nowhere in their initial request for mental health experts was it contemplated that an expert would be needed for the penalty phase to explain their client's life.[11]

On February 15, 2006, defense counsel submitted their revised proposed budget. (Revised Proposed Budget Ex Parte and Under Seal, 02/17/2006, Dkt. 42-1.) Consistent with the magistrate judge's request, counsel broke down the request for mental health experts into two categories: $10,000 for a neuropsychologist and $20,000 for a psychiatrist. (*Id.* at 6.) The psychiatrist would only be needed if Mr. Caro had brain damage. (*Id.*) Nowhere in the revised budget did counsel explain how and why the

---

[10] The ex parte budget-related conferences with defense counsel in front of Magistrate Judge Sargent were not recorded. The ABA Guidelines make clear: "If requests for the resources needed to provide high quality legal representation at any stage of the proceedings are denied, counsel should make a full record to preserve the issue for further review." ABA Guidelines No. 10.4 cmt. Counsel's failure to preserve the record of conferences related to the budget was below the standard of care. *See* Hammond Decl. ¶ 31.

[11] While counsel budgeted $10,000 (100 hours at $100/hour) for a social historian, they anticipated that person would only be necessary to testify as to facts in Mr. Caro's background. (Dkt. 42-1, at 8-9.) Indeed, counsel noted that their intention was to use family members or other sources in describing Mr. Caro's life history. (*Id.* at 8.)

70

mental health experts would be useful during the penalty phase of Mr. Caro's trial, that is despite counsel recognizing in their request for funding for a mitigation specialist that "mitigation may be especially important in this case, because there is strong evidence of our client's guilt." (*Id.* at 5.)

At the same time the proposed budget was approved (*see* Letter from Judge Wilkins approving Proposed Budget, 03/01/2006, Dkt. 54), the court indicated that it was applying a hold-back provision whereby it would pay two-thirds of a voucher upon receipt and would pay the remainder upon completion of the trial (Mem. Order, 03/01/2006, Dkt. 55). This caused concern for mitigation specialist Dr. Norton, who indicated that she would not work under any hold-back provisions. (Ex Parte and Sealed Mot. for Authorization for Expert Services, 03/20/2006, Dkt. 65, ¶ 3.) Because of this, counsel asked the court to authorize services of mitigation specialist Hans Selvog, Ph.D., L.C.S.W., to replace Dr. Norton. (*Id.* ¶¶ 4-5.) Dr. Selvog's background is in clinical and forensic social work; he has a doctorate degree in social work and is a licensed clinical social worker. (Vitae of Hans H. Selvog, Ph.D., L.C.S.W., 03/20/2006, Dkt. 65-1.) At the time, he had eighteen years of experience as a forensic social work evaluator in capital sentencing hearings. (*Id.*)

When Dr. Selvog began work as the mitigation specialist on the case in March 2006, he received no file from prior mitigation specialist Dr. Norton nor any notes from the one month she worked on the case one year earlier. (Declaration of Hans Selvog, PH.D., L.C.S.W., 12/31/2012, attached as Ex. 7, ¶ 3 (hereinafter "Selvog Decl.").) Shortly after being appointed, Dr. Selvog was told that Mr. Kalista scheduled a meeting

with Dr. Spica for April 17, 2006.  (Email to Selvog from Kalista, 04/13/2006.)[12]  After that meeting, Dr. Spica informed counsel that he would be willing to serve as a neuropsychologist.  (Letter to Kalista from Spica, 04/18/2006.)  In that regard, Dr. Spica explained that he would need to meet with Mr. Caro for two days, each day consisting of four hours, and that he would need time to score and analyze the results as well as review records and prepare a report.  (*Id.*)  He also explained that the neuropsychological examination was "aimed toward obtaining quantified measurements of [Mr. Caro's] performance in various neurobehavioral domains."  (*Id.*)  Based on these representations, counsel asked for funding for Dr. Spica up to forty hours (Ex Parte and Sealed Mot. for Authorization for Expert Services, 04/19/2006, Dkt. 94), which was granted (Oral Minute Order, 04/24/2006, Dkt. 99).

Dr. Spica made arrangements to see Mr. Caro on June 9 and 16, 2006.  (Email to Kalista from Spica, 05/25/2006.)  Prior to his evaluation, counsel provided Dr. Spica with records consisting primarily of Mr. Caro's BOP file.  Counsel did not instruct Dr. Spica to develop a social or developmental history.  Dr. Spica only sent six hours reviewing records before evaluating Mr. Caro.  (Invoice of D. Malcolm Spica, Ph.D., 06/07/2006.)

During the month of May, the mitigation specialist was gathering information about the family and attempting to locate records.  On May 3, 2006, Dr. Selvog met with Mr. Caro for the first *and only* time.  (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ L.)  He spent a total of six hours with

---

[12] According to Mr. Kalista's billing records, this meeting lasted approximately one hour. (CJA Voucher Worksheet, 06/05/2006.)

Mr. Caro. (Authorization of Payment, 06/02/2006, Dkt. 159 at 2-3.) Dr. Selvog then traveled to Falfurrias, Texas to interview Mr. Caro's family members and gather information about Mr. Caro's background. (Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ N; Authorization of Payment, 06/02/2006, Dkt. 159, at 2-3.) Based on his mitigation investigation, Dr. Selvog prepared a Time-Line Narrative of Mr. Caro's developmental history. (Time-Line Narrative Chronological Critical Incidents and Developmental History of Carlos Caro.) Dr. Selvog believed a narrative was critical to assist experts in explaining Mr. Caro's life story. (Selvog Decl. ¶ 6.)

Around this time, Dr. Selvog also drafted a memorandum to counsel noting that there were other issues that needed to be explored. (Mem. to Simmons, Kalista, and Mullikin from Selvog, 06/13/2006.) In particular, Dr. Selvog recommended retaining other experts, including a child psychiatrist to investigate Mr. Caro's "shut-down, autistic behavior" and a neonatologist. (*Id.*) These experts were never retained. That same memorandum stressed to counsel that there were "a lot of open areas to investigate and no time." (*Id.*) Dr. Selvog also stressed that if a continuance is granted, they need to "increase family contact and get face-to-face contact set up with as many family members as possible." (*Id.*) This never happened.

In June 2006, Dr. Spica met with Mr. Caro. Dr. Selvog informed trial counsel that Dr. Spica's tests indicated that Mr. Caro has brain damage. (Email from Selvog to Kalista and Simmons, 06/15/2006.) Dr. Spica liked the idea of using a neonatologist and child psychiatrist. (*Id.*) But he suggested other experts that also may be helpful. (*Id.*)

73

Dr. Spica reported his test results to counsel on June 20, 2006. (Email to Kalista, Selvog, Simmons from Spica, 06/20/2006.) He indicated that Mr. Caro has frontal lobe dysfunction, which "makes him highly suggestible, believing that information presented to him is familiar." (*Id.*) He further reported that Mr. Caro appears to "lose track of what he's doing" and then misunderstand why his "behavior results in a certain outcome." (*Id.*) After learning this information, counsel sought to retain psychiatrist Keith Caruso, M.D. (Email to Caruso from Simmons, 06/24/2006.)

Dr. Spica completed his report on June 26, 2006. (Neuropsychological Consultation of Carlos David Caro by D. Malcolm Spica, Ph.D., 06/09/2006, 06/16/2006, attached as Ex. 10-C (hereinafter "Spica Consult.").) On June 27, 2006, defense counsel moved for a continuance of the trial date. (Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203.) In that motion, counsel indicated that they understood that brain damage is "highly relevant to mitigation in a capital sentencing proceeding." (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ O.) Counsel further indicated that Mr. Caro would be seeking to hire a psychiatrist and neonatologist as recommended by Dr. Selvog. (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ P.)[13] These experts, counsel suggested, "may be able to further explain to the jury if and how [Mr. Caro's] mental conditions affected his development as

---

[13] Counsel subsequently filed an Ex Parte and Sealed Motion for Authorization for Expert Services (07/10/2006, Dkt. 210), seeking $15,000 in funding for Dr. Caruso's services, but did not file a request for funding for a neonatologist.

a child, his earlier criminal activity, and life history within and without the Bureau of Prisons." (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ R.)

The court continued the trial until January 22, 2007. (Order Granting Mot. for Continuance, 06/27/2006, Dkt. 206.) It ordered Mr. Caro to provide notice to the government of its intent to present a mental health defense no later than September 15, 2006, and if experts would be used as to the issue of guilt, then Mr. Caro was ordered to provide a written summary of expert opinions by October 1, 2006. (Order, 07/12/2006, Dkt. 229.)

Dr. Caruso examined Mr. Caro in August. Before his examination, counsel provided him with documents related to the offense for which Mr. Caro was facing the death penalty, as well as other incident reports. (Letter to Caruso from Kalista, 07/31/2006.) The information was related to Mr. Caro's time in the BOP and his criminal activity. In this letter, no information related to Mr. Caro's upbringing or childhood was provided. In fact, counsel had retained Dr. Caruso to consider Mr. Caro's mental state at the time of the crime. After Dr. Caruso completed his examination, he informed counsel that he would not be helpful. (Selvog Decl. ¶ 10; Kalista Decl. ¶ 15.) Despite knowing nearly five months before trial that they would not call Dr. Caruso, counsel made no attempt to locate another psychiatrist or other mental health expert who could testify during the penalty phase of Mr. Caro's trial to provide background related to Mr. Caro's traumatic childhood.

On September 15, 2006, counsel gave notice of their intent to present a mental health defense at both the guilt/innocence and penalty phases of Mr. Caro's trial. (Carlos David Caro's Notice to the Government's Attorneys Pursuant to Rule 12.2(b), 09/15/2006, Dkt. 279.) Immediately upon receiving notice, the government sought to have Mr. Caro evaluated by its experts (Mot. for Immediate Disclosure of Report of Mental Health Examination and to Compel Def. to Submit to Mental Health Examination by Government Experts, 09/15/2006, Dkt. 281), and the court ordered that evaluation to occur beginning September 25, 2006 (Order, 09/22/2006, Dkt. 294). On the same day, defense counsel withdrew their intention to introduce evidence related to Mr. Caro's mental condition as it related to the issue of guilt. (Withdrawal of Notice to Government's Attorneys of Intent to Present Evidence Pursuant to Rule 12.2(b)(1) on the Issue of Guilt, 09/21/2006, Dkt. 292.) Defense counsel also objected to the Court's order requiring Mr. Caro to submit to testing by the government's expert and requested that such examination be stayed until certain procedures were in place regarding firewalling and testing. (Objection to Magistrate Judge's Order of Sept. 21, 2006 [Dkt. 289] and Request for Stay and for Immediate Hr'g, 09/23/2006, Dkt. 295; Carlos David Caro's Mot. for Stay of Order Directing Government Mental Examination of Def., 09/23/2006, Dkt. 296.) This request was denied. (Order, 09/25/2006, Dkt. 298.)[14]

---

[14] Although a hearing was held on this motion (Order, 09/25/2006, Dkt. 298 at 1 ("Counsel was heard on the Motion by telephone conference call")), there is no transcript of the proceedings.

On September 25, the government revealed that psychiatrist Robert T.M. Phillips and clinical psychologist Paul Montalbano would be evaluating Mr. Caro. (Email to Kalista from Giorno, 09/25/2006.) Defense counsel immediately reached out to the community to determine if others had experience with either of the government's experts. (Email from Kalista, 09/25/2006.) Defense counsel learned that Dr. Phillips was described as bright, smooth, and capable. (Email to Kalista, 09/25/2006.) They also learned that Dr. Montalbano, who would be performing the testing, had done bad psychological testing in another case and had been discredited by the authors of the tests he had misused. (Email to Kalista and Simmons, 09/26/2006.)

On September 28, 2006, Mr. Kalista and Mr. Giorno had a conversation regarding Dr. Phillips's evaluation of Mr. Caro. (Email to Kalista from Giorno, 09/28/2006.) Defense counsel advised Mr. Giorno that the defense mental health expert based his opinion solely on testing of Mr. Caro and did not question him about the incident involving Mr. Sandoval, Mr. Benavidez, or the incident at Oakdale. (*Id.*) As a result, Mr. Caro would not be answering any of Dr. Phillips's questions related to those matters. (*Id.*)

Pursuant to the Court's order, after completing his evaluation in September, Dr. Phillips did not disclose his findings to either the government or the defense. (Order, 09/22/2006, Dkt. 289, ¶5.)[15] The defense, therefore, continued to prepare for trial

---

[15] The order also required that the Government expert "shall preserve all notes taken during their examination of the defendant." (Order, 09/22/2006, Dkt. 289, ¶6.) Mr. Caro's current counsel contacted Dr. Phillips, and despite this order, he indicated that his records in this case have been destroyed.

without knowing details from the government expert's report but only knowing that the governments expert would do well on the stand.

As time drew closer to trial, the defense had to seek additional funding and submitted a revised budget. (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332.) The magistrate judge noted during the pretrial conference that the trial was continued because of mental health issues, but the expenses that have been incurred do not "seem to be related to those issues at all." (Tr. 11/03/2006 (in camera) at 3.) Indeed, as Judge Sargent noted, "I would have anticipated that there would be some increased spending related to that issue." (*Id.*) But there was not. There was, however, a statement that counsel "believe[d] that Dr. Spica would be a witness in the case," (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332 at 9),[16] indicating that counsel anticipated using his testimony at trial.

There was also discussion of Dr. Selvog's budget being increased so that he could travel to Texas again to meet with family and assist in making a videotape of Mr. Caro's hometown. (Tr. 11/03/2006 (in camera), at 21, 26.)[17] This would be his third trip to

---

[16] The second budget was further revised in light of Magistrate Judge Sargent's request for additional information. (Letter from Sargent to Kalista and Simmons, 11/16/2006, Dkt. 352.) The New Second Revised Budget provided additional written support for the funding requests. (New Second Revised Budget Ex Parte and Under Seal, 11/27/2006, Dkt. 367.) The budget requested additional funds for Dr. Selvog to travel to Chicago to interview family witnesses (Dkt. 367 at 15), but this never occurred. (Selvog Decl. ¶ 12; *see also* Mem. to Mullikin, Kalista, and Simmons from Selvog, 05/15/2006; Letter to Hernandez from Selvog, 10/20/2006.)

[17] Counsel filed a motion seeking funding for the videotape, indicating that the video would be prepared for "use at the trial" and that Mr. Caro's life history would be "incomplete without a complete presentation of his environmental and social history

Texas. (*Id.* at 28.)[18]  The revised budget showed an increase in both the mitigation specialist's and fact investigator's fees, as well as attorneys' fees, but the only increase in expert fees was for Dr. Cunningham and Mr. Aiken—the future dangerousness experts. (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332 at 16-17.)

This is true even though defense counsel retained an expert that was not previously included in the budget—neurologist Russell Swerdlow, M.D. (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332 at 9.)  The need for a neurologist came about from the request to have Mr. Caro undergo an EEG and MRI.  Both government and defense counsel agreed that it was necessary to have their respective experts "review and interpret the EEG record and the MRI record in order to fully conduct their evaluation of [Mr. Caro]."  (Agreed Order Regarding MRI and EEG, 11/03/2006, Dkt. 334.)

In light of the EEG and MRI, the government's expert sought to conduct a follow-up neurological examination of Mr. Caro (Letter from Phillips to Judge Jones, 11/29/2006, Dkt. 373-2), which defense counsel opposed (Mot. for an Order to Prohibit Subsequent Psychological Exam. by Dr. Phillips and to Prohibit Videotape, 11/22/2006, Dkt. 364).  When arguing the motion to the Court, counsel recognized that they would,

---

associated with his developmental years."  (Ex Parte Sealed Motion for Authorization and Funds to Employ Videographer, 11/16/06, Dkt. 351 at 1.)  The video was not shown to the jury.

[18] Dr. Selvog went to San Antonio, where Mr. Caro's wife and daughter resided, in April 2005 (Out-of-Court Hourly Worksheet, 04/06/2006 to 04/17/2006) and he went to various parts of Texas, including Mr. Caro's hometown Falfurrias, in May 2005 (Out-of-Court Hourly Worksheet, 05/12/2006-05/26/2006).

"assuming that Mr. Caro is convicted, . . . have an opportunity at least to review the Government's report and see what all the testing they did." (Tr. 11/28/2006 at 8.) Despite defense counsel's attempt to prevent this examination from occurring, Dr. Phillips and Dr. Montalbano were permitted to examine Mr. Caro again. (Order, 11/29/2006, Dkt. 372.) Counsel were aware that the government's experts conducted a neurological examination of their client, but never asked to have an expert also conduct similar testing.

In December as trial grew near, defense counsel began seeking subpoenas for witnesses. Magistrate Judge Sargent asked for explanation regarding the need for mitigation witnesses, which counsel provided. (Ex Parte Sealed Documents in Support of Motion for Issuance of Subpoenas and Writs of Habeas Corpus Ad Testificandum, 12/12/2006, Dkt. 409.) In particular, Dr. Selvog submitted a declaration supporting the need for testimony from Mr. Caro's brothers, Noe and Jose. (Decl. of Hans Selvog, Ph.D., L.C.S.W., 12/11/2006, Dkt. 409-3.) Jose and Noe could provide first-hand eyewitness accounts of the violence in the house where Mr. Caro grew up. (*Id.* at 5-6.) They could also provide intimate details about Mr. Caro's unusual behavior as a child. (*Id.*) At the end of his declaration, Dr. Selvog noted: "In my opinion, the absence of these witnesses would prevent the jurors from viscerally knowing and appreciating the full extent of Mr. Caro's personal history." (*Id.* at 6.) The court granted defense

counsel's request and issued subpoenas for these key witnesses. (Sealed Ex Parte Order, 12/29/2006, Dkt. 443.)[19]

One month before trial, defense counsel learned from their neurologist Dr. Swerdlow that the EEG report was "worthless" and that it was impossible to conclude anything from it. (Email from Swerdlow to Selvog and Kalista, 12/12/2006.)[20] Upon review of the EEG tracing itself, Dr. Swerdlow concluded that the tracing was inadequate for interpretation but it was essentially normal. (Email from Swerdlow to Kalista, 12/14/2006.)[21] Upon review of the MRI, Dr. Swerdlow indicated that it was a good quality study and, according to his reading, it was "normal." (Email from Swerdlow to Kalista, 12/20/2006.)[22] Dr. Swerdlow spent eighteen minutes reviewing the EEG and MRI, and twelve minutes consulting with counsel on his findings. (Authorization for Payment, 01/23/2007, Dkt. 522.)

In preparation for the penalty phase, defense counsel sought travel orders for their witnesses. (Carlos David Caro's Ex Parte and Sealed Mot. For Travel Order for Defense Witnesses, 02/02/2007, Dkt. 580.) Notably, in that motion, counsel indicated that Amada Fergason, Mr. Caro's mother's social worker, could not travel due to medical conditions.

---

[19] The Magistrate Judge denied the request for subpoenas for Melissa Caro, Veronica Caro, Edna Balderas, and Laura Perez, but the District Court overruled that finding. (Sealed Order, 01/05/2007, Dkt. 466.)

[20] Dr. Phillips noted similar conclusions regarding the EEG report. (Report of Forensic Evaluation by Robert T.M. Phillips, M.D., Ph.D., D.F.A.P.A., and Paul Montalbano, Ph.D., 01/30/2007, Dkt. 561, at 34 (hereinafter "Phillips Report").)

[21] Dr. Phillips noted that the EEG was of poor quality. (Phillips Report at 34.)

[22] Dr. Phillips noted that the MRI was "technically satisfactory and appears to be normal." (Phillips Report at 34.)

(*Id.* ¶ 6.)  They indicated that they would confer with the government about her testimony.  (*Id.*)  She did not testify at trial; no arrangements were made for her to present testimony through alternate means.[23]

### b)    Trial

On January 22, 2007, Mr. Caro's trial began.  At that time, there was no plan regarding the use of mental health experts during the penalty phase of trial.  Dr. Selvog, concerned by this, called a meeting on January 24.  (Selvog Decl. ¶ 14.)  It appears that during that meeting, the decision was made that it was not likely that Dr. Spica would be called as a witness.  This was based primarily on concerns related to the government's expert, Dr. Phillips.  Neither Dr. Selvog nor counsel reviewed Dr. Phillips's report before this decision was made.  (Selvog Decl. ¶ 14; Kalista Decl. ¶ 18.)

After Mr. Caro was convicted of first-degree murder, he was found eligible to receive the death penalty based on his prior convictions, which counsel did not challenge.  That same day, counsel indicated that Mr. Caro had not yet decided whether to call a mental health expert at the penalty phase of trial but agreed to notify the court by 2:00 p.m. the following day if an expert would be used.  (Tr. 2/1/2007 at 89-90.)  If counsel gave notice, then they would be permitted review the government's expert's report.  (*Id.*)

---

[23] Ms. Fergason provided a statement on the videotaped recording that counsel prepared (Ex Parte Sealed Motion for Authorization and Funds to Employ Videographer, 11/16/06, Dkt. 351), but that was not played for the jury.

No notice was ever filed. And counsel went forward with the penalty phase without the benefit of mental health experts.

During the penalty phase, defense counsel submitted a list of 22 mitigating factors to the jury. (Special Verdict Form, 02/13/2007, Dkt. 639 (hereinafter "Special Verdict Form").)[24] In support of those factors, counsel put on a total of eight witnesses. Two of those witnesses, Mr. Aiken and Dr. Cunningham, were "experts" who were called to testify regarding the BOPs ability to safely house Mr. Caro for the rest of his life. These experts, however, were greatly undermined and ended up confirming the government's position: that it could not be guaranteed that Mr. Caro could be safely housed. The only testimony presented to explain Mr. Caro to the jury was via lay witnesses. This testimony lasted approximately four hours and came from three of Mr. Caro's paternal aunts; one of Mr. Caro's teachers; one of Mr. Caro's maternal cousins; and Mr. Caro's wife.

Susannah Rodriguez was the first person with knowledge regarding Carlos's[25] childhood to testify during the penalty phase. Ms. Rodriguez described the town where Carlos was raised and provided background information on the family. (Tr. 02/07/2007 at

---

[24] Not a single juror found that the following mitigating factors were proven: (2) Mr. Caro exhibited symptoms of failure to thrive as he was a listless and inactive baby; (10) The ability of Mr. Caro's mother to nurture her sons was impeded by her repeated victimization at the hands of her violent and abusive husband; (12) For certain periods of time, Mr. Caro proved himself to be a good father and husband; (15) Mr. Caro was not involved in gangs or gang-related activity while in the community; (16) Mr. Caro was not involved in gang-related activity in prison until he was sentenced to thirty years incarceration in 2001; and (21) Mr. Caro is 40 years old, and is less likely, as he ages, to engage in violent behavior. (Special Verdict Form, 2/13/2007, Dkt. 639 at 3-6.)

[25] For purposes of clarity when discussing the Caro family, first names will be used.

