# EXHIBIT 1

# EXHIBIT 1

## DECLARATION OF MARK A. BEZY

MARK A. BEZY, declare as follows:

1.    I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and prison and inmate culture.

2.    I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up. During that time, I held a number of positions, including (a) Warden of the Federal Correctional Complex ("FCC") at Terre Haute, Indiana from August 2004 through October 2006; (b) Warden of the FCC in Elkton, Ohio from December 2002 through August 2004; (c) Associate Warden at the United States Penitentiary ("USP") in Leavenworth, Kansas, from July 1999 through November 2002; (d) Correctional Services Administrator for the North Central Regional Office of the BOP in Kansas City, Kansas from May 1995 through July 1999; and (e) Captain at the maximum security USP in Marion, Illinois from February, 1992 through May 1995. Between 1986 and 1987, I was a representative on the BOP California Prison Gang Task Force.

3.    At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country. It housed the majority of what were considered the most incorrigible and difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement. At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through facility's step-down process.

4.    While the hope and goal of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream high-security facility after three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program. The BOP recognized that some inmates would likely require highly restrictive security measures during the entire term of their incarceration. These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the USP Administrative Maximum Facility ("ADX") in Florence, Colorado when that facility opened in 1994, and they remain housed at ADX today, over 18 years later.

5.    From 1995 to 1999, I served as Correctional Services Administrator for the BOP North Central Regional Office in Kansas City, Kansas. In that management position, I created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high security offenders from USP-Marion to the ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases - approximately 4,000 cases in all. I also oversaw the initial review process for inmates submitted for placement in the Central Unit and subsequent due process hearings.

1

6.      As Associate Warden at the USP in Leavenworth, Kansas, a prison that housed up to 2,500 inmates, I directed the "KC Model Program," which effectively managed disruptive and violent inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

7.      As Warden of FCC-Terre Haute, I managed programs and services for the various facilities at Terre Haute, including a 1,500 adult male high-security USP, a 1,200 adult male medium-security FCI, a 450 minimum-security adult male Federal Prison Camp, and death row, which housed 37 adult offenders under death sentences. I oversaw 675 personnel, managed an annual budget of $64 million, and implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I managed several emergency situations that occurred while I was Warden, including a homicide, and numerous inmate assaults and emergency lockdowns. As Warden, I received top-secret clearance to review classified documents relating to particular inmates.

8.      Between 1987 and 2006, I chaired and was a member of a number of "After Action Reviews" fact-finding committees to examine the causal factors leading up to serious prison incidents, homicides and disturbances.

9.      I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology. As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP employs to this day.

10.      I retired from the BOP in October 2006. I have been certified as an expert in BOP policies and procedures, inmate culture, and/or prison management by the United States District Courts for the Eastern District of Missouri, Eastern District of Pennsylvania, Eastern District of Missouri, Northern District of Georgia, Eastern District of Texas, and the Western District of North Carolina.

11.      In the instant case, I have been retained by counsel for Carlos David Caro and have been asked to provide my opinion, based on my thirty-year history in corrections, regarding the following matters:

- The conduct of the BOP in placing Mr. Sandoval in the cell with Mr. Caro;

- The impact of prison and gang culture in this case;

- Conditions at the BOP, including the ADX-Florence, that are designed to neutralize inmates deemed to be a threat to institutional security and/or to alleviate the threat to the safety and well-being of other individuals, whether inside or outside prison walls; and

- BOP documentation of its investigation into the death of Mr. Sandoval.

2

12.    I have reviewed the following materials: Portions of the trial record, including the opening statements and closing arguments and the testimony of Gregory Hershberger, John Gordon, John Gilley, Brian Laster, James Aiken and Mark Cunningham, Ph.D.; BOP files for Mr. Caro and Mr. Sandoval; Mr. Caro's presentence reports; miscellaneous government documents concerning inmate on inmate assaults at FCI-Lee on July 15, 2003 (Case No. 03-cr-10110-JPJ) and on August 29, 2003 (Case No. 03-cr-10115-JPJ), the direct appeal opinion affirming Mr. Caro's convictions and sentences; and various BOP regulations and program statements.

