# EXHIBIT 5

# EXHIBIT 5

# DECLARATION OF STEPHEN J. KALISTA

I, Stephen J. Kalista, declare under penalty of perjury the following:

1.  I am an attorney and had licenses to practice in Virginia and Georgia. I am currently retired but practiced law from June, 1976 to December, 2007.

2.  I, along with James Simmons, represented Carlos Caro in his capital murder case, No. 06-cr-00001-JPJ-1, in the United States District Court for the Western District of Virginia.

3.  When I was appointed to represent Mr. Caro, I had represented four capital defendants who were prosecuted by the state of Virginia and one capital defendant who was prosecuted by the Federal Government.

4.  I was appointed to represent Mr. Caro in January 2005, in the case involving the death of Roberto Sandoval. At that time, the Government had not yet indicted Mr. Caro nor had it received death certification from the Department of Justice (DOJ).

5.  After Mr. Simmons and I were appointed, we sought and received funding so that investigation related to mitigation could begin.

6.  Mr. Simmons and I did not present anything in writing to the DOJ but attended in person the meeting in June 2005.

7.  In October 2005, we learned from the Government that the DOJ had authorized death.

8.  In January 2006, Mr. Caro was indicted and charged with first-degree premeditated murder, as well as three statutory aggravating factors. At that time, a trial date was set for July 2006. I felt that was sufficient time to prepare for trial.

9.  From the beginning, Mr. Simmons and I believed this would be a penalty-phase case and that our best result would be a life sentence. We did not divide the responsibilities in the case in a certain manner. We both worked on all aspects of the case.

10. We also knew from the beginning that this case involved gang activity and that the Government would be presenting information regarding this. We were aware that the Government would argue that Mr. Caro posed a future threat at least in part because of his gang activity and would use his prior actions in prison against him.

11. We attempted to present an argument during the guilt/innocence phase that Mr. Caro did not act with premeditation but rather acted in the heat of passion. I do not recall considering a self-defense argument.

12. Hans Selvog, Ph.D., ended up working as the mitigation specialist on Mr. Caro's case. Mr. Simmons recommended that we use Dr. Selvog after Lee Norton indicated that she would not be able to work under the court's hold-back provision. While Mr. Simmons and I relied upon Dr. Selvog for recommendations related to mitigation experts, I believe that I initially located neuropsychologist Malcolm Spica, Ph.D., before Dr. Selvog was retained.

13. Dr. Spica conducted neuropsychological testing of Mr. Caro. Dr. Spica provided a report that indicated Mr. Caro had brain impairment and suggested that we consult with forensic psychiatrist Keith Caruso, M.D.

14. Dr. Selvog may have recommended that we consult with a neonatologist. I do not recall speaking with a neonatologist.

15. We hired Dr. Caruso, who evaluated Mr. Caro. When Dr. Caruso was retained, we had not determined whether testimony from a mental health expert would be introduced during the guilt/innocence or the penalty phase or both. Therefore, Dr. Caruso interviewed Mr. Caro about the crime, and he learned information that was not helpful to the defense. We did not ask to hire another psychiatrist to specifically testify at the penalty phase. We did not ask to hire a consulting expert.

16. After Dr. Caruso's examination of Mr. Caro, we provided notice that we would introduce a mental health defense during both the guilt/innocence phase and the penalty phase. Shortly thereafter, we withdrew our notice of

the intent to introduce a mental health defense during the guilt/innocence phase.

17. We learned that the Government would be using Dr. Robert Phillips as its expert. We immediately sought information on Dr. Phillips, and found out that he had a good reputation and was known to present well on the stand.

18. At some point during trial, we decided that we were not going to present mental health testimony during the penalty phase. We did not review Dr. Phillips's report. We made this decision based on the reputation of Dr. Phillips, his anticipated testimony, and a feeling that we could not rebut that testimony.

19. We went to the penalty phase of Mr. Caro's trial without any expert mental health witnesses. I handled the opening statement for the penalty phase. I also handled the examination of several witnesses.

20. This was a difficult case. There was not much in Mr. Caro's personal life that we felt we could present to a jury to humanize Mr. Caro. He cheated on his wife; he was not a good father; he was a three-time loser as far as drugs; and he had difficulty while incarcerated. I think we did the best we could under the circumstances, although in the end, I don't think we were able to sufficiently humanize him.

21. I was aware that the Government was going to introduce testimony from Sean Bullock, who was housed across from Mr. Caro at the time Roberto Sandoval was killed. I received a copy of the grand jury transcript where Mr. Bullock testified. I reviewed the housing unit logs from USP Lee. I overlooked the fact that Mr. Bullock had a cellmate at the time of Mr. Sandoval's death. There was no strategic reason for not interviewing Mr. Bullock's cellmate.

22. I knew that Mr. Caro's other convictions and sentences would be used as both statutory and non-statutory aggravating circumstances. I did not pursue any collateral challenges to any of Mr. Caro's previous convictions and sentences. I had no strategic reason for failing to do so.

23. I recall that Mr. Caro pled guilty to conspiracy to commit murder of inmate Benevidez as part of a plea agreement but that an equally culpable co-defendant received a much lesser sentence. I was also aware that the principal co-defendant involved in planning the attack on Mr. Benevidez, and all other co-defendants in that case, pled guilty and received substantially lower sentences.

24. Prior to signing this declaration, I spoke with Mr. Caro's current counsel and reviewed various portions of his case file they provided to me. This declaration is not meant to be a complete description of every aspect of my representation of Mr. Caro.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Stephen J. Kalista

12/29/2012
_____
Date