# EXHIBIT 7

# EXHIBIT 7

### Declaration of Hans Selvog, Ph.D., L.C.S.W.

I, Hans Selvog, do state the following:

1. My name is Hans Selvog. I was retained as the mitigation specialist in United States v. Caro, 06-cr-00001, in the United States District Court for the Western District of Virginia. In connection with my appointment, I provided Mr. Caro's attorney Steven Kalista with a copy of my Curriculum Vitae and an affidavit I prepared for another purpose. I have attached to this declaration a copy of my then-current CV as Exhibit A and the affidavit as Exhibit B.

2. I am a licensed clinical social worker. I have a master's degree and a doctorate degree in Social Work. I have assisted the defense on behalf of indigent capital (and non-capital) defendants by conducting comprehensive, documented, and corroborated psychosocial studies and mental health analyses.

3. Before I was hired, Lee Norton had previously been the mitigation specialist on Mr. Caro's case. I do not personally know Ms. Norton, and I did not receive any documentation of what Ms. Norton may have done during her time on Mr. Caro's case.

4. The typical duties that I perform as mitigation specialist are enumerated at pages 4-5, paragraph 10, of my affidavit (Exhibit B). My role in Mr. Caro's case, however, was limited to gathering information related to his childhood and his mental health. I was not instructed to focus on his adulthood and his incarceration, nor was I instructed to investigate mitigating information related to his prior convictions. It was my understanding that such information was being gathered by the other investigator on the case, Danny Mullikin.

5. When I was retained in March 2006, the trial was scheduled for July 2006. It was continued to January 2007.

6. After I gathered information through interviews, research, and record collections, I prepared a narrative, or social history, of Mr. Caro's childhood. The purpose of this social history was to provide information to a mental health expert to assist such expert in explaining to the jury the impact of Mr. Caro's life on his mental development and functioning.

7.    When I was retained, I was informed by Mr. Caro's attorneys that a neuropsychologist had been hired to conduct testing to determine whether Mr. Caro had brain impairment. The neuropsychologist was Malcolm Spica, Ph.D. I was not familiar with Dr. Spica and had not worked with him in the past.

8.    After Dr. Spica tested Mr. Caro, he informed me that Mr. Caro had brain damage. In light of Dr. Spica's findings, in June 2006, I recommended that two additional experts were necessary in explaining Mr. Caro's developmental difficulties and his cognitive deficits: a forensic psychiatrist and a neonatologist.

9.    It is my opinion that at least one expert was necessary to testify and explain to a jury how Mr. Caro's brain impairment and traumatic childhood has impacted his life and his functioning.

10.   Forensic psychiatrist Keith Caruso, M.D., evaluated Mr. Caro in August 2006. I was not asked to do any background research on Dr. Caruso or his reputation in the community; that is something that the lawyers will generally do themselves. In a conference call with Dr. Caruso after his evaluation of Mr. Caro, I, Mr. Kalista, and Mr. Simmons learned that it was Dr. Caruso's opinion that Dr. Spica's findings of brain impairment were solid. Dr. Caruso also informed the defense team that Mr. Caro provided him with information regarding the offense that was not helpful. At that time, it was apparent that Dr. Caruso would not be able to serve as a mitigation witness. Despite this, I do not recall ever being asked for recommendations for another psychiatrist who could testify and provide the jury with an explanation of Mr. Caro's brain impairment or the impact of his traumatic childhood.

11.   I do not know why a neonatologist was not hired. My notes indicated that I recommended Gary Gutcher, M.D. I may have spoken with him, but I do not recall. I most likely would have made notes if I had spoken to anyone else.

12.   In conducting my investigation, it was my impression that the attorneys were hampered by financial concerns. At one point, I wanted to travel to Illinois to interview Mr. Caro's aunts and his cousin but was told that I could conduct the interview via telephone. I do not recall if I was ever able to

reach and speak with those relatives. It is not my practice to conduct a formal mitigation interview over the phone. I may make initial contact with a witness by phone but would then travel to a witness to meet face-to-face with them to conduct an interview. The reason for this is because the information and questions are such that human contact, rapport, and trust must be established to fully uncover possibly personal and embarrassing information that is unlikely to be available through phone call.

13. As the January 2007 trial date grew closer, I had a conversation with Dr. Spica about him testifying. During our conversation, Dr. Spica raised concerns that he could not offer testimony regarding mens rea; I assured him that we did not want him to testify about the offense or Mr. Caro's state-of-mind at time of offense but as to only his test results showing brain damage and Mr. Caro's developmental background.

14. After the trial began, I called a meeting to determine if Dr. Spica would be called as a witness. At that point, Dr. Spica was the only possible expert who could testify because there had been no other expert retained after the defense attorneys decided not to use Dr. Caruso five months earlier. During this meeting, the attorneys decided that Dr. Spica would not be called. I recall the biggest concern was that the attorneys were afraid of the Government's rebuttal expert, Dr. Robert Phillips. I had not seen Dr. Phillips' report.

