# EXHIBIT 8

# EXHIBIT 8

## Declaration of Donna Marie Schwartz-Watts, M.D.

I, Donna Marie Schwartz-Watts, M.D., declare under penalty of perjury:

### Professional Background

1. I am a physician licensed to practice medicine.

2. I completed medical school in 1989, and graduated from the University of South Carolina School of Medicine.

3. I am Board Certified in General Psychiatry and have Added Qualifications in Forensic Psychiatry. My curriculum vitae is attached to my declaration as Exhibit A.

4. From June 1997 until June 2010, I was an Associate Professor and then Professor of Clinical Psychiatry and the Director of Forensic Services in the Department of Neuropsychiatry at the University of South Carolina School of Medicine. During my tenure at the University, I taught residents as well as treated patients. I conducted research and presented and published papers.

5. I am presently employed at Bryan Psychiatric Hospital as a Senior Psychiatrist. I treat people with post-traumatic stress disorder (PTSD) on a frequent basis. The treatment team I work with routinely screen all patients we treat for PTSD with a questionnaire. Many of our patients would not be diagnosed were it not for this specified form of screening. I remain a Department of Mental health Professor of Psychiatry at the University of South Carolina School of Medicine and a Clinical professor of Forensic Psychiatry at the Medical University of South Carolina. I continue to train medical students and residents in Forensic Psychiatry.

6. I also conduct psychiatric evaluations at the request of clients, attorneys, and courts in both criminal and civil cases. Throughout my career, I have conducted thousands of forensic evaluations. From November 1998 until June 2009, I served as a court-appointed psychiatrist (through a contract with the Department of Mental Health) under the South Carolina Sexually Violent Predator Statute. I

have been qualified as an expert in both state and federal court approximately 750 times.

## Involvement in Carlos David Caro's Case

7.  I was contacted by Assistant Federal Public Defender Robin Konrad and retained in *United States v. Caro*, 06-cr-00001. I was retained to review the prior evaluations conducted in preparation for Mr. Caro's trial, and to review information regarding Mr. Caro's background that was collected and prepared by defense counsel in preparation for trial as well as information presented during his trial. Upon Ms. Konrad's request, I evaluated her client Carlos David Caro, reviewed documents that I have been provided, and am now offering my opinion.

8.  I evaluated Mr. Caro on January 3, 2013. I met with Mr. Caro for approximately two hours at USP-Terre Haute, where most federal death row inmates are housed. This was a contact interview conducted at a table separating the two of us in a legal visitation room. Mr. Caro was restrained in handcuffs, a waist chain, and ankle restraints, consistent with the policies of the United States Bureau of Prisons. My initial evaluation consisted of an interview and mental status examination.

9.  In addition to my evaluation of Mr. Caro, I have reviewed records related to Mr. Caro including, but not limited to:
    - Neuropsychological Consultation, by D. Malcolm Spica, Ph.D., 06/19/2006 and 06/16/2006;
    - DVD of evaluation of Mr. Caro on 11/30/2006, by Dr. Robert Phillips, M.D., Ph.D., D.F.A.P.A.;
    - Report of Forensic Evaluation, by Robert Phillips, M.D., Ph.D., D.F.A.P.A., and Paul Montalbano, Ph.D., 01/29/2007;
    - Letter from Dr. Phillips to Honorable James Jones, 11/29/2006;
    - Declaration of Hans Selvog, Ph.D., L.C.S.W., 12/11/2006;
    - Testimony of Susannah Rodriguez, 02/07/2007 Trial Transcript pp. 69-115;
    - Testimony of Yomedia Martinez, Delia Contreras and Diamantina Razo, 02/07/2007 Trial Transcript pp. 123-171;

- Testimony of Laura Perez and Lou Yveth Caro, 02/08/2007 Trial Transcript pp. 2-63;
- Defense Trial Exhibit No. 8, Carlos Caro School Records;
- Defense Trial Exhibit No. 9, Letter from Brooks County ISD Director of Special Education to Dr. Hans Selvog;
- Time-line Narrative Chronological Critical Incidents and Developmental History of Carlos Caro.

10.  I have not reviewed all of the documents that Dr. Phillips indicated in his report he reviewed. It is my understanding from counsel that Dr. Phillips has destroyed those records.

11.  After conducting an evaluation and reviewing the records listed above, I offer the following information and opinions. I reserve the right to supplement this declaration and my opinions expressed here should I receive additional information.

