# EXHIBIT 23

# EXHIBIT 23

U.S. Department of Justice

# The Federal Death Penalty System:

## Supplementary Data, Analysis and Revised Protocols for Capital Case Review





# June 6, 2001

## THE FEDERAL DEATH PENALTY SYSTEM:

Supplementary Data, Analysis and Revised Protocols for Capital Case Review

U.S. Department of Justice

Washington, D.C.

June 6, 2001

## TABLE OF CONTENTS

INTRODUCTION

PART I: LEGAL RULES AND ADMINISTRATIVE PROCEDURES

    A.  Federal Death Penalty Law

    B.  The Capital Case Review Procedure

PART II: STUDY OF THE SYSTEM

    A.  The September 12, 2000 Report

    B.  Related Justice Department and Administration Decisions

    C.  The Supplementary Study

PART III: ANALYSIS OF THE DATA

    A.  Potential Federal Capital Cases

    B.  Subsequent Decisional Stages

PART IV: PROTOCOL REVISION

A.  Broadening the Scope of the Process

B.  Simplification of Decisions Against Seeking the Death Penalty

---

THE FEDERAL DEATH PENALTY SYSTEM:

Supplementary Data, Analysis and Revised Protocols for Capital Case Review

U.S. Department of Justice
Washington, D.C.
June 6, 2001

INTRODUCTION

This report completes a survey and assessment of the federal death penalty system. At the direction of Attorney General Janet Reno, a study of decision-making processes and demographic factors in federal capital cases was carried out last year. The Department of Justice published an initial report setting out the results of this study on September 12, 2000 (hereafter, the "Sept. 12 report"). Attorney General Reno wished to supplement the information that was available at the time of the Sept. 12 report, and the Department undertook further information gathering and analysis. Noting the pendency of this follow-up study, President Clinton delayed the first scheduled federal execution in the modern period, and directed that the results of the Department's analysis be reported to the President by the end of April 2001.

Further study has now been carried out, and its results have been analyzed. The findings under the augmented data, and related policy decisions, may be summarized as follows:

The proportion of minority defendants in federal capital cases exceeds the proportion of minority individuals in the general population. The information gathered by the Department indicates that the cause of this disproportion is not racial or ethnic bias, but the representation of minorities in the pool of potential federal capital cases. A factor of particular importance is the focus of federal enforcement efforts on drug trafficking enterprises and related criminal violence. The prosecution of drug crimes has generally been a key priority both of Congress and of federal law enforcement for many years. Federal authorities are often better able to carry out effective prosecutions in this area for such reasons as the complexity of drug enterprise cases, their multi jurisdictional character, and the availability to federal prosecutors of greater investigative resources or more effective legal tools.

In areas where large-scale, organized drug trafficking is largely carried out by gangs whose membership is drawn from minority groups, the active federal role in investigating and prosecuting these crimes results in a high proportion of minority defendants in federal cases, including a high proportion of minority defendants in potential capital cases arising from the lethal violence associated with the drug trade. This is not the result of any form of bias, but reflects the normal factors that affect the division of federal and state prosecutorial responsibility: the nature of the offenses subject to federal jurisdiction, the demographics of crime in areas where that jurisdiction is exercised, the respective capacities of federal and state law enforcement authorities; and the cooperative arrangements and divisions of responsibility that federal and state authorities develop in light of these considerations.

Within the universe of federal cases that may be pursued as capital crimes, cases in which the death penalty is actually sought depend on subsequent exercises of prosecutorial judgment and discretion. Under existing Justice Department procedures, United States Attorneys cannot decide unilaterally whether to seek the death penalty in cases involving capital charges, but are required to submit all such cases to a central review procedure. These cases are reviewed by a committee of senior attorneys, and the Attorney General personally makes a final decision whether to seek a capital sentence. The Sept. 12 report found that at no stage of the review process were decisions to recommend or approve the seeking of a capital sentence made at higher rates for Black or Hispanic defendants than for White defendants. For example, in the cases considered by the Attorney General, the Attorney General approved seeking the death penalty for 38% of White defendants, 25% of Black defendants, and 20% of Hispanic defendants.

The data available in the preparation of the Sept. 12 report was limited to information concerning cases involving capital charges that were submitted to the review procedure. Data was not available concerning cases in the United States Attorneys' offices which would factually support charging an offense punishable by death, but which were not actually charged as capital crimes and submitted for review. Attorney General Reno accordingly directed that more complete information be obtained. The United States Attorney offices submitted this supplementary information subsequent to the Sept. 12 report.

Like the data considered in the Sept. 12 report, the augmented data provides no evidence that minority defendants are subjected to bias or otherwise disfavored in decisions concerning capital punishment. Within the broader universe of potential capital cases, capital charges and submission to the review procedure for a decision about seeking the death penalty did not occur with any greater frequency in cases involving Black or Hispanic defendants than in cases involving White defendants.

While the Department's review of existing federal death penalty procedures has produced no evidence of bias against racial or ethnic minorities, it has suggested that changes could be made to promote public confidence in the process's fairness and to improve its efficiency. For example, as noted above, consideration of the broader universe of potential capital cases reinforced the findings of the Sept. 12 study which tended to refute any assumption of bias against racial or ethnic minorities. However, obtaining information about this broader class of cases required an extraordinary effort because the existing review procedure does not regularly obtain information about cases in which a capital charge is factually supportable, but the U.S. Attorney office decides to charge (or accept a plea to) a noncapital crime. Hence, in the future, U.S. Attorneys will be required to submit information, including racial and ethnic data, about potential capital cases, as well as those in which a capital offense is actually being charged. This should help to maintain public confidence in the fairness of the process by making more complete racial and ethnic data available for both actual and potential federal capital cases on a continuing basis.

Part I of this report describes the legal rules and administrative procedures governing federal capital cases, including the existing safeguards against racial and ethnic bias. Part II describes the central findings of the Sept. 12 report, the reaction and policy decisions of Department and Administration officials at the time, their direction that more extensive data collection and analysis be carried out, and the results of further study. Part III analyzes the data as it bears on the role of racial or ethnic factors. Part IV discusses the contemplated revision of the Department's protocol for reviewing capital cases.

## PART I: LEGAL RULES AND ADMINISTRATIVE PROCEDURES

Decisions of the Supreme Court beginning in the early 1970s imposed new restrictions on capital punishment, producing a temporary cessation in the use of the death penalty as a criminal sanction. Most states subsequently reformed their death penalty laws and procedures to conform to the new standards. Congress initially sought to do the same for federal cases



through provisions of the Anti-Drug Abuse Act of 1988, which made the death penalty available for certain drug-related offenses. The federal death penalty was effectively revived on a broader basis through provisions of the Violent Crime Control and Law Enforcement Act of 1994, which added death penalty authorizations to many additional offense provisions, and established general statutory procedures for seeking and imposing capital sentences. The federal offenses for which the death penalty is currently authorized generally require as a necessary element the killing of a victim, but they include a few non-homicidal offenses, such as treason and espionage.

