# EXHIBIT 27

# EXHIBIT 27

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

IN THE MATTER OF:    CARO

BEFORE:              19 MEMBERS OF THE FEDERAL GRAND JURY
                     JANUARY 3, 2006
                     10:03 A.M.

                     HEARD BEFORE PANEL NO. 1:05 G J 03

WITNESS:             DOUGLAS FENDER

A P P E A R A N C E S

FOR THE U. S. GOVERNMENT:    ANTHONY GIORNO, ESQ.
                             ASSISTANT U. S. ATTORNEY
                             WESTERN DISTRICT
                             ROANOKE, VIRGINIA

REPORTED BY:                 PEGGY N. PIERCE

ORIGINAL

CARO-1310

2

DOUGLAS FENDER

Having been duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. GIORNO:

Q    Morning, sir.

A    Good morning.

Q    Would you state your full name, please, for the Grand Jury?

A    Douglas Fender. I'm a Special Agent with the FBI currently assigned to the Bristol resident agency.

Q    In that capacity were you one of the individuals who's assigned to investigate crimes that occur at the United States Penitentiary in Lee County?

A    Yes, sir, I am.

Q    And that is, of course, a, a, basically a, a place that's within the special maritime and territorial jurisdiction of the United States, is that correct?

A    Yes, it is.

Q    I want to call your attention to December 16 and 17 of 2003. Did you, were you

CARO-1311

3

involved in the investigation of the murder of a fellow by the name of Roberto Sandoval?

A    Yes, sir, I was.

Q    When, when did you first learn about the Sandoval murder?

A    I was contacted at approximately 9:00 p.m. on December the 17th of 2003 by prison officials there, the investigators, and they stated that they had a suspicious death of an individual identified as Roberto Sandoval and that, that is when I became involved in the case.

Q    Okay.  Now Sandoval was an inmate there at the, at the prison, is that correct?

A    Yes, he was.

Q    And as a result of the investigation at the prison was it determined that the person who killed him was another inmate by the name of Carlos David Caro?

A    Yes, it was.

Q    And was Mr. Caro, did he have any, any kind of gang affiliation?

A    Yes, he was.  He was a, a member of the Texas Syndicate.

Q    Okay.  Now the Texas Syndicate is

CARO-312

4

a, it's a Latino prison gang, is that correct?

A    Yes, it is.

Q    And there are several members of that prison gang scattered basically throughout the United States, both, both outside the prison and inside prisons, is that correct?

A    That is correct.  It exists not only in the prison, but also outside of the prisons.

Q    Okay.  And in addition to that there were, there was a fairly large group of T.S. members at the USP Lee, is that correct?

A    Yes, sir.

Q    Now was, was Roberto Sandoval a member of the Texas Syndicate or was he a want a be member of the Texas Syndicate?

A    He was, when he was first processed into USP Lee, his records noted that he, he, he was, had all the characteristics of being a Texas Syndicate member.  Whether they ever determined that for sure or not I don't know, but he was, as you say, at least a want a be.

Q    Okay.  The -- I, I take it prior to, to the murder of Roberto Sandoval, Carlos Caro had been assigned to the SHU, the special

CARO-1313

housing unit, is that correct?

A    Yes, he had.

Q    And the special housing unit there at the USP Lee is, is arguably the most secure place in the facility, is that correct?

A    That's correct.  It is --

Q    They --

A    USP Lee is a maximum security facility and this special housing unit is an area where inmates are housed for either security reasons or disciplinary reasons for the security of themselves and, also, others in the institution.

Q    Okay.  Caro was in the special housing unit as a result of his being involved in an incident where another Texas Syndicate member, Ricardo Benevidez, was, was stabbed, is that correct?

A    That is correct.

Q    And I believe that, that Caro was, was, admitted involvement in that and was subsequently sentenced to a term of imprisonment for stabbing Benevidez, is that correct?

A    Yes, he was.

Q    On the, the 16th of December, 2003

CARO-1314

6

was, was Sandoval also placed in the special housing unit?

A    He was.  On that date Sandoval was placed in the, in the SHU, special housing unit, for I believe a possession of a weapon.

Q    Okay.  The -- was -- did the inmates, excuse me, did the guards there, the individuals at the, the prison attempt to put Sandoval in the same cell as Caro?

A    Yes, they did.

Q    And was -- did Caro indicate whether or not he would accept a, a cellie as it's called?

A    At, at first he refused Sandoval, which I believe was on the 16th, and then eventually on the 17th he agreed to accept him into the cell.

Q    Okay.  At that time was, from what you could ascertain was there any signs of any animosity between Sandoval and Caro, anything that would suggest that there might be any problems between those two inmates?

A    None whatsoever.

Q    Okay.  Call your attention to the 17th of December, 2003.  At that point Sandoval

CARO-1315

7

had been in the cell with Caro less than twenty-four hours, is that correct?

A        That's correct.

Q        And what was the first sign that the, the prison officials had that something was amiss there in the cell?

A        At approximately 7:00 p.m. as they were doing the mail delivery to the inmates there in the special housing unit.

Q        I'm sorry. What time of, what time of day, day or night?

A        It, it was around 7:00 p.m. --

Q        Okay.

A        -- if I recall. And as they were making their rounds to deliver the mail through that housing unit, I guess the first thing, the very first thing that they noticed was that Caro pecked on the glass of the jail cell and basically said, you know, get this guy outta here.

Q        Okay. And at that time, of course, the only people in the cell were Caro and Sandoval?

A        Just the two of 'em throughout the evening on the, the 16, the 17th.

8

Q    Okay.  So when, when, when Caro pecked on the, on the, the cell door and said come and get this, this piece of crap outta my cell, is that what he said was -- I've cleaned it up a little bit.

A    That, that's exactly right.  And the expurlative (phonetic) that he used was come and get this piece of shit out of this cell.

Q    Okay.  And the guard then looked in the cell?

A    Yes, he did.

Q    And observed that Caro, that, that Sandoval was laying on the, the cell floor and had a towel ligature wrapped around his neck, is that correct?

A    Yes, he did.  He -- the guard noted that he looked into the cell, Sandoval was lying on the floor with his head facing towards the door and that he had an orange towel tied around his neck with a single knot in it.

Q    And did the, I take it then that the guard called for some backup and they, and they made entry into the cell, is that correct?

A    Yes, sir, that's correct.

Q    When the prison officials made

9

entry into the cell, they found Sandoval laying there on the ground and had, he had no sign of, no pulse, is that correct?

A    That's correct.  He was unresponsive.

Q    And he also appeared to be bleeding from his, from, from basically his nose and his ears, is that correct?

A    That's, that's correct.

Q    Okay.  And also did the guards find a towel ligature wrapped around his neck?

A    Yes, they did.

Q    With a knot?  And, and it was knotted in the back?

A    The, the initial -- they, they did. The initial guard that pulled him or when they pulled him out of the jail cell, they found a towel tied around his neck with a knot in it and, of course, removed that right away and attempted CPR with negative results.

Q    And did the autopsy that was performed on Mr. Sandoval indicate that the cause of death was strangulation?

A    Yes, it did.

Q    The -- did you later on speak with,

CARO-318

10

with Carlos Caro?

A    Yes, sir, I did.

Q    When was it that you spoke with Caro?

A    It was, we initially started the interview at about 12:40 a.m. on the 18th, which was that same night obviously after midnight.

Q    Okay.  And that was after basically the, the cell had been secured and things like that, is that correct?

A    Yes, sir.

Q    And did you, before talking with Caro, did you advise him of his Constitutional rights pursuant to Miranda?

A    Yes, I did.

Q    And did he execute a written waiver of rights form?

A    Yes, sir, he did.

Q    Did he, after doing so, did he agree to speak with you?

A    Yes, he did.

Q    And did you talk to Caro about, about the reason why Sandoval died?

A    Yes, I did.

Q    And what did Caro tell you was the

CARO-1319

11

reason why Sandoval was killed?

A    What he told us, and, and again we read him his rights, I reminded him a couple times that his statement was voluntary to me, and what Mr. Caro said was that earlier in the day the breakfast trays were brought to the unit there, to, to the jail cell and that Sandoval was still asleep and that he had, the two trays were delivered and that Caro basically ate both of the breakfast trays.

And that later in the day when Sandoval woke up, that he expressed his concern about the fact that Caro had eaten his breakfast try and began to curse Caro. And in addition to that, he said, you know, I'm gonna eat your breakfast tray tomorrow.

And that was pretty much the gist in summary of what Caro said the whole dispute and subsequent murder was about.

Q    Okay. And did -- okay, so they have this, this argument about the, about the breakfast and did Caro say whether, whether Sandoval tried to attack him in any way or made any aggressive movements or tried to assault him at all?

CARO-320

12

A    He made no indication of that whatsoever.

Q    Okay. And so, so what was it that, that caused -- I mean why did, did Caro kill Sandoval?

A    Basically what he said was it was over the breakfast tray.

Q    And did Caro tell you how he did it?

A    He said that he had placed the towel around Sandoval's neck and tied it in a single knot and that basically in about three or four minutes that he quit breathing.

Q    Okay. And did he give any, did, did Caro give any other reason as to why he would have killed Sandoval other than over the breakfast tray?

A    None whatsoever.

Q    Okay. Did, did Caro express any remorse at all over the, the killing or anything like that?

A    He had none. None at all when I interviewed him.

Q    And did you also learn that, that while Mr. Caro was, was being held in a separate

13

cell while the investigation was ongoing, did, did Caro make comments to another guard there named Jose Castillo?

A    Yes, he did.

Q    And did -- he made the statement to Castillo in Spanish, is that correct?

A    Yes, that's correct.

Q    And --

A    What happened was right after the murder they segregated Caro into an area and placed a video camera on him with this guard, Castillo, standing right there beside the video camera. And during this time period Caro basically said to Castillo in Spanish I killed the guy because he pissed me off.

Q    Killed him because he pissed me off?

A    Yes.

Q    Okay. This indictment, of course, is charged as a capital murder indictment. There are certain findings that the Jury has to make in order to, to charge it as a capital case and they are set forth in the indictment. The, the first thing that, that has to be found is that at the time of the offense that Carlos Caro

CARO-1322

14

was then eighteen years of age or older at the time of the offense. Caro was born in 196-, on February 9th, 1967, is that correct?

A     That is correct.

Q     That would have made him over the age of eighteen at the time that, that, that --

A     Yes, sir.

Q     -- that Sandoval was murdered?

A     That is correct.

(Brief pause when Court Reporter's equipment malfunctions.)

Q     Agent Fender, before the, the equipment malfunctioned there, we were talking about Mr. Caro and we established that at the time of the offense that he was eighteen years of age or older.

The, referring to the notice of special findings regarding Count 1, Paragraph B, there are certain statutory intent factors enumerated in, in, as enumerated in Title 18 United States Code Section 3591(a)(2), one of which this was an intentional killing, and I think that was established. I mean there was no claim by Caro that this was an accident or I didn't mean to kill him or anything like that.

CARO-1323

15

Is that correct?

A    None whatsoever.

Q    The other factors underneath that, intentionally inflict some serious bodily injury resulting in the death of Roberto Sandoval, intentional participation in an illegal act, intentionally creating a grave risk of death, all of those factors would be basically inherent in the, in, in the crime itself and the circumstances under which the crime was committed. Is that correct?

A    Yes, sir.

Q    The fact that this was unprovoked, premeditated, thought out, is that correct?

A    That's correct.

Q    Now I want to refer you to Paragraph C. These are aggravating factors enumerated in Title 18 United States Code Section 3592. In the first one it alleges that Carlos David Caro has been previously convicted of two state or Federal offenses punishable by a term of imprisonment of more than one year committed on different occasions involving the distribution of a controlled substance. And this sort of goes hand-in-glove with, with No.

16

2, which is that Carlos David Caro had been previously convicted of violating Title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970, for which a sentence of five years, five or more years may be imposed. And basically that, the, the long term there, Title II, Title III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 are the Federal narcotic laws, is that correct?

A    That's correct.

Q    All right.  And, and in that regard did you have occasion to obtain copies of Caro's prior criminal record?

A    I have and I have reviewed those and he meets the criteria on both of those situations, having been convicted of one possession with the intent to distribute marijuana in 1988, the same charge in 1994, and then in 2000 possession with the intent to distribute cocaine.

Q    Okay.  And as a result of that last conviction, the 2000 conviction out of the Northern District of Texas, he was serving a thirty year sentence, is that correct?

A    That's correct.

CARO-325

17

Q     The, the final factor set forth in Paragraph C is that Carlos David Caro committed the offense after substantial planning and premeditation to cause the death of Roberto Sandoval. And that's based on the fact that apparently the breakfast tray was delivered and eaten by Caro some time that morning, is that correct?

A     That's correct.

Q     And the altercation took place, I mean the, the argument took place after Sandoval woke up and realized that, that, that Caro had eaten it, is that correct?

A     That's correct.

Q     And the actual killing took place some time leading up to the, the 7:00 o'clock hour in the evening, is that correct?

A     That's correct.

Q     So Caro would have had time to think about what he was gonna do to, to, to keep Sandoval from eating his breakfast?

A     Yes. From the period of time that Sandoval woke up, which was probably some time before midday, until the actual murder occurred at some time after 6:00 p.m.

CARO-326

18

Q    And, and I take it that has Mr. Caro ever at any point expressed any remorse at all for the killing of, of Roberto Sandoval?

A    No.

MR. GIORNO:  Answer any questions the Grand Jurors may have of you concerning the case.

GRAND JUROR:  What was the approximate time of death of Mr. Sandoval?

THE WITNESS:  They had made a check of that special housing unit at some time after 6:00 p.m. and then 7:00 o'clock was the, the actual mail delivery, so some time between 6:00 and 7:00 I think is the estimated time of death.

GRAND JUROR:  The, the mortician or whoever did the autopsy, did they not have listed a time of death?

THE WITNESS:  I'm not sure that they gave an approximate, an exact time on that. Not, not that I'm aware of.

GRAND JUROR:  Okay.

Q    Agent Fender, let me, if I could, perhaps this might help.  I have the autopsy report in the case.  Madam Foreperson, may I approach the witness?

19

THE FOREMAN:   Yes.

A    I see it, but I didn't see the time.

Q    I'm looking here at the, this is a report of investigation by medical examiner or investigator and this was signed by the medical examiner and apparently based on, on, on his or her investigation or his investigation, last seen alive December 17th, '03 at 6:30 p.m. USP Lee in his cell.  The time of death, according to this based on, on, from what he found, would have been December 17th at approximately 7:00 p.m.  And I'm assuming that, assuming that that is based on, on reports that he received about when he was last seen alive and when he was found dead.

A    Okay.

Q    Okay.  And that information would have come to them from people at the prison when they last would have seen Mr. Sandoval?

A    That, that is correct.  So the last, probably in answer to your, to your question, the last check of the cell would have been around 6:30 and I guess based on that information to the medical examiner, the next

CARO-1328

20

check was at 7:00, so the time of death would have been approximately 7:00 p.m.

Q   Down there in the SHU they, the, the, the guards make fairly routine and frequent visits, is that correct?

A   Yes, they do.

Q   To make sure that, that things are okay down there given the nature of the, of what the SHU is, is that correct?

A   That's correct.

MR. GIORNO:  Okay.

GRAND JUROR:  One other question. Based upon the, the history of Mr. Caro and the fact that he had stabbed another person numerous times, why would anybody be put in the cell with this, this person?  That is, that is the burning question.

THE WITNESS:  It -- that -- it is not unusual to house two people in a jail cell in the special housing unit just due to availability of space.

GRAND JUROR:  But this guy is violent.

THE WITNESS:  Right.

GRAND JUROR:  He had already

CARO-329

21

stabbed somebody numerous times. I don't understand why they would put anybody in the cell with him.

THE WITNESS: Right. And it is not unusual to -- and they try to pair, particularly in the special housing unit and also out in the general population, and keep in mind there's probably over fifteen hundred inmates at this institution at this point, they try to pair these individuals up and place them in a jail cell with similar interests, similar backgrounds.

So given the fact that Roberto Sandoval was at least a want a be Texas Syndicate person, they try to put Texas Syndicate members together in the same jail cell because generally speaking they get along fine. So that, therein lies the reason that he was probably placed with Caro.

GRAND JUROR: And there was no other place to put Sandoval?

THE WITNESS: Not that I'm aware of.

GRAND JUROR: Okay.

THE WITNESS: And there was no

CARO-330

22

reason to think there was any reason to think Caro was gonna harm him.

GRAND JUROR: The fact that he had already stabbed another inmate numerous times.

THE WITNESS: Right.

GRAND JUROR: That wasn't a red flag to anyone?

THE WITNESS: Yeah. I, I can only speak, you know, as to what their procedures are for pairing people up and, and housing 'em together.

GRAND JUROR: Okay. Thank you.

MR. GIORNO: Other questions by the Grand Jury? All right. Well, we will, we will then leave and let you deliberate on, on the probable cause on this indictment. If you have any questions, we'll be right outside the, the door there.

THE WITNESS: Okay. Thank you.

(Whereupon, this concludes this witness' testimony in the proceedings.)

CARO-1331

23

STATE OF VIRGINIA, at large

COUNTY OF GRAYSON, to-wit:

## CERTIFICATE

I, Peggy N. Pierce, Court Reporter and Notary Public, at large, do hereby certify that the above and foregoing proceeding was duly recorded and transcribed by me and that the foregoing represents a true and correct transcript of the proceeding given.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in any way interested in the outcome of said cause.

Given under my hand this ___9___ day of January, 2006.

My commission expires:   03/31/06

_____
Court Reporter
Notary Public

CARO-4332