# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:06cr00001** |
| | ) | |
| **CARLOS CARO,** | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |

### UNITED STATES' MOTION TO DISMISS IN RESPONSE TO PETITIONER'S MOTION FOR RELIEF PURSUANT TO TITLE 28, UNITED STATES CODE, SECTION 2255

The petitioner, Carlos Caro, has filed a motion for relief pursuant to 28, U.S.C. §2255 (hereinafter, "Petition") seeking the vacation of his conviction for the willful, deliberate and premeditated murder of Roberto Sandoval and the subsequent imposition of the sentence of death. He asserts sixteen claims in support of his motion. The United States responds to each claim, *seriatim.*

### STATEMENT OF THE CASE

Carlos David Caro has been involved in the drug trade since at least 1987 when he was 20 years of age. On August 8, 2000, he was arrested and subsequently convicted of drug trafficking for the third time. On May 7, 2001, he was sentenced to 360 months imprisonment to run consecutive to an 18 month revocation sentence previously imposed.

Caro is a long term validated member of the Texas Syndicate, a violent prison gang and has been identified by prison officials in at least one institution as a person who carried great influence in the gang. In 2002, while Caro was incarcerated at Federal Correctional Institute (FCI)-Oakdale, Louisiana, prison officials attempted to secure his assistance in avoiding conflict

1

with newly arriving prisoners who were members of a rival gang.  Caro rebuffed those efforts, stating, "the Texas Syndicate were going to do what they had to do."  Subsequently, the Texas Syndicate members violently attacked the newcomers.  Taking responsibility, Caro stated, "I don't give a fuck if they send me to the United States Penitentiary.  My brothers follow orders. . . It doesn't even matter if we're prosecuted.  I have 30 years to do. I certainly don't care about myself."  *United States v. Caro,* 597 F.3d 608, 610 (4th Cir. 2010).

Following the 2002 incident at FCI-Oakdale, the Bureau of Prisons (BOP) transferred Caro to the United States Penitentiary-Lee, County (USP-Lee), a more secure facility.  There, in August, 2003, Caro and another Texas Syndicate inmate, Juan Moreno-Marquez, used "shanks," to ambush and attack Ricardo Benavidez, stabbing him twenty-nine times before guards could intervene.  Five other Texas Syndicate members, also armed with shanks, stood nearby but were unable to enter the room where Benavidez was stabbed.  In November, 2003, Caro was indicted for attempted murder and weapons offenses in connection with his role in the assault on Benavidez.  Caro pled guilty to the Benavidez assault on August 3, 2004 pursuant to a written plea agreement, proposed by Moreno-Marquez, which by its terms, was conditioned upon Moreno-Marquez receiving a more favorable disposition of his charges.  On November 1, 2004, he was sentenced to 327 months imprisonment, which was ordered to run consecutively to any sentence that Caro was then serving.[1]

Caro was sent to the Special Housing Unit (SHU) after the Benavidez assault. The SHU is arguably the most secure part of the penitentiary which is, by nature and definition, the most secure facility in the BOP system.  Penitentiaries are classified as "maximum security" and typically house inmates who cannot safely be held at less secure institutions such federal correctional institutions.

---

[1]  The proceedings involving the Benevidez assault will be sometimes referred to herein as "the Benevidez case."

On December 16, 2003, Dustin Watts was the USP-Lee officer who was responsible for cell assignments in the SHU. He told the jury that, being mindful of potential conflicts that might arise from placing hostile inmates in the same cell, "careful thought" was given to placements based on the background and affiliations of the individual inmates who are considered as possible cellmates. *Trial Transcript (TT) 1/29/07 at 62-64*. When a bus carrying inmates arrives at USP-Lee, as one did on December 16, 2003, the incoming inmates are first placed in the SHU pending assignment to cells in the general population. *Id. at 64-65*. Of those prisoners received on December 16, eleven were released to the general population, but fifteen remained in the SHU. *Id.* The influx of new inmates, of necessity, required the institution to free up space in the SHU. *Id. at 66.*

Roberto Sandoval was admitted to the SHU on December 16, 2003. In order to create an open cell in the SHU, Watts decided to place Sandoval, who was also a member of the Texas Syndicate, with Caro. *Id. at 68-69*. The initial attempt to place Sandoval with Caro was done by Officer John Gilley. There is no evidence that Sandoval requested placement with Caro or that he previously attempted to procure placement with Caro for any reason. Gilley testified that when he approached Caro with Sandoval, Caro "calmly" stated, "I'm not accepting a cellmate." *Id. at 101-102, 110*. Gilley reported Caro's refusal to Watts who, because Caro did not give a reason for his refusal, assumed that Caro simply preferred to be in a cell by himself. *Id. at 71*. Nevertheless, Watts directed that Sandoval be assigned to a different cell which was then unoccupied.

Brian Laster worked the later shift in the SHU on December 16, 2003. During that shift, Sandoval asked if he could share a cell with Caro rather than be placed with one of the incoming prisoners. Before agreeing to Sandoval's request, Laster asked Caro specifically if he would

3

accept Sandoval. Caro agreed stating, "We're brothers. Done time together." *Id. at 115-116*. Sandoval was placed in Caro's cell at around 9 p.m. on December 16, 2003.

The next day at 6:10 a.m., Sandoval and Caro were served breakfast in their cell. They later took approximately one hour of recreation outside and were last observed by prison staff at approximately 6:10 p.m. There were no incidents between the two men and nothing suggested that there was any animosity or ill will between them.

At about 6:40 p.m. on December 17, 2003, Caro called a guard who was making his rounds in the SHU and stated, "Come and get this piece of shit out of here," and pointed at Sandoval lying next to the cell door. The guard looked into the cell and observed Sandoval, who was lying motionless with blood on him and a towel wrapped around his neck. Other guards quickly arrived and handcuffed Caro. When asked whether Sandoval was still breathing, Caro replied, "No. At this time he's stinking up the room, get him out." *United States v. Caro, 597 F.3d at 611*.

In a post-Miranda statement to FBI Special Agent Douglas Fender, Caro readily admitted that he killed Sandoval because, in his words, he had eaten Sandoval's breakfast that morning and Sandoval threatened to eat Caro's breakfast the following day. The next day, Caro taunted a prison guard, grinning a calling out, "When are you going to get me a new cellie?" *Id.*

Caro later discussed the murder with his wife and others, including Texas Syndicate member Roel Rivas. In one instance, Caro explained that he "killed a guy two weeks ago . . . (f)or being a fool." In a subsequent telephone conversation, Caro reported that, "Sandoval called me mother fucker, that whore, that's why I fucked him up." *Id. at 631*. Later, Caro told Rivas that he murdered Sandoval because "they gave me a cell mate and he disrespected me, so I

took him down."  *Id. at 611*. Caro never claimed that he acted in self-defense or that he had additional motivations when he strangled Sandoval.

On December 30, 2004, the United States Attorney sent a target letter to Caro in connection with the murder of Sandoval.  Contemporaneously, the United States Attorney requested the court to appoint counsel for Caro in connection with the case.  The court appointed Stephen Kalista and James Simmons (hereinafter sometimes referred to as "trial counsel") to represent Caro.  On February 1, 2005, trial counsel was invited to appear before the Department of Justice Capital Case Review Committee ("CCRC") in order to present any evidence or information that they might have to persuade the Attorney General that the death penalty should not be authorized against Caro in the event he were to be indicted in connection with the Sandoval murder.  Almost immediately, trial counsel applied for and obtained the court's permission[2] to retain a mitigation specialist, a private investigator and mental health experts including a licensed clinical psychologist / neuropsychologist and a psychiatrist.

A meeting with trial counsel, the United States Attorney and the CCRC was scheduled for June 6, 2005.  Although their appearance was not mandated by the Department of Justice, the Constitution or by statute, trial counsel attended the meeting but did not make any prior written submission on Caro's behalf.  On October 5, 2005, the Attorney General authorized the United States Attorney to seek the death penalty against Caro.

Caro was indicted on January 3, 2006.  He was tried by a jury and convicted of capital murder on February 1, 2007.  During the penalty phase, the jury heard evidence from the following defense witnesses:

---

[2]  Since they were appointed to represent Caro, trial counsel was required to obtain court approval before expending any fees for travel, experts and other costs of litigation.  Each cost had to be justified prior to receiving  court authorization.

- James Aiken: a correctional specialist, and Dr. Mark Cunningham, a clinical and forensic psychologist. Both agreed that Caro was "a dangerous inmate," *TT 2/7/07 at 38-39(Aiken); TT 2/12/07 at 103 (Cunningham),* but opined that the BOP had the ability to manage and control him safely if he received a life sentence.

- Susanna Rodriguez, Yomieda Martinez, Delia Contreras and Laura Perez: Caro's family and others who knew him as a child and a young man. They testified about his home and family life and the poverty he experienced. They reported Caro's father's long-standing problem with alcohol and drugs, describing him as "an aggressive drunk, a violent drunk" who would fight with others and his wife and spend his money on alcohol instead of supporting his family. They described his father's criminal activity including burglary, possession and suspected trafficking of illegal drugs, his "erratic" employment, the family's lack of education and the children's involvement with alcohol and drugs. Each stated that, unlike his brothers, Jose and Noe, Caro was never a behavior problem, nor did he fight or get into trouble. Through those witnesses, the jury learned that Caro's father died in 1984 of cirrhosis of the liver and his mother died in a house fire in 1997 while Caro and his brothers were in prison. Although Caro's father was violent with his mother, there is no evidence that he was violent with Caro or his brothers.

- Louyveth Caro: Caro's wife. She chronicled his involvement with drugs and their several separations as well as his infidelity. However, she also said that he was never violent and while they were together, their relationship was "great."

6

Based on the evidence presented, the jury found twelve mitigating factors, including that Caro (a) was exposed to domestic violence growing up; (b) was not encouraged in school; (c) came from an impoverished community; (d) was well-behaved growing up; (e) failed to reach high school after needing special education; (f) was shy and respectful compared to his brothers; (g) was brought into illegal drug trafficking by his uncles; (h) never abused his wife or daughter; (i) was not violent or aggressive until he received his 30 year sentence for drug trafficking; (j) has never attacked prison staff; (k) has never tried to escape, and (l) had been securely detained since December 18, 2003.

The jury found two statutory aggravating factors had been proved beyond a reasonable doubt including (1) that Caro was previously convicted of two offenses involving distribution of illegal drugs committed on different occasions and punishable by imprisonment for over one year, and (2) Caro had been previously convicted of a federal drug offense punishable by five or more years. They also found three non-statutory aggravating factors including future dangerousness, impact on the family of the victim and lack of remorse. The penalty phase of Caro's capital trial lasted nine days, following which the jury returned a sentence of death. That sentence was imposed by the court on March 30, 2007.

<u>THE *STRICKLAND* TEST FOR INEFFECTIVE ASSISTANCE OF COUNSEL</u>

*Strickland v. Washington,* 466 U.S. 668 (1984) sets forth the standards to be applied in evaluating a claim of ineffective assistance of counsel. To prove ineffective assistance of counsel, Caro must satisfy a two-pronged test set requiring him to show (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" meaning that counsel's representation fell below an objective standard of reasonableness, *Id*. at 687-88, and (2) that counsel's deficient performance prejudiced him. *Id*. at 694.

If a petitioner fails to satisfy either prong of the *Strickland* test, a court does not need to inquire whether he has satisfied the other prong. Id. at 697.

*Strickland* established a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689; *see also, Fields v. Att'y Gen. of Md.,* 956 F.2d 1290, 1297-99 (4th Cir. 1992); *Hutchins v. Garrison,* 724 F.2d 1425, 1430-31 (4th Cir. 1983), and the petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.; see also, Bowie v. Branker,* 512 F.3d 112, 119 n.8 (4th Cir. 2008). "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . and to evaluate the [challenged] conduct from counsel's perspective at the time." Id. "[E]ffective representation is not synonymous with errorless representation." *Springer v. Collins*, 586 F.2d 329, 332 (4th Cir. 1978).

In addition to proving deficient performance, a petitioner must show that he suffered prejudice as a result of his counsel's deficient performance, that is, he must establish that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine the confidence of the outcome." *Strickland*, 466 U.S. at 694. Caro bears the burden of proving *Strickland* prejudice. *Fields,* 956 F.2d at 1290.

Reasonableness is the benchmark by which Counsel's performance is measured. *Strickland,* 466 U.S. 668, 688–92. The American Bar Association Guidelines for the Appointment and Performance of Counsel in Capital Cases (the "ABA Guidelines") are not the standards to determine what is "reasonable" for defense counsel in capital litigation. Rather, the ABA Guidelines are merely meant to serve as models for what is reasonable; strict adherence is not required by the law. *Hummel v. Rosemeyer,* 564 F.3d 290, 302 (3d Cir.2009) ("The [ABA]

8

Standards are guides, but only guides, to what is reasonable."); *Showers v. Beard,* 635 F.3d 625, 633 (3d Cir.2011) (stating that the ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases are "informative," although not "dispositive" for determining whether counsel was ineffective). Similarly, the declarations of legal "experts," while informative, do not set the standard to evaluate the performance of trial.

<u>REPLY TO CLAIMS FOR RELIEF:  PRETRIAL</u>

<u>Claim One</u>:  Caro asserts that the Government violated his Fifth Amendment due-process rights by deliberately and tactically delaying the indictment of the capital case until after the government had negotiated a disproportionate plea agreement in the Benavidez assault.  He surmises that the reason for the delay in charging him in connection with the Sandoval murder "appears to have been the government's interest in convicting and sentencing Caro to the longest possible sentence . . . so it could set up the Sandoval case for death, including the argument that the only effective punishment available . . . was death, as Caro was already serving a de facto life sentence." *Petition* at 20.

There was no explicit or implicit plan by the government to lure Caro into a plea in the Benavidez case so that his plea could be used against him in the Sandoval case and Caro has not adduced any evidence suggesting that such a "plan" existed.  To circumvent the absence of such evidence, Caro relies upon the delay between the time of the Sandoval murder and Caro's indictment for that offense.

To establish a Due Process violation, the defendant has the burden of showing that 1) the pre-indictment delay was an intentional device to gain some tactical advantage over the defendant or was done in reckless disregard of circumstances, known to the prosecution,

suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense, and 2) the intentional delay caused the defendant actual prejudice.

The seminal cases regarding when pre-indictment delay deprives a defendant of due process are *United States v. Marion,* 404 U.S. 307 (1971) and *United States v. Lovasco,* 431 U.S. 783 (1977). In *Marion,* the Court found that a 38 month delay between the end of the criminal scheme charged and the time of the indictment that did not extend beyond the period of the applicable statute of limitations did not violate the defendant's rights under the Fifth Amendment Due Process Clause in the absence of a showing of intentional delay and actual prejudice.

*Lovasco* involved a 17 month delay during which two witnesses died. The Court reversed a lower court ruling dismissing the indictment, stating "while proof of actual prejudice makes a due process claim ripe, it does not automatically make it valid." Rather, the analysis requires consideration of the reasons for the delay as well as prejudice to the accused. The Court further observed that investigative delays do not deprive a defendant of his due process rights even if his rights may have been "somewhat prejudiced" by the lapse of time. *United States v. Automated Med. Labs, Inc.,* 770 F.2d 399, 402-404 (4th Cir. 1985). *See also*, *Jones v. Angelone,* 94 F.3d 900, 905 (4th Cir. 1996) (collecting cases).

The United States submits that Caro has failed to adduce any evidence to support a finding that the government intentional delayed the Sandoval indictment to gain some tactical advantage. The record also fails to establish an intentional delay done with "reckless disregard" for the consequences to Caro's ability to defend. To the contrary, the delay between the murder and the indictment was reasonable given the gravity of the crime, the need to investigate and the legal prerequisites to charge Caro with capital murder. Caro murdered Sandoval on December 17, 2003. The Bureau of Prisons SIS officers conducted mass interviews on December 22, 2003.

10

*Petition* at 48.   After conducting grand jury proceedings and follow up investigation, including forensic testing, the United States Attorney requested appointment of counsel on December 30, 2004, less than 13 months after the murder.  As Caro notes in his petition, the United States Attorney may not seek the death penalty unless and until the Attorney General authorizes him to do so.  *Petition* at 26.  Counsel appeared before the CCRC in June, 2005.   The Attorney General authorized the United States Attorney to seek the death penalty on October 5, 2005 and Caro was charged with capital murder in January, 2006.   Certainly, there can be no suggestion that pre-indictment proceedings were unduly delayed.

Caro claims government wrongdoing and prejudice arising from the "disproportionality" of his plea to a more serious offense than any of his co-defendants, including Moreno-Marquez, and the resultant 327 month sentence he received in connection with the Benavidez case. The apparent disproportionality does not, without more, establish government wrongdoing or actual prejudice.

Caro's plea in the Benavidez case was negotiated with the assistance of competent counsel, Lou Dene.  Dene states that while he was aware of the Sandoval homicide, that case "was separate from the (Benavidez) case in which I represented him." *Declaration of Lou Dene, Caro Exhibit 3, paragraph 3*.  Contrary to Caro's claim that "the government . . . required Mr. Caro to plead to the most serious charge," *Petition* at 22, Dene states the plea agreement was proposed not by the government, but by Moreno-Marquez. *Id., paragraph 5*.  Caro accepted the plea agreement, telling Dene the same thing he had told the prison authorities in Louisiana: that "he wasn't going anywhere, so the long sentence did not matter to him." *Id. paragraph 6*.  The United States submits that Caro's claim that the delay in the Sandoval indictment was coerced by the government to gain some tactical advantage must fail.

At the penalty phase of the Sandoval case, the government relied upon Caro's involvement in the Benavidez case to argue that he was a future danger and that he was already serving the functional equivalent of life. His plea agreement in the Benavidez case did not change the calculus for either argument.  Excluding the conviction and sentence in the Benavidez case, at the time of the penalty phase of the Sandoval case, Caro was 37 years of age and was already serving a term of 378 months imprisonment. *Caro Exhibit 50 at paragraphs 32-33*. Regardless of whether he had been convicted or sentenced in the Benavidez case, the United States would have relied on his extant sentence and argued that when he murdered Sandoval, Caro was then serving the functional equivalent of life[3].  The evidence that he and his fellow gang member stabbed Benavidez twenty-nine times would have been offered as proof of future dangerousness.

Even assuming that Caro is able to demonstrate actual prejudice, Caro is not entitled to the relief he seeks. The court must balance the defendant's prejudice against the government's justification for delay. "The basic inquiry then becomes whether the government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.' " *Howell v. Barker,* 904 F.2d 889, 895 (4th Cir. 1996) .

Caro has admitted that he willfully and deliberately murdered Sandoval for a host of trivial reasons.  There is no basis to conclude that Caro's prosecution for murdering Sandoval and the resultant death penalty violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'

---

[3]  Caro's plea agreement in the Benevidez case did provide him with the admittedly limited benefit of receiving an adjustment for acceptance of responsibility, thereby reducing his guideline range from 360 months-life to 262-327 months. *Exhibit 50,* paragraph 63.   It is noteworthy that the court imposed the maximum guideline punishment available and stated that if the guidelines were not mandatory, he would have imposed "a life sentence based on the defendant's criminal record and the facts of this offense."  *Caro Sentencing Hearing Transcript, Exhibit 52.*

For each of the foregoing reasons, the United States submits that Claim 1 is without merit and should be dismissed.

Claim Two:  Caro claims that he was deprived of his right to the effective assistance of counsel as guaranteed by 18 U.S.C. §3006a and the Sixth Amendment of the Constitution at the death certification stage. *Petition* at 26.  The claim has no merit.

The United States Attorney's Manual (USAM) establishes a protocol which mandates review of all death eligible cases by a committee and the approval of the Attorney General before the United States Attorney may seek a sentence of death. §§9-10.040-.050.  *Petition* at 26-27. The existence of such a protocol does not, however, render the review committee process a "critical stage of a criminal proceeding" to which the Sixth Amendment right to effective assistance of counsel attaches. Nor is there any constitutional or statutory basis to support a claim that effective representation by defense counsel requires a thorough investigation and the submission of a package of written arguments and supporting documentation of mitigating evidence to the CCRC.

There is no Constitutional or statutory right to a hearing before the CCRC.  Rather, the protocol is established by the USAM and exists at the discretion of the Attorney General. Section 1-1.100 of the USAM states that its purpose is to provide "only internal Department of Justice Guidance. **It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law or by any party in any matter civil or criminal**." (Emphasis added).

As the Court noted in *Marion,* the Sixth Amendment does not apply until Caro became an "accused," which only occurred at the time of his indictment.  The majority of the courts have found that the CCRC protocol "does not create substantive or procedural rights." *United States v.*

13

*Roman,* 931 F.Supp. 960, 964 (D.R.I. 1996).  Rather, "[t]he protocol articulates internal administrative procedures to be followed by DOJ personnel...." *Id.* It "provides for 'standards for determination' to guide the death penalty decision making process." *Id.* (citing DOJ Manual, § 9–10.000G).  *Accord: United States v. McVeigh,* 944 F.Supp. 1478, 1483 (D. Colo.1996) ("the decision to seek the death penalty under the Act is a matter of prosecutorial discretion [and] [t]he Protocol [does] not create any individual right or entitlement...."). *Cf. United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir.1990), *cert, denied,* 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990) ("the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party") (citations omitted); *United States v. Loften,* 518 F.Supp. 839, 856 (S.D.N.Y.1981), *aff'd,* 819 F.2d 1130 (2d Cir.1987) ("internal Government policies do not create rights in private citizens. The United States Attorney's Manual itself specifically states that it is not intended to, does not, and may not be relied upon to, create any rights whatever in any party").

Caro's reliance on *United States v. Pena-Gonzalez,* 62 F.Supp.2d 358 (D. Puerto Rico 1999) is misplaced.  In *Pena-Gonzalez*, defendant's counsel failed to submit any mitigating evidence to the government pursuant to the Protocol or to represent him at the death penalty certification process. 62 F. Supp. 2d at 359. The Attorney General subsequently certified that she would seek the death penalty against the defendant. *Id*. The defendant moved to strike the death penalty certification, arguing that his right to counsel and due process rights were violated because his counsel failed to represent him throughout the certification process. *Id*. In striking the certification, the court held that "a capital punishment certification hearing is a 'critical stage of a criminal proceeding where 'substantial rights of a criminal accused may be affected." *Id*. at 363.  The *Pena-Gonzalez* holding is incorrect for two reasons.  First, the court found authority

14

for its holding by analogizing the certification process to a sentencing hearing, *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) (holding that a sentencing hearing is a critical stage), and to an adult certification hearing in which a court determines whether to try a juvenile as an adult. 62 F. Supp. 2d at 363. However, both of these proceedings are judicial proceedings presided over by a judge, as opposed to the administrative, discretionary decision-making process of whether to seek the death penalty. Second, the court's analysis simply ignores the fact that a defendant does not possess any "substantial rights" in the discretionary decision-making process of an executive agency, as discussed above. *Accord: United States v. Torres Gomez,* 62 F. Supp. 2d 402 (D. Puerto Rico 1999) (criticizing rationale of *Pena-Gonzalez* and holding that the death penalty certification process is not a critical stage of litigation). Accordingly, *Pena-Gonzalez* offers no support for Caro's position. *See also*, *U.S. v. Shakir*, 113 F. Supp. 2d 1182 (M.D. Tenn. 2000).

In addition to the lack of legal support for the argument that the CCRC review process is a "critical stage" of the proceedings, there are also practical obstacles. To apply *Strickland* to the review process, the court would have to determine an appropriate standard of care for a defense attorney representing a defendant in a purely discretionary and unilateral protocol established by the Department of Justice. Counsel for the defendant often will not provide mitigation or other information to the CCRC because of concerns that the prosecution will use that information to gain insights to strategy and evidence that the defense will use at trial. This strategy is recognized by Caro's "expert," Larry Hammond. *See, Hammond Declaration, Caro Exhibit 4, paragraph 41*. In a case such as Caro's, where the evidence of his role in murdering Sandoval was never in dispute, and Caro was serving the functional equivalent of a life sentence when he murdered Sandoval, it was not unreasonable for defense counsel to approach the case with a

view toward obtaining a life sentence following a penalty phase hearing. *Kalista Declaration, Caro Exhibit 5, paragraph 9.* In such case, the failure to "tip one's hand" by disclosing mitigating information to the CCRC could not be considered ineffective assistance of counsel.

Caro's claim also fails to demonstrate that if trial counsel had presented mitigating evidence to the CCRC, the Attorney General would not have authorized the death penalty. Neither the meetings nor the deliberations of the CCRC are recorded, and the submissions of the United States Attorneys with regard to the death penalty are exempt from discovery. Moreover, a determination of prejudice would be impossible to make, given that the entire decision as to whether to seek the death penalty ultimately rests on the personal and entirely confidential discretion of the Attorney General. Accordingly, there is no basis to support the allegation that trial counsel was ineffective at the pretrial stage of the case.

<u>REPLY TO CLAIMS FOR RELIEF: GUILT/INNOCENSE PHASE</u>

<u>Claim Three:</u> Caro charges that his right to a fair trial was infringed by misconduct on the part of Jurors 32 and 62[4] in violation of the Fifth and Sixth Amendments. *Petition* at 38.

As a preliminary matter, the record contains a thorough voir dire including questions to test whether each juror would automatically vote to impose the death penalty as required by the Sixth Amendment. *TT 1/22-23/07*; s*ee Morgan v. Illinois*, 504 U.S. 719 (1992). Prior to empaneling a jury, the Court asked every prospective juror the following question to determine their capacity to sit on the jury under *Morgan*:

> On the other hand, would you automatically vote to impose the death penalty, or could you consider life in prison without possibility of release depending on the circumstances?

---

[4] The petition attributes certain post-trial statements to juror 32. However, no declaration or other means to authenticate the statements has been submitted. On June 7, 2013, counsel for Caro informed the government that no such declaration exists, but the allegation was made in good faith. The government accepts the representation that the allegation was made in good faith. Nevertheless, the government objects to any effort by Caro to utilize post-trial statements attributed to Juror 32 to support his claims.

*See*, *e.g.*, *TT 1/22/*07 at 28, 29, 31, 33, 34, 52. Like the Court did with every prospective juror, with Jurors 32 and 62, the Court went beyond the mandate under *Morgan*—not only asking them if they would automatically vote for the death penalty—the Court also phrased the question in the form of whether a juror could consider life without the possibility of release. The Court questioned Juror 32:

> THE COURT: On the other hand, would you automatically vote to impose the death penalty? In other words, would you consider life in prison without possibility of release depending on the circumstances?
>
> JUROR NUMBER THIRTY-TWO: Yes.

> *TT 1/22/07* at 109. Likewise with Juror 62, the Court conducted the same colloquy:
>
> THE COURT: On the other hand, would you automatically vote to impose the death penalty?
>
> PROSPECTIVE JUROR: No.
>
> THE COURT: In other words, could you consider life in prison without possibility of release, depending on the circumstances?
>
> PROSPECTIVE JUROR: Yes, sir.

*TT 1/23/07* at 51. This colloquy was designed to ensure that Jurors 32 and 62 would give individualized consideration to this crime and this defendant before voting to impose a sentence. Additionally, the colloquy alerted all jurors to the possibility of a sentence of life without the possibility of release.

Mr. Caro now claims that these jurors gave either factually inaccurate or misleading answers about their ability to consider a sentence other than death in a capital crime. *Petition* at 41-42. In support of this claim, he submits a declaration by Juror 62 stating in relevant part:

> I am now and was at the time of the trial strongly in favor of the death penalty in cases where guilt is obvious….There is nothing the defense offered, or could have offered, that would have changed my mind about the sentence because Caro committed the crime.

*Petition* at 40, *Caro Exhibit* # 32.

He further asserts that after the trial, juror 32 stated:

> the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and once he reached that conclusion, he had made up his mind about the death penalty, noting that the Bible states "An eye for an eye." After trial he also said nothing the defense could have offered would have changed his mind.

*Petition* at 42.

Both jurors filled out jury questionnaires prior to trial, and answered questions relevant to their views on the death penalty. Juror 32, in answer to question 58, asking "[i]n general, what are your feelings about the death penalty (capital punishment), stated, "I feel the death penalty should only be used in clear cut cases." *Exhibit* 38, Juror 32 Questionnaire, p. 26. In answer to question 59, asking the prospective juror to assess the strong of their opinion about the death penalty, Juror 32 checked the box for "strongly favor." *Id*. In the space for explanation of this answer, Juror 32 wrote "as stated above," referring to question 58. *Id*. Question 60 asked if the juror's opinions on the death penalty were based on religious or moral beliefs, and juror 32 answered in the negative. *Id*. Juror 32 also answered "no," to questions 61 and 62, asking if the juror's feelings about the death penalty were such that the juror would always or never vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances. *Id*. at 27.

In answer to question 58, asking "[i]n general, what are your feelings about the death penalty (capital punishment), Juror 62 stated, "sometimes its (sic) deserved." *Exhibit* 44, Juror 62 Questionnaire, p. 26. In answer to question 59, asking the prospective juror to assess the

strong of their opinion about the death penalty, Juror 62 checked the box for "neither favor or oppose." *Id*. In the space for explanation of this answer, Juror 62 wrote "each case is individual." *Id*. Question 60 asked if the juror's opinions on the death penalty were based on religious or moral beliefs, and Juror 62 answered in the negative. *Id*. Juror 62 also answered "no," to questions 61 and 62, asking if the juror's feelings about the death penalty were such that the juror would always or never vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances. *Id*. at 27.

Caro has no declaration from Juror 32 and has no evidence to authenticate the post-trial statements attributable to him. The declaration from Juror 62 is inadmissible under Rule 606(b) of the Federal Rules of Evidence, which precludes consideration of any testimony or declarations of former jurors in which they speculate upon how their subjective thought processes might have differed had they been presented with additional or different mitigating evidence. *Tanner v. United States*, 483 U.S. 107, 121–22 (1987); *Bacon v. Lee*, 225 F.3d 470, 485 (4th Cir. 2000) (applying Fed. R. Evid. 606(b) to capital habeas proceedings); *Fullwood v. Lee*, 290 F.3d 663, 679-680 (2002); *Summers v. Dretke*, 431 F.3d 861, 873 (5th Cir. 2005) ("Under Rule 606(b) of the Federal Rules of Evidence, jurors' affidavits are inadmissible 'regarding the following four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.' ").

To the degree that the declaration speaks to the decision-making processes of the jurors, consideration of the declaration is barred by Rule 606(b). Specifically, the hearsay statements in juror 62's declaration concerning what the defense could have offered to change his mind concerns the mindset and mental process of jurors during the deliberative process. Consideration

of this portion of the declaration would invade the most sacred place in our criminal justice system: a juror's deliberative thought processes. Consequently, that portion of the declaration should not be considered.

But even if the Court does consider that portion of the declaration, Mr. Caro's claim still fails as a matter of law because he cannot establish that the jury that convicted him and sentenced him to death was not impartial.

The Sixth Amendment guarantees defendants the right to an impartial jury in all criminal prosecutions. "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). This right is violated if "even one [partial] juror is empaneled and the death sentence is imposed." *Id.* at 728. In capital cases, "a juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729.

Now, Mr. Caro claims that two jurors at his trial and sentencing were *Morgan*-impaired, accusing them of factually inaccurate (Juror 62, *pet*. at 41) and misleading answers (Juror 32, *pet*. at 42) in their questionnaires, because they now say, among other things, that no amount of mitigating evidence could have changed their minds to impose the death-penalty. *Pet*. at 40, 42. Mr. Caro's claim is governed by *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984).

In *McDonough Power Equip., Inc.* the Supreme Court established a two-part test for determining whether a new trial is required in the context of juror deceit during voir dire or on jury questionnaires. To prevail Mr. Caro must "first demonstrate that a juror failed to answer

20

honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. This test applies equally to a deliberate concealment and an innocent non-disclosure. *Jones v. Cooper*, 311 F.3d 306, 313 (4th Cir. 2002).

Additionally, where a court considers post-verdict statements of jurors, courts are reticent to impeach verdicts based on post-trial juror statements, even where the statements are admissible under Federal Rule of Evidence 606(b). *See Tanner*, 483 U.S. at 118, citing and quoting *United States v. Dioguardi*, 492 F.2d 70, 79 n.12 (2d Cir. 1974). Indeed, "[c]onsideration of statements made by trial jurors after they experienced the entire trial and sentencing hearing and after deliberation of the verdict are not reasonably probative of … whether [jurors] could consider the evidence with open minds and follow the court's instructions on the law." *Neil v. Gibson*, 278 F.3d 1044, 1056 (10th Cir. 2001) (quoting *United States v. McVeigh*, 118 F.Supp.2d 1137, 1153 (D. Colo. 2000))

Caro's claim fails because the affidavits are consistent with the answers each juror gave during voir dire**.** As an initial matter, Mr. Caro cannot establish that either juror "failed to answer honestly a material question." See *McDonough Power Equip., Inc.*, 464 U.S. at 556. The responses in the questionnaires, during voir dire and in the declaration submitted by Mr. Caro (as well as the alleged post-trial declarations of Juror 32) are consistent with one another for three reasons.

First, the statements contained in the affidavits were made by each juror after they listened to evidence at the guilt phase, voted Mr. Caro guilty, listened to aggravating and mitigating evidence, and finally voted to impose the death penalty. As the Tenth Circuit recognized in *Neil*, statements of these jurors "after they experienced the entire trial and

sentencing hearing and after deliberation of the verdict are not reasonably probative of …

whether [jurors] could consider the evidence with open minds and follow the court's instructions

on the law." *Neil*, 278 F.3d at 1056.

Second, the jurors in their affidavits do not claim to have answered questions prior to the

trial inaccurately, and none of the statements in the affidavits contradict any of the statements

made during voir dire or in the questionnaires. A juror's statement that the evidence offered

during the guilt phase of the trial was so persuasive and the crime so egregious that the death

penalty was warranted in no way establishes that the juror would impose the death sentence in

every capital case—which is consistent with the Sixth Amendment. *See Morgan*, 504 U.S. at

727. It is consistent with the Sixth Amendment for a juror, after listening to the evidence, to

state that they were convinced that death was the appropriate sentence. It is inconsistent with the

Sixth Amendment for a juror to state that they formed an opinion before hearing evidence in the

case. Neither juror in this case stated that they formed an opinion prior to hearing the evidence.

Neither affidavit contradicts the respective jurors' statements on voir dire or indicates that they

were incapable of considering all of the evidence, mitigators, or life imprisonment as a potential

sentence.

Third, the statements attributed to the jurors are not objective in nature; therefore, the

accuracy of the statements is not readily verifiable. The circumstances presented by the

statements in this case are therefore distinguishable from many cases dealing with juror

dishonesty involving statements that are objective in nature—where the accuracy of the

statement is easily corroborated or disproven. For example, such cases include: where a juror

lies about being a relative of a prosecution witness, *Williams, v. Taylor*, 529 U.S. 420 (2000);

where a juror fails to disclose during voir dire that their spouse was murdered, *United States v.*

*Faulks*, 454 F.3d 410 (4th Cir. 2006); or where a juror fails to disclose a blood relation to a co-defendant in the case, *Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006). All these instances involve objective voir dire questions, and the facts which proved that the responses were dishonest were clear. On the other hand, the statements in the Caro jury affidavits are subjective in nature concerning jurors' feelings about a specific sentencing decision made in light of evidence considered and weighed during deliberations. Because of the subjective, nebulous nature of the statements, one cannot make an objective assessment of their accuracy.

When presented with similar evidence of alleged juror dishonesty, the Fourth Circuit found similar declarations lacking. *Jones*, 311 F.3d at 313. In *Jones*, a petitioner sentenced to death claimed that a sentencing juror lied on a juror questionnaire. *Id.* at 308. The *Jones* juror failed to accurately respond to a question about whether any family members had been arrested or convicted of a crime, but in addition, according to an investigator's affidavit, the juror stated that she believed that "the Bible mandates imposition of the death penalty in every case of first-degree murder." *Id.* at 312. The Fourth Circuit held that the alleged statements, while troubling, did not prove juror bias. *Id.* The Court concluded that her statement was "fully consistent with the juror's voir dire responses, wherein she declared her support for the death penalty "when appropriate," . . .and where she stated that she could fairly balance aggravating and mitigating factors." *Id.* The *Jones* Court concluded that "[i]t cannot be inferred from any statement in the affidavit that the juror could not disregard her personal feelings about the death penalty or apply the law as written, or that the juror lied when she stated that she could be a fair juror." *Id.* The Court also stated, "That the juror strongly supported the death penalty does not raise an inference that she could not follow the court's instructions properly." *Id.* at 313. *See*, *also*, *Nicholson v. Branker*, 739 F. Supp. 2d 839, 870-71 (E.D.N.C. 2010) ("even if petitioner could show that with

different questioning [a juror] would now indicate she could not fully consider the mitigators or consider a life sentence, that would not establish he is entitled to relief. … Even if petitioner could establish ... that [a juror] had some misunderstanding of the application of the law, it would not establish she was not impartial.").

For reasons similar to those in *Jones*, Juror 32's statements that the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and that once he reached that conclusion, he had made up his mind about the death penalty, and that the Bible states "an eye for an eye," are not inconsistent with his voir dire answers or his questionnaire. *See id.* In his questionnaire, Juror 32 stated that he felt the death penalty should only be used in "clear cut cases," and that he would not always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense. *Sealed Exhibit* 38, Juror 32 Questionnaire, pp. 26-27. Further, and importantly, he stated that he would be able to follow the judge's instructions, and in the colloquy with the Court, he confirmed that he would consider life imprisonment as a punishment, depending on the circumstances. Trial Transcript, Jan. 22, 2007 at 109. In that light, the record does not establish that the juror was impartial. *See Jones*, 311 F.3d at 313.

Likewise, Juror 62's affidavit stating that she did not favor or oppose the death penalty, and that it was "sometimes . . .deserved," as well as noting that "each case is individual," is not inconsistent with the affidavit affirming that she is now, and was at the time of trial, "strongly in favor of the death penalty in cases where evidence of guilt is obvious," and that there is nothing the defense could have offered that would have changed her mind about the sentence, "because Mr. Caro committed the crime." As in *Jones*, in light of the court's colloquy and the juror's statement that she strongly favored the death penalty where guilt was obvious does not give rise

to an inference that she could not properly follow the Court's instructions. *Jones*, 311 F.3d at 313.

Mr. Caro's claim fails because the evidence offered does not establish that juror 32 or 62 was substantially impaired. The declaration and statements submitted by Caro discuss particularities of Caro's offense and each juror's consideration of the evidence presented at Caro's trial. Indeed, Juror 62's declaration states that she believed that death was the appropriate sentence "because Caro committed *the crime*." *Sealed Exhibit* 32 (emphasis added). The juror does not state that death is the appropriate sentence for any death eligible crime. Quite the contrary, Juror 62 states—given the nature of the crime and the weight of the evidence proving Mr. Caro committed it—that death was the appropriate sentence. Therefore, the affidavit does not disqualify Juror 62.

Likewise, Juror 32 allegedly states the evidence was "conclusive." *Petition* at 42. After hearing and considering the "conclusive" evidence of guilt, this juror determined—in light of that evidence—death was the appropriate sentence. This juror did not go into the trial with his mind made up; rather, he was persuaded that death was the appropriate sentence by "conclusive" evidence. *Morgan* forbids a juror sitting who, prior to any evidence, would automatically vote to impose the death sentence for any capital crime, not a juror who votes for the death sentence after hearing "conclusive" evidence.

Moreover, the statements are not indicative of jurors who had their minds made up before the first witness is sworn. On the contrary, they paint a picture of jurors who were actively listening and weighing evidence. Indeed, the statements show that each juror gave particularized consideration to Mr. Caro's offense and his individualized circumstances.

To illustrate a *Morgan*-impaired juror, the record offers an example. Juror number 16 was excused for cause based on *Morgan*-based impairment:

> THE COURT: No, the question is whether you would always, if the defendant was found guilty of murder, whether you would always vote, regardless of the circumstances, to impose the death penalty? (sic) In other words, the jury would have found that the defendant had taken a life, and would you then feel that the only appropriate punishment was the death penalty?
>
> JUROR NUMBER SIXTEEN: I'd probably have to say yes, yes on that.

*TT 1/22/07* at 67. Unlike Jurors 32 and 62—who considered the evidence prior to determining the proper sentence—the Court found that Juror 16 had formed a decision on the sentence before hearing any evidence and struck the juror for cause.

*Id.* at 73.

The Court properly found Juror 16 impaired because that juror would have imposed the death sentence in every capital case. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). As the Supreme Court stated, "a juror who will automatically vote for the death penalty in *every case*" cannot follow the instructions of the court. *Morgan*, 504 U.S. at 729 (emphasis added). Jurors 32 and 62, by contrast, do not state that they would impose a capital sentence in every death-eligible case; rather, they state that death is appropriate in cases as egregious and where guilt is conclusive as in Mr. Caro's.

The statements attributed to Jurors 32 and 62 are a far cry from the substantial impairment seen above for three reasons: 1) They specifically state that each juror listened and considered the evidence, 2) The statements refer to an opinion formed specifically about Mr. Caro's crime (not a categorical belief about capital crimes that applied generally), and most importantly, 3) The statements in no way indicate that either juror was unable to follow the

instructions given by the Court.  In sum, the statements do not indicate that Jurors 32 and 62 could not disregard their personal feelings about the death penalty, or apply the law as written, and Caro has failed to establish that these jurors denied him his constitutional right to an impartial jury.  *See Jones* 311 F.3d at 312-313.

Finally, Caro could have, but did not raise this challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore procedurally defaulted.   A collateral attack under § 2255 may not substitute for an appeal.  *United States v. Frady,* 456 U.S. 152, 165 (1982).  Claims regarding trial errors that could have been, but were not raised on direct appeal are barred from review under § 2255, unless the defendant shows cause for the default and actual prejudice resulting from such errors or demonstrates that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack because he is likely actually innocent of criminal conduct. *See United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir. 1999) (citing  *Frady,* 456 U.S. 152, 167–68 (1982).  However, even if this claim were not defaulted, for the reasons above, Caro cannot prevail on the merits, and his claim should be denied.

Claim Four:  Caro claims he was deprived of his right to effective assistance of trial counsel as guaranteed by 18 U.S.C. §3006 and the Sixth Amendment of the Constitution during the guilt/innocence phase.  *Petition* at 43.  The thrust of Claim Four is that trial counsel "failed to develop a compelling theme" or to "create a reasonable defense" during the guilt / innocence phase.  *Petition* at 44.  Caro offers four specific instances which, collectively, he relies upon to support his complaint. They are:

A.  Trial counsel failed to develop a cohesive theory of defense.
B.  Trial counsel failed to adequately investigate and impeach the government's only purported eyewitness, Sean Bullock.

C. Trial counsel failed to adequately investigate and present evidence of the BOP's negligence regarding the decision to grant Mr. Sandoval's request to be placed in Mr. Caro's cell.

D. Trial counsel failed to adequately investigate and present evidence in support of self-defense, second degree murder or manslaughter.

None of these contentions have merit.

The claim that trial counsel failed to develop a cohesive theory of defense (Claim Four A, *Petition* at 43) is not supported by the record. The government submits that trial counsel did develop a *cohesive* theory of defense. They failed, however, to develop a *viable* theory of defense not due to any error or omission on their part, but rather due to the lack of any substantive evidence to support a viable defense.

Trial counsel was faced with a daunting task when they were appointed to represent Caro. Evidence was overwhelming that Caro murdered Sandoval willfully, deliberately and with premeditation: only two men were in the cell; one, Sandoval, was dead, strangled by a towel; the other, Caro, was alive and suffered no injuries; the medical examiner testified that it would have taken several minutes for Caro to strangle Sandoval to death; there was no evidence of prior bad blood or arguments between the two men, who were both members of the same gang; Caro never claimed that he acted in self-defense or that he was provoked in any way by Sandoval; Caro admitted that he killed Sandoval because Sandoval threatened to eat Caro's breakfast; Caro bragged to his family and a fellow gang member that murdered Sandoval because Sandoval disrespected him; Caro taunted the guards after killing Sandoval, asking when he was going to receive a new cellmate. Evidence of provocation, heat of passion, mutual combat or any other factor that would reduce the crime to anything other than first degree murder was wholly lacking. Despite the absence of any evidence to support their theory, trial counsel argued that Caro's actions were not premeditated and he acted in the heat of passion. *Kalista Declaration, Caro*

28

*Exhibit 5 at paragraph 11.* Trial counsel requested and was granted an instruction that would have allowed the jury to find Caro guilty of second degree murder, and they argued for that finding. The jury rejected their argument.

The scenario posited by Caro to support "a compelling story for conviction of a lesser-included offense," *Petition* at 45-46, is fantasy. Disregarding Caro's numerous admissions, his petition asserts that "no one knows . . . what motivated the killing." *Id.* at 45. The allegation that Sandoval posed a danger because he "would not give up" in his quest to be celled with Caro, *id.,* runs contrary to the testimony of the SIS officers that the first attempt to place Sandoval in Caro's cell was initiated by the prison officials, not Sandoval. It was only after Sandoval was faced with the possibility that he would be celled with a member of a rival gang that he asked to be placed with Caro, who had no objection to the placement.

While "prison culture" might be relevant to the issue of punishment, it is wholly irrelevant to whether Caro was guilty of first degree murder. "Prison culture" does not negate premeditation. To the contrary, an argument could be made that a prisoner's desire to save face would be proof that the decision to harm another inmate was a volitional act. The whole "prison culture" theory is a red herring because there is no evidence that "prison culture" played any role in Caro's decision to strange Sandoval to death.

Caro charges that trial counsel failed to effectively cross-examine Sean Bullock and to impeach him with the testimony of his cell mate, Joseph Bland. (Claim Four B, *Petition at 46-53).* The government submits that Bullock was effectively cross-examined by trial counsel and their failure to identify and interview his cell mate, Joseph Bland, did not prejudice Caro. There is no reasonable probability that the results of the guilt phase would have been different if Bland had testified or if Bullock had been subject to further cross-examination.

Bullock was extensively impeached by trial counsel. *TT 1/29/07 at 81-111, 114-115.* In addition to the disclosure of Bullock's extensive criminal background and resultant life sentence, his violence and disciplinary problems in prison, *id. at 56-57, 60-62,* trial counsel established that Bullock used aliases "to deceive people." They pointed out inconsistencies in his testimony at trial and to the grand jury, and statements in his "mass interview form." They elicited Bullock's hope that he would receive benefits in exchange for his testimony. Trial counsel also examined Bullock about his cellmate, questioning why Bullock did not tell his "cellie" about what he saw in Caro's cell. *Id. at 101-102.*

Bland's affidavit is hardly compelling proof that Bullock's testimony was fabricated. Bland states that he and his unnamed "cell mate" were playing cards for about 30 minutes prior to learning of Sandoval's murder. Neither Bullock nor Bland can say with any certainty when the murder occurred in relation to when they were playing cards. Bland's conclusion that his cell mate "was not standing by the door prior to inmate Sandoval being removed from cell 123" is of minimal significance for two reasons. First, Bullock did not say he was standing at the door when Sandoval was removed from his cell. Rather, he stated that he was at that location earlier in the day when he observed Caro with the orange towel around Sandoval's neck. Second, Bullock testified that did not tell his cellmate about what he saw concerning the incident, which he dismissed as "just playing," *TT 01/30/07 at 75.*

Caro cannot establish any prejudice arising from the failure to impeach Bullock. Even if Bullock was further cross-examined or impeached to the point where the jury could discount his testimony in its entirety, there is still no reasonable probability that the outcome of the guilt phase would have been different. The amount of other incriminatory evidence against Caro, including his admissions to Fender, his letters to and telephone conversations with his family and

fellow gang member, was substantial. Bullock's "rear view mirror. . . kind of quick, a second" observations were superfluous in the context of the great volume of evidence against Caro.

Caro faults trial counsel for failing to present evidence of the BOP's "negligence" in placing Sandoval in Caro's cell. (Claim Four C, *Petition* at 53). The United States submits that it was neither unreasonable nor negligent for the guards to place Sandoval in Caro's cell. Hence, there was nothing that trial counsel could present on that subject.

The testimony of Dustin Watts, John Gilley and Brian Laster, summarized at pages 2-4, supra, makes it clear that the placement of Sandoval with Caro was not random or without thought. The initial decision to place Sandoval with Caro was initiated by Watts, not Sandoval. It was only later that Sandoval requested placement with Caro rather than with one of the new inmates. At that time, Caro readily agreed to accept his "brother."

The scenario spun by Caro suggesting that Caro's initial refusal to take a cellmate, any cellmate as it turns out, should have been a "red flag" for the SHU officers, *Petition at 56*, is based solely on the opinion of Mark Bezy. In the face of overwhelming evidence to the contrary, Bezy charges that Sandoval's request to be placed Caro's cell was "more than . . . benign" and was "disrespectful" and the jury could somehow interpret Sandoval's request as "an aggressive challenge to Caro."

Perhaps the confusion is caused by Bezy's misunderstanding of the facts leading up to the placement. In his January, 2013 declaration, Bezy writes

> I also was struck by Mr. Sandoval's request to be placed with Mr. Caro after Mr. Caro had just refused a cellmate. In light of the prison culture, which demands respect among inmate, this *subsequent request by Mr. Sandoval* suggests to me that Mr. Sandoval had a strong and specific reason to want to be placed in Mr. Caro's cell. *This second request after Mr. Caro's refusal* could be interpreted through the eyes of prison culture as an aggressive challenge to Mr. Caro.

*Bezy Declaration, Caro Exhibit 1, paragraph 17.*

The evidence, of course, is that the placement was initiated by the guards. Sandoval only asked to be placed with Caro after facing placement with a stranger.

Bezy further opines

> The fact that Mr. Sandoval was armed before he went into the SHU should have been another red-flag to the prison that something was going on that needed to be addressed. The possession of weapons by inmates is a sign that there is some sort of tension within the prison. Inmates want to do peaceful time. If inmates are "arming up," the prison needs to find out the source of the tension and address it.

*Id. paragraph 18.*

Bezy's conclusions are conjectural. There is nothing to connect Sandoval's earlier possession of a shank and his death at the hands of Caro. Nor is there any indication that officials at USP-Lee should have seen that unrelated incident as a "red flag" indicating something more sinister was afoot that created a conflict between Caro and Sandoval. This court does not need an expert to know that the possession of weapons by inmates is, unfortunately, commonplace at USP-Lee.

Caro has never claimed to anyone that he murdered Sandoval because he feared for his safety or that the killing was in any way gang related. Trial counsel had no evidence to support a claim that BOP was negligent in placing Sandoval with Caro and they were not ineffective in failing to pursue that argument.

Caro complains that trial counsel failed to adequately investigate and present evidence of self-defense, second degree murder or manslaughter. (Claim Four D, *Petition* at 57.) He asserts that his defense counsel "had sufficient evidence for a prima facie case of self-defense based on circumstances at the prison during the previous five months." That argument is specious.

To accept Caro's argument that events occurring months before the murder and for the most part having nothing to do with Sandoval would be the basis for a self-defense claim would

be to accept a premise that ALL murders at USP-Lee are arguably self-defense.  The factors

cited by Caro, *Petition* at 57-59, are nothing more than a series of events unconnected to the

murder and are legally and factually insufficient to support a case of self-defense or

manslaughter.  They are at odds with Caro's admissions that he killed Sandoval over breakfast

and because Sandoval "disrespected" him. They ignore his callous comments to the guards and

to his family members and fellow gang member after the murder. Trial counsel did, of course,

argue for second degree murder. However, their failure to argue self-defense or manslaughter,

given the complete absence of evidence to support those arguments, does not constitute

ineffective assistance of counsel. Nor does their failure to make those arguments support a

finding that, but for the alleged errors of trial counsel, there is a reasonable probability that the

outcome of the proceeding would have been different.

Claim Five:  Caro charges that the government withheld exculpatory and impeachment

evidence in violation of *Brady / Giglio* and otherwise violated his constitutional rights.

Specifically, he claims that the government misrepresented the fact that Sean Bullock had a

cellmate at the time of the Sandoval murder in its communications with defense counsel.

*Petition* at 62.  Prior to trial, defense counsel requested "'a list of all inmates with their prison

numbers in the SHU on December 16 and December 17, 2003, showing the specific cells in

which they were housed.'"  *Petition* at 62, quoting Motion for Issuance of Subpoena Duces

Tecum, 3/27/2006, Dkt. 72.  The Court granted Caro's request on March 30, 2006, by oral order.

The government provided "records from which this information might be gleaned" and also

notified Caro that it had no "per se" list of inmates in the SHU on December 16-17, 2003.

Giorno letter to Kalista, 6/8/2006; Daily Log and Roster, 12/20/2003.  One of the documents the

government provided was a Roster dated December 20, 2003, and Caro correctly notes that the

Roster showed the names of the inmates and their cell locations for December 20, 2003, not for December 16-17, 2003. *Petition* at 63. As Caro points out, the December 20 roster shows Bullock as the only inmate in cell 146. The roster does not show the presence of Bland; this is consistent with Caro's allegation that Bland was moved from cell 146 on December 19. Caro acknowledges, however, that the SHU logs for December 17-20—that the government provided prior to trial—show that Bland was moved from cell 146 on December 19, 2003[5] "to another range and cell." *Petition* at 63. In spite of this roster, Caro alleges that the records did not reflect the fact that Bland was in cell 146 on December 16 and 17, and that the daily log for December 16, "would have shown that Mr. Bland was moved into cell 146 on December 16." *Petition* at 63. Caro alleges that the government did not produce the document in response to his discovery request, and that the mass interviews of the inmates did not include a report for an interview with inmate Bland, Bullock's cellmate. *Petition* at 63. However, Caro admits immediately thereafter, that "[o]ne month before trial, the government produced a copy of Mr. Bullock's grand jury testimony," and that "the government finally disclosed the existence of the cell mate through a couple passing references in Mr. Bullock's grand jury testimony." *Petition* at 63-64. Nonetheless, Caro claims that despite that disclosure, defense counsel was "lulled by these misrepresentations by the government," and "rendered ineffective" because counsel still failed to appreciate that Bullock had a cellmate until trial. *Petition* at 64. For three separate, and independent, reasons, Caro's claim in this issue should be denied.

---

[5] Caro's petition states "December 19, 2006, two days after the offense," which the undersigned notes is a typographical error. *See Petition* at 63.

**I.      Caro's claim is procedurally barred.**

Caro could have raised on direct appeal the challenge he presents in Claim Five of this habeas petition, and because he did not, his claim is procedurally defaulted in this § 2255 action. *See Bousley v. United States,* 523 U.S. 614, 622 (1998) (citing *Frady,* 456 U.S. 152).   A collateral attack under § 2255 may not substitute for an appeal. Claims that could have been but were not raised on direct appeal are procedurally barred from review under § 2255, unless the defendant demonstrates cause for his default and actual prejudice or demonstrates actual innocence.  *Id.*  Caro has not presented any argument establishing cause for failing to raise the issue and actual prejudice or an actual innocence argument, and his claim should be denied on the basis of procedural default.  *See id.*

**II.     The alleged *Brady* material was disclosed to defense counsel in a timely fashion; additionally, the evidence was available to Caro from other sources.**

Caro's petition should also be denied because he has failed to establish that the government violated *Brady/Giglio*, or that the evidence in question was material.  Under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny, the government must disclose material evidence favorable to the defendant.  An extension of this rule also requires disclosure of evidence affecting the credibility of government witnesses. *See United States v. Bagley,* 473 U.S. 667, 676 (1985); *Giglio v. United States,* 405 U.S. 150, 154 (1972).  Undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also id.,* 473 U.S. at 685 (opinion of White, J., concurring); *Bond v. Procunier,* 780 F.2d 461, 464 (4th Cir. 1986).  But when the evidence at issue was "available to the defendant from other sources," the defendant has no *Brady/Giglio* claim when the

government fails to produce it. *United States v. Wilson,* 901 F.2d 378, 380 (4th Cir.1990), citing and quoting *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 479 U.S. 852 (1986) (Furthermore, "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources."); *see also United States v. Grossman,* 843 F.2d 78, 85 (2d Cir.1988) (no *Brady* violation occurs when a defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence") (citations omitted); *Lugo v. Munoz,* 682 F.2d 7, 9–10 (1st Cir.1982) (government has no *Brady* burden when facts are available to a diligent defense attorney).

In his petition, Caro makes note of AUSA Giorno's letter to Mr. Kalista, in which AUSA Giorno states that he had no list of inmates in the SHU on December 16-17, 2003, but was providing "records from which this information might be gleaned." Giorno letter to Kalista, 6/8/2006. In other words, the government gave Caro's counsel what it had in its possession that was responsive to his request. Further, on December 28, 2006, a full month before trial, the government produced a copy of Bullock's grand jury testimony, in which Bullock stated that he had a cellmate on the day Caro killed Sandoval. *Sealed Exhibit* 26, pp. 18, 22. Caro acknowledges in his petition that "on the eve of trial, the government finally disclosed the existence of the cell mate . . .," *Petition* at 64. There is no *Brady/Giglio* claim even when the government fails to produce evidence, where the evidence is "available to the defendant from other sources." *Wilson*, 901 F.2d at 380.

Caro also argues, "[t]he government should have provided this information sooner . . .," but given that Bullock clearly stated in the grand jury testimony which was provided on December 28, 2006, and the trial in this case did not start until January 5, 2007, Caro had plenty of time in which to make use of the information before Bland testified at trial. Moreover, the

documents that the government provided Caro's counsel, SHU logs for December 17-20, showed that Bland was in cell 146 on December 19, and moved to another location on that date. This information, in conjunction with Bullock's testimony, should have alerted counsel to the question of when Bland was placed in cell 146. In fact, when he asserts that defense counsel was ineffective for failing to identify or interview Bullock's cellmate Caro acknowledges that defense should have known the identity based on the government's discovery. Petition at 47. In sum, Caro argues that the government violated *Brady* by failing to disclose documents which would have revealed the existence of Bullock's cellmate, but simultaneously admits that this information was in fact disclosed in the grand jury testimony he received, and was so apparent to defense counsel that they were ineffective for failing to identify and interview Bullock's cellmate.[6] Because the alleged *Brady* material was actually disclosed prior to trial and available to the defendant from other sources, Claim Five should be dismissed.

III.     **The evidence proving that Caro murdered Sandoval is so substantial that even if Caro presented the evidence he claims to be *Brady* material, this evidence does not undermine confidence in the outcome of the trial.**

Finally, for the reasons set forth earlier pertaining to Issue Four-B, Caro cannot establish that the information he claims was not disclosed was material for purposes of his *Brady* claim. Even assuming that he had had the logs and rosters for December 16-17, and had learned in that manner, instead of through Bullock's grand jury testimony, that Bullock had a cellmate on the day of the murder, and even further assuming that Caro had entirely discredited Bullock's

_____

[6] These arguments are completely inconsistent. The record does not suggest that the government withheld material evidence or that defense counsel was ineffective for failing to identify a material witness. Quite the contrary, the record reveals that defense counsel had the documents they needed to identify Bullock's cellmate, and whether they made a strategic decision or not, there was no prejudice to Caro, because even if Bullock were completely discredited at trial, it does not change the fact that police found Caro alone in his cell with his cellmate strangled, and discrediting Bullock could not change the overwhelming impact of the damning statements and admissions that Caro made after the murder.

testimony at trial, there is no reasonable probability that the outcome of the case would have been different.   Caro's callous statements in this case, in addition to the fact that Sandoval was found dead in the cell with Caro, strangled by the towel which remained around his neck, constitute overwhelming evidence proving that Caro murdered Sandoval.  *See Caro*, 597 F.3d at 611.  Undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability that the outcome of the case would have been different "is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682.   Given the overwhelming evidence establishing that Caro murdered Sandoval, even if defense counsel could have completely discredited Bullock, it would not have undermined the other independent evidence that proved Caro murdered Sandoval.  Furthermore, in light of the particular facts of the case, any attempt to discredit Bullock at trial may have seemed frivolous and could have alienated defense counsel with the jury.  In sum, the evidence Caro claims to be *Brady* material offers no reasonable probability that the result of the trial would have been different.  Therefore, Caro's petition for relief based upon Claim Five should be denied.

<center>REPLY TO CLAIMS FOR RELIEF: PENALTY PHASE</center>

Claim Six:  Caro claims that he was deprived of his right to the effective assistance of trial counsel as guaranteed by 18 U.S.C. §3006a and the Sixth Amendment of the Constitution at the penalty phase. He relies upon twelve specific instances which, collectively, he relies upon to support his complaint.  Each will be addressed, *seriatim.*

Caro first claims that trial counsel was ineffective by failing to challenge his conviction and sentence for the Benavidez stabbing  based upon the government's deliberate and tactical delay of his indictment.  (Claim Six A, *Petition* at *65).* He asserts the challenge would have been

<center>38</center>

"meritorious" and would prevent the government from "seeking the death penalty or arguing facts related to the Benavidez assault as an aggravating factor in support of his death sentence."

For the reasons set forth in response to Claim One, *supra,* the United States submits that there was no basis for trial counsel to challenge Caro's conviction or sentence in the Benavidez case. No evidence supports his claim that the government delayed indicting Caro for the Sandoval murder to gain some tactical advantage or in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense. A challenge to the Benavidez conviction and sentence would have been futile and trial counsel was not ineffective in failing to pursue that course of action.

Even if the Benavidez case had not been concluded prior to the resolution of the Sandoval penalty phase, the United States would still have been able to introduce evidence of the facts and circumstances surrounding the assault as an aggravating factor in support of the death penalty. Accordingly, the United States submits that Caro has not demonstrated that, but for the alleged errors of trial counsel, there is a reasonable probability that the outcome of the penalty proceeding would have been different.

Caro faults trial counsel for failing to adequately investigate, develop, and present a compelling mitigation story about his life. (Claim Six B, *Petition* at 66*).* Again, the record does not support his complaint.

Caro's summary conclusion that trial counsel simply presented "seemingly unrelated mitigating factors" that failed to support their case for life, *Petition* at 104*,* ignores the limited options available to defense counsel, minimizes the quality and significance of trial counsel's investigative efforts and the evidence they offered and overstates the significance of the evidence

that was not presented.   Contrary to his claim, the record establishes that trial counsel adequately and effectively investigated, developed and presented relevant mitigating testimony from family members, his wife, one of his teachers in an attempt to humanize the man who had so brutally and callously strangled Sandoval to death for no reason.  They presented two prison experts who truthfully stated that although Caro continued to pose a danger to other inmates the BOP could effectively control him to guarantee he would not harm anyone else if he were to be imprisoned for life.  As more fully discussed below, the mitigation evidence presented was not random or haphazard, but rather the product of diligent investigation and preparation by trial counsel.

<u>Mitigation Experts and a Private Investigator</u>

Faced with uncontradicted evidence that Caro killed Sandoval, his admissions of guilt, the trivial reasons he gave for taking a human life and his words and actions evincing a lack of remorse for the murder, trial counsel properly concluded that Caro's "would be a penalty phase case" and that their best result would be a life sentence. *Kalista Declaration, Caro Exhibit 5 at paragraph 9.*

Caro concedes, that despite these difficult circumstances, trial counsel made reasonable and diligent efforts to build a mitigation defense. Within two months of their appointment, trial counsel sought assistance from mental health experts to address "issues such as competency, criminal responsibility, impaired capacity, disturbance, and other mental health related factors." *Petition* at 66.  They retained a mitigation specialist, Dr. Lee Norton who undertook "to collect critical records, interview relatives and other potential mitigation witnesses."  She spent almost 50 hours in April, 2006 assisting trial counsel with the development of the case for mitigation. *Petition* at 66-67.

40

On March 20, 2006, and through no fault of trial counsel, Dr. Norton abruptly withdrew from the case. There is no evidence that Dr. Norton's investigation revealed anything that trial counsel could have presented that would be relevant to mitigation. Undeterred, trial counsel promptly obtained the appointment of another mitigation specialist, Hans Selvog, who assisted them for the duration of the case. *Id.* at 71.

In April, 2006, defense obtained the court's permission to hire D.A. Mullikin as a private investigator assist with the development of mitigation evidence. Although the record demonstrates that he performed services as evidenced by invoices dated May 6 and June 2, 2005, *id.* at 67, there is no evidence that his investigation revealed anything that trial counsel could have presented that would be relevant to mitigation.

<u>The Mental Health Experts</u>

Beginning in January, 2006, trial investigated mental health professionals who could "conduct testing on (Caro) to determine the possibility of organic brain damage and to do a routine psychological work up prior to a psychiatric evaluation." *Emails from Kalista to Drs. Doris E. Nevin and Nancy Davis, January 24, 2006, Government Exhibit 1*. On February 15, 2006, upon recommendation of Dr. Davis, President of the Knoxville Area Psychological Association, they retained Dr. Malcolm Spica,[7] a licensed clinical psychologist and neuropsychologist. Spica spent 7.5 hours with Caro over two days, June 9 and June 16, 2006. According to Spica's neuropsychological consultation report, Caro "stated that he has not suffered any significant head injuries of which he is aware. . . no history of serious illness, losses of consciousness, prolonged high fevers, seizures or sensory disturbances," *Exhibit C to Spica*

---

[7] Counsels' early requests also indicate an awareness that other experts might be necessary depending on how their investigation proceeded. They identified the possible need for a psychiatrist "only . . . if Caro had brain damage." *Id.* at 70.

*Declaration, Caro Exhibit 10 at 1.* Spica found no evidence of "major head injuries." *Id. at 7.* His evaluation makes no mention of "brain damage."[8] He reports that "neuropsychological test results revealed converging signs of frontal lobe dysfunction[9]," and diagnoses Caro with "Cognitive disorder – NOS (not otherwise specified)." He "speculates" that those "cognitive deficits" caused Caro to have "disordered thinking when under pressure," and "deficits in discriminating between actual information and distorted approximations." *Id. at 6-7.* At the conclusion of his report, Spica recommended consultation with "a forensic psychiatrist to integrate these findings with an assessment of Mr. Caro's psychiatric, neurocognitive, and adaptive functioning relative" to his case. He specifically recommended Dr. Keith Caruso, who he had "found. . . to be particularly helpful in this regard." *Id. at 7.* Spica's report does not mention the need for a neonatologist or an expert in any other medical specialty.

The mitigation specialist, Selvog, is a licensed clinical social worker, not a mental health expert. On June 13, 2006, he sent what may be described a "stream-of-consciousness" memorandum to defense counsel offering "random thoughts . . . about the case." *Selvog 6/13/06 Memorandum entitled, "Potential Caro Witnesses and other issues," Government Exhibit 4 at 3.* Unaware of or perhaps ignoring the absence of any mention in Spica's report that Caro suffered from "brain damage," Selvog suggested that the defense needed a neonatologist "to help us figure out Caro's diagnosis regarding post-natal Failure to Thrive problem (i.e. sensory disintegration) anecdotally reported by the family." He also conjectured that an occupational

---

[8] The absence of brain damage is supported by Dr. Swerdlow's reports to trial counsel on December 12, 2006 (EEG purporting to show abnormalities "worthless) and December 14, 2006 (EEG "inadequate . . . to establish interictal abnormality suggestive of focal lesion") and December 20, 2006 (MRI was "normal.") *Government Exhibit 2.*
[9] Spica's report regarding "frontal lobe dysfunction" is contrary to his June 20, 2006 email to Kalista and Selvog. *Government Exhibit 3.* In contrast to the report, Spica's email states, "Mr. C(aro) demonstrates converging *although somewhat inconsistent signs of frontal lobe dysfunction."* Spica's declaration does not explain that inconsistency.

therapist or child psychiatrist might be needed regarding Caro's "muteness, isolation, almost autistic-like persona and behavior throughout childhood." *Id.*[10]

Trial counsel accepted the recommendations of Selvog and Spica. They hired Dr. Caruso, who examined Caro in August, 2006. Other than a note that Caruso's examination was "not helpful to the defense," *Kalista Declaration, Caro Exhibit 5 at paragraph 15,* there is no report of Caruso's findings or recommendations to trial counsel. In Selvog's December 31, 2012 declaration, he confirms that Caruso received certain unspecified information from Caro regarding the offense was "not helpful" and he would not be able to serve as a mitigation witness. *Selvog Declaration, Caro Exhibit 7, at paragraph 10.* He does not state when he learned this from Caruso. There is no indication that Selvog, Spica or any other expert recommended that trial counsel seek court approval to retain another forensic psychiatrist.

A discretionary decision not to offer evidence that is itself somewhat damaging, or will result in the presentation of damaging rebuttal, does not constitute ineffectiveness. *See Wiggins v. Smith*, 539 U.S. 510, 525, 535 (2003) (counsel may reasonably decide not to present mitigating evidence which is double-edged), citing *Burger v. Kemp*, 483 U.S. 776 (1987) and *Darden v. Wainwright*, 477 U.S. 168 (1986); *cf. Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir.1997) (counsel is not ineffective in failing to present psychological evidence which in "its best possible light ... is a basket of cobras"). Moreover, the defendant cannot demonstrate ineffectiveness when his attorney made a knowing decision to forgo evidence that would have opened the door to damaging rebuttal:

> In evaluating whether there is reasonable probability the additional mitigation evidence would have resulted in a different verdict, this court is charged with considering all of the relevant evidence that the jury would have had before it, not just the mitigation evidence.

---

[10] Selvog's overstatements of Caro's mental issues and attendant brain damage are not supported by any mental health or family member witness.

The court finds that trial counsel pursued a reasonable trial strategy that would have been undermined by the expert testimony that Petitioner argues should have been presented. Trial counsel carefully investigated and considered all possible mitigation evidence before making a strategic decision not to present the testimony of Drs. Halleck, Morton, Melikian, and Hilkey. . . . [¶]The court finds that trial counsels' decision not to present the testimony of Drs. Halleck, Melikian, Morton, and Hilkey was a reasonable strategic decision made after a thorough mental health investigation and in light of the risks of opening doors to damaging evidence.

*Fulks v. United States*, 875 F. Supp. 2d 535, 560-61 (D.S.C. 2010); *see also Link v. Luebbers*, 469 F.3d 1197, 1203 (8th Cir. 2006) ("In the light of this damaging information, it would have been reasonable for Martin to believe that it would be better to avoid what Green would later call a "a battle of experts" over Link's psychological makeup"); *Bonnin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) (upholding a decision not to present mental health evidence that would have opened the door to damaging information).

The record establishes that the defense investigated, retained and developed appropriate mental health experts prior to trial. The fact that those experts failed to make a compelling mitigation case is not the fault of trial counsel. Dr. Caruso's examination failed to provide evidence that would "integrate" Spica's findings into a meaningful case for mitigation, and was in fact harmful to their case. On September 15, 2006, relying on Spica to provide mitigating mental health evidence, trial counsel notified the court that they would present a mental health defense at both the guilt / innocence and penalty phases of the trial. The government immediately moved the court to have Caro examined under procedures to be set by the court. Fed. R. Crim. P. 12.2(c)(1)(B). The court granted the government's request on September 25. Perhaps concerned that the damaging admissions made by Caro to Caruso regarding the offense would be repeated to the court designated expert, trial counsel modified its notice to limit mental health evidence to the penalty phase. *Petition* at 76.

The court's examination of Caro was conducted by Dr. Robert T.M. Phillips beginning on September 26, 2006. His report dated January 29, 2007 was filed with the court under seal in accordance with Fed. R. Crim. P. 12.2(c)(2) and was not disclosed to trial counsel or the government.

In January, 2007, apparently for the first time, Dr. Spica "raised concerns that he could not offer testimony regarding mens rea." Selvog "assured him" that the only things they wanted him to testify about were "his test results showing brain damage" and Caro's "developmental background." *Selvog Declaration, Caro Exhibit 7 at paragraph 13.* Despite knowing that Caruso was not a viable witness, and that no other mental health expert other than Spica was available, there is no indication that Selvog recommended that trial counsel hire other mental health experts.

There is no doubt that trial counsel was aware of Caro's potential mental health issues and in fact gave notice of intent to present that evidence at the penalty phase. *Kalista Declaration, Caro Exhibit 5, at paragraphs 15-18.* Caro challenges trial counsel's ultimate decision not to do so. *Petition* at 90-98. Specifically, he alleges, first, that trial counsel should have found another psychiatrist to testify "how Caro's brain impairment affected him throughout his life." He further charges that the decisions made by counsel concerning the report of Dr. Phillips "were unreasonable and uninformed." *Petition* at 95.

Caro offers a letter dated December 22, 2012 from Dr. Thomas M. Hyde, a neurologist, and a Declaration dated January 7, 2013 from Dr. Donna Marie Schwartz-Watts, a psychiatrist, witnesses then unknown to trial counsel, to argue that trial counsel should have continued to pursue other experts when they learned that Caruso and Spica would not provide the mitigating

mental health evidence they expected and hoped for.  The claim that trial counsel erred in failing to find a substitute for Caruso has no support in the law.

Trial counsel is "not required to pursue every path until it bears fruit or until all conceivable hope withers." *Huffington v. Nuth,* 140 F.3d 572, 581 (4th Cir. 1998).  Assessment of the reasonableness of counsel's actions must take into account "the practical limitations and tactical decisions that trial counsel faced. . . . Particularly when evaluating decisions not to investigate further, we must regard counsel's choices with an eye for 'reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Bunch v. Thompson,* 949 F.2d 1354, 1363 (4th Cir. 1991).

Trial counsel hired a neuropsychologist (Spica) and a mitigation specialist (Selvog). Trial counsel followed the recommendations of those experts and hired a forensic psychiatrist (Caruso) in an attempt to establish the case for mitigation.  Caruso's inability to provide helpful information, and the failure of trial counsel to find the "right" psychiatrists, does not establish that their performance was deficient.

The argument that the decision of trial counsel not to proffer mental health evidence was unreasonable is also unfounded.  The failure of the defense to call certain witnesses is not sufficient grounds for a Sixth Amendment claim. *United States v. Hughes,* 635 F.2d 449, 453 (5th Cir. 1981) (discussing failure to call alibi witnesses); *Lema v. United States,* 987 F.2d 48, 54 (1st Cir. 1993)(decision whether to call particular witness is almost always strategic); *Strickland,* 466 U.S. 668, 690 (strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable).  As trial approached, Spica was the only witness known to trial counsel who could proffer mental health evidence at the sentencing phase. Based at least in part on their research and investigation of Phillips' reputation and a review of

his testimony in prior cases, trial counsel concluded that they "could not rebut" his testimony[11],

and they made the decision not to present mental health testimony at the penalty of the trial.

*Kalista Declaration, Caro Exhibit 5, at 17-18; See also, Government Exhibit 5, email from*

*redacted to Kalista dated September 25, 2006 (Phillips described as "very capable government*

*witness"); email from redacted to Kalista dated September 26, 2006 enclosing "Phillips'*

*testimony from EDVA MS-13 case).*

The decision to forego presentation of mental health evidence at the penalty phase was no

doubt informed by two factors not within the control of the defense team. First, issues

concerning a defendant's mental condition bearing on the issue of punishment in a capital case

are governed by Fed. R. Crim. P. 12.2(b)(2) and (c). Under the provisions of Fed. R. Crim. P.

12.2(c)(2), the results of a capital sentencing examination of the defendant are sealed and may

not be disclosed to counsel "unless the defendant is found guilty" of the capital crime, "and the

defendant confirms an intent to offer during the sentencing proceedings" evidence of the

defendant's mental health. Thus, while trial counsel knew that Caro's examination would be

conducted by Phillips, a "very capable government witness," they did not have access to his

report until after Caro was convicted. As a further condition to the review of Phillips' report, trial

counsel had to "confirm" their intention to make his mental health an issue at sentencing.

Second, trial counsel could reasonably conclude, based upon Caruso's examination, that Phillips

would provide information that would be extremely damaging to their case for mitigation.[12] At

---

[11] The contention that Montalbano, who assisted Phillips in his testing of Caro, "could be discredited on cross-examination," *Petition* at 95-96, is speculative. The "discrediting" information came from a single source with only anecdotal information about Montalbano's work.

[12] The concerns of trial counsel are validated by Phillips' findings in his report to the court dated January 29, 2007. He reports, among other things, that Caro "reported a happy childhood and denied any history of abuse." *Report of Robert T.M. Phillips, M.D., Ph.D., D.F.A.P.A at 14.* He concludes that "within a reasonable degree of medical and psychiatric certainty, . . . Caro is a man of low-average to average intellectual functioning who does not demonstrate any deficits in adaptive functioning. . . (t)here was no evidence that Mr. Caro suffers from any mental or emotional

47

the time of Caro's conviction, trial counsel lacked expert testimony to effectively rebut any adverse findings by Phillips and his team.  Certainly, neither Spica nor Caruso could do it. The lack of rebuttal testimony was not due to trial counsel's failure to exercise due diligence in investigating and identifying appropriate mental health experts, but rather to the inability of their selected experts to assist them.

Caro contends that trial counsel was ineffective because they failed to call Caro's brothers, Noe and Jose, as witnesses, and that failure prejudiced him at the penalty phase of his trial.[13] *Petition* at 100.  Neither contention is correct.

Relying entirely on Selvog's January, 2013 declaration, Caro argues that the failure to call the brothers deprived the jury of "eyewitness accounts of the violence in the house were Mr. Caro grew up" and "intimate details of Mr. Caro's unusual behavior as a child" thus preventing the jurors from "viscerally knowing and appreciating the full extent of Mr. Caro's personal history." *Petition* at 80. His claim is problematic for a number of reasons. First, there are no affidavits or other documents from the brothers stating a willingness to testify of the substance of their testimony.  Second, there is no indication that Selvog recommended the brothers as "crucial witnesses" or witnesses at all before his December 31, 2012 declaration.  Their names are absent from his May 15, 2006 memorandum to trial counsel, *Government Exhibit 6,* and his June 13, 2006 "stream-of-consciousness" memorandum to trial counsel. *Government Exhibit 4.*  His "Timeline" is consistent with the testimony of Caro's aunts, cousin, teacher and wife and

---

condition that . . . impairs his capacity to meet the tasks of day-to-day living." *Id.* at 12.  Further, "twelve psychological reviews performed by seven different psychologists at five different federal correctional facilities consistently found that his mental status was within normal limits." *Id.* at 16.

[13]  Caro also cites the failure to present testimony from Amada Fergason, Mrs. Caro's mother's social worker who could not travel due to medical reasons but did provide a statement on videotape that was not played for the jury. The petition does not reveal the content of the videotape or provide any indication of how, if at all, it would be relevant to mitigation. *Petition* at 82-83.

portrays Noe and Jose as criminal miscreants and ne'er-do-wells. *Selvog Timeline (undated), Government Exhibit 7 at 2-4.*

Third, any testimony the brothers may have offered would have added nothing to the story presented by the other mitigation witnesses and may well have been detrimental to his case. Caro's family members presented a fulsome look at Caro's life and it is pure speculation to claim that the testimony of Jose and Noe would have materially added to the mitigation case.

Interestingly, Caro attacks trial counsel's decision to present mitigation evidence from witnesses who painted a very sympathetic picture of his early years. Those witnesses, he complains, "were undermined on cross-examination." For example, he complains that Laura Perez, Caro's cousin, provided testimony that included information that ran counter to his contention that Caro had a difficult and traumatic childhood. *Petition* at 106-109. Perez, of course, was among the "potential Caro witnesses" identified by Selvog in his June 13, 2006 memorandum. Nevertheless, because the testimony of Perez and other family members included information that both helped and hurt Caro, he claims their decision to call those family members as witnesses made them ineffective. Caro could not be more wrong in that claim. Trial counsel did not have the luxury of choosing witnesses who could portray Caro as a saint. Nor could they choose witnesses who would not be subject to the crucible of cross-examination. It is not the fault of trial counsel that the jury received a "complete portrait" of the man they were sentencing.

By overstating the significance of Caro's mental health issues and the testimony of Noe and Jose, while faulting the strategic decisions not to introduce mental health evidence, Caro concludes that trial counsel's "deficient performance" in failing to present a "compelling" mitigation story prejudiced him at the penalty phase. *Petition at 109.* The United States disagrees. The record shows that trial counsel conducted a thorough investigation and made

reasonable attempts to present a mitigation story about Caro's life.  As Mr. Kalista points out, they did not have much to work with: Caro "cheated on his wife; he was not a good father; he was a three time loser as far as drugs; and he had difficulty while incarcerated." *Kalista Declaration, Caro Exhibit 5, paragraph 20.* The inability to "humanize" Caro is more the product of the lack of any humanizing characteristics than by any errors or omissions of trial counsel.

Based on the foregoing, the United States submits that trial counsel was not deficient as charged in Claim Six B.  In any event, there is no reasonable probability that, but for those alleged deficiencies the outcome of the penalty proceeding would have been different.

Caro faults trial counsel for failing to investigate prison culture and to subject the evidence of Caro's leadership position in the Texas Syndicate to "meaningful adversarial testing." Claim Six C, *Petition* at 113.  The argument is not supported by the record.

Caro concedes, as he must, that trial counsel (1) properly anticipated that the government would argue that Caro was not a mere foot soldier, but rather occupied a position of authority in the gang, at least as it relates to incident at FCI-Oakdale; (2) that trial counsel made reasonable efforts to exclude that evidence, and (3) that trial counsel hired a "gang expert" to assist them with addressing gang related issues that might arise during the trial. *Petition* at 114-115. Discounting those efforts, he relies on Bezy, an expert that was not known to trial counsel, to propose, based entirely on conjecture, that Caro was not a leader of the Texas Syndicate at FCI-Oakdale. Bezy's conjecture is belied by the evidence.

SIS Lieutenant John Gordon was working at Oakdale in July, 2002.  Gordon was soon expecting to intake inmates who were members of the Paisas, a gang that clashed with the Texas Syndicate. *TT 2/5/07 at 165.*  Prior to the arrival of the Paisas, Gordon undertook to open "a line

of communication between (prison officials) and the leadership of these gangs" and, hopefully, avoid any physical confrontations between them. When Gordon reached out to the leadership of the Texas Syndicate, "Caro showed up." *Id. at 168.* According to Gordon, Caro made it clear that he was the leader of the Texas Syndicate at Oakdale. *Id.* Caro rebuffed Gordon's plea to keep the peace, responding in no uncertain terms that "the Texas Syndicate was going to do what it had to do." *Id.* True to Caro's words, the Texas Syndicate attacked the Paisas the afternoon of their arrival at the facility. Caro told Gordon, "his brothers take orders, they follow orders." *Id. at 170.* Caro's words and actions speak for themselves and the jury could properly infer that he exercised a leadership role in the gang. Based upon their conversations, Gordon viewed Caro as a gang member who, in his opinion, had the ability to prevent a confrontation between the Texas Syndicate and the Paisas but refused to do so.

There is no reason to believe that Bezy's opinion about Caro's role as a leader would be sufficient to impeach Gordon's conclusions. Even it had been presented to the jury, there is no reasonable probability that the result of the penalty hearing would have been different.

Caro claims that trial counsel was ineffective in failing to challenge the government's claim that the BOP lacked the ability to control improper inmate communications. He argues that trial counsel should have relied upon the existence of BOP policies and program statements to "dispel the misleading impressions" left by the government witnesses. Claim Six D, *Petition* at 116, 118.

Evidence presented at Caro's trial of the inmates' ability to communicate with individuals outside of the facility was not inaccurate or misleading. Experts for both the prosecution and the defense stated that inmates at even the most secure federal correctional facilities, including ADX, were able to communicate with persons outside of the institution despite the best efforts to

prevent such communications. *See, e.g., Testimony of James Aiken, "you never get to absolute zero" in the ability to control inmate communications. TT 02/07/07 at 42-43.*

The government has never claimed that BOP lacks program statements, policies and other administrative procedures that are intended to prevent such communications. Rather, the point is that despite the existence of such procedures, BOP can never fully control an inmate's access to those outside of the facility. Those same program statements, policies and other administrative procedures were in place while Caro was incarcerated, yet the uncontradicted evidence is that Caro himself communicated with family and gang members by letter and telephone while he was incarcerated at USP-Lee. Even if trial counsel had brought out the details of the BOP intended prophylactic measures, there is no reasonable probability that the outcome of the penalty proceeding would have been different.

Caro argues that counsel was ineffective in failing to present evidence of "prison culture" that would somehow explain that Caro's statements and lack of remorse were "typical to inmates and necessary for survival." Claim Six E, *Petition at 118.* His argument fails because there is no reasonable probability that the results of the penalty proceeding or the jury's findings with regard to lack of remorse would have been different had Caro introduced the proffered testimony.

As Caro points out, the United States at trial portrayed Caro as a "predator' who lacked remorse. Caro cannot and does not dispute the accuracy of the evidence adduced at trial, including Caro's role in the melee' at FCI-Oakdale and the callous comments he made in the wake of that incident. He cannot dispute his role in the stabbing of Benavidez He cannot dispute that he strangled Sandoval to death over a trivial matter. More importantly, he cannot dispute his callous remarks and his matter-of-fact discussion of the murder with his family and friends.

No evidence in the record suggests or intimates that Caro made the callous statements because of some need for self-preservation, and Bezy's attempts to explain them as such are conjectural. Let us assume, arguendo, that "bravado" might explain his comments to the guards ("Come and get this piece of shit out of here." . . . "(H)e's stinking up the room, get him out." . . . "Caro taunted a prison guard, grinning and calling out, 'When (are) you . . . going (to) assign (me) a new cellie?". . . "Several days later, again grinning, Caro requested fellow inmate Ortiz for his next cellie,"). Bravado does nothing to explain or justify his numerous oral and written statements to family and a fellow gang member, which are totally devoid of remorse. (Letter to family member: "I killed a guy two weeks ago . . . for being a fool"; Statement to his wife, laughing: "(Sandoval) called me a mother fucker": Statement to fellow gang member, Role Rivas: "It's because they gave me a cell mate and he disrespected me, so I took him down;" "Sandoval called me mother fucker, that whore, that's why I fucked him up." *Caro,* 597 F.3d at 611, 631. From this evidence, there is no reasonable probability that the proffered testimony from Bezy would have caused the result of the penalty proceeding to be different.

Caro charges that trial counsel failed to adequately investigate Caro's underlying conviction for conspiracy to commit murder and failed to file a collateral challenge to that unconstitutional conviction. Claim Six F, *Petition at 119.* As part of that charge, he states that Caro's counsel in the Benavidez case, Lou Dene, failed to advise him that a guilty plea to the conspiracy would likely be used against him as an aggravating factor in the Sandoval case. He claims that Dene's alleged error should have been used by trial counsel to challenge the prior conviction and sentence but they failed to do so and that failure prejudiced him.

The government agrees that, in some cases, counsel's failure to advise a defendant of collateral consequences of a plea could be a basis to invalidate the guilty plea in that case.

*Padilla v. Kentucky,* 559 U.S. 356 (2010); *United States v. Akinsade,* 686 F.3d 348 (4th Cir. 2012). However, the government is unaware of any case holding that a defendant may claim prejudice arising from the alleged failure of defense counsel to advise the defendant of the consequences of a guilty plea can be used to invalidate the resultant judgment and sentence in a different case.

The government concedes that Dene did not advise Caro that the Benevidez plea "would likely be used against him" in the Sandoval case. *Dene Declaration, Caro Exhibit 3, paragraph 6.* However, in order to demonstrate resultant prejudice in the Sandoval case, he must establish that a) if Dene had advised him that his guilty plea in Benevidez would be used as an aggravating factor in the Sandoval case, he would not have pled guilty; b) that he would have been acquitted or convicted of a lesser offense in the resultant Benevidez trial; and c) there is a reasonable probability that his acquittal or conviction of a lesser offense would have convinced the jury to impose a life sentence. He cannot meet that burden.

The interlocking plea agreements between Moreno-Marquez and Caro were proposed by Moreno-Marquez and acquiesced in by Caro. The government had no role in formulating that proposal, but merely accepted it for reasons unconnected to the Sandoval case. The pleas in the Benevidez case benefitted both men, Moreno-Marquez certainly more so than Caro. Moreover, Dene does not state that he would have recommended that Caro plead not guilty and proceed to trial in the Benevidez case if he had known that his guilty plea would be used against him in the penalty phase of the Sandoval case. Also lacking is any evidence whatsoever that Caro would have accepted Dene's recommendation. From the record, it appears that the motivating factor for Caro's plea was not Dene's failure to advise, but rather Caro's desire to benefit his fellow gang member, Moreno-Marquez.

The United States again submits that there is no reasonable probability that the results of the penalty phase would have been different had Caro not accepted the plea agreement in the Benevidez case. At the time of the Benevidez stabbing, Caro was 37 years of age and was already serving a term of 378 months imprisonment. He told officials at FCI-Oakdale and Dene that he had no concerns about the effect that his actions would have on the length of his confinement. After the stabbing, and while housed in the Special Housing Unit, arguably the most secure part of a maximum security facility, Caro strangled Sandoval to death with a towel. In the highly unlikely event that Caro would have been convicted of a lesser offense or acquitted in the Benavidez case, Caro's *actions* in that case would still have been admissible against him in the Sandoval case. Regardless of the outcome of the Benevidez case, the United States still had a compelling basis to argue that when he murdered Sandoval, Caro was then serving the functional equivalent of life and would remain a danger to inmates and others around him if he was not sentenced to death. Even if the evidence of his plea and sentence in the Benavidez case had been excluded, there is no reasonable probability that the outcome of the penalty proceeding would have been different.

Caro alleges that his trial counsel was ineffective for failing to offer *Skipper* evidence to rebut aggravating evidence. Claim Six G, *Petition at 128.* His claim has no merit.

Under the Eighth and Fourteenth Amendments to the Constitution, the sentencer in a capital case may "not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett,* 438 U.S. at 604 (emphasis in original). In *Lockett,* the Supreme Court declared an Ohio death penalty statute unconstitutional because it specified only three factors that could be considered by the sentencer in mitigation of

the offense. *See id.* at 608.  In *Eddings v. Oklahoma,* 455 U.S. 104 (1982), the Court extended

*Lockett* to a case in which the state court refused to consider, as a matter of law, any mitigating

evidence of the defendant's violent family history and abuse. *See id.* at 112-13. "Just as the State

may not by statute preclude the sentencer from considering any mitigating factor," the Court

held, "neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating

evidence." *Id.* at 113-14.  In accordance with those precedents, in *Skipper v. South Carolina,* 476

U.S. 1, 6-8 (1986), the Court reversed the imposition of a death sentence where the trial judge

had excluded as irrelevant, evidence of the defendant's good behavior in jail while he awaited

trial.  In reliance upon *Skipper*, Caro does not allege that the court excluded any mitigating

evidence, but that his trial counsel was ineffective, in violation of his Sixth Amendment rights,

for failing to offer certain mitigating *Skipper* evidence on his behalf.  *Petition* at 128.  When a

petitioner alleges, as Caro does here, that his counsel should have put forth additional evidence

in mitigation, the Court assesses prejudice by "reweigh[ing] the evidence in aggravation against

the totality of available mitigating evidence." *Wiggins v. Smith,* 539 U.S. 510, 534 (2003).

Caro argues that his counsel should have ensured that the jury heard that Caro plead

guilty to the Benavidez assault in order to help co-defendant Moreno-Marquez have an

opportunity "to get out of prison as a young man."  *Petition* at 129.  Caro claims that his plea in

that case "was a selfless act . . .  which carried no benefit and every disadvantage for him."  *Id*.

Caro also claims that his counsel was ineffective for failing to present evidence that "the BOP

considered Caro a 'good inmate,' appropriate for housing at USP-Marion or ADX Florence."

*Petition* at 129.  Caro also argues that opinions of Dr. M. Geyer, a psychologist who evaluated

Caro monthly from the time of Caro's placement in the SHU until his transfer to ADX-Florence,

should have been presented. *Petition* at 130. Specifically, Caro argues that his counsel should have presented the following conclusions from Dr. Geyer:

> His violence while incarcerated appears to be gang related and tied directly to his involvement with the TS . . .. Inmate Caro has not been a disruptive inmate or violent in any other settings unless he was involved with TS activities. *Petition* at 130; *Sealed Exhibit* 56 at 2 (*Psychological Evaluation of Carlos Caro*, 9/7/2004).

> With regards to violence prediction, it appears that Inmate Caro has only acted aggressively with other Texas Syndicate gang members. His violence appears to be instrumental rather than impulsive. Inmate Caro is pleasant to interact with professionally and other staff at this facility have described him as a "good inmate." *Petition* at 130; *Sealed Exhibit* 56 at 3.

Caro argues that these reports "reflect a person who is amenable to supervision within the correctional system and who is not violent by nature," and that Dr. Geyer's conclusions "rebut the government's characterization of Mr. Caro as a dangerous, violent individual." Finally, Caro asserts that his counsel should have presented evidence from the Psychology Round Notes of January 2, 2004, which included a note that Caro "'initiated a conversation to advise that another inmate was experiencing psychological distress.'" *Petition* at 131. Caro argues that this information would have "revealed him to be a caring person with redeeming qualities." *Petition* at 131. For the reasons below, Caro cannot establish that his counsel was ineffective for failing to present this evidence, and further, even if this court concluded that Caro's counsel was ineffective, Caro cannot establish a reasonable probability that the outcome of the penalty phase would have been different but for any alleged error by counsel. *See Strickland*, 466 U.S. at 694. Given the aggravating factors in this case, and the strength of the government's case, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed was justified. *See Strickland*, at 698-700.

Caro has not established that trial counsel was ineffective in failing to introduce his motivation to plead because trial counsel did not have any basis to make such an argument. The record reflects that Caro plead guilty in light of overwhelming evidence proving his guilt in the case, including video surveillance footage which showed Caro and Moreno-Marquez stabbing the victim, Benavidez, multiple times. *Transcript of Carlos Caro Guilty Plea*, Case No. 2:03CR115, August 3, 2004, pp. 14-18. At Caro's guilty plea the government represented that the evidence established that Caro and Moreno-Marquez assaulted fellow inmate Ricardo Benavidez with homemade knives made out of sharpened Plexiglas. *Id*. at 14. Caro had been identified at the time by prison employees as a member of the Texas Syndicate gang based on tattoos on his body, and Moreno-Marquez had also admitted his membership in the gang. *Id*. During the assault, Caro and Moreno-Marquez stabbed Benavidez multiple times. *Id*. at 14-15. The government stated that a prison employee saw Benavidez leaving one room with Caro and Moreno-Marquez in pursuit, and "at the same time striking him and striking at him with knives in their hands." *Id*. at 15. The assault was captured on video surveillance cameras, and a later search turned up two Plexiglas knives, and DNA testing established that Benavidez's blood was on the clothing of Caro and Moreno-Marquez. *Id*. at 15. Later, Moreno-Marquez made a spontaneous statement, saying, "We hit him like we hit Alcantara (sic)."[14] The transcript of the plea colloquy for Moreno-Marquez reflects that the government's evidence established that Caro "appeared to be the most culpable of all of the defendants," (*Ex*. 55), and at Caro's sentencing hearing, his attorney, Lou Dene, agreed that Caro "was one of the main instigators in the conspiracy." *Sealed Exhibit* 52, p. 3. Counsel for the government indicated that Caro had "admi[tted] that he and his co-defendant took the sharpened Plexiglas weapons and repeatedly

---

[14] The government indicated at the plea hearing that Alcantara was a reference to another inmate who had been assaulted by members of the Texas Syndicate about a month before the Benavidez assault. *Tr*. at 16.

stabbed the victim, . . ..” *Id*. at 4. The record thus establishes that the government's evidence proved that Caro was in fact guilty of the offenses charged in the Benavidez case, and that Caro plead guilty in light of that evidence.

The government's counsel explained that the decision to treat Moreno-Marquez differently was based in part on an uncooperative victim, and that after determining that Caro was the most culpable of all the defendants, the respective agreements with Caro and Moreno-Marquez were in the best interests of the United States. *Transcript of Moreno-Marquez Sentencing Hearing*, November 2, 2004, *Sealed Exhibit* 55, pp.5-6. There is no dispute that Caro would have been aware that Moreno-Marquez's sentence would be much shorter than his own, given that the plea agreements were contingent upon one another and the maximum statutory penalty for the offense of conviction for Moreno-Marquez was five years. *See Moreno-Marquez Plea Agreement, Sealed Exhibit* 53 at 1; 18 U.S.C. § 1791(a)(2) and (b)(3). But there was no mention during this hearing, or at Caro's guilty plea or sentencing hearing, of his intention to plead guilty in order to allow Moreno-Marquez to get out of jail earlier. In his Petition, Caro cites to his argument in Issue Six F, which in turn relies on a declaration of his Mr. Dene for the assertion that he acted selflessly in pleading guilty to the Benavidez assault, only to benefit Mr. Moreno-Marquez. *Petition* at 129, 119-20. But Mr. Dene's declaration states that he obtained a plea agreement for Mr. Caro "whereby Mr. Caro would plead to the most serious offense of Conspiracy to Commit Murder and the Government would allow his co-defendant, Juan Carlos Moreno-Marquez to plead to the lesser offense of possessing a prohibited object." *Dene Declaration, Caro Exhibit* 3, p.1. Mr. Dene continues, stating, "[t]he plea agreement, which I understood was proposed by Mr. Moreno-Marquez, provided no real benefit to Mr. Caro; however it did benefit Mr. Moreno-Marquez." *Id*.

Caro does not tell us why he pled guilty and from the record before the court it is impossible to ascertain what reason or reasons motivated his decision. Whether Caro plead guilty to benefit Moreno-Marquez, or because the government's evidence was overwhelming, is unknown. The fact that his decision to plead did benefit Moreno-Marquez, and that Caro's counsel now states that it "provided no real benefit" to Caro, does not establish Caro's intentions, and Mr. Dene's declaration does not, and could not, speak for Caro's mental state regarding his motives in pleading. Further, even had Caro's trial counsel attempted to establish Caro's intentions through Mr. Dene's testimony, such evidence would have been inadmissible as speculative on Mr. Dene's part. *See* Fed. R. Evid. 611(a), 701. Thus, trial counsel was not ineffective in failing to argue Caro's "selfless act" in connection with the Benavidez case.

However, even assuming that Caro was motivated by a desire to help Moreno-Marquez get out of prison earlier, and negotiated his plea agreement in order to accomplish that goal, he cannot say that he received no benefit from his plea. In the Benavidez case, Caro's total offense level was 34, which with a criminal history category of VI, translated to a guideline range of 262 to 327 months. *Transcript of Caro Sentencing Proceedings*, No. 2:03CR115, November 1, 2004, *Sealed Exhibit* 52, p. 2. Without his plea agreement, Caro would not have received the three level downward adjustment for acceptance of responsibility, and his range would have been 360-life. *See* U.S. Sentencing Guidelines, Sentencing Table. Thus, and even acknowledging that Caro was already subject to significant imprisonment, Caro benefitted from his plea agreement in the Benavidez case because he was able to reduce his guideline range to something less than life imprisonment.

Additional evidence regarding Caro's purported intentions in pleading to the assault would not have offset the aggravating factors in this case. Any effort to paint his guilty plea as a

"selfless act" would have been heard against the backdrop of the evidence of Caro's vicious crimes against both Benavidez and Sandoval, and his callous, highly incriminating statements about the murder. In that light, evidence that Caro plead guilty in order to make it possible for his fellow Texas Syndicate gang brother to be released from prison earlier does not create a reasonable probability that the jury would have reached a different sentencing decision.

Dr. Geyer's report is not entirely favorable to Caro. The report also reflects that Caro had "assaulted another TS member which resulted in the recent conviction and his deceased cell mate in SHU was also a TS gang member…." *Sealed Exhibit* 56, p.2. Dr. Geyer opined that "Inmate Caro's violence is *planned and instrumental, rather than impulsive*." *Id*. *Emphasis added.* Additionally, Dr. Geyer stated, "violence prediction is often difficult to ascertain and further evaluation into this inmate's violence risk would appear warranted in the future." *Id*. Finally, in his conclusions and recommendations, Dr. Geyer stated that "[i]f Inmate Caro is placed at U.S.P. Marion or Florence ADX, psychology staff may wish to conduct a thorough violence risk assessment before he is returned to a general population setting." *Id*. at 3. Though Dr. Geyer's notes reflect that Caro had some pleasant interactions with staff, his report was not inconsistent with the government's evidence and theory of the case. Caro was convicted of premeditated murder. Dr. Geyer describes Caro's violence as "planned and instrumental," rather than "impulsive, a conclusion which strongly suggests that Caro's violent acts are calculated, intentional, purpose driven and consistent with the government's case, which proved that Caro killed Sandoval in a premeditated manner.

Even if this Court finds that trial counsel was deficient in failing to present testimony from Dr. Geyer, Caro cannot establish prejudice. The addition of Geyer's conclusions would not have significantly altered the balance of mitigating and aggravating evidence that was presented

at sentencing.  Caro's statements and actions unquestionably established that though he might not always be violent, he was capable of killing, willing to kill and exhibited no apparent remorse for his actions afterwards.  In that light, additional evidence regarding the psychologist's conclusions, evidence that, on one occasion in January of 2004, Caro remarked that a fellow inmate was experiencing psychological distress, and the additional evidence of Caro's concern for another inmate in the Psychology Round Notes, would not have offset the aggravating factors in this case.  Thus, after reweighing the totality of the mitigating evidence against the aggravating evidence, this Court should conclude that Caro has not shown a reasonable probability that the jury would have returned a sentence other than death.  Caro has not met the *Strickland* standard in that he "has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. [The prisoner's] sentencing proceeding was not fundamentally unfair." *Strickland,* at 700; *Caro*, 597 F.3d at 636 (The proceeding below adhered to fundamental fairness.  Each aggravating factor determined by the jury was well supported by the record.  Finally, we cannot see how cumulative error could have caused the jury to weigh sentencing factors any differently.).   For all these reasons, Caro's claim Six G should be denied.

Caro contends that the Bureau of Prisons "acted negligently and contrary to sound correctional practices in regards to housing of Caro and Sandoval," and that such evidence "could have influenced" the decision of one juror in the case.  Claim Six H*, Petition at 132.*  For the reasons set forth in response to Claim Four C, *supra,* the United States maintains that there is no basis to claim that the BOP was negligent in placing Sandoval in Caro's cell. Further, Caro's stated reason for murdering Sandoval was a dispute over breakfast and because Sandoval allegedly "disrespected" him. There is no basis to claim that the murder was causally connected

to the placement of Sandoval as opposed to any other random inmate in Caro's cell. His argument that defense counsel was deficient in failing to "investigate and present" evidence of something that did not exist should be rejected.

Caro claims that trial counsel was ineffective for failing to object to the government's presentation of testimony concerning specific acts of violence by inmates other than Caro, in violation of the Court's order of November 20, 2006 prohibiting such evidence. Claim Six I. *Strickland* requires defendants claiming ineffective assistance of counsel to show that their attorneys' actions "were not supported by a reasonable strategy." *Massaro v. United States*, 538 U.S. 500, 504 (2003). Courts, moreover, accord great deference to counsel's tactical decisions, "such as refraining from cross-examining a particular witness or from asking a particular line of questions." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (noting strong presumption that counsel makes decisions for tactical reasons, rather than out of neglect). It follows, then, that counsel has no obligation to raise a futile objection. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

As more fully explained below, because evidence of violence by inmates other than Caro was offered in response to the testimony of Caro's expert, Cunningham, and to demonstrate bias through cross-examination, the government did not violate the court order and, therefore, an objection by trial counsel would have been futile. Further, because such evidence was brief, followed identical testimony by Cunningham and was collateral to the larger issue of the BOP's ability to control inmate behavior, Caro cannot establish prejudice arising from the failure of trial

counsel to object.  Even if challenged testimony was excluded, there is no reasonable probability that the outcome of the penalty proceeding would have been different.

On January 11, 2006, the United States filed a Notice of Intent to Seek the Death Penalty, alleging Caro's future dangerousness as an aggravating factor.   Dkt. 8, 1/11/2006, 1:06CR-00001.  The notice did not include reliance on acts of violence by inmates other than Caro.  Rather, the future dangerousness aggravator was based upon:

> a. Continuing *pattern of violence and recidivist conduct*: While imprisoned, CARLOS DAVID CARO has occupied a leadership position in a violent gang and, through his connection with the gang, has been involved in physical assaults on other inmates on at least two occasions. He also has committed numerous prior felony drug offenses.
>
> b. *Low rehabilitative potential*: CARLOS DAVID CARO has a lengthy history of illegal conduct outside the prison setting and a significant history of violent and non-violent rules violations while in custody. Through his words and recidivism, he has demonstrated that the threat of incarceration does not deter his misconduct.
>
> Among CARO'S in-custody misconduct, he participated in a July 11, 2002 gang-based assault on other inmates at the United States Prison in Oakdale.  When questioned about his involvement in the Oakdale incident, CARO expressed a lack of concern about being prosecuted because he was already serving a 30-year sentence. He implied his belief that government officials could not meaningfully punish him in view of his pre-existing sentence.  CARO expressed a similar lack of concern about the consequences arising from his August 29, 2003 attempted murder of Ricardo Benavidez, whom he stabbed 29 times.
>
> c. *Lack of remorse*:  CARLOS DAVID CARO has not expressed remorse for his violent acts, including (but not limited to) the murder of Sandoval, the stabbing of Benavidez and the gang-based assault in Oakdale.  After killing Sandoval, CARO referred to the victim in vulgar terms and taunted guards by asking when he would receive a new cell mate.

In response, trial counsel filed four discovery motions seeking data[15] from the BOP records, including BOP records and data concerning (1) all inmates who have ever been confined

---

[15]  Caro does not allege that the government introduced any of the data sought by his discovery requests.

in the Florence ADMAX Control Unit; (2) all inmate homicides that have occurred in the BOP nationwide in the last twenty years; and (3) all incidents of inmate violence at Florence ADMAX. The court noted that "[t]he information sought by the defendant is based on the opinions of Dr. Cunningham," and his need for group data to support his scientific research pertaining to an individualized future dangerousness risk assessment for Caro. *Id*.

The government objected to the motion because Caro could not demonstrate that the data sought was exculpatory under *Brady v. Maryland,* 373 U.S. 83 (1963) and production would impose an undue burden to the government. *United States v. Caro*, 461 F.Supp.2d 478, 480-81 (W.D.Va. 2006).

The court sustained the government's objection. In doing so, the court noted, first, that the government had represented "that it does not intend to offer any of the contested information into evidence itself." *Id.* The court recognized that "[i]f the defendant is convicted, the government will likely introduce evidence in the sentencing phase of the trial that he poses a threat of danger to prison staff and other inmates if he is imprisoned, rather than put to death. In rebuttal, the defendant may produce evidence that if the defendant is incarcerated at Florence ADMAX, particularly in the Control Unit, he will not be a future threat to others." *Id*. The court found that Caro failed to establish that the data sought was material under Brady. Further, the court held the information was not discoverable under either Fed. R. Crim. P. 16 or 17. The court's ruling was based upon Caro's failure to provide "at least 'some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" *Id., citing United States v. Ross,* 511 F.2d 757, 762-63 (5th Cir. 1975). In conclusion, the court wrote, "I point out, however, that I (sustain the government's objection) in light of the government's representation that it does not intend to introduce any of

the requested data in its own case. Otherwise, Rule 16 might very well require its prior disclosure to the defendant . . . [a]ccordingly, absent proper disclosure, the government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness." *Id* at 481-482.

The court's ruling was consistent with the language of Rule 16, which requires disclosure of documents the government intends to rely upon in its case-in-chief, and upon the well-established rule that the government need not provide documents it thinks it might use in rebuttal. *United States v. Delia*, 944 F.2d 1010, 1017 -1018 (2d Cir. 1991); *United States v. Schneiderman*, 104 F.Supp. 405, 410 (C.D. Cal. 1952). The court's discovery rulings were affirmed by the Fourth Circuit on direct appeal. *United States v. Caro, 597 F.3d at 619-622.*

Caro asserts that the United States violated the court order and trial counsel was ineffective in failing to object to the elicitation by the government of instances of inmate violence not involving Caro. He charges that "had his counsel objected, the Court would have had no choice but to sustain the objection." He further claims trial counsel's ineffectiveness was prejudicial to him in that the failure to object prevented him from being sentenced on the basis of his own conduct. *Petition* at 133-136. His arguments have no merit.

Caro challenges the propriety of testimony concerning acts of violence by other inmates during the government's (1) direct examination of its rebuttal witnesses, Olson and Hershberger, and (2) cross-examination of defense witness Cunningham. *Petition* at 133-136.

The court's order did not purport to preclude the government from introducing evidence of violence by other inmates for any and all purposes. Rather, the prohibition related to the use of such information "in its own case." The testimony that Caro complains of here was developed during the defense case, in cross-examination of and rebuttal to Cunningham. Olson and

Hershberger were clearly identified by the government as rebuttal witnesses. During the government's case-in-chief, government's counsel informed the court and trial counsel that because of witness scheduling issues, he intended to present rebuttal witness Olson out of order. (*TT*, 2/6/2007 at 29). The government had anticipated the relevance of the testimony of Olson and Hershberger based on Cunningham's testimony in prior cases regarding specific acts of violence and the BOP response thereto, and the slideshow that trial counsel provided to the government in lieu of a formal report by Cunningham.

Cunningham's direct testimony followed the pattern predicted by the government. He presented himself as an "expert in prison violence and security measures within the Bureau of Prisons." *TT 2/12/07 at 17.* His testimony was based in part on his review of "an extensive body of statistical data provided . . . over the years" by the BOP" and "extensive disciplinary files related to ADX." *Id. at 20.* He spoke first about "mechanisms available" within BOP to "control disruptive or violent inmates." *Id. at 23.* He provided extensive testimony citing instances of violence by inmates other than Caro. He informed the jury that "32 percent of the inmates at ADX have killed another inmate in prison," and the rate of inmate on inmate murder varies from three to six in any given year. . . that rate is someplace between 18 and 24 per 100,000 inmates per year." *Id. at 37, 39.* Cunningham specifically mentioned multiple inmate on inmate murders at ADX and the measures put in place by the BOP, not only at ADX but at other federal facilities, to prevent future occurrences. *Id. at 45-48.* He cited specific examples of inmates fashioning shanks from materials at ADX and the institutions prophylactic responses. *Id. at 69-70.*

Cunningham also testified extensively about the ADX step down process and the length of stay for each inmate in the Control Unit[16] at ADX. *Id. at 41-45.* Although he complained that the BOP had not provided certain information to him, he told the jury that, based on testimony from ADX wardens in other cases, "the typical policy of the Bureau of Prisons is to confine an inmate who has killed another inmate on the Control Unit for six years" before reviewing the placement. *Id. at 75-76.* He acknowledged, further, that he had received information on "assaultive conduct in the general population" from 1994 to 2001 but was awaiting updated data from the BOP. *Id. at 79-80.*

Cunningham conceded that Caro would continue to pose a danger to other inmates and staff "for the foreseeable future, I would certainly say for the next five to ten years. . . and perhaps beyond that. . . and perhaps much further out." *Id. at 104.* The gist of his testimony, however, was that the Bureau of Prisons responsiveness to prison violence was "dynamic" and learning from those lessons, the BOP had the ability to control Caro despite his conceded future dangerousness.

Hershberger and Olson were offered in response to Cunningham. Olson, a "code breaker," employed by the government, told the jury that certain inmates use code to communicate with inmates and also with people on the outside. *TT 2/6/07 at 25.* His testified about a letter sent in 1997, from a member of the Aryan Brotherhood, from Florence ADMAX. *Id.* at 27-28, 31-32. When Caro's counsel objected to the testimony, the government explained, saying "I discussed this with defense counsel earlier. Technically, if we were going to call Mr. Olson, he would be a rebuttal witness. . . . What Agent Olson's testimony is going to relate to is the types of codes used to show that in spite of the best measures at ADMAX inmates are able to communicate in code, and we'll explain one of the codes that he, . . ., personally worked on and

---

[16] The Control Unit at ADX appears to be that facility's version of the SHU.

personally broke, and explain to the jury briefly how that works*." Id*. at 29. Olson testified

about the coded messages embedded in the 1997 letter, including one "Baconian message" that

stated, " 'confirmed message from Chris to move on DC.'" *Id.* at 37. Olson testified that it was

his understanding (anecdotally) that after this letter was sent, two African American inmates

were assaulted and killed in Lewisburg, Pennsylvania.

Hershberger, a long time BOP employee and former warden at ADX, testified

immediately after Cunningham. He spoke extensively about the disciplinary procedures and

security protocols that are used by the BOP system-wide, including ADX. *TT 2/12/07* at 174 et

seq. Acknowledging that ADX is used to house inmates who have killed other inmates,

Hershberger told the jury about the strictures that could or could not be used to control inmates.

For example, Hershberger said that "every federal inmate in the system has the opportunity for

visits. . . correspondence out, receiving correspondence, magazines and so forth. *Id. at 185.* He

described conditions at USP-Marion, another high security facility, as being "similar" to ADX,

Notwithstanding those security measures, two guards and Marion were murdered and two

seriously wounded in two separate incidents on the same day. *Id. at 188.* Similar to

Cunningham's testimony, Hershberger told the jury that, in response to those attacks, the BOP

implemented changes in protocol with a view toward preventing similar occurrences. *Id. at 189.*

The United States submits that there was no violation of the court's order of November

20, 2006. Both Hershberger and Olson were rebuttal witnesses. Their testimony came only after

Cunningham's recitation of rates and instances of inmate on inmate homicides, including

specific examples of such violence, relating to the general ability of the BOP to control inmate

misconduct. Their testimony, like Cunningham's, stands for the proposition that regardless of

the security measures implemented, there is no mechanism to guarantee that inmate will commit acts of violence while incarcerated.

Assuming, arguendo, that the trial court had relied on its earlier discovery ruling to completely bar the rebuttal testimony of Olsen and Hershberger concerning acts of violence by other inmates (before and after the defense case-in-chief), no reasonable probability exists that the outcome of the penalty proceeding would have been different. Caro's future dangerousness was conceded by his own experts. The evidence from both the prosecution and defense indicated that ADX housing was, by design, temporary. Through Cunningham's testimony alone, the jury learned about inmate murders and acts of violence in the ADX and even in the Control Unit. Significantly, the jury found the future dangerousness allegation despite agreeing with the defense that Caro had been, subsequent to the murder, "properly and securely housed . . . at various high security federal institutions" since December, 2003.

Caro also complains that during the cross-examination of Cunningham, the government "asked questions about another defendant's case in which Dr. Cunningham was an expert." *Petition* at 135. Caro complains that the government "asked if the defendant (in that case) was a member of Al Qaeda, and then further asked if he built the bomb to blow up American embassies." *Id.* The government did, in fact, ask Dr. Cunningham whether the defendant in that case was a member of Al Qaeda, and to confirm that the defendant had been convicted of conspiring to blow up the American embassies in Africa. Those questions, however, were asked in the context of a cross-examination directed at establishing bias and attacking Dr. Cunningham's credibility. *TT 2/12/2007* at 87-89.

Caro's complaint that his counsel should have objected to this testimony fails for several reasons, first and foremost among them being the fact that Mr. Kalista did in fact object to the

70

government's line of questioning, arguing that the government was improperly suggesting "that somehow he [was] aligned with the defendant" and that this was "simply an attempt to inflame the passions of the jury against him, and not deal with the substance of the information brought out on [] direct." *Id*. at 89-90, 148-149. Thus, Caro's assertion that his trial counsel did not object fails as a factual matter.

Additionally, Caro's argument fails because the government did not violate the court's order during cross-examination of Cunningham. In response to Mr. Kalista's objection, government's counsel explained, "Your Honor, this is proper bias cross-examination. This witness's evidence is he makes a living coming in here testifying on behalf of, or however he wants to define it, criminal defendants charged with capital murder. It doesn't matter who sits over there. And the jury should know that that's what he does. And so we think it's proper bias cross-examination." *Id*. at 90. After some considerable discussion with the parties, the Court concluded that it was permissible for the government to establish that Cunningham was willing to testify for many individuals and that in each case he opined that they have a low likelihood of future violence in the prison system. But court found objectionable the government's attempt to "characteriz[e] the witness as being less subject to credibility because in some way he stands up for people who have committed horrible acts." *Id*. at 92-93.

The district court gave a limiting instruction which cured any potential prejudice resulting from the use of the Al Qaeda example in the cross of Cunningham. *TT* 2/12 /07 at 163. *See United States v. Francisco,* 35 F.3d 116, 119 (4th Cir. 1994); *see also Richardson v. Marsh,* 481 U.S. 200, 211 (1987) ( "[J]uries are presumed to follow their instructions."); *United States v. Ince,* 21 F.3d 576, 584 (4th Cir. 1994) ("[W]e recognize the presumption of cure by a court's instruction.").

Finally, Caro complains that the government introduced evidence "that three terrorists managed to send out coded letters from ADX." *Petition* at 135. Again, this testimony was developed during the cross-examination of Cunningham, *TT 2/12/07* at 119, and does not mention a specific instance of violence by any inmate.

In any event, Caro cannot demonstrate prejudice resulting from trial counsel's failure to object to the challenged testimony. Certainly, the jury was not surprised by the testimony or Olson or Hershberger that inmates harm other inmates. Cunningham gave them specific examples of such acts and the jury heard that Caro stabbed Benavidez and strangled Sandoval to death in the SHU. Cunningham initiated the presentation of evidence concerning inmate on inmate violence to establish that the BOP had the experience and resources to mitigate such violence within the system. The government does not dispute that the BOP uses its best efforts to protect those entrusted to its care. Rather, the specific instances of inmate violence despite the efforts of the BOP supports the government's argument, recognized in the Court's order, that such violence can never be abated completely.

Caro's status as a danger to others was uncontested. Indeed, it was conceded by his experts and was supported by evidence of his acts of violence against other inmates while incarcerated. There is no reasonable probability that exclusion of testimony of acts of violence by inmates other than Caro would have produced a different outcome in the penalty proceeding. For all of the above reasons, Caro's claim in Issue Six-I should be denied.

Caro alleges that his trial counsel rendered constitutionally ineffective assistance of counsel by failing to object to certain arguments made by the government's counsel during closing argument. Claim Six J, *Petition* at 136. Caro asserts that the government improperly argued that "it was the responsibility of the jury to 'control' Carlos Caro and the only means to

72

do so was by imposing the death penalty." *Id*. at 137. He also asserts that the government improperly argued that the death penalty was necessary because otherwise there would be no punishment for Caro for Sandoval's murder. *Id*. at 137. Finally, he argues that the government violated the Eighth Amendment and *Caldwell v. Mississippi*, 472 U.S. 320 (1985), when it "made improper statements in closing argument that attempted to minimize the jury's responsibility regarding Caro's sentence, . . .and encouraging the jury to focus instead on what it called 'the law.'" *Petition* at 138. Caro argues that his right to effective representation was violated by virtue of his counsel failing to object to these arguments. *Id*. at 136-140. For the reasons set forth herein, Caro's appeal on this issue should be denied.

Caro acknowledges, as he must, that his appellate counsel raised on direct appeal a challenge to the government's closing argument that the jury should "control" Caro by imposing the death penalty, and that Caro would receive no punishment for his crime without the death penalty. *Id*. at 137-38. He further acknowledges that the Fourth Circuit found that neither of these arguments prejudiced Caro, and his appeal on these grounds was denied.[17] *See United States v. Caro*, 597 F.3d at 624-627. Caro cannot prevail on these claims (Claim Six J1 and J2) under the *Strickland* standard because, even assuming that his counsel was ineffective for failing to object to one of these arguments, he cannot establish prejudice where the Fourth Circuit has already determined that there was no prejudice resulting from the error. *See Caro*, 597 F.3d at 624-27.

Caro's third allegation in this issue (Claim Six J3) pertains to the government's statements in closing arguments which Caro alleges violated the rule in *Caldwell v. Mississippi*. Petition at 138. Caro accuses the government of "minimiz[ing] the severity of a death sentence

---

[17] Though the Court found the government's argument regarding the use of the death penalty to "control" Caro troubling, it stated, "we cannot conclude that Caro suffered such prejudice as to warrant reversal." *Caro*, 597 F.3d at 625.

by shifting the emphasis away from the act of putting a defendant to death, and encouraging the jury to focus instead on what it called 'the law.'" *Petition* at 138. But Caro has failed to set forth a meritorious claim under *Caldwell v. Mississippi.* As set forth fully in the response to Claim Eight, Caro misstates the government's argument. The record clearly reflects that counsel for the government stated " . . .You will not hear Judge Jones use that term. The job is not to kill anyone. It's *not* the law." *TT* 2/13/2007 at 98 (emphasis added). By leaving out the word "not," Caro completely and meaningfully alters the meaning of the government's statement. For the reasons set forth *infra*, regarding Claim Eight, (addressing both statements which Caro alleges were made in violation of *Caldwell*), Caro has failed to establish that the government violated *Caldwell v. Mississippi*, and for the same reasons, his appeal alleging that his counsel was ineffective for failing to challenge the government's statements should also fail.[18]

Lastly, Caro alleges that despite the Fourth Circuit's decision denying relief on the two grounds raised in that appeal alleging error in closing arguments, this court should revisit that Court's conclusions, "in light of the additional facts and arguments presented on this modified record." *Petition* at 140. Caro asserts that the combined "errors in jury argument (including both the error in commenting about the defendant's silence and the error in asserting that the jury had a law enforcement role, as well as the prosecutor's attempt to minimize the jury's responsibility) by themselves or when coupled with the other errors in these proceedings," warrant relief. *Petition* at 140.

As already noted, the Fourth Circuit found that there was no prejudice to Caro as a result of any argument by the government that the jury should "control" Caro by imposing the death

---

[18] In his Claim Eight, Caro presents a substantive legal argument alleging that certain of the government's statements in closing argument were in violation of *Caldwell v. Mississippi*, and the government has responded to that issue in this response regarding Claim Eight. The United States incorporates by reference its response to the substantive legal arguments, as they pertain to Caro's argument in this issue, regarding ineffective assistance of counsel for failing to object to those arguments.

penalty, and that Caro would receive no punishment for his crime without the death penalty. *Caro*, 597 F.3d at 624-627. And as set forth above, Caro cannot establish prejudice, even assuming his counsel was ineffective for failing to raise an objection, where the Fourth Circuit has determined that there was no prejudice resulting from the error. *See id*. Nor can Caro establish that he was prejudiced by adding to the list any of the other claimed errors in this issue. *See Petition* at 140. For the reasons already stated regarding sub-issue J3, Caro has entirely failed to set forth a viable claim of error in reliance upon *Caldwell v. Mississippi*, and therefore cannot establish that his counsel was ineffective for failing to object, or that he was prejudiced by such a failure, and considering this argument in conjunction with issues J1 and J2 does nothing to advance Caro's argument.

Finally, regarding his claim that the government erred in commenting on the defendant's silence, that, too, was found to be harmless error by the Fourth Circuit in its opinion.[19] *Caro*, 597 F.3d at 627. The Fourth Circuit resolved the issue on direct appeal, finding that "given the court's cautionary instruction and overwhelming information showing Caro's lack of remorse, we conclude that any error would have been harmless under 18 U.S.C. 3595(c)(2)." *Id*. The court's cautionary instruction stated, "Remember that the defendant has a constitutional right to remain silent, and mere silence, alone, by the defendant should not be considered as proof of lack of remorse." *Id*. at 630-31. The *Caro* Court "presume[d] that a properly instructed jury has acted in a manner consistent with the instruction." *Id*. at 631 (internal quotation and citations omitted). The Court also considered Caro's "affirmative conduct displaying lack of remorse" in

---

[19] The government assumes in this regard that Caro is referring to the language in the government's notice of intent to seek the death penalty under the FDPA, which asserted a non-statutory aggravating factor of lack of remorse, specifically stating that "Carols David Caro has not expressed remorse for his violent acts, including (but not limited to) the murder of Sandoval, the stabbing of Benavidez and the gang-based assault in Oakdale." The government makes this assumption because Caro raised a challenge to this language in his direct appeal, arguing that the government and the district court violated his Fifth Amendment privilege against self-incrimination by having the jury consider his failure to speak words of remorse. *Caro*, 597 F.3d at 627.

reaching its conclusion that "the jury could not reasonably have reached another conclusion regarding lack of remorse." *Id*. at 631. Specifically, the Court noted that Caro yelled after killing Sandoval, "Come get this piece of shit out of here." *Id*.; J.A. 676. When asked whether Sandoval was breathing, Caro answered, "No. At this time he's stinking up the room, get him out." *Id*.; J.A. 684. Caro explained his actions, saying, "[Sandoval] called me a mother fucker, that whore, that's why I fucked him up; and Caro bragged, "I killed a guy two weeks ago . . .[f]or being a fool." *Id*. Thus, because the Fourth Circuit concluded that any error in the government's comments pertaining to Caro's right to silence was harmless, Caro's argument that his attorney was ineffective for failing to object fails under the *Strickland* standard. For all of the above reasons, Caro has not established that his counsel was ineffective for failing to object to certain arguments, nor that any combined alleged failures collectively establish ineffective assistance of counsel. For all these reasons, Caro's argument in Claim Six-J should be denied.

Caro alleges that the record reflects that Juror #33 was "frequently sleeping," and that his trial counsel rendered ineffective assistance of counsel by failing to strike Juror #33. Claim Six K, *Petition* at 141. For the reasons set forth below, Caro's claim should be denied.

On February 5, 2007, just before the lunch recess, the district court spoke to counsel, and stated as follows:

> Counsel, Juror Number 33, who is the young man seated in the back on the end, has been nodding off some. And obviously I'm concerned about that, particularly in view of the importance of these proceedings. And what I intend to do is see what he does after lunch, but I am concerned about his situation, and would be interested in any comments that counsel may have in that regard. So, we'll take our luncheon recess and we'll be in recess for one hour. *Tr.* 2/05/2007 at 105.

The record does not reflect any further comments from either counsel or the court after lunch or at the end of the day's proceedings.

On February 7, 2007, two days later, the court stated as follows:

Counsel, we are still having a problem with juror #33 who appears to continue to sleep. He's near to me at the end of the second row. He has his hand in front of his face, and his eyes closed, and he did that a lot this morning. He was better yesterday, but as I indicated, we had another problem today. And I'm inclined to, to discharge that juror. I want to give counsel an opportunity to give me their views, either now or before we come back. *Tr.* 2/7/2007 at 66.

Counsel for the United States opposed excusing the juror, and suggested that the court talk to the juror. *Id.* The government's counsel said, "I have kind of been watching him since we were first alerted a few days ago. He does tend to, they close, they open, and he kind of rubs his head, puts his hands on his face, drinks water, he does a lot of movements. I don't know, I would say that if you talk to him and ask him is he okay, is he paying attention, before we just discharge him." *Id.* In response, Caro's attorney said, "Your Honor, that would also, I think, I have not observed him today, I observed him yesterday. He did seem to be awake and alert yesterday. I think it would be appropriate for the court to question him. If he's on medication, is he working night shift, or something, I don't know. *Id.* at 66-67. The court then agreed to talk to the juror, as follows:

> The Court:  Yes, sir, juror number 33, seems to me you've been having a little problem this morning. Are you feeling all right? Are you having any difficulty?

> Juror #33:  Just a little bit. I'm just been having trouble sleeping. I have a little bit of anxiety problem, sir.

> The Court:  Have you been able to stay awake during the course of the proceedings?

> Juror #33:  Yes, sir.

> The Court:  So, you're hearing everything?

Juror #33:      Yes, sir.

The Court:      You understand how important it is every member of the jury hear the evidence?

Juror #33:      Yes, sir.

The Court:      If you'll let me know if you're having any difficulty, if you're not being able to concentrate, will you do that?

Juror #33:      Yes, sir.

Later in the trial, on February 12, 2007, the court returned to the question of juror #33. The court asked if there were any further comments from counsel or the defendant. *Tr. 2/12/2007 at 217.* The government's attorney stated that "based upon our observations of him, I think the court's admonition to him was sufficient. He seems to be doing well. We have nothing." *Id.* at 217. Counsel for Caro stated, "[y]our Honor, we have no problem. We think the admonition was apparently taken to heart, and he seems to be paying attention." *Id.* The court then summarized for the record what had happened regarding Juror #33. The court stated, "On the first day of the sentencing phase of the trial, it did appear, and again, that was during the Government's case in chief in the sentencing hearing, it did appear that Juror Number 33 was having some difficulty in staying awake in the morning. It was all right in the afternoon. And then on the third day of the, again, continuing in the Government's evidence in the morning, he had another problem. At that time the court indicated that it was considering removing him as a juror. Counsel, counsel for both parties requested I interview him in the courtroom, and I did. He, he indicated that he had been not sleeping very well, but that he had been following the evidence, and I admonished him to let me know if he was having any problems. And since then, and particularly since the defense evidence, he appears to have done all right. So, based on that, and on the request of the parties in the case, I will not remove him as a juror. *Id.* at 218.

In *United States v. Freitag,* 230 F.3d 1019 (7th Cir.2000), the Seventh Circuit discussed the standard for addressing the issue of sleeping or dozing jurors.  That Court held that "[i]f sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury. *Id*. at  1023, citing *United States v. Kimberlin,* 805 F.2d 210, 244 (7th Cir.1986); *United States v. Bradley,* 173 F.3d 225, 230 (3d Cir.1999); *United States v. Springfield,* 829 F.2d 860, 864 (9th Cir.1987). However, a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how to handle a sleeping juror.  *Id*. (internal citations omitted).  Reversal is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury. *Id*., citing *Springfield,* 829 F.2d at 864.  In order to warrant a new trial, the *effect* of the sleeping juror must have "prejudiced the defendant to the extent that he has not received a fair trial," and "not every incident of juror misconduct requires a new trial." *United States v. Hendrix,* 549 F.2d 1225, 1229 (9th Cir. 1977).

In this case, Caro has raised an ineffective assistance claim under *Strickland v. Washington,* which requires that he show that in failing to attempt to strike the allegedly sleeping juror, his counsel's performance was deficient, and that the deficiency prejudiced the defense. 466 U.S. at 687. For the reasons herein, Caro is unable to meet his burden under *Strickland*.

First, as a factual matter, the record does not conclusively establish that the juror was sleeping. Though the court initially noted its observations that the juror was "nodding off some," and later, "appear[ed] to continue to sleep," when the juror was questioned by the court, he claimed to have heard everything in the proceedings.  *TT* 2/5/2007 at 105; *TT* 2/6/2007 at 66-67. The record further reflects that during the remainder of the first day in question, February 5, 2007, and on the next day, the juror was fine.  *See TT* 2/12/2007 at 217-218.  On the third day,

February 7, 2007, the court noticed that the juror was having problems again, and at the request of the parties, the court interviewed the juror. Significantly, the juror confirmed that he had been following the evidence in the case, though he had not been sleeping well, and had some anxiety problems. *See TT* 2/7/2007 at 67. Later, Caro's counsel and the government's counsel agreed that there was no need to strike the juror. *TT 2/12/2007 at 217*. When asked if there were any further comments from the parties regarding juror #33, Caro's counsel even noted, "we have no problem." *Id*. Caro's argument assumes as a necessary predicate, that the juror was sleeping, and that his counsel was aware that the juror was sleeping and failed to make a motion to strike the juror. But instead, trial counsel stated, "[y]our Honor, we have no problem. We think the admonition was apparently taken to heart, and he seems to be paying attention." *Id*. The record thus contradicts Caro's underlying assumptions, and entirely undermines his argument. Caro cannot establish that the juror was actually sleeping, or that his counsel was ineffective for failing to attempt to have the juror removed for sleeping, when neither his counsel, nor government's counsel nor the court, ultimately, were persuaded that the juror was inattentive to a degree that he needed to be removed.

For the same reasons, even if counsel had moved to replace the juror with an alternate, or for a new trial, and while recognizing that the court first had concerns that the juror may have been sleeping, it is unlikely that the court would have granted such relief because the evidence developed after the court's initial observations was not sufficiently strong to warrant removal. *See Bell v. True*, 413 F.Supp.2d 657, 717-719 (W.D.Va. 2006). Though the district court initially indicated that it was considering removing the juror, as set forth above, the factual record developed after the court's initial observations indicates that both parties and the court were satisfied that the juror was paying attention, and the juror himself confirmed that this was

so.  The court considered its own observations of the juror, the colloquy with the juror, and the remarks of both parties before concluding that it would not remove the juror.  The record reflects that the parties paid particular attention to the juror's attentiveness, that the court inquired specifically with the juror regarding his attentiveness, and that the juror confirmed he had heard the evidence in the proceedings.  Thus, especially when after the admonition, the parties and the court agreed that the juror was paying attention, Caro cannot meet his burden under *Strickland* of proving either ineffectiveness or prejudice from his counsel's failure to attempt to have the juror removed.

The cases cited by Caro in support of his argument are factually distinguishable.  For example, in *Barrett*, 703 F.2d 1076, 1082, the juror admitted that he was sleeping.  In *People v. Simkins*, 792 N.Y.S. 2d 170 (N.Y. App. Div. 2005), though the juror did not admit sleeping, and instead stated that he had closed his eyes, but was otherwise aware of the proceedings, the record reflected that "the court itself observed that this juror was sleeping during much of the testimony.  Other jurors were questioned, who informed the court that not only was the juror sleeping, but that they had to continuously nudge the juror to wake him."  In *People v. Evans*, 710 P.2d 1167, 1168 (Colo. App. 1985), the court found that the juror was sleeping, gave no notice of this fact to defense counsel, and instituted contempt proceedings against the juror only after the verdict was returned.  In *People v. Jones*, 861 N.E. 2d 176, 278 (Ill. App. Ct. 2006), the "trial court was aware of the inattentiveness of the juror throughout almost the entire proceedings."  And in *State v. Majid*, 914 N.E. 2d 1113 (Ohio Ct. App. 2009), the judge saw numerous instances of the juror sleeping, but responded to counsel's objections, saying, "I saw it.  So what.  Let him sleep.  You guy's picked the jury.  I didn't."  In Caro's case, the evidence is not nearly so compelling.  The record in Caro's case does indicate that the court observed that juror #33 was "nodding off

some," and "appear[ed] to continue to sleep," during proceedings on the mornings of February 5, and 7, 2007, respectively. However, regarding the observation on February 7, counsel for the government clarified that the juror had been putting his hands in front of his face and closing his eyes. Tr. 2/7/07 at 66. The court then questioned the juror, at which time the juror said he had been able to stay awake, and had heard the evidence in the proceedings. *Id*. at 67. Caro's case is thus unlike those above, where the record much more definitively established that a juror was sleeping, either through an admission, the court's ultimate conclusions or other evidence. Here, the juror did not admit he was sleeping, the juror affirmed that he was following the evidence in the proceedings, and the record established that the parties were satisfied that the juror did not need to be removed and that the court concurred with that view in its opinion deciding not to remove the juror.

Moreover, even assuming that the juror had dozed at some point during the Government's case-in-chief, or that the court's remarks indicate that the court was persuaded that the juror had slept through some portion of the proceedings, but that it was not necessary to remove the juror, Caro still cannot meet his burden under *Strickland* establishing ineffectiveness or prejudice, absent any evidence that the juror was unable to consider the case fairly. *See United States v. Johnson,* 409 Fed.Appx. 688, 692 (4th Cir. 2011). In *Johnson*, the Court concluded that "there [was] no evidence that the juror was sleeping," and that "[a]t worst, the record reflects that the juror was tired and perhaps inattentive for an undefined period of time during the Defense's opening argument and the informant's direct testimony." 409 Fed.Appx. at 692. The *Johnson* Court noted that "once the [trial] court noticed the juror, the court took a momentary break and instructed the jury on the importance of being alert. Absent any evidence that the juror was unable to consider the case fairly, Johnson has failed to show error, much less

plain error." Caro's claim is also similar to one rejected in *United States v. Postell*, 891 F.2d 287 (4th Cir. 1989) (unpublished). In *Postell*, the defendants claimed (on direct appeal) that the district court had erred in failing to remove a juror who fell asleep during trial. The *Postell* Court rejected the assignment of error for several reasons, including the fact that there was some question as to "whether the juror actually fell asleep, or was only momentarily inattentive," and because the appellants failed to make any showing that the juror "slept through essential portions of the trial and was unable to consider the entire case fairly." *Id.* Again, based on the record developed by the trial court after noticing that juror #33 may be having trouble staying awake, Caro cannot establish that the juror was unable to consider the case fairly. *See United States v. Aguilar*, 188 Fed.Appx. 897, 900 (11th Cir. 2006). In *Aguilar*, the record indicates that the district court judge noticed that Juror Bivins was sleeping or having trouble staying awake during both side's opening arguments and on the first day of trial. No mention is made of Bivins being asleep on the second day of trial. At the end of the third day of trial, the district court judge noted that Bivins slept through a considerable portion of that day's session. In his order denying a new trial, the district court judge stated that he kept a close watch on Bivins and instructed a court officer to do the same. The district court believed that it was not necessary to remove Bivins, as he was alert through the substantial portions of the trial. Additionally, the judge was satisfied by Bivins's reassurances that he could perform his duty. The *Aguilar* Court held that "that the district court did not abuse its discretion in allowing Bivins to remain on the jury." 188 Fed.Appx. at 900, citing *Freitag,* 230 F.3d at 1023. The *Aguilar* Court further found that "[t]he district court judge was in the best position to determine the extent of Bivins's inattention and he decided that Bivins could deliberate and render judgment in this case." *Id.* In Caro's case, the court likewise ultimately determined that the juror did not need to be removed, and only after

Caro's counsel and counsel for the government had both articulated their agreement that they were satisfied that the juror was paying attention to the case. In that light, Caro is unable to establish either that his counsel was ineffective for failing to attempt to strike the juror, or that he was prejudiced by the juror remaining on the jury. *See Cutchin v. Pearson*, 2006 WL 2659982 (W.D.Va. 2006) ("Once the judge had found that the juror was not sleeping, counsel had no ground on which to move for a mistrial and his failure to make such a motion did not prejudice Cutchin's defense"). For all these reasons, Caro's claim should be denied.

Claim Seven: Caro claims that the government violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments by withholding exculpatory and impeachment evidence and presenting improper evidence and argument regarding future dangerousness. *Petition at 147*. His claim is without merit.

Caro asserts that his Constitutional rights under *Brady v. Maryland* were violated when the Government failed to provide his counsel with information regarding the length of stay of inmates at Florence ADMAX. Claim Seven A. Specifically, Caro claims that this information would have shown that, despite Florence ADMAX's "Step Down" program, many inmates remained incarcerated in Florence ADMAX for more than three years. According to Caro, without this information he was unable to counter the Government's assertion that he could not remain at Florence ADMAX for an extended period of time. Caro's *Brady* violation claim is unavailing. First, Caro raised this issue on direct appeal. *See United States v. Caro*, 597 F.3d 608, 617 (4th Cir. 2010). As such, Caro cannot raise this issue on collateral review. *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976). Second, even if the Court were to find that this issue was not raised on direct appeal, there is no *Brady* violation because

84

there is no reasonable probability that the suppressed evidence would have produced a different sentence. *See Strickler v. Greene*, 527 U.S. 263, 281 (1999).

### a. Caro is re-litigating an issue that was raised on appeal

Prior to sentencing, Caro requested information from BOP records regarding, among other things, "Names, prison numbers, assignment rationale and tenures of all inmates in the Control Unit at Florence ADMAX since opening in 1994 to present date showing date assigned, the reason assigned and date exiting the Control Unit to lesser security or release from BOP." *Caro*, 597 F.3d at 617. After the government denied this request, Caro filed various motions— one of which requested a court order compelling the government to produce the information under *Brady.* On November 20, 2006, the district court denied Caro's *Brady* motion. On direct appeal, Caro challenged, in pertinent part, the district court's denial of his *Brady* motion. The Fourth Circuit fully considered this issue and affirmed the district court's decision.

The Fourth Circuit has held that a litigant "may not circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion." *United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009). Here, Caro has asserted in his § 2255 motion the same *Brady* violation that he asserted on appeal—that the Government violated *Brady* by not turning over data regarding the length of stay of inmates at Florence ADMAX. *See* Brief of Appellant, *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) (No. 07-5), 2009 WL 2996586, n.45 ("Because Rule 16 and *Brady* both require the disclosure of exculpatory evidence, this claim also alleges a violation of *Brady*'s constitutional commands. . . . Appellant requests a remand for a hearing to determine whether the information requested from BOP was *Brady* material."). Simply stated, Caro's § 2255 motion attempts to evade the Fourth Circuit's ruling by re-alleging the same issue. *Boeckenhaupt v. United States*, 537 F.2d, at 1183 (holding that issues previously

85

decided on direct appeal may not be raised on collateral review).  Accordingly, Petitioner's motion should be denied.

>  b.  *Even if the Court were to find that this issue was not raised on appeal, there is still no Brady violation.*

To prove a *Brady* violation, the defendant must show that non-disclosed evidence was (1) favorable to the defendant; (2) material; and (3) that the prosecution had the materials and failed to disclose them.  *See United States v. King*, 628 F.3d 693, 701-02 (4th Cir. 2011).  Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  And, a "reasonable probability" of a different result is shown "when the government's non-disclosure 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley,* 473 U.S. at 678).  Thus, while "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence . . . , strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281; *see also United States v. Bagley,* 473 U.S. at 677 (Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.") (internal quotation marks omitted).

Caro claims that the non-disclosed information would have shown, that at the time of his sentencing hearing, there were inmates at Florence ADMAX who had served more than three years.  As a result, the Government prevented Caro from rebutting the testimony of the Government's witness, Warden Hershberger, and misrepresented to the jury the truth regarding

Florence ADMAX's Step Down program. There is no reasonable probability, however, that this information would have had any bearing on the jury's ultimate sentencing decision, let alone undermine the confidence of the sentencing.

When deciding the punishment for a defendant who has been found guilty in a capital murder case, jurors are asked to weigh the aggravating and mitigating circumstances of the case. *See* 18 U.S.C. §3593(d) (2013). Here, the jury found that each alleged aggravating factor had been established beyond a reasonable doubt. Also, the jurors indicated that they unanimously found 12 of the 22 mitigating factors that Caro proposed. Finally, some jurors found that four other mitigating factors were proven including the mitigating factor that Caro would be incarcerated in a secure federal institution. Besides citing to an informal survey conducted by a law firm in New Mexico in November 2010, Caro provides no plausible reason to believe that the non-disclosed information would have significantly altered the evidence heard by the jury and influenced the sentencing. Simply stated, there is not a reasonable probability that this additional information would have caused the mitigating factors to outweigh the aggravating factors presented by the Government. Indeed, evidence from both the Government and Caro's witnesses illustrated that inmates could remain at Florence ADMAX for more than three years.

Caro's expert witness, Dr. Mark Cunningham, informed the jury that while DOJ and BOP had refused to provide him data regarding the length and range of stay for prisoners at Florence ADMAX, he had an opportunity to tour the Florence ADMAX facilities. Cunningham testified that he had been told by senior staff during this tour that it has taken five years' time for the average prisoner to successfully complete the Step Down program and that at least five individuals had been incarcerated continuously at Florence ADMAX since its 1994 opening. *TT 02/12/07* at 40-41 ("I have requested from the [DOJ] and [BOP] very specific statistical

information on length of stay at [Florence ADMAX] . . . .  During the last tour  the, the

individual who was providing that, one of the senior staff member there, indicated that of the

inmates that do successfully exit the facility on what's called a stop down program, that their

average length of stay there has been five years.  That's an average.  Your range must be much

greater.  He also described that there were five individuals . . . who had been there since the

facility opened in December, 1994").  Cunningham also noted that his research revealed that

BOP typically placed a federal inmate who killed another inmate in Florence ADMAX's more

restrictive Control Unit for six years before even considering other placements, though typical

did not mean automatic.  *TT 02/12/07a*t 76 ("Testimony in other cases by wardens from

[Florence ADMAX] reflects that the typical policy of the [BOP] is to confine an inmate who has

killed another inmate on the Control Unit for six years.").  Even the Government's witness,

Warden Gregory Hershberger, conceded that in special cases, inmates might remain in Florence-

ADMAX for years.  *See id.* at 184, 202.

   The informal survey that Caro cites in his § 2255 motion merely reiterates a fact that the

jury already heard:  that some Florence ADMAX prisoners take more than three years to

complete the Step Down program.  Moreover, the informal survey does not counter the

government's central argument—that Caro's term at Florence ADMAX would not be permanent.

Even Dr. Cunningham admitted that Florence ADMAX is not "intended to be a permanent

placement . . . ," *see id.* at 39, and that the "hope" of the BOP is to return the inmates to the

general population at another facility.  *See id.* at 40 ("But many of the inmates that are there they

hope they can send out some day.").  Warden Hershberger echoed this fact.  *See id.* at 177, 184.

   For the reasons discussed above, the non-disclosed information concerning the length of

stay of inmates at Florence ADMAX is not material under *Brady*.  Furthermore, the non-

disclosed information would not have impeached the Government's central argument that an inmate's term at Florence ADMAX is intended to be temporary.  As such, Caro's claim should be denied.

Caro asserts that the Government failed to disclose exculpatory evidence regarding his status as a leader of the Texas Syndicate.  Claim Seven B.  In particular, Caro argues that the Government possessed three documents that suggested that Caro was not the leader of the Texas Syndicate at USP-Lee and was possibly in "bad standing" with the Texas Syndicate.  Caro claims that if these three documents had been produced, they would have refuted the government's assertions that Caro was in fact the leader of the Texas Syndicate at the time of the trial.[20]  Caro's claim is without merit.

As explained earlier, to prove a *Brady* violation, the defendant must show that non-disclosed evidence was (1) favorable to the defendant; (2) material; and (3) that the prosecution had the materials and failed to disclose them.  *See United States v. King*, 628 F.3d 693, 701-02 (4th Cir. 2011).  Thus, a real *Brady* violation does not occur "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also United States v. Bagley,* 473 U.S. at 677 (Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.") (internal quotation marks omitted).  There is no reasonable probability, however, that this information would have had any bearing on the jury's ultimate sentencing decision, let alone undermine the confidence of the sentencing.

---

[20] The Government concedes that the three documents referenced in this claim of Caro's § 2255 motion were not disclosed.  As such, Caro's ineffective assistance of counsel claim outlined in footnote 41 is moot.

The three documents referenced in Caro's § 2255 motion only suggest that Caro was not *the* leader of the Texas Syndicate[21] and that Caro may have been in "bad standing" with the Texas Syndicate after he murdered Sandoval. The Government, however, never argued that Caro was *the* leader of the Texas Syndicate. *See TT 02/13/07* at 21-22 ("How do we know he is a leader in [the Texas Syndicate]? Because he said so."); *id.* at 96 ("Whether he's a leader, whether he's an enforcer, don't know, but he was a player. When they needed somebody for a hit on Benavidez, they picked him."). Rather, based on Caro's past, the Government argued that Caro was involved in the Texas Syndicate and, at the very least, had a high-ranking position. *See id.* at 22 (explaining that in the summer of 2002, when Lieutenant Gordon needed to talk to a leader of the Texas Syndicate in an effort to keep the peace with another rival gang, the Texas Syndicate sent Caro as their representative).[22]

Caro provides no plausible reason to believe that the non-disclosed information regarding his possible "bad standing" with the Texas Syndicate would have significantly altered the evidence heard by the jury and influenced the sentencing. Thus, there is not a reasonable probability that this additional information would have altered the jury's analysis of the aggravating factors presented by the Government. Simply stated, this non-disclosed information could not reasonably be taken to put Caro's whole sentencing hearing in such a different light as to undermine confidence in the sentence. *See Winston v. Kelly*, 592 F.3d 535, 556 (4th Cir. 2010) (explaining that a *Brady* violation requires a "collective assessment of whether

---

[21] The Grand Jury testimony of Mr. Mrad simply stated that after Ricardo Benavidez was the leader of the Texas Syndicate and after he was assaulted, by Caro and others, Francisco Tijerina assumed leadership of the Texas Syndicate.

[22] Caro responded to Lt. Gordon's request for peace by explaining that "the Texas Syndicate were going to do what they had to do." Soon after, Caro and fellow Texas Syndicate members violently attacked the rival gang members. Taking responsibility, Caro commented: "I don't give a fuck if they send me to the United States Penitentiary. My brothers follow orders. They know what they're getting into. It doesn't even matter if we're prosecuted. I have 30 years to do. I certainly don't care about myself."

introduction of the exculpatory evidence might have affected the outcome of the [punishment].").
For these reasons, the non-disclosed information concerning the leader of the Texas Syndicate and Caro's alleged standing with the Texas Syndicate is not material under *Brady*. Furthermore, the non-disclosed information would not have impeached the Government's main assertion—that Caro was a member of the Texas Syndicate and was considered to occupy and presented himself as occupying a leadership role in the gang.

Furthermore, two of the non-disclosed documents, a December 24, 2003 internal BOP memorandum and a November 14, 2006 internal BOP form, suggested that Caro was in "bad standing" with the Texas Syndicate. As an initial matter, the BOP memoranda reflect the opinions of the BOP. It is highly unlikely that the Texas Syndicate told the BOP that Caro was in "bad standing." The BOP memoranda are of questionable utility to rebut evidence of Caro's statements and actions at FCI-Oakdale concerning his leadership role.

As a secondary matter, it is well-recognized that the government cannot be said to have suppressed evidence of what the defendant himself knew or could have learned from other sources. *See United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) ("[I]nformation actually known by the defendant falls outside the ambit of the *Brady* rule."); *United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990) (finding that *Brady* requires that the government disclose only evidence that is not available to the defense from other sources, either directly or through diligent investigation); *see also West v. Johnson,* 92 F.3d 1385, 1399 (5th Cir.1996) (rejecting capital defendant's *Brady* claim that the prosecution suppressed evidence suggesting that the defendant fabricated his confession of stealing a necklace from the victim; the defendant "knew whether or not he had taken the necklace, and necessarily knew that better than the prosecution could have"); *United States v. Diaz,* 922 F.2d 998, 1007 (2d Cir.1990) ("[T]here is no improper

suppression within the meaning of *Brady* where the facts are already known by the defendant.”).

Here, it appears that Caro knew his own standing within the gang; or, at the very least, knew Texas Syndicate members who could have informed him of his standing. Indeed, sometime in January 2004, Caro sent a letter to “the godfather of the Texas Syndicate,” *see TT 02/13/07* at 28, requesting that he remain in good standing with the gang. As such, Caro had no need for the Government to provide him with information he already knew. *See, e.g., Owens v. Guida*, 549 F.3d 399, 415-16 (6th Cir. 2008) (“*Brady* obviously does not apply to information that is not wholly within the control of the prosecution. . . . This rule makes sense because if the defendant could have presented similar evidence to prove the same point that the allegedly-suppressed information would have been introduced to prove, but did not, it is not reasonably probable that government disclosure would have led to a different result.”).

For the reasons expressed above, Caro’s *Brady* claim regarding information about his status in the Texas Syndicate should be denied.

Caro asserts in footnote 38 of his petition that the Government’s comment during its closing argument that “[w]e know if, if Carlos Caro goes to [Florence ADMAX], he’s not going to stay there,” was vouching and Caro’s counsel’s failure to object constitutes ineffective assistance of counsel. *Petition* at 150. This claim is without merit.

Improper remarks during the government’s closing arguments violate a defendant’s due process rights if the remarks “so prejudiced the defendant’s substantial rights that the defendant was denied a fair trial.” *United States v. Wilson,* 624 F.3d 640, 656 (4th Cir. 2010). Therefore, to obtain relief on this claim, the defendant must demonstrate both that the statement was improper and that it caused prejudice. *United States v. Smith,* 441 F.3d 254, 264 (4th Cir. 2006). The Fourth Circuit has recognized four relevant factors when evaluating prejudice: “(1) the

degree to which the comments could have misled the jury; (2) whether the comments were isolated or extensive; (3) the strength of proof of guilt absent the inappropriate comments; and (4) whether the comments were deliberately made to divert the jury's attention." *United States v. Collins,* 415 F.3d 304, 309 (4th Cir. 2005) (quoting *United States v. Sanchez,* 118 F.3d 192, 198 (4th Cir. 1997)) (internal quotation marks omitted).

Moreover, a prosecutor may not vouch for a government witness in arguments to the jury. *United States v. Sanchez,* <u>118 F.3d 192</u>, 198 (4th Cir. 1997). "Vouching occurs when the prosecutor indicates a personal belief in the credibility or honesty of a witness. . . ." *Sanchez,* <u>118 F.3d at 198</u>.

Although attempts to bolster a witness by vouching for his credibility are normally improper, *see Sanchez*, 118 F.3d at 198, the government may explain why the jury might find the government's witnesses credible. *See United States v. Sullivan*, 455 F.3d 248, 259 (4th Cir. 2006); *see also United States v. Bentley*, 561 F.3d 803, 813 (8th Cir. 2009). After careful review of the record of this case, the Government's statement that "we know" does not constitute improper vouching. The remark occurred before the prosecutor discussed the testimony of the Government and Caro's witnesses' comments regarding Florence ADMAX. The Government did not ask the jury to rely on him in making its decision, but later instructed the jury to consider the testimony of Warden Hershberger and Dr. Cunningham. *See TT 02/13/07* at 34-35. In short, the statement was properly argumentative and simply reiterated a fact that both Hershberger and Dr. Cunningham articulated—that an inmate's term at Florence ADMAX is temporary, not permanent. *See TT 02/12/07* at 39-40, 177, 184.

Even if the court were to define the Government's comments as vouching, Caro was not prejudiced by the failure of trial counsel to object. The comment was isolated and not extensive.

Furthermore, the one minor remark neither misled nor diverted the juries' attention from the evidence elicited during the sentencing hearing. Finally, whether to enter formal objections during a prosecutor's closing argument is a strategic decision that many trial counsel approach differently. *See*, *e.g.*, *United States v. Gomes*, 642 F.3d 43, 47 (1st Cir. 2011). Even if Caro's counsel made a poor decision in not objecting to the prosecutor's statement, it does not fall so short of the ordinary standards of the legal profession as to be objectively unreasonable within the meaning of *Strickland*. Again, as just stated, Caro counsel's decision did not unduly prejudice him. For these reasons, Caro's vouching and ineffective assistance of counsel claim is without merit.

Claim Eight: Caro complains that the government's comments in closing arguments violated his Eighth Amendment rights under *Caldwell v. Mississippi. Petition at 157.* His complaint is without merit.

Caro argues that the government violated the Eighth Amendment and the rule in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), with two remarks in its closing arguments. Caro alleges the violations stemmed from the following two statements:

1) If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done. You would not be alone in that regard. . . .

2) The last thing I would like to talk about is the law. Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term. The job is not to kill anyone. It's the law.

*Petition* at 157-158, citing *TT*. 2/13/2007 at 17, 98. Caro argues that "the implicit messages of the government were: You need not feel responsible for causing the death of Mr. Carlos Caro, other juries have done so. And, it is not your job to kill, it's the law." *Id*. at 158. Caro argues that "[t]he jury, not the 'law' or the Judge or the Fourth Circuit was responsible for deciding whether Mr. Caro would live or die," and that the government's statements had an intended purpose of minimizing the jury's sense of responsibility, and likely achieved that purpose, in violation of the Eighth Amendment and the Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). *Id.*

In *Caldwell,* 472 U.S. 320, 325-26, this Court found constitutionally impermissible a prosecutor's statement, at the penalty phase of a capital trial, that the jury's decision was "not the final decision" because it was "automatically reviewable." The prosecutor's assurances were impermissible, the Court ruled, because they created an unacceptable risk that the jury would "minimize the importance of its role," "believ[ing] that the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." *Caldwell,* 472 U.S., at 333, 329. This belief, the Court explained, is inconsistent with the "heightened 'need for reliability' " in capital sentencing. *Id.,* at 323, quoting *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) (plurality opinion). In *Romano v. Oklahoma,* 512 U.S. 1, 9 (1994), however, the Supreme Court subsequently explained that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." (quoting *Dugger v. Adams,* 489 U.S. 401, 407 (1989). The issue is whether the jury was "affirmatively misled regarding its role in the sentencing process." *Id.* at 9.

Caro's assertion that the two statements from the government's closing remarks violate the Eighth Amendment under *Caldwell* is misplaced and fails for several reasons. First and

foremost is that Caro has misrepresented the government's statement in the second quote upon which he relies. The correct quote is, " . . .You will not hear Judge Jones use that term. The job is not to kill anyone. It's *not* the law." *TT 2/13/07* at 98 (emphasis added). Clearly, the prosecutor did not make the statement that Caro alleges, and his claim relating to that statement fails on its face.[23]

The second remark, though accurately quoted, does not establish any *Caldwell* error. Caro argues that the government was in effect saying to the jury that they "need not feel responsible for causing the death of Mr. Carlos Caro, other juries have done so." *Petition* at 158. Though it is true that grammatically, the sentence could be read to say that this jury would not be the first jury to conclude that Carlos Caro should be sentenced to death, such a conclusion does not comport with common sense, nor does it advance Caro's argument. There is simply no reasonable possibility that the jury was confused into thinking that some other jury could be partly responsible for "causing the death" of Caro, as he puts it.[24] To suggest that the prosecutor's remark may have persuaded the jury to think that another jury had made that decision – thereby relieving this jury of responsibility - is not within the realm of reasonable possibilities, and is inconsistent with the entirety of the judge's instructions and arguments from both counsel. There was only one jury deciding Caro's guilt and punishment, and nothing the government said in its remarks could have confused the jury on this point. Instead, it is clear that the prosecutor was simply and correctly stating that the jury in this case was not the first jury historically to have had the weighty responsibility of deciding whether to punish a criminal

---

[23] It should be noted that in Issue Six J-3, Caro relies upon this same inaccurate representation of the transcript to argue that his trial counsel was ineffective, and in Issue Nine D, as the grounds for ineffectiveness of appellate counsel. *Petition* at 138, 170.

[24] Of course, the jury does not in its decision making, "cause the death" of the defendant, but rather votes, after considering all the evidence and aggravating and mitigating factors, and in light of the law as the court's instructions reflect, to determine whether the defendant should be sentenced to death.

defendant with the death penalty and that they would not be the first jury to impose the death penalty if that is what they decided to do, after considering the evidence, and the aggravating and mitigating factors in light of the law and the court's instructions. The remark was a true and accurate observation of historical fact, and with that intended meaning, the prosecutor's remark did not minimize the "awesome responsibility" that accompanies the jury's decision in a death penalty case.

The prosecutor's remarks immediately preceding the alleged erroneous statement lend further support for the government's view on this point. The prosecutor stated:

> the judge has told you, and I think you consider it, it's not just a matter of a mechanical process of saying, well, let's count up the number of mitigators as opposed to counting up the number of aggravators. It's a weighing process . . .. The judge is also going to tell you, and there will be specific language from one of his instructions, instruction number one, he's going to tell you that if you determine the weighing process does justify a death sentence, you should impose that sentence. Ladies and gentlemen, I want you always to be mindful of this task. *Tr.* at 17.

With these words, the prosecutor appropriately communicated the nature of the jury's task by highlighting repeatedly that the jury was required to weigh the mitigating factors against the aggravating factors in reaching their decision, and noting that the court would instruct them regarding the application of the death penalty. The Supreme Court has held that "*Caldwell* is relevant only to certain types of comment- those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 184, n.15 (1986). To establish a violation under *Caldwell*, Caro "must show that the prosecutor's remarks improperly described the role assigned to the jury . . .." *Dugger v. Adams*, 489 U.S. 401, 407 (1989). Caro cannot make such a showing by looking at the particular remark in isolation, nor by examining the fuller

context of the prosecutor's comments, because the remarks were not misleading in describing the jury's role in the sentencing process.

Further, it is significant that the complained of remark was stated in the past tense. The remark was undeniably referencing the fact that *in the past*, "other juries have [imposed the death penalty]." This can only mean that the prosecutor is speaking of other juries *in other cases*. Given that the prosecutor was referring to past juries in other cases, as a matter of logic, the remark could not be suggesting to the jury that some other jury or person would *later* bear any of the responsibility in *Caro's* case. In *Caldwell*, the prosecutor's remark was ultimately problematic because it referenced the higher court which would *later* review the jury's decision, potentially relieving the jurors from their own sense of responsibility at the time of their decision. It thus minimized the importance of the jury's role because it led potentially to a belief that the responsibility for the determination "rest[ed] elsewhere." *Caldwell* at - -. By telling Caro's jury that other juries had made the decision to impose the death penalty in other cases, the prosecutor was stating the simple truth that they would not be the first in our system of justice to reach such a weighty decision. But that observation did not carry any message that the jury in this case should not feel entirely responsible for the decision that lay before them, and only them.

Finally, in his continuing remarks, the prosecutor stated:

> You'll be asked to make one judgment, and it's this: Is the death penalty for Carolos Caro justified? Is it justified? And you have this balancing test of aggravators and mitigators, and you must come to a decision. And if you collectively and unanimously find that the death sentence is, in fact, justified, then what do you do? Well, the law tells you, Judge Jones will tell you, and it's before you, if you determine that the weighing process does justify a death sentence, you should impose that sentence. That's the law. The law commands if you find it to be justified, you should impose it. Petition at 98.

98

In this way, the prosecutor again clearly *emphasized* the jury's responsibility to weigh the aggravating and mitigating factors and clarified that only if they found that in the weighing process a death sentence was *justified*, should they should impose that sentence. The comments were within the boundaries of the law, consistent with the court's instructions, and nothing in these remarks was in violation of the Eighth Amendment, nor in conflict with the holding in *Caldwell*.

Finally, a collateral attack under § 2255 may not substitute for an appeal. Claims regarding trial errors that could have been, but were not raised on direct appeal are barred from review under § 2255, unless the defendant shows cause for the default and actual prejudice resulting from such errors or demonstrates that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack because he is likely actually innocent of criminal conduct. *See United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir.1999) (citing *United States v. Frady,* 456 U.S. 152, 167–68 (1982)). Caro could have, but did not raise this *Caldwell* challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore procedurally defaulted. However, even if the claim were not defaulted, for the reasons above, Caro cannot prevail on the merits of his claim, and his claim should be denied.

<u>REPLY TO CLAIMS FOR RELIEF: DIRECT APPEAL</u>

<u>Claim Nine</u>: Caro complains that his appellate counsel failed to appeal a variety of issues and that his Sixth Amendment right to effective counsel was violated by counsel's failure to pursue certain issues on appeal. *Petition* at 159. His complaint has no merit.

In *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that due process of law requires that a defendant receive effective assistance of appellate counsel on direct appeal. Claims for ineffective assistance of appellate counsel, like those for trial counsel, are properly

analyzed under the two-pronged test of *Strickland.  Smith v. Murray,* 477 U.S. 527, 535–36

(1986) (applying *Strickland* to claim of attorney error on appeal).  The Supreme Court, however,

also has held that appellate counsel has no constitutional duty to raise every nonfrivolous issue

on appeal if counsel, as a matter of professional judgment, decides not to raise such issue on

appeal. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The *Barnes* Court determined that

appellate counsel must be allowed to exercise his reasonable professional judgment in selecting

those issues most promising for review.   *Id*. at 752-53.   The *Barnes* Court specifically stated

that "[a] brief that raises every colorable issue runs the risk of burying good arguments...." *Id.*   In

this case, without the benefit of additional evidence, this Court cannot know or discern counsel's

reasoning in deciding what issues to present on appeal.  However,  such a hearing is unnecessary

in that Petitioner has failed to set forth any issue which if it had been appealed would have

resulted in any different outcome in his case, and has therefore failed to show prejudice as

required under the second prong of the *Strickland v. Washington*, 466 U.S. 668 (1984).  *See*

*Griffin v. Aiken*, 775 F.2d 1226, 1235-36 (4th Cir. 1985).[25]

Caro's appellate counsel was not ineffective for failing to challenge the court's refusal to

instruct the jury that the aggravating factors must outweigh the mitigating factors sufficiently and

beyond a reasonable doubt. Claim Nine A.

In Caro's trial pleading titled "Defendant's Response to Issues Regarding Proposed Jury

Instructions," he requested that the Court instruct the jury "that the government must prove

beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating

---

[25] This Court is not required to address the issue whether "counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.  Instead, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,  which we expect will often be so, that course should be followed." *Richardson v. Branker*, 668 F.3d 128, 141 (4th Cir. 2012), quoting *Strickland* at 697; *see also Buckner v. Polk,* 453 F.3d 195, 202 (4th Cir.2006) (following Supreme Court's instruction in *Strickland* to proceed directly to "prejudice" prong if petitioner cannot demonstrate reasonable probability that outcome of trial would be different but for counsel's performance).

factors in order to justify the death penalty." The Court did not accept Caro's instruction. In the Court's Instruction No. 6, regarding "Aggravating Factors," the District Court instructed the jury that they must consider the factors separately, and that they "must decide for each one whether you unanimously agree that it has been proved by the government beyond a reasonable doubt, . . . ." In the Court's Instruction No. 9, regarding "Weighing Aggravation and Mitigation," the Court instructed the jury, "You must determine whether the proven aggravating factors sufficiently outweigh any proven mitigating factors to justify a sentence of death." CITE. The Court instructed the jury that "What constitutes sufficient justification for a sentence of death in this case is exclusively left to you. . .. If you unanimously find that the comparative weight of the aggravating factor or factors is sufficient to justify a sentence of death, answer "Yes" on the Special Verdict Form, Part III-A . . . ."

"The Supreme Court has repeatedly has emphasized that key to harmonizing a capital sentencing scheme with the proscription against cruel and unusual punishment is an individualized determination by the jury of whether, taking into account all the relevant aggravating and mitigating factors, a death sentence is appropriate in a particular case." *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007), citing *Tuilaepa v. California,* 512 U.S. 967, 973 (1994); *Zant v. Stephens,* 462 U.S. 862, 879 (1983). The Court has held that the jury's discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id*., citing and quoting *Gregg,* 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.). However, once a jury has concluded that a defendant is eligible for the death penalty, "it may be given unfettered discretion in the weighing process." *Id*., citing *Tuilaepa,* 512 U.S. at 979 (explaining that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision"); *see also Ayers v. Belmontes,* 549

U.S. 7 (2006). Caro's argument that the jury should have been further instructed, requiring that they find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors is foreclosed by these precedents.

In further support, the Government notes that the FDPA does not set out a reasonable doubt standard in the portion of the statute that deals with weighing aggravating and mitigating factors. *See* 18 U.S.C. § 3593(e). The statute does refer to the reasonable doubt standard in two other sections. *See id.* §§ 3591(a)(2), 3593(c). Because the inclusion of a term in one part of a statute is persuasive evidence that its omission elsewhere is deliberate, *see Green,* 407 F.3d at 443, it is apparent that Congress did not intend the reasonable doubt standard to apply to the weighing process. For that reason, the instructions that the Court gave regarding how the jury should weigh the aggravating factors and mitigating factors, that is, without Caro's requested instruction requiring that they find beyond a reasonable doubt that the aggravators outweighed the mitigators, was not in conflict with the statute and he was not harmed by the instruction given. Caro relies upon two Circuit Court cases, *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008) and *Sampson*, 486 F.3d 13, in support of his argument that his appellate counsel should have challenged the district court's refusal to give his requested instruction. *Pet*. at 161-162. But neither of these cases provides a basis upon which this Court could conclude that the jury in this case was improperly instructed, or that as a result, Caro's appellate counsel was ineffective for failing to object to the instruction.

In *Sampson*, the district court did give an instruction which went beyond the Caro Court's instructions. *See Sampson*, 486 F.3d at 30. The Sampson Court instructed the jury in pertinent part, "[h]owever you personally define sufficiency, the prosecution must convince you beyond a reasonable doubt that the aggravating factor or factors sufficiently outweigh the mitigating

factors to make death the appropriate penalty in this case." *Id.* Nonetheless, Sampson appealed, arguing (in part) that the instructions failed to require that the jury find beyond a reasonable doubt that aggravating factors outweighed mitigating factors before voting to impose the death penalty. *Id.* at 29. Finally, the *Sampson* Court pointed to the Supreme Court's decision in *Tuilaepa*, 512 U.S. at 979, for the holding by that Court that "once a jury has found a defendant death-eligible, it may be given unfettered discretion in the weighing process." *Id.* at 31. The *Sampson* Court, in reliance on *Tuilaepa*, concluded that Sampson's argument was "foreclosed by these precedents." *Id.* Likewise, Caro's argument is precluded by the Supreme Court's *Tuilaepa* decision. 512 U.S. at 979-980.

In *Fell*, as Caro notes in his Petition, the Court included an instruction telling the jury that they "may find  . . .that the aggravating factors proven, do not, standing alone, justify the imposition of death beyond a reasonable doubt." 531 F.3d at 234. But the issue (pertaining to the jury instructions) that the *Fell* Court was considering was whether "the overlap of aggravating factors necessarily skewed the jury's decision-making in favor of the death penalty." [26] *Id.* Thus, though the district court's instruction was different from Caro's, the holding in *Fell* does not constitute legal precedent sufficient to support Caro's argument.

Finally, Caro's reliance upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, including *Ring v. Arizona*, 536 U.S. 584 (2002), is equally unhelpful to his argument. As he recognizes, the Supreme Court in *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at

---

[26] The "district court in *Fell* instructed the jury to consider three statutory aggravating factors and four non-statutory aggravating factors, as well as nineteen mitigating factors. " *Fell*, 531 F.3d at 234. Fell argued on appeal "that three of the non-statutory aggravating factors substantially overlapped because they rest on the same factual predicate-that Fell intentionally participated in the death of King." *Id.* Fell argued that "by finding this fact, the jury could more easily find aggravating factors and then more easily find that those factors outweighed the mitigating factors presented by Fell." *Id.* at 235.

490; *Pet*. at 160.  Shortly thereafter, the *Ring* Court addressed a challenge to Arizona's capital sentencing scheme, under which a judge, after a jury finding of guilt for first-degree murder, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.  *Ring v. Arizona*, 536 U.S. at 584.  The *Ring* Court held that the Arizona statute violated the Sixth Amendment right to a jury trial in capital prosecutions, and in so doing, overruled *Walton v. Arizona,* 497 U.S. 639 (1990), "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Id.* at 585.   Nothing in the record of Caro's case implicates the holdings in *Apprendi* or *Ring v. Arizona*, and in light of the Supreme Court's holding in *Tuilaepa, id*., Caro cannot say that his attorney was ineffective for failing to challenge the district court's instruction in this case, or that the outcome of his case would have been different in light of such an appeal.  For all the above reasons, Caro's claim should be denied.

Caro argues that his appellate counsel was ineffective for failing to argue that the government violated the order of the district court regarding the presentation of specific acts of violence by inmates other than Caro to prove future dangerousness. Claim Nine-C**.**  His complaint has no merit

Caro's complaint is closely related to his claim in issue Six-I, *supra*, wherein he argues that his trial counsel was ineffective for failing to object to the government's presentation of testimony during the direct examination of its rebuttal witnesses Daniel Olson  and Gregory Hershberger, and during the cross-examination of defense witness Dr. Cunningham.  *See Petition* at 133.   Here, Caro claims that his appellate counsel was also ineffective for failing to raise the same argument on direct appeal.  *Petition* at 168.

In evaluating Petitioner's claim, this Court applies the familiar *Strickland* standard, *Richardson v. Branker,* 668 F.3d 128, 139–40 (4th Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 441 (2012) (noting that in the context of an ineffective assistance of appellate counsel claim, the "proceeding" at issue is the forum in which the petitioner's appeal was heard). It is well-established that appellate counsel need not raise on appeal every nonfrivolous issue requested by a defendant. *Jones v. Barnes,* 463 U.S. at 752. Indeed, " '[w]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Jones,* 463 U.S. at 751–52). For reasons similar to those set forth in its response in Six-I, incorporated by reference herein, Caro cannot establish either the performance or prejudice prongs under *Strickland,* and he is therefore not entitled to relief on this issue. *See Strickland*, 466 U.S. at 690, 694.

Caro's appellate counsel challenged the district court's denial of his motion for discovery under *Brady*, the denial of his motions for Rule 17(c) subpoenas, and his discovery motion under Federal Rule of Criminal Procedure 16(a)(1)(E).[27] *See Caro*, 597 F.3d at 619-22. Regarding Caro's challenge under Rule 16, the appellate Court noted that Caro only asserted that subsection (i) of Rule 16 applied.[28] *Id*. at 620-21. The Court therefore focused on

---

[27] The Fourth Circuit agreed with the District Court's decision denying Caro's *Brady* motion on the grounds that "Caro failed to establish that the information requested would be favorable to him." *Id*. at 619. The Court concluded that Caro could "only speculate as to what the requested information might reveal," and therefore that he could not satisfy *Brady's* requirement that the requested material would be favorable to him. *Id*. The Court also found that the District Court did not abuse its discretion in denying Caro's motion for Rule 17 subpoenas, because "'a Rule 17 subpoena *duces tecum* cannot substitute for the limited discovery otherwise permitted in criminal cases and the hope of obtaining favorable evidence does not justify the issuance of such a subpoena.'" *Id.* at 620, quoting *Caro*, 461 F.Supp.2d at 481.

[28] Rule 16, as the Court noted, provides in pertinent part:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and :

subsection (i) of Rule 16, and in doing so, concluded that the District Court had not abused its

discretion "by finding that the requested information was not 'material to preparing the

defense.'" *Id*. at 622-23; Fed. R. Crim. P. 16(a)(1)(E)(i).  In its footnote 14, the Court of Appeals

stated,

> "When asked during oral argument whether Caro asserted any claim arising from the government having violated the district court's order that it 'may not rely on specific instances of inmate violence  (other than the defendant's own) in seeking to prove his future dangerousness,' *Caro*, 461 F.Supp.2d at 482, counsel for Caro stated that she noted the governments misconduct merely to bolster her argument about subsection (i).  Regardless of whether subsection (ii) would apply, we cannot grant relief that Caro plainly failed to request." *Caro*, 597 F.3d at 612, n.14.

Footnote 14 thus pertains to the question of whether subsection (ii) of Rule 16 would

have applied to require disclosure of material that "the government intends to use in its case-in-

chief at trial." *Caro*, 597 F.3d at 621, n.14; Fed. R. Crim. P. 16(a)(1)(E).  As already stated, the

testimony Caro objects to was not introduced in the government's case-in-chief, but in rebuttal

and on cross-examination, of Cunningham.[29]  The court's order was premised on the language

of Rule 16(a)(1)(E)(ii) and the government's representation that it would not introduce "any of

the requested data in its own case." *Caro*, 461 F.Supp.2d at 481-82.  The court noted, however,

that "[i]f the defendant is convicted, the government will likely introduce evidence in the

sentencing phase of the trial that he poses a threat of danger to prison staff and other inmates if

---

    (i)       The item is material to preparing the defense;

    (ii)      The government intends to use the item in its case-in-chief at trial; or

    (iii)     The item was obtained from or belongs to the defendant.

Fed.R.Crim.P. 16(a)(1)(E); *Caro*, 597 F.3d at 620.

[29] The record reflects that the government presented evidence in support of the alleged aggravators, which focused on Caro's own obduracy, that is his recidivism and lack of rehabilitative potential.  It was in response to the government's case-in-chief that Dr. Cunningham testified regarding the ability of the BOP to house Caro securely. And it was in rebuttal to the defense, specifically Dr. Cunningham's testimony, that the government presented its cross-examination of Dr. Cunningham, and its rebuttal witnesses Olson and Hershberger.

he is imprisoned, rather than put to death. In rebuttal, the defendant may produce evidence that if the defendant is incarcerated at Florence ADMAX, particularly in the Control Unit, he will not be a future threat to others." *Caro*, 461 F.Supp.2d at 481. The district court's order did not address or preclude the possibility that the government might, in rebuttal to the defense testimony, present evidence pertaining to specific instances of violence by others. The Court was properly considering Caro's request within the parameters of Rule 16, which does not require disclosure of rebuttal material. Fed. R. Crim. P. 16(a)(1)(E). Thus, where Cunningham's testimony opened the door to the government's response, it is unlikely that the Court would have granted any request for discovery, or sustained any objection by Caro to the rebuttal or cross-examination testimony.[30] *See* Fed. R. Crim. P. 16 (a)(1)(E)(ii). For these reasons, the testimony presented by the government did not violate Rule 16 or the district court order, and Caro has not established that his appellate counsel rendered ineffective assistance of counsel in omitting a challenge to this portion of the trial.

It should also be noted that any claim made on appeal would have been subject to plain-error analysis. Fed. R. Crim. P. 52(b); *Jones v. United States*, 527 U.S. 373, 388-89 (1999). At the trial, Caro's counsel understandably, and for the reasons set forth in the response to Six-I, omitted a demand for discovery arising from the presentation of Olson and Hershberger's rebuttal  testimony, and Cunningham's cross-examination, and likewise refrained from objecting to the portions of those presentations which mentioned specific instances of violence by persons

---

[30] Consistent with this view, it must be assumed that Caro's counsel understood that both Olson and Hershberger were rebuttal witnesses, when counsel for the government made specific representations to that fact, see tr. 2/6/2007 at 29, 2/7/2007 at 3.

other than Caro.  Counsel thus failed to preserve the issue for appeal, and review would be only for plain error.  *Id.*  Plain error occurs when there is "(1) . . . error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Foster,* 507 F.3d 233, 249 (4th Cir. 2007).  In that light, Caro cannot establish that his appellate counsel was ineffective under *Strickland* for omitting an argument that the circumstances described herein establish a plain error.

Caro relies on footnote 14 for his assertion that the Fourth Circuit "makes fairly plain that the government's use of specific instances of violence by persons other than Mr. Caro was error because it violated the district court's ruling," and therefore, he was prejudiced by his appellate counsel's failure to raise the issue on direct appeal."  *Petition* at 168.  But Caro's interpretation of the Court's footnote reads meaning into the Court's words which is contradicted by the record .  It is just as likely that the Court was simply explaining why it was not addressing the issue, and not hinting at a factual finding that it declined to make.  But even assuming that the Fourth Circuit had internally concluded that the record reflected error, Caro cannot meet *Strickland's* prejudice prong given the facts and circumstances of this case.  *See Response*, Issue Six-I, *supra*.  Significantly, in consideration of Caro's argument that cumulative error warranted reversal, the Fourth Circuit  concluded that "[a]lthough we recognized several possible errors, they were not widespread or prejudicial enough to have fatally infected Caro's trial or sentencing hearing."  *Caro*, 597 F.3d at 636.  The Court found that "[t]he proceedings below adhered to fundamental fairness," And that "[e]ach aggravating factor determined by the jury was well supported by the record."  *Id.*  Finally, in consideration of whether Caro could have been prejudiced by any of the errors the Court noted, it observed, [w]e cannot see how cumulative error could have caused the

jury to weigh sentencing factors any differently." *Id*. For all these reasons, Caro is not entitled to relief, and his appeal on this issue should be denied.

Caro argues that his appellate counsel was ineffective for failing to argue on direct appeal that the government, in closing argument, violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Claim Nine D. For the reasons set forth in this Response, pertaining to Claim Eight, incorporated herein by reference, Caro fails to establish that his appellate counsel's performance was deficient under *Strickland*. As already noted, appellate counsel need not raise on appeal every nonfrivolous issue requested by a defendant. *Jones v. Barnes,* 463 U.S. at 752.

Further, for the same reasons as set forth in response to Claim Eight, Caro has failed to establish prejudice because he cannot show that there is any reasonable probability that but for his counsel's unprofessional errors, the result of the proceedings would have been any different. *See Strickland*, 466 U.S. at 694.

Caro argues that his appellate counsel was ineffective for failing to argue on direct appeal the systemic challenges he presents in Claims Ten, Eleven, Twelve, Thirteen, Fourteen and Fifteen of this Petition. Claim Nine E. For the reasons set forth in this Response pertaining to those claims, and incorporated herein by reference, Caro fails to establish that his appellate counsel's performance was deficient under *Strickland*. Further, for the same reasons, Caro has failed to establish prejudice because he cannot show that there is any reasonable probability that but for his counsel's unprofessional errors, the result of the proceedings would have been any different. *See Strickland*, 466 U.S. at 694.

Caro next argues that the Government's use of the non-statutory aggravating factor of future dangerousness violated his right to a non-arbitrary sentencing process under the Eighth

Amendment and 18 U.S.C. § 3595(c)(2)(A). Claim Ten. Caro could have, but did not raise this challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore procedurally defaulted. In any event, Caro's argument does not comport with Supreme Court precedent, however.[31] Additionally, Caro's reliance on statistical studies is inappropriate and unpersuasive. As such, Caro's claim should be denied.

    a. *The Future Dangerousness Factor Meets Constitutional Standards of Reliability and is Not Arbitrary*

In *Jurek v. Texas*, the Supreme Court held that a capital sentencing jury may evaluate and consider a defendant's propensity to commit future acts of violence as an aggravating factor weighing in favor of the death penalty. *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976). In rejecting the claim that it was impossible to predict future behavior, the *Jurek* Court recognized that many decisions rendered throughout the criminal justice system, such as bail determinations, sentencing, and parole decisions, are predictions of future criminal conduct of a defendant. *Jurek*, 428 U.S. at 275. Thus, the capital sentencing jury's task in answering the question of future dangerousness was "no different from the task performed countless times each day throughout the American system of criminal justice." *Id.* at 276. Consequently, under *Jurek*, a capital sentencing jury's prediction of future dangerousness is not only Constitutional, but essential. *See United States v. Sampson*, 335 F. Supp.2d 166, 222 (D. Mass. 2004) ("Future dangerousness is certainly relevant to the decision of whether the death penalty is justified in a particular case.").

---

[31] Under 18 U.S.C. § 3595(c)(2)(A), if the Court of Appeals finds that "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," then the Court of Appeals should remand the case for reconsideration under section 3593 or impose a sentence other than death. Caro appears to argue that by considering future dangerousness, the jury imposed the death penalty based on an "arbitrary factor." As such, Caro's 3595(c)(2)(A) claim rests solely on whether future dangerousness is an aggravating factor that is constitutionally reliable to assure that the death penalty is not being arbitrarily imposed.

While the Court recognized that predicting future behavior was "not easy," *Jurek*, 428 U.S. at 274, the Court has not deviated from its holding in *Jurek*. *See California v. Ramos*, 463 U.S. 992, 1003 (1983) ("[T]he Briggs Instruction focuses the jury on the defendant's probable future dangerousness. The approval in *Jurek* of explicit consideration of this factor in the capital sentencing decision defeats respondent's contention . . . ."); *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) ("This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial."). Indeed, the Court has affirmed a death sentence where the jury determined future dangerousness based in part on lay witness testimony about unadjudicated acts of violence committed by the defendant both prior and subsequent to the instant capital murder. *See Johnson v. Texas*, 509 U.S. 350 (1993). And, the Court has affirmed the government's use of expert testimony to establish future dangerousness. *See Barefoot v. Estelle,* 463 U.S. 880, 897–99 (1983), *superseded in part by statute,* Pub.L. No. 104–132, § 102 (1996) (28 U.S.C. § 2253(c)), *as recognized in Slack v. McDaniel,* 529 U.S. 473, 480–81 (2000). Finally, the Court has approved consideration of a defendant's future dangerousness as both a statutory and non-statutory aggravating factor in capital sentencing. *See California v. Ramos*, 463 U.S. at 1008 ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment"); *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) ("Although South Carolina statutes do not mandate consideration of the defendant's future dangerousness in capital sentencing, the State's evidence in aggravation is not limited to evidence relating to statutory aggravating circumstances.").

Applying these precedents, the Fourth Circuit has consistently upheld consideration of future dangerousness as an aggravating factor. *E.g.*, *United States v. Runyon*, 707 F.3d 475, 505

(4th Cir. 2013) (permitting the introduction of unadjudicated conduct to support non-statutory aggravators for future dangerousness); *United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009) ("The Supreme Court has recognized future dangerousness as a legitimate aggravating factor in capital proceedings."); *Eaton v. Angelone,* 139 F.3d 990, 998 (4th Cir. 1998) (denying habeas relief, upholding state capital sentencing scheme that considered a defendant's future dangerousness).

In citing to studies that suggest predictions of future dangerousness are often wrong, Caro argues that the court should deviate from the controlling law of *Jurek* and its progeny. Caro cannot point to a single case in which a court determined that the future dangerousness aggravating factor failed to meet the Constitutional standards of reliability, however. Even the district court in *Sampson*, the one court decision cited by Caro that called into question a jury's ability "to predict reliably whether a murderer is likely to commit violent crimes again," ultimately concluded that it could not strike down the future dangerousness factor based on the "relatively recent studies" cited by the defendant because the Supreme Court's opinion in *Jurek* and *Barefoot* controlled. *See United States v. Sampson*, 335 F.Supp.2d 166, 218-23 (D. Mass. 2004).

Moreover, the reliability concerns raised by Caro in the instant motion are not new considerations. Rather, Caro repeats the argument reviewed and refuted by the Supreme Court in *Barefoot*. Specifically, in *Barefoot*, the Supreme Court recognized that some studies indicated that predictions of future dangerousness were often wrong. *Barefoot*, 463 U.S. at 901 n. 7. Regardless, this did not render consideration of future dangerousness unconstitutional because "[a]ll of these professional doubts about the usefulness of psychiatric predictions can be called to the attention of the jury." *Id*.

Because *Jurek* is still controlling law, the Government asserts that future dangerousness, as a non-statutory aggravating factor, meets the Constitutional standards of reliability.

b. *Defendant's Reliance on Statistical Studies is Inappropriate and Unpersuasive*

In *McCleskey v. Kemp*, the Supreme Court discussed the inappropriate and unpersuasive nature of statistical studies offered by the defendant to "prove" the unconstitutional nature of the capital sentencing process. *McClesky v. Kemp*, 481 U.S. 279 (1987). The *McCleskey* defendant presented statistical studies to prove Georgia jurors were imposing the death penalty in a racially discriminatory manner. The studies purported to show that black defendants were statistically far more likely to be condemned to death by a Georgia jury than similarly situated white defendants, particularly when the victim was white. *Id*. at 286-87.

The defendant in *McCleskey* urged the Court to change the sentencing procedure without support from case law or statute, relying solely on statistical studies. Now, Caro wishes for this Court to do the same thing. The *McCleskey* Court refused to consider the statistical studies, describing the studies as the sort of anecdotal data best suited to sway politicians, not judges; and as a result, found the defendant's argument meritless. *Id.* at 319 ("It is the legislatures, the elected representatives of the people that are 'constituted to respond to the will and consequently the moral values of the people.' Legislatures also are better qualified to weigh and 'evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts,' . . . It is the ultimate duty of courts to determine on a case-by-case basis whether these laws are applied consistently with the Constitution.")(internal citations omitted). This Court should follow suit and find Caro's statistical studies equally inappropriate and unpersuasive.

Additionally, the two statistical studies cited by Caro were written by Dr. Mark D. Cunningham. Although these studies suggest that predictions of future dangerousness are completely unreliable, Dr. Cunningham made predictions of future dangerousness in this case. *United States v. Caro*, 597 F.3d 608, 616, 626 n.18 (4th Cir. 2010) (Cunningham testified "that Caro would be unlikely to endanger anyone during a life sentence because the BOP would adequately secure Caro," but Cunningham admitted that "in the general population of a U.S. penitentiary, there is a very high risk that Mr. Caro would seriously injure someone else."); *see also*, *United States v. Barnette,* 211 F.3d 803, 810 (4th Cir. 2003) (Cunningham "conclude[ed] that there was little likelihood Barnette would commit future violent acts in prison."); *Martinez v. Dretke,* 173 F. App'x 347, 350 (5th Cir. 2006) (per curiam) ("Cunningham testified that there was only a small chance that a person like Martinez would commit future acts of violence in prison").

While Dr. Cunningham seems to frequently opine on the unlikelihood of a capital defendant being a future danger, Caro claims that neither jurors nor experts can reliably determine which such offenders pose a danger. Caro cannot have it both ways. Future dangerousness is either a characteristic that may reliably be predicted or it is not.

For the above-stated reasons, Caro's claim that the use of future dangerousness as an aggravating factor violated his right to non-arbitrary sentencing under the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(A), should be denied.

Claim Eleven: Caro charges that the federal death penalty act is rendered unconstitutional because it allows prosecutorial and jury discretion. Relying on *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), he argues that the Federal Death Penalty Act allows the death penalty to be imposed in a way that is inconsistent and unpredictable, and that it is therefore unconstitutional.

*Petition* at 179. As the First Circuit aptly stated in an analogous case, however, "[t]his argument mistakes the nature of the arbitrariness concern in the Supreme Court's jurisprudence. . . . [T]he primary emphasis of the Court's death penalty jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness." *United States v. Sampson*, 486 F.3d 13, 24 (1st Cir. 2007). Likewise, "[t]his argument ignores the remainder of the *Eddings* Court's discussion of consistency, in which the Court recognized that 'a consistency produced by ignoring individual differences is a false consistency.'" *Id.* at 24 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)).

Instead, nuance and guided discretion are crucial to the proper functioning of the criminal justice system. After all, "[t]he capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation." *McCleskey v. Kemp*, 481 U.S. 279, 311 (1987) And "a capital punishment system that did not allow for discretionary acts of leniency 'would be totally alien to our notions of criminal justice.'" *Id.* at 312 (quoting *Gregg v. Georgia*, 428 U.S. 153, 199 n.50 (1976)). At most, the evidence offered by Caro demonstrates the exercise of some discretion, not the exercise of discretion arbitrarily and capriciously.

In support of the alleged inconsistencies, Caro provides thirty-four extremely short summaries of various death penalty cases. *Petition* at 180-84. He likewise includes lists of facts related to "every authorized federal death penalty case from 1988 until 2003." *Petition, Exs*. 12-22. These fact summaries are unhelpful; much more detailed information would be required to make any meaningful comparison between cases. Absent a showing of arbitrariness and

capriciousness, Caro would need to be able to show that other similarly situated defendants did not receive the death penalty. *See McCleskey*, 481 U.S. at 306-07. He has entirely failed to do so.

The evidence provided by Caro is no evidence at all of arbitrary or capricious imposition of the FDPA but rather too-brief statements of no value to an assessment of his claim. *Accord Sampson*, 486 F.3d at 25 ("In all events, the 'evidence' that Sampson submits is wholly inadequate to prove that the death penalty has been imposed in an arbitrary manner. The summaries on which Sampson relies to demonstrate inconsistency are devoid of details and fail to account for the objective circumstances of the underlying crimes."). By failing to disclose sufficient individual detail that could account for individual variations, Caro's evidence proves nothing at all. Furthermore, Caro's claim that the government has the burden of demonstrating a principled basis for distinguishing these cases, *Petition* at 184, is completely unsupported by any case law. *See United States v. Williams*, S100CR.1008(NRB), 2004 WL 2980027 at *6 (S.D.N.Y. Dec. 22, 2004), *aff'd*, 506 F.3d 151 (2d Cir. 2007). Ultimately, there is no basis on which this Court should under the Federal Death Penalty Act "find[] that similar cases are treated differently." *Sampson*, 486 F.3d at 25. Caro's claim should therefore be rejected.

In a similar vein, Caro next contends that the federal capital punishment system is imposed on the basis of race and geography and that it is therefore unconstitutional. Claim Twelve. *See Petition* at 185, 188. He requests that his sentence be vacated on this ground. *Id.* at 185. Although he requests a comprehensive hearing explaining the charging practices of the DOJ, he does not explain specifically which "constitutional violations" have occurred. *See id.* 188. Assuming that his basis for asking for his sentence to be vacated is on the basis of a violation of either his Fifth or his Eighth Amendment rights, his claims are entirely unavailing.

116

Furthermore, he provides insufficient evidence to support any claim for a hearing about discriminatory practices; this claim should therefore also be rejected.

### A. The Decision of the Supreme Court in McClesky v. Kemp Is Controlling

The Supreme Court, in *McCleskey v. Kemp*, 481 U.S. 279 (1987), set the standard for what proof was required to show a violation of a defendant's right to equal protection.[32] "[T]o prevail under the Equal Protection Clause, [a defendant] must prove that the decision makers in *his* case acted with discriminatory purpose." *Id.* at 292. The Court elaborated that in some circumstances, as in a Title VII case, statistical evidence may be inferential support for a conclusion of discriminatory intent. But "the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII case. In those cases, the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions." *Id.* at 294-95 (footnote omitted). In the capital punishment context, "absent far stronger proof" of individualized discriminatory intent, "it is unnecessary to seek . . . rebuttal" of statistical evidence of discriminatory impact, "because a legitimate and unchallenged explanation for the decision is apparent from the record: [the defendant] committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty." *Id.* at 296-97. "Similarly, the policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, 'often years after they were made.'" *Id.* at 296 (footnote omitted).

The imposition of the penalty in the instant case was permitted by the United States Constitution and the Federal Death Penalty Act. All that Caro has provided is bare statistical

---

[32] Although *McCleskey* dealt directly with claims brought under the Fourteenth Amendment, the analysis under *McCleskey* has applied to both Fifth and Eighth Amendment claims brought under the Federal Death Penalty Act in this way. *See United States v. Sampson*, 486 F.3d 13, 26 (1st Cir. 2007).

data.[33] This is exactly what *McCleskey* holds insufficient. Caro does not even attempt to distinguish his case from *McCleskey*. Based on binding precedent from the Supreme Court, Caro's claims should be rejected.

***B. The Specific Statistical Evidence Offered By Caro Does Not Provide Any Basis For Distinguishing* McCleskey**

Notwithstanding the fact that Caro has provided different statistical evidence, *McCleskey* still directly controls because there are no material differences in the statistics provided. Specifically, they are no more probative of whether the statistical discrepancies should be attributed to discriminatory motive or the plethora of other possible factors. In fact, the First Circuit rejected an identical argument made by a capital defendant and based on the same DOJ study and supplement as the one referenced by Caro. The First Circuit analyzed both the Fifth and Eighth Amendment claims brought in that case, held that *McCleskey* controlled, and rejected the claims. *See United States v. Sampson*, 486 F.3d 13, 26 (1st Cir. 2007). In the words of that court, "[t]he statistics submitted by Sampson are no more probative than those rejected in *McCleskey*. The DOJ study provides no basis for attributing the statistical discrepancies with respect to geography and race in FDPA prosecutions to discrimination rather than to other factors, such as differences in the nature of the crimes involved." *Id.* at 26-27. The Ninth Circuit, like the First Circuit, has given exactly the same response to a challenge to the federal death penalty act on exactly the same grounds and statistical evidence. *See United States v. Mitchell*, 502 F.3d 931, 982 (9th Cir. 2007) (applying *McCleskey* to reject an identical argument to the one in *Sampson* and in the instant case that was also based on the same statistics). For the same reasons elaborated by the Supreme Court in *McCleskey* and the First Circuit in *Sampson*, this

---

[33] Statements by individuals that they are troubled by racial disparity in capital sentencing are in no way probative of discriminatory intent in charging practices. Such statements are therefore not evidence of discriminatory intent.

Court should hold that Caro has failed to show discriminatory intent sufficient to make out a Fifth or Eighth Amendment claim.

**C. Caro Provides No Evidence of Discriminatory Effect or Intent, and Therefore His Request for a Hearing Is Entirely Unsupported**

Caro requests a hearing on the issue of the Department of Justice's capital charging practices, claiming that he is entitled to know what is "behind the numbers." *Petition* at 188. Caro is simply wrong; he is not entitled to a hearing on this issue. The only way in which he would be entitled to information about the capital charging practices of the Department of Justice would be if he could demonstrate both that similarly situated defendants of a different race were not prosecuted and that prosecutors in his case acted with discriminatory purpose. Because the statistics he offers show nothing about similarly situated defendants, and because he provides no evidence of discriminatory intent specific to his case, his request for a hearing should be denied. Precedent regarding the standard required for discovery for a claim of selective prosecution is instructive. *See United States v. Barnes*, 532 F. Supp. 2d 625, 636-37 (S.D.N.Y. 2008) (applying the selective prosecution standard to reject a claim that a defendant against whom the death penalty was sought was entitled to an "explanation"). This standard is a high hurdle that cannot be met by Caro's bare statistics.

In the words of the Supreme Court, "a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent. . . . [T]he defendant must make a 'credible showing' that 'similarly situated individuals of a different race were not prosecuted.'" *United States v. Bass*, 536 U.S. 862, 863 (2002) (quoting *United States v. Armstrong*, 517 U.S. 456, 465, 470 (1996)). Likewise, "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *Id.* at 864. Furthermore, a defendant seeking a hearing on a selective prosecution claim must provide

evidence of discriminatory intent specific to his case. He must credibly demonstrate that "that the decision to prosecute was 'invidious or in bad faith.'" *United States v. Olvis*, 97 F.3d 739, 743-44 (4th Cir. 1996). And "statistical evidence of racial disparity alone cannot establish any element of a discrimination claim," including a claim of bad faith. *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012), as amended (Feb. 15, 2012). For all of these reasons, Caro has not carried his burden to show that he is entitled to a hearing. His request should be rejected.

Claim Thirteen: Caro charges that the death penalty is categorically cruel and unusual punishment.  He concedes that the death penalty is not cruel and unusual per se under the Supreme Court's jurisprudence. "[T]he death penalty is not a form of punishment that may never be imposed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *accord id.* at 226 (opinion of  White, J., joined by Burger, C.J., and Rehnquist, J). *See also McCleskey v. Kemp*, 481 U.S. 279, 300-05 (1987); *Kansas v. Marsh*, 548 U.S. 163, 174 (2006). This Court has definitively recognized that the argument that the death penalty is per se unconstitutional is unavailing. *United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010). Caro's argument is simply foreclosed by the longstanding, binding precedent of the Supreme Court and the Fourth Circuit.

Claim Fourteen:  Caro argues that the federal capital punishment system at the time of his trial violated international law. *Petition* at 189.  More specifically, Caro argues that under the Convention on the Elimination of All Forms of Racial Discrimination ("CERD"), adopted Dec. 21, 1965, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights ("ICCR"), adopted  Dec. 16, 1996, 999 U.N.T.S. 171, "statistical evidence of racial disparity is enough to warrant – and require – corrective action by the United States." *Petition at 189-190*. Caro argues that under CERD, specifically, "the United States must take action to correct

governmental policies that have a discriminatory effect, regardless of whether they also have a discriminatory purpose." Caro points out that the ICCPR, addresses the administration of capital punishment, and that it provides that " '[n]o one shall arbitrarily deprived of his life.'" *Petition* at 190; ICCPR, pt. 3, art. 6, § 1, 999 U.N.T.S. 171.

Questions such as those raised by Caro relating to the relationship of international treaties and the application of the death penalty, are decided according to American constitutional law. *See Celestine v. Butler,* 823 F.2d 74, 79-80 (5th Cir.1987), *cert denied* 483 U.S. 1036 (1987)(Petitioner, alleging racial discrimination, claimed that treaties of which the United States was a signator superseded Louisiana law under the Supremacy Clause. The court held that "how these issues are to be determined is settled under American constitutional law."). In general, federal courts to have considered similar arguments have rejected them. For example, in *Buell v. Mitchell,* 274 F.3d 337, 370-372 (6th Cir.2001), the Sixth Circuit held that the Ohio death penalty does not violate the International Covenant or any other international agreements entered into by the United States, because these agreements do not specifically outlaw the death penalty, and to the extent that they ban cruel and unusual punishment, the United States has included reservations preserving the right to impose the death penalty within the limits of the U.S. Constitution. *See also United States v. Bin Laden et al.,* 126 F.Supp.2d 290, 294 (S.D.N.Y.2001). In fact, the undersigned has found no case in which a federal court has ever held that international law superseded the FDPA. *See, e.g., Hain v. Gibson,* 287 F.3d 1224, 1243–44 (10th Cir.2002); *Buell v. Mitchell,* 274 F.3d 337, 337-76 (6th Cir. 2001); *Coleman v. Mitchell,* 268 F.3d 417, 443 (6th Cir.2001); *White v. Johnson,* 79 F.3d 432, 440 n. 2 (5th Cir.1996); *Bemore v. Cullen,* No. 08–311, 2011 WL 1044633 (S.D.Cal. Mar. 22, 2011); *United States v. Williams,* No. 06–79, 2007 U.S. Dist. LEXIS 73775, at *20–21 (D.Haw. Oct. 2, 2007);

*United States v. Perez,* No. 3:02–7, 2004 WL 935260 (D.Conn. Apr. 29, 2004); *United States v. Quinones,* No. 00–761, 2004 WL 1234044 (S.D.N.Y. June 3, 2004); *United States v. Bin Laden,* 126 F.Supp.2d 290, 294 (S.D.N.Y.2001).[34]

Relief under § 2255 does extend to treaty violations. *Wesson v. U.S. Penitentiary Beaumont, TX*, 305 F.3d 343, 348 (5th Cir. 2002), citing *Davis v. United States,* 417 U.S. 333, 344 (1974). But "[i]n ratifying the ICCPR, the United States specifically reserved the right to impose capital punishment subject only to U.S. Constitutional restraints." *Perez*, citing International Covenant on Civil and Political Rights (ICCPR), opened for signature Dec. 19, 1966, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) (ratified by United States on Sept. 8, 1992). Moreover, the United States also made clear in its ratification of the ICCPR that it "considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States." *Id.* Thus, the United States has made clear that it is bound only by the Constitution in its application of capital punishment, and not by any contrary interpretation of the ICCPR. Further, with respect to the ICCPR and the CERD, the United States expressly declared upon ratification that "the provisions of the Convention are not self-executing." *See United States v. Perez*, 3:02CR7(JBA), 2004 WL 935260 (D. Conn. Apr. 29, 2004)(internal citations and quotations omitted); *accord Dutton v. Warden, Fed. Corr. Inst. Estill, 37 Fed.Appx. 51, 53 (4th Cir. 2002) (unpublished) ("[T]he ICCPR is not privately enforceable.")*;; *Ruhaak v. Commissioner of Internal Revenue*, 422 Fed.Appx. 530, 532 (7th Cir. 2011); *Kanli v. Duke University*, 1:12CV63, 2012 WL 2366449

---

[34] One federal district court in Ohio observed in 2007, that "[s]ince the reinstatement of the death penalty in *Gregg v. Georgia,* 429 U.S. 875 (1976), the Supreme Court has never relied on those international agreements to find a death penalty unconstitutional. *Montgomery v. Bagley,* 482 F.Supp.2d 919, 1000 (N.D.Ohio 2007).

(M.D.N.C. June 21, 2012). Because the treaties are not self-executing, neither the ICCPR nor CERD bind federal courts and Congress has yet to enact implementing legislation. *Buell* 274 F.3d at 372 (collecting cases); see also *Grandison v. Corcoran* 78 F.Supp.2d 499, 517 (D.Md. 2000), citing *White v. Johnson,* 79 F.3d 432, 440 n. 2 (5th Cir.), *cert. denied,* 519 U.S. 911 (1996)("The federal courts have observed that the ICCPR gives no more protection in criminal prosecutions, including death penalty cases, than that afforded by the Constitution."). Thus, habeas relief is not available to Caro regarding his claims in Issue Fourteen. *See United States, ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002); *accord Dutton v. Warden, FCI Estill,* 37 Fed.Appx. 51 at *1 (4th Cir. 2002) (detailing congressional history of treaty). For these reasons, Claim Fourteen should be denied.

Claim Fifteen: Caro argues in his Claim Fifteen, that "the preclusion of 'plain-error' review by the Federal Death-Penalty Act renders the statute unconstitutional. *Petition at 191-194.* As a preliminary matter, the government argues that Caro could have, but did not raise this challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore procedurally defaulted. A collateral attack under § 2255 may not substitute for an appeal. Claims regarding trial errors that could have been, but were not raised on direct appeal are barred from review under § 2255, unless the defendant shows cause for the default and actual prejudice resulting from such errors or demonstrates that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack because he is likely actually innocent of criminal conduct. *See United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir.1999) (citing *United States v. Frady,* 456 U.S. 152, 167–68 (1982). However, even if this claim were not defaulted, for the reasons below, Caro cannot prevail on the merits, and his appeal in this regard should be denied.

There is nothing in the FDPA that would preclude plain error review.  The FDPA

provides in pertinent part:

(b)  Review.  The court of appeals shall review the entire record on the case, including - -

(1) the evidence submitted during the trial;

(2) the information submitted during the sentencing hearing;

(3) the procedures employed in the sentencing hearing; and

(4) the special findings required under section 3593(d).

(c)  Decision and disposition.

(1) The court of appeals shall address all substantive and procedural issues raised
on the appeal of a sentence of death, and shall consider whether the sentence of
death was imposed under the influence of passion, prejudice, or any other
arbitrary factor and whether the evidence supports an aggravating factor required
to be considered under section 3592.

(2)  Whenever the court of appeals finds that - -

(A) The sentence of death was imposed under the influence of passion,
prejudice, or any other arbitrary factor;

(B) the admissible evidence and information adduced does not support the
special finding of the existence of the required aggravating factor; or

(C)  the proceedings involved any other legal error requiring reversal of
the sentence that was properly preserved for appeal under the rules of
criminal procedure, the court shall remand the case for reconsideration
under section 3593 or imposition of a sentence other than death.  The court
of appeals shall not reverse or vacate a sentence of death on account of
any error which can be harmless, including any erroneous special finding
of an aggravating factor, where the Government establishes beyond a
reasonable doubt that the error was harmless.

The statute thus provides for review of errors "properly preserved for appeal under the

rules of criminal procedure." 18 U.S.C. § 3595(c).  Fed. R. Crim. P. 52(b) provides that "plain

errors or defects affecting substantial rights may be noticed although they were not brought to

the attention of the court." The Supreme Court has applied plain-error review to jury instruction challenge in an FDPA prosecution, holding that the FDPA "does not explicitly announce an exception to plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme." *See Jones v. United States,* 527 U.S. 373, 389-390 (1999); *United States v. Fell*, 531 F.3d 197, 209-210 (2d Cir. 2008)(citing *Jones*, 527 U.S. at 388-89, and concluding in reliance upon *Jones* that review for plain error in a death penalty case was appropriate for certain evidentiary issues not preserved at trial); *United States v. Cooper*, 91 F. Supp. 2d 90, 99 (D.D.C. 2000)(citing *Jones* in support of conclusion that the FDPA does not preclude plain error review). In light of *Jones*, Caro's argument the FDPA is unconstitutional for failing to allow for plain-error review is without merit and should be denied.

Claim Sixteen: Finally, aggregating the claims discussed above, Caro maintains that the cumulative effect of the alleged errors entitles him to habeas relief. Petition at 194. The cumulative error doctrine affords relief when multiple harmless errors prejudice a defendant to the same degree as a single reversible error. *United States v. Basham,* 561 F.3d 302, 330 (4th Cir. 2009). However, as for ineffective assistance of counsel claims, the Fourth Circuit has emphasized that it evaluates such claims on an individual rather than cumulative basis. *Compare Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir. 1998) (finding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively"), *with Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir. 1989) (finding the consideration of combined errors to be appropriate). The same goes for alleged cumulative errors of the trial court. *See Arnold v. Evatt,* 113 F.3d 1352, 1364 (4th Cir. 1997) (rejecting a claim of cumulative effect of trial court's errors based on rejection of each of the individual court error claims), *cert. denied,* 522 U.S. 1058 (1998); *Mohr v. United States,* No. 03–2893, 2007 WL

2903235, at *10 (D.Md. Sept. 30, 2007) (holding that once the court found no attorney error, there could be no cumulative error); *Robinson v. Conroy,* No. 01–1671, 2002 WL 32785545, at *4 (D.Md. Jan. 16, 2002) ("Because none of the issues raised by Robinson could be considered error, he cannot string them together in hopes of forming a constitutional violation.") Here, because Caro has failed to prove individual constitutional errors by counsel, his claim of cumulative error would fail, even if the law of this Circuit recognized the cumulative error argument. *See Fisher,* 163 F.3d at 852 ("Having just determined that none of counsel's actions could be considered constitutional error ... it would be odd ... to conclude that those same actions, when considered collectively, deprived [the defendant] of a fair trial."). In any case, Caro has failed to prove any constitutional error which warrants relief. Accordingly, his request for relief under the cumulative error doctrine should be denied.

<u>CONCLUSION</u>

Trial counsel was not ineffective in any aspect of their representation of Caro at the pretrial, guilt / innocence, penalty or appellate phases of his case. Nor did the prosecution violate any of Caro's rights by withholding information in violation of *Brady, Giglio* or other material evidence. The systemic challenges raised by Caro are without merit. Accordingly, the United States requests that Caro's petition be dismissed.

<div style="margin-left: 50%;">

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

</div>

Date: <u>June 11, 2013</u>          /s/ Anthony P. Giorno
                        Anthony P. Giorno
                        Assistant United States Attorney
                        Virginia State Bar No. 15830
                        P.O. Box 1709
                        Roanoke, VA  24008-1709

Tel: (540) 857-2250; Fax: (540) 857-2614
Email: anthony.giorno@usdoj.gov

/s/ Jean B. Hudson
Jean B. Hudson
Assistant United States Attorney
Virginia State Bar No. 25870
255 West Main Street, Room 130
Charlottesville, VA  22902
Tel: (434) 293-4283
Email: jean.hudson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have this 11th day of June, 2013, electronically filed the **United States'**

**Motion to Dismiss in Response to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence**

**Pursuant to Title 28, United States Code, Section 2255** with the Clerk of the Court using CM/ECF

system, which will send notification of such filing to all counsel of record.

/s/ Anthony P. Giorno
Assistant United States Attorney