83

69-76, 82-88.) She told the jury that her brother (Carlos's father) was a "pretty heavy" drinker and he was "an aggressive drunk, a violent drunk." (*Id.* at 78.) While she testified that her brother would hit Carlos's mother when he was drunk (*id.* at 91), the only incident that she described in detail was when she saw Carlos's father choking Carlos's mother (*id.* at 103). But she said that Carlos and his siblings were not around to witness this event. Ms. Rodriguez only painted a cursory overview of the family dynamics.

Ms. Rodriguez described Carlos as being a sickly infant who was ill the first year of his life. (*Id.* at 94.) She described Carlos as quiet and a loner. (*Id.* at 93.) She also explained that he was slow at learning to crawl, walk, and speak. (*Id.* at 95.) At age nine, Carlos did not know how to tie his shoes or tell time. (*Id.*) On cross-examination, however, Ms. Rodriguez agreed that Carlos became a good writer, a "very careful writer." (*Id.* at 112-13.) There were no questions asked to explain what this meant on redirect.

The two other paternal aunts who testified after Ms. Rodriguez did not add much new information to the mitigation story. Delia Contreras told the jury how Carlos's older brother Jose came to live with her after he got in trouble. (Tr. 02/07/2007 at 141.) Ms. Contreras also testified that she saw Carlos become "real upset and cry[]" when his parents would fight. (*Id.* at 148.) Diamantina Razo testified that she never saw Carlos's father beat his mother, but she heard about it. (*Id.* at 164.) Ms. Razo testified that Carlos's mother did the best she could. (*Id* at 167, 170.) The common facts presented from the three aunts were that Carlos was a quiet, non-violent, respectful boy who was a

84

sickly infant; that Carlos's father was an alcoholic; that his parents were abusive toward each other; and that Carlos's father and uncles were involved in illegal drug trafficking.

The other three mitigation witnesses were Carlos's teacher, cousin, and wife. Yomieda Martinez was Carlos's mathematics teacher while he was in junior high school. (Tr. 02/07/2007 at 128.) Her testimony was very brief. She described Carlos as timid, quiet, and respectful. (*Id.* at 129.) Ms. Martinez identified Carlos's school records and noted that he received a lot of Ds, but she did not explain anything regarding the records. (*Id.* at 132.)

Laura Perez is Carlos's maternal cousin. Ms. Perez briefly discussed Carlos's maternal family tree but her testimony was limited by the government's objection when describing her mother's substance addiction. (Tr. 02/08/2007 at 4-10.) She told the jury that she used to stay at her cousin Carlos's house and his father drank and physically fought with his mother. (*Id.* at 11.) But, she said she could not say that she actually saw his father go so far as to punch his mother. (*Id.*) Ms. Perez identified a few pictures of Carlos (*id.* at 13-16), and told the jury that Carlos's mother died in a fire (*id.* at 17-18). On cross-examination, Ms. Perez was questioned about the video statement she provided and admitted that she remembers having a loving environment at her grandparents' home. (*Id.* at 19-20.)

The last witness to provide testimony regarding Carlos was his wife, LouYveth. She told the jury how she met Carlos and how they were married and had a child—a child that was born while Carlos was serving his first stint in prison for his involvement in the family drug business. (Tr. 02/08/2007 at 26-30.) While she described her

85

relationship with Carlos as "great" (*id.* at 31) and described him as being a "good dad" when he was released from prison the first time (*id.* at 32), she also told the jury that Carlos's supervised release was revoked because he used drugs (*id.* at 32). After Carlos was released from prison again, their relationship was "rocky," and he would come home late and did not have a regular job. (*Id.* at 33.) She told the jury that she learned on the radio that her husband had been arrested again for drug-related activity. (*Id.* at 34.) Carlos was sentenced to almost six years in federal prison. (*Id.*) Yveth was left to care for the daughter on her own, with the help of her parents. (*Id.* at 35, 37-38.)

After Carlos got out of prison the second time, Yveth said things were "better" and they were "very happy and very excited." (*Id.* at 39.) This lasted for about one-and-a-half years. (*Id.*) Until one day, Carlos left the house and did not return. (*Id.* at 40.) She saw him once several months later because she was in an accident; Yveth had not seen Carlos since that day until the day she testified at his trial. (*Id.* at 40-41.) She was very angry and upset when Carlos was arrested again; she does not know the details regarding his third time in prison. (*Id.* at 42.)

The brief testimony by Yveth that Carlos was a good father and husband was undermined on cross-examination. She said that after his first release from prison, Carlos was "in and out of [her] house" and "drifted in and out from time to time." (*Id.* at 52.) He didn't have a job, and Yveth was the primary caretaker for their daughter. (*Id.* at 54.) She said that when Carlos got out of prison the second time, things were perfect—until "he just left the house and never came back." (*Id.* at 57-58.) And then, the prosecutor asked Yveth about the girlfriend Carlos had while they were married (*id.* at 61) and the

possibility that Carlos was the father of her child (*id.* at 62). No redirect occurred. The testimony of these six witnesses was the only evidence presented to the jury to humanize Mr. Caro.

The jury spent approximately two-and-a-half hours deliberating to make the decision whether Mr. Caro should be put to death by the United States Government. (Minute Entry, 02/13/2007, Dkt. 636.) It was obvious that there was factual support for several of the mitigating factors. The jury unanimously found that Mr. Caro was exposed to repeated instances of domestic violence and household disruption during his childhood; that he was raised in a home where education was not valued; that he was raised in a poverty-striken community with limited economic opportunities; that he was an obedient, respectful, well-behaved child at home, in the school, and in the community; that he was a shy, respectful student in contrast to his brothers, and that his parents showed no interest in their children's academic progress; that his maternal uncles involved him illegal drug trafficking; and that he has never been physically violent or abusive toward his wife or daughter. (Special Verdict Form at 3-5.)

The jury all agreed that Mr. Caro had a troubled childhood, but there was no expert testimony to explain *why that mattered.* Because the bulk of the evidence presented at the penalty phase related to the debate over Mr. Caro's future dangerousness, and what little mitigating evidence was offered failed to sufficiently humanize and explain Mr. Caro as an individual, it is not surprising that the jury voted for death.

## 2.    Counsel's Performance was Deficient

Mr. Caro's trial attorneys determined from the outset that the best they could do

for their client was a sentence other than death. (Mem. to File from Simmons, 03/23/2005.) Yet they failed to take the reasonable and necessary steps to present a compelling mitigation case that would convince at least one juror to vote for life. Counsel failed to understand the need to obtain consulting mental health and behavioral experts early in the case and in their initial budget request. The rest of the case was hampered by the fact they only sought two mental health experts.

Despite this failure from the outset, counsel did gather sufficient information to tell a story of a little boy who was born into a traumatic and chaotic home environment and who had no real choice in life except to become a drug mule. But, they did not use their expert who determined Mr. Caro had brain damage and functioned on the level of a ten-year-old. Nor did they obtain another expert who could have explained the impact of Mr. Caro's traumatic childhood on his development. The only expert evidence presented at the penalty phase related to Mr. Caro's future dangerousness, and not only failed to sufficiently humanize and explain Mr. Caro as an individual, but also asserted he was dangerous. Counsel also did not present critical lay witness testimony—preventing the jury from hearing from Mr. Caro's brothers who witnessed first-hand the violence between their parents. What little evidence that counsel did present in attempting to humanize their client was inadequate.

Counsel's deficiencies resulted in the jury having an incomplete portrait of the man they were sentencing. Instead of knowing the true story, the jury was left to believe that Mr. Caro was a violent criminal unworthy of having his life spared. We know now that had Mr. Caro's attorneys presented evidence of their client's brain damage, then

88

there is a likelihood that Mr. Caro would have received a sentence less than death.

### a) Counsel never developed a reasoned and cohesive mitigation theme for trial

During the penalty phase, "defense counsel must both rebut the prosecution's case in favor of the death penalty and affirmatively present the best possible case in favor of a sentence other than death" ABA Guidelines No. 1.1 cmt. Further, "counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial." ABA Guidelines No. 10.11 cmt. Because of this, it is critical that mitigation investigation "begin as quickly as possible." ABA Guidelines No. 10.7 cmt. The theme that is developed must humanize their client and present him as more than the terrible crime for which he is standing trial.

Indeed, it is critical for counsel to recognize that "capital trials require a defense that is cognizant of the reality that the defendant is likely to be found guilty by the jury and that the same jury will then weigh aggravating and mitigating evidence." (Hammond Decl. ¶ 25.) "Inescapably, however, much of the foundation for the presentation of both aggravating and mitigating evidence will have been laid during the presentation of evidence at the guilt/innocence stage." (Hammond Decl. ¶ 27.) It is because of the uniqueness of death penalty cases that is imperative for a capital defense to develop themes that permeate all aspects of the work. (Hammond Decl. ¶ 25.) This work must begin immediately and requires both human and financial resources. (Hammond Decl. ¶ 27.)

In Mr. Caro's case, as counsel indicated, "[t]here was not much in Mr. Caro's

89

personal life that we felt we could present to a jury to humanize him. He cheated on his wife; he was not a good father; he was a three-time loser as far as drugs; and he had difficulty while incarcerated." (Kalista Decl. ¶ 20.) Counsel admitted that, "in the end, I don't think we were able to sufficiently humanize him." (*Id.*) This statement couldn't be more true. But the reason why counsel were unable to sufficiently humanize Carlos was because they did not do their job as required under prevailing professional norms.

As explained in the first page of one the training manuals in counsel's file: "Part of [a capital defense attorney's] job, of course, is to learn our clients' stories in great detail, and from as many different sources as possible. But another part involves recognizing the possible meanings of what we are uncovering as we probe." David Freedman, Capital Resource Counsel Project & Federal Death Penalty Resource Counsel, Guide to Mental Health Mitigation 1 May 2004. Here, despite having a mitigation specialist who was gathering information and advising counsel on several types of experts who should be retained, counsel never had a strategy for presenting a compelling mitigation story. (Selvog Decl. ¶ 20.) Counsel fell short in requesting mental health experts, creating a persuasive narrative of Mr. Caro's life story, and ultimately in presenting their case to the jury.

> **b)    Counsel failed to appropriately request, adequately develop, and present testimony of mental-health experts**

"[M]ental health experts are essential to defending capital cases." ABA Guidelines No. 4.1 cmt. Mental health experts "gather facts, through professional

examination, interviews, and elsewhere, that they will share with the judge or jury." *Ake v. Oklahoma,* 470 U.S. 68, 80 (1985). Indeed, the *Ake* court recognized that psychiatry plays a "pivotal role" in criminal proceedings. *Id.* at 79.

As the ABA Guidelines explain, "an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning," and "[e]xpert witnesses may be useful for this purpose and may assist the jury in understanding the significance of the observations." ABA Guidelines No. 10.11 cmt. In determining what experts are needed, counsel should select experts who fit the specific needs of the case "rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively." *Id.* "Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs." *Id.* No. 4.1 cmt. Indeed, "counsel should structure the team in such a way as to distinguish between experts who will play a 'consulting' role, serving as part of the defense team covered by the attorney-client privilege and work product doctrine, and experts who will be called to testify, thereby waiving such protections." *Id.* No. 10.4 cmt.

Developing a mental health defense is an undisputed key aspect of capital defense. (Hammond Decl. ¶¶ 28, 46.) In the instant case, counsel's performance was deficient from the outset. Counsel's initial funding request to the court denotes a cursory understanding, at best, of mental health experts. At the time that counsel submitted the budget for this case, they had been representing Mr. Caro for over a year; mitigation

specialist Dr. Norton had met with their client and their client's family. They should have known by then that Mr. Caro had a history of trauma and that additional mental health experts should be expected. But in their budget submitted to the court, counsel recognized that in capital cases, "it is essential to consider psychological evaluation and testing." (Refused Proposed Budget Ex-Parte and Under Seal, 02/17/2006, Dkt. 42-1 at 6.) The remainder of their budget request for mental health experts (one paragraph) lacks a true understanding of the need to explore any mental health defense for purposes of the penalty phase.

The only two mental health experts listed were a neuropsychologist "and perhaps, a psychiatrist." (Dkt. 42-1 at 6.) They told the court that a psychiatrist would be needed *only* if the neuropsychological testing shows signs of brain damage. (*Id.*) "While this investigation may well properly involve a neuropsychological evaluation, there is no substitute for a thorough mental state evaluation, which may require—as it did here—a combination of experts and consultants." (Hammond Decl. ¶ 30.) There was no recognition that they could potentially need other experts to explain their client—experts such as a psychiatrist or a neonatologist to explain Mr. Caro's childhood and his being mute. There was no request for consulting experts, in addition to testifying experts. And there was no request for experts for the purpose of educating the jury on specific topics. Counsel's performance was deficient under the ABA Guidelines and standard of care existing at the time they represented Mr. Caro. (Hammond Decl. ¶¶ 46, 48.)

In their preparation, counsel retained only two mental health experts: Dr. Spica, who determined through neuropsychological testing that Mr. Caro has brain impairment,

and Dr. Caruso, a forensic psychiatrist of questionable background[26] who indicated he had learned information about the offense that counsel did not believe would be helpful. (Kalista Decl. ¶ 15.) Counsel never retained an alternative psychiatrist even though they knew that Dr. Caruso could not testify at trial. They also never sought to increase the budget for mental health experts, which even the magistrate judge thought odd. (Tr. 11/03/2006 (in camera) at 3.)

Nor did counsel seek other types of mental health experts as recommended by the mitigation specialist. On June 13, 2006, Dr. Selvog recommended obtaining other experts, including a child psychiatrist and a neonatologist to explain the significance of the narrative Dr. Selvog prepared about Mr. Caro's developmental history and the critical incidents of his childhood. (Mem. to Simmons, Kalista, and Mullikin from Selvog, 06/13/06.) Trial counsel never retained these experts.

Of the two mental health experts counsel did retain, one provided counsel with mitigating evidence. Over six months before trial, Dr. Spica diagnosed Mr. Caro with Cognitive Disorder NOS. In lay terms, this means that Mr. Caro has brain damage. (Spica Consult at 7.) In particular, Mr. Caro has frontal lobe dysfunction that impairs his daily functioning and makes him highly suggestible. (*Id.* at 6.) Dr. Spica opined that Mr. Caro has "unreliable judgment skills, and an inability to sort through information provided to him." (*Id.* at 7.) He further explained that Mr. Caro's reasoning ability

---

[26] While in medical school, Dr. Caruso manipulated research data. Because of this, he was required to repeat his last year. This information was made public during a capital trial in Tennessee, where Mr. Simmons is licensed to practice law, in May 2006—before Dr. Caruso was retained in this case.

93

"under calm, controlled conditions ranks at the level of a 10-year-old" but that if he is under pressure, he will perform at a much more impaired level. (*Id.*)

Instead of using this critical information to build a defense that could help explain Mr. Caro to the jury, counsel decided not to present any mental health expert testimony. Dr. Spica was never called to testify at sentencing, and he was never told why he was not called to testify. (Spica Decl. ¶ 7.) After the trial started but before Mr. Caro was convicted, counsel made the decision not to call Dr. Spica *without even reviewing the report* of the government's expert, Dr. Phillips. (Kalista Decl. ¶ 18.) Counsel indicates that their decision was based on Dr. Phillip's reputation, his anticipated testimony, and a "feeling" that his testimony could not be rebutted. (Kalista Decl. ¶ 18.)

Counsel's decision to forego presentation of evidence of Mr. Caro's brain damage was neither informed nor reasonable. First, counsel's decision not to present evidence of brain damage was inherently unreasonable because their inadequate development of a mental health defense before trial was unreasonable. As discussed above, from the beginning of the case, counsel never sought funding for or retained the necessary experts to build a defense. Their mitigation specialist Dr. Selvog indicated that expert testimony was critical to present information about Mr. Caro's brain impairment to the jury. (Selvog Decl. ¶ 9.) Shortly upon his involvement in the case, Dr. Selvog had identified various experts, including a psychiatrist, who he believed would be helpful in explaining Mr. Caro's brain impairment and other mitigating factors to the jury. (*Id.* ¶ 9; Mem. To Simmons, Kalista, and Mullikin, from Selvog, 06/13/2006.) Counsel were also aware, because Dr. Spica had informed them upon being retained, that he would only perform

94

the testing; Dr. Spica recommended initially, and again in his report, that a psychiatrist should be consulted to assess Mr. Caro's psychiatric, neurocognitive, and adaptive functions. (Spica Decl. ¶ 6; Spica Consult at 7; Letter to Kalista from Spica, 04/18/2006.)

Once counsel learned in August that Dr. Caruso would not be able to serve as a testifying psychiatrist at the penalty phase, they should have—but did not—find another psychiatrist to explain how Mr. Caro's brain impairment affected him throughout his life. (Hammond Decl. ¶48.) As a result, when counsel went to trial, the only one of the two mental health experts who was available to testify was Dr. Spica. At that point, however, it was too late to make strategic decisions regarding a mental health expert. (Selvog Decl. ¶ 15.) There were no other options besides Dr. Spica who had never testified in a criminal case (Spica Decl. ¶ 3.), and who had not been prepared to testify. As his billing records indicate, he had not consulted or billed for work on this case since early September, 2006. (Invoice of D. Malcolm Spica, 01/24/2007.)

Any decision that counsel made based on purported concerns about Dr. Phillips's opinion were also unreasonable and uninformed. Notably, Dr. Phillips was not the expert who conducted neuropsychological testing; the prosecutor informed counsel months prior to trial that Dr. Montalbano would be performing psychological testing in September 2006. (Email from Giorno to Kalista, 09/25/2006.) Counsel had learned information challenging Dr. Montalbano's procedures in another case (Email to Kalista and Simmons, 09/26/2006) and therefore knew, or should have known, well before trial that the government's expert who conducted the testing could be discredited on cross-

95

examination. If this were a concern, counsel should have filed a motion in limine to limit the government to presenting only testimony relevant to only rebut Dr. Spica's testimony regarding brain damage. Counsel's failure to do this demonstrates again that they lacked a cohesive strategy for presenting mitigating mental health evidence. What is more, it also suggests that counsel lacked a true understanding of the difference between the various mental health experts that they had retained and that the government had retained.[27]

Compounding the unreasonableness of counsel's decision is that it was based on a "feeling" that Dr. Phillip's anticipated testimony could not be rebutted. But counsel did not review Dr. Phillips's report. (Kalista Decl. ¶ 18; Spica Decl. ¶ 7; Selvog Decl. ¶ 14.) Nor did counsel consult with Dr. Spica about the government's experts. (Declaration of D. Malcolm Spica, 01/04/2013, attached as Ex. 10, ¶ 7 (hereinafter "Spica Decl."); Invoice of D. Malcolm Spica, 01/24/2007.).) Had they review Dr. Phillips's report and consulted with Dr. Spica, they would have learned that Dr. Phillips's opinion relying, in part, upon Dr. Montalbano's testing was problematic for two reasons. First, Dr. Montalbano did not administer the appropriate tests that would have shown deficits and demonstrated that Mr. Caro has brain impairment. (Spica Decl. ¶ 11.) Second, Dr. Montalbano administered some of the same tests that Dr. Spica administered, less than

---

[27] Dr. Spica, who is a psychologist (Ph.D.), conducts neuropsychological testing to determine whether one has brain impairment. In contrast, Dr. Caruso, who is a psychiatrist (M.D.), conducts an interview and mental status assessment of an individual. Dr. Phillips who is a psychiatrist, *not* a psychologist, did not and could not perform the testing that that psychologists Dr. Montalbano (Ph.D.) or Dr. Spica performed.

six months earlier. (*Id.* ¶ 12.) This resulted in what is termed "practice effect," where some scores are artificially higher due to the fact that the second test was given shortly after the first test. (*Id.*)

Further, had counsel reviewed Dr. Phillips's report, they could have obtained an opinion to undermine the neurological examination performed by Dr. Phillips. Indeed, they indicated in the first approved budget that if testing "suggests a possibility" of brain damage, then counsel would ask for funding for a "full neurological examination." (Dkt. 42-1 at 6.) But they did not. Had they simply consulted an expert to review Dr. Phillips's neurological examination, they would have learned that Dr. Phillips's examination was "cursory" and lacked "many of the tests routinely performed on forensic cases, especially those where there might be a suspicion of frontal lobe dysfunction." (Letter from Thomas M. Hyde, M.D. Ph.D., to Robin Konrad, 12/22/2012, attached as Ex. 11.) Moreover, even though Dr. Phillips's administration of neurological testing was "substandard," some of the tests he administered to Mr. Caro revealed abnormal results. (*Id.*) Such evidence is at odds with Dr. Phillips's conclusion that Mr. Caro's performance was "superior." (*Id*; *see also* Phillips Report.)

Mr. Caro's trial counsel's performance fell below the standard of care by failing to present evidence of brain damage to the jury. "Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination." ABA Guidelines No. 1.1 cmt. Had counsel adequately prepared in advance of trial in accordance with the standard of care for capital defense

attorneys, they would have been able to present evidence of Mr. Caro's cognitive deficits and would have been able to cross-examine Dr. Phillips regarding his opinions. Counsel's decision to prevent the jury from hearing this evidence was unreasonable and their performance was deficient.

> ### c)    Counsel's failure to obtain a mental-health expert to explain the effects of Mr. Caro's childhood trauma was unreasonable

Counsel also learned that Mr. Caro had a traumatic childhood filled with violence and neglect.  Mitigation specialist Dr. Selvog interviewed many family members and learned much of this information six months before trial.  He prepared a timeline detailing the trauma Mr. Caro suffered as child.  But rather than find proper experts who could educate and explain this to the jury, counsel picked one expert—Dr. Caruso. Neither counsel nor Dr. Selvog had worked with Dr. Caruso in the past.  Neither Dr. Caruso's resume nor his personal report of his qualifications demonstrate that he was the appropriate expert for this case.  Moreover, counsel did not ask Dr. Selvog to conduct any research on Mr. Caruso's background or reputation.  (Selvog Decl. ¶ 10.)  Indeed, counsel should have been aware before retaining Dr. Caruso that his opinion could be undermined on cross-examination because he was required to repeat his last year of medical school.

But counsel used Dr. Caruso as a catch-all expert who evaluated Mr. Caro to not only determine whether there were any mental disease or defects that could be used as a defense during the guilt/innocence phase of trial, but also whether there were any

mitigating circumstances that could be presented to the jury.   (Kalista Decl. ¶ 15.)  The

bulk of records that they provided Dr. Caruso related to Mr. Caro's BOP record and the

incidents in which he was involved.  (Letter to Caruso from Kalista, 07/31/2006.)

Dr. Caruso met with Mr. Caro and reported back to counsel that he learned

information that would not be helpful in developing a defense for the guilt/innocence

phase.  He told counsel that they did not want to use him.  Counsel followed Dr. Caruso's

advice, but at that point, they ceased to develop *any* expert mental health testimony that

could have been provided at the penalty phase beyond the existing evidence of brain

damage.  (Kalista Decl. ¶ 15.)   While counsel indicated that they relied upon their

mitigation specialist to advise and recommend mental health experts (Kalista Decl. ¶ 12),

that does not appear to be the case.  Dr. Selvog, who is a licensed clinical social worker

(Selvog Decl. ¶ 2), advised them of the need to consult with and retain additional experts.

Counsel, however, did not seek another psychiatrist or expert with a relevant background

who could explain the impact of Mr. Caro's traumatic childhood on him, in spite of the

mitigation specialist's strong recommendation that this type of expert should be retained.

(Email from Selvog to Kalista, Simmons, 06/15/2006; (Mem. to Simmons, Kalista, and

Mullikin from Selvog, 06/13/2006.)  While the mitigation specialist was attempting to

carry out his role under the ABA Guidelines,[28] counsel disregarded his guidance and

---

[28]  *See, e.g.*, ABA Guidelines No. 4.1 cmt. ("The mitigation specialist compiles a
comprehensive and well-documented psycho-social history of the client based on an
exhaustive investigation; analyzes the significance of the information in terms of impact
on development, including effect on personality and behavior; finds mitigating themes in
the client's life history; identifies the need for expert assistance; assists in locating
appropriate experts; provides social history information to experts to enable them to

99

expertise.

Counsel's performance fell below the standard of care. Where counsel had documented evidence of not only brain impairment, but also evidence that Mr. Caro was in special education classes, that his nickname was "el mudo" (the mute) because he did not speak, and that his father was a severe alcoholic who frequently beat his mother, their failure to retain an expert to present testimony regarding the impact of these factors was unreasonable. (Hammond Decl. ¶ 48) It is Dr. Selvog's opinion that at least one expert was necessary to testify as to how Mr. Caro's brain impairment and traumatic childhood impacted his life and his functioning. (Selvog Decl. ¶ 9.)

### d)    Counsel's failure to present testimony of Mr. Caro's brothers: Jose and Noe

While counsel called six witnesses to help tell the story of Mr. Caro's childhood and likely developmental trajectory, they failed to call two of the most critical witnesses: Carlos's brothers Jose and Noe. Unlike any of the other witnesses they did present, Jose and Noe lived with of Carlos in the violent and chaotic household. The fact that counsel did not present the testimony of these available witnesses underscores their failure to understand and adequately present Mr. Caro's mitigation story.

Mr. Caro's brother Jose is almost two years older than Carlos and his brother Noe is one year younger than Carlos. Both boys witnessed the abuse that Carlos witnessed.

---

conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.").

As counsel explained in their pretrial request for subpoenas, Jose and Noe were two critical witnesses to help the jury "appreciat[e] the full extent of Mr. Caro's personal history." (Decl. of Hans Selvog., 12/11/2006, Dkt. 409.) Counsel's mitigation specialist believed that they were critical witnesses. (Selvog Decl. ¶ 19.) Even though the subpoenas were issued, and Jose and Noe were at the local jail waiting to testify, counsel did not call them to the stand.

Jose and Noe could have shown the jury another side to Carlos's life that was not sufficiently described by people who did not live under the same roof as Carlos. Jose and Noe both could share memories of their alcoholic father. Both men would describe how their father would beat their mother at least once a week on pay day, and how their father was drunk daily. They both would describe how their father would slap their mother in front of the three boys and how their mother would have black eyes. They would also testify how they would get into fistfights with their father when he beat their mother.

Jose said that one of the worst beatings happened during a period where his parents were separated. Their mother had gone to a dance at a wedding and had taken Jose, Carlos, and Noe with her. Their father showed up drunk at the dance and grabbed his mother and the boys out of the dance and into his car. As their father drove home, he slapped their mother repeatedly while the boys in the back seat cried and screamed, telling their father to stop. When they arrived home, their father continued to beat their mother. The next day, the violence was ignored; no one spoke of it.

Noe Caro said he and his brothers could easily overhear his parents arguing because the house was small. Noe and his brothers cried when his parents fought.

Sometimes they tried to help their mother and then their father would hit them too. Noe remembered once when his mother struck his father with an object and lacerated his forehead. Noe remembers that the police were called at times to the house because of the commotion.

In addition to being an abusive husband, Carlos's father was also an adulterer. Both Jose and Noe could have told the jury about their father's affair with Rosa Munoz, whom they called "Gavi." She was a regular customer at a local beer joint where their father frequented. Both Noe and Jose think that Rosa's son is their half-brother. And they remember when Rosa shot their father in the chest with a rifle after he slapped her.

The brothers could also provide insight to Carlos that was more intimate than the aunts and cousin who testified. Both of them would have explained that their brother did not talk to anyone and kept to himself. He rarely talked with either of them. At times, Carlos did not even respond when they spoke to him. Carlos was often in his own little world, staring into space.

Noe and Jose would have been able to tell the jury how different Carlos was from them; Carlos was not a troublemaker. He was not violent, did not get into fights, and did not steal or use drugs—things which they both did from a young age. They could have said how much Carlos loved their mother, and he looked out for her, more so than Noe and Jose.

Finally, Noe and Jose could have given the jury more information about the drug culture to which they were introduced at a young ago. Jose was only in elementary school when he witnessed the use and trade of illegal substances. Both Noe and Jose

knew as children that their father was involved in dealing drugs. They also knew that their maternal uncle, Rosendo Rodriguez, was in prison for a federal drug offense involving heroin. Noe and Carlos acted as drug mules for their uncles when they were only 14 or 15 years old. They made very little money compared to their uncles, who abandoned them when they were arrested.

Counsel's failure to call these available witnesses to the stand was unreasonable. The ABA Guidelines instruct that "[c]ounsel should ordinarily use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions." ABA Guidelines No. 10.11 cmt. Here, even though counsel did not present experts, they could have called these two key witnesses. "[Carlos's] brothers would have been able to describe the violence they each endured and/or witnessed in their childhood family home. They have been described as more verbal and social than [Carlos]." (Declaration of Donna Marie Schwartz-Watts, M.D., 01/07/2013, attached as Ex. 8, ¶ 29 (hereinafter "Schwartz-Watts Decl.").) Moreover, the brothers' testimony could have provided a context for Carlos's involvement in drug activity, which could have been explained through expert testimony. (Schwartz-Watts Decl. ¶ 40.) Instead of learning that substance abuse is often a symptom of anxiety, the jury only heard that Mr. Caro made a choice and left his wife to use drugs.

That counsel did not call Jose and Noe further demonstrates that they never "develop[ed] a strategy for presenting a compelling mitigation story." (Selvog Decl. ¶ 20.) Without the testimony of witnesses who had first-hand accounts of the violence in the house, the prosecutor was able to discount the hostile and chaotic environment where

103

Carlos lived. (Tr. 02/13/2007 at 29–30.) In fact, the prosecutor said that Carlos's father was never violent with the children, which Noe and Jose would have disputed. (*Id.* at 30.) Counsel's failure to present their testimony to the jury was deficient performance.

> **e)  The limited mitigation case that counsel presented was undermined by counsel's own argument to the jury and by counsel's introduction of a witness who previously recorded a statement that was used against her and other witnesses**

"[I]t is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors." ABA Guidelines 10.11 cmt. Here, the latter rather than the former happened. The jury was provided a list of twenty-two mitigating factors. (Special Verdict Form.) Of the total, thirteen of them (numbers 2–14) related to facts that were, or should have been, provided by the family and teacher witnesses. One factor that was not found by any juror—that Carlos proved to be a good father or husband at times—is a direct result of counsel's own argument. Moreover, counsel's decision to present testimony from cousin Laura Perez, who had previously described wonderful and loving childhood memories with Carlos, allowed the jury to discount the true severity of the home life in which Carlos was raised.

### (1)  Opening and closing statements

Because counsel did not present testimony from an expert to explain Mr. Caro's childhood and how it affected him, the only opportunity to provide a narrative to the jury was during opening and closing statements. Rather than take this opportunity to show the

104

jury how their client developed and his all-too-inevitable destiny, they told their jury that their client made "choices" and that he took the "easy" way out.

In opening statements, counsel emphasized to the jury on at least three occasions that Mr. Caro took the "easy" way out by choosing the drug trade. (Tr. 02/05/2007 at 60, 62, 63.) Rather than explaining the realities of prison culture and prison life, they said that Mr. Caro chose to join a gang. (Tr. 02/05/2007 at 66.) Counsel also told the jury that Mr. Caro could "hardly" be called a good father (Tr. 02/05/2007 at 65), even though they listed "be[ing] a good father" as a mitigating factor (Special Verdict Form at 4).

During closing statements, defense counsel told the jury that the case was about choices. (Tr. 02/13/2007 at 40.) And, counsel told the jury that something went "terribly wrong in that family" but he "do[es]n't know what it was." (*Id.* at 41.) Counsel talked about the importance of having a positive loving environment (*id.* at 51), but the jury never heard any testimony about how a violent, abusive household can impact a child. Counsel also said that Carlos's mother's role "had to be affected in some way because the bad influence of her husband" (*id.* at 54), but the jury never had evidence explaining how it could have been affected. Counsel admitted that Carlos "may not have been a very good husband . . . or a very good father because he wasn't there." (*Id.* at 57.)

Counsel fell short in attempting to present a compelling argument supporting a life sentence. Their statements to the jury did little to explain and humanize Mr. Caro. Instead, their statements underscore their failure to develop a consistent theme in defense of Mr. Caro.

105

**(2)   Witnesses who were undermined on cross-examination**

Counsel chose to present testimony from Mr. Caro's cousin, Laura Perez, despite knowing that such decision would result in her videotaped statement being produced. In a videotaped interview prepared by defense counsel before trial, *see* n.17 *supra*, Ms. Perez described her childhood, explaining how she, Mr. Caro, and his brothers spent time with their grandparents. Ms. Perez emphasized the loving environment her grandparents provided. She gushed over how fortunate she was to have this experience as a child, and said that she wished her own children could have had such as wonderful environment. When counsel decided to call Ms. Perez as a witness, counsel provided her videotaped statement to the government. *See* Fed. R. Crim. P. 26.2.

Ms. Perez answered the government's questions on cross-examination:

> Q:   An in that video do you remember when you were talking about your life at your grandparents' house?
>
> A:   Uh-huh.
>
> Q:   And those were good times, were they not?
>
> A:   Yes, sir.
>
> \* \* \* \*
>
> Q:   And were you able to go there and ride the horses and have a good time?
>
> A:   They had a little stable in the back of the house, and we'd go feed them every day after school and ride them.
>
> Q:   And Mr. Caro was able to go over there, as well, and have fun and enjoy that?
>
> A:   Yes, sir.

106

Q:    I think you also recounted a story of when your grandmother would make a big pot of hot chocolate of some sort?

A:    Uh-huh.

Q:    Talked about you were there, and Mr. Caro was there, and others, and what a great time; is that correct?

A:    That's correct.

Q:    And I think you described it as just a loving environment; is that correct?

A:    Yes.

Q:    In fact, I think if I recall, you stated that you hoped your children would be able to grow up in the same environment that you and Mr. Caro had at your grandparents'; is that right?

A:    Yes.

(Tr. 02/08/2007 at 19-20.)  Counsel's attempt to minimize this testimony on redirect was unsuccessful; counsel gave up after one objection was sustained due to a leading question.  (*Id.* at 23.)  What is more, on redirect Ms. Perez emphasized that she would want a loving mother like Mr. Caro's.  (*Id.*)  This testimony, as well as other similar testimony, likely resulted in no juror finding as a mitigating fact that the ability of Mr. Caro's mother to nurture her sons was impeded by the victimization she suffered from her husband.  (Special Verdict Form at 4.)

Ms. Perez's direct testimony did not provide the jury with any new information regarding Mr. Caro's story, but the government used her video statement not only against her but also others on cross-examination.   Ms. Contreras was asked on cross-

examination, "And there were times when the grandchildren would go over to your parents' home and ride horses and have hot chocolate, and all those things?" and she responded, "Yes." (Tr. 02/07/2007 at 157.)    Ms. Rodriguez was asked on cross-examination, "And is it fair to say that when Carlos would go to his grandparents' home that that was a really loving environment for not only Mr. Caro, but for his other cousins when they went to your parents' house?" and she responded, "Yes." (Tr. 02/07/2007 at 111.) Ms. Rodriguez was further asked, "And I guess by all accounts your parents really loved all these kids and would bring them in, and make hot chocolate for them, and ride horses and all kinds of neat things?" to which she responded "Yeah." (*Id.*)

While Mr. Caro certainly may have had a loving environment at his grandparents' home, this should not have been the end of the story—yet the government made sure the jury repeatedly heard that information.  In fact, in his closing statement, the prosecutor reminded the jury about Mr. Caro's "very loving extended family" and that a lot of children grow up in worse circumstances and "don't have grandma and grandpa, and aunts and uncles to look after them." (Tr. 02/13/2007 at 29.)  The prosecutor reminded the jury how it heard testimony from aunts and a cousin who talked about the good times and how the extended family provided Mr. Caro with a "safety net to look after him." (*Id.*) Counsel failed to put this evidence in the context of the rest of Mr. Caro's life, and failed to explain that it did not negate the trauma and damage caused by the majority of his child hood experiences.

And in any event, it was unreasonable for counsel to present the testimony of Ms. Perez where the harm outweighed what benefit—if any—she provided.  Ms. Perez did

108

not present new or compelling mitigating testimony. When weighed against the risk that the government would seize on this misleading evidence, counsel's decision to present her testimony was unreasonable and further supports the fact that counsel lacked a mitigation strategy in this case.

### 3.    Counsel's deficient performance prejudiced Mr. Caro

Despite the fact that the mitigation specialist developed a compelling factual story to tell the jury, it did not get fully presented at trial. That was because counsel deprived the jury of the opportunity to hear from expert witnesses and from the relatives closest to Carlos: his brothers. In addition to presenting testimony from a neuropsychologist, counsel should have also retained and presented testimony from a forensic psychiatrist who has extensive and relevant experience, such as Donna Schwartz-Watts, M.D. Dr. Schwartz-Watts is an educator and also has been qualified as a forensic expert in hundreds of cases. (Schwartz-Watts Decl. ¶¶ 4-6.) She also has a background in evaluating and treating individuals with trauma history, including PTSD. (*Id* ¶ 5.) An expert with this type of specialized background relevant to the particularities in Mr. Caro's case would have been able to explain to the jury how his brain impairment and traumatic childhood has affected him. Had the jury been allowed to hear the true story of Carlos David Caro, there is a reasonable probability that this information would have tipped the balance of aggravating and mitigating circumstances in favor of a life sentence.

Here, the jury heard no expert testimony to provide context to the facts presented by the lay witnesses. An expert like Dr. Schwartz-Watts could have explained that Mr.

Caro has an anxiety disorder as a result of his traumatic childhood. (Schwartz-Watts Decl. ¶¶ 12, 30-32.) Through an expert opinion, the jury would have heard how witnessing the violence between his parents and being abused by his older brother resulted in him being avoidant and a loner. (*Id.* ¶¶ 30, 32, 40.) Mr. Caro's avoidant behavior results in him being neither a leader nor a follower. (*Id.* ¶ 40.) This information would have been critical to counter the government's accusation that Mr. Caro was a gang leader.

Dr. Schwartz-Watts also could have explained the impact of Mr. Caro's mother's neglect on her young son. The jury heard testimony describing how Mr. Caro's mother did not help her young son get dressed or feed him breakfast; instead he would get dressed as best as he could and walk to a family member's home to eat. (Tr. 02/07/2007 at 151.) Dr. Schwartz-Watts could have provided significance to Mr. Caro's odd behavior as a child—being mute and staring into space—and explained that this could have been a psychiatric symptom called "frozen watchfulness." (Schwartz-Watts Decl. ¶ 37.) This lack of attachment can be associated with pathological care—and could have been a direct result of his mother's neglect. (*Id.*) An expert could have also told the jury that his developmental delays—such as being severely late in learning how to talk, tie his shoes, or tell time—"can be seen in children with cognitive impairments and in children who are exposed to trauma." (*Id.* ¶ 19.)

Dr. Schwartz-Watts could have also explained Mr. Caro's responses, which may seem unusual to some people. Mr. Caro has a constricted affect, which is a result of trauma. (*Id.* ¶¶ 14, 31.) What this means is that he does not outwardly express internal

110

emotions with full range and as one may expect. (*Id.* ¶ 31.) For example, Mr. Caro inappropriately smiled when he became frustrated by being unsuccessful in performing a task (*id.* ¶ 14), and despite reporting being sad about his own mother's death, his outward emotional expression was not on par to the sadness he expressed (*id.* ¶ 31). Dr. Schwartz-Watts's explanation of Mr. Caro's behaviors would have been relevant for the jury to hear because one of the aggravating factors alleged by the government was that Mr. Caro expressed no remorse for Mr. Sandoval's death. If, however, an expert had explained to the jury that Mr. Caro suffers from anxiety disorder because of his childhood trauma and one of the symptoms is a constricted affect, then the jury may not have found that aggravating factor beyond a reasonable doubt.

Dr. Schwartz-Watts could have explained to the jury that substance abuse is often associated with exposure to trauma. (*Id.* ¶ 40.) She could have also explained that Mr. Caro was born into an impoverished family and community with limited options. (*Id.*) As a result, due to his environment and his mental limitations, Mr. Caro began transporting drugs for financial security. (*Id.*)

What is more, the jury could have heard from both Dr. Schwartz-Watts and Dr. Spica that Mr. Caro suffers from brain damage. They both diagnosed him with Cognitive Disorder NOS. (Spica Consult at 7; Schwartz-Watts Decl. ¶ 12.) Dr. Spica's testing indicated that Mr. Caro's "abstract reasoning abilities are variable, depending on his level of distress while attempting a task." (Spica Consult at 4.) In explaining Mr. Caro's deficits, Dr. Spica noted that it "is likely impairing in [Mr. Caro's] daily life, as it makes him highly suggestible, believing that information presented to him is familiar.

He likely has difficulty discriminating between actual facts and information that is close but distorted." (Spica Consult at 6.)  Dr. Spica could have informed the jury that individuals who have brain deficits like Mr. Caro (i.e., frontal lobe dysfunction) "tend to have difficulty organizing, processing, and comprehending new information provided to them." (Spica Decl. ¶ 8.)

Put more bluntly, Mr. Caro's reasoning ability is akin to that of a ten-year-old. (Spica Consult at 7.)  Dr. Schwartz-Watts could have explained and supplemented Dr. Spica's test results with her medical opinion that her mental status examination shows that Mr. Caro has cognitive dysfunction.  (Schwartz-Watts Decl. ¶ 17.)  Mr. Caro's brain impairment, coupled with his anxiety disorder, makes him more likely than others without these impairments to exercise poor judgment.  (*Id.* ¶ 41.)

The information that could have and should have been presented by experts and other lay witnesses would have changed the story that the jury would have heard about Mr. Caro.  If this evidence had been presented at trial, counsel would have had a physiological and psychological explanation for Mr. Caro's behavior in this case.  Mr. Caro, who avoids others as part of his disorder, was likely under increased anxiety when Mr. Sandoval was placed in his cell after he had refused Mr. Sandoval earlier that day. His already impaired brain and heightened anxiety left Mr. Caro functioning at a level significantly below that of a 10 year old.  While counsel argued in closing to the jury that this case was about Mr. Caro's choices, the circumstances as they truly occurred represented anything but a reasoned choice. These facts about how his traumatic childhood and dysfunctional brain affects him on a daily basis would have given the jury

112

an opportunity to vote for life over death.

Juror # 79 and Juror # 24 (the foreperson) have *both* indicated that expert evidence

of brain damage could have made a difference in their sentencing decision. How much

more compelling that evidence would have been if jurors were told not only about his

brain damage, but how that damage affected his ability to reason and his judgment and

how his childhood trauma further affected his perception of life choices. (Sealed Juror #

79 Decl.; Declaration of Juror # 24, 11/20/2012, attached as ███ Ex. 29 (hereinafter

"Juror # 24 Decl.").) Had the jury heard the evidence above, "there is a reasonable

probability that at least one juror would have struck a different balance." *Wiggins*, 539

U.S. at 537.

## C. Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful Adversarial Testing

At trial, government witness Officer John Gordon testified. Mr. Gordon, an SIS

Lieutenant at FCI-Oakdale in July 2002, testified that, at that time, Mr. Caro was the

leader of the Texas Syndicate at FCI-Oakdale. He concluded this based on a meeting he

had with Mr. Caro after he "reached out" in some unspecified fashion to leadership of the

prison gangs to try to open up a "line of communication" between the SIS department

and the leadership of these gangs. (Tr. 02/05/2007 at 166-67). At the time that he

"reached out," Mr. Gordon did not know who was the leader of the Texas Syndicate. (Tr.

02/05/2007 at 174). In response to Mr. Gordon's "reach[ing] out," Mr. Caro showed up

for a meeting. During this meeting, Mr. Caro told Mr. Gordon that the Texas Syndicate

113

was going to do what it had to do and Mr. Gordon had to do what he had to do. (Tr. 02/05/2007 at 167-68.)    Based on Mr. Caro's appearance at the meeting and his statement, Mr. Gordon concluded that Mr. Caro was the leader of the Texas Syndicate. (Tr. 02/05/2007 at 174.)

Mr. Gordon also testified that a gang fight occurred between members of the Texas Syndicate and members of another gang known as Paisa/Border Brothers several weeks after his meeting with Mr. Caro on July 11, 2002. (Tr. 02/05/2007 at 163-80.) Mr. Caro later told him that the gang was responsible for the assault and that his brothers follow orders.  Mr. Gordon deduced that Mr. Caro ordered the gang assault because he believed Mr. Caro was the leader at the time and the gang does not do anything without following orders. (Tr. 02/05/2007 at 171-72.)

Trial counsel were provided notice over a year before trial that the government would attempt to prove the future dangerousness aggravator by presenting evidence of Mr. Caro's connection to a gang and his involvement in assaults on other inmates. (Notice of Intent to Seek Death Penalty, 01/11/2006, Dkt. 8, at 2.)  Defense counsel anticipated that the government would attempt to introduce this particular evidence in support of the future dangerousness aggravator and had filed two motions *in limine* to exclude it, arguing that it was unreliable and violated the confrontation clause. (Mot. in Limine to Exclude Report Regarding Incident at FCI Oakdale, Louisiana, 02/03/2007, Dkt. 589; Second Mot. in Limine to Exclude Report Regarding Incident at FCI Oakdale, Louisiana, 02/04/2007, Dkt. 590.)    The Court denied their motions.    (Oral Order, 02/06/2007, Dkt. 600.)  Even though they knew that the government would present this

114

information, trial counsel presented no evidence to rebut the assertion that Mr. Caro had been a gang leader during the assault that occurred at Oakdale in 2002.

Trial counsel had hired a "gang expert," however, they never developed an overall defense that integrated the relevant gang facts that they knew or should have known would be introduced at trial by the government, and the jury was never presented with evidence that would have helped them appreciate these facts in a way that was beneficial to Mr. Caro. For example, counsel could have presented testimony that Mr. Gordon's conclusion that Mr. Caro was the leader of the gang and ordered the attack were based on erroneous assumptions. In fact,

> There is an inherent level of distrust between prison gangs and prison officials that must be overcome before any meaningful dialogue can occur between a gang and a prison. This was the first meeting between the Texas Syndicate and the prison. Under these circumstances, where there has been no prior dialogue or the establishment of mutual respect between the gang and the prison, it is highly unlikely that the leader of the Texas Syndicate, a "Disruptive Group," would blindly walk into a one-on-one meeting with Mr. Gordon. It is much more likely that the leader would have sent someone else in his place to "test the waters."

(Bezy Decl. ¶ 21.) Mr. Caro's statement that the Texas Syndicate was going to do what it had to do and that Mr. Gordon had to do what he had to do was nothing more than a typical inmate response. (Bezy Decl. ¶ 20.)

Mr. Gordon also testified that he told Mr. Caro during their meeting that he needed to know "who the membership was in the Texas Syndicate." (Tr. 02/05/2007 at 168.) This was an extremely inappropriate question to pose to any gang member. In essence, it was asking Mr. Caro to "snitch" on his brothers by disclosing their identity. Yet, defense

counsel failed to challenge the ignorance of asking this question, which would have revealed that Mr. Gordon was not experienced with working with gang members and therefore his assumptions and conclusions were questionable. (Bezy Decl. ¶ 22.)

Had defense counsel discredited Mr. Gordon's testimony, the government would have been left with nothing to support its assertion that Mr. Caro was, or had been, a leader of a gang. Instead, the jury was left with the uncontested assertion that Mr. Caro was a gang leader and had ordered an assault. Counsel's failure to investigate this matter and meaningfully impeach Mr. Gordon was prejudicial to Mr. Caro.

### D. Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's Ability to Control Improper Inmate Communications, and failed to Subject the Government's Evidence to Meaningful Adversarial Testing

The government presented expert testimony through Gregory Hershberger, a retired BOP employee and former warden, that in spite of security concerns, Mr. Caro inevitably would have future access to a telephone, mail correspondence, and visitors, and that the BOP could only take away an inmate's privilege for telephone calls, mail correspondence and visitors after a hearing. (*See, e.g.*, Tr. 02/12/2007 at 191 (BOP cannot guarantee that Mr. Caro will not send out coded messages); *id.* at 191 (difficult to guarantee that Mr. Caro would "not use proxies to send messages to his gang members on the outside"); *id.* at 191-92 (does not believe that the BOP could "completely prevent" Mr. Caro from abusing the telephone); *id.* at 202-03 (privileges such as visitation and telephone can only be withheld after a hearing).)

In closing, the government argued that if Mr. Caro goes to ADX-Florence, he "can

116

probably still communicate with his gang buddies." (Tr. 02/13/2007 at 34.) The government misleadingly stated that inmates "have certain privileges which would allow the communication, and also increasing contact. He can use the telephone. He can have visitation with his buddies. . . . We know that he can write letters." (Tr. 02/13/2007 at 34.)

Due to their failure to investigate relevant facts and law, trial counsel were unable to refute the government's evidence. Contrary to the government's argument, the BOP did have both the authority and the ability to control Mr. Caro's future communications. Defense counsel, however, did not bring out this information either through its own witness or through a meaningful cross-examination of the government's witnesses.

For example, while Dr. Cunningham made brief references to Special Administrative Measures ("SAMs"), defense counsel failed to provide details about the regulations that authorize these measures. *See* 28 C.F.R. § 501.3. Section 501.3 authorizes the government to construct individualized conditions of confinement, including limitations on correspondence, visiting and use of the telephone, in order to protect persons. There is no requirement in section 501.3 that the inmate first receive a hearing. While these conditions must be periodically reviewed, they can be extended for as long as they are warranted. (Bezy Decl. ¶ 33.)

Similarly, BOP has numerous program statements that describe the authority of prison officials to take away an inmate's telephone, visitation, and mail privileges. *See* BOP Program Statements No. P5264.08 (Inmate Telephone Restrictions); BOP Program Statement No. 5264.14 (Correspondence); and BOP Program Statement No. 5267.08

117

(Visiting Regulations); *see also* Bezy Decl. ¶ 36.  Because of their failure to adequately investigate and research, counsel was unable to effectively cross-examine and dispel the misleading impressions left by Mr. Hershberger and the government.  Counsel's failure to research and present this information to the jury constitutes deficient performance that prejudiced Mr. Caro.  *See, e.g., United States v. Darryl Lamont Johnson*, Case No. 02-cv-06998, Mem. Opinion and Order, Dkt. 112 (N.D. Ill. Dec. 13, 2010).

### E. Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning Prison Culture and Statements of Remorse

At trial, the government portrayed Mr. Caro as a "predator" who lacked remorse and must be "controlled" by use of the death penalty.  (Tr. 02/13/2007 at 22, 27-28, 37-38, 92, 94.)  In support of its argument that Mr. Caro lacked remorse, the government referred to several statements by Mr. Caro, as well as themes running through these statements: "Come and get this guy out of my cell, this piece of shit out of my cell," "He stinks," "He's a dead man," "Sandoval got in the way and disrespected me.  That's what you've got to do," "I've got to do what I've got to do," and "when am I going to get a new cellmate?" (Tr. 02/13/2007 at 27-28.)

The evidence supporting this portrayal, however, should have been examined in light of the culture of its environment—prison.  Had counsel developed a cohesive and complete defense that explored and explained the impact of the surrounding prison culture on the offense, the jury would have heard evidence that these statements were typical to inmates and necessary for survival.  Had counsel presented relevant evidence regarding prison culture, the jury would have learned that an inmate's survival in prison

118

depends on portraying an image of strength. This image of strength, which is necessary to prevent future attacks, is based not only on an inmate's actions, but what he tells others about those actions. (Bezy Decl. ¶ 19.) Any statements or sign of remorse by Mr. Caro after the death of Mr. Sandoval would have been viewed as weakness by other inmates and would have opened the door to possible future attacks on Mr. Caro. (Bezy Decl. ¶ 19.)

This failure by defense counsel to place Mr. Caro's statements in the context of prison culture prejudiced him. The jury found beyond a reasonable doubt that Mr. Caro had not expressed remorse for killing Mr. Sandoval. (Special Verdict Form at 2.) Juror # 24 stated that Mr. Caro's apparent lack of remorse influenced her decision. (Juror # 24 Decl.) Had counsel presented evidence of prison culture and the need for "bravado," there is a reasonable likelihood that a juror would have determined that Mr. Caro's statements did not reflect a lack of remorse and the aggravating factor would not have been found by the jury.

### F. Trial Counsel Failed to Adequately Investigate Mr. Caro's Underlying Conviction for Conspiracy to Commit Murder and Failed to File a Collateral Challenge to that Unconstitutional Conviction

1.  **Mr. Caro's Prior Counsel Failed to Advise Him that a Guilty Plea for Conspiracy to Murder in the Benavidez Assault Could and Likely Would be Used Against Him by the Government as an Aggravating Circumstance in the Sandoval Case**

Mr. Caro was represented by Louis Dene in the Benavidez assault. (Declaration of Louis Dene, 11/09/2012, attached as Ex. 3, ¶ 2 (hereinafter "Dene Decl.").) Mr. Dene

119

negotiated a plea agreement on Mr. Caro's behalf that required Mr. Caro to plead to Conspiracy to Commit Murder, the most serious charge, as a condition for co-defendant Juan Moreno-Marquez to receive a guilty plea to the lesser charge of weapons possession. (Caro Plea Agreement, ████ Ex.49, at 2.)[29] Mr. Moreno-Marquez's plea agreement was made contingent on Mr. Caro's guilty plea to conspiracy to commit murder. (████ Ex. 53 at 2.) Mr. Caro did not benefit from the deal. Mr. Caro received a consecutive sentence of 327 months, while his co-defendants, including Mr. Moreno-Marquez—who was one of the knife men and who was a career offender—received sentences ranging from only 24 months to 57 months. (Docket Sheet Case Information, No. 2:03-cr-10115-JPJ.)

Mr. Dene recognized that this plea agreement provided no real benefit to Mr. Caro, though it did benefit his co-defendant, Mr. Moreno-Marquez. (Dene Decl. ¶ 5.) Mr. Caro's only apparent reason for signing this plea agreement was to help a younger man, Mr. Moreno-Marquez, receive a lesser sentence and be released from prison while still relatively young. (Dene Decl. ¶ 5.) Mr. Dene did advise Mr. Caro that he would likely receive a long sentence for the conspiracy to murder conviction. (*Id.* at ¶ 6.)

This guilty plea agreement was signed on June 29, 2004 (more than six months after the death of Roberto Sandoval). (████ Ex. 49 at 7.) At that time, Mr. Dene was aware that Mr. Sandoval had been killed and he believed that the government intended to proceed with a capital case against Mr. Caro. (Dene Decl. ¶¶ 3, 4.) Nevertheless, Mr.

---

[29] The circumstances surrounding the Benavidez assault are set forth more fully in Claim One, *supra.*

Dene failed to advise Mr. Caro that the conspiracy to commit murder conviction and resulting sentence would be used against him in the later capital case and, for that reason, he should not sign the plea agreement. (*Id.* ¶ 6.)

Mr. Dene knew that Mr. Caro was of limited education, had not completed high school, and had no understanding of the legal proceedings without the benefit of counsel. (*Id.* ¶ 7.) Mr. Dene also knew, because he had spent considerable time with Mr. Caro that Mr. Caro liked and trusted Mr. Dene. (*Id.* ¶ 8.) For this reason, Mr. Dene believes that if he had advised Mr. Caro to go to trial, then Mr. Caro would have gone to trial. (*Id.* ¶ 8.)

The consequence to Mr. Caro for Mr. Dene's failure to properly advise him was death. This consequence is so severe that defense counsel had a Sixth Amendment obligation to warn Mr. Caro in connection with his guilty plea. The Supreme Court recognized this obligation in *Hill v. Lockhart*, 474 U.S. 52 (1985). Similarly, the American Bar Association stated, as early as 1999, that it was a standard of practice for guilty pleas that attorneys should advise clients of the collateral consequences of guilty pleas. Am. Bar Ass'n, *ABA Standards for Criminal Justice: Pleas of Guilty* No. 14-3.2(f) (3rd ed. 1999). Indeed, numerous legal organizations had recognized this as a standard of competent guilty plea practice before Mr. Dene represented Mr. Caro in the Benavidez assault. *See Padilla v. Kentucky*, 130 S. Ct. 1473, 1482-83 (2010) (citing several professional standards from 1980s and 1990s as a basis for the *Strickland* finding that defense counsel was ineffective in failing to warn of the deportation consequences of a guilty plea).

The *Hill* and *Padilla* cases, as well as the ABA standards, have established that

121

severe consequences, such as parole ineligibility, deportation, or additional incarceration, even if collateral, must be warned. Moreover, subsequent federal cases have held that the *Padilla* holding was only a clarification of the *Strickland* duties, such that it applied to cases pre-dating *Padilla. See, e.g., United States v. Orocio,* 645 F.3d 630, 641 (3d Cir. 2011). Indeed, the *Orocio* decision, quoting *Padilla,* further observed that the Supreme Court's decision in *Hill v. Lockhart,* 474 U.S. 52 (1985), which applied a duty to warn of the consequences of a guilty plea to parole eligibility, did not "open the flood gates" as to such claims. *Id.* at 641. In other words, it has long been the case that such a failure to advise of significant collateral consequences was ineffective under professional standards and warranted habeas relief when prejudice results.

Prejudice is shown when there is a reasonable probability that, but for counsel's errors, a defendant would have gone to trial. *Hill,* 474 U.S. at 58-59; *see also Missouri v. Frye,* 132 S. Ct. 1399, 1409-10 (2012) ("In cases where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'") (*quoting Hill,* 474 U.S. at 59); *United States v. Akinsade,* 686 F.3d 248, 253-54 (4th Cir. 2012) (applying *Hill* standard to defendant who received bad advice as to immigration consequences, and assessing prejudice based on the strength of the government's trial case); *United States v. Mooney,* 497 F.3d 397, 404-05 (4th Cir. 2007) (applying *Hill* and finding prejudice where defendant pled guilty because counsel failed to advise him of a potentially successful affirmative defense); *United States v. Gajendragadkar,* No. 97-

122

7267, 149 F.3d 1171, at *2 (4th Cir. June 3, 1998) (unpublished opinion) (applying *Hill* to context of defendant who did not receive advice as to immigration consequences and who had a strong interest in remaining in the United States); *United States v. Lewis*, 477 F. App'x, 79, 81-82 (4th Cir. 2012) (unpublished opinion) (applying *Hill* to context in which defense counsel incorrectly advised defendant as to his criminal record (that he was a career offender) when he was not, and finding prejudice where this negated *Lewis* reason for pleading guilty). Mr. Caro would have gone to trial if his attorney had so advised him. (Dene Decl. ¶ 6.)

Had Mr. Caro proceeded to trial, there is a good chance the jury would have found him not guilty on the conspiracy to commit murder charge. As asserted by the government at the sentencing of co-defendant Moreno-Marquez, the evidence in this case was not particularly strong. In answering the Court's question as to why the government negotiated a plea agreement with Mr. Moreno-Marquez, Assistant U.S. Attorney Mountcastle stated: "because of the problems of going forward with proof in a jury trial with a totally uncooperative victim." (*See* ████ Ex. 55 (Moreno-Marquez Sentencing Transcript in case no. 2:03-cr-10115-JPJ), at 4-6.) That fact applied equally to Mr. Caro's case.

Not only was the proof of the case difficult, as admitted by the government, but the case was strikingly similarly to another USP-Lee prison assault case which was tried shortly before the guilty pleas were taken in this case. *See United States v. Edgar Garcia*, Case No. 2:03-cr-10110-JPJ (W.D. Va.). In that case, the government charged two defendants with a video-taped shank assault at USP-Lee. (Case No. 2:03-cr-10115-

123

JPJ, Indictment, 01/03/2006, Dkt. 2.) Like Mr. Caro, the defendants were charged with conspiracy to commit murder, assault with intent to commit murder and weapons possession. *Id.* The victim had many superficial shank cuts. (Declaration of Joseph Rasnic, 11/30/2012, attached as Ex. 6 at ¶ 4 (hereinafter "Rasnic Decl.").) Unlike the defendants in the *Benavidez* matter, defendants Edgar Garcia and Gilberto Jaramillo both went to trial. (Case No. 2:03-cr-10115-JPJ, Docket.) The jury's verdict acquitted each of the defendants of the serious charges, and convicted them on only the weapons possession charges. (*Id.* at Dkt. 26.) The rationale for doing so, even though the defendants were admitted knife men, was because the wounds were all superficial no serious injury had been intended. (Rasnic Decl. ¶ 6.) That same argument was available to Mr. Caro given the superficial nature of the wounds to Mr. Benavidez (Sealed Ex. 60 at 1 (Benavidez Treating Physician Note ██████████, 08/30/2003 noting that there was "no evidence of deeply penetrating injury")) and it is equally likely that he would have been convicted of a lesser offense.

### 2.    Trial Counsel Could Have Timely Challenged the Prior Conviction and Sentence, But Failed To Do So

Mr. Caro's judgment in the Benavidez assault was entered on November 1, 2004. Less than three months later, on January 25, 2005, the Court appointed both Stephen Kalista and James Simmons to represent Mr. Caro in the predecessor administrative case, Case No. 2:05-mc-1. The purpose of those appointments was to protect Mr. Caro's interests during the period in which the DOJ decided whether to file the case as a capital or non-capital case. The DOJ scheduled their death authorization meeting for June 6,

124

2005. (Letter to Kalista from Giorno, 03/18/2005).) Before this meeting, however, defense counsel knew that there was a significant possibility that the government would seek death in this case.

Defense counsel requested a copy of Mr. Dene's file early in the case (due to its importance), though the file which was provided did not contain discovery from the Benavidez assault.[30] There is no evidence, though, that defense counsel made any further efforts to get the Benavidez discovery. Mr. Kalista, who talked with Mr. Dene about his file by telephone, never asked Mr. Dene about his legal advice to Mr. Caro regarding the Benavidez assault guilty plea and failed to obtain a complete copy of Mr. Dene's file. (Dene Decl. ¶ 10.) This failure was not strategic.

Both Mr. Kalista and Mr. Simmons knew or should have known from the time of their appointment that the conviction and sentence in the Benavidez assault would be significant, if not the *most* significant, evidence in the government's aggravation evidence pertinent to Mr. Caro's prior record. Mr. Caro's three previous drug convictions from Texas were non-violent. Mr. Caro was involved in a gang fight while at FCI-Oakdale, but that incident did not involve serious injuries and did not result in any criminal charges. Only the Benavidez assault involved a prior conviction for a significant crime of violence. This prior case also was a local one, over which the very same judge had presided. Considering these circumstances, counsel had sufficient red flags and time to investigate the Benavidez case and timely file a motion to vacate or set aside the

---

[30] This belief is based on undersigned counsel's review of trial counsel's files.

125

conviction pursuant to 18 U.S.C. § 2255.

Mr. Kalista and Mr. Simmons had a duty to investigate aggravating evidence, including obtaining the full file of Mr. Dene and fully interviewing Mr. Dene. *See* ABA Guidelines No. 10.7.B.1 (2003), *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005). Trial counsel also had an obligation to move to set aside the conviction pursuant to 28 U.S.C. § 2255 as invalid due to Mr. Dene's ineffectiveness in representing Mr. Caro in the Benavidez assault. ABA Guidelines No. 10.7cmt. (stating that "Counsel must investigate prior convictions . . . that could be used as aggravating circumstances . . . .If a prior conviction is legally flawed, counsel should seek to have it set aside."); *see also* Hammond Decl. ¶ 35. "Whether within the criminal case or outside of it, counsel has a duty to pursue appropriate remedies if the investigation reveals that such conditions exist." ABA Guidelines No. 10.7 cmt.; *cf. Johnson v. Mississippi*, 486 U.S. 578, 586 (1988) (holding that denial of post-conviction relief violated the Eighth Amendment when the aggravating evidence included a conviction that was later vacated); *Amadeo v. Zant*, 486 U.S. 214, 219 (1988) (federal habeas corpus petitioner pursued independent litigation to establish a factual predicate that was then used to establish a jury discrimination claim in his habeas petition). Trial counsel's failure to adequately investigate the Benavidez assault and pursue a collateral attack on the prior conviction fell below the standard of care for capital defense attorneys. (Hammond Decl. ¶ 45.)

### 3. Trial Counsel's Failure to Investigate and Challenge the Prior Conviction in the Benavidez Assault Prejudiced Mr. Caro

Trial counsel's failure to challenge Mr. Caro's underlying conviction in the

126

Benavidez assault prejudiced Mr. Caro. It allowed the government to present Mr. Caro as a violent inmate, who, due to his lengthy consecutive sentences, was already facing prison for the rest of his life. It allowed the government to argue that Mr. Caro must receive the death penalty or otherwise he would receive "zero punishment" for his offense. (Tr. 02/13/2007 at 26, 89, 94.) Several jurors stated that the fact that Mr. Caro was facing a *de facto* life sentence already influenced their decision to vote for death, and without this existing sentence, they might not have voted for the death penalty. (*See, e.g.*, Juror # 33 Decl.; Juror # 24 Decl.) Each of these arguments, under the holding in *Johnson*, 486 U.S. at 586, could have been "undone" by a proper § 2255 motion to vacate the conviction. As such, the failure to advise Mr. Caro and challenge the prior conviction constitutes prejudice within the meaning of *Strickland*, *Hill*, *Padilla* and *Wiggins*, 539 U.S. at 537.

**4.    This Court Should Stay Its Decision in This Case Pending Its Decision on the § 2255 Motion filed in Case No. 2:03-cr-10115-JPJ**

Mr. Caro will file a separate § 2255 motion in Case No. 2:03-cr-10115-JPJ (W.D. Va.), for the reasons discussed *supra*. Mr. Caro is entitled to an order either staying this matter pending the resolution of the § 2255 motion in Case No. 2:03-cr-10115-JPJ, or for a joint scheduling order which results in a resolution of the 28 U.S.C. § 2255 motion in Case No. 2:03-cr-10115-JPJ before the § 2255 motion in this case. The Supreme Court has concluded that the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants. *Landis v. North Am. Co.*, 299 U.S. 248,

127

254 (1936). Federal courts have wide ranging powers to shape relief and procedures to effectuate habeas corpus jurisdiction. *Harris v. Nelson*, 394 U.S. 286, 291 (1969). Here, Mr. Caro requests that the Court stay these proceedings so that the holding in *Johnson v. Mississippi* can be given full effect while he challenges his underlying conviction. *See* 486 U.S. at 584-87.

### G. Trial Counsel Failed to Present *Skipper* Evidence To Rebut Aggravating Evidence

The Eighth Amendment requires the sentencer in a capital case to consider, *"as a mitigating factor*, any aspects of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586 604-05 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, due process requires that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362 (1977). Trial counsel's representation fell below the standard of care in failing to present such explanatory, mitigating evidence on behalf of Mr. Caro.

### 1. Evidence of Circumstances Surrounding Guilty Plea in the Benavidez Assault

During the penalty phase of the case, the government presented—by unchallenged stipulation—that Mr. Caro had been convicted in Case No. 2:03CR10115 (W.D. Va.) of conspiracy to commit murder, for which had had received a consecutive sentence of 327 months (over 27 years). (Tr. 02/05/2007 at 105-06.) What the jury was not told, and

128

should have been told by defense counsel, was that Mr. Caro's guilty plea to conspiracy to commit murder was a selfless act by Mr. Caro, which carried no benefit and every disadvantage for him. (*See* Claim Six-F; Claim One, *supra,* incorporated herein by reference.)[31] Unbeknownst to the jury, Mr. Caro's plea agreement was specifically tailored to give an equally culpable co-defendant, Mr. Moreno-Marquez, a chance to get out of prison as a young man. Mr. Moreno-Marquez's plea to possession of a weapon was contingent on Mr. Caro pleading guilty to conspiracy to commit murder. With the deal, Mr. Moreno-Marquez, still a young man with little time left to serve, faced a maximum sentence of five years. Without the deal, Mr. Moreno-Marquez, a career criminal with 28 criminal history points, faced a sentence comparable to the 27-year sentence received by Mr. Caro.

> **2.** **Evidence that the BOP Considered Mr. Caro a "Good Inmate," Appropriate for Housing at USP-Marion or ADX-Florence**

Throughout the sentencing phase of the trial, from opening argument and direct testimony through rebuttal testimony of Mr. Hershberger and closing argument, the government presented Mr. Caro as a dangerous person who could not be safely housed in the Bureau of Prisons. (Tr. 02/5/2007 at 46; Tr. 02/12/2007 at 163; Tr. 02/13/2007 at 20, 34, 38-39.) Trial counsel had a professional obligation to use all reasonably available evidence to rebut that evidence and argument. Once such piece of evidence, never

---

[31] While Mr. Caro is now challenging the validity of that conviction, but trial counsel did not. It was therefore imperative for counsel to use circumstances of that case to assist them in mitigating the crime.

introduced by counsel, is the opinion of Dr. M. Geyer, the psychologist who evaluated Mr. Caro monthly from the time of Mr. Caro's placement in the SHU until his transfer to ADX-Florence more than a year later. In particular, Dr. Geyer evaluated Mr. Caro on 09/07/2004 to determine his suitability for placement at ADX-Florence or USP Marion.

In his discussion of Mr. Caro's history and background, Dr. Geyer stated:

> His violence while incarcerated appears to be gang related and tied directly to his involvement with the TS. . . . Inmate *Caro has not been a disruptive inmate or violent in any other settings* unless he was involved with TS activities.

(Psychological Evaluation ██████████, 09/07/2004, attached as Sealed Exhibit 56 at 2.) Later, when discussing Mr. Caro's risk of future violence, Dr. Geyer opined:

> With regards to violence prediction, it appears that Inmate Caro has only acted aggressively with other Texas Syndicate gang members. His violence appears to be instrumental rather than impulsive. Inmate Caro is pleasant to interact with professionally and *other staff at this facility have described him as a "good inmate."*

(*Id.* at 3 (emphasis added).)

This report and numerous others reflect a person who is amenable to supervision within the correctional system and who is not violent by nature. It is inconceivable that this information would not be placed before the jury to rebut the government's characterization of Mr. Caro as a dangerous, violent individual. Dr. Geyer, the prison's own psychologist, did not consider him violent ordinarily. Dr. Geyer reported that other staff at the prison considered Mr. Caro to be a good inmate. This totally contradicts the image portrayed by the government at trial. Further, this information was *known* to trial counsel. By letter half a year before the government filed its indictment against Mr.

130

Caro, Mr. Kalista wrote a letter to his co-counsel, enclosing a copy of the 09/07/2004 report, stating that they should talk to Dr. Geyer. (Letter to Simmons from Kalista, 06/06/2005.) Regrettably, nothing in counsel's file indicates that this was ever followed up on, and Dr. Geyer's observations and opinions were never presented to the jury.

### 3.    Mr. Caro's Concern for the Well-Being of Others

Instead of the cold-blooded, uncaring person that the government portrayed, incidents in Mr. Caro's BOP file revealed him to be a caring person with redeeming qualities. For example, Psychology Round Notes of 01/22/2004 noted that Mr. Caro "initiated a conversation to advise that another inmate was experiencing psychological distress." (Psychology Round Notes, 01/22/2004, attached as Sealed Ex. 57.) Again, this side of Mr. Caro was not presented to the jury.

None of the above facts were presented to the jury during Mr. Caro's trial. Moreover, there was no valid strategic reason for counsel's failure to do so. Rather, it appears that the failure to offer this evidence was attributable to counsel's failure to obtain, review, and understand the importance of the information available to counsel. The demands of capital defense investigation and competent understanding of mitigation evidence is not met by superficial inquiries which fail to seek and present ready sources of information. *Wiggins*, 539 U.S. at 525. All of the above information was readily available to trial counsel, in review of attorney Dene's file in the conspiracy to murder case and in the discovery provided by the government in this case. Counsel's failure to appreciate the significance and follow up on this information was not effective assistance of counsel under the controlling legal standards.

Counsel's failure to present mitigating evidence to rebut the government was gravely prejudicial to Mr. Caro, allowing the government to mischaracterize Mr. Caro as a violent, selfish person who killed over breakfast, when in fact, Mr. Caro was a caring person who was willing to spend the rest of his life in prison so that a younger man, Mr. Moreno-Marques, could leave prison quickly. There is a reasonable probability that "at least one juror would have struck a different balance" at the penalty phase if this evidence had been presented. *Wiggins*, 539 U.S. at 537.

## H. Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell

As discussed in Claim Four-C *supra*, trial counsel failed to present evidence related to the BOP's placement of Mr. Sandoval in the cell with Mr. Caro. Mr. Caro's counsel's deficient performance as discussed in Claim Six-H, also prejudiced him at the penalty phase. Had this evidence been presented, there is a "reasonable possibility that, but for counsel's unprofessional errors, the result of the proceedings" would have been different and "at least one juror would have struck a different balance" as to the evidence. *Wiggins*, 539 U.S. at 534, 537. Juror # 24 has stated that information that "Sandoval had been caught with a prison shank" and that "the guards acted negligently and contrary to sound correctional practices in regards to the housing of Caro and Sandoval" "would have made a difference" and "could have influenced [the juror's] decision." (Juror # 24 Decl.) Juror # 47 similarly has stated that knowledge that "Sandoval was sent to the SHU because he had a shank" "would have affected [the juror's] decision." (Juror # 47 Decl.)

132

## I. Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instances of Violence By Persons Other than Mr. Caro

Before trial, defense counsel sought discovery regarding future dangerousness, including information about violent acts by other inmates. *See United States v. Caro*, 461 F. Supp. 2d 478, 480-81 (W.D. Va. 2006). This Court denied the discovery request, but did so in reliance on the government's representation that it did not intend to introduce such data. *Id.* at 482. This Court further ordered that the "government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness." *Id.* Despite the Court's order, the government still introduced specific acts of violence through its witnesses. Trial counsel, however, failed to object to the government's introduction of evidence of specific instances of violence, evidence that was in clear violation of the district court's order. Had trial counsel objected, the Court would have had no choice but to sustain the objection. Counsel's failure to object to these errors was deficient performance that prejudiced Mr. Caro by allowing jurors to be influenced by these harmful facts.

Contrary to the district court's order, the government did in fact use instances of violence by third parties to suggest to the jury that Mr. Caro receive the death penalty. For example, Daniel Olson, an expert crypto-analyst employed by the government, testified at trial that inmates other than Mr. Caro—Aryan Brotherhood inmates—used a coded letter to transmit an order from ADX-Florence to USP-Lewisburg which resulted in the death of two African-American inmates. (*See* Tr. 02/06/2007, Dkt. 683 at 25, 35, 37.) Defense counsel objected to the testimony based on hearsay, but failed to argue that

133

this use of "specific instances" violated the district court's prior order as well as the holding in *Zant*. *Id.* at 29.

The evidence about Aryan Brotherhood inmates was prejudicial and wholly unrelated to a Hispanic-American inmate with no association to the Aryan Brotherhood. Eight of the government's twelve witnesses—Mrad, Nors, Fender, Brown, Summers, Blaze, Gordon and Guzman—discussed various aspects of two coded letters that involved Mr. Caro. (*See,e.g.*, Tr. 01/31/2007 at 57-59; Tr. 02/06/2007 at 16-21; Tr. 02/05/2007 at 111-13; Brown testimony Tr. 02/05/2007 at 122-29.) However, none of these witnesses testified that Mr. Caro's letters contained any threats of violence or ordered killings; nor could they have because the letters contained no such threats or orders. After the testimony and cross-examination of these eight witnesses, the government called Daniel Olson, who did not testify about Mr. Caro or his letters or the ability of inmates in general to send out coded letters. Instead, he testified about a specific coded letter sent by an Aryan Brotherhood inmate to order a killing. (Tr. 02/06/2007 at 27-38.) This specific instance of violence was not only not necessary for the government's argument, it was highly prejudicial, and was intended to inflame the fears and confusion of the jury. No longer were the jurors considering the possible future danger of Mr. Caro, but considering the danger of a completely different person.

This was not the only time in this trial that the government violated the court's order and presented evidence of violent acts by others. To counter the government's aggravating factor of future dangerousness, the defense called Mark Cunningham, who argued that Mr. Caro, though dangerous, would pose no danger at ADX-Florence because

134

he would be single-celled and would not have access to other inmates. (*See* Tr. 02/12/2007 at 65-80.) During the cross-examination of Dr. Cunningham, the prosecutor, without objection, asked questions about another defendant's case in which Dr. Cunningham was an expert. The prosecutor asked if that defendant was a member of Al Qaeda (*id.* at 87-88), and then further asked if he built the bomb to blow up American embassies (*id.* at 88). Despite this irrelevant and prejudicial evidence being introduced, trial counsel did not object. (*Id.*)[32]

The government also introduced, without objection, evidence that three terrorists managed to send out coded letters from ADX. (*Id.* at 119.) Neither the government nor defense counsel included the additional information that this occurred in 2002-2004 and that the DOJ study cited by the government for this information also stated that, "Since issuance of the report, the BOP has reported that it is now monitoring 100 percent of terrorist inmates' mail and telephone calls and is translating and screening all correspondence to and from terrorist inmates written in a foreign language."[33]

The government's witness Mr. Hershberger continued with additional irrelevant and prejudicial evidence, without objection, that twenty years earlier, an inmate at USP-Marion murdered two officers and seriously wounded two other officers. (*Id.* at 188, 198.) Mr. Hershberger also testified, without objection, that another inmate murdered an

---

[32] The Court, on its own, gave a limiting instruction regarding this testimony but such instruction could not "unring" the bell that counsel could have easily prevented through a timely objection.

[33] DOJ, Top Management and Performance Challenges in the Department of Justice § 6 (2006), *available at* http://www.justice.gov/oig/challenges/2006.htm (last visited 01/07/2013).

inmate at USP-Leavenworth, an inmate at USP-Marion, and an officer at USP-Marion. (*Id.* at 208.) None of this testimony about other violent inmates had anything to do with Mr. Caro, and violated the district court's order, yet defense counsel failed to object to any of it.

The failure to object to the improper "specific instances" testimony constitutes ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687; *see also Lyons v. McCotter*, 770 F.2d 529, 535 (5th Cir. 1985) (holding that failure to raise a meritorious objection was below professional standards and prejudiced the defendant); ABA Guidelines, No. 10.8 cmt. & n. 227 (noting duty of counsel to preserve error to prevent wrongful convictions and death sentences).

The introduction of violent conduct by other inmates removed from trial any possibility that Mr. Caro would be sentenced solely on his own conduct and was prejudicial in and of itself and also when considered in light of the cumulative error in this case. *See* Claim 16 *infra*.

### J. Trial Counsel Failed to Object to the Government's Improper Arguments Made During Closing Statement

The Government made several improper arguments during closing statement that prevented Mr. Caro from receiving a fair sentencing. Counsel should have objected to the prosecutor's unconstitutional arguments. Had they done so, Mr. Caro's jury may not have been improperly influenced by these statements.

136

## 1.    The Government Improperly Argued to the Jury that It Should Control Mr. Caro by Imposing the Death Penalty

The government argued in its closing, without objection, that it was the responsibility of the jury to "control" Carlos Caro and the only means to do so was by imposing the death penalty. (Tr. 02/13/2007 at 97-98.) The Court of Appeals held that this argument was improper. *United States v. Caro*, 597 F.3d 608, 625-26 (2010). The argument was improper because it invited the jury to take on the role of "law enforcement" rather than the neutral role assigned to the jury. *Id.* (*citing United States v. Young*, 470 U.S. 1, 18 (1985); *see also Viereck v. United States*, 318 U.S. 236, 247-48 (1943) (holding that prosecutor's argument that jury had to "do your duty" by convicting the defendant was "highly prejudicial"). The Fourth Circuit, however, found that this error did not prejudice Mr. Caro.[34]

## 2.    The Government Improperly Argued to the Jury that Unless Mr. Caro Received the Death Penalty There Would    Be No Punishment for the Death of Roberto Sandoval

During trial, the government also argued on several occasions, without objection, that the death penalty was necessary for Mr. Caro because otherwise he would receive "zero punishment" by the imposition of a life-without-parole sentence. (Tr. 02/13/2007

---

[34] *But see United States v. Wilson*, 135 F.3d 291, 297-98 (4th Cir. 1998) (*citing Darden v. Wainwright*, 477 U.S. 168, 181 (1986)) and holding that improper jury argument which infected the trial was a violation of due process under the Fifth Amendment); *see also Lesko v. Lehman*, 925 F.2d 1527, 1540-41 (3rd Cir. 1991) (granting habeas relief where prosecution argued that the jury had a "duty" to even the "the score" by putting the defendant to death); *Cargle v. Mullin*, 317 F.3d 1196, 1220-21 (10th Cir. 2003) (holding that cumulative error in jury arguments and ineffective assistance, which so infected the trial as to deny due process, required habeas relief).

at 26, 89 and 94.) In fact, the government went so far as to argue, without objection, that the failure to return a death verdict would mean that Mr. Caro would return to prison as a "conquering hero." (*Id.* at 89.) The Fourth Circuit, on direct review of the conviction, agreed that the government's arguments about sending a message that you could kill without punishment were "improper," because they diverted the jury from an "individualized [sentencing] determination on the basis of the character of the individual and the circumstances of the crime" as required by federal law. (*quoting Zant v. Stephens*, 462 U.S. 862, 879 (1983)). *Caro*, 597 F.3d at 626 n.17. Nevertheless, no remedy was ordered because the panel determined that, in light of the other facts of record, there was no prejudice. *Id.*

> 3. **The Government Violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi* by minimizing the jury's responsibility**

As discussed in Claim Eight, *infra*, trial counsel failed to argue that the government violated Mr. Caro's rights under the Eighth Amendment and *Caldwell v. Mississippi*, 472 U.S. 320 (1985), when it made improper statements in closing argument that attempted to minimize the jury's responsibility regarding Mr. Caro's sentence, and by making other misleading statements to the jury regarding the capital sentencing process. The government was able to minimize the severity of a death sentence by shifting the emphasis away from the act of putting a defendant to death, and encouraging the jury to focus instead on what it called "the law." (Tr. 02/13/2007 at 98.) Counsel's failure undermines confidence in the outcome of the penalty phase because had they objected to the government's misleading statements about the applicable law and the

138

significance of a death verdict, it might have influenced at least one juror to vote for a life sentence.

> **4.    Defense Counsel Was Ineffective for Failing to Object to the Prosecutor's Unconstitutional and Prejudicial Statements**

Such appeals to the passion and prejudice of a jury violate the right to due process of law under the Fifth and Fourteenth Amendments. *See United States v. Wilson*, 135 F.3d 291, 297-98 (4th Cir. 1998) (*citing Darden v. Wainwright*, 477 U.S. 168, 181 (1986) and holding that improper jury argument which infected the trial was a violation of Due Process under the Fifth Amendment); *Cargle v. Mullin*, 317 F.3d 1196, 1220-21 (10th Cir. 2003) (holding that cumulative error in jury arguments and ineffective assistance, which so infected the trial as to deny due process, required habeas relief). The Federal Death Penalty Act of 1994 likewise provides that no judgment of death may be affirmed when imposed "under the influence of passion." 18 U.S.C. § 3595(c)(2)(A); *see also People v. Kuntu*, 752 N.E.2d 380, 403-04 (Ill. 2001) (holding that the prosecution argument that a life sentence for a killer of multiple persons would give him five "free" murders was an improper appeal to passion and citing cases); *United States v. Solivan*, 937 F.2d 1146, 1148, 1153-55 (6th Cir. 1991) (holding that prosecution's remarks to "tell her [the defendant] and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky" were extremely prejudicial and violated defendant's right to a fair trial); *United States v. Sanchez*, 659 F.3d 1252, 1256-57 (9th Cir. 2011) (reversing jury verdict based on an improper "send a message" argument by the government and citing cases).

The failure of defense counsel to object to clearly improper arguments was deficient performance. *See* ABA Guidelines No. 10.8 cmt. & n. 227 (noting duty of counsel to preserve error to prevent wrongful convictions and death sentences); *Lyons*, 770 F.2d at 535; *Northrop v. Trippett*, 265 F.3d 372, 383-84 (6th Cir. 2001) (holding that failure to move to suppress evidence constituted ineffective assistance and prejudiced the defense).

The Fourth Circuit's conclusions that there was no prejudice from counsel's failure to object (Subclaims J1 and J2)[35] must now be re-weighed in light of the additional facts and arguments presented on this modified record. *Cf. Wiggins*, 539 U.S. at 537. In this case, the errors in jury argument (including both the error in commenting about the defendant's silence and the error in asserting that the jury had a law enforcement role, as well as the prosecutor's attempt to minimize the jury's responsibility) by themselves or when coupled with the other errors in these proceedings, constitute more than enough error to create a reasonable probability of a different result by a single juror. For example, Juror # 33 stated that the "single most important factor in [his] decision for the death penalty was that Carlos Caro was already serving a sentence that amounted to life in prison, so giving him a life sentence would have been, in effect, giving him no punishment for the homicide. This was not acceptable." (███ Ex. 30 (Decl. of Juror # 33.)) Juror # 24 similarly stated that one of the factors influencing her decision was that giving Mr. Caro a life sentence would not be any punishment. (Juror #

---

[35] The Fourth Circuit did not review Subclaim J3 because, as alleged in Claim Nine D, appellate counsel failed to raise the issue.

140

24 Decl.)

**K. Trial Counsel Failed to Accept the Invited Excuse of a Frequently Sleeping Juror, and the Court Violated Mr. Caro's Fifth and Fourteenth Amendment Due-Process Rights and Sixth Amendment Jury Trial Right by Failing to Excuse the Juror**

Juror # 33 first introduced himself to the Court during voir dire as the sole operator of a used car lot in Tazewell, Virginia. (Tr. 01/22/2007 at 99-100; *see also* Questionnaire of Juror # 33, attached as ███████Ex. 39.) As sole operator of a used car lot, he asked the Court to excuse him because other family members were not available to operate the used car lot in his absence. (Tr. 01/22/2007 at 99-100.) Based on that explanation, defense counsel asked that Juror # 33 be excused because he could not concentrate on the trial given his work situation. (*Id.* at 139-40.) The government objected because it believed, contrary to Juror # 33's assertion, that his father and brother could assist in the business and in any case placing the hardship on the juror was appropriate. (*Id.* at 138-39.) After this exchange, the district court determined not to excuse Juror # 33. (*Id.* at 140-42.)

Juror # 33 later had multiple problems staying awake during trial. The first problem noted on the record occurred on February 5, 2007, when the district court voiced the following concerns:

> THE COURT: Counsel, Juror Number 33, who is the young man seated in the back on the end, has been nodding off some. And obviously I'm concerned about that, particularly in view of the importance of these proceedings. And what I intend to do is see what he does after lunch, but I am concerned about his situation, and would be interested in any comments that counsel may have in that regard. So, we'll take our luncheon recess and we'll be in recess for one hour.

(Tr. 02/05/2007 at 105.)  Several noteworthy events occurred during the morning of February 5, 2007.  The jury heard stipulations and instructions as to its "eligibility findings" and returned a verdict on eligibility; the jury heard opening statements from counsel regarding the penalty phase; and the jury heard the direct and cross-examination of government witness David Mrad about the use of coded letters in prison.  (*Id.* at 1-104.)  Counsel did not comment on this issue upon return from lunch.  (*Id.* at 105.)  Counsel also did not comment at the end of the day.  (*Id.* at 181-82.)

The problems with Juror # 33 were again noted on the record two days later, on February 7, 2012, when the district court voiced additional concerns:

> THE COURT:  Counsel, we are still having a problem with juror # 33 who appears to continue to sleep.  He's near to me at the end of the second row. He has his hand in front of his face, and his eyes closed, and he did that a lot this morning.  He was better yesterday, but as I indicated, we had another problem today.  And I'm inclined to, to discharge that juror.  I want to give counsel an opportunity to give me their views, either now or before we come back.

(Tr. 02/07/2007 at 66.)  The government opposed excusing the juror and suggested that the district court talk with him before excusing him.  (*Id.*)  Defense counsel agreed with the suggestion to question the juror, and noted that he might be affected by medication or nighttime work.  (*Id.* at 66-67; *see also* ████ Ex. 39 at 20 (juror noting that defendant takes medication for asthma.))

When the juror was questioned, he said that he was having trouble sleeping and also having trouble with an anxiety problem.  (*Id.* at 67.)  He said that he heard the evidence and that he would bring to the court's attention any further problems he might

have. *Id.* at 67. Before the court's comment in the morning of February 7, 2012, the defense had presented the testimony of expert James Aiken about control measures in maximum security.

Later in the proceedings, the district court noted that Juror # 33 seemed to be following the court's admonitions and "had done alright" such that he would not be removed. (Tr. 02/12/2007 at 218.) However, the very next day the Court brought to the parties' attention yet a third issue regarding Juror # 33, when the juror advised the Court's security officer that he had had anxiety problems yesterday and that his anxiety may force him to leave the courtroom today. (Tr. 02/13/2007, Dkt #687 at 12-13.) On February 12, 2007, the day Juror # 33 suffered anxiety problems, the jury heard from defense expert Mark Cunningham about security measures at ADX-Florence and the ability of the BOP to control Mr. Caro without future danger. On February 13, 2007, the jury heard final argument and jury instructions and then returned its verdict of death.

Notwithstanding the multiple warnings of Juror # 33's anxiety, sleeping, and lack of attention, defense counsel never moved to strike him. This failure to strike cannot be excused as a strategy call as counsel, during jury selection, had rated the first alternate, Juror # 18, favorably with a "+", and Juror # 33 negatively, with a "-". (Juror Rating Sheets, 01/25/2007.) Moreover, as of February 7, 2012, Juror # 33 already had returned two negative verdicts against Carlos Caro in very quick succession.

The failure of defense counsel to object to the continued sitting of Juror # 33 violated Mr. Caro's Sixth Amendment right to effective assistance of counsel. *See Strickland*, 466 U.S. at 687; *Lyons*, 770 F.2d at 535; ABA Guidelines No. 10.8 cmt & n.

227 (noting duty of counsel to preserve error to prevent wrongful convictions and death sentences); Hammond Decl. ¶ 51.)

The continued presence of Juror # 33 on the jury denied Mr. Caro his right to a fair trial and reasoned jury verdict by 12 impartial jurors. This "right to an impartial adjudicator, be it judge or jury" is "'so basic to a fair trial that its infraction can never be treated as harmless error.'" *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (*quoting Chapman v. California*, 386 U.S. 18, 23 (1967)). The Supreme Court further explained that: "As was stated in *Witherspoon*, a capital defendant's constitutional right not be sentenced by a 'tribunal organized to return a verdict of death' surely equates with a criminal defendant's right not to have his culpability determined by a 'tribunal "organized to convict."'" *Id.* (*quoting Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). The right to an impartial jury determination is so strong that when a single juror is affected prejudice must be presumed. *See, e.g., Stone v. United States*, 113 F.2d 70, 77-78 (6th Cir. 1940).

These principles have been applied to sleeping jurors in non-capital cases. One such example is *United States v. Barrett*, 703 F.2d 1076, 1082-83 (9th Cir. 1983). In *Barrett*, a juror admitted that he was sleeping during trial, but the trial judge decided not to inquire into the matter because the juror was not, in his opinion, sleeping. The Court of Appeals reversed because, on such error, it was plain error to not further inquire into the juror's conduct. Similar holdings have been reached by the state courts in instances of sleeping jurors and require reversal of verdicts reached by sleeping jurors. *See, e.g., People v. Simpkins*, 792 N.Y.S. 2d 170, (N.Y. App. Div. 2005) (holding that a juror who

144

repeatedly slept was grossly unqualified and that the resulting verdict must be reversed for new trial); *People v. Evans*, 710 P.2d 1167, 1168 (Colo. App. 1985) (requiring new trial in case of sleeping juror); *People v. Jones*, 861 N.E.2d 276, 280 (Ill. App. Ct. 2006) (requiring new trial or hearing for sleeping juror).

Perhaps the clearest statement of the law as to sleeping juror was given in *State v. Majid*, 914 N.E.2d 1113 (Ohio Ct. App. 2009), a capital case.  It established the following: (1) sleeping by a juror is a form of jury misconduct; (2) a juror who sleeps during trial cannot be expected to perform his duties; (3) the removal of such a juror is a prerogative of the trial court and does not require the consent of the parties; (4) numerous instances of sleep by a juror constitute a denial of due process of law and require reversal of the conviction (since the prejudice flows from the substantial nature of the juror misconduct). *Id.* at 1115-16.

In the instant case, the situation was worse than in *Barrett* and like that in *Majid*. Juror # 33, as observed on multiple occasions during trial, was either sleeping or otherwise inattentive.  This was observed during the presentation of crucial testimony, instructions and argument.  Juror # 33 announced on the last day of the penalty phase trial that he was "anxious"–the same term he had used earlier to describe his inattentiveness or sleepiness.  Given such circumstances, defense counsel's failure to challenge the juror constitutes ineffective assistance of counsel and prejudice because such a juror cannot, consistent with *Witherspoon*, *Barrett* and *Majid*, and the other cases cited, fairly

145

adjudicate the death penalty.[36]

### L. Counsel's Deficiencies, Both Individually and Cumulatively, Prejudiced Mr. Caro

Counsel's performance, as described above, was deficient. The Supreme Court has instructed that when making a prejudice determination in a claim of ineffective assistance of counsel, the "must consider the totality of the evidence before the judge or jury." *See, e.g., Strickland*, 466 U.S. at 695. All of the information that has been alleged throughout this motion must be considered. In this case, evidence rebutting the government's aggravating factor of future dangerousness and presenting mitigating evidence about Mr. Caro himself was essential to mitigate the government's argument that Mr. Caro was a remorseless killer whom the BOP could never control. While Mr. Caro may not have "overcome a finding of future dangerousness," the information that was presented was never presented to the jury "might well have influenced the jury's appraisal of his moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

---

[36] This argument is also consistent with the Fifth Circuit's ruling in *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001) (en banc). In that case, when defense counsel slept through not insubstantial portions of the trial, the Court of Appeals presumed prejudice because of his inability to assist the defendant during those times. In the same way, when a juror, as is apparent from this record, sleeps on multiple occasions during a trial, the resulting verdict must be viewed as both the product of ineffective assistance (in failing to challenge the juror) and prejudice, since it cannot be known with certainty how the omitted testimony, argument or instructions may have influenced the consideration of the many aggravating and mitigating factors presented.

146

**CLAIM SEVEN:   BY WITHHOLDING MATERIAL EXCULPATORY AND
IMPEACHMENT   EVIDENCE,   AND   PRESENTING   MISLEADING
PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE
GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH,
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

On January 11, 2006, the government filed its Notice of Intent to Seek the Death
Penalty, listing future dangerousness as one of two non-statutory aggravating factors.
(Notice of Intent to Seek Death Penalty, 01/11/2006, Dkt. 8.)   One of the main future
dangerousness disputes during the penalty phase was the BOP's ability—or inability—to
securely and safely house dangerous inmates at ADX-Florence or other USPs.   In an
ironic twist, the government argued that the BOP was *not* capable of safely and securely
housing its inmates, while the defense argued the opposite.   The government specifically
argued that, in spite of how dangerous it claimed Mr. Caro to be, the BOP could only
*temporarily* house him it its most secure facility, ADX-Florence.   In support of this
aggravating factor, the government also alleged that Mr. Caro "has occupied a leadership
position in a violent gang." (*Id.* at 3.)

Defense counsel made numerous requests for *Brady* material.   Counsel first sent a
letter to the government on March 14, 2005, thanking the AUSA for providing Mr.
Caro's Central BOP file, and also specifically requested "any other materials . . . relevant
to mitigation." (Kalista Letter, 3/14/2005.)   Counsel next filed a Motion for Exculpatory
Evidence, requesting both information that may be favorable to Mr. Caro on the issues of
guilt and punishment, as well as impeachment evidence that would tend to diminish the
credibility of the government's witnesses.   Counsel requested   the   disclosure   of   "any
statements, written or oral, of any government witnesses which are favorable" to Mr.

Caro. Counsel further requested that the government provide the material in sufficient time before trial to allow the defense to "use such evidence in a meaningful way." (Mot. for Exculpatory Evidence, Dkt. 19.)

Finally, counsel filed a second Motion for Exculpatory Evidence that was specifically related to penalty phase information. In addition to repeating its general Brady claims, counsel specifically requested information regarding the length of stay of inmates at ADX-Florence. Counsel also noted, correctly, that they anticipated that the government would present evidence of Mr. Caro's "membership position in a prison gang." (Mot. for Exculpatory Evidence Related to Penalty Phase Information, 10/03/2006, Dkt. 307 at 2.)

## A.    The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and Its Predecessor Prison, USP-Marion, for More than Three Years.

A significant part of the government's future dangerousness argument rested on the proposition that if Mr. Caro was sent to ADX-Florence, the highest security facility within the BOP system, his stay would be temporary—three years—and that inevitably he would return to general population at another facility. Thus, the government urged the jury to find that there was no way to ensure that Mr. Caro would not kill again. (*See* Tr. 02/13/2007 at 35 (asking whether jury can rely on BOP to send Mr. Caro to "a place where he won't kill again"); *id.* at 88 (asking jurors whether they had any doubt that Mr. Caro will "kill again"); *id.* at 93 (same).)

In their second *Brady* request, defense counsel asked for specific information and

148

documents regarding the length of stay for inmates housed at ADX-Florence, as well as the disciplinary record of inmates after they had committed the murder of another inmate (Carlos David Caro's Mot. for Exculpatory Evidence Related to Penalty Phase Information, 10/03/2006, Dkt. 307.) At a pretrial hearing on the motion, the government asserted that it intended to argue that an inmate's stay at ADX-Florence was temporary and conceded that the defense was entitled to documents that would refute this assertion. (Tr. 11/03/2006 at 29-30 (pretrial hearing).) The government also generally agreed that the defense was entitled to data that refuted the government's opinion and that it was obligated to turn this information over to the defense. (Tr. 11/03/2006 at 37 (pretrial hearing).)

The magistrate judge granted Mr. Caro's second *Brady* motion for specific documents and information (Order, 11/06/2006, Dkt. 344), but the government filed an objection (Objection to the Order of the Magistrate Judge, 11/08/2006, Dkt. 345). The district court granted the government's objection on the ground that the defense could only speculate as to the content of the requested information and thus had not shown that it was material evidence favorable to the accused. (Opinion and Order, 11/20/2006, Dkt. 363.)

The government presented testimony through Mr. Hershberger, a retired BOP employee and former warden at the ADX-Florence for one-and-one-half years (Tr. 02/12/2007 at 174) that ADX-Florence could not keep Mr. Caro at ADX for an extended period of time. Rather, ADX-Florence would be forced to place him in the three-year step down program where he would advance in the absence of misconduct and if he

149

showed responsibility, and within a relatively short period of time, BOP would have no choice but to move him back into an open population environment. (*See, e.g.*, Tr. 02/12/2007 at 177 (goal is to work inmates through a minimum 3-year program); *id.* at 183 (goal of the ADX control unit is to return the inmate to open population); *id.* at 202 (step down is automatic if there is no misbehavior and inmate shows responsibility); *id.* at 200-03 (inmate who killed another inmate would be in the three-year program).) Indeed, when asked about Thomas Silverstein, an inmate who had been housed at ADX for a longer period of time, [37] Mr. Hershberger explained that Mr. Silverstein was a "very special case." (*Id.* at 201.)

The government emphasized to the jury in its closing argument that Mr. Caro would eventually be transferred from ADX-Florence. (Tr. 02/13/2007 at 34 ("We know that if, if Carlos Caro goes to that facility, he's not going to stay there. . . . he eventually, . . . will graduate out, be stepped down out of that facility" back into a USP);[38] *id.* at 35 ("You heard the testimony of Mr. Hershberger. Three years, three years for him to be stepped down out of ADX and into a USP."); *id.* at 35 (Mr. Caro "may initially go to ADMAX, but will be moved out to the USP on a 3-year program"); *id.* at 90 ("Everyone agrees, every witness agrees he's getting out of ADX, that in some time within three to five years he will be back at a USP.").)

---

[37] Mr. Silverstein is a federal prisoner who has been convicted of four separate murders while he's been incarcerated. He has a specially designed cell where he is housed in ADX-Florence and has not been transferred to general population.

[38] The government's statement that "we know" represents vouching, which went unchallenged at trial, and counsel's failure to object constitutes ineffective assistance of counsel.

While the Court denied Mr. Caro's *Brady* motion requesting specific information, the government's obligation under *Brady* to disclose material exculpatory information continued. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (*Brady* claim lies when the government fails to volunteer exculpatory evidence when the evidence is of "sufficient significance to result in the denial of the defendant's right to a fair trial") (*quoting United States v. Agurs*, 427 U.S. 97, 108 (1976). As the government conceded and represented to the Court during the pretrial hearing, evidence that would refute its argument that Mr. Caro could only be held for three years at ADX-Florence was exculpatory and that it was obligated to turn this evidence over to the defense.

As of this filing, Mr. Caro still has not received the data he requested from the government in preparation for trial. Mr. Caro, however, now has the benefit of an informal survey conducted by a law firm in New Mexico in November 2010. The survey questionnaire was sent to 129 inmates housed at ADX-Florence seeking information about the number of consecutive years each inmate had been housed at ADX-Florence. (Affidavit of Jeanne Dvorak, 11/11/2011, attached as ▮▮▮ Ex. 48.) While the survey involved only a portion of the inmates at ADX-Florence,[39] the results refute the government's evidence presented at trial.

The evidence now available to Mr. Caro, despite the government's failure to provide such information, shows that at the time of Mr. Caro's trial, there were many inmates other than Mr. Silverstein who had been housed at ADX-Florence more than

---

[39] As of November 2006, which was two months prior to Mr. Caro's trial, 470 inmates were housed at ADX-Florence. (Tr. 02/12/2007 at 37.)

151

three years. Of these 129 questionnaires, 14 were returned unanswered indicating that these prisoners were under Specialized Administrative Measures ("SAMs") (and thus BOP had limited their correspondence such that they could not respond to the survey) and 69 were completed and returned. Of these 69 inmates, 43 claimed they had been in ADX-Florence, or ADX-Florence and USP-Marion,[40] for eight or more consecutive years. Indeed, 22 of these inmates had been at ADX-Florence/USP-Marion for over 13 years.

Applying this data to 2007, the time of Mr. Caro's trial, these results show that when the government was claiming that BOP policies prevented it from housing Mr. Caro at ADX-Florence for more than three years, at least 43 inmates currently housed at ADX-Florence had been at ADX-Florence or ADX-Florence/USP-Marion for more than five years. The longest stay, as of Mr. Caro's trial, was 27 years, and 22 inmates had been there for at least 10 or more years.

What is more, Mr. Caro has learned through consulting with former BOP official Mark Bezy who retired in 2006, that he specifically recalls eight inmates who had been housed under very strict conditions of confinement due to security concerns and who are still housed at ADX-Florence today. (Bezy Decl. ¶ 28.)

The government, *i.e.*, the BOP, clearly had access to this information at the time of Mr. Caro's trial. In fact, the government had complete and sole access to all of the

---

[40] ADX-Florence was not opened until 1994. (Tr. 02/12/2007 at 41.) Prior to that time, USP-Marion served the same function as ADX-Florence and had conditions of confinement similar to ADX-Florence. (Tr. 02/13/2007 at 176, 188.)

relevant data. The evidence withheld by the government would have shown that in spite of the BOP's "goal" to move inmates out of ADX-Florence through its step-down and other programs, in reality, BOP often did not meet this goal; there was not just one exception in the form of inmate Silverstein, but many exceptions. Regardless, the government did not disclose this evidence, misrepresented the truth to the jury, and violated Mr. Caro's rights.

**B.     The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro was Not a Gang Leader at USP-Lee**

During the penalty phase of trial, the government presented testimony that on July 11, 2002, Carlos Caro had been the leader of the Texas Syndicate at FCI-Oakdale and had ordered an attack on members of another gang. During argument, the government implied that Mr. Caro was, or might still be, a leader of the Texas Syndicate. (Tr. 02/13/2007 at 21-22 (arguing that Mr. Caro, "is not just a member [of the Texas Syndicate], but he's a leader"); *id.* at 96 (arguing that Mr. Caro "becomes a player" in the Texas Syndicate . . . "[w]hether he's a leader, whether he's an enforcer, don't know").)

At the time of trial, however, the government had information and documents indicating that Mr. Caro was not the leader of the Texas Syndicate at USP-Lee and indeed might not even be in good standing with the gang. The government did not disclose these documents to the defense.

On October 22, 2003, less than two months before the death of Mr. Sandoval, the SIS intelligence officer at USP-Lee testified under oath before a grand jury about the

153

Texas Syndicate. (Sealed Ex. 28.) He testified that at the time of the July 2003 inmate assault at USP-Lee, inmate Ricardo Benavidez was the leader of the Texas Syndicate and that after the assault on Mr. Benavidez, an inmate by the name of Francisco Tijerina became the leader. (Sealed Ex. 28 at 15.) The government did not disclose this information or grand jury transcript to the defense. And, while this SIS intelligence officer testified for the government at trial, the government never disclosed this prior testimony to the defense.

The government also possessed an internal BOP memorandum dated December 24, 2003, just one week after the death of Mr. Sandoval. This memo reflects that an inmate told a prison official that "whoever did this to Sandoval, if they come out, there's gonna be trouble. We have already met and the decision has been made." (Internal BOP Memorandum ███████████, 12/24/2003, attached as Sealed Ex. 58.) The government never disclosed this document to the defense.

On November 14, 2006, just two months before the trial in this case, the BOP prepared another internal form regarding an escorted trip for Mr. Caro. That form provided the "additional information" that Mr. Caro "is believed to be in 'bad standing' with the [redacted] gang." (Internal BOP Transportation Report ██████████, 11/14/2006, attached as Sealed Ex. 59.) The government also did not disclose this document, or any other information or documentations that led them to believe that Mr. Caro was in "bad standing" with the gang.

At trial, the government did not tell the jury that Mr. Caro might be in "bad standing" with the gang; instead the government said the exact opposite—that Mr. Caro

154

is a leader, or at minimum, an enforcer, in the gang. All of these non-disclosed documents were clearly exculpatory and refuted the government's assertions and implications that Mr. Caro at the time of trial was, or might still be, the leader of the Texas Syndicate. The government's failure to provide this information to Mr. Caro was a violation of *Brady*.[41]

## C.    The Government's Failure to Produce Material Exculpatory Evidence Considered Cumulatively Violated Mr. Caro's Constitutional Rights

As a result of the government's violation of its obligation under *Brady v. Maryland*—coupled with trial counsel's failure to investigate, research, and present contradictory evidence related to future dangerousness and prison communication[42]—the jury never heard critical information, and the government's future dangerousness evidence was never subjected to meaningful adversarial testing. The jury unanimously found beyond a reasonable doubt that if sentenced to life, Mr. Caro would commit acts of violence against other inmates or staff within the federal prison system, and that he had not expressed remorse for killing Mr. Sandoval. (Special Verdict Form at 2.)

The suppression of evidence that is material and favorable to a defendant violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is deemed "material"

---

[41] This *Brady* assertion is based on a review of trial counsel's file and discussions with trial counsel. However, if the information was disclosed to trial counsel and not presented to the jury, Mr. Caro makes the alternative claim that his capital defense was prejudiced by this ineffective assistance. *See Wiggins*, 539 U.S. at 525; *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008). Moreover, the government had an affirmative duty to volunteer this information during the penalty phase and to not argue contradictory positions, to prevent a fundamentally unfair trial. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976).

[42] *See* Claim Six-D, *supra*.

155

if "there is a reasonable possibility that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable possibility' is a possibility sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The principal issue during Mr. Caro's penalty trial was future dangerousness. In closing, the government devoted the majority of its argument to this issue. (2/13/2007 Tr. at 20-28, 33-39, 88-92, 94-96.) By withholding exculpatory documents and information, and presenting inaccurate testimony and argument, the government misled the jury on two critical points: Mr. Caro purported "leadership" role in a gang and the BOP's current ability to securely house dangerous inmates. This misleading evidence on such critical issues removes any confidence in the jury's sentence.

That this evidence was material also is supported generally by empirical research that suggests that future dangerousness is one of the most significant issues for jurors when deciding whether to impose a sentence of death. *United States v. Darryl Lamont Johnson*, 02-cv-06998, Dkt. 112, (12/13/2010 Memorandum Opinion and Order) (citing John H. Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 Law & Hum. Behav. 151, 160 (1994) ("[N]early all jurors [surveyed] . . . offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a

156

continuing threat to society.")).

**D.    Mr. Caro's Death Sentence, Which Relied on Incomplete, Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment**

As stated above, Mr. Caro's death sentence was achieved, in material part, on the basis of inaccurate, incomplete and misleading "future dangerousness" testimony.    Such testimony led to the jury's finding that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release."    (Verdict, 02/13/2007, Dkt. 639.)    Because such incomplete and misleading testimony was presented to and relied upon by the jury which determined his fate, Mr. Caro's sentence of death violates the Eighth Amendment to the United States Constitution. *Johnson v. Mississippi*, 486 U.S. 578 (1988).

**CLAIM    EIGHT:    THE    GOVERNMENT    VIOLATED    THE    EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, BY MINIMZING THE JURY'S RESPONSIBILITY.**

Supreme Court jurisprudence on capital cases is premised on the assumption that "jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision." *Caldwell v. Mississippi*, 472 U.S. 320, 329-30 (1985).    Arguments that minimize this sense of responsibility violate the Constitution. *See, e.g., id.* at 335-41 (prosecutor's argument to the jury that its decision was not final was unconstitutional).    "The uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the

157

importance of its role." *Id.* at 333.

In its closing argument, the government made two arguments that diminished the jury's responsibility:

> If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done. You would not be alone in that regard.
> . . .
> The last thing I would like to talk about is the law. Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term. The job is not to kill anyone. It's the law.

(Tr. 02/13/2007 at 17, 98.)

In this case, the implicit messages of the government were: You need not feel responsible for causing the death of Mr. Carlos Caro, other juries have done so. And, it is not your job to kill, it's the law. There can be no purpose for these statements other than to inappropriately lighten the jury's burden of determining whether to send Mr. Caro to his death. The jury, not the "law" or the Judge or the Fourth Circuit, was responsible for deciding whether Mr. Caro would live or die. The government statements likely achieved their intended purpose of minimizing the jury's sense of responsibility regarding a death sentence. Given these prejudicial statements, there can be no confidence in the verdict.

158

## GROUNDS FOR RELIEF: DIRECT APPEAL

**CLAIM NINE: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE FOURTEENTH AMENDMENT OF THE CONSTITUTION.**

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial." ABA Guidelines No. 10.8 cmt. On direct appeal, counsel failed to raise the following claims. The failure to raise these challenges to Mr. Caro's conviction and death sentence fell below the standard of care. These errors both individually and cumulatively deprived Mr. Caro of his right to effective assistance of counsel on appeal. *See Evitts v. Lucey*, 469 U.S. 387 (1985); *cf. United States v. Peak*, 992 F.2d 39 (4th Cir. 1993).

**A.    Appellate Counsel Failed to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Sufficiently and Beyond a Reasonable Doubt, in Violation of Mr. Caro's Fifth, Sixth, Eight, and Fourteenth Amendments**

At trial, counsel requested a jury instruction that "the government must prove beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors in order to justify the death penalty." (Defendant's Response, Dkt. #611, at 1.) The legal authority cited in support of this instruction included the decisions in *In re Winship, Apprendi, Ring*, a variety of state cases, and other Supreme Court case law, including *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Woodson v. North Carolina*, 428 U.S. 280 (1976), which emphasized, like *Ring*, that the Eighth Amendment's

159

requirements impose more duties, not less, to capital case findings. (Defendant's Response, Dkt. 611, at 1-6). The district court denied the request. (*See* Dkt. 640) Notwithstanding the preservation of this error by trial counsel, and the premise that the Eighth Amendment requires more, not less, in capital cases, *Ring*, 536 U.S. at 597, 606, appellate counsel failed to include this issue in Mr. Caro's appeal.

In 2000, the Supreme Court decided the landmark case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Relying on bedrock principles of law, such as the right to a jury trial and the right to have the government prove all of the elements of a crime beyond a reasonable doubt, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. *Apprendi* rejected the notion that an accusation could be treated as a "sentencing factor" for the purpose of evading the due process and the jury trial right since that notion was "unknown to the practice of criminal indictment, trial by jury, and judgment by court." *Id.* at 478. The Supreme Court also made clear that this tradition had continued since the Supreme Court's decision in *In re Winship*, 397 U.S. 358 (1970), which required proof of all statutory elements beyond a reasonable doubt. *Id.* at 484. The dissent in *Apprendi* specifically noted that the *Apprendi* holding cast "serious doubt" on "sentencing systems employed by the Federal Government and States alike." *Id.* at 523-24 (O'Connor, J., dissenting).

Next in the line of *Apprendi's* progeny came the Supreme Court's decision in *Ring*

*v. Arizona*, 536 U.S. 584 (2002), which applied *Apprendi* to capital sentencing. In doing so, the Supreme Court specifically rejected Arizona's argument that judge-made findings as to aggravation factors were sufficient under the Constitution:

> Apart from the Eighth Amendment provenance of aggravating factors, Arizona presents "no specific reason for excepting capital defendants from the constitutional protections . . . extend[ed] to defendants generally, and none is readily apparent." [*Apprendi*], at 539, 120 S. Ct. 2348 (O'C, J., dissenting). The notion "that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence ... is without precedent in our constitutional jurisprudence." [*Id.*]

536 U.S. at 606. The third and fourth major *Apprendi*-based decisions from the Supreme Court were *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), which, as predicted by Justice O'Connor, held unconstitutional state and federal sentencing systems that did not require juries to find beyond a reasonable doubt all facts that increased a sentence above the statutory maximum.

Trial counsel's request has been supported by two subsequent federal courts of appeal decisions that have approved the "beyond a reasonable doubt" language as applied to the instruction that the aggravating factor or factors must sufficiently outweigh the mitigating factor or factors. *See United States v. Fell*, 531 F.3d 197, 234 (2d Cir. 2008) (approving instruction that "you may find . . . that the aggravating factors proven, do not, standing alone, justify the imposition of death beyond a reasonable doubt."); *United States v. Sampson*, 486 F.3d 13, 33 (1st Cir. 2007) (approving instruction that the

prosecution prove "beyond a reasonable doubt that the aggravating factor or factors sufficiently outweigh the mitigating factors to make death the appropriate penalty in [the] case"). While trial counsel did not have the benefit of the holdings in those cases as persuasive authority, appellate counsel did. Their opening brief was filed *after* both of those opinions were issued. (*See* Appellant's Br., 02/12/2009, App. Dkt. 89.)

In this case, appellate counsel had no reason not to raise this issue and the failure to do so constitutes ineffective assistance of counsel.

## B.    Appellate Counsel Failed to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty

At the time of Mr. Caro's trial, it was well established that the government "may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). Mr. Caro, however, did not get the neutral jury to which he was constitutionally entitled. Rather, the jury selected in this matter was composed of ten persons who favored the death penalty, most of them strongly, and two persons with neutral views. (*See, e.g.,* Questionnaire of Juror # 08, attached as ▮ Ex. 34; Questionnaire of Juror # 12, attached as ▮ Ex. 35; Questionnaire of Juror # 24, attached as ▮ Ex. 36; Questionnaire of Juror # 30, attached as ▮ Ex. 37; ▮ Ex. 38; ▮ Ex. 39; Questionnaire of Juror # 39, attached as ▮ Ex. 40; Questionnaire of Juror # 47, attached as ▮ Ex. 42; ▮ Ex. 44; Questionnaire of Juror # 67, attached as ▮ Ex. 45; Questionnaire of Juror # 79, attached as ▮ Ex. 46; and Questionnaire of Juror # 97, attached as ▮ Ex. 47.) There were no jurors who even slightly

disfavored the death penalty.

In *Witherspoon v. Illinois*, the Supreme Court held that the government in a capital case may challenge a juror for cause on the basis of an opposition to the death penalty only when the juror makes it clear that he or she "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case." 391 U.S. at 522 n.21. "[A] sentence of death cannot be carried out if the jury that imposed it or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or conscientious or religious scruples against its infliction." *Id.* at 522. These principles are important to insure that the jury selection procedures do not result in a jury "uncommonly willing to condemn a man to die." *Id.* The improper exclusion of a single juror for cause is harmful *per se* and warrants relief without a showing of prejudice. *Gray v. Mississippi*, 481 U.S. 648, 659-60 (1987).

The Supreme Court's subsequent case law has confirmed the holding in *Witherspoon. See Lockhart v. McCree*, 476 U.S. 162, 176 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Gray*, 481 U.S. at 662-63 (plurality opinion). *Witherspoon* and its progeny have established the following test: A venireman "may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980). The mere fact that a juror's views may "affect" his performance is not a sufficient ground to strike a juror. *Id.*

at 49-50.

Mr. Caro ended up with this death-leaning jury because those individual jurors who had philosophical questions about the death penalty were questioned in a manner that resulted in their disqualification, even when they were willing to follow the law. Two examples in particular demonstrate how this flawed process improperly excluded persons with conscientious disapproval for the death penalty but who were otherwise willing to follow the law: Jurors # 40 and # 57.

These two jurors indicated in their questionnaires that they were strongly opposed to the death penalty. (*See* Questionnaire of Juror # 40, attached as ███ Ex. 41, at Question 59; ███ Ex. 43 at 59.) Generally speaking, these jurors had religious or philosophical beliefs that it was wrong to kill another human being. *Id.* Notwithstanding these beliefs, these two jurors expressed during voir dire a willingness to follow the law and the Court's instructions. When Juror # 40 was questioned, he testified both that he would not automatically impose the death penalty and neither would he automatically vote against the death penalty. (Tr. 01/22/2007 at 113-14.) He was asked a second time by the Court and repeated that he would not be an "automatic" juror. *Id.* at 115. Juror # 40 was then asked a third time, at the request of the prosecution, was "put on the spot" by a question asking him to read his questionnaire answer about being strongly opposed to the death penalty. *Id.* at 136. Even so, his third answer to the question was that "I'm kind of mixed. I'm kind of iffy about that." *Id.* at 136. He was then asked a fourth time about his questionnaire answer and whether "you had changed your mind?" *Id.* at 136.

His fourth answer was that "it's kind of a touchy subject." *Id.* at 136. The fifth time he was asked, he started to answer the question and the Court completed his answer for him saying, "That you could not." *Id.* at 137. He then agreed with the Court and was excused. *Id.* at 137, 141. In other words, the predominance of Juror # 40's answers qualified him as a juror until the Court answered a question for him and then excused him based on the Court's answer. This is the very kind of exclusion that *Withspoon* and its progeny absolutely prohibit. While it is understood that the Court was acting in good faith in an attempt to obtain a qualified jury, the manner of this questioning and the exclusion of Juror # 40 violated the precepts of *Witherspoon* and *Gray.*

The second telling example is juror # 57. Juror # 57 initially told the Court that he would not consider the death penalty. (Tr. 01/23/2007 at 47.) Upon being asked again, he said that he would consider the death penalty. *Id.* at 47. He was then asked whether his mind was closed to the death penalty and he said, "No." *Id.* at 47-48. The Court then said, "Well, I'm not sure I understand your answer, Juror # 57. Again, the question to you is some people may believe for religious or philosophical or ethical reasons . . . that under no circumstances could they ever vote for the death penalty . . . their mind is closed to the death penalty as a possible punishment. Now is that your belief?" *Id.* at 48. His answer was "No, it's not." *Id.*

Despite the clear answer, the questioning of Juror # 57 continued, "In other words, you say that under some circumstances you could vote for the death penalty?" *Id.* at 48. He answered, "Maybe." *Id.* "In other words, there are circumstances your mind would at least be open to considering the death penalty as a possible punishment?" *Id.* He again

165

answered "Yes." Thus, in the initial questioning he confirmed for Court by four different answers that he would consider the death penalty.

Notwithstanding Juror # 57's repeated willingness to consider the death penalty, the government moved to strike him not based on his answers in open court, but based on his prior questionnaire answers which indicated religious beliefs in opposition to the death penalty. *Id.* at 52-53. The defense opposed him being stricken because of his unequivocal answers which indicated that he would consider the death penalty. *Id.* at 54.

The Court then questioned Juror # 57 further. *Id.* at 57-58. The Court asked Juror # 57 about his questionnaire answers in which he indicated that the Bible says thou shalt not kill. *Id.* at 57. He agreed that he had said that. *Id.* He also agreed that he had said that he strongly opposed the death penalty. *Id.* He then was asked about whether his "feelings" were such that he would never impose the death penalty, and he agreed. *Id.* He then was asked more about his feeling and said that, "It would just make me feel like that I killed this man." *Id.* He then agreed with the question that he could not vote the death penalty. *Id.* In other words, Juror # 57 was responsible and acknowledged his own religious beliefs which opposed the death penalty. However, the preponderance of his answers to the Court showed a willingness to impose the death penalty under appropriate circumstances. This is another instance where the "final answer"--which was the result of repeated questioning about the juror's religious beliefs and expressed skepticism of his earlier answers, was less reliable than the earlier answers of the juror because the later questioning invited a result whereas the earlier questioning was neutral. Like the exclusion of Juror # 40, the exclusion of Juror # 57 violated the precepts of *Witherspoon*

166

and *Gray.*

When appellate counsel fails to raise legal issues which are significant and supported by precedent, the courts deem such failures as ineffective assistance under *Strickland. See, e.g., Bostick v. Stevenson,* 589 F.3d 160, 168 (4th Cir. 2009) (holding that failure of trial counsel to consult with defendant as to appeal of non-frivolous issues constituted ineffective assistance); *United States v. Butler,* No. 97-7299,1999 WL 25555, at *2 (4th Cir. 1999) (unpublished opinion) (holding that a legal issue which was "significant and obvious" was required to be raised on direct appeal and remanding for further proceedings and, citing *Jones v. Barnes,* 463 U.S. 745 (1983)).

While it is true that appellate counsel made a general challenge to the "reverse-*Witherspoon*" questioning in this case, including the lack of an individual voir dire by defense counsel, appellate counsel failed to challenge on appeal the particular exclusion of Jurors # 40 and # 57. (*See* Appellant's Br. 02/12/2009, App. Dkt. 89.) Appellate counsel raised the issue of the adequacy of the jury questionnaire and the adequacy of the jury questioning given the district court's refusal to permit counsel to participate in an individual voir dire of jurors. (*See id.* at 36-55.) Though that argument made several valid points about the limitations of the voir dire process used, it completely neglected to describe the particular voir dire of any jurors, including Jurors # 40 and # 57, and likewise failed to assert the claims that the exclusion of Jurors # 40 and # 57 violated Mr. Caro's rights under *Gray v. Mississippi.*[43] As such, relief is warranted due to ineffective

---

[43] Trial counsel adequately preserved this issue as to these jurors given the various objections made. However, should this Court find that trial counsel failed to preserve

167

assistance of counsel.

## C.    Appellate Counsel Failed to Raise a Meritorious Argument Regarding Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Mr. Caro.

As discussed in Claim Six-I, *supra*, Mr. Caro's trial counsel failed to object when the government introduced evidence of specific acts of other inmates, in violation of the trial court's order. On appeal, the Fourth Circuit noted that it could not grant relief as to the use of specific instances of violence by persons other than Mr. Caro when that claim was never raised on appeal. *United States v. Caro*, 597 F.3d 608, 621 n.14 (4th Cir. 2010) ("we cannot grant relief that Caro plainly failed to request."). Here, the prejudicial impact of appellate counsel's failure to raise this meritorious issue is clear from the Fourth Circuit opinion.

Notwithstanding the Court of Appeals' refusal to grant relief that was not requested, its decision makes fairly plain that the government's use of specific instances of violence by persons other than Mr. Caro was error because it violated the district court's ruling. *See id.* In addition, the use of specific instances of violence was error because it contradicted the Supreme Court's controlling Eighth Amendment precedent in *Zant v. Stephens*, 462 U.S. 862, 879 (1983), which requires that aggravation evidence be considered as "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Caro*, 597 F.3d at 625 n.17 (*quoting*

---

such challenge, then it is Mr. Caro's alternative claim that trial counsel violated *Strickland* by the failure to preserve the error, and that such error is prejudicial *per se* under *Gray*.

*Zant*, 462 U.S. at 879). Such an "individualized determination" cannot be made when the government is allowed to improperly suggest that Mr. Caro receive the death penalty because of crimes committed by third parties with no connection to Mr. Caro. As such, the government has thwarted the "individualized determination" required by the Eighth Amendment.

The government violated the district court's order and Mr. Caro's constitutional rights by introducing specific acts of violence by persons other than Mr. Caro. As expressly noted by the Court of Appeals, appellate counsel failed to raise this argument on appeal and thus the court "[could not] grant relief that Caro plainly failed to request." *Id.* at 621 n.14.

Here, the performance of appellate counsel was beneath professional standards since the failure to raise what the Court of Appeals acknowledged was a strong issue was not based on tactic, but was based on oversight of the district court's own ruling and the holding in *Zant.* Upon the finding of such an Eighth Amendment violation, the appropriate remedy is to vacate the death penalty imposed. *See, e.g., Caldwell v. Mississippi*, 472 U.S. 320, 333, 340 (1985); *Riley v. Taylor*, 277 F.3d 261 (3rd Cir. 2001). Such a remedy is certainly appropriate in this instance because the government had notice of both the district court's contrary order and the governing Eighth Amendment standards under *Zant* before it took its detour into this inadmissible and prejudicial evidence and argument.

169

**D.     Appellate Counsel Failed to Raise the Claim that the Government Violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi* by Minimizing the Jury's Responsibility**

Mr. Caro incorporates herein the facts and law stated in Claim Eight, *supra.* Appellate counsel should have raised, but did not, the claim that Mr. Caro was denied his right to a fair sentencing when the government made improper statements that minimized the jury's sense of responsibility regarding a death sentence. Appellate counsel's failure to raise this issue on appeal prevented the Fourth Circuit from reviewing this meritorious claim and granting relief.

**E.     Appellate Counsel Failed to Raise Systemic Challenges to the Death Penalty**

Appellate counsel should have raised, but did not, systemic challenges to the death penalty as discussed in Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen, *infra.* Mr. Caro should not be precluded from raising them in this motion because counsel's failure to raise these claims deprived him from his constitutional right to the effective assistance of counsel.

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES**

**CLAIM TEN: THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A)**

The United States Supreme Court has repeatedly stressed the imperative for reliability in capital sentencing. In *Woodson v. North Carolina*, 428 U.S. 280 (1976), the

170

Court explained that

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 305 (plurality opinion); *see also Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *Beck v. Alabama*, 447 U.S. 625, 638 (1980) ("To insure that the death penalty is indeed imposed on the basis of 'reason rather than caprice or emotion,' we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Gardner v. Florida*, 430 U.S. 349, 359 (1977). From this imperative flows the rule that "capital punishment be imposed fairly and with reasonable consistency or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). With that rule in mind, Mr. Caro contends that the jury's prediction of his "future dangerousness," which the Government alleged as a non-statutory aggravating factor at sentencing, is impermissibly unreliable. The utilization of the future-dangerousness factor, he asserts, therefore violated his right to a non-arbitrary sentencing process under the Eighth Amendment as well as his right a non-arbitrary sentencing process under 18 U.S.C. § 3595(c)(2)(A).[44]

The notion of future dangerousness as an aggravating factor originated with

---

[44] In Mr. Caro's case, the future-dangerousness factor was worded as follows: "Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release?" (Special Verdict Form, 02/13/2007, Dkt. 639 at 2.)

Texas's capital-punishment statute. *See* Tex. Code Crim. Proc. art. 37.071 (Supp. 1975–76). Reformulating the statute in the aftermath of *Furman v. Georgia*, 408 U.S. 238 (1972), the state legislature crafted a predictive question for sentencing juries: "[W]hether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071(b) (Supp. 1975–1976). This and two retrospective questions concerning intent and provocation were put to the juries, and, if a jury found that the state had proven beyond a reasonable doubt that the answer to all three questions was yes, then the death sentence would be imposed.[45] *Id.* art. 37.071(b).

The United States Supreme Court upheld Texas's capital-punishment statute in *Jurek v. Texas*, 428 U.S. 262 (1976). Passing judgment on the nascent future-dangerousness factor, the Court analogized to other predictive tasks performed in the justice system, albeit none of them as grave as the task borne by capital juries:

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be

---

[45] The two retrospective questions were, one, "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result" and, two, "if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex. Code Crim. Proc. art. 37.071(b) (Supp.1975-76).

made by parole authorities.  The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice.

*Id.* at 274-76.  In *Barefoot v. Estelle*, 463 U.S. 880 (1983), the Court's only other foray into future dangerousness, the Court held that the Constitution does not prohibit the introduction of expert evidence concerning future dangerousness.  In doing so, however, the Court revealed a tentativeness not apparent in *Jurek*:

> We are unconvinced, however, *at least as of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.

*Id.* at 901 (emphasis added).

In the decades since *Jurek*, numerous studies have shown that it is not only "not easy to predict future behavior," it is impossible as far as dangerousness is concerned.  *See United States v. Sampson*, 335 F. Supp. 2d 166, 222 (D. Mass. 2004) ("There are relatively recent studies that suggest that it is not just difficult for jurors to predict reliably whether a murderer is likely to commit violent crimes again, but that it is impossible.").  Two of the most damaging studies focused on federal capital prisoners for whom juries considered future dangerousness as an aggravating factor at sentencing.  One of the studies, published in 2008, examined inmates sentenced to life without the possibility of release ("LWOP").  *See* Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46 (2008).  The other study, published in 2009, examined inmates sentenced to LWOP as

173

well as inmates sentenced to death. *See* Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223 (2009). In both studies, juries displayed "alarmingly poor predictive performance." *Id.* at 240–41; *see* Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 61 (2008).

For the 2008 study, the Bureau of Prisons provided the authors information concerning 145 capital inmates who had entered prison to serve an LWOP sentence between 1991 and 2005. *Id.* at 51. The study documented and compared the rates of violent and potentially violent disciplinary infractions, arrayed across 14 categories, for the LWOP inmates and other inmates housed in United States prisons. *Id.* at 54–57. One hundred and four of the LWOP inmates were tried in cases where, as with Mr. Caro, the government alleged as a non-statutory aggravating factor some variation or proxy of "whether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at 57, Table 1.

Most strikingly, the study compared the rates of infractions for the LWOP inmates against whom the government had alleged future dangerousness and the LWOP inmates against whom the government had not alleged future dangerousness and found that there were no statistically significant differences between the two groups. *Id.* at 57, Table 3. In other words, *the predictions of future dangerousness were completely unreliable.* The rates of violence were relatively low among those LWOP inmates against whom the

174

government had alleged future dangerousness, just as they were for the larger group of all LWOP inmates. *Id.* at 56–57, Table 3. For example, the rate of "assaults with moderate injury" among future-danger LWOP inmates was vanishingly low at 1.56 per 1000 inmates. The rate among all U.S. Penitentiary inmates, by comparison, was 4.70 per 1000 inmates. *Id.* at Table 3. In the 14-year period covered by the study, "just less than one in a hundred [future-danger LWOP inmates] had perpetrated an assault causing 'moderate' injuries (i.e., serious injuries requiring evacuation to an outside hospital, but not life-threatening)." *Id.* at 61; *see id.* at 55–57, Table 3. Furthermore, "[n]one had perpetrated an assault resulting in 'major' (i.e., life-threatening) injury." *Id.* In fact, 28% of these inmates had never been cited for a disciplinary infraction. *Id.*

Tellingly, the LWOP inmates were not a disproportionate source of misconduct or violence as compared to other inmates imprisoned in U.S. Penitentiaries. *Id.* at 60. Indeed, none of the comparisons between the LWOP inmates and other U.S. Penitentiary inmates were statistically significant. *Id.* at 56, 60, Table 2. As the authors of the study concluded:

> [S]cientific data demonstrate that only a minority of capital offenders perpetrate serious violence in prison, and that it is not possible to reliably identify at trial which of these defendants are more likely than not to commit these acts. . . . Quite the contrary, in the face of base rate data, it is only assessments of varying improbability of prison violence among these offenders that are reliable."

*Id.* at 61 (emphasis in original).

In the 2009 study, the participants were capital inmates who entered United States prisons with an LWOP sentence or, like Mr. Caro, a death sentence as early as August

175

1993. Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223, 232–34 (2009). The "follow-up" period for LWOP inmates and death-sentenced inmates ended, respectively, in June 2006 and August 2007. *Id.* at 234. Like Mr. Caro, all of the participants were sentenced under the Federal Death Penalty Act in cases where the government had alleged as a non-statutory aggravating factor some variation or proxy of "whether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at 232.

The 2009 study bolsters many of the key findings of the 2008 study. As with the 2008 study, the 2009 study revealed that the rates of serious violence among the participants was uniformly low. For example, only 4.2% of the capital inmates from whom juries had predicted future dangerousness had been cited for a serious assault.[46] *Id.* at 237–38, Table 2. The 2009 study also found that "[t]he annual rate of serious and potentially violent rule violations is broadly similar to that of other inmates serving time in U.S. Penitentiaries." *Id.* at 238. The annual rate for serious assaults, for instance, was 7.29 per 1000 for the capital inmates and 10.07 per 1000 for other inmates. *Id.* at Table 2. Lastly, the study reinforced the finding of the 2008 study and earlier studies that

---

[46] The authors categorized disciplinary infractions according to Federal Bureau of Prisons disciplinary infraction code numbers: 100-Level (more serious) to 400-Level (least serious). Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223, 235–36, Table 2 n.1 (2009). "Serious assault" encompassed codes 100, 100A, 101, 101A, 107. *Id.* at Table 3 n.1. Generally stated, the study defined a "serious assault" as an "act[] involving the potential for serious injury." *Id.* at 239.

the correlates of violence in prison are often counter-intuitive. In other words, "[t]he most obvious 'common sense' factors are not reliably predictive of serious prison violence, i.e., being a convicted murderer, being convicted of multiple murders, being involved in a continuing criminal enterprise, serving a life-without-parole sentence or exhibiting an Antisocial Personality Disorder." *Id.* at 227 (citations omitted).

The essence of the 2009 study is its well-founded conclusion that jurors cannot identify the relatively rare offender who will commit a serious act of violence while imprisoned. *Id.* at 239–40, Table 4. The authors arrived at this conclusion by comparing jury predictions of future dangerousness to actual behavioral outcomes for inmates serving an LWOP sentence and inmates sentenced to death. *Id.* at Table 4. The results show that "affirmative predictions of future dangerousness are wrong far more often than right." *Id.* at 239–40, Table 4. Predictions of future dangerousness for LWOP inmates were correct in less than one-third of the cases, *id.*, and among inmates sentenced to death "in no instance was the jury prediction of future dangerousness correct," *id.* And this, as the authors noted, "was in spite of some capital inmates having contact with each other." *Id.* In the aggregate, *jury predictions that capital defendants would commit future acts of violence were incorrect nine out of ten times. Id.*

The ramification of these and similar studies is clear: Future dangerousness as an aggravating factor cannot be predicted with sufficient reliability to assure that the death penalty is not being arbitrarily and capriciously imposed. *See Gregg v. Georgia*, 428 U.S. 153, 188-89 (1976) (plurality opinion) ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken

177

or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). As the authors of the 2008 study observed, "it is only assessments of varying *improbability* of prison violence among offenders that are reliable." Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 61 (2008). The jury in Mr. Caro's case was no better equipped to predict his future dangerousness than any other jury, which is to say that it was not equipped at all. Juries—including the jury in Mr. Caro's case—that impose the death penalty based on the probability of future dangerousness do so unconstitutionally.

The Eighth Amendment strictly regulates the procedures by which death sentences are imposed, paying particular attention to their reliability. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."). As study after study has shown, the utilization of the future-dangerousness factor could hardly be a less reliable procedure for determining whether a person should live or die. Indeed, "[t]he error rate of this 'future dangerousness' assertion . . . is sobering, both in its inability to discriminate who will and will not engage in violent misconduct in prison and in the minority who fulfill the prediction." Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 61 (2008). The error rate unquestionably exceeds that which the Eighth Amendment

178

allows. *Lockett*, 438 U.S. at 604 (explaining that the Eighth Amendment demands an exceptionally high degree of reliability when a death sentence is imposed). The utilization of the future-dangerousness factor therefore violated Mr. Caro's right to a non-arbitrary sentencing process under the Eighth Amendment as well as his right a non-arbitrary sentencing process under 18 U.S.C. § 3595(c)(2)(A).

**CLAIM ELEVEN: THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING CASES IN WHICH THE FEDERAL DEATH-PENALTY IS IMPOSED FROM THOSE IN WHICH IT IS NOT IMPOSED RENDERS THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL.**

The Supreme Court has held that the Constitution will not tolerate sentences of death that are imposed arbitrarily or capriciously. *See Furman v. Georgia*, 408 U.S. 238, 295-306 (1972) (Brennan, J., Concurring). In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court reaffirmed "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."

The reality of the federal death penalty in practice is that there is no consistency or predictability in the manner in which federal courts have imposed the federal death penalty. In fact, there is no consistency in the cases that proceed to trial compared to those that plead out. Included as exhibits to this motion are summaries of the facts and circumstances of the status or resolution of every authorized federal death penalty case from 1988 until 2003, organized as follows: Federal Capital Prosecutions Awaiting Trial, attached as Ex. 12; Federal Capital Defendants Who Died Before or During Trial, attached as Ex. 13; Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons, attached as Ex. 14; Federal Capital Prosecutions in Which the Attorney

179

General Withdrew a Notice of Intent to Seek the Death Penalty, attached as Ex. 15;
Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other than Death,
attached as Ex. 16; Federal Capital Defendants Who Were Found Not Guilty of the
Capital Charge or Were Innocent, attached as Ex. 17; Federal Capital Defendants
Convicted of a Lesser Offense, attached as Ex. 18; Federal Capital Cases Where the
Death Penalty Has Been Rejected by Juries or Judges, attached as Ex. 19; Federal Capital
Cases Resulting in a Sentence of Death, attached as Ex. 20; Federal Capital Cases
Resulting in Execution, attached as Ex. 21; A Listing of Former Federal Death Row
Inmates, attached as Ex. 22.

One cannot read the descriptions of these cases without coming to the realization
that *all* of the cases are by their own terms horrible, and *all* involved the infliction of
agony on victims and survivors.  Yet, for indiscernible reasons, some defendants were
sentenced to death, but the vast majority were not.  If any basis can be distinguished, it is
race and region, as Mr. Caro argues in Claim 12.  Fairness and consistency are the
opposite of arbitrariness and caprice.  In the demonstrated absence of fairness and
consistency, the federal death penalty must be set aside.

This argument is not refuted by pointing out the difficulties inherent in comparing
cases.  Selected summaries of the cases quickly put that overly simplistic argument to
rest:

1.  *United States v. Timothy McVeigh* (D. Colo.).  The Oklahoma City
    bombing case.  168 dead.  Hundreds injured.  Tried, convicted,
    sentenced to death, executed.

180

2.   *United States v. Terry Nichols* (D. Colo.).  McVeigh's co-defendant. Tried, convicted, sentenced to life.

3.   *United States v. Khalfan Mohamed and Rashed al`-Owhali* (S.D.N.Y.).  Two defendants associated with Osama bin Laden and al Qaeda convicted in simultaneous terrorist truck bombings in 1998 of two American embassies in East Africa.  224 killed, including 12 Americans; thousands injured.  Tried, convicted, sentenced to life.

4.   *United States v. Theodore Kaczynski* (E.D. Cal.).  The Unabomber. Three murders by mail bombs.  Plea agreement.  Sentenced to life.

5.   *United States v. Joseph Minerd* (W.D. Pa.).  Arson and pipe bomb used to kill pregnant girlfriend, her fetus and three-year old daughter.  Tried, convicted, sentenced to life.

6.   *United States v. Coleman Johnson* (W.D. Va.).  Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

7.   *United States v. Christopher Dean* (D. Vt.).  Defendant sent pipe bomb through the mail killing victim and disfiguring victim's mother.  Plea agreement.  Sentenced to life.

8.   *United States v. Billy Cooper* (S.D. Miss.).  Carjacking killing of two victims.  Tried, convicted, sentenced to life.

9.   *United States v. Christopher Vialva and Brandon Bernard* (W.D. Texas).  Carjacking double homicide.  Tried, convicted, sentenced to death.

10.  *United States v. David Paul Hammer* (M.D. Pa.).  Prison inmate guilty of strangling to death cellmate at USP-Allenwood.  Sentenced to death.[47]

11.  *United States v. Michael O'Driscoll* (M.D. Pa.).  Prison inmate

---

[47] In 2005, the United States District Court for the Middle District of Pennsylvania vacated Hammer's death sentence and granted Hammer a retrial of the penalty phase, which has yet to commence.  *See* Op. Concerning Fourth Amended § 2255 Mot. 263–73, *United States v. Hammer*, No. 4:CR-96-239, ECF No. 1216 (M.D. Pa. Dec. 27, 2005).

181

guilty of stabbing to death fellow inmate at USP-Allenwood. Same judge, same courtroom and same defense attorneys as *United States v. David Paul Hammer*. Sentenced to life.

12. *United States v. Storey* (D. Kansas). Prison inmate with Aryan Brotherhood ties killed fellow prisoner at USP-Leavenworth. Plea agreement. Sentenced to less than life sentence.

13. *United States v. Douglas Black and Steven Riddle* (D. Colo.). Inmates at USP-Florence attacked two suspected "snitches," one killed, one injured. Plea agreements. Substantially less than life sentences.

14. *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (E.D.N.Y.). Chinese gang members who kidnapped, raped, and murdered victims held for ransom. Fu Xin Chen and Jai Wu Chen entered plea agreements. Attorney General withdrew death authorization shortly before Peng trial. Peng convicted after trial. All three sentenced to life.

15. *United States v. Louis Jones* (N.D. Texas). Decorated Gulf War veteran with no prior record abducted, raped and killed young woman soldier. Tried, convicted, sentenced to death, executed.

16. *United States v. Cory Johnson, James Roane, and Richard Tipton* (E.D. Va.). 11 drug-related murders. Tried, convicted, sentenced to death.

17. *United States v. Dean Anthony Beckford* (E.D. Va.). Six drug-related murders. Tried, convicted, life sentence.

18. *United States v. Clarence Heatley and John Cuff* (S.D.N.Y.). 14 drug-related murders. Plea agreement. Sentenced to life.

19. *United States v. Thomas Pitera* (E.D.N.Y.). Seven drug-related murders in context of organized crime. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

20. *United States v. German Sinisterra and Arboleda Ortiz* (W.D. Mo.). One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

21.    *United States v. Kevin Grey and Rodney Moore* (D.D.C.).  31 drug-related murders.  Tried, convicted, sentenced to life.

22.    *United States v. Darryl Johnson* (N.D. Ill.).    Two drug-related murders.  Tried, convicted, sentenced to death.[48]

23.    *United States v. Peter Rollock* (S.D.N.Y.).    Eight drug-related murders, including some ordered by defendant while incarcerated.  Plea agreement.  Sentenced to life.

24.    *United States v. Tommy Edelin* (D.D.C.).  14 drug-related murders.  Tried, convicted, sentenced to life.

25.    *United States v. Reynaldo Villarreal and Baldemar Villarreal* (E.D. Texas).  Drug-related murder of law enforcement officer.  Tried, convicted, sentenced to life.

26.    *United States v. Juan Raul Garza* (S.D. Tex.).  Three drug-related murders.  Tried, convicted, sentenced to death, executed.

27.    *United States v. Anthony Jones* (D. Md.).  Six drug-related murders.  Tried, convicted, sentenced to life.

28.    *United States v. Chevy Kehoe and Daniel Lee* (D. Ark.).  Three murders in connection with activities of white supremacist organization.  Tried and convicted together.  Kehoe—considered more culpable—sentenced to life.  Lee sentenced to death.

29.    *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y.).  Millionaire Sikh businessman hired killers of two employees cooperating with authorities in criminal investigation of defendant.  Tried, convicted, sentenced to life.

30.    *United States v. Trinity Ingle and Jeffery Paul* (W.D. Ark.).  Murder of elderly, retired National Parks employee.  Victim shot while bound and gagged.  Tried separately.  Ingle convicted and sentenced to life; Paul convicted and sentenced to death.

---

[48] In 2010, the United States District Court for the Northern District of Illinois vacated Johnson's death sentence and granted Johnson a retrial of the penalty phase, which has yet to commence.  *See* Op. Concerning § 2255 Mot. 5–8, *United States v. Johnson*, No. 1:02-cv-06998, ECF No. 112 (N.D. Ill. Dec. 13, 2010).

31.   *United States v. Kristen Gilbert* (D. Mass.).  VA nurse murdered four patients and attempted to murder three more.  Tried, convicted, sentenced to life.

32.   *United States v. LaFawn Bobbitt and Rashi Jones* (E.D. Va.).  Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

33.   *United States v. Billie Allen and Norris Holder* (W.D. Mo.).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both sentenced to death.

Ultimately, the full force of this argument derives from the cumulative effect of examining, in their entirety, the case-by-case summaries of authorized cases compiled in the Exhibits.  By definition, because all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should be) the worst of the worst cases in the federal system.  Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (or would not) argue in summation, "If this case doesn't call for the death penalty, what case does?"  And yet, in case after case—indeed, in the overwhelming majority of such cases—juries returned life verdicts or plea agreements were offered and accepted.  If one cannot discern a principled basis for distinguishing between cases where death is imposed and cases where death is not, the death penalty must be abolished as arbitrary and capricious.  If such a principled distinction exists, Mr. Caro challenges the Government to articulate it.  Should the Government prove unable to meet their burden of showing a legitimate distinction, then Mr. Caro's sentence must be set aside.

**CLAIM TWELVE: THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.   THIS COURT SHOULD VACATE MR. CARO'S SENTENCE ON THIS BASIS ALONE.**

In September 2000, the DOJ released a comprehensive study of how the federal death penalty has been administered from 1988 to mid-2000.  U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988–2000)* (2000) (hereinafter "DOJ Study") (2000), http://www.justice.gov/dag/pubdoc/_dp_survey_final. pdf.  The DOJ filed a supplemental report on June 6, 2001.  U.S. Dep't of Justice, *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review* (2001), attached as Ex. 23 (hereinafter "DOJ Supp Study").  The essence of the study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis.  As reported in the DOJ Study, after 12 years of discriminatory and irrational charging decisions, the federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other."  Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at that time had been sentenced to death in the South.  Virginia and Texas had contributed four defendants apiece.  No other jurisdiction, at the time of the DOJ Study's release, had sentenced more than a single defendant to death.[1]

_____

[1]  As of December 18, 2012, there were 58 inmates on federal death row. *List of Death Row Prisoners*, Death Penalty Information Center (Dec. 18, 2012), http://www.deathpenaltyinfo.org/federal-death-row-prisoners.  The federal districts in three "death friendly" states—Texas, Virginia and Missouri—account for almost half of

In terms of which defendants actually faced the federal death penalty, the DOJ Study showed that of the 159 cases in which the Attorney General had authorized a capital prosecution, 44 defendants were white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%). (*See* Ex. 9 at T-2, Table 1A.) Thus, more than 70% of the federal defendants targeted for the death penalty were non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the DOJ Study exposed a regional bias to enforcement of the federal death penalty.[49] The study revealed the following on the issue of regional disparity:

1. From 1995 onward, of the 94 federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.[50] (DOJ Study at 12.)

---

this population (25 out of 58). *Id.* With regard to racial composition, 26 of the inmates were black; 23 were white; 8 were Hispanic; and one was Native American. *Id.*

[49] Studies of state capital punishment systems also provide compelling evidence of the link between racial disparity and racial bias—particularly since no state in the country has as high a percentage of racial minorities condemned to death as the federal government. *See* Criminal Justice Project of the NAACP Legal Defense and Educational Fund, Inc., *Death Row U.S.A.*, 56 (Fall 2012), http://deathpenaltyinfo.org/documents/DR USAFall2012.pdf. In a congressionally mandated 1990 study, the General Accounting Office reviewed 28 previous studies of state capital punishment systems and concluded that the studies revealed "a pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty after the *Furman* decision." General Accounting Office, *Report to the Senate and House Committees on the Judiciary, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* 5 (1990), attached as Ex. 24 (hereinafter "GAO Report.") It determined that these disparities remained even after statistically controlling for other factors such as aggravating circumstances, prior criminal record, and number of victims and that, in more than half of the studies reviewed, the race of the defendant was a factor in determining whether someone would receive the death penalty. *Id.* at 5–6.

[50] Any murder committed with a gun during a robbery is a potential federal death penalty

2.    Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[51] (DOJ Study at T-59–62.)

The release of the report drew the following predictable public reactions from

officials at the Justice Department and the White House:

> Saying she was 'sorely troubled' by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

Marc Lacey & Raymond Bonner, *Reno Troubled by Death Penalty Statistics*, N.Y.

Times, Sept. 13, 2000, at A17.  In addition, Attorney General Reno called for "[a]n even

broader analysis."  *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *rev'd*, 536 U.S.

---

case.  *See* 18 U.S.C. § 924.  In *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.

[51] A recent report prepared at the request of the Defender Services Committee of the United States Judicial Conference and the Office of Defender Services of the Administrative Office of the U.S. Courts showed a slight easing in the regional bias to enforcement of the federal death penalty between 1998 and 2009.  Jon B. Gould & Lisa Greenman, *Report to the Committee on Defender Services: Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* 12–16 (Sept. 2010), http://www.uscourts.gov/uscourts/FederalCourts/ AppointmentOfCounsel/FDPC2010.pdf .Sharp geographic disparities in the authorization of capital prosecutions nevertheless remain.  For example, as of 2009, the Fourth Circuit still had the largest federal capital caseload, representing about one-fifth of all federal death penalty cases brought nationwide.  *Id.* at 13.  Furthermore, while just six states—California, Maryland, Missouri, New York, Texas, and Virginia—accounted for nearly half of the 325 federal defendants authorized for capital prosecution, fourteen states had never seen a federal capital prosecution. *Id.* at 16, fig. 7.

187

862 (2002) (per curiam) (quoting Attorney General Reno). The New York Times also reported the reaction of Deputy Attorney General Eric Holder, at the time the highest-ranking African American at the Justice Department:

> "I can't help but be personally and professionally disturbed by the numbers that we discuss today," Deputy Attorney General Eric Holder said. "To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity."

Marc Lacey & Raymond Bonner, *Reno Troubled by Death Penalty Statistics,* N.Y. Times, Sept. 13, 2000, at A17. During his confirmation hearings, Attorney General John Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." *Bass*, 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations. Mr. Caro is entitled to know what is "behind the numbers" and that, in the absence of a convincing race-and region-neutral explanation for the Department of Justice's capital-charging practices, his death-sentence must be reversed. Mr. Caro seeks a hearing on this issue.

## CLAIM THIRTEEN: MR. CARO'S DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT.

Mr. Caro concedes that the United States Supreme Court has held that "the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." *Gregg v. Georgia*, 428

U.S. 153, 187 (1976). The Court reached this conclusion because it believed that the death penalty could serve the "two principal social purposes" of "retribution and deterrence of capital crimes by prospective offenders." *Id.* at 183. However, in the years since *Gregg*, a steady tide of empirical evidence has eroded these two justifications for the death penalty. *See, e.g.*, John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794 (2005) (reviewing statistical studies concerning death penalty and finding "not just 'reasonable doubt' about whether there is any deterrent effect of the death penalty, but profound uncertainty").

Mr. Caro submits that the death penalty serves neither the goal of retribution nor the goal of deterrence, and it should therefore be abolished in deference to the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Accordingly, Mr. Caro's death sentence is categorically cruel and unusual punishment in violation of the Eighth Amendment, and he is entitled to relief.

## CLAIM FOURTEEN: THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF MR. CARO'S TRIAL VIOLATED INTERNATIONAL LAW.

The biased and disparate federal capital punishment system described *supra* in Claim Twelve offended not only the United States Constitution but international law as well. Under both the Convention on the Elimination of All Forms of Racial Discrimination ("CERD"), *adopted* Dec. 21, 1965, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights ("ICCPR"), *adopted* Dec. 16, 1966, 999 U.N.T.S. 171, statistical evidence of racial disparity is enough to warrant—and

189

require—corrective action by the United States.

The CERD, which the United States signed in 1966 and ratified in 1994, requires that signatory states "review governmental, national and local policies, and . . . amend, rescind or nullify any laws and regulations *which have the effect of creating or perpetuating racial discrimination* wherever it exists," CERD, pt. 1, art. 2, § 1(c), 660 U.N.T.S. 195 (emphasis added), and expressly extends that requirement to the administration of criminal justice systems, *id.* pt. 1, art. 5, § a. Further, the CERD defines "racial discrimination" as any distinction based on race or ethnicity that has "the purpose or *effect* of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms." *Id.* pt. 1, art. 1, § 1 (emphasis added). In its ratification resolution, the Senate declared that the CERD "shall be implemented by the Federal Government to the extent that it exercises jurisdiction over the matters covered therein. . . . ." 140 Cong. Rec. S7634–02 (daily ed. June 24, 1994). Thus, under the plain language of the CERD, the United States must take action to correct governmental policies that have a discriminatory effect, regardless of whether they also have a discriminatory purpose.

The ICCPR, which the United States signed in 1977 and ratified in 1992, *see* 138 Cong. Rec. S4781 (daily ed. Apr. 2, 1992), specifically addresses the administration of capital punishment. It provides: "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." ICCPR, pt. 3, art. 6, § 1, 999 U.N.T.S. 171. The United States ratified the ICCPR subject to a reservation on Article 6 allowing for the imposition of capital punishment, but the

reservation does not apply to the arbitrary deprivation clause. Because the available data reveal that the federal death penalty system has operated in an arbitrary manner, the ICCPR also provides a strong basis for vacating Mr. Caro's death sentence. *See United States v. Duarte-Acero*, 208 F.3d 1282, 1284–85 (11th Cir. 2000) (explaining that the ICCPR is "coexistent with the United States Constitution and federal statutes, the supreme law of the land").

Article 2 of the ICCPR speaks clearly of the role of domestic courts in protecting individual rights under the covenant:

3. Each State Party to the present Covenant undertakes:

> (a)    To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy . . .

> (b)    To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial . . . authorities . . .

> (c)    To ensure that the competent authorities shall enforce such remedies when granted.

ICCPR, pt. 2, art 2, § 3(a)–(c), 999 U.N.T.S. 171. Because Mr. Caro's death sentence is the product of a federal capital punishment system that stood in violation of international law at the time of his trial, this Court should grant relief.

## CLAIM FIFTEEN:   THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE STATUTE UNCONSTITUTIONAL.

Meaningful appellate review is an indispensable component of a constitutional death penalty scheme. Such review provides a necessary check on the arbitrary and

capricious infliction of the death penalty. *Parker v. Dugger*, 498 U.S. 308, 321 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"); *see also Clemons v. Mississippi*, 494 U.S. 738, 749 (1990) ("[T]his Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency.").

In enacting the Federal Death-Penalty Act ("FDPA"), however, Congress actually curtailed the scope of appellate review and, thereby, rendered the statute unconstitutional. The relevant section reads as follows:

(b)    Review.  The court of appeals shall review the entire record on the case, including—

(1)    the evidence submitted during the trial;

(2)    the information submitted during the sentencing hearing;

(3)    the procedures employed in the sentencing hearing; and

(4)    the special findings required under section 3593(d).

(c)    Decision and disposition.

(1)    The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports an aggravating factor required to be considered under section 3592.

(2)    Whenever the court of appeals finds that—

(A)    The sentence of death was imposed under the influence passion, prejudice, or any other arbitrary factor;

(B)    the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C)    the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

18 U.S.C. § 3595 (emphasis added).

The doctrine of plain error is available in all criminal appeals, and gives an appellate court the option of noticing obvious errors that were not brought to the attention of the district court. *See, e.g., United States v. Frady*, 456 U.S. 152 (1982); *Silber v. United States*, 370 U.S. 717 (1962). Nevertheless, by its plain language, the above-quoted provision precludes plain-error analysis by a court of appeals reviewing a capital case.

By failing to allow for plain-error review, the FDPA ignores the line of Supreme Court cases requiring meaningful appellate review as a pre-condition to a finding that a death-penalty scheme is constitutional. It also ignores the fact that the Supreme Court has repeatedly recognized that "death is different" and, in recognition of that difference, has required heightened standards of reliability to justify death verdicts.

A statute that requires an appellate court to affirm a death verdict that was returned as a result of plain error in the proceedings below is antithetical to tenets of heightened reliability, meaningful appellate review, and equal protection. The FDPA is therefore unconstitutional.

193

GROUND FOR RELIEF: CUMULATIVE ERROR

**CLAIM SIXTEEN: MR. CARO'S CONVICTION, AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

Mr. Caro's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Caro's guilt/innocence and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487 & n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973). "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (internal quotations and brackets omitted).

Mr. Caro incorporates by specific reference all facts, allegations, and arguments made elsewhere in this motion and the exhibits thereto. In addition, Mr. Caro re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Caro of important constitutional rights, including but not limited to his right

194

to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this motion individually justifies reversal, when considered cumulatively, these errors denied Mr. Caro his constitutional rights. These constitutional violations warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619 (1993), 638 n.9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Caro's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Carlos David Caro asks that this Court provide the following relief:

1. That Defendant be permitted to file a Memorandum of Law in support of this motion in accordance with a briefing schedule established by this Court;

2. Require Respondent to file an answer to the motion in the form prescribed by Section 2255 Rule 5, identifying all proceedings conducted in Defendant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3. Permit Defendant to file a reply to Respondent's answer, responding to any affirmative defenses raised by the answer;

4. Permit Defendant to utilize the processes of discovery set forth in Federal

195

Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his motion, and any defenses thereto raised by Respondent's answer;

5.     Permit Defendant to amend this motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6.     Conduct an evidentiary hearing to resolve any factual disputes raised by Respondent's answer to this motion, or by Defendant's response to any affirmative defenses raised by Respondent.  Because Defendant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.     Permit oral argument as appropriate and required;

8.     Vacate Defendant's conviction and sentence and order that appropriate retrial and/or sentencing hearings be conducted; and

9.     Grant such further and additional relief as may be just.

## CERTIFICATION

Pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings for the United States District Courts, undersigned counsel declare under penalty of perjury that they are attorneys appointed by the United States District Court for the Western District of Virginia to represent Carlos David Caro in his proceedings pursuant to 28 U.S.C. § 2255.  As such, undersigned counsel are authorized to file this motion pursuant to 28

196

U.S.C. § 2255 on Mr. Caro's behalf. This motion is signed by undersigned counsel under

penalty of perjury.


Respectfully submitted this 8th day of January, 2013.

s/Karen M. Wilkinson
Jon M. Sands
Federal Public Defender
Karen M. Wilkinson (Arizona Bar No. 014095)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona  85007
karen_wilkinson@fd.org
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

Fay F. Spence, Esquire (Virginia State Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890


Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276- 619-6080

Attorneys for Defendant
Carlos David Caro

## CERTIFICATE OF SERVICE

I hereby certify that on January 8th, 2013, I filed the foregoing Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 Under Seal with the Clerk of the Court by email, and also emailed a copy to the party listed below:


Anthony Giorno, AUSA.
Email: anthony.giorno@usdoj.gov


s/Stephanie Bame_____
Legal Assistant
Capital Habeas Unit