### The Placement of Mr. Sandoval in Mr. Caro's Cell.

13.    With regard to this case involving the death of Mr. Sandoval, I was surprised for a number of reasons that the prison staff placed another inmate in Mr. Caro's cell on December 16, 2003. BOP records reveal that prior to the Sandoval incident there was some sort of tension at USP-Lee among the members of a prison gang known as the Texas Syndicate and that the BOP was aware of the tension. There had been two inmate-on-inmate assaults just a few months earlier in July 2003 and in August 2003. Both the victims and perpetrators of these offenses were members, or claimed members, of the Texas Syndicate. In August 2003, Mr. Caro and another inmate were videotaped assaulting the victim of the second incident, Ricardo Benavidez. In fact, the government knew that Mr. Benavidez was the leader of the Texas Syndicate at USP-Lee at the time of his assault. In light of Mr. Benavidez's status as a leader, the BOP should have anticipated the possibility that another inmate would attempt to assault or kill Mr. Caro in retribution for the Benavidez assault.

14.    The BOP also had designated the Texas Syndicate as a dangerous "Disruptive Group." The fact that the tension was occurring within a Disruptive Group should also have caused the BOP to take extra precautions. Until the BOP concluded its investigation and determined the source of the conflict, sound correctional practices dictated that Mr. Caro should have been single celled. Before placing a cellmate with Mr. Caro, the Special Housing Unit ("SHU") prison officers should have consulted with the Special Investigative Services ("SIS") (who investigated gang activities) at USP-Lee before placing another inmate in Mr. Caro's cell, both for Mr. Caro's own protection and the protection of the other inmate. The SIS Officer or Lieutenant also should have pro-actively directed the SHU officers to single cell Mr. Caro (such as they did after the death of Mr. Sandoval).

15.    The fact that sound correctional practices dictated that Mr. Caro be single celled after the Benavidez assault is borne out by the BOP's own SIS investigative report of the assault, which recommended that Mr. Caro be kept separate from other Texas Syndicate members. While this was an appropriate recommendation for these circumstances, the recommendation should have been immediately implemented after the Benavidez assault, not 14 months after the assault when the report finally issued.

16.    I also was struck by the fact that the SHU officers did not document or communicate Mr. Caro's refusal to take a cellmate to the next shift. The officers should have written Mr. Caro an Incident Report for refusing to accept a cellmate, which is in violation of Code 306—refusing to work or accept a program assignment, or Code 307—refusing an order of any staff member. The officers also should have documented Mr. Caro's refusal in the SHU log book. The failure to document this refusal was in violation of standard operating procedures and

sound correctional practices. When an inmate refuses a cellmate, it is vital for the BOP to document the incident and discover the reason for the refusal. In light of the Benavidez assault and the likelihood that Mr. Caro did not know how all of the Texas Syndicate members were reacting to the assault, his refusal was prudent.

17.    I also was struck by Mr. Sandoval's request to be placed with Mr. Caro after Mr. Caro had just refused a cellmate. In light of the prison culture, which demands respect among inmates, this subsequent request by Mr. Sandoval suggests to me that Mr. Sandoval had a strong and specific reason to want to be placed in Mr. Caro's cell. This second request after Mr. Caro's initial refusal could be interpreted through the eyes of prison culture as an aggressive challenge to Mr. Caro.

18.    The fact that Mr. Sandoval was armed before he went into the SHU should have been another red-flag to the prison that something was going on that needed to be addressed. The possession of weapons by inmates is a sign that there is some sort of tension within the prison. Inmates want to do peaceful time. If inmates are "arming up," the prison needs to find out the source of the tension and address it.

### Prison and Gang Culture.

19.    After Mr. Sandoval's death, Mr. Caro made numerous remarks that appear callous and cold-hearted. It is necessary to view these remarks within the context of the environment – prison. In prison, it is vital for inmates to maintain an image of strength. They need to create a bad and fearful image so other inmates won't prey on them. If they do not do this, they will become a victim. An inmate's reputation is based not only on his actions, but on what he tells others about those actions. To have shown remorse after killing Mr. Sandoval would have been viewed by other inmates as a sign of weakness.

20.    At trial, Officer Gordon testified about a gang fight at FCI-Oakdale on July 11, 2002 between members of the Texas Syndicate and members of another gang known as Paisa/Border Brothers. Mr. Gordon, who was an SIS Lieutenant at the time, stated that he had concluded that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale at the time of this fight. This conclusion was based on the fact that four-to-five weeks before the fight, Mr. Gordon had reached out to leadership of the prison gangs to try to open up a dialogue between the prison and the gangs. In response to this reaching out, Mr. Caro showed up for a meeting. During this meeting, Mr. Caro gave Mr. Gordon a typical and very general inmate response, i.e., that the Texas Syndicate was going to do what it had to do and Mr. Gordon had to do what he had to do. Based on this meeting, Mr. Gordon concluded that Mr. Caro was the leader of the Texas Syndicate. Mr. Gordon also testified that after the assault, Mr. Caro stated that the Texas Syndicate was responsible for the assault, that another inmate who was a member of the Azteca gang was not involved, and that his brothers follow orders. Finally, Mr. Gordon deduced that Mr. Caro must have ordered the gang assault because he was the leader of the Texas Syndicate and the Texas Syndicate does not do anything without following orders.

21.    None of these facts, either taken alone or together, support the conclusion that Mr. Caro was a leader of the Texas Syndicate at FCI-Oakdale. In fact, they lead me to the opposite conclusion—that Mr. Caro was not the leader of the Texas Syndicate at FCI-Oakdale. There is an inherent level of distrust between prison gangs and prison officials that must be overcome

4

before any meaningful dialogue can occur between a gang and a prison. This was the first meeting between the Texas Syndicate and the prison. Under these circumstances, where there has been no prior dialogue or the establishment of mutual respect, it is highly unlikely that the leader of the Texas Syndicate, a "Disruptive Group," would blindly walk into a one-on-one meeting with Mr. Gordon. It is much more likely that the leader would have sent someone else in his place to "test the waters."

22.    Mr. Gordon also testified that he told Mr. Caro that he needed to know "who the membership was in the Texas Syndicate." As part of SIS Office, Mr. Gordon should have known that this was an extremely inappropriate question to pose to any gang member. It would be like asking the member to "give up" his brothers and cooperate with the prison. This question likely not only did not open up communications or dialogue, but likely shut the door on any future meaningful communications and hindered the development of any mutual trust.

23.    None of Mr. Gordon's testimony leads me to conclude that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale on July 11, 2002, or that he ordered the assault.

### The Ability of the Bureau of Prisons to Neutralize Inmates Deemed to be a Threat.

24.    The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder. The approximately 200,000 plus inmates in federal custody are classified according to their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." BOP Program Statement No. 5100.08 at 1 (9/12/2006, Inmate Security and Custody Classification).

25.    As it did during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological objectives and mission, including to ensure the safety of staff and inmates and the security of the prison and the public. The BOP's discretion is not absolute—it must comply with the United States Constitution, as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, however, the BOP has many tools it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

26.    Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's ability to freely communicate with anyone outside the prison, whether by phone, in person, or by mail. These strict conditions can be, and were at the time of Mr. Caro's trial in 2007, imposed for as long as the BOP deemed necessary to ensure the security and safety of prison staff, other inmates, and the public.

5

27.    As described further below, in my professional opinion, the ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the government alleged warranted Mr. Caro's death sentence. Indeed, given the circumstance of his most recent conviction, his history and his status within a Disruptive Group, Carlos Caro was eligible for ADX placement if deemed necessary and appropriate by the BOP.

28.    I strongly disagree with the government's witness testimony and argument at trial that Mr. Caro would necessarily have been housed at the ADX for only three-to-five years and then sent to another facility. As I stated previously, the main goal of the BOP is to safely and securely house inmates. If this goal required that inmates stay indefinitely at the ADX, then the inmate would not be moved to another BOP facility. I am aware of numerous inmates who, over the years, have been subject to special security measures due to the special challenges that they present, and they are still housed at the ADX. Inmates such as T.D. Bingham, Barry Mills, Thomas Silverstein, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski have been housed under very strict conditions of confinement due to security concerns, and as of December 31, 2012, continue to be housed at the ADX. To my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

29.    The proposition advanced by the government at Mr. Caro's trial that an inmate receives a great deal of freedom if not incarcerated at the ADX is, at best, a serious misstatement and, at worst, a gross distortion and mischaracterization of the BOP's role, function, authorities, and abilities.

30.    Strict conditions of confinement are not solely the province of the ADX and are nothing unusual or novel in the BOP. Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail. The BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. For example, the Special Management Unit (SMU) at the United States Penitentiary in Lewisburg, Pennsylvania, as well as six other units, has controls similar to those found at the ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions, who participated in or had a leadership role in a geographical or gang related group, or who present unique security and management concerns.

31.    Moreover, all high-security federal prisons contain a SHU where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the high-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

32.    Additionally, USP-Terre Haute and other BOP facilities, have Communications Management Units ("CMU") that isolate inmates away from the general population and are

6

designed to monitor any and all inmate communications. USP-Terre Haute also maintains the Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the BOP may also place non-condemned inmates who pose unique security risks in that unit if deemed necessary and appropriate given the circumstances. Indeed, as FCC-Terre Haute Warden, I housed non-condemned individuals in the SCU who had been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was Warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents, violent or otherwise, while they were in the SCU.

33.    Special Administrative Measures ("SAMs") also allow the BOP to construct individualized conditions of confinement "that are reasonably necessary to protect persons against the risk of death or serious bodily injury" and "may include housing the inmate in administrative detention and /or limiting certain privileges, including, but not limited to, correspondence, visiting, . . . and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAMs order is totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed by BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAMs orders are required to be periodically reviewed, they may be extended for as long as conditions persist (i.e., indefinitely). A number of inmates have been held under SAMs orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Caro's trial in 2007.

34.    At trial, Mr. Hershberger admitted that the BOP had housed Thomas Silverstein in a very high security setting, but stated that this was a "very special case." While each inmate presents a unique circumstance that warrants unique conditions of confinement, highly restrictive and secure conditions of confinement were, and are to my knowledge, routinely imposed on other high-risk inmates by the BOP for as long as necessary to ensure the security and safety of BOP staff, other inmates, and the public.

35.    Federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.

36.    The BOP can, does, and did at the time of Mr. Caro's trial in 2007, take away inmates' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public. See, e.g., BOP Program Statement No. P5264.08 at 14 (2/11/2008, Inmate Telephone Restrictions) ("Inmates may be subjected to telephone restrictions imposed by the Warden to protect the safety, security and good order of the institution."); BOP Program Statement No. 5264.14 at 10 (4/05/2011, Correspondence) ("The Warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification."); BOP Program

7

Statement No. 5267.08 at 1 (5/11/2006, Visiting Regulations) ("Warden may restrict inmate visiting when necessary to ensure the security and good order of the institution.").

37.    As a Captain, Associate Warden, and Warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. We were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls could be made.

38.    The same can be said for inmate abuse of correspondence and visitation privileges. As a senior manager or head of numerous correctional facilities, I was involved in countless decisions to terminate or closely monitor the visitation of, and correspondence to and from, specific individuals where there was a concern about institutional or individual safety. Actions taken to deter or detect unlawful conduct included, among other things, real-time monitoring and recording of visitation, review of correspondence, and the interception and translation of letters written in foreign languages or code. For example, at USP-Marion, Yu Kikumura, a member of the terrorist organization Japanese Red Army, had all incoming and outgoing mail inspected and translated. It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate. John Gotti and Luis Felipe are examples of inmates who also received this sort of treatment.

39.    Given the facts underlying Mr. Caro's convictions, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were available to the BOP in 2007, and remain available today.

## BOP Documentation of its Investigation of the Death of Mr. Sandoval.

40.    After an incident of this severity, the BOP should have created a roster of and interviewed all inmates housed on Mr. Caro's range at the time of the incident. These interviews should have been conducted as soon as possible after Mr. Sandoval's death to determine what the inmates saw or knew about the incident. These interviews are referred to as "Mass Interviews."

41.    Normally, after a suspected homicide, the BOP conducts an extensive review of the incident to determine the causes and to make thorough recommendations for preventing the recurrence of such incidents in the future. It is sound correctional policy after an incident of this nature to determine exactly what happened and why. The natural question is, "will there be more incidents?" These reviews and investigations begin at the local level (the prison) with an investigation that results in a document referred to as the "SIS Report." The SIS Report is an investigative summary of the incident, and includes an analysis of the circumstances and causes of the incident along with appropriate recommendations. The SIS Report is policy driven and is required by national BOP policy.

42.    It also is common for the BOP to conduct a regional investigation, which results in an "After-Action Report." Typically, such reviews are initiated by the Regional Director and conducted by a team of individuals from outside the institution in order to provide greater

8

objectivity and integrity to the review. It is normal protocol for these teams to look into causal factors for the incident and make recommendations for institutional corrective measures.

43.    I understand that I have been provided all of the BOP reports concerning the death of Mr. Sandoval that were provided by the government to defense trial counsel. I see no reference to any such investigation effort, which I find to be remarkable.

I declare under penalty of perjury that the foregoing is true and correct.

_____1/1/2013_____
Date

_____Mark A. Bezy_____

9