15. Based on my experience as a mitigation specialist in over 100 capital cases, at that point it was too late to make strategic decisions regarding a mental health expert. Without Dr. Spica's testimony, there was no presentation of brain damage to the jury.

16. In addition to assisting with expert witnesses, I provided the attorneys with information from lay witnesses who would be able to explain facts regarding Mr. Caro's background to the jury. Prompted by the Magistrate Judge's response to the defense's request for witness subpoenas, I prepared a letter on December 8, 2006, that explained why it was important to have many lay witnesses testify.

17. We made a videotape of Mr. Caro's hometown, Falfurrias. This recording did not turn out as I had expected, as it failed to provide an accurate picture of the impoverished neighborhood in which Mr. Caro was raised. I was not

aware that it would be provided to the Government despite the fact we were not admitting it as an exhibit at trial.

18.  Another one of my duties during trial was to draft the direct examination questions for the lay witnesses. I did so and provided these questions to the attorneys. I did most of the preparation for witness testimony without the assistance of counsel. Defense counsel only met with each witness the night before their testimony, preparing them by using a copy of the direct exam guide I put together. I would describe the quality of preparation as poor because it was last minute and defense counsel did not seem to have their own sense of the mitigation story they were preparing to put into evidence. For example, when Stephen Kalista was going over the direct exam questions with a witness, he expressed confusion about the direction of the questioning and what it was we were trying to accomplish with the questions.

19.  While it is always important for lay witnesses to provide a portrait of a capital defendant's childhood, it was especially critical in this case because the jury would hear no expert witness testimony. Mr. Caro's brothers, Jose Caro III and Noe Caro, were two critical witnesses in explaining the violence and trauma that occurred while they were children. They were not called, however, to testify at trial.

20.  In my opinion, the attorneys failed to develop a strategy for presenting a compelling mitigation story.

21.  The evidence that was presented at the penalty phase of Mr. Caro's trial presented a limited picture of Mr. Caro's childhood. There were also lay witnesses who did not testify but who could have added necessary facts to the story.

22.  Moreover, notably absent from the penalty phase was an expert who would have presented evidence of Mr. Caro's brain impairment and who would have explained to the jury how his brain impairment, developmental delays, and his traumatic childhood impacted him.

Page 4 of 5

I declare under penalty of perjury that the foregoing is true and correct.

Hans Selvog, Ph.D.

12.31.2012

Date

# EXHIBIT A

# to Declaration of

# Hans Selvog

CURRICULUM VITAE

## HANS H. SELVOG, PH.D., L.C.S.W.
### Augustus Institute/National Center on Institutions and Alternatives
3127 Mt. Vernon Drive
Alexandria, Virginia 22305
Office: (703) 684-0373; Facsimile: (703) 684-6037
Home: (703) 998-6278; Cell: (703) 926-2742
Email: hselvog@ncianet.org; Website: www.ncianet.org

### EDUCATION

2005     Ph.D. in Social Work – Virginia Commonwealth University. Dissertation title: *The Nature of Collaboration between Social Workers and Probation Officers in the Treatment and Management of Sex Offenders: A Co-operative Inquiry.* Directed by Michael Sheridan.

1986     M.S.W. – Virginia Commonwealth University. Concentration: Criminal Justice.

1976     B.A. - Bethel College, St. Paul, Minnesota. Major: Social Work and Sociology.

### CLINICAL LICENSES

1991     L.C.S.W., District of Columbia, Commonwealth of Virginia, and Maryland.

1996     Virginia-Certified Sex Offender Treatment Provider, Board of Psychology, Commonwealth of Virginia.

### U.S. SUPREME COURT CITATION

2003     U.S. Supreme Court decision, Wiggins v. Smith (June 26, 2003). The Honorable Sandra Day O'Connor wrote the 7-2 majority opinion in which my work as a forensic social worker was cited throughout. http://www.supremecourtus.gov/opinions/02pdf/02-311.pdf

### CLINICAL PRACTICE EXPERiENCE

- Eighteen years post-M.S.W. plus five years post-B.A. clinical experience with adults, couples, families, and youth in outpatient and residential mental health settings.
- Eighteen years experience as expert witness (as a forensic social work evaluator) in (1) capital murder sentencing hearings at the state and federal levels and in U.S. Military Courts including pre-trial through post-trial appellate stages; and (2) state and federal criminal sentencing hearings related to violent/aggressive and sexual abuse behaviors.

### TEACHiNG EXPERIENCE

- Ten years experience as advanced-placement field instructor of M.S.W. students.
- Taught graduate level seminar "Human Behavior in the Social Environment" (SLWK 610), 1999 Virginia Commonwealth University.
- Conducted death penalty mitigation trainings for defense bars in Louisiana (2000 & 1992) and Virginia (1999, 1994, & 1993), Naval Justice School (1996), and NAACP Legal Defense Fund (1988). See attached list of itemized professional trainings / presentations.

*Page 2*

- Taught continuing education seminars for the following Maryland entities: Mental Hygiene Administration, Department of Juvenile Justice, State Prosecutor Office, Public Defender Office, Probation and Parole Office, and Juvenile Correctional Staff (2002, 1997 &1996). See attached list of itemized professional trainings / presentations.

## RESEARCH

University of New Hampshire (1999), original research presented at the Sixth International Family Violence Research Conference, "Difference in the Degree of Impairment Associated with Childhood Sexual Abuse Scale (DIASAS) Between Adult Male Survivors of Child Sexual Abuse that are Sexual Offenders and Those that are Not."

## PROFESSIONAL EXPERIENCE

June 1985 to Present
National Center on Institutions and Alternatives (NCIA)
Alexandria, Virginia

> 1989 to Present
> Clinical Director, Augustus Institute for Forensic Services, a program of NCIA.
>
> Manage private nonprofit outpatient mental health clinic. Supervise clinical staff. Write proposals and grant applications. Conduct psychosocial/psychosexual evaluations. Provide individual and group therapy services for a variety of populations including sexual offenders, persons with compulsive sexual behaviors, victims of sexual abuse (adolescents and adults) and chronically mentally ill, mentally retarded and dual diagnosed clients. Testify at sentencing on assessment and treatment recommendations. Conduct state-contracted clinical training and supervision of mental health professionals in the assessment and treatment of adult and adolescent sex offenders. Spokesperson for the Augustus Institute on issues related to sex offender treatment effectiveness and recidivism, laws governing sex offenders such as community notification, and the treatment of offenders and victims.
>
> 1987 to Present,
> Mental Health Expert and Consultant in Capital Murder Cases.
>
> Assist the defense on behalf of indigent capital (and non-capital) defendants by conducting comprehensive, documented, and corroborated psychosocial studies and mental health analyses. Serve as member of the defense team by educating and advising defense counsel on mitigating factors. To date, completed evaluation of ca. 100 death penalty defendants in both state and federal jurisdictions at most stages of litigation from pre-trial to post-conviction to habeas to clemency. Qualified and testified as an expert witness in over 15 states at both the federal and state level.
>
> 1990-1996
> Project Consultant, Community-Based Alternatives Initiative and Youth-In-Transition
> (residential programs of NCIA)

*Page 3*

Baltimore, Maryland

Prepared psychosocial assessments of and individual treatment plans for dual diagnosed population (court involved developmentally delayed and mentally ill) and chronic behavior disordered teenagers. Recommended comprehensive community-based program plan and provided weekly individualized therapy to select clients. Trained staff on assessment and treatment of compulsive sexual disorders.

1989-1990
Project Associate, NCIA Jail and Prison Overcrowding Technical Assistance
Alexandria, Virginia

Identified policies and programs to alleviate overcrowded prisons and jails for state and local governments. Comprehensive assessments provided to counties in Alabama, Delaware and Georgia.

1986-1989
Director, NCIA Southeast Regional Office
Atlanta, Georgia

Responsible for administration and management of regional office. Provided direct sentencing services to defense attorneys and the courts by investigating defendant's background and offense behavior and developing sentencing options for the consideration of state and federal courts. Conducted investigation and mitigation development in capital cases. Assessed jails and prisons and recommended methods of reducing overcrowding.

1985-1989
Case Developer, Client Specific Planning
Alexandria, Virginia

Developed comprehensive sentencing analysis reports for presentation to the courts and parole boards on behalf of felony defendants.

1985-1986
Case Developer, Parole Assistance Project
Alexandria, Virginia

Developed community-based release programs for technical violators of probation and parole for pilot program to reduce prison overcrowding. Assessed and evaluated methods of referral to the project. Developed and coordinated strategies to assure that inmate, correctional staff and the community were aware of the project. Interacted with the various levels of the criminal justice system to develop a mutual flow of information. Developed guidelines that ensured the acceptance of the project by the Courts, Parole Board, correctional staff and community.

1985
Project Coordinator
Summer Youth Employment Project, Virginia Home for Boys

*Page 4*

Richmond, Virginia

Coordinated employment project for court-referred youth. Interviewed applicants; assessed applicants' abilities; coordinated work projects and work assignments; supervised work site supervisors and youth employees; developed written framework of project philosophy and structure.

1984-1985
Case Manager
Henrico County Department of Mental Health and Mental Retardation
Richmond, Virginia

Provided case management services and supportive counseling for chronically mentally ill clients in a psychosocial rehabilitation setting. Performed psychosocial intake assessment of program applicants; developed community resources appropriate to client need; facilitated family support group and group work with clients. Developed comprehensive treatment plans.

1983-1984
Residential Counselor, Virginia Home for Boys
Richmond, Virginia

Provided supervision of and counseling for court-referred youth. Supervised youth in development of independent living skills; provided individual and family therapy; facilitated therapeutic and recreational group work in long-term treatment setting.

1982-1983
Caseworker, Youth Guidance
Rockford, Illinois

Provided individual and family therapy and supervised therapeutic and recreational group work for youth referred from the courts and state social service agencies. Provided treatment services as an adjunct to probation office; developed community resources; coordinated and supervised specially designed camping experiences for youth; testified in court about youth's behavior in treatment.

1975-1976
Chemical Dependency Counselor, Shoreview Treatment Center
St. Paul, Minnesota

Provided individual, family and group therapy in residential long-term substance abuse treatment center. Developed resources for reintegration of clients into community, supervised residents in daily treatment structure; assessed resident needs and abilities; provided educational lectures on substance abuse; monitored client progress in half-way house facility; supervised clients in community; provided aftercare out-patient counseling; coordinated therapeutic and recreational retreat for residents.

1973 to 1975
Youth Counselor, City of St. Anthony Village

*Page 5*

St. Anthony, Minnesota

Provided individual and family counseling for youth referred from city juvenile office and high school counseling office. Supervised community youth center; provided consultation to community human services board on developing community resources for youth.

## PROFESSIONAL TRAININGS / PRESENTATIONS

Maryland Mental Hygiene Administration, 2002, "Risk Assessment of Sex Offenders."
Conducted three-day continuing education training on risk assessment instruments for adults and juveniles for 30 clinical staff.

Louisiana Association of Criminal Defense Lawyers, "Capital Defense Certification" seminar, Baton Rouge, Louisiana. Invited to speak on mitigation development in capital cases. September 2000.

University of New Hampshire, 1999, original research presented at the Sixth International Family Violence Research Conference entitled "Difference in the Degree of Impairment Associated with Childhood Sexual Abuse Scale (DIASAS) Between Adult Male Survivors of Child Sexual Abuse that are Sexual Offenders and Those that are Not."

Virginia Bar Association, Death Penalty Mitigation, in Charlottesville, Virginia. 1999. Lectured on recent research on the correlation between brain dysfunction in combination with environmental traumas in the first 33 months of life and later aggressive or violent behavior during adolescence or adulthood.

Offender Aid and Restoration, lecture to volunteer staff on the assessment and treatment of sexual offenders. Summer 1999.

"Advocacy Under Megan's Laws," the sixth national conference of The National Association of Sentencing Advocates in conjunction with The Sentencing Project: The Celling of America. Arlington, Virginia, April 1998.

"The Causes, Assessment and Treatment of Sex Offenders," two-day training presented to the Maryland Department of Juvenile Justice, Department of Social Services, Mental Hygiene Administration, State Prosecutor Office, Public Defender Office, Probation and Parole Office, and Juvenile Correctional Staff, September 1996. Continued one-day seminars on above topic at Chesapeake College, Easton, Maryland, and at Maryland Regional Mental Health Hospital in Cambridge, Maryland, November 1996, and January, March and May 1997.

"An Examination of the Disproportionate Number of African American Youth in the Maryland Juvenile Justice System," Coordinator and Moderator of two, two-day conferences in Ocean City, Maryland, October 1996 and April 1997, sponsored by The Augustus Institute and the Maryland Mental Hygiene Administration, Eastern Regional Office, with a grant from the Maryland Juvenile Justice Advisory Council in the Governor's Office of Crime Control and Prevention.

*Page 6*

Capital Case Mitigation Training, invited faculty member to teach three-day death penalty litigation course, Naval Justice School Death Penalty Defense Seminar, Newport, Rhode Island, September 1996.

"Etiology, Assessment and Treatment of the Paraphilias: Compulsive Sexual Disorders," LaPlata, Maryland; Charles County Freedom Landing, Charles County Department of Mental Health, April 1996.

"Etiology, Assessment and Treatment of Sex Offenders," Alcohol and Drug Services Assessment Center, Fairfax County, Fairfax, Virginia, March 1996.

"Etiology, Assessment and Treatment of Compulsive Sexual Disorders," District of Columbia Department of Human Services, Child Welfare Agency, Washington, D.C., November and December 1995.

"Etiology, Assessment and Treatment of Compulsive Sexual Disorders," Loudon County Department of Mental Health, Leesburg, Virginia, September 1995.

"Etiology, Assessment and Treatment of Compulsive Sexual Disorders," Salvation Army, Men's Substance Abuse Residential Treatment Program, Annandale, Virginia, July 1995.

"Etiology, Assessment and Treatment of Adolescent Sex Offenders," Crossroads, Fairfax County Residential Substance Abuse Treatment Facility for Adolescents, Fairfax, Virginia, July 1995.

"Etiology, Assessment and Treatment of Adolescents and Adult Sexual Paraphilias," a two-day training/lecture presented to the Maryland Mental Hygiene Administration, Eastern Shore, Community Mental Health Professionals, October 1994; one-day training/lecture on continuation of above, Cambridge, Maryland, November 1994, and January, March and June 1995.

Death Penalty Mitigation lecture to criminal law class for Dean Jamie Ruskin, Washington College of Law, The American University, Washington, D.C., March 1995.

"Advocacy at Sentencing for the Adult Sex Offender," presentation at the ATSA 13th Annual Research and Treatment Conference, San Francisco, California, November 1994.

Death Penalty Mitigation lecture to the p-cap, post-conviction assistance project, University of Virginia, School of Law, Charlottesville, Virginia, November 1994.

"Sexual Abuse Treatment: Victims and Perpetrators," lecture at the 4th Annual Mental Health Networking Conference, Mental Health Association in Alexandria, Virginia, October 1994.

"Assessment and Treatment of Adolescent Sex Offenders," lecture to Fairfax County Juvenile Probation Office, January 1994.

*Page 7*

Virginia Capital Case Clearinghouse, Washington and Lee University, School of Law, Fifth
Annual Continuing Legal Education Seminar, "Defending a Capital Case in Virginia V,"
Lexington, Virginia, April 1993.

Sexual Abuse Multi-Disciplinary Team, Child Protective Services, Department of Human
Development, Fairfax County, Virginia, on assessment and treatment of sex offenders,
January 25, 1993.

Louisiana Association of Criminal Defense Lawyers, "Question Authority" seminar, Baton
Rouge, Louisiana. Invited to speak on mitigation development in capital cases.
September 1992.

Third Annual Seminar, The Law and Treatment of Sexual Offenders, Arlington Bar Association
and General District Court. Spoke on the treatment efficacy of therapy with sexual
offenders. November 1992.

Pinebrooke Psychiatric Hospital, Inpatient Psychiatric Clinical Program, Culpeper, Virginia, on
assessment and treatment of compulsive sexual disorders, June 1991.

Yale Conference on Alternative Sentencing for Alabama Circuit Court Judges. Invited to present a
sentencing alternative of an actual case being considered by one of the participating
judges as part of a statewide effort to utilize options to imprisonment, 1989.

NAACP Legal Defense Fund, annual training on defense work in capital cases. Invited to present
methodology for conducting corroborated social background histories and mitigation
development, Airlie House, Warrenton, Virginia, 1988.

Independent Council of Juvenile Court Judges Continuing Education Training Seminar. Invited
to present alternatives to incarceration for juvenile offenders. Georgia Juvenile Judges,
Albany, Georgia, 1987

Death Penalty Specific Continuing Education

Life in the Balance 2006, National Legal Aid & Defender Association, March 2006, Philadelphia,
Pennsylvania.

National Consortium for Capital Defense Training, February 2006, Charleston, South Carolina.

Federal Death Penalty Resource Counsel Strategy Session, November 2005, Pittsburgh,
Pennsylvania.

Making the Case for Life VII, October 2004, Arlington, Virginia.

Sex Offender Specific Continuing Education

University of New Hampshire, July 1999, Sixth International Family Violence Research
Conference.

*Page 8*

University of New Hampshire, July 1998, Fifth International Family Violence Research Conference.

Behavioral Medicine Institute, Training Program in Evaluating Sex Offenders, Atlanta, Georgia, April 1997.

Penile Plethysmography Using the CAT System, three day training at the Offices of Behavioral Technology, Inc., Dr. Robert Card, Salt Lake City, Utah, April 1996.

ATSA 13th Annual Research and Treatment Conference, San Francisco, California, November 1994.

Proper Uses of Phallometric Assessment and Aversive Counterconditioning in Treatment, by William Marshall, Ph.D., former president and lifetime achievement award winner of ATSA, at the ATSA (Association for the Treatment of Sex Abusers) 12th Annual 1993 Research and Treatment Conference, Boston, Massachusetts, November 1993.

Judith Becker, Ph.D., The Sources and Treatment of Sexual Paraphilias of Adolescents, sponsored by The Augustus Institute with a grant from the Public Welfare Foundation, October 1993.

The Assessment and Treatment of Sex Offenders Using the Penile Plethysmograph, The Farrall Institute, Grand Island, Nebraska, June 1993.

Clinical Supervision and Training under Dr. Jerome G. Miller, President of the National Center on Institutions and Alternatives, August 1989 to Present.

Second International Conference on the Treatment of Sex Offenders, University of Minnesota, Minneapolis, Minnesota, 1991.

Judith Becker, Ph.D., New York State Psychiatric Institute, Seminar at Reaffirming Rehabilitation II: Beyond the "Nothing Works" Myth Conference, Arlington, Virginia, June 1990.

## MEDIA AND MISCELLANEOUS

Quoted in NASW News. O'Neill, J. V. (2003, November). Forensic field broader than most think: Sentencing mitigation part, but not all, of practice. *NASWNews*, *48*(10). Retrieved December 2, 2003, from http://www.socialworkers.org/pubs/news/2003/11/forensic2.asp

NET cable news channel, appeared live speaking about violence between children, May 16, 1997, Washington, D.C.

USA Today, quoted on violence between children, May 5, 1997.

Channel 8 News, Daytime Talk, with Monique Braxton, during sexual abuse awareness month, on treating victims of sexual abuse, May 1997, Springfield, Virginia.

*Page 9*

CNN, Burden of Proof, appeared live speaking about Megan's Law, April 8, 1997, Washington, D.C.

CNN Radio Detroit with Jimmy Barrett, appeared live speaking about sex offender treatment via telephone on February 27, 1997.

KNZR-1560, The Rob and Danielle Show, appeared live via telephone on the treatment of sex offenders, on February 19, 1997, Bakersfield, California.

Appeared on MSNBC cable news network on the effect of limiting appeals for death row inmates, October 1996.

Appeared on Fox Morning News on Community Notification of Paroled Sex Offenders, November 1996.

Quoted in the Virginia Child Protection Newsletter on Sex Offender Treatment Outcome, Volume 48, Summer 1996.

# EXHIBIT B

# to Declaration of

# Hans Selvog

Affidavit of Hans Selvog    1
Capital Case Mitigation

COMMONWEALTH OF VIRGINIA
CITY OF ALEXANDRIA

## AFFIDAVIT OF HANS H. SELVOG

Personally appeared before the undersigned officer duly authorized to administer oaths, **HANS H. SELVOG**, who, after having been duly sworn, deposes and says on oath, that the facts set forth below are true and correct.

1.       My name is Hans H. Selvog.  I am the Clinical Director of the Augustus Institute, an outpatient mental health clinic of the National Center on Institutions and Alternatives.  Formerly, from September 1986 to June 1989, 1 was the Director of the Southeast Regional Office of the National Center on Institutions and Alternatives in Atlanta, Georgia.  My background is in Clinical and Forensic Social Work and, since 1973, includes case management services to the juvenile justice system in Illinois, Minnesota and Virginia, and direct sentencing services in adult and juvenile courts to attorneys and their clients throughout the Midwestern, Northeastern and Southeastern regions of the United States.  I also have clinical experience treating the chronically mentally ill, the chronic substance abuser, and the victims and perpetrators of sexual abuse, which includes juvenile, adult and developmentally handicapped populations.  I have provided therapeutic services to juveniles, adults, couples and families.  I have a Doctoral Degree in Social Work and I am certified as a Licensed Clinical Social Worker in both Virginia and the District of Columbia.  I have conducted hundreds of comprehensive social histories for use in the courts.  I have spent hundreds of hours per case investigating social backgrounds of capital case defendants in over 150 cases.  In most of these cases, I have provided testimony in court on the information I have gathered.  I have been qualified as an expert witness in six capital cases in Maryland, one capital case in Tennessee, one capital case in Louisiana, one capital case in Indiana, two federal capital cases in the Eastern District of Virginia, Richmond Division and Norfolk Division, a federal habeas corpus hearing before a

**KS-287**

Affidavit of Hans Selvog   2
Capital Case Mitigation

magistrate in the Western District of Virginia in Roanoke, and in the United States Marine Corps' general court-martial proceedings involving two capital offenses in North Carolina and one in California. As Director of NCIA's Southeast Regional Office, I received a grant to utilize my office as a national clearinghouse on expert mitigation development and assistance to attorneys representing capital defendants. In 1988, I conducted a training seminar on mitigation development and social history investigation for the annual NAACP Legal Defense Fund Death Penalty Conference at Airlie House in Warrenton, Virginia. Subsequently, I have been an invited lecturer on capital case mitigation to continuing legal education seminars for defense attorneys in Louisiana and Virginia. Finally, I recently taught at the Naval Justice School in Newport, Rhode Island, on death penalty mitigation preparation.

2.     The National Center on Institutions and Alternatives is a private, non-profit criminal justice and mental health organization with 20 years experience providing penalty phase services to defense counsel and their clients. Services in capital cases include a comprehensive compilation of the defendant's psychosocial background, a clinical assessment of this data, and expert testimony during the penalty phase.

3.     Capital defense experts unanimously agree that preparation of each and every death penalty trial should include a realistic expectation that the case will progress to the penalty phase. Therefore, it is imperative from the very beginning that the defense team aggressively search out and put together a complete economic, educational, medical, mental health, and psychosocial history of the client from several generations prior to the defendant's birth to the present day. Otherwise, mitigating circumstances may go undiscovered or misunderstood. The United States Supreme Court has clearly stated the purpose of presenting mitigation information which I have an expertise in gathering and presenting. With the defendant's life in the balance, it is incumbent upon trial counsel to conduct an adequate mitigation investigation which trial counsel is obligated by law to do.

**KS-288**

Affidavit of Hans Selvog   3
Capital Case Mitigation

4.      Defense counsel asked me in my capacity as an expert mitigation specialist to estimate the cost and time of conducting a social history for the consideration of the court. Conducting a thorough investigation requires a minimum range of 250 to 300 hours and an expertise quite different in scope from that of most defense attorneys. My rate for providing this service is $150 an hour plus expenses. Expert testimony at sentencing is in addition to this estimate.

5.      First and foremost will be to interview the defendant. The initial interview will take two full days. At least two or more follow-up interviews will be conducted following the different phases of the investigation: interviewing witnesses and examining retrieved records.

6.      The defendant's formative and developmental years are critical and it will be required to interview family, friends and other witnesses who knew the defendant. These witnesses include but are not limited to medical doctors, school teachers, and neighbors. Documents such as medical, educational, social service, mental health, etc. pertaining to the defendant, which includes relevant records of family members, will be reviewed and attempts will be made to interview those who, as noted in the records, had direct contact with the defendant or his family. In the course of an investigation, many new leads are discovered that were not anticipated prior to the investigation's embarkment. Time must be allowed to follow-up on additional and potentially effective newly discovered witnesses.

7.      Once this information is obtained, an equal and usually greater amount of time is required to analyze it and to write a corroborated, comprehensive chronological narrative addressing the defendant's psychosocial development as well as the pertinent legal issues raised by defense counsel. All time and tasks will be carefully documented for the Court and filed on a regular and timely basis for payment.

**KS-289**

Affidavit of Hans Selvog    4
Capital Case Mitigation

8.    A completed psychosocial history is foremost and critical to defense counsel by informing them of the issues in the defendant's background which point to other experts who will be needed to further investigate the effects of particular areas of mitigation specific to the defendant. A thoroughly investigated background report takes a minimum range of four to six months to complete.

9.    Drawing on my clinical background in assessing symptoms of substance abuse, mental illness, mental retardation, learning disorders, domestic violence, physical/sexual abuse, and other emotional/psychological disorders and environmental/developmental stressors, the information derived from an investigation would be used to corroborate pertinent mitigating factors of the defendant's psychosocial background and developmental history. The facts obtained would be presented during the sentencing phase of the trial and do most certainly shape defense counsel's approach to the guilt/innocence phase.

10.    A complete capital case social history investigation will include the following:
a)    Interview Defendant.

b)    Interview nuclear and extended family members, significant others, employers, co-workers, neighbors, friends, school teachers, classmates, co-defendants; if applicable, interview probation officers, foster parents, foster siblings, social workers, institutional staff: mental health, jails, prisons, medical.

c)    Compile records of social service, mental health, criminal justice, educational, and medical documents to complete a psychosocial history and interview practitioners directly involved with defendant in each record.

d)    Travel will be required for interviews and many interviews may need to be conducted several times. Also gather physical evidence (i.e., photographs, video tapes) to recreate background of defendant for jury.

e)    Identify witnesses, prepare affidavits, identify custodian of records, obtain certified records to be used as evidence. Obtain

**KS-290**

court order when defendant was raised in a different state than the state where the individual is being tried to have records released or when juvenile records are present.

f)     Assess symptoms of psychosocial/medical problems and alert defense attorneys of additional experts necessary to establish presence of mental handicap, learning disorder, substance abuse/addiction, physical/sexual abuse, neurological condition (i.e., temporal lobe disorder), mental illness, and other conditions or trauma significant to mitigation.

g)     Development of mitigation for presentation to jury.

h)     Investigate institutions:    Gather reports which describe conditions and practices of the treatment facilities in which the defendant was committed.

11.    In many cases, in order to provide assistance to indigent capital defendants, the Court has authorized funds for counsel to hire the Augustus Institue/National Center on Institutions and Alternatives for expert assistance in preparation of the penalty phase of a capital trial. Funds have been authorized in the following capital cases (the cases in bold face type are those in which I personally conducted the investigation): State of Georgia v. Carl Isaacs, Perry, 1987; State of Georgia v. Wayne Coleman, Atlanta, 1987; State of Georgia v. Larry Ragus, Gwinnett County, 1989; State of Georgia v. Danny Rucker, Royston, 1989; State of Georgia v. Johnnie Dee Jones, Lincoln County, 1992; Commonwealth of Virginia v. Frank Weston, City of Alexandria, 1986; Commonwealth of Virginia v. Ronald Henderson, Winchester, 1991; Commonwealth of Virginia v. Virgil Fox, Jr., Nelson County, 1991; Commonwealth of Virginia v. Joseph Wise, 1993;  Commonwealth of Virginia v. Russell Tross, Rockingham County, Harrisonburg, 1993; Commonwealth of Virginia v. Carlson Robinson, 1994; Commonwealth of Virginia v. Bruce Kenney, 1995; Commonwealth of Virginia v. Gregory Murphy, 2001; State of Tennessee v. Jay Cameron, Nashville, 1987; State of Tennessee v. David Scott Poe, Montgomery County, 1991; State of Tennessee v. Joe T. Baker Jr., Clarksville, 1992; State of Tennessee v. Courtney Mathews, 1995; State of New Hampshire v. Kenneth Johnson, Hillsborough County Superior Court, 1990; State of

**KS-291**

Oklahoma v. Alfred Brian Mitchell, 1992; State of Indiana v. Rufus Averhart, Allen County, 1995, State of Ohio v. Rosalie Grant, Johnston, Ohio, 1985; and State of Indiana v. Rufus Averhart, 1995. In the federal courts, I have been appointed in the following cases: United States of America v. Private Ronnie Curtis, U. S. Court of Military Appeals, 1991; United States of America v. L.Cpl. Kenneth G. Parker, Onslow County, North Carolina, 1992; United States v. LCDR Michael W. Fricke, SC, USN, Naval Base Norfolk, Virginia, 1994; United States v. L.Cpl. Shannon Schlamer, Camp Lejeune, 1994; United States of America v. Srgt. Jesse Quintanilla, Camp Pendleton, 1996; United States of America v. Richard Tipton and United States of America v. Marvin Damon, Eastern District of Virginia - Richmond Division, 1992; United States of America v. Jean Claude Oscar, Eastern District of Virginia - Norfolk Division, 1994; United States of America, District of Columbia, v. Wayne Perry, 1994, United States of America, District of Columbia, v. Donzell McCauley, 1994; United States of America, Northern District Court of New York, v. Tyrone Walker, 1995; United States of America v. Terrance Boyd, Rhode Island, 1995; United States of America v. Cory Gist, Eastern District of North Carolina, 1996; United Stated of America v. Denis Rivera, Eastern District of Virginia – Alexandria Division, 2005; United States of America v. John Richard Mayhew Jr., Southern District of Ohio, 2005; United Stated of America v. Tommie Dorsey, Washington, D.C., 2005; and United States of America v. Donald York, Eastern District of Michigan, 2005.

12.     The State of Maryland through the Public Defender's Service has authorized expenditure of public funds for our services in the following cases: State of Maryland v. Derrick White, 1988; State of Maryland v. Michael Moore; State of Maryland v. James Bailey, Prince Georges County, 1984; State of Maryland v. James Calhoun El, Montgomery County, 1990; State of Maryland v. Timothy Deadrick, 1991; State of Maryland v. Marselle Bowers, 1991; State of Maryland v. Richard Tichnell, 1991; State of Maryland v. Ronald Scoates, Queen Anne County, 1991; State of Maryland v. Tyrone Gilliam, Towson, 1992; State of Maryland

**KS-292**

v. Kenneth Collins, Somerset County, 1992; State of Maryland v. Damon Bowie, Prince George's County, 1992; State of Maryland v. Michael Warren, Montgomery County, 1992; State of Maryland v. Kevin Wiggins, 1993; State of Maryland v. Michael Whittlesey, Caroline County, 1993; State of Maryland v. Michael Bryson, Anne Arundel County, 1993; State of Maryland v. Alan Newman, Montgomery County, 1993; State of Maryland v. Rodney Solomon, Howard County, 1993; State of Maryland v. Scotland Williams, 1994; State of Maryland v. Wallace Ball, Towson, 1995; State of Maryland v. John Johnson, Cumberland, 1995; and State of Maryland v. Alexander Watson, 2005.  The State of Louisiana, through the indigent defender offices has authorized expenditure of public funds for our services in the following cases:  State of Louisiana v. Stanley Lay, New Orleans, 1986; State of Louisiana v. Willie Watson; State of Louisiana v. Floyd Carmouche, Lafayette, 1988; State of Louisiana v. Chad Lukas Young, Opelousas, 1990; State of Louisiana v. Andra Coleman, Opelousas, 1990; State of Louisiana v. Jeffrey William Simpson, Lafayette, 1989; State of Louisiana v. Gerald Wilson, Metarie, 1989; State of Louisiana v. Jimmy Charles, Opelousas, 1991; State of Louisiana v. Darrell Aucoin, Lafayette, 1991; State of Louisiana v. Kevin Touchet, Lafayette, 1991; State of Louisiana v. Tyjuane Williams, Baton Rouge, 1992; State of Louisiana v. Bartholomew Cross, Lake Charles, 1993; State of Louisiana v. Rickey Langley, Lake Charles, 1993; State of Louisiana v. James Christopher Hudson, Opelousas, 1993; State of Louisiana v. Albert Earl Lavalais, Opelousas, 1993; State of Louisiana v. Sidney Robinson, 1995; and State of Louisiana v. Eric Proctor, Lafayette, 1996.

13.    In the western region of the United States, NCIA has been appointed in the following cases:  State of California v. Peter Fan, 1986; State of California v. Robert Massie, 1986; State of California v. Ernest Kirkwood, 1987; State of California v. Brian L. Marquess, 1988; State of California v. James O'Malley, 1988; State of California v. Fermin Ledesma, 1989;

**KS-293**

Affidavit of Hans Selvog    8
Capital Case Mitigation

State of California v. Carlos Avena, 1989; State of California v. Peter Edelbacher, 1989; State of California v. Edward Wilson, 1991.

14.    In addition, we have provided services through funding by the Louisiana Indigent Defense Board, the Florida Office of the Capital Collateral Representative, and the Virginia Capital Representation Resource Center.

15.    Finally, NCIA has been appointed in several cases at the federal habeas corpus level of appeal: Commonwealth of Virginia v. Herman Barnes, Oklahoma v. Wayne Thompson, several cases in Florida, Commonwealth of Virginia v. Roy Bruce Smith, 1994; Commonwealth of Virginia v. Larry Stout, 1994; Commonwealth of Virginia v. Ronald Watkins, 1994; and Commonwealth of Virginia v. Johnile Dubois, 1995.

**KS-294**

Affidavit of Hans Selvog   9
Capital Case Mitigation

FURTHER AFFIANT SAYETH NOT

THIS _____ day of _____, 2000.


_____

Hans H. Selvog


Sworn to and subscribed before

me this _____ day of _____, 2000.


_____

Notary Public

**KS-295**