## Background Information and Summary of Diagnoses

12.  After my initial evaluation of Mr. Caro and my review of his records, it is my professional opinion that Mr. Caro meets the criteria for the following disorders based on the Diagnostic and Statistic Manual of Mental Disorders (DSM-IV-TR).

| | |
|---|---|
| Axis I) | Anxiety Disorder NOS (PTSD), 300.00 |
| | Cognitive Disorder NOS, 294.9 |
| | Adult Antisocial Behavior, V71.01 |
| Axis II) | No diagnosis |
| Axis III) | No diagnosis |
| Axis IV) | Incarceration |
| Axis V) | 55 |

13.  I also informed Ms. Konrad that it is my opinion that Mr. Caro should be given a more complete neuropsychological evaluation, a Positron Emission Tomography (PET), and a repeated Electrocephalography (EEG), to determine his present cognitive functioning. He has long term and short term memory deficits. He performed poorly on tasks of verbal fluency and visuospatial design. He had a history of impairments and a prior abnormal EEG, which may have been of poor quality according to Dr. Phillips report. His family reports he had a history of staring off into space when he was younger. Mr. Caro could

benefit from neuroimaging. Neuroimaging (PET) delineates brain function, whereas the MRI that Mr. Caro had delineates brain structure. Since he does give up on tasks due to frustration, the neuroimaging will complement his neuropsychological testing. Having a normal MRI means that Mr. Caro's brain structure is intact, but it is not a study of brain function.

14. During my mental status examination of Mr. Caro, he was reserved and only answered questions asked of him. He rarely offered spontaneous speech. He did not appear anxious, although when he became frustrated at a task, he would smile inappropriately. His affect was generally constricted, although he smiled appropriately a few times and on one occasion appeared sad when discussing the death of his mother. He also smiled inappropriately when performing cognitive tasks that were difficult. Mr. Caro was not psychotic, suicidal, or homicidal, although he has a foreshortened sense of the future. He was able to maintain eye contact.

15. On the cognitive screening testing I conducted, Mr. Caro was alert and orientated to all but the date, which he missed by one day. He had difficulty performing a task of abstraction. He could not explain how a car and train were alike. Only when prompted, Mr. Caro was able to respond, "they move." He was unable to abstract the similarity between a fly and a tree. Mr. Caro registered three items but was only able to recall two after five and ten minutes. He was not able to recall the third object with a clue and forced choice. He was unable to name three wishes when asked. He did answer "freedom."

16. On further cognitive testing, Mr. Caro performed poorly on a test of verbal fluency. He was asked to provide as many words as possible beginning with the letter "D." Mr. Caro was only able to provide four words before becoming anxious and repeatedly saying, "I don't know," not realizing that "don't" begins with a "D." He gave up on this one-minute task after 40 seconds. Mr. Caro also had difficulty reproducing a visual spatial design. Although, Mr. Caro was handcuffed he did not appear mechanically limited when completing the task. When reproducing two intersecting pentagons, he did not complete angles, and he overshot angles.

17. Mr. Caro's performance on cognitive testing is indicative of dysfunction based on his age, lack of head injury, and his reported abstinence from alcohol since his confinement. His performance is consistent with the more sensitive testing performed by Dr. Spica. There was no evidence that he was intentionally trying to perform poorly. He would give up on more difficult tasks after an initial good effort.

18. In his mental status examination, Dr. Phillips does not report doing verbal fluency cognitive screening tests. Dr. Phillips did not note short term memory impairment. The cognitive screening testing, however, is only screening; it is not intended to be used for the purpose of determining the extent of cognitive deficits.

19. Mr. Caro's history is significant in regards to the trauma he experienced and was exposed to during his developmental and formative years. Furthermore, the developmental delays which were reported by various family members prior to and during his trial are multifactorial. Developmental delays can be seen in children with cognitive impairments and in children who are exposed to trauma.

20. The reports prepared by prior evaluators that I have reviewed fail to discuss a complete trauma history for Mr. Caro. Some evaluators noted his exposure to abuse but did not record or review any symptoms of post-traumatic stress disorder or other anxiety disorders. If they had taken a complete trauma history, they would have identified several symptoms of PTSD that were reported and/or exhibited. For instance, Mr. Caro has difficulty recalling specific details of traumas he witnessed; he has a poor memory of his childhood. Mr. Caro avoids discussing witnessing his mother's physical abuse and avoids describing his own abuse at the hands of his brother. He denies having a startle response but admits being hyper alert when he is in the general prison population, which he refers to as the compound. Mr. Caro has noted a decrease in his alertness since he takes recreation alone due to his status.

21. Mr. Caro was born in Falfurrias, TX on February 9, 1967, to Jose Maria Caro Jr. and Virginia Rodriguez Caro. Mr. Caro was the second born of four children. All four children born to Jose Jr. and Virginia were boys. According to several family members, Mr. Caro

was a sickly infant who vomited frequently. He was unable to hold down milk or formula. After some time, the family realized that Mr. Caro was able to keep goats milk down. In addition to Mr. Caro being a sickly infant his mother was suffering from postpartum depression after giving birth to him. Mr. Caro did not walk until he was almost two years old. Family members reported that Mr. Caro stayed to himself and that he was known as "El Mudo," which means The Mute.

22. Mr. Caro's father was an abusive alcoholic with a criminal history who eventually died in 1987 from cirrhosis of the liver. Prior to his father's death, Mr. Caro endured a childhood filled with witnessing his father beat his mother. It was not uncommon for Mr. Caro's father to come home drunk to their small, one bedroom home and beat his mother severely. His father would beat his mother on a daily basis because he was drunk on a daily basis. Mr. Caro's siblings recall their father beating their mother and giving her black eyes.

23. It did not take long for Mr. Caro's older brother, Jose III, to learn from their father's physical abuse. Mr. Caro would often be punched or hit by his older brother Jose III. Mr. Caro never knew why his brother would beat him, but he recalls it happening frequently. He reports that he does not recall fighting back. As a child, not knowing when or why the beatings would come caused Mr. Caro great anxiety.

24. Not only was Mr. Caro's father physically abusive towards Mr. Caro's mother, but he had an extramarital affair. The affair ended with Mr. Caro's father being shot in the chest by his mistress, which almost caused his death. Mr. Caro's older brother, Jose III, witnessed their father being shot. Upon being asked, Mr. Caro said when he was a child he knew of his father's unfaithful behavior, as did his mother.

25. When Mr. Caro's mother was angry at his father she would abandon her children in order to go out to dance. According to family members, Mr. Caro's mother neglected her children because she did not provide the attention her boys needed. Mr. Caro's mother was not the type of mother who would help him get ready for school, make sure he got to school, or help with his homework. When Mr. Caro was little he would get dressed the best way he could and walk to a family member's house to get something to eat before school. Mr.

Caro's aunt reported that, at nine-years-old, Mr. Caro could not tie his shoes or tell time.

26.    Mr. Caro struggled in school. Mr. Caro was given the Otis-Lennon Mental Abilities Test which yielded an IQ of 87 in the second grade, an 84 in fourth grade, and an 83 in 8th grade. According to his school records, when he was given the California Achievement Test in the sixth grade, he was functioning at a third grade level when it came to his vocabulary and comprehension. By sixth grade, Mr. Caro was placed in special education classes. He dropped out of high school before completing the tenth grade.

27.    Mr. Caro was 17-years-old at the time of his father's death, but when asked, he was unable to recall his age. According to reports from his aunt, Mr. Caro was in the hospital room at the time of his father's death. Mr. Caro has no specific memory of his father taking his last dying breath.

28.    Mr. Caro's mother passed away while he was incarcerated and he was unable to attend her funeral. He admitted to having one period of depression after the death of his mother. He stated he was "messed up" for a couple of months afterwards.

29.    I reviewed the trial testimony describing Mr. Caro's childhood family home as reported by Mr. Caro's three aunts and one cousin. I also reviewed the Time-line Narrative of Chronological Critical Incidents and Developmental History of Carlos Caro, which I have been told was prepared by the mitigation specialist before Mr. Caro's trial. While Mr. Caro's extended family members reported some of the traumatic events that occurred in Mr. Caro's family, witnesses such as Mr. Caro's brothers would have been able to describe the violence they each endured and/or witnessed in their childhood family home. They have been described as more verbal and social than Mr. Caro.

### Discussion of Diagnoses

30.    I have diagnosed Mr. Caro with Anxiety Disorder NOS (not otherwise specified), and determined that he meets some of the criteria for PTSD. As previously mentioned, Mr. Caro's family told prior counsel information which was consistent with symptoms of PTSD

such as his cousin describing Mr. Caro as being a reserved and quiet child who didn't volunteer information which is consistent with being avoidant; his maternal uncle Daniel noting that Mr. Caro stayed to himself and avoided groups; paternal aunts Delia and Veronica noting that Mr. Caro never talked to anyone. In addition, Mr. Caro's brother Noe stated that Mr. Caro liked to stay alone and be by himself.

31. Individuals who suffer from PTSD often have constricted affect. This means that they do not outwardly express emotions with a full range. In other words, their outward expression of emotions does not reflect their inner feelings. For example, when discussing the death of his mother, Mr. Caro remained reserved and reported feeling sad, but his outward expression of emotion did not reflect the sadness he reported.

32. In Dr. Phillip's report Caro, he mentioned that Mr. Caro saw his father beat his mother up during his childhood, but Dr. Phillips never addressed the trauma and the effect it had on Mr. Caro. Dr. Phillips noted Mr. Caro's potential for violence should decrease based on actuarial scales but that Mr. Caro felt disrespected and retaliated against. One of the major symptoms of PTSD is that the individual often re-experiences the traumatic events. While Mr. Caro denies that he has recurrent intrusive thoughts about childhood events, he does avoid thinking about traumatic events. In a letter Mr. Caro wrote to his wife, he prayed that other inmates would "stay the fuck away from him," which is indicative of the avoidance symptom of PTSD.

33. I have also diagnosed Mr. Caro with Cognitive Disorder NOS. He has problems with verbal fluency, short term memory, long term memory and reproducing a visuospatial design.

34. Dr. Spica conducted a neuropsychological evaluation of Mr. Caro prior to his trial and reported frontal lobe dysfunction. Dr. Spica tested Mr. Caro in the 1st percentile on management of information, maintaining cognitive set and concept formation. Mr. Caro scored in the 1st percentile on the Wisconsin Card Sorting – Categories Achieved. He scored in the 7th percent in Booklet Category Test. Dr. Spica ultimately diagnosed him with Cognitive Disorder, Not Otherwise Specified. On his present mental status examination, Mr. Caro continues to demonstrate difficulties with frontal lobe functioning. Neuropsychological testing is a more sensitive method to

delineate brain functioning compared to mental status examination and neurological evaluation.

35. On the Validity Indicator Profile (VIP) Dr. Spica found that Mr. Caro did not sustain consistent effort as the items got harder. He did poorly on Trails B which is another indicator of cognitive impairment.

36. I have also diagnosed Mr. Caro with Adult Antisocial Behavior. In reaching this diagnosis, it should be noted that he only meets the criteria for adult antisocial behavior because his current conviction consists of an act that imposed physical or psychological harm on another person. Mr. Caro does not have a life-long history or childhood history of engaging in such aggressive behavior. This diagnosis is different from a diagnosis of Antisocial Personality Disorder. Adult Antisocial Behavior is another condition that is the focus of clinical attention but is not indicative of mental illness. To be clear, this diagnosis is not a personality disorder, and was incorrectly coded on Axis II by Dr. Phillips.

37. Because Mr. Caro's mother is deceased, I did not have the opportunity to question her directly regarding her ability to parent her sons while dealing with a physically abusive alcoholic spouse. As discussed in paragraph 25 above, there are indications that Mr. Caro's mother was neglectful of her duties as a parent due, in part, to the abusive relationship she had with her husband. There is evidence that Mr. Caro failed to take initiative and respond to social interactions in an appropriate developmental way. He had symptoms of "frozen watchfulness," which is a lack of attachment that can be associated with pathological care. (DSM-TR p. 127). In other words, this behavior could be a direct result of his mother's neglect. His deficits may have also been indicative of a pervasive developmental disorder; however this is less likely since the symptoms of muteness and staring off into space have not persisted into adulthood.

38. As Dr. Phillips noted in his report, Mr. Caro has had no criminal history prior to the age of 20 years old despite his siblings and other family members having strong histories of criminal activity.

39. Mr. Caro also has a strong family history for substance abuse. Mr. Caro as well was a former substance abuser. I agree with Dr.

Phillips's diagnosis of Polysubstance Dependence By History. Mr. Caro presently denies using any substances since his confinement at Terre Haute.

40.    In general, Mr. Caro is a reserved individual who tends to avoid conflicts and unnecessary interactions with others, although he is able to adapt. He was reared in an environment where domestic violence was common, and he was a victim of domestic violence. There is no evidence that Mr. Caro has been a follower or a leader. He describes himself as a loner and demonstrates avoidant characteristics. Being avoidant is one of the symptoms of PTSD. Mr. Caro was raised in poverty and became involved in transporting drugs as a means of financial security. He also had a comorbid substance abuse, which is often associated with exposure to trauma.

41.    As a result of Mr. Caro's brain impairment and anxiety disorder likely arising from his traumatic history, he tends to become more increasingly anxious and unable to use all of the cognitive strategies available to him. His baseline cognitive impairments are further exacerbated by his anxiety disorder. What this means is that when Mr. Caro becomes anxious, he is more likely to exercise poor judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 7th day of January 2013, in the State of South Carolina.

_____
Donna Marie Schwartz-Watts, M.D.

# EXHIBIT A

## to Declaration of

## Donna M. Schwartz-Watts

# Curriculum Vitae
## *DONNA MARIE SCHWARTZ-WATTS, M.D.*
donnawattsmd@gmail.com

## PRESENT POSITIONS:

**Senior Psychiatrist (certified)**
Bryan Psychiatric Hospital

**DMH Clinical Professor of Psychiatry**
University of South Carolina School of Medicine
Department of Neuropsychiatry and Behavioral Science

**Clinical Professor, Forensic Psychiatry Program**
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences

## PROFESSIONAL LICENSURE:

Diplomate, Psychiatry, (Board Certification #40726), January 1995, recertified 7/05
Added Qualifications in Forensic Psychiatry, July 1996 #471, recertified 7/06
South Carolina Medical License # 16574

## EDUCATION:

1981 - 1985
B.A. Psychology
Furman University
Greenville, South Carolina

1985 - 1989
Doctor of Medicine
University of South Carolina School of Medicine
Columbia, South Carolina

**POSTGRADUATE FELLOWSHIPS AND RESIDENCY POSITIONS:**

1989 - 1993            Resident in General Psychiatry
                       William S. Hall Psychiatric Institute
                       Columbia, South Carolina

1993 - 1994            Fellowship in Forensic Psychiatry
                       William S. Hall Psychiatric Institute
                       Columbia, South Carolina

**ACADEMIC POSITIONS/EMPLOYMENT/UNIVERSITY APPOINTMENTS:**

5/2012 to present      Clinical Professor of Psychiatry
                       Medical University of South Carolina
                       Department of Psychiatry

7/2010 to present      DMH Professor of Psychiatry
                       University of South Carolina School of Medicine
                       Department of Neuropsychiatry

7/2006-7/2010          Professor of Clinical Psychiatry
                       Director, Forensic Psychiatry Services
                       University of South Carolina School of Medicine
                       Department of Neuropsychiatry and Behavioral Science
                       3555 Harden Street Extension, Suite 102
                       Columbia, South Carolina 29203
                       (803) 434-4698 (803) 434-2367 (fax)

                       Consulting and Treating Forensic Psychiatrist
                       South Carolina Department of Juvenile Justice

                       Consulting and Treating Forensic Psychiatrist
                       South Carolina Department of Corrections

11/98-6/2009           Consulting and Treating Forensic Psychiatrist
                       Behavioral Disorders Treatment Program
                       (Sexually Violent Predator Program:  SC 44-48-110)
                       South Carolina Department of Mental Health

6/1997- 7/2006         Associate Professor
                       Director, Forensic Services
                       Department of Neuropsychiatry
                       University of South Carolina School of Medicine

1/2004-7/2004          Acting Assistant Director, Psychiatry Residency Program
                       University of South Carolina School of Medicine
                       Department of Neuropsychiatry and Behavioral Science

2

| | |
|---|---|
| 9/1995-5/1997 | Forensic Residency Training Director<br>University of South Carolina School of Medicine |
| 7 /1996 – 6/1997 | Psychiatrist C   William S. Hall Psychiatric Institute<br>Residential Treatment Director of NGRI Unit |
| 1/1995 – 6/1996 | Teaching Psychiatrist II   William S. Hall Psychiatric Institute<br>Out-patient Forensic Psychiatrist |
| 1/1995 – 12/1997 | Assistant Professor University of South Carolina School of Medicine<br>Department of Neuropsychiatry |
| 7/1994 –6/1995 | Instructor University of South Carolina School of Medicine<br>Department of Neuropsychiatry |
| 7/1994 – 12/1994 | Teaching Psychiatrist I   William S. Hall Psychiatric Institute<br>In-patient and Out-patient Forensic Psychiatrist |

## MEDICAL STAFF APPOINTMENTS:

Bryan Psychiatric Hospital (current)
South Carolina Department of Corrections (courtesy)
South Carolina Department of Juvenile Justice (inactive 7/2010)
William S. Hall Psychiatric Institute
Palmetto Health Richland Memorial Hospital (courtesy)
Palmetto Health Baptist Medical Center (courtesy)
Providence Hospital (pending)

## UNIVERSITY/ MEDICAL STAFF COMMITTEES:

| | |
|---|---|
| 2007-2010 | Member, Appointments and Promotions Committee |
| 2002- 2009 | Member, Alumni Committee, USC School of Medicine |
| 1996- 2010 | Member, Residency Selection Committee |
| 1995- 2010 | Member, Residency Training Committee |
| 2002- 2003 | Member, Search Committee, Chairman of Neuropsychiatry |
| 2000-2001 | Member, Committee on Women USC |
| 1997 | Member, Traditions Committee USCSM |
| 1997 | Member, Search Committee, Director Rehabilitation Counseling |
| 1997 | Physician Advisor, Environment of Care |
| 1996 | Member, Search Committee Chair of Department of Neuropsychiatry and<br>Director of Hall Institute |
| 1996 | Member, Finance Committee, University Specialty Clinics |
| 1994-1996 | Member, Infection Control Committee |
| 1993-1994 | Member, Research Committee |

3

## HONORS AND AWARDS:

2007                    Outstanding Female Physician Mentor Award

2004-2005              Outstanding Forensic Teaching Award
                            Presented by the USC SOM Forensic Fellowship Training Program
1992              Rappeport Scholarship in Forensic Psychiatry
                            Presented by the American Academy of Psychiatry and the Law
1989              Neurology Award, School of Medicine
1985              Cum Laude Graduate, Furman University
                  Phi Beta Kappa, Furman University
                  Alpha Epsilon Delta, Furman University

## MEMBERSHIPS AND OFFICES IN PROFESSIONAL ORGANIZATIONS:

2002-2009      American Board of Psychiatry and Neurology
                Forensic Certification Committee

1999-Present    American Board of Psychiatry and Neurology
                1999-Present    Board Examiner

1997-2003      Group for the Advancement of Psychiatry (GAP), General Member
                1999              Chair

1992- Present   American Academy of Psychiatry and the Law  (AAPL)
                1995-2000        Rappeport Committee (President appointed)
                1995-2000        Education Committee (President appointed)
                1998-2000        Program Committee (President appointed)
                1999              Program Chair
                1995-97          Mentor to Rappeport Fellow

1989-1998      American Psychiatric Association, General Member

1989-1998      South Carolina Psychiatric Association
                1995-1998        Federal Legislative Representative (President appointed)
                1995-1999        Executive Council
                1996-1998        Secretary-Treasurer

1997            NAMI Advisory Board Physician Representative

## PUBLICATIONS:

Schwartz-Watts DM:  "Commentary:  Stalking Risk Profile."  The Journal of the American Academy
        of Psychiatry and the Law, 34:455-457, 2006.

Schwartz-Watts DM, Frierson RL:  "20: Crisis Stabilization in Correctional Settings." in Clinical Practice in Correctional Medicine , Second Edition, edited by Michael Puisis, D.O., S.C. Mosby, Inc affiliate of Elsevier, Inc   2005.

Schwartz-Watts DM.  "Asperger's Disorder and Murder." Analysis & Commentary   The Journal of the American Academy of Psychiatry and the Law  33:390-3, 2005.

Schwartz-Watts DM, Rowell CN. "Commentary: Update on Assessing Risk for Violence Among Stalkers." The Journal of the American Academy of Psychiatry and the Law  31:440-3, 2003.

Giorgi-Guarnieri D, Zonana HV, Schwartz-Watts DM.  "Practice Guideline: Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense."  Supplement to The Journal of the American Academy of Psychiatry and the Law   30:2, 2002.

Frierson R, Schwartz-Watts D, Malone T, Morgan D. "Capital Versus Noncapital Murderers" in revision The Journal of the American Academy of Psychiatry and the Law, 1998.

Schwartz-Watts D, Morgan D.  "Violent Versus Nonviolent Stalkers," accepted, The Journal of the American Academy of Psychiatry and the Law, 1998.

Schwartz-Watts D, Morgan D, Barnes C.  "Stalkers:  The South Carolina Experience,"  The Journal of the American Academy of Psychiatry and the Law,1997, 24:541-545.

Schwartz-Watts D, Montgomery L, Morgan D.  "Seroprevalence of Human Immunodeficiency Virus Among Pre-Trial Detainees," The Bulletin of the American Academy of Psychiatry and the Law, 1995, 23:285-289.

**POSTERS:**

Internet Chat Rooms: Who Solicits Children? R. Gregg Dwyer, MD, EdD, Donna Schwartz-Watts MD , William Burke, PhD, American Academy of Psychiatry and the Law 39th Annual Meeting, Seattle, WA October , 2008

**PRESENTATIONS:**

"Predators Among Us" University of South Carolina 2012 Mini Med School, October 2, 2012, Columbia, South Carolina

"How Death is Different-Using ABA Guidelines to Meet the Standard of Care in Death Penalty Cases and Social History Investigations: The team Approach" with Joe VonKallist, Capital Case Workshop, September 19, 2012, Wilmington, North Carolina

"Protecting Mental Health" South Carolina Attorney General's Continuing Legal Education Ethics Seminar, Blatt Building, Columbia, SC 12/2/11

"Autistic Spectrum Disorders and the Legal System ", DMH Annual CME, William S Hall Psychiatric Institute 9/11

"Issues of Mental Competency" South Carolina Circuit Court Judges Conference, Spartanburg, South Carolina, May 4-6, 2011

Stalking in the New Millennium": Department of Mental Health Day Long CME, Columbia SC, October 2009

"Internet Predators": South Carolina Psychiatric Association Annual Meeting, Myrtle Beach, South Carolina, 1/2009

"Internet Predators": Panel Speaker, South Carolina Bar Association Annual Meeting, Myrtle Beach South Carolina, 1/2009

Internet Predators: ICAC Quarterly Meeting, Columbia, South Carolina  11/21/2008

Project Safe Childhood, Advanced Online Child Exploitation Seminar, National Advocacy Center Columbia, SC, July 29, 2008

"Violent Crimes and the Commitment of Sexually Violent Predators, MUSC Judges and Attorneys Substance Abuse and Ethics Seminar, Charleston, South Carolina, December 7, 2007

"Autistic Spectrum Disorders and Corrections" South Carolina Department of Corrections Mental Health Seminar, Columbia, South Carolina, December, 2007

"Pitfalls in Sex offender Commitment Hearings" Panel Speaker, American Academy of Psychiatry and the Law 38th Annual meeting, Miami, Florida, October 22, 2007

"Treating the Untreatable" Panel Speaker, American Academy of Psychiatry and the Law 38th Annual Meeting, Miami, Florida,  October 19, 2007

"Risk Assessment in General Psychiatry: Department of Mental Health Annual Day Long CME, Columbia, SC September 21, 2007

"Mitigation in Noncapital Cases" SC Public Defender's Conference, Myrtle Beach, SC October 2007.

"Nuts and Bolts of Sexually Violent Predator Proceedings" SC Bar CLE, Columbia, South Carolina July 27, 2007

University of South Carolina School of Medicine Founder's Day Speaker for Woman in Medicine, Columbia, South Carolina, April 2007.

"Autistic Spectrum Disorders and Mitigation," Washington DC March 2007

"Sex Crimes and their Aftermath II" Panel Discussion and Presentation, Jack Swerling
    Moderator, South Carolina Bar Association Conference, Charleston, SC, January 25,
    2007

"Psychiatry for the Brilliant Fact Finders" Invited Speaker, South Carolina Judges Conference,
    Greenville, SC, May 12, 2006.

"Sex Crimes and their Aftermath" Panel Discussion and Presentation, Jack Swerling Moderator,
    South Carolina Bar Association Conference, Charleston, SC January 27, 2006.

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice
    National Institute of Trial Advocacy, Atlanta Georgia , June 4-5, 2005

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice
    National Institute of Trial Advocacy, Atlanta Georgia , June 5-6, 2004

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice
    National Institute of Trial Advocacy, New York, New York, June 20-21,2003

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New
    York, New York. June 20-22,2002.

South Carolina Probation, Paroles and Pardons Annual Conference. "A State of Mind". Myrtle
    Beach, SC. November 11, 2002.

American Academy of Psychiatry and the Law, "Difficult Case? Consult your Colleagues."
    Newport Beach, California. October 26, 2002

South Carolina Public Defender's Conference, "Issues and Concerns Regarding the Sexually Violent
    Predator Statue" Litchfield Beach, South Carolina, September 30, 2002

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New
    York, New York, June 28-30-2002.

American Academy of Psychiatry and the Law, "Death Penalty"   Boston, MA, October 28, 2001

American Academy of Psychiatry and the Law, "Ask the Expert" and "The Difficult Case" Panel
    Discussions. Boston, MA, October 28, 2001

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New
     York, New York, June 14-17-2001.

Annual Capital Defense Training Seminar, "The Importance of Timing in the Presentation of Your
     Client's Story:  Frontloading Mitigation" with John Blume, Attorney,  Jekyll Island, Georgia,
     February 9, 2001

University of Texas, Department of Psychiatry Grand Rounds "Profile of a Stalker"  San Antonio,
     Texas, December 19, 2000

Willford Hall Medical Center, Lackland Air Force Base, Texas, "Death Penalty Evaluations,"
     December 18, 2000.

Willford Hall Medical Center, Lackland Air Force Base, Texas, "Texas Sexually Violent Predator
     Statute,"  December 18, 2000

American Academy of Psychiatry and the Law, " Juveniles Who Carry Weapons on School Grounds"
      Baltimore, Maryland, October 15, 1999

American Academy of Forensic Science, Workshop Presenter, San Francisco, 1998 "Classification
     and Typology of Stalkers."

Kansas City, Western Missouri Forensic Department, 1997 "Evaluation of Stalking."

University of South Carolina School of Medicine Women's Month Featured Presenter, 1997
     "Stalkers:  The South Carolina Experience."

American Academy of Psychiatry and the Law, Denver, CO, 1997 "Psychotic versus Nonpsychotic
     Stalkers."

American Academy of Psychiatry and the Law, Denver, CO, 1997 "Harassing Telephone Callers."

American Academy of Psychiatry and the Law, Denver, CO, 1997  Panel on Maintaining Competence
     sponsored by Education Committee

American Academy of Psychiatry and the Law, Puerto Rico, 1996 "Violent Versus Nonviolent
     Stalkers",

American Academy of Psychiatry and the Law, Puerto Rico, 1996 "Capital Versus Noncapital
     Murderers"

American Academy of Psychiatry and the Law, Puerto Rico, 1996  "Treatment of Insanity Acquittees
     Across the United States."

William S. Hall Psychiatric Institute Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

Georgia Regional Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

American Academy of Psychiatry and the Law, Seattle, Washington, 1995  "Stalkers:  The South Carolina Experience"

South Carolina Psychiatric Association, Hilton Head Symposium, 1995 "What General Psychiatrists Need to Know About Forensic Psychiatry."

American Academy of Psychiatry and the Law Annual Conference, San Antonio, Texas   1993 "Seroprevalence of HIV Among Inpatient Pre-trial Detainees"

American Medical Association, North Carolina  1990 "Tertiary Metastases Presenting As Panhypopituitarism"

**PRESENT RESEARCH:**

Schwartz-Watts D. "Death Penalty"

Schwartz-Watts D, Barth E, Morgan D. "Harassing Telephone Callers"

Schwartz-Watts D, Morgan D.  "Psychotic Versus Nonpsychotic Stalkers"

Schwartz-Watts D, Morgan D.  "Comparing Stalkers to the Criminally Domestic Violent."

Schwartz-Watts D, Bloom J, Sloan C.  "Psychiatric and Legal Perspectives of Stalking."

**PRESENT GRANTS:**

Internet Crimes Against Children: Development of a Typology of Offenders for Use in Prevention, Investigations and Treatment; U.S. Department of Justice Office of Justice Programs Grant; 2010-MC-CX-003; Principle Investigator: RG Dwyer; Co-Principal Investigator: D DeHart; Co-Investigators/Consultants: R Moran, DM Schwartz-Watts, W Burke, DL Laufersweiler-Dwyer; 2010 - 2013

Internet Chat Room Solicitation of Children: A Study of Psychosocial and Criminal Justice Factors as They Relate to Public Safety Risk; American Academy of Psychiatry and the Law Institute for Education and Research (AIER) Grant; Principal Investigator: RG Dwyer; Co-investigators: D DeHart, DM Schwartz-Watts, W Burke & R Moran; 2009 - 2010

Co-author w Alicia Hall, PhD, Harry Wright, MD Autistic Spectrum Disorders and Corrections
(Revised 1/6/13)

9