These federal legislative enactments have been paralleled by the Justice Department's adoption of administrative standards and procedures for death penalty decisions in federal cases. Following the 1988 enactment, the Department adopted a policy that required United States Attorneys to submit to the Attorney General for review and approval any case in which the United States Attorney wished to seek the death penalty. Following the 1994 enactment's expansion of federal death penalty authorizations, the Department adopted the current protocol for death penalty cases. The current protocol requires United States Attorneys to submit to a centralized review process all cases involving a pending charge of an offense for which the death penalty is a legally authorized sanction, regardless of whether the United States Attorney wishes to seek the death penalty.

Both the legal rules and the administrative procedures that currently govern federal capital cases incorporate extensive safeguards against any influence of racial or ethnic bias or prejudice. The main features of the existing system are as follows:

## A. FEDERAL DEATH PENALTY LAW

The federal cases in which a defendant is eligible for a capital sentence are generally those in which: (1) the defendant is charged with a crime for which the death penalty is a legally authorized sanction, (2) the defendant intended or had a high degree of culpability with respect to the death of the victim, and (3) one or more aggravating factors specified in a statutory list are present in the case. The statutory aggravating factors include such factors as the commission of a killing in the course of another serious offense, the defendant's having a prior criminal history involving serious violent offenses, the commission of a killing after substantial planning and premeditation, killing multiple victims, or endangering the lives of other persons (in addition to the person killed) in committing the crime. 18 U.S.C. 3591-93.[1] To seek a capital sentence, a prosecutor must file a notice of intent to seek the death penalty. The notice must identify the aggravating factor or factors which the government proposes to prove as justifying a sentence of death. 18 U.S.C. 3593(a).

The prosecutor is constitutionally prohibited from engaging in discrimination or favoritism based on invidious factors, such as race or ethnicity, in deciding whether to seek a capital sentence, and is likewise prohibited from making any appeal to racial or ethnic prejudice in remarks to the jury. A showing that the prosecutor or other decision makers in the case acted on the basis of racial or ethnic bias would entitle the defendant to relief from a capital sentence.[2]

In cases where a capital sentence is sought, the defendant is entitled to the appointment of two lawyers to represent him, "of whom at least 1 shall be learned in the law applicable to capital cases." 18 U.S.C. 3005. Indigent capital defendants have a continuing right at all stages of litigation and review to provision of needed defense resources, and to appointment of defense counsel who satisfy specific years-of-experience standards or "whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation." 21 U.S.C. 848(q).

In the selection of the jury, potential jurors are subject to questioning ("voir dire") concerning bias, including possible racial or ethnic bias against the defendant. If it appears that a potential juror harbors such bias against the defendant, defense counsel can challenge the person "for cause," and the court will exclude the person from the jury. The parties in a capital case are also afforded a large number of peremptory challenges - 20 for each side - which they can use at their



discretion. Fed. R. Crim. P. 24(b). For example, defense counsel who suspect that a potential juror or jurors might be affected by racial or ethnic bias against the defendant can use peremptory challenges to exclude these persons from the jury. However, neither the prosecution nor the defense is permitted to use peremptory challenges to exclude persons from the jury because of their race or ethnicity.[3]

If the defendant is convicted of a capital offense, the guilt-determination phase of the trial is followed by a special hearing to determine whether a sentence of death is justified. The hearing is normally held before a jury of 12 members. At the hearing, the prosecutor presents evidence in support of the aggravating factors for which notice has previously been provided, and the defense is free to present evidence concerning any mitigating factors. The government must prove the existence of aggravating factors beyond a reasonable doubt, and the jury must unanimously agree that such a factor or factors have been established. The defendant need only establish the existence of mitigating factors by a preponderance of the evidence, and each juror is free to conclude that such factors have been established, regardless of whether other members of the jury agree. To recommend a sentence of death, the jury must determine that the defendant had the requisite culpability with respect to the victim's death, and must unanimously agree that the aggravating factor or factors it has found sufficiently outweigh any mitigating factors to justify a capital sentence. If the jury does recommend a capital sentence, the court is required to sentence the defendant accordingly. If the jury does not unanimously agree that the death penalty should be imposed, the defendant is given a lesser (non-capital) sentence. 18 U.S.C. 3593-94.

The rules for capital sentencing hearings require special instructions and certifications to guard against any possible influence of bias or prejudice. The court instructs the jury that, "in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be." On returning a recommendation concerning the sentence, the jury must also return to the court a certificate signed by each juror, "that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be." 18 U.S.C. 3593(f).

In cases where a capital sentence is imposed, the court of appeals' review of the case includes a determination of "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." If the appellate court finds that the sentence was based on such improper factors, it must send the case back to the trial court for another capital sentencing hearing or imposition of a noncapital sentence. 18 U.S.C. 3595. Following the appeal, there is regularly further judicial review in capital cases, including a motion for collateral relief under 28 U.S.C. 2255. The defendant may thereafter apply for executive clemency. As noted above, the defendant has a continuing right to adequate resources and representation by competent counsel at all stages of the process.

B. THE CAPITAL CASE REVIEW PROCEDURE

The Justice Department's capital case review procedure is governed by a protocol set out in section 9-10.010 et seq. of the United States Attorneys' Manual (USAM). The procedure "is designed to promote consistency and fairness." The protocol provides that "[a]s is the case in all other actions taken in the course of Federal prosecutions, bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty." USAM 9-10.080.

The protocol requires United States Attorneys to submit cases involving a pending charge of an offense for which the death penalty is a legally authorized sanction, regardless of whether or not the U.S. Attorney recommends seeking the death penalty. The death penalty cannot be sought without the prior written authorization of the Attorney General.



The U.S. Attorneys' capital case submissions are sent to the Criminal Division and must include a death penalty evaluation form for each defendant charged with a capital offense, a detailed prosecution memorandum, copies of indictments, written materials submitted by defense counsel in opposition to the death penalty, and other significant documents and evidence as appropriate. The Capital Case Unit of the Criminal Division reviews the submission, seeks additional information when necessary, and drafts an initial analysis and proposed recommendation.

The case is then forwarded to a committee of senior Justice Department lawyers, the Attorney General's capital case review committee. The review committee meets with the Capital Case Unit attorneys, the U.S. Attorney and/or the prosecutors in the U.S. Attorney's office who are responsible for the case, and defense counsel. During this meeting, defense counsel are afforded an opportunity to present any arguments against seeking the death penalty for their client. The review committee considers "all information presented to it, including any evidence of racial bias against the defendant or evidence that the Department has engaged in a pattern or practice of racial discrimination in the administration of the Federal death penalty." USAM 9-10.050. The review committee thereafter meets to finalize its recommendation to the Attorney General, to whom all submitted materials are forwarded. The Attorney General makes a final decision as to whether a capital sentence should be sought in the case.



As a safeguard against any possible influence of racial or ethnic bias, the review process is carried out in a "race-blind" manner. The United States Attorney's office does not provide information about the race or ethnicity of the defendant to review committee members, to attorneys from the Criminal Division's Capital Case unit who assist the review committee, or to the Attorney General. The only individuals in Washington, D.C., who are ordinarily given racial or ethnic information are paralegal assistants in the Capital Case Unit who collect the statistics under separate cover from the United States Attorneys.[4] This information provides the pool from which most of the data of the Sept. 12 report on race and ethnicity in federal capital cases was drawn.

PART II: STUDY OF THE SYSTEM

A. THE SEPTEMBER 12, 2000 REPORT

On September 12, 2000, the Department released the results of a survey of the federal death penalty system. The findings from that survey are set out exhaustively in the Sept. 12 report and its accompanying statistical tables, and need not be repeated here in detail. The central findings regarding racial and ethnic proportions were as follows:

First, in cases submitted by the United States Attorneys for departmental review, the proportions of Black and Hispanic defendants were greater than the proportions of Blacks and Hispanics in the general population. Of the 682 defendants reviewed under the Department's death penalty decision-making procedures in the period 1995 to 2000, 134 (20%) were White, 324 (48%) were Black, and 195 (29%) were Hispanic. (Sept. 12 report at 6.)[5]

Second, recommendations and decisions to seek the death penalty were less likely at each stage of the process for Black and Hispanic defendants than for White defendants. In other words, United States Attorneys recommended the death penalty in smaller proportions of the submitted cases involving Black or Hispanic defendants than in those involving White defendants; the Attorney General's capital case review committee likewise recommended the death penalty in smaller proportions of the submitted cases involving Black or Hispanic defendants than in those involving White defendants; and the Attorney General made a decision to seek the death penalty in smaller proportions of the submitted cases involving Black or Hispanic defendants than in those involving White defendants. (Sept. 12 report at 7.)

In the cases considered by the Attorney General, the Attorney General decided to seek the death penalty for 38% of the White defendants, 25% of the Black defendants, and 20% of the Hispanic defendants. (Sept. 12 report at 7.) The finding that the death penalty was sought at lower rates for Black and Hispanic defendants than for White defendants held true



both in "intraracial" cases, involving defendants and victims of the same race and ethnicity, and in "interracial" cases, involving defendants and victims of different races or ethnicities. (Sept. 12 report at 25-26.)[6]

## B. RELATED JUSTICE DEPARTMENT AND ADMINISTRATION DECISIONS

In announcing the results of the Sept. 12 report, Attorney General Reno noted that the information showed racial/ethnic disparities in the federal death penalty system, in comparison to the general population. Specifically, as noted above, in the 682 cases submitted to the Department's death penalty review procedure by U.S. Attorney offices between 1995 and July 2000, 20% involved White defendants, 48% involved Black defendants, and 29% involved Hispanic defendants. She further noted, however, that statistical disparities relating to race and ethnicity are not unique in any sense to the federal death penalty context, but are "true of the entire criminal justice system, both state and federal." With respect to the decisions made in the Department's review process, she noted that the proportion of cases in which seeking the death penalty was actually authorized was higher for White defendants than for defendants of other races/ethnicities. Specifically, as noted, in the cases considered by the Attorney General, the death penalty was authorized 38% of the time for White defendants, 25% of the time for Black defendants, and 20% of the time for Hispanic defendants.[7]

Attorney General Reno did not believe that the findings of this study showed that racial or ethnic bias affected the decision-making process in federal death penalty cases. However, the available information was generally limited to the information submitted by U.S. Attorney offices in connection with the capital case review procedure. She accordingly directed that further study be carried out to illuminate any statistical disparities at other stages of the process, such as decisions whether to pursue federal rather than state charges in potentially capital cases.

Attorney General Reno rejected the idea of declaring a moratorium on the federal death penalty pending the completion of further study for several reasons: (1) defendants in federal capital cases are competently represented (including representation by two attorneys at least one of whom is experienced in capital litigation, with sufficient defense resources), (2) there is no issue of federal capital convicts being innocent of the crimes for which they have been sentenced to death, (3) the evidence and the law have justified the decisions in all cases to seek capital punishment, and (4) the study's findings did not show bias - as opposed to disparities which could result from non-invidious factors - in federal capital cases.[8]

However, President Clinton thereafter issued a reprieve which delayed for six months the first scheduled federal execution in the contemporary period, pointing to the pendency of further study and analysis of the issue of racial and ethnic disparities. He directed that the Department's analysis be reported to the President by the end of April 2001.[9]

## C. THE SUPPLEMENTARY STUDY

The follow-up to the Sept. 12 report outlined by Attorney General Reno included solicitation of external research proposals, submission by the United States Attorneys within 60 days of data about potential capital cases in their offices that were not submitted to the Department's capital case review process, and other examination of factors used to decide which homicide cases are taken into the federal system when there is joint state and federal jurisdiction.

With respect to the potential solicitation of external research proposals, the National Institute of Justice held a meeting with researchers and practitioners on January 10, 2001. The discussion at the meeting indicated that attempting to obtain a comprehensive understanding of the statistical proportions found in federal capital (and potential capital) cases would entail a highly complex, multi-year research initiative. It further indicated that even if such a study were carried out, it could

not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases. It was also clear that this approach could not produce policy-relevant findings within the time frame specified by President Clinton, or in time to inform decisions about carrying out death sentences whose execution dates were approaching.

It was possible, however, to carry out promptly the more defined tasks identified by the President and the Attorney General. The U.S. Attorneys submitted information concerning cases in their offices in which the facts would have supported a capital charge, but which were not charged as capital crimes and submitted to the departmental review procedure. Analysis of this additional information produced findings which were similar in character to the findings of the Sept. 12 report.

Within the broader pool of potential capital cases, the racial and ethnic proportions were again found to be different from those in the general population. This broader pool of cases involved 973 defendants, in comparison with the 682 defendants in the cases submitted to the departmental review procedure.[10] Of the 973 defendants in the broader class, 17% (166) were White, 42% (408) were Black, and 36% (350) were Hispanic.[11]

The augmented data was also similar to the original data of the Sept. 12 report in that it provided no evidence of favoritism towards White defendants in comparison with minority defendants. Rather, potential capital cases involving Black or Hispanic defendants were less likely to result in capital charges and submission of the case to the review procedure. Specifically, capital charges were brought and the case was submitted for review for 81% of the White defendants; the corresponding figures for Black defendants and Hispanic defendants were 79% and 56% respectively.[12]

Likewise, considering the process as a whole, potential capital cases involving Black or Hispanic defendants were less likely to result in decisions to seek the death penalty. Specifically, the Attorney General ultimately decided to seek the death penalty for 27% of the White defendants (44 out of 166), 17% of the Black defendants (71 out of 408), and 9% of the Hispanic defendants (32 out of 350).[13]

It was also possible to carry out within a reasonable time frame additional consultation concerning the reasons for the exercise of federal jurisdiction in potential capital cases. The information obtained indicates that the racial and ethnic proportions found in the general pool of potential federal capital cases, and differences among the racial and ethnic proportions in different districts, result from non-invidious causes. Some of these causes are general in nature, and apply to the findings in many districts; others reflect unique conditions in particular districts and the relationship between federal and state authorities in those districts. Part III of this report provides more specific analysis of this information.

---

PART III: ANALYSIS OF THE DATA

As discussed in Part I of this report, a wide range of protections and remedies exist, both legal and administrative, to guard against any influence of racial or ethnic bias in the administration of capital punishment at the federal level. Nor is there anything in the character, training, or background of federal prosecutors that would dispose them to act from such invidious motives. Rather, they are experienced legal professionals whose values and practices are shaped by general societal attitudes and the specific values of the legal system that strongly condemn discrimination based on race or ethnicity.

Given the absence of any reason to expect a priori that racial or ethnic bias would play a role in federal capital punishment decisions, the question then becomes whether there is empirical evidence which nevertheless demonstrates that the system is subverted by such bias. The findings of the Sept. 12 report and the further study conducted thereafter do not support such a conclusion. The following analysis considers this issue first in relation to the general pool of potential federal capital cases, and thereafter in relation to the decisions made at subsequent stages of the review process.

## A. POTENTIAL FEDERAL CAPITAL CASES

In assessing the implications of statistical data as possible evidence of bias or prejudice, it is necessary to distinguish between statistical disparities on the one hand and discrimination on the other. For example, in a federal district that prosecutes a large number of securities fraud cases, a finding that the defendants in these cases are practically all White would not imply that federal prosecutors in these cases are engaging in favoritism to potential Black and Hispanic defendants, or discriminating against White defendants. Rather, it may just be the case that most persons who commit these crimes in the district are White. Account must be taken of the differing incidences of crimes in different demographic groups.

This point applies to the pool of potential capital cases as in any other area. Both common experience and empirical data indicate that the offenses that may lead to homicides and capital charges are not evenly distributed across all population groups. Since crime and victimization are not evenly distributed across the general population, there is no reason to expect that the racial and ethnic proportions in potential capital cases will be the same as, or similar to, the racial and ethnic proportions in the general population.[14]

Turning to the area of federal capital cases, it must also be understood that federal criminal jurisdiction is limited, and generally supplementary, in character. The Sept. 12 report (at p. 4) explained:

> In evaluating the data ... the reader should bear in mind that the vast majority of homicides in the United States, like most violent crimes, are investigated exclusively by local police officers working hand-in-hand with local prosecutors, who file charges against defendants in state courts, either as a capital case or non-capital case. When a homicide is prosecuted federally - either as a capital or non-capital case - it is often because of the availability of certain federal laws or because of a federal initiative to address a particular crime problem. Criminal organizations often operate in multiple jurisdictions, making it difficult for any single local prosecutor to investigate or prosecute a case. Additionally, many states lack the equivalent of the federal witness protection program and the ability to conduct complex long-term investigations using resource intensive investigative techniques such as court-ordered wiretaps and undercover operations.
>
> Apart from these differences in laws and resources, which often affect whether a particular homicide is prosecuted in state or federal court - either as a capital or non-capital case - state and federal law enforcement officials often work cooperatively to maximize their overall ability to prevent and prosecute violent criminal activity in their respective communities. Such cooperation is a central feature of current federal law enforcement policy. In some areas, these cooperative efforts lead to agreements that certain kinds of offenses, particularly violent crimes, will be handled by federal authorities . . . . In some cities, a large number of cases involving multiple murders by drug and other criminal organizations are investigated by joint federal and local task forces and prosecuted federally due to some of the factors cited above, such as the geographic reach of the organization and the availability of a witness protection program.

As discussed in Part II of this report, the proportion of Black and Hispanic defendants in the pool of potential federal capital cases exceeds the proportion of Blacks and Hispanics in the general population. The Department's follow-up study of this issue produced no evidence that this statistical disparity results from bias or prejudice, as opposed to non-invidious factors like those discussed above, which can result in disparities in any part of the criminal justice system. To see concretely how these factors can affect the demographic proportions in federal capital cases, it is helpful to examine more specifically the nature of these cases, and the reasons for the exercise of federal jurisdiction, in a number of particular districts.

### 1. Eastern District of Virginia

In the 1995-2000 period considered by the Sept. 12 report, the U.S. Attorney office for the Eastern District of Virginia charged capital offenses in 66 cases and submitted these cases to the Department's capital case review procedure. Of these 66 defendants, 5 were White, 59 were Black, and 2 were Hispanic.




While the defendants in these cases were predominantly Black, analysis of the underlying grounds for federal prosecution shows only legitimate, non-invidious reasons for the district's actions. Of the 66 capital cases submitted by this district, 51% involved drug-related murders, 29% involved killings committed by inmates at the Lorton correctional facility, and 20% involved a mixed bag of offenses as discussed below. The reasons for the exercise of federal jurisdiction in these cases were as follows:

*Drug-related killings*

Most of the capital charges in the Eastern District of Virginia (51%) resulted from drug cases. The cases in this category originated primarily from large-scale trafficking organizations involving multiple murders, as indicated by the fact that 70% of them were charged under the provision defining the Continuing Criminal Enterprise (CCE) drug offense, 21 U.S.C. 848, or as conspiracies in relation to a CCE murder; 12% were charged as murder in aid of racketeering under 18 U.S.C. 1959, or under both 18 U.S.C. 1959 and 21 U.S.C. 848; and 18% were charged under 18 U.S.C. 924(j) (causing death through use of a firearm during drug offense). Most of these drug-related murder cases arose from federal, state, and local task forces.

The defendants in these cases are not White because the members of the drug gangs that engage in large-scale trafficking in the Eastern District of Virginia are not White. However, the large federal role in that district in prosecuting serious drug crimes generally, and potentially capital drug-related homicides in particular, has nothing to do with the race of the defendants. Rather, the factors which have contributed to this assumption of federal responsibility include the following:

First, Virginia prosecutors have had little ability to use state grand juries in investigations. The availability of compulsory process to federal prosecutors through the use of federal grand juries has provided a critical advantage in the investigation of ongoing drug conspiracies, which account for most of the drug-related murders in the district.

Second, until recently, each defendant was entitled to a separate trial in the state system. This is a severe disadvantage in prosecuting cases involving multiple defendants, whose joint activities may have resulted in numerous killings. There is no comparable problem in federal prosecutions, in which it is usually possible to secure a joint trial for defendants who have engaged in this type of coordinated criminal activity.

Third, Virginia has many prosecution units. The Eastern District of Virginia has within its boundaries 43 counties, each with its own Commonwealth's Attorney, and 21 independent cities, most of which also have their own Commonwealth's Attorneys. The state Attorney General does not have general prosecution authority throughout the state. Thus, in the state system, defendants who commit crimes in more than one jurisdiction must be prosecuted in each jurisdiction separately. Again, this is a serious disadvantage in attempting to prosecute drug trafficking activity, and related violence and homicides, which cut across jurisdictional boundaries within the state. The U.S. Attorney, in contrast, can prosecute a defendant or defendants in a single trial for activities committed in the various state jurisdictions which constitute federal crimes.

Fourth, Virginia prosecutors are generally in a less favorable position to prosecute conspiracy cases. Their offices often have limited resources and cannot devote the manpower to investigate ongoing conspiracies, particularly when the organizations permeate numerous other jurisdictions as well. Task forces including both law enforcement officers and prosecutors make the most sense in these cases. Combining the abilities of local law enforcement officers and the prosecution advantages of the federal system, it is possible to make many serious cases which might otherwise go unsolved or resist successful prosecution.

*Cases from Lorton*

As a result of recent reforms, persons sentenced to imprisonment for the commission of felonies under the District of



Columbia Code will serve their sentences in the regular federal prison system. However, prior to these reforms, incarcerated D.C. felons were housed in a separate prison located in Lorton, Virginia. The Eastern District of Virginia was responsible for prosecuting killings committed by inmates at that institution, which accounted for 29% of the cases it submitted to the Department's capital case review procedure. Not surprisingly, the incarcerated felon population deriving from a majority Black urban jurisdiction (D.C.) has been predominantly Black, and the defendants in potential capital cases arising from killings by inmates in that incarcerated felon population have been Black.

*Other cases*

The remaining 20% of the cases submitted by the Eastern District of Virginia involved five espionage defendants, two bank robbery defendants, two kidnapping defendants, three carjacking defendants, and one murder in a federal enclave. The five espionage defendants were White. Their race, of course, had nothing to do with the decision to prosecute these cases federally; espionage, by its nature, is a crime that only the federal government prosecutes. Likewise, the murder in a federal enclave implicated obvious federal interests.

The carjacking case involved three members of the same family who hijacked trucks and killed the drivers. They committed their crimes in more than one state and in more than one local jurisdiction within Virginia. Federal prosecution made possible a joint trial of these crimes, which otherwise would have had to be tried separately in various local Virginia jurisdictions.

The bank robbery was a complicated case in which the need to utilize the powers of a federal grand jury made federal prosecution appropriate. The two kidnapping cases arose from abduction-murders in which state prosecution was not an option, because it was not provable which particular states the victims were in at the time the kidnappers killed them. This is not an impediment to a successful federal kidnapping prosecution.

## 2. District of Puerto Rico

The District of Puerto Rico submitted 72 cases, all involving Hispanic defendants, to the Department's capital case review procedure. The District of Puerto Rico has an unusually large number of homicide cases because the U.S. Attorney has agreed with the local authorities that the U.S. Attorney's office will prosecute fatal carjacking cases. The obvious reason the defendants in these cases were Hispanic is that the population of Puerto Rico is generally Hispanic.

## 3. District of Columbia

The United States Attorney's office for the District of Columbia submitted cases involving 23 defendants to the Department's capital case review procedure, of whom 22 were Black. Most of these cases (66%) involved defendants charged in multi-defendant racketeering (RICO) and Continuing Criminal Enterprise (CCE) drug offense cases. Of the remainder, 13% involved federal carjacking charges, 13% involved killing a federal witness, 4% involved killing a law enforcement officer, and 4% involved terrorism.

The U.S. Attorney's office is responsible for the prosecution of local crimes under the District of Columbia Code, as well as being responsible for the prosecution of federal offenses in D.C. Hence, in contrast to other districts, the U.S. Attorney office in D.C. has jurisdiction to prosecute crimes occurring in its geographic area regardless of whether it brings federal charges. The choice for that office in murder cases is between pursuing a murder prosecution under local D.C. law in the D.C. Superior Court, or bringing a federal charge and prosecuting the case in federal district court.

Because of D.C.'s demographics, cases involving serious violent crimes - whether prosecuted under federal law or local D.C. law - usually involve Black defendants. Where the choice is made to proceed in federal court, the decision has nothing to do with the defendant's race or ethnicity. Rather, it depends on the availability of a federal offense that applies to the criminal

conduct, and whether there are prosecutorial advantages in litigating in one forum rather than the other.

For example, as noted above, most of the cases from D.C. submitted to the review procedure involved drug-related killings. The U.S. Attorney's office has frequently brought federal prosecutions involving drug trafficking groups and street gangs as a valuable alternative to single-incident murder cases in the local Superior Court for several reasons:

First, the federal courts are better suited and better equipped to handle multi-defendant complex criminal prosecutions than the local Superior Court. The federal district court in D.C. has extensive experience in handling these complex cases, which raise significant witness and jury security issues.

Second, use of the federal RICO and CCE offenses makes it possible to join together evidence relating to drug trafficking, murders, and other violence in a single case. This is a major advantage in comparison with single-incident prosecution of murders in the local Superior Court.

Third, the Federal Rules of Evidence are superior from a prosecutorial standpoint to the evidence rules applied in Superior Court proceedings - for example, in relation to the admissibility of evidence of the defendant's commission of similar or related crimes on other occasions.

Fourth, federal RICO/CCE prosecutions allow the government to: (1) introduce evidence of acts committed by violent defendants when they were juveniles, (2) avoid statutes of limitations issues for crimes other than murders (e.g., assaults and drug trafficking), (3) avoid venue problems in prosecuting multijurisdictional criminal operations, and (4) achieve consolidated trials of related criminal activity where severance would more likely occur in a Superior Court prosecution.

## 4. Central District of California

The Central District of California submitted cases involving 15 defendants to the Department's capital case review procedure, including three White defendants, four Black defendants, and six Hispanic defendants. The 40% (six out of 15) figure for Hispanics in this district was somewhat greater than the proportion of Hispanic defendants in submitted cases generally (29%). However, the proportion of Hispanic defendants in federal capital cases in this district is increased by federal prosecution of members of the "Mexican Mafia." This prison gang has been a serious problem in the California correctional system. The problem can be ameliorated through federal prosecution, which results in the defendants serving their sentences in the federal prison system.

Thus, the causes of the exercise of federal jurisdiction in potential capital cases are varied. Some, such as a federal enforcement emphasis on the prosecution of drug enterprises and related violence, are common to many districts. Others, such as the Eastern District of Virginia's jurisdiction over killings by inmates in D.C.'s prison, and the agreement concerning carjacking prosecutions in the District of Puerto Rico, are specific to particular districts. The common feature of these causes is that they may result in racial and ethnic disparities in federal capital cases when coupled with the demographics of crime in the areas where federal jurisdiction is exercised, but they do not involve any influence of racial or ethnic bias on federal prosecutorial decisions. Rather, as with the division of federal and state responsibility in other areas of prosecution and law enforcement, they reflect non-invidious decisions based on relative federal and state capacities, and cooperative arrangements developed with state and local authorities that take account of those capacities.

A final question in this area is that of "geographic" or "regional" disparity in federal capital cases, which was also identified as a matter meriting further examination in the follow-up to the Sept.12 study. This question, which relates to the

fact that some districts have generated larger numbers of potential capital cases than others, can be taken in two ways:

Taken in one way, the reference to "geographic" disparities may reflect a concern that such disparities result from racial or ethnic bias. Articulated more fully, the thought would be that U.S. Attorney personnel in some districts, for reasons of racial or ethnic bias, may have a particular desire to secure the death penalty for minority defendants. Hence, they exercise federal jurisdiction to prosecute more potentially capital cases involving such defendants, so as to be able to convict them federally for capital crimes and secure their execution. This might account for the unusually large number of capital case submissions from some districts.

If this were actually what was going on, one would expect the districts with unusually large numbers of capital case submissions to seek the death penalty with special vigor in relation to minority defendants. The data do not support this notion. For example, aside from the Eastern District of Virginia and the District of Puerto Rico, which have been discussed above, the districts with the largest number of capital case submissions have been the District of Maryland, the Eastern District of New York, and the Southern District of New York. The figures from these districts are as follows:

- The District of Maryland charged capital crimes and submitted to the Department's review procedure cases involving 41 defendants, of whom 36 were Black. However, it recommended the death penalty for only five of the 36, a proportion of 14%. This is below the national proportion of 25% for recommendations by U.S. Attorneys that the death penalty be sought for Black defendants in submitted cases.

- The Eastern District of New York submitted cases involving 58 defendants to the review procedure, of whom 19 were White, 20 were Black, 12 were Hispanic, and 7 were in the "Other" category. It only recommended the death penalty for one of the Black defendants, and for none of the Hispanic defendants.

- The Southern District of New York submitted cases involving 50 defendants to the review procedure, involving 4 White defendants, 17 Black defendants, 28 Hispanic defendants, and 1 "Other" defendant. This was a considerably higher proportion of Hispanic defendants than the national norm - but the district recommended the death penalty for none of them. The district recommended the death penalty for 5 of the 17 Black defendants, a proportion of 29%, which differed little from the national norm of 25%.

In short, there is nothing in the data from these districts which suggests that their high incidence of capital case submissions had anything to do with a desire based on racial or ethnic bias to secure capital sentences for minority defendants.[15]

A second way of taking the reference to "geographic" disparities would be as reflecting a sense that it is intrinsically necessary or desirable for capital cases to be distributed in some proportionate manner among the various districts, independent of any concern about racial or ethnic bias. In this sense, however, geographic "disparities" are neither avoidable nor undesirable. As this report has explained at length, the federal criminal jurisdiction is supplementary and complementary to state and local law enforcement jurisdiction. This necessarily results in large differences among the districts in enforcement priorities and in the division of responsibilities with their state and local counterparts. For example, in districts which accord a high priority to federal prosecution of violent drug gangs, that focus tends to generate a high volume of federal prosecutions involving drug-related killings. Other districts may not prioritize such prosecutions to the same degree because (for example) drugs are generally less of a problem in their areas, state and local authorities have relatively good capacities for dealing with such crimes, or there is relatively little advantage in federal, as opposed to state or local, prosecution in these cases.

There is nothing illegitimate about a district focusing on the actual needs of the geographic area for which it is responsible in decisions about the exercise of federal jurisdiction. Rather, a U.S. Attorney who failed to do so would be derelict in his or her basic responsibilities. To the extent that this results in varying numbers of federal capital cases among

  

the districts, it is no different than, nor any more objectionable than, the "disparities" among the districts which occur equally in non-capital cases.

## B. SUBSEQUENT DECISIONAL STAGES

With respect to recommendations and decisions by the Attorney General's review committee and by the Attorney General, there is little to add to the discussion in Part II of this report. Decisions to seek the death penalty have been recommended and approved in lower proportions of cases involving Black or Hispanic defendants than White defendants. There is nothing in these findings which suggests that the system involves racial or ethnic bias against minorities. As discussed above, the review process is designed to shield the review committee members and the Attorney General as far as possible from information concerning race and ethnicity in the submitted cases. What decisionmakers do not know about cannot influence their decisions.

Analysis of the actions of the U.S. Attorneys' offices is somewhat more complex, because they make a larger number of decisions which may affect the capital or non-capital treatment of their cases. However, the conclusion is the same. The U.S. Attorney offices have charged capital offenses and submitted cases to the review procedure in lower proportions of potential capital cases involving Black or Hispanic defendants than White defendants. They have also recommended seeking the death penalty in the submitted cases in lower proportions of cases involving Black or Hispanic defendants than White defendants. The racial and ethnic proportions in their recommendations have been similar to the racial and ethnic proportions in the recommendations and decisions by the review committee and the Attorney General. (Sept. 12 report at 7, 38-39.)

Following a decision by the Attorney General to seek the death penalty, a capital sentence may nevertheless not be sought because the U.S. Attorney office subsequently reaches a plea agreement to a non-capital charge with the defendant.[16] This has occurred for 48% of the White defendants, 25% of the Black defendants, and 28% of the Hispanic defendants in cases where the Attorney General approved the death penalty. (Sept. 12 report at 31-32).[17] While White defendants superficially fared better at this stage, inferring that these disparities resulted from racial or ethnic bias on the part of the U.S. Attorney offices would be unwarranted for a number of reasons:

First, in contrast to a recommendation for or against seeking the death penalty, the decision about pleas is not under the control of the U.S. Attorney's office. It takes two to make a plea agreement. Inferring bias from disparities in such agreements would not be justified unless non-invidious causes could be excluded, including possible differences in the inclination of defendants from different groups to seek or accept plea agreements. Indeed, since the actions of U.S. Attorney offices at all earlier stages of the process carry no suggestion of bias against racial or ethnic minorities - but rather involve seeking the death penalty with less frequency in cases involving Black or Hispanic defendants - it would be an odd assumption that such bias suddenly springs into existence at the end of the process, and becomes an operative factor at that point in decisions about non-capital pleas.

Second, the findings of the Department's study would not be suggestive of bias by the U.S. Attorneys' offices, even if one were to impute to those offices complete responsibility for the occurrence or nonoccurrence of pleas at the final stage of the process. Consider the class of potential capital cases in which a U.S. Attorney office concludes, either initially or at some point in the process, that a capital sentence should not be sought. The means the office potentially has at its disposal to achieve the desired non-capital treatment of the case include: (1) refraining from a capital charge and review procedure submission in the first place, (2) submitting the case to the review procedure with a recommendation against the death penalty and persuading the Attorney General to accept this recommendation, (3) reaching a non-capital plea agreement with the defendant following the review procedure submission of the case but prior to a decision by the Attorney General whether to seek the death penalty, or (4) reaching a non-capital plea agreement with the defendant subsequent to a decision by the Attorney General to seek the death penalty.

 

These methods will not necessarily be successful to the same degree at all stages of the process in achieving the desired result (i.e., non-capital treatment of the case) in relation to defendants from different population groups. To the extent that the desired result is not achieved at earlier stages in the process, there may be more motivation to use the methods available at later stages to secure a non-capital disposition. Given the possibility of such trade-offs between actions at different stages, the racial and ethnic proportions at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices. Rather, one must look at what happens in the process as a whole.

This point can be assessed in quantitative terms by aggregating the effects of the various actions noted above that the U.S. Attorney offices can take to secure non-capital treatment of a case - refraining at the start from a capital charge and review procedure submission, submitting the case and successfully recommending against the death penalty, reaching a non-capital plea after submission but before an Attorney General decision, or reaching a non-capital plea after an Attorney General decision to seek the death penalty. When the figures are toted up, one finds that these actions of the U.S. Attorney offices secured non-capital treatment for 74% of the White defendants, 81% of the Black defendants, and 86% of the Hispanic defendants, in potential capital cases.[18] As with the other findings of the Department's study, there is nothing in these figures which suggests possible bias against minority defendants. Rather, the U.S. Attorney offices have exercised their powers with greater frequency to avoid death penalty prosecutions of minority defendants.[19]

A final point of some potential relevance is the outcome in capital cases that went to trial. Suppose the Department in its decisions about seeking capital punishment were favoring White defendants over minority defendants in comparable cases. One would expect such favoritism to result in a larger proportion of relatively weak cases for capital punishment involving minority defendants in which the Department sought the death penalty. This would in turn make it less likely that capital punishment would actually be imposed in cases involving minority defendants that went to trial. However, the outcome of tried cases provides no support for such a hypothesis. Rather, the jury returned a verdict for the death penalty in about half of the cases in which the Department sought it, and this proportion was about the same for White, Black, and Hispanic defendants.[20]

## PART IV: PROTOCOL REVISION

While the Department's study of its death penalty decision-making processes has found no evidence of bias against racial or ethnic minorities, the study has indicated that certain modifications of the capital case review procedure are warranted to promote public confidence in the fairness of the process and to improve its efficiency. Some of these changes effectively broaden the scope of the process, including submission of information concerning a larger class of cases by the U.S. Attorney offices. Other changes would simplify and abbreviate the process in cases where the decision is against seeking a capital sentence.

## A. BROADENING THE SCOPE OF THE PROCESS

Under the existing protocol, U.S. Attorneys submit to the capital case review procedure only cases in which an offense is being charged for which the death penalty is a legally authorized sanction. This limited the information that was available for the Sept. 12 report. Information was subsequently obtained from the U.S. Attorneys' offices concerning a broader class of potential capital cases, but a special, ad hoc effort was necessary to do so.

The Department has concluded that information of this type should regularly be available. This should help to maintain public confidence in the system by making more complete racial and ethnic data available for both actual and potential federal capital cases. The amendment to the protocol will specifically require that, where a United States Attorney has



obtained an indictment charging a capital offense or conduct that could be charged as a capital offense, the United States Attorney must fill out and submit a death penalty evaluation form, even if the United States Attorney does not intend to request authorization to seek the death penalty. These forms will include (among other information) gender, race, and ethnicity information for defendants and victims, the charges against the defendant, and the reasons the United States Attorney decided not to seek the death penalty or charge a capital offense.

The amendments to the protocol will also include two other changes in the direction of increased centralization:

First, in cases where the Attorney General approves seeking a capital sentence, the United States Attorney office will be required to submit the notice of intention to seek the death penalty it proposes to file in the case to the Criminal Division's Capital Case Unit. As discussed in Part I of this report, the notice includes a specification of the aggravating factors that the government intends to prove as the basis for imposing a capital sentence. Review by the Criminal Division will ensure consistent application of the statutory and nonstatutory aggravating factors in federal death penalty proceedings.

Second, where the Attorney General approves seeking a capital sentence, Attorney General approval will also be required for subsequent decisions to refrain from pursuing a capital sentence in the case. Under the current protocol, a United States Attorney can effectively negate a decision by the Attorney General to seek a capital sentence by subsequently reaching a plea agreement with the defendant to a noncapital offense. As in other areas, however, if subsequent developments show grounds for reconsidering a decision by the Attorney General, the proper recourse is to advise the Attorney General of the changed circumstances. The revised protocol will require this approach.

---

## B. SIMPLIFICATION OF DECISIONS AGAINST SEEKING THE DEATH PENALTY

The revised protocol will maintain a uniform requirement that the approval of the Attorney General be obtained both for decisions to seek a capital sentence and for decisions not to seek a capital sentence. The United States Attorneys will be required to submit information concerning cases involving capital charges, regardless of their recommendations concerning the sentence. However, an expedited and simplified decisional process - not requiring the participation of defense counsel - will be authorized in cases in which the U.S. Attorney does not wish to seek a capital sentence. The full-dress review process will be reserved for cases in which: (1) the United States Attorney does wish to seek the death penalty, or (2) the reviewers decline to accept the United States Attorney's recommendation against seeking the death penalty on the basis of the abbreviated review process.

This modification of the protocol will produce a more efficient process with no loss of fairness. The data of the Sept. 12 report showed that the United States Attorneys recommended against seeking the death penalty for 494 out of 682 defendants in submitted cases. (Sept. 12 report at 12.) In such cases, notwithstanding the negative recommendation, the full process must be run through under the current system. This includes submission of information concerning the case and supporting materials by the U.S. Attorney; preparation of an initial analysis and recommendation by the Criminal Division's Capital Case Unit; consideration by the capital case review committee, including hearing argument from defense counsel and U.S. Attorney personnel; and further review and a final decision by the Attorney General. In the vast majority of these cases - 94% - the Attorney General concurs in the U.S. Attorney's recommendation not to seek the death penalty. (Sept. 12 report at 40-41.) Hence, the normal result is no change from what the U.S. Attorney recommended.

The revised protocol will make it possible to focus the review procedure's resources more fully on cases in which the U.S. Attorney does propose to seek the death penalty, while providing a quicker and less burdensome process for reaching a final decision against seeking a capital sentence where the U.S. Attorney recommends against the death penalty. Defense resources will be conserved by not regularly requiring a presentation to the review committee by defense counsel where the U.S. Attorney office is not seeking a capital sentence. In addition, the costs of appointing a second lawyer for the defendant - as required by 18 U.S.C. 3005 for death penalty cases - will more frequently be avoided because the abbreviated process will produce quicker final decisions by the Department not to seek a capital sentence.



The Attorney General will, of course, retain legal authority as head of the Justice Department to determine in an exceptional case that the death penalty is an appropriate punishment, notwithstanding the United States Attorney's view that it should not be pursued. However, if the Attorney General declines to accept the United States Attorney's recommendation against a capital sentence on the basis of the abbreviated review process, the full review procedure will then be employed, including providing defense counsel an opportunity to be heard by the review committee. Hence, the protocol revision will increase the general efficiency of the process, while sacrificing no safeguard of fairness for defendants in cases where the Department may ultimately decide to seek the death penalty.

---

1. The capital sentencing procedures for most federal crimes appear in 18 U.S.C. 3591ff. Separate procedures of a similar character for certain drug-related capital offenses are set forth in 21 U.S.C. 848(e)-(r). Back

2. See McCleskey v. Kemp, 481 U.S. 279, 309 & n.30 (1987). Back

3. See id.; Batson v. Kentucky, 476 U.S. 79 (1986); Georgia v. McCollum, 505 U.S. 42 (1992). Back

4. Defense counsel, however, choose in some cases to provide participants in the review process with information concerning a defendant's race or ethnicity. Back

5. Except where otherwise indicated, the figures in this report relate to the operation of the Department's current capital case review procedure from its establishment in January 1995 until July 2000, which was the cutoff date for data considered in the Sept. 12 report. Defendants are classified for purposes of discussion and analysis as White, Black, or Hispanic. "Hispanic" includes Hispanic individuals regardless of race. It can be estimated that about 90% of the defendants in the "Hispanic" category would be characterized as White in racial terms. See Sept. 12 report at T-xvi & n.2. The Department's data also places some defendants in an "Other" category. This category is generally not discussed separately in this report because it combines individuals from several different groups - Asian, Pacific Islander, Native American, Aleut, Indian, or unknown - and the numbers involved are small. The "Other" defendants were 29 out of the 682 defendants considered under the review procedure, comprising 4% of the total. Back

6. The figures in the accompanying textual discussion relate to the period 1995-2000, during which the current statutes and capital case review procedure were in effect. In the period 1988-1994, the federal death penalty was only available for certain drug-related killings under 21 U.S.C. 848(e), and U.S. Attorneys submitted for the Attorney General's review only cases in which they recommended seeking the death penalty. See Sept. 12 report at 1-2. The cases so submitted involved 52 defendants, who were 13% (7) White, 75% (39) Black, 10% (5) Hispanic, and 2% (1) "Other." The Attorney General approved seeking the death penalty for 100% of the White defendants (7 out of 7), 87% of the Black defendants (34 out of 39), and 100% of the Hispanic defendants (5 out of 5). See Sept. 12 report at 6-7, 23-24. Back

7. Attorney General's Remarks Regarding the Federal Death Penalty Study (Dept. of Justice Sept. 12, 2000); Press Conference with Attorney General Reno and Deputy Attorney General Holder, Topic: The Death Penalty (Sept. 12, 2000). Back

8. See id. Back

9. Statement by the President: Staying the Execution of Juan Raul Garcia (The White House Dec. 7, 2000). Back

10. The supplementary data submitted by the U.S. Attorney offices included "A" data and "C" data. The "A" data was data on 231 cases (beyond the 682 submitted to the review procedure) that the offices provided in response to a directive to submit information concerning: (1) any cases that should have been, but were not, submitted to the capital case review procedure, (2) cases exempted from submission because the defendant pled to a noncapital offense, and (3) cases that could have been brought as death eligible cases but were not. When added to the 682 defendants in submitted cases, the

"A" data produced a broader class of 913 defendants who were 17% (158) White, 42% (387) Black, 37% (334) Hispanic, and 4% (34) "Other." The "C" data was data on additional cases which, according to the districts, had gone or were going through the review process, or involved fugitives. Adding the "C" cases as well as the "A" cases produces a universe of 973 defendants in potential capital cases, as indicated in the accompanying text. Back

11. The remaining 5% of defendants (49) in the augmented class were in the "Other" category. Back

12. The numbers of defendants whose cases were submitted to the review procedure were 134 out of 166 White defendants, 324 out of 408 Black defendants, and 195 out of 350 Hispanic defendants. See Sept. 12 report at 6. If only "A" cases are included in defining the universe of potential capital cases, the corresponding proportions of defendants in potential capital cases who were capitally charged and submitted to the review procedure are as follows: 85% of White defendants (134 out of 158), 84% of Black defendants (324 out of 387), and 58% of Hispanic defendants (195 out of 334). Back

13. The corresponding figures if "A" cases but not "C" are included in defining the universe of potential capital cases are as follows: 28% of White defendants (44 out of 158), 18% of Black defendants (71 out of 387), and 10% of Hispanic defendants (32 out of 334). Back

14. See, e.g., Bureau of Justice Statistics, Homicide Trends in the United States - Trends by Race, www.ojp.usdoj.gov/bjs/homicide/race.htm; Bureau of Justice Statistics, Violent Victimization and Race, 1993-98, at 2, 4, 6, 10 (Mar. 2001); Bureau of Justice Statistics, Correctional Populations in the United States, 1997, at iii, 4-5 (Nov. 2000). Back

15. The figures for submissions and recommendations by these districts, and the national average of 25% for recommendations to seek the death penalty in submitted cases involving Black defendants (81 out of 324 defendants), are documented in the Sept. 12 report, Table 5A, at T-14 to T-17. Back

16. The U.S. Attorneys currently have discretion to make such plea agreements. Under the revised protocol discussed in Part IV of this report, the Attorney General's approval will be required for a non-capital plea agreement subsequent to a decision by the Attorney General to seek a capital sentence. Back

17. The U.S. Attorney offices reached subsequent non-capital plea agreements with 51 out of the 159 defendants for whom the Attorney General authorized seeking the death penalty. See Sept. 12 report at 31. There were also 11 cases, almost all involving minority defendants, in which the Attorney General subsequently reversed her decision to seek the death penalty. See Sept. 12 report at 33, Table 3A at T-6 (reconsideration of decision to seek the death penalty for 1 White defendant, 3 Black defendants, 5 Hispanic defendants, and 2 "Other" defendants). In addition, in relation to 4 defendants (1 Black and 3 Hispanic), the death penalty was not pursued through trial because of dismissals or other judicial action. See id. Back

18. For example, the supplementary data submitted by the U.S. Attorney offices showed 166 White defendants in potential capital cases. Figures documented in the Sept. 12 report at 6, 41, 31-32 show the following: In relation to 32 of these defendants, the U.S. Attorney offices refrained from a capital charge and review procedure submission. In relation to 62 of these defendants, the U.S. Attorney offices submitted their cases to the review procedure with a recommendation against the death penalty, and the Attorney General concurred. In relation to 8 of these defendants, U.S. Attorney offices reached a non-capital plea agreement with the defendant following submission to the review procedure but before an Attorney General decision about the death penalty. In relation to 21 of these defendants, U.S. Attorney offices reached a non-capital plea agreement with the defendant after an Attorney General decision to seek the death penalty. Summing 32, 62, 8, and 21 gives 123 White defendants for whom the U.S. Attorney office successfully sought and secured non-capital treatment of their cases. This is 74% of the 166 White defendants in potential capital cases. Carrying out the same computation process for Black and Hispanic defendants yields the figures of 81% and 86% appearing in the text.

These figures include both "A" and "C" cases in defining the universe of potential capital cases. If the starting point is the somewhat smaller universe of potential capital cases which includes "A" cases but not "C" cases, the corresponding figures (by the same process of computation) are that the U.S. Attorney offices successfully avoided capital treatment for 73% of

White defendants, 80% of Black defendants, and 85% of Hispanic defendants. Back

19. The Sept. 12 report (at pp. 30-31) noted that focusing on plea agreements which occur after the Attorney General authorizes seeking the death penalty is potentially misleading, because plea agreements that foreclose a capital sentence can also occur at earlier stages of the process, including prior to indictment and review procedure submission, and during the pendency of cases in the review process. Statistical information was not available at the time concerning cases which were not submitted to the review procedure for such reasons as pre-indictment plea agreements to non-capital charges. The supplementary data submitted by the U.S. Attorney offices following the Sept. 12 report provided information on the broader universe of potential capital cases in the U.S. Attorney offices, making possible the accompanying textual discussion's more complete assessment of the treatment of defendants from different population groups. Back

20. Specifically, between the initial revival of the federal death penalty in 1988 and the July 2000 endpoint for data considered in the Sept. 12 report, juries convicted defendants of capital offenses in 57 out of 62 cases in which the government sought the death penalty. Where the defendant was convicted of a capital offense, the jury returned a death penalty verdict for 6 out of 14 White defendants, 16 out of 33 Black defendants, and 3 out of 6 Hispanic defendants. (Sept. 12 report at 32-34.) Back