UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Number 1:06CR00001-JPJ |
| vs. | |
| CARLOS DAVID CARO, | DEATH-PENALTY CASE |
| Defendant/Petitioner. | |

_____

OPPOSITION TO UNITED STATES' MOTION TO DISMISS IN RESPONSE TO
PETITIONER'S MOTION FOR RELIEF PURSUANT TO TITLE 28,
UNITED STATES CODE, SECTION 2255

_____

**INTRODUCTION** ........................................................................................1

    A.  Procedural Posture of the Case..................................................................1

    B.  Legal Standard of Review for Motion to Dismiss.....................................2

    C.  Factual Disputes Noted in the Government's Statement of the Case. ......8

        1.  Mr. Caro Disputes that He Was a Gang Leader. ..................................8

        2.  Mr. Caro Disputes the Government's Assertions Regarding Mr. Sandoval's Motivation for Seeking Entry into Mr. Caro's Cell..................................9

        3.  Mr. Caro Disputes the Inferences to Be Drawn from the Statements he Made after the Death of Mr. Sandoval. ......................................................10

        4.  Mr. Caro Disputes the Government's Allegation that Trial Counsel Retained Mental Health Experts "Almost Immediately" After Their Appointment. .........................................................................................11

**GROUNDS FOR RELIEF: PRETRIAL**...............................................11

**CLAIM ONE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED his FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT, WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE.** .......................................................11

**CLAIM TWO: MR. CARO HAS SUFFICIENTLY ALLEGED THE INEFFECTIVE ASSISTANCE OF COUNSEL AT THE DEATH-CERTIFICATION STAGE OF THE CASE.** ..........................................16

    A.  The Issue is Right to Effective Counsel, Not Right to Death-Certification Hearing. .............................................................................................16

    B.  The Sixth Amendment Right to Counsel Applies at the Death Certifcation Stage. .................................................................................................18

    C.  The Court Will Have to Decide the Appropriate Standard of Care for Defense Counsel in Capital Cases.......................................................20

    D.  Whether Trial Counsel's Performance was a Reasonable Strategy is a Disputed Factual Issue. ......................................................................21

    E.  Whether Mr. Caro was Prejudiced by Trial Counsel's Deficient Performance is a Disputed Factual Issue. ..............................................22

**GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE**....................................23

**CLAIM THREE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT JUROR MISCONDUCT INFRINGED HIS RIGHT TO A FAIR TRIAL. ..............23**

A. Federal Rules of Evidence Do Not Apply to Capital Sentencing Proceedings. ..................................................................................................24

B. The Alleged Recent Statements of the Jurors Directly Conflict With Their Prior Voir Dire Answers, Creating a Disputed Issue of Material Fact. .........................24

C. Mr. Caro has Sufficiently Alleged that the Two Jurors Were Not Impartial and Would Have Been Struck for Cause if They Had Provided Truthful Answers in Voir Dire. ..................................................................................................26

D. The Juror-Misconduct Claims Are Not Procedurally Barred Because the Facts Necessary to Adjudicate the Claims Are Outside the Record and Must be Developed.................................................................................................28

**CLAIM FOUR: MR. CARO HAS SUFFICIENTLY ALLEGED THE inEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE. ..........................29**

A. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Develop a Cohesive Theory of Defense. .......................................................................30

   1. Trial Counsel Could Have Presented a Cohesive and Viable Defense Based on a "Cold Dose of Revenge"Theory. ............................................31

   2. Trial Counsel's "Breakfast Dispute" Defense Was Unreasonable Because it Was Inconsistent with the Evidence, Failed to Answer Key Questions, and Added Nothing to the Mitigation Phase of Trial. ......................................34

   3. Mr. Caro's Suggested Defense Is Not a "Fantasy" and the Government's Disagreement with His Allegations Makes Summary Dismissal Improper. ..............36

B. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Impeach the Government's Only Purported Eyewitness, Sean Bullock. ..................................................................................................39

C. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell.................42

D. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence In Support of Self-Defense, Second-Degree Murder, or Manslaughter.............................................................................44

E. The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Mr. Caro's Claim of Ineffective Assistance of Counsel at the Guilt/Innocence Phase of Trial Improper for Summary Dismissal........ 46

**CLAIM FIVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING TRIAL COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ..................................... 47**

A. Mr. Caro's Claim is Not Procedurally Defaulted Because it Relies on Evidence Outside of the Record and Thus Could Not Have Been Raised on Appeal. ..................................................................................................................48

B. The Government Did Not Disclose the Exculpatory Information in a Timely Manner. .............................................................................................................50

C. In Light of the Government's Knowing Misrepresentations, the Evidence Was Not Otherwise Available to Mr. Caro. ..................................................52

D. The Suppressed Evidence Contradicted the Government's Sole Purported Eyewitness and Is Material. ........................................................................53

**GROUNDS FOR RELIEF: PENALTY PHASE .....................................................57**

**CLAIM SIX: MR. CARO HAS SUFFICIENTLY ALLEGED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY PHASE. ......................................................................................................................57**

A. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Challenge the Government's Deliberate and Tactical Delay of Mr. Caro's Indictment........................57

B. Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance was Deficient When They Failed to Adequately Investigate, Develop, and Present a Compelling Mitigation Story About Mr. Caro's Life. ...................................................59

   1. Whether Counsel's Failure to Present Mental Health Evidence Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue. ....................... 62

   2. Whether Counsel's Failure to Present Testimony of Mr. Caro's Brothers Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue. ............ 71

   3. Whether Counsel's Presentation of a Harmful Witness Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.................................... 74

   4. Mr. Caro Has Asserted Facts That, If True, Would Entitle Him to Relief; Summary Dismissal of Claim Six (B) Is Improper. .................................................. 75

C. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful Adversarial Testing. ...................................................................................... 77

D. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's Ability to Control Improper Inmate Communications, and Failed to Subject the Government's Evidence to Meaningful Adversarial Testing. ............................................. 80

E. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning Prison Culture and Statements of Remorse. ................................................................................. 83

F. Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to File a Motion to Set Aside the Benavidez Conviction. .......................................................................................................... 85

G. Mr. Caro has Sufficiently Alleged that Trial Counsel Were Ineffective in Failing to Present Additional *Skipper* Evidence To Rebut Aggravating Evidence. ....... 88

H. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell. ................. 94

I. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instaces of Violence by Persons Other than Mr. Caro. ....................................................................... 95

J. Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Object to The Government's Improper Closing Argument. .......................................................................................................... 99

K. Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Seek Removal of a Sleeping Juror. ........................... 102

L. The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Summary Dismissal of Mr. Caro's Claim of Ineffective Assistance of Counsel at the Penalty Phase of Trial Improper................. 105

CLAIM SEVEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND PRESENTING MISLEADING PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE

**GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ...................................106**

A. The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and its Precedessor Prison, USP-Marion, for More than Three Years. ....................................................107

    1. Mr. Caro's *Brady* Claim is Not Procedurally Defaulted Because it Rests on Evidence Outside the Record. ..........................................................................107

    2. The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence. .......................109

B. The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro Was Not a Gang Leader at USP-Lee. .....................................................................................116

    1. The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence. .......................117

    2. The Government's Contention That Mr. Caro Knew or Should Have Known About the Existence of This Evidence is Mere Conjecture. .........................119

C. The Government's Argument Fails to Address the Cumulative Impact of the Withheld Evidenc, Thereby Making Summary Dismissal Improper..........................120

D. Mr. Caro's Death Sentence, Which Relied on Incomplete, Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment. .......................................................................122

**CLAIM EIGHT: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED THE EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, 472 U.S. 320 (1985), BY MAKING COMMENTS THAT MINIMIZED THE JURY'S RESPONSIBILITY AT THE PENALTY PHASE....................................................123**

**CLAIM NINE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT APPELLATE COUNSEL HAS PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE NON-FRIVOLOUS APPELLATE ISSUES DURING MR. CARO'S DIRECT APPEAL. .............................................125**

A. Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Beyond a Resonable Doubt. ...............................................................................................................127

B. Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty. ................................................................ 132

C. Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Appeal the Government's Use of Specific Acts of Violence by Person's Other Than Mr. Caro. ................................................................ 132

D. Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Argue that the Rule in *Caldwell v. Mississippi* Was Violated by the Government's Minimization of the Jury's Responsibility for a Death Verdict. ........... 135

E. Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Assert Systemic Death Penalty Challenges. ........................................... 135

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES** ....................................... 136

**CLAIM TEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A).** ....................................... 136

**CLAIM ELEVEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING THOSE CASES IN WHICH THE FEDERAL DEATH PENALTY IS IMPOSED FROM THOSE CASES IN WHICH IT IS NOT IMPOSED RENDER THE FEDERAL DEATH-PENALTY ACT UNCONSTITUTIONAL** ....................................... 142

**CLAIM TWELVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.** ....................................... 145

**CLAIM THIRTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT** ................... 147

**CLAIM FOURTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF his TRIAL VIOLATED INTERNATIONAL LAW.** ....................................... 148

A. The ICCPR Is a Self-Executing Treaty. ............................................................... 149

1.   The Doctrine of Self-Execution of Treaties. ...................................................... 149

2.   The Legal Import of the Senate's Declaration Regarding the ICCPR............... 152

B.   The Plain Language of the ICCPR Indicates That Individual Rights Were Created and That the United States Agreed to Provide a Forum and Remedies for the Vindication of Those Rights to Those of Its Citizens Who Claim a Violation of Those Rights. ........................................................................................ 156

C.   The Biased and Disparate Federal Capital Punishment System in Place at the Time of Mr. Caro's Trial Violated the International Covenant on Civil and Political Rights. ........................................................................................................ 158

**CLAIM FIFTEEN:  MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE ACT UNCONSTITUTIONAL. ......... 159**

**GROUND FOR RELIEF: CUMULATIVE ERROR ................................................. 162**

**CLAIM SIXTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE ........................................................................................................................ 162**

**CONCLUSION ........................................................................................................... 162**

## INTRODUCTION

### A.    Procedural Posture of the Case.

Carlos David Caro filed a Motion for Collateral Relief Pursuant to 28 U.S.C. §2255, consisting of 198 pages, with 16 claims and 28 sub-claims ("2255 Motion"). (ECF Nos. 781, 782, 790.)  The 2255 Motion includes detailed factual allegations, many of which rely on facts outside the existing court record.  Although Mr. Caro, at this early stage, was not required to produce any evidence,[1] he attached 60 exhibits in support of allegations made in his motion, including declarations from experts, trial counsel, and jurors, a neuropsychological report, grand jury testimony, internal Bureau of Prison ("BOP") memoranda and documents, juror questionnaires, and data regarding the death penalty.  Mr. Caro also asserted facts in his motion that were supported by citations to specific documents, but he did not attach the actual documents to the motion.   Counsel for Mr. Caro subsequently provided copies of these documents to the Government pursuant to an informal request.[2]

The Government responded to Mr. Caro's 2255 Motion, not by filing an answer, but by filing its Motion to Dismiss in Response to Petitioner's Motion for Relief Pursuant to title 28, United States Code, Section 2255 ("Motion to Dismiss") that asks the Court to summarily dismiss all of Mr. Caro's claims.  (ECF No. 791.)  The 127-page Motion to

---

[1] Rule 2 of the Rules Governing Section 2255 Proceedings in the United States District Court (hereinafter "2255 Rules") states only that a motion must specify the grounds for relief, state the facts supporting each ground, and state the relief requested.  Rule 2 does not require a petitioner to produce any evidence.

[2] Mr. Caro propounded his own informal request for documents to the Government, but the Government has taken the position that it is unwilling to produce any documents until after the Court rules on this Motion to Dismiss.

1

Dismiss does not raise any general procedural or technical defense to Mr. Caro's 2255 Motion, but rather responds to the merits of most claims.[3]  The Government's choice to file its Motion to Dismiss, as opposed to an answer, is somewhat perplexing.  Mr. Caro has alleged viable claims that are supported by specific factual allegations, many of which involve evidence outside the existing record, and most of the Government's arguments create disputed issues of fact.  The Government's request for dismissal thus is premature, as Mr. Caro has not yet had the opportunity to introduce evidence in support of his extra-record allegations.

Mr. Caro also has filed a Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 in the related case of *United States v. Caro et al.*, Case No. 2:03-cr-10115 (W.D. Va.).  (ECF No. 189.)   In response, the Government filed a motion to dismiss that argues that Mr. Caro's motion in that case is untimely.  (ECF No. 195.)

The Court has set oral argument on both of the Government's motions to dismiss for November 25, 2013.

**B.      Legal Standard of Review for Motion to Dismiss.**

The Government's Motion to Dismiss repeatedly urges the Court to resolve factual disputes, make credibility determinations, and ignore Mr. Caro's allegations of new evidence.  The Government's arguments rest on a misunderstanding of the standards that the Court must apply at this early stage of the proceedings.  At this initial stage, before the Government has even answered Mr. Caro's 2255 Motion, the question before this

---

[3] For a limited number of claims, the Government alternatively argues procedural default based on the specific circumstances of that claim.

Court is whether Mr. Caro's allegations, viewed against the existing record, are so "palpably incredible" or "patently frivolous or false" that summary dismissal is appropriate. *See Blackledge v. Allison*, 431 U.S. 63, 76-78 (1977); *United States v. White*, 366 F.3d 291, 296-97 (4th Cir. 2004).

Dismissal is appropriate only when "the motion and the files and records of the case conclusively show that the petitioner is entitled to no relief." 28 U.S.C. § 2255(b). In evaluating the Government's Motion to Dismiss, the Court must construe Mr. Caro's 2255 Motion in the light most favorable to him and must accept Mr. Caro's factual allegations as true unless they are conclusively refuted by the record. *See, e.g.*, *United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000) (accepting petitioner's facts as true); *Battlefield Builders, Inc. v. Swango*, 743 F.2d 1060, 1061-62 (4th Cir. 1984) (stating that Rule 12 of the Federal Rules of Civil Procedure requires the court to construe plaintiff's allegations in the "light most favorable to plaintiff"). The Court also must draw all reasonable inferences in favor of Mr. Caro. *See Goldfarb v. Supreme Court of Virginia*, 766 F.2d 859, 860 n.1 (4th Cir. 1985) (*citing Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 172 (1967)) (stating that when faced with a dismissal under Rule 12 of the Federal Rules of Civil Procedure, the court must "accept as true the facts stated in the complaint and all reasonable inferences that favor the plaintiff").

In responding to this Motion to Dismiss, Mr. Caro is not required to present evidence in support of his allegations. Unless patently false and incredible on their face, the Court must accept all of his allegations as true. Mr. Caro, however, has referred to and attached exhibits to his response, as he did in his 2255 Motion. The exhibits have

3

been included to show the Court that his claims are factually supported and not "patently frivolous." The exhibits are only a portion of the evidence Mr. Caro intends to submit in support of his 2255 Motion. Mr. Caro anticipates the opportunity to develop the record through discovery and an evidentiary hearing, where factual disputes can be resolved. Mr. Caro anticipates filing his initial discovery motion and request for a hearing before the oral argument on November 25, 2013.

Evidentiary development is contemplated under the federal habeas statutes, rules, and case law. *See, e.g.*, 2255 Rule 6 (discovery), 2255 Rule 7 (expanding the record), and 2255 Rule 8 (evidentiary hearing). Based on the disputes raised by the Government in its Motion to Dismiss, Mr. Caro anticipates that an evidentiary hearing will be necessary. *See* 2255 Rule 5 Advisory Notes ("Numerous cases have held that the Government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held") (citing numerous cases including *Machibroda v. United States*, 368 U.S. 487, 496 (1962).) In *Machibroda*, the Supreme Court granted an evidentiary hearing because "the specific and detailed factual assertions of the petition, while improbable" could not be said at that juncture to be incredible. 368 U.S. at 496. *See also Witherspoon*, 231 F.3d at 927 (holding that the district court erred in dismissing petitioner's motion without holding an evidentiary hearing because petitioner's "facts if true would entitle him to relief" and "the record does not conclusively demonstrate that [petitioner] was entitled to no relief").

It bears remembering that this is a capital case. The law requires courts to give careful consideration to claims when a defendant has been sentenced to death. *See*

*California v. Ramos*, 463 U.S. 992, 998-99 (1983) ("The qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."); *Kyles v. Whitley*, 514 U.S. 419, 421-22 (1995) ("Our duty to search for constitutional error with painstaking care is never more exacting that it is in a capital case.") ([citation omitted]); *Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012) (Courts should consider "the heightened need for fairness in the administration of death[,] . . . born of the appreciation that death truly is different from all other punishments a society inflicts upon its citizens.") (*quoting Callins v. Collins*, 510 U.S. 1141, 1149 (1994) (Blackmun, J., dissenting from denial of certiorari)).

The Government attacks Mr. Caro's 2255 Motion piecemeal and urges the Court to rule on each issue in isolation from the other evidence presented by Mr. Caro. The substantive law does not support this approach. To prove prejudice under *Strickland v. Washington*, the Court is required a review *all errors*. 466 U.S. 668, 649 (1984) (noting that "there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different[]") (emphasis added). Indeed, *Strickland* makes clear that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 466 U.S. at 695. *See Elmore v. Ozmint*, 661 F.3d 783, 868 (4th Cir. 2011) (holding that the state PCR court's analysis "unreasonably broke from *Strickland* by considering less than the totality of the evidence, and . . . unreasonably discounted evidence favorable to [the petitioner] by unduly minimizing its import and evaluating it piecemeal").

This cumulative approach applies in reviewing the errors from guilt/innocence phase and the penalty phase. As the Fourth Circuit has recently explained "the totality-of-the-evidence standard required the state [post-conviction review] court to consider *all* of the trial and PCR evidence favoring [defendant's] acquittal and then to reweigh that evidence against the State's evidence of guilt." *Elmore v. Ozmint*, 661 F.3d 783, 868 (4th Cir. 2011). When determining whether there was prejudice during the penalty-phase, the Court must also apply the totality-of-the-evidence standard. *See Strickland*, 466 U.S. at 695; *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (noting that courts must look at "both that [evidence] adduced at trial, and the evidence adduced in the habeas proceeding[s]"). Moreover, this Court should review the cumulative error of counsel's deficiencies related to the guilt/innocence phase when considering prejudice during the penalty phase. *See, e.g.*, *Moore v. Johnson,* 194 F.3d 586, 619 (5th Cir. 1999) ("When, as here, the same jury considered guilt and punishment, the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable."). This Court must undertake a factual review of counsel's alleged deficiencies, determine whether counsel's actions were reasonable, and if not, whether the combined errors prejudiced Mr. Caro. This type of analysis is not appropriate for summary dismissal.

This same comprehensive analysis is also required for *Brady* claims. *See Kyles* 514 U.S. at 436-37 n.10 (describing that the fourth aspect of materiality is defined "in terms of suppressed evidence considered collectively, not item by item"); *United States v. Ellis*, 121 F.3d 908, 916 (4th Cir. 1997) (Although "courts of necessity examine

6

undisclosed evidence item-by-item, their materiality determinations must evaluate the cumulative effect of all suppressed evidence to determine whether a *Brady* violation has occurred."); *Winston v. Kelly*, 592 F.3d 535, 556 (4th Cir. 2010) (noting that "it was necessary to consider all the evidence in the record—not just the new evidence—because the materiality element of a *Brady* claim requires a collective assessment of whether introduction of the exculpatory evidence might have affected the outcome of the trial" (*citing Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003)); *Monroe*, 323 F.3d at 298 ("we are obliged to assess the materiality of exculpatory evidence 'collectively, not item by item[]'") (*citing Kyles*, 514 U.S. at 436).

Finally, the court must consider the combined impact of all errors on a defendant's trial in order to determine whether the court still has confidence in the conviction and sentence, or whether a defendant's fundamental right to a fair trial was denied. *See, e.g., Cargle*, 317 F.3d at 1207 (explaining that "claims should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice").[4] Thus, a "petitioner's claim of error at the penalty phase may be cumulated with guilt-phase error, so long as the prejudicial effect of the latter influenced the jury's determination of sentence." *Id*. at 1208.

Analyzing the combined impact of all errors in post-conviction proceedings is no different than the analysis conducted by appellate courts when reviewing trial error. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973) (holding that the two separate

---

[4] The errors in that case involved "ineffectiveness of trial counsel (and associated/alternative *Brady* error) and prosecutorial misconduct." *Cagle*, 317 F.3d at 1220.

errors of excluding evidence and prohibiting cross-examination of a witness together deprived defendant of a fair trial); *United States v. Caro*, 597 F.3d 608, 635-36 (4th Cir. 2010) (analyzing "several possible errors" cumulatively, but holding that they did not "fatally infect" the trial or sentencing hearing).

**C.      Factual Disputes Noted in the Government's Statement of the Case.**

The Government's Motion to Dismiss begins with a seven-page "Statement of the Case." (ECF No. 791 at 1-7.) Mr. Caro disputes many of the assertions made by the Government in this introductory section. Listed below are some of these disputed assertions:[5]

**1.      Mr. Caro Disputes that He Was a Gang Leader.**

The Government states that Mr. Caro "has been identified by prison officials in at least one institution as a person who carried great influence in the gang." (ECF No. 791 at 1.) At trial, one Government witness, Officer John Gordon, testified to his belief that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale and initiated an assault on members of another gang. (Tr. 02/05/2007 at 168-69, 171-72.) While Mr. Caro does not dispute that Mr. Gordon so testified at trial, Mr. Caro disputes his conclusions. Mark Bezy, who has 28 years of experience working at BOP including working as Warden of FCC-Terre Haute, disagrees with Mr. Gordon's conclusion, and believes it was unlikely that Mr. Caro was a gang leader at FCI-Oakdale. (ECF No. 790-1 ¶¶ 19-23.)

---

[5] In response to each claim, Mr. Caro also disputes additional assertions presented in the Government's motion.

The Government also fails to mention the suppressed evidence regarding Mr. Caro's lack of leadership position in the gang. The Government argued at trial that Mr. Caro might still be a leader a USP-Lee, but then withheld documents that reveal the BOP's belief that two individuals other than Mr. Caro were the leaders of the Texas Syndicate at USP-Lee, and that the BOP believed Mr. Caro to be in "bad standing" with the gang. (ECF No. 790 at 153-55.) Mr. Caro's alleged position in the gang was one of the non-statutory aggravators alleged by the Government and argued during the penalty phase of his trial.

### 2. Mr. Caro Disputes the Government's Assertions Regarding Mr. Sandoval's Motivation for Seeking Entry into Mr. Caro's Cell.

The Government also claims that Mr. Sandoval "asked if he could share a cell with Caro rather than be placed with one of the incoming prisoners." (ECF No. 791 at 3.) Mr. Caro disputes this allegation. Officer Brian Laster testified at trial that Mr. Sandoval asked him if he could be placed in Mr. Caro's cell. Mr. Laster at no time testified about Mr. Sandoval's reason for wanting to get into Mr. Caro's cell. There is no evidence that Mr. Sandoval's request was driven by a concern regarding "incoming prisoners" and the Government's assertion is nothing more than speculation.[6]

Mr. Caro also disputes the assertion that the assigning officer, Dustin Watts, gave "careful thought" to the assignment of Mr. Sandoval in the Special Housing Unit

---

[6] Inmate Sean Bullock's testimony that "officers" asked Mr. Caro if he would take a cellmate because "a bus was coming in," was not supported by any officer's testimony at trial and is disputed by the large number of available spots in the Special Housing Unit at the time Mr. Sandoval was placed in Mr. Caro's cell. (*See* ECF No. 790 at 49-50.) More importantly, Mr. Caro has challenged Mr. Bullock's credibility and this issue must be resolved before dismissing the 2255 Motion. (*See id.* at 62.)

("SHU").[7]  (*Id.*)  According to Mr. Watts, this "thought" consisted of placing members of the same gang together.  (Tr. 01/29/2007 at 62-64.)  Mr. Watts' actions, however, were not appropriate in this circumstance, and were the result of BOP negligence and lack of communication, not "careful thought."  (ECF No. 790 at 53-57.)

Mr. Watts assigned Mr. Sandoval in Mr. Caro's cell because they belonged to the same gang.  (Tr. 01/29/07 at 63.)  As discussed more fully in Claim Four (C), *infra*, the circumstances leading up to the death of Mr. Sandoval, however, dicated that the BOP should have done the exact opposite, and should have kept Mr. Caro separated from members of his gang.  This same conclusion was reached by BOP employees when they recommended in their internal report on the Benavidez assault that Mr. Caro be housed separate from all other members of the Texas Syndicate.  (ECF No. 782, Sealed Ex. 51 at 12; *see also* ECF No. 790-1 ¶¶ 13-18.)  While the BOP officials responsible for investigating gang activities were cognizant of the risk of placing Mr. Sandoval into Mr. Caro's cell, that concern apparently was never communicated to the SHU officers.

### 3. Mr. Caro Disputes the Inferences to Be Drawn from the Statements he Made after the Death of Mr. Sandoval.

Mr. Caro disputes the inferences that should be drawn from statements he made after the death of Mr. Sandoval, and contends that these statements should be evaluated in light of prison culture, the tension within the Texas Syndicate before and at the time of Mr. Sandoval's death, and Mr. Caro's suggested defense.  *See* Claim Six (E), *infra*.

---

[7] Mr. Watts's actual testimony was, "[i]t's something you have to give thought to."  Tr. 01/29/2007 at 62.

**4.      Mr. Caro Disputes the Government's Allegation that Trial Counsel Retained Mental Health Experts "Almost Immediately" After Their Appointment.**

The Government alleges that "almost immediately" after appointment, trial counsel applied for and obtained the Court's permission to retain "mental health experts including a licensed clinical psychologist/neuropsychologist and a psychiatrist." (ECF No. 791 at 5.)  Mr. Caro disputes this statement.  Counsel did not seek funding for a psychologist, neuropsychologist or psychiatrist until after the DOJ certified Mr. Caro's case for death and after Mr. Caro was indicted—*over one year* after counsel was appointed.  (ECF No. 38 (revised budget filed Feb. 15, 2006, asking for funding for neuropsychologist, and also psychiatrist but only if client has brain damage); *see also United States v. Caro*, 2:05-mc-00001 (W.D. Va.), ECF No. 9 (Mar. 22, 2005, seeking funds only for mitigation specialist) ECF No. 14 (Apr. 13, 2005, seeking funds only for fact investigator).)

**GROUNDS FOR RELIEF: PRETRIAL**

**CLAIM ONE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED HIS FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT, WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false."  He has met this burden.  Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate.  *See Machibroda,* 368 U.S. at 514.

The parties appear to agree on the appropriate test in reviewing Claim One: Mr. Caro must show actual prejudice from the delay. Once prejudice is shown, the analysis shifts to the Government's reasons for the delay, and the Court must then balance these two interests. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). The unconstitutionality of a delay is not driven by the length of the delay. *Compare United States v. Marion*, 404 U.S. 307, 325-26 (1971) (38-month delay did not violate due process) *with Howell*, 904 F.2d at 894-95 (27-month delay violated due process). Rather, the test necessitates a case-by-case analysis that is fact intensive. *Id.* at 894 (noting that "the sound administration of justice to the rights of a defendant to a fair trial will necessarily involve a delicate judgment *based on the circumstances of each case*" (citation omitted).)

The Government argues that Mr. Caro has not shown actual prejudice because even if Mr. Caro had not been convicted for the Benavidez assault, it still could have argued that he was already serving a de facto life sentence based on his existing 378-month sentence for a drug violation. Mr. Caro disagrees. Assuming good time credit, it appears that under that sentence, Mr. Caro would have been eligible for release at about age 60. (*See* ECF No. 782, Sealed Ex. 50 ¶¶ 32, 33.). While incarceration until the age of 60 years is a long sentence, it is not a life sentence. The Government therefore would not have been able to argue that a life sentence in this case was "zero punishment" (Tr. 02/13/07 at 94), or "no consequences, zero" (*id.*). Mr. Caro has submitted evidence demonstrating that the Government's argument unfairly influenced the jury. (*See* ECF No. 790-30) (Juror #33 declaring that "the single most important factor . . . was that

12

Carlos Caro was already serving a sentence that amounted to life in prison . . . ." And further declaring under oath that, "If Caro had not already been serving that lengthy sentence, then it is possible that I would not have voted for the death penalty."); ECF No. 790-29 (Juror #24 stating that "one of the factors" was "that he already had, essentially, a life sentence . . . .").)

Without the Benavidez conviction, the Government also would have lost its argument that Mr. Caro already had a prior conviction for conspiracy to commit murder. (Tr. 02/13/07 at 96-97 ("[T]hey convicted him of conspiracy to commit murder [and] Judge Jones sentenced him to another 27 years.").) Without this prior conviction, Mr. Caro's counsel would have been able to point out to the jury that Mr. Caro did not have a single prior conviction for violent conduct. And, unlike many drug offenses, none of Mr. Caro's prior three drug offenses involved either weapons or violence. (ECF No. 782, Sealed Ex. 50 ¶¶ 31-33.) These facts go directly toward showing actual prejudice.

The Government also argues that Mr. Caro "has failed to adduce any evidence" to support his claim that it intentionally delayed for tactical reasons or with reckless disregard for the consequences of the delay. (ECF No. 791 at 10.)[8] Mr. Caro disputes this contention. The gross disproportionality of the plea agreements in the Benavidez case (ECF No. 790 at 20-24 (57-month sentence for co-defendant Moreno-Marquez

_____

[8] The Government contends, without providing any evidence, that there was no plan by the Government. (ECF No. 791 at 9.) This assertion is not only unsupported by any evidence, it is meaningless in the context of a motion to dismiss.

compared to a 327-month sentence for Mr. Caro for identical conduct)),[9] the Government's misrepresentations to the Court, plus the failure to secure counsel for Mr. Caro in this capital case until shortly after the Court sentenced Mr. Caro based on the disproportionate plea agreement, is evidence of intentional delay for tactical reasons, or at a minimum, reckless disregard for the consequences of this delay.

The Government argues that the delay was reasonable given the gravity of the crime, the need to investigate, and the need to secure authorization to seek the death penalty from the Attorney General. But for the fact of the Benavidez prosecution, Mr. Caro might agree that 24 ½ months in a capital case was not an unreasonable delay. The Benavidez case, however, alters the analysis because the delay of the capital indictment had the immediate and predictable effect of preventing the appointment of specialized capital counsel, at a time when such counsel could have protected Mr. Caro against the disproportionate conviction and sentence. No capital counsel appointed during the Benavidez prosecution would have stood by and permitted Mr. Caro to enter into this plea agreement for conspiracy to commit murder. There was absolutely nothing to be gained, and everything, including Mr. Caro's life, to be lost from such a plea. (*See* ECF No. 790-4 (Declaration of Larry Hammond) at 15-16.)

The Government attempts to deflect its own role in the disproportionate pleas by noting that codefendant Moreno-Marquez "proposed" the plea agreement. (ECF No. 791 at 11.) This assertion is disingenuous. The Government has absolute control over the

---

[9] At the time of this sentencing, co-defendant Moreno-Marquez had 28 criminal history points, while Mr. Caro had 12 criminal history points. (ECF No. 782, Sealed Ex. 50 at 8; ECF No. 790-55 at 3.)

plea agreements it offers or doesn't offer. Moreover, the prosecutor has a duty, as an officer of the court, to seek justice, to properly advise the court, and to not mislead the court, regardless of what a codefendant proposes. Mr. Caro's codefendant Moreno-Marquez was not responsible for the Government's deals; he was merely a tool that provided an unjustifiable and unfair opportunity that the Government should have rejected, but which it improperly seized.

The Government provides no explanation for waiting until after Mr. Caro's sentencing in the Benavidez case before notifying either Mr. Caro or the Court that it was investigating Mr. Caro for the murder of Mr. Sandoval and that the Court should appoint counsel for him. (*See United States v. Caro*, No. 2:05-mc-00001 W.D. Va.), ECF No. 3 (Letter from Assistant United States Attorney, Anthony P. Giorno, to the Honorable James P. Jones, dated Dec. 30, 2004 letter to Court; Letter from A. Giorno to Carlos David Caro, dated Dec. 30, 2004 (hereinafter "Target Letter"), attached as Ex. 61.) The delay becomes even more suspect in light of the fact that the Government convened a grand jury in this case about two months after the offense and almost ten months before it sought capital counsel for Mr. Caro. (ECF No. 782, Sealed Ex. 26 at 42.)

Mr. Caro has sufficiently alleged that the Government's delay prejudiced him and that the Government's delay was tactical or reckless. His claim is supported by facts and reasonable inferences, which for purposes of this motion must be taken as true. The fact-intensive analysis that must be conducted to resolve this claim cannot occur in the context of this Motion to Dismiss.

**CLAIM TWO: MR. CARO HAS SUFFICIENTLY ALLEGED THE INEFFECTIVE ASSISTANCE OF COUNSEL AT THE DEATH-CERTIFICATION STAGE OF THE CASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda*, 368 U.S. at 514.

The Government suggests several unpersuasive arguments against Mr. Caro's claim of ineffective assistance of counsel at the death-certification stage: (1) that Mr. Caro had no substantive or procedural right to the death-certification review process created by the United States Attorney's Manual; (2) that the Sixth Amendment did not apply until Mr. Caro was indicted; (3) that the Court would have to determine an appropriate standard of care for a defense attorney representing capital defendants before the DOJ; (4) that trial counsel made a reasonable strategic decision in their handling of the death-certification proceeding; and (5) that Mr. Caro suffered no prejudice as a result of any deficiencies in trial counsel's performance. (ECF No. 791 at 13-16.) These arguments are insufficient in the context of the Government's request for summary dismissal.

**A. The Issue is Right to Effective Counsel, Not Right to Death-Certification Hearing.**

The Government's first argument completely misses the point. The issue is not whether Caro had a right to the review process, but whether he had the right to *effective assistance of counsel* during the process, once the review process was afforded to him. It

is beyond debate that he had the right to effective assistance of counsel at that hearing. As one District Court noted, "For defense counsel to short circuit the DOJ mitigation process that could result in a death penalty declination would amount to ineffective assistance of counsel." *United States v. Baquedano*, No. 10-20338, 2011 WL 1743742, at *2 (E.D. Mich. May 5, 2011).

In the cases cited by the Government, in which claims involving the death-certification process were rejected, the issue did not involve effective assistance of defense counsel. Rather, these cases involved challenges to the Government's actions, such as timeliness of the death-certification hearing in relation to the indictment, and whether these procedural irregularities entitled the defendant to have the death penalty request judicially dismissed. *See, e.g.*, *United States v. Torres Gomez*, 62 F. Supp. 2d 402 (D.P.R. 1999); *United States v. Shakir*, 113 F. Supp. 2d 1182 (M.D. Tenn. 2000). Another case involved a discovery dispute, when defense counsel sought pre-indictment discovery of the Government's file, requesting items such as the U.S. Attorney's evaluation of the case. In denying the discovery on privilege and work-product grounds, the court assumed without deciding that the death-certification process was a critical stage in which defendant was entitled to effective assistance of counsel. *United States v. Fernandez*, 231 F.3d 1240, 1248 (9th Cir. 2000).

As an analogy, consider that a defendant is not entitled to receive an offered plea bargain from the Government. However, if an offer is made, counsel must be effective in communicating the offer and advising the defendant about it. *See Lafler v. Cooper*, 132 S. Ct. 1376 (2012); *Missouri v. Frye*, 132 S. Ct. 1399 (2012). Capital counsel also has an

obligation to explore the possibility of plea negotiations if an offer is not made..  Just as a defendant is not entitled to a plea offer, he may not be entitled to a death-certification process with the procedures adopted by the U.S. Attorney's Manual.  But if such a process is made available to the defense, through counsel, counsel then has a constitutional duty to handle the process effectively.

**B.    The Sixth Amendment Right to Counsel Applies at the Death Certifcation Stage.**

The argument that the Sixth Amendment does not apply at the death-certification hearing is specious.  Under the Sixth Amendment, an accused is guaranteed counsel "at any stage of the prosecution, formal or informal, in court or out," in which counsel's absence might be detrimental to the accused person's defense.  *United States v. Wade*, 388 U.S. 218, 226 (1967). Contrary to the Government's assertion, Mr. Caro was an "accused" long before the formal indictment was issued against him.  He was an accused from the moment he was questioned about the incident, when he was given his *Miranda* rights to protect his Fifth and Sixth Amendment rights.  He was an accused when the Government sent him the letter saying they were investigating him for the murder of Roberto Sandoval and that he was a target of a pending grand jury investigation. (*See* Target Letter, Ex. 61.)  The case law recognizes several instances when an accused has the right to counsel before the indictment has issued, including at preliminary hearings, *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991), and bond hearings, *United States v. Johnson*, 516 F. Supp. 696 (E.D. Pa. 1981), *aff'd*, 688 F.2d 826 (3d Cir. 1982) and *aff'd*, 709 F.2d 1496 (3rd Cir. 1983). The death-certification process is certainly an adversarial

18

one between the Government and the accused. The Government is represented by its United States Attorney, not by law enforcement officers; defense counsel is invited to participate in submitting material and oral argument in opposition to the U.S. Attorney's position. The outcome of the death-certification process is literally a determination of whether to seek life or death, and as such, it constitutes a critical stage at which a defendant is entitled to counsel. *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 87 (D.P.R. 2003). Indeed, the Government implicitly acknowledges this right in its December 30, 2004 letter to the Court, stating, "we believe that Mr. Caro, upon request, will be eligible for the appointment of two counsel, one of whom has prior experience defending capital cases." *United States v. Caro*, 2:05-mc-00001 (W.D. Va.), ECF No. 3 (Dec. 30, 2004).

Because death-certification applies only to capital cases, there is a greater need for constitutional protection. As the Supreme Court has long recognized, there is a "significant constitutional difference between the death penalty and lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980). The greater stakes require heightened procedural safeguards. *Id*. Certainly, the court has recognized some matters as "critical stages" in capital cases that are not necessarily critical in non-capital cases. For instance, the accused in a capital case has a Sixth Amendment right to counsel's presence at a pre-sentence interview with the probation officer, while that right has not been accorded constitutional significance in non-capital cases. *Estelle v. Smith*, 451 U.S. 454 (1981).

The Court need not rely on the "death is different" principle to find the death-certification process to be a critical stage for Sixth Amendment purposes. The Supreme

19

Court has already "recognized that negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010) (*citing Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). Counsel's ineffectiveness during the plea process will support a claim for ineffective assistance of counsel. *Hill*, 474 U.S. at 57-58. Because the Attorney General is the only one who can authorize a binding plea agreement that takes the death penalty off the table, effective representation at the death-certification proceedings prescribed by the Attorney General is essential to the plea negotiation and bargaining process.

> [P]lea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages.

*Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012). Anything less "might deny a defendant effective representation at the *only* stage" when legal advice can help him. *Massiah v. United States*, 377 U. S. 201, 204 (1964) (internal quotation marks and citation omitted) (emphasis added). If a defendant is entitled to effective counsel during the plea negotiation process when mere jail time or deportation is involved, the right must certainly exist in the more somber negotiations of a capital case.

## C. The Court Will Have to Decide the Appropriate Standard of Care for Defense Counsel in Capital Cases.

The Court will need to determine the appropriate standard of care for defense counsel in capital cases during the death-certification process. Determining the parameters of the professional standards which prevailed at the time of Mr. Caro's trial

requires a critical factual inquiry that must be conducted by this Court in assessing the merits of this claim. Mr. Caro has alleged that trial counsel's representation did not meet the standard of care for defense attorneys in capital cases in several specific ways: They failed to conduct an adequate mitigation investigation before the death-certification hearing, and they failed to prepare and submit a written mitigation package to submit to the local United States Attorney. In support of the contention that these duties exist, Mr. Caro has cited ABA Guidelines for the Performance of Counsel in Capital Cases (2003)[10] and has attached a declaration from a *Strickland* expert on capital defense litigation (ECF No. 790-4). Notably, the Government's Motion to Dismiss did not dispute the existence of these duties. Having alleged these duties and their breach, Mr. Caro is entitled to the opportunity to develop any disputed facts further, as he will be entitled to relief if he can prove these allegations.

**D. Whether Trial Counsel's Performance was a Reasonable Strategy is a Disputed Factual Issue.**

Mr. Caro contends that trial counsel's investigation was woefully inadequate and not a reasonable basis for any decision about what to submit at the death-certification hearing. Whether trial counsel's investigation was adequate to support any purported strategy depends on the quantity, quality, type, and impact of the materials discovered and developed after trial. These are issues of disputed fact. As these facts are outside the record, summary dismissal is not appropriate. Mr. Caro has alleged that trial counsel

---

[10] *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (Summer 2003) (hereinafter "ABA Guidelines") Pinpoint page references will be to the Hofstra Law Review.

unreasonably delayed in the selection and hiring of a mitigation specialist and an investigator, and that no mental-health experts were consulted before the certification hearing. He has further alleged that a proper investigation would have revealed Mr. Caro's frontal lobe developmental brain impairment, severe domestic abuse, educational and developmental delays, and the impact of prison gang culture on the events leading to Sandoval's death. Mr. Caro alleges that failure to investigate and obtain this information, before deciding what to present to the death-certification committee, renders any "strategic" decision uninformed and unreasonable. If Mr. Caro can prove these allegations, he would be entitled to habeas relief. Accordingly, summary dismissal of this claim is improper, and Mr. Caro is entitled to an opportunity to develop the record further at an evidentiary hearing.

**E.     Whether Mr. Caro was Prejudiced by Trial Counsel's Deficient Performance is a Disputed Factual Issue.**

Mr. Caro has alleged facts showing prejudice, including that Attorney General Ashcroft did not authorize the death penalty, after the certification process, in more than 75% of eligible cases. In cases involving BOP-inmate-homicides, the Attorney General did not authorize or withdrew authorization for the death penalty in more than 67% of the cases. This proceeding is the first opportunity for any court to assess the impact of counsel's omissions on the outcome of the death-certification process. The facts pled and reasonable inferences from them, if proven, demonstrate a reasonable probability of a different outcome but for trial counsel's ineffective performance. Mr. Caro has pled

22

sufficient facts to be entitled to develop his claim further, and it is premature to summarily dismiss this claim at this early stage.

**GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE**

**CLAIM THREE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT JUROR MISCONDUCT INFRINGED HIS RIGHT TO A FAIR TRIAL.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda*, 368 U.S. at 514.

Mr. Caro has alleged specific facts in support of his claim that two jurors gave untruthful answers to questions on voir dire, and that factual answers to the questions would have warranted disqualification of the jurors on the grounds that they could not be impartial jurors in a death penalty case as required by *Morgan v. Illinois,* 504 U.S. 719 (1992). The Government argues that (1) Rule 606(b) of the Federal Rules of Evidence precludes consideration of testimony from former jurors about their thought processes during deliberations; (2) the alleged statements of the two jurors are not inconsistent with their voir dire answers; (3) the alleged statements do not show juror impartiality; and (4) the claim is procedurally defaulted because Mr. Caro did not raise the issue on his direct appeal. As discussed more fully below, none of these arguments is relevant at this stage of the proceeding.

**A.      Federal Rules of Evidence Do Not Apply to Capital Sentencing Proceedings.**

Under 18 U.S.C. § 3593(c), the Federal Rules of Evidence do not apply to capital sentencing proceedings under the Federal Death Penalty Act. Accordingly, it would be anomalous to use the Federal Rules of Evidence to preclude Mr. Caro from proving, by juror declarations and future testimony, that they could not be impartial during sentencing proceedings. *See United States v. Fell*, No. 2:01CR12, 2013, WL 1953322, at *3 (D. Vt. May 10, 2013) (noting that Fed. R. Evid. 606 (b) does not apply to penalty phase proceedings under the Federal Death Penalty Act). The case cited by the Government, *Bacon v. Lee*, 225 F.3d 470 (4th Cir. 2000), involved application of a North Carolina statute to a North Carolina death-penalty case, and has no bearing on the applicability of Rule 606(b) to the present proceeding.

Even if Rule 606(b) applied, the allegations do not involve the deliberative process and interaction with other jurors, but only their expressed attitudes about the death penalty and their willingness to consider mitigating evidence with an open mind. Because these jurors have expressed attitudes that directly conflict with answers they gave on voir dire, it would be manifestly unjust to prevent Mr. Caro from proving that untruthful answers on voir dire led to the empanelment of two jurors improperly partial towards automatic imposition of the death penalty if there is no doubt about guilt.

**B.      The Alleged Recent Statements of the Jurors Directly Conflict With Their Prior Voir Dire Answers, Creating a Disputed Issue of Material Fact.**

The Government's arguments directly contradict the allegations pled in the 2255 Motion. Mr. Caro's allegations and the inferences reasonably drawn from them create a

factual dispute that cannot be resolved on the pleadings alone, and he is entitled to an evidentiary hearing and the opportunity to develop this claim for adjudication on the merits. In particular, Mr. Caro has alleged the following specific statements in direct contradiction of answers given on voir dire.

Juror #32

Juror #32 stated in his questionnaire that he would not always vote for a sentence of death as punishment for someone guilty of a death-penalty-eligible offense. He admitted being in favor of the death penalty, but expressed reservations about the penalty if there were some lingering doubt about guilt. Nonetheless, he also stated that he would be open to consideration of all the evidence and would not automatically impose the death penalty if the person were guilty. (ECF No. 790-38, at 26-27.) In contrast, Juror #32 now states that he had made up his mind to vote for the death penalty *during the guilt phase of the trial*, before any sentencing evidence had been presented. This is the direct opposite of the constitutional mandate of *Morgan v. Illinois,* 504 U.S. 719 (1992). He formed an opinion on the appropriate sentence before hearing *any* sentencing phase evidence, either aggravating or mitigating, and said that no amount of mitigating evidence would persuade him to impose a sentence other than death because he had no doubt that Mr. Caro was guilty. This automatic vote for the death penalty, as long as he was certain of guilt, is not following the law, is not consideration of mitigating and aggravating circumstances as required by law, and is contrary to what he said he could do in voir dire. *Id.* at 729. Certainly at this stage of the proceedings, Mr. Caro has sufficiently pled that Juror #32's voir dire answers were untruthful and that truthful

25

answers would have made him subject to challenge for cause. Accordingly, he is entitled to develop this claim for adjudication on the merits.

<u>Juror #62</u>

On her voir dire questionnaire, Juror #62 stated that she neither favored nor opposed the death penalty and that she would not always vote for a sentence of death for someone convicted of a death-penalty-eligible offense. (ECF No. 790-44, at 27.)  In her declaration signed after trial, she stated that "I am now, and was at the time of the trial strongly in favor of the death penalty in cases where evidence of guilt is obvious." (ECF No. 790-32.) "Strongly in favor of the death penalty" is contradictory to "neither favor nor oppose."  She further stated in her declaration that "nothing that the defense offered or could have offered" would change her mind about the death sentence because Mr. Caro was guilty of the crime. (ECF No. 790-32.)  This directly conflicts with her voir dire statements that she would not always vote for the death penalty and would openly listen to the mitigating and aggravating evidence before making a decision. Mr. Caro's allegations are sufficient to raise a disputed issue of fact that needs to be developed for adjudication on the merits.  Summary dismissal is not warranted at this stage.

**C.     Mr. Caro has Sufficiently Alleged that the Two Jurors Were Not Impartial and Would Have Been Struck for Cause if They Had Provided Truthful Answers in Voir Dire.**

A new trial is required if Mr. Caro can show that (1) a juror failed to honestly answer a material question and (2) if the correct answer had been given, the defendant would have a valid basis to challenge the juror for cause.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *Jones v. Cooper*, 311 F.3d 306, 310 (4th

26

Cir. 2002). Contrary to the Government's implication, the untruthful information need *not* be intentional concealment. *Jones,* 311 F.3d at 310. Even if Jurors #32 and #62 believed that they could be fair and impartial, their post-trial statements make it abundantly clear that they really and truly favored automatic imposition of the death penalty, so long as they were sure of the defendant's actual guilt. The danger of impartiality is far more insidious when a person believes he can be fair, but cannot. Because they believed that the death penalty was the only appropriate punishment, once they were convinced of his actual guilt, they could not follow the Court's instructions to consider evidence of aggravating and mitigating circumstances as required by law *before* deciding to impose the death penalty. *Morgan*, 504 U.S. at 729. Mr. Caro need not demonstrate his ultimate success on this issue at the pleading stage; he need only allege a non-frivolous claim that the juror's answer was false, and that he would have challenged the juror for cause if an honest, accurate answer had been provided.

The Government's suggestion that these jurors listened to the evidence before deciding the sentence contradicts Mr. Caro's factual allegations. Likewise, the Government's assertion that the penalty was based on the "egregious" nature of the case is pulled from thin air. (ECF No. 791 at 26.) The jurors did not say they voted to impose the death penalty because the crime was egregious. They said only that death was appropriate because they were sure of his guilt. Such factual disputes require resolution at an evidentiary hearing.

27

**D.** **The Juror-Misconduct Claims Are Not Procedurally Barred Because the Facts Necessary to Adjudicate the Claims Are Outside the Record and Must be Developed.**

Like ineffective-assistance-of-counsel claims, juror-misconduct claims are poorly suited to resolution on direct appeal. The evidence of misconduct is not in the trial record, because the jurors did not make the contradictory statements until well after the trial. Further, Mr. Caro had no way to know that these jurors had given inaccurate information on voir dire. At the time of the appeal, by local Rules of Court, counsel for Mr. Caro could not contact jurors and discuss the case with them, because they were still serving a term of juror service to the Court. Failure to learn of the juror misconduct at the time of or before the appeal cannot be considered default when there is no lawful way he could have learned of the misconduct at the time. *See Waley v. Johnston*, 316 U.S. 101, 104 (1942) (*per curiam*); *Ida v. United States*, 191 F. Supp. 2d 426, 436 (S.D.N.Y. 2002); *United States v. Fell*, No. 2:01CR12, 2013 WL 1953322 (D. Vt. May 10, 2013).

Because Mr. Caro has sufficiently alleged specific facts in support of his juror misconduct claim, which facts are disputed by the Government, and which could not have been raised at the time of his appeal, the Government's Motion to Dismiss this Claim is premature and are appropriately litigated in post-conviction proceedings, where the Court can consider extra-record information.[11]

---

[11] *See, e.g., Williams v. Taylor*, 529 U.S. 420, 440-43 (2000) (permitting claim in federal habeas corpus that a juror concealed information that would have disqualified her from being a juror); *Fullwood v. Lee*, 290 F.3d 663, 681-84 (4th Cir. 2002) (noting that state post-conviction counsel obtained affidavit from juror regarding extraneous influences and ordering a federal hearing to determine the effect upon the jury's verdict).

**CLAIM FOUR: MR. CARO HAS SUFFICIENTLY ALLEGED THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda*, 368 U.S. at 514.

Mr. Caro has alleged that trial counsel was ineffective during the guilt phase of the trial by failing to adequately investigate a key government witness; prison and gang culture and other gang-related issues; and BOP negligence. As a result of this inadequate investigation, trial counsel (a) failed to develop a cohesive theory of defense that would have incorporated and explained evidence in a manner favorable to Mr. Caro; (b) failed to discover a key witness who would have impeached the Government's only purported eyewitness to the offense; (c) failed to present evidence of BOP negligence and lay a proper foundation for the admission of important evidence; and (d) failed to present evidence in support of self-defense or a lesser charge.

The Government disputes this claim on the merits, arguing that counsel's conduct was not deficient. (ECF No. 791 at 2-33.) The Government alternatively argues that even if counsel's conduct in Claim Four (B) and Four (D) was not deficient, Mr. Caro was not prejudiced. (*Id*. at 29 (Claim Four B), *id*. 32 (Claim Four D).) The Government did not move to dismiss Mr. Caro's argument that the Court should consider these sub-claims

together when determining whether counsel's deficient conduct prejudiced him. (ECF No. 790 at 61-62 (Claim Four E).)

The Government's arguments, which dispute or ignore Mr. Caro's alleged facts, are inappropriate in this Motion to Dismiss. Mr. Caro has alleged a plausible non-frivolous claim that does not warrant summary dismissal.

## A. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Develop a Cohesive Theory of Defense.

The Government urges the Court to summarily dismiss this claim on two grounds, neither of which is appropriate at this early stage of the proceedings. First, the Government argues that Mr. Caro's claim is not supported by the record and that any failure to provide a viable defense resulted from the lack of any substantive evidence. Second, the Government argues that the defense suggested here by Mr. Caro is "fantasy" because Mr. Sandoval wanted in Mr. Caro's cell to avoid placement with a rival gang member and Mr. Caro's reference to "prison culture" is a red herring that doesn't negate premeditation. (ECF No. 791 at 28-29.) The Government's arguments miss the point because it focuses solely on trial-record evidence. Mr. Caro's claim, however, relies on evidence outside the trial record. The Government improperly ignores Mr. Caro's new evidence; disputes Mr. Caro's allegations, including Mr. Sandoval's motivation for placement in Mr. Caro's cell; and questions the credibility of Mr. Caro's expert who has opined on prison culture. Resolution of these disputed issues cannot be resolved in the context of this Motion to Dismiss.

### 1. Trial Counsel Could Have Presented a Cohesive and Viable Defense Based on a "Cold Dose of Revenge" Theory.

Had Mr. Caro's counsel adequately investigated, hired appropriate experts, and received all of the evidence from the Government to which they were entitled,[12] they would have been able to develop a cohesive and viable defense. Instead of arguing, as they did, that Mr. Caro killed in the heat of passion over a breakfast dispute, they could have presented a self-defense based on a "cold dose of revenge" against Mr. Caro for assaulting Mr. Benavidez. Mr. Caro's counsel, however, never discovered the relevant facts and thus never meaningfully considered a defense based on self-defense. (ECF No. 790-5 ¶ 11, ECF No. 790-9 ¶ 4.)

The Government believed that several months before Mr. Sandoval's death, Mr. Caro had assaulted the leader of the Texas Syndicate (the Benavidez assault) and that the attack was planned by inmate Tijerina "in an attempt to gain control of the Texas Syndicate leadersip" at USP-Lee. (ECF No. 782, Sealed Ex. 51 at 12; *also* Sealed Ex. 28 at 18-19.) As a result of his participation in this assault, Mr. Caro had reason to be concerned about retribution or, as phrased by a Government agent, "a cold dose of revenge." (Sealed Ex. 28 at 27.) This concern is revealed in a letter intercepted by the BOP from Mr. Caro and other Texas Syndicate members involved in the assault, which seeks forgiveness and claims that "they had been misled into thinking the attack on Benavidez was a sanctioned attack." (ECF No. 782, Sealed Ex. 51 at 10.) At trial, the Government's witness Jacoba Guzman testified that the letter stated that there had been

---

[12] *See* Claims 5 and 7(B), *infra*.

"no reason" for the attack on Mr. Benavidez and that Mr. Benavidez was in "good standing." (Tr. 02/06/07 at 18-21.) There is no evidence that Mr. Caro ever received any communication via either telephone or letter that he had been granted the requested forgiveness and was not in bad standing.

Consistent with a concern for retribution, Mr. Caro refused to take Mr. Sandoval as a cellmate. Mr. Sandoval was a Texas Syndicate prospective member, or prospect. (*See* United States Penitentiary, Lee County, VA, Intake Screening Interview of Robert Sandoval, dated June 17, 2003 (hereinafter "Intake Screening Interview"), Sealed Ex. 74.) In order to become a full member, he needed to commit a "homicide or serious assault for the benefit of the gang." (*See* Expert Disclosure in *United States v. Caro*, Case No. 03-10115 (hereinafter "Expert Disclosure"), Sealed Ex. 75 at JR-157; *also* ECF No. 782, Sealed Ex. 28 at 5 (stating that the Texas Syndicate was a "blood in, blood out" gang in which you "take someone's blood to get in, you lose your blood to get out).) Mr. Sandoval's motive to get inside Mr. Caro's cell was to gain full membership status by assaulting or killing Mr. Caro. Mr. Sandoval's request to be placed in Mr. Caro's cell, coming only hours after Mr. Caro's refusal to accept a cellmate, was unusual and, in light of prison culture, could be deemed aggressive. (ECF No. 790, Ex. 1 ¶ 17.) There was no video or audio recording of what happened inside Mr. Caro's cell, and the only purported eye-witness was cooperating inmate Bullock, who could have been impeached by counsel had they conducted an adequate investigation.

This "cold dose of revenge" defense would have been consistent with the testimony of FBI Agent Fender, who testified that he didn't think the killing was the

result of a "breakfast tray," but that it had something to do with the gang.[13]  The "cold dose of revenge" defense also would have been consistent with FBI Agent Fender's observation that the "Texas Syndicate . . . tend to prey more on themselves than they do anybody else.  There's a lot of, lot of internal violence with the Texas Syndicate."  (ECF No. 782, Sealed Ex. 27 at 5.)  Finally, if the events that resulted in Mr. Sandoval's death were gang related, Mr. Caro would have been prohibited by gang rules from disclosing this fact.    (Supplemental Declaration of Mark Bezy, dated Oct. 8, 2013 (hereinafter "Bezy Supp. Decl."), attached as Ex. 62 ¶ 3.)[14]  Thus, this defense would have explained why Mr. Caro would have portrayed the incident as anything other than a gang matter.

The Constitution guarantees a meaningful opportunity to present a defense.  *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) (reversing because the court erred in precluding testimony about the environment of the defendant's confession).  Mr. Caro could have presented this defense, either within the legal framework of second-degree murder, manslaughter, or self-defense.[15]    Some of the evidence could have been

---

[13] At trial, Douglas Fender, the FBI agent in charge of investigating Mr. Sandoval's killing testified as follows:  "I began to engage Mr. Caro in a line of questioning basically concerning the fact that I didn't think this killing was as a result of the breakfast tray, that I thought it had something to do with the Texas Syndicate and his affiliation with the Texas Syndicate."  (Tr. 01/31/2007 at 25-26.)

[14] When FBI Agent Fender attempted to discuss with Mr. Caro whether the killing was gang related, Mr. Caro terminated the interview.  (Tr. 01/31/2007 at 25-26.)  *See also* Expert Disclosure, Sealed Ex. 75 at JR-163.

[15] The Court was cognizant of a defendant's right to present a defense, especially in a capital case.  *See, e.g.,* Tr. 01/31/07 at 89 (granting a jury instruction on second-degree murder even though "it's at most a close case, but there is a constitutional aspect to the question because it is a capital case, and for the reasons stated by defense counsel I think there is sufficient evidence under those circumstances to instruct the jury as to second degree murder").

introduced and developed through the Government's own trial witnesses, BOP Intelligence Officer D. Mrad, FBI Agent Fender, and Jacoba Guzman, and through Government's documents. This evidence could have been supplemented with the testimony of a gang expert, who could have testified about gang rules, gang "hits," and the consequences for unsanctioned "hits."[16] A cohesive and viable defense existed, but counsel failed to discover it.

### 2. Trial Counsel's "Breakfast Dispute" Defense Was Unreasonable Because it Was Inconsistent with the Evidence, Failed to Answer Key Questions, and Added Nothing to the Mitigation Phase of Trial.

Rather than presenting a "cold dose of revenge" defense, counsel argued that Mr. Caro acted with heat-of-passion and killed Mr. Sandoval over a breakfast dispute. This defense was unreasonable because it was inconsistent with other evidence, left critical questions unanswered, did not lay the foundation for evidence of Mr. Sandoval's previous possession of a weapon, and provided nothing for mitigation in the penalty phase.

One of the main weaknesses of the "breakfast dispute" defense was that it was not supported by the timing of Mr. Sandoval's death, which occurred in the evening, long after breakfast. Rather than supporting a heat of passion defense, the long passage of time between breakfast and the death of Mr. Sandoval allowed time for premeditation.

The defense also failed to answer critical questions regarding Mr. Caro's initial refusal of Mr. Sandoval, and Mr. Sandoval's subsequent request to be placed in Mr.

---

[16] Defense counsel hired a "gang expert," James Marquart, but his expected testimony would have focused on future dangerousness. (*See* Letter from James W. Marquart to Stephen Kalista, dated Dec. 6, 2006 (hereinafter "Marquart Letter"), attached as Ex. 63.)

Caro's cell. Mr. Caro's attorneys raised these questions in their opening statement. (Tr. 01/29/07 at 36 ("There certainly could be a valid reason why the inmate in the cell refuses someone coming to that cell."); *id* at 46 ("We believe the real issue for you to decide is was it a premeditated killing? Why did Sandoval want in the cell with Caro?").)[17] After raising these questions, though, counsel did not deliver answers. This was a critical failing of counsel and their defense. Without any defense answer as to why Mr. Sandoval wanted in the cell with Mr. Caro, the jury had no reason to doubt the Government's speculation that Mr. Sandoval's motivation for entry into Mr. Caro's cell was to avoid placement with a rival gang member. This resulted in the jury having no choice but to find premeditation. Raising these issues and then failing to answer them through evidence reveals not only the inadequacies of their defense, but constitutes deficient performance. *See, e.g., Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that [has] been promised in an opening.").

The "breakfast dispute" defense was unreasonable in other ways. This defense, which implicitly adopted Mr. Caro's statements about a breakfast dispute, did nothing to mitigate Mr. Caro's apparently callous post-offense statements about the dispute.[18] The "breakfast dispute" defense also failed to lay the foundation for introduction of evidence regarding Mr. Sandoval's possession of a weapon. (ECF No. 790 at 56-57.) *See United*

---

[17] This last unanswered question that linked premeditation with why Mr. Sandoval wanted into Mr. Caro's cell was the last word from defense counsel before the trial began. (Tr. 01/29/07 at 46.)

[18] Counsel could have explained these statements if they presented testimony regarding prison culture. *See* Claim Six E, *infra*.

*States v. Caro*, 597 F.3d 608, 634 (2010) (noting that defense counsel waited until the penalty phase to "offer information about why Sandoval was placed in the SHU" and affirming that Caro failed to lay the foundation for introduction of the weapon).

The "breakfast dispute" defense was unreasonable because it also failed to mitigate the anticipated penalty phase, which focused heavily on Mr. Caro's alleged leadership role in the gang and good standing in the Texas Syndicate.[19] This defense did nothing to rebut the Government's claims about Mr. Caro's continued important role in the Texas Syndicate. Finally, the proposition that Mr. Caro was a "hot head" who would kill over something as minor as a "breakfast dispute"—which was inconsistent with Mr. Caro's prior conduct in prison[20]—did nothing to mitigate the Government's argument that he would remain a danger in the future.

> **3.** **Mr. Caro's Suggested Defense Is Not a "Fantasy" and the Government's Disagreement with His Allegations Makes Summary Dismissal Improper.**

The Government argues that Mr. Caro's suggested defense is "fantasy" and that his allegations regarding Mr. Sandoval's motive for seeking entry into Mr. Caro's cell are "contrary to the testimony of the SIS officers." (ECF No. 791 at 29.) The Government's argument merely highlights one of many factual disputes raised in Mr. Caro's 2255 Motion that cannot be resolved in this Motion to Dismiss. Moreover, the Government's contention fails on the merits, as none of the SIS officers testified at trial that Mr.

---

[19] The Government concedes that it withheld evidence that indicated that after the Benavidez assault and Sandoval killing, the BOP believed that Mr. Caro was in bad standing with the gang. (ECF No. 791 at 89, n.20.)

[20] *See* ECF No. 782, Sealed Ex. 52 at 2 (BOP report indicating that Mr. Caro has not been disruptive or violent outside of gang related activities).

36

Sandoval wanted into Mr. Caro's cell to avoid being celled with a member of a rival gang. Brian Laster was specifically asked if Mr. Sandoval made any comment to him or request of him. (Tr. 01/29/2007 at 115.) In response to this question, Mr. Laster testified that Mr. Sandoval "asked if he could move in with inmate Caro, if they could cell together." (*Id.*) Neither Mr. Laster nor any other officer testified that Mr. Sandoval asked to be placed in Mr. Caro's cell to avoid placement with a rival gang member.

The Government's proposition is inconsistent not only with evidence presented at trial but also with facts revealed during investigation in these collateral proceedings. At the time of Mr. Sandoval's request, he already had been placed in an empty cell. The USP-Lee housing logs further reveal that even after the bus arrived and inmates were placed in the prison, there still was sufficient housing for inmates in the SHU. [21] (ECF No. 790 at 49.) Also inconsistent with the Government's contention, an assigning officer in the SHU testified at trial that the BOP did not place members of opposing gangs in the same cell. (Tr. 01/29/2007 at 63.)

The Government next argues, without any support, that the "whole prison culture theory" is a "red herring" and unrelated to premeditation. (ECF No. 791 at 29.) As discussed above, an understanding of gang and prison culture was essential to

---

[21] The only evidence that arguably supports the Government's assertion comes from cooperating inmate Sean Bullock, the Government's only purported "eye-witness." Mr. Bullock testified that the "officers" asked Mr. Caro if he would take a cellmate, *i.e.*, Mr. Sandoval, because a "bus was coming in." Mr. Bullock's testimony is not corroborated by the testimony of a single officer and is also not credible for the reasons stated in Mr. Caro's 2255 Motion (*see* ECF No. 790 at 46-51) and in Mr. Caro's response to claim Four (B), *infra*. Mr. Bullock's testimony also is contradicted by his cellmate, Joseph Bland, whose testimony was not presented at trial. (ECF No. 790-2.)

understanding the circumstances and players of the Benavidez assault and how they relate to this case, to understanding Mr. Caro's reluctance to take a cellmate, to understanding the implications to be drawn from Mr. Sandoval's request, and to understanding Mr. Caro's post-offense statements. This killing occurred within a prison, by one inmate against another inmate. It involved members of the same gang, similar to two prior and recent assaults at USP-Lee.

As stated by Mr. Bezy, there are two sets of rules that all inmates must follow or face the consequences; the BOP rules and the inmate rules. If an inmate, like Mr. Caro, also belongs to a prison gang, there is a third set of rules to follow, the gang rules, which govern inmate conduct.[22] One common gang rule, shared by the Texas Syndicate, is that members may not talk about any gang-related matters with people who are not members of the gang. (*See* Expert Disclosure, Sealed Ex. 75 at JR-157, JR-183-84; Bezy Supp. Decl., Ex. 62 ¶ 3.) Contrary to the Government's assertion, prison and gang culture does support Mr. Caro's "cold dose of revenge" defense and negates premeditation. Trial counsel should have presented this evidence through a gang andn prison-culture expert, but failed to do so.

Mr. Caro's claim is supported by specific and disputed factual allegations that are not frivolous or incredible. The Government's disagreement with these facts and the reasonable inferences that can be drawn from these facts is premature and inappropriate

---

[22] The Government's experts, in the Benavidez case, acknowledged that the Texas Syndicate "enforces its rules, of which there are a number and which are well-established, strictly, and establishes sanctions which range from a fine to death." (Expert Disclosure, Sealed Ex. 75 at JR-157.)

in the context of this Motion to Dismiss.  Mr. Caro is entitled to a full and fair hearing on this claim.

**B.      Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Impeach the Government's Only Purported Eyewitness, Sean Bullock.**

The Government does not dispute that Mr. Bullock had a cellmate, Joseph Bland, at the time of the offense, that trial counsel failed to discover and interview Mr. Bland, or that counsel failed to point out numerous inconsistencies and fallacies in Mr. Bullock's trial testimony.  Rather, the Government attempts to reconcile the declaration of Mr. Bland with Mr. Bullock's testimony, and argues that trial counsel's minimal impeachment effort was effective.  (ECF No. 791 at 29-30.)  The Government alternatively argues that Mr. Caro was not prejudiced by the alleged deficiencies.  (*Id.* at 30-31.)  The issues before the Court regarding counsel's investigation and prejudice to Mr. Caro involve facts outside the trial record and cannot be resolved in the context of a motion to dismiss.

The importance of Mr. Bullock's testimony to the Government's premeditation case cannot be underestimated.  The issue at trial was whether the murder was premeditated or conducted in the heat of the moment.  Mr. Bullock was the Government's sole purported eyewitness regarding premeditation.  The Government even took the unusual step of calling a character witness, BOP employee Gregory Bondurant, who testified to his opinion that Mr. Bullock was truthful.  (Tr. 01/31/2007 at 34-36.) The Government referred to Mr. Bullock's testimony on at least 13 separate occasions during trial to argue that Mr. Caro ambushed or "snuck up" on Mr. Sandoval from

behind. (*See* ECF No. 790 at 52 (citing transcript).) This evidence was critical to the Government's premeditation case. As stated by Mr. Caro's *Strickland* expert, Larry Hammond:

> Exactly how the death of Mr. Sandoval occurred turned out to be the difference between a life or death sentence for Mr. Caro. The image of the planned and violently executed strangulation dominated the Government's closing arguments. The Government was able to weave together the circumstantial evidence and Mr. Caro's incriminating statements with Mr. Bullock's account to paint a picture that could only have propelled the jury to find as it did – that this homicide deserved the death penalty.

(ECF No. 790-4, ¶ 49.)

Trial counsel had a duty to investigate Mr. Bullock, a critical witness they knew the Government would call at trial. *See Rompilla v. Beard*, 545 U.S. 374, 383-90 (2005). Trial counsel's failure to investigate Mr. Bullock and meaningfully impeach him constitutes deficient performance. *See, e.g.*, *Elmore v. Ozmint*, 661 F.3d 783, 859 (2011) (holding that failure to investigate in *Strickland* analysis could not be justified by defense counsel's reliance on State's evidence); *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) (explaining that counsel has a duty to "investigate possible methods for impeaching prosecution witnesses") (citation omitted); *United States v. Mason*, 481 F. App'x 815, 818-19 (4th Cir. 2012) (unpublished opinion) (remanding case for further proceedings because defendant's *Strickland* claim that trial counsel was ineffective for failing "to investigate evidence that would have impeached the Government's key witness" arguably had merit).[23]

---

[23] Mr. Caro also has alleged that trial counsel failed to discover Mr. Bland, and failed to impeach Mr. Bullock with the known inconsistencies between his trial testimony and that

Had trial counsel conducted an adequate investigation, they would have discovered Mr. Bullock's cellmate, Mr. Bland, whose testimony would have directly contradicted that of Mr. Bullock. Counsel failed to do this. (See ECF No. 790-5, ¶ 21.) The fact that Mr. Bullock was the only purported eyewitness and that his testimony bore directly on the issue of premeditation leads to the conclusion that there is a "reasonable probability that at least one juror would have struck a different balance." *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003). This conclusion is supported by the fact that at least two jurors have opined that Mr. Bullock's testimony was critical. (ECF No. 790 at 53). Finally, the prejudice to Mr. Caro from this deficient conduct must be viewed in light of the totality of the evidence, "both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). This "totality of the evidence," from a procedural point of view, simply cannot occur within the context of this Motion to Dismiss.

The Government attempts to paint a story where Mr. Bland's declaration and Mr. Bullock's testimony can be reconciled. They cannot be reconciled; Mr. Bland directly contradicts Mr. Bullock. The Government paints a picture where Mr. Bullock sees the murder, says nothing to Mr. Bland, and then sits down and plays cards. This story ignores the part of Mr. Bland's declaration where he states that Mr. Bullock "was not standing by the door prior to inmate Sandoval being removed from cell 123." (ECF No.

---

of his prior statements as well as the testimony of other trial witnesses, failing to point out that Mr. Bullock "got the day wrong, the weapon wrong, the statements made by Officer Gilley wrong, the statements made by Officer Laster wrong, the response by Officer Teters wrong, and, initially, his own viewpoint wrong." (ECF No. 790 at 50.)

41

790-2 ¶ 6) Mr. Bland's statement cannot be reconciled with Mr. Bullock's testimony that he was standing at his cell door and watching the officers deliver mail when they discovered Mr. Sandoval down in the cell. (Tr. 01/30/07 at 68.)

The Government fails to explain how it came to pass that Mr. Bullock, who purportedly was not to receive any benefit for his testimony in this case, recently received a concededly illegal reduction in his statutorily mandated life sentence, and now Mr. Bullock will be released in October 2017. (ECF No. 790 at 51.)

**C.     Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell.**

The Government disputes Mr. Caro's allegation that the BOP was negligent when it placed Mr. Sandoval in Mr. Caro's cell. It first argues that the placement of Mr. Sandoval in Mr. Caro's cell "was not random or without thought." (ECF No. 791 at 31.) This may be true, but it does not disprove Mr. Caro's claim, which is based not only on his expert's opinion, but also on the knowledge and opinion of the BOP's own officers in charge of gang investigations at USP-Lee and on common sense.

Officer Dustin Watts assigned Mr. Sandoval to Mr. Caro's cell because they belonged to the same gang. (Tr. 01/29/07 at 63.) While this general rule-of-thumb might be advisable at times, the circumstances here warranted the opposite conclusion. The Texas Syndicate had been categorized as a "Disruptive Group," one of the five most dangerous prison gangs. (ECF No. 790 at 54; Tr. 02/05/2007 at 92-96.) Within the last five months, there had been two previous within-gang assaults on Texas Syndicate members. The BOP knew that Mr. Caro had assaulted the leader of the Texas Syndicate,

that there had been a power struggle within the gang, and that Mr. Caro could expect "a cold dose of revenge" in the future. (ECF No. 782, Sealed Ex. 28.) The BOP officials who were investigating gang activities at USP-Lee, however, never bothered to communicate to the SHU officers that, in light of these recent circumstances, Mr. Caro should be separated from members of his own gang.[24]

The Government ignores the opinion of its own BOP investigator, and rather argues that Mr. Caro's expert, Mr. Bezy, perhaps misunderstood the facts because he referred to Mr. Sandoval's request as a "subsequent" or "second" request. Mr. Bezy did not misunderstand the facts. He clearly understood that BOP officers made the first request to place Mr. Sandoval in Mr. Caro's cell, that Mr. Caro refused, and then Mr. Sandoval made a second request after Mr. Caro's refusal. (Bezy Supp. Decl., Ex. 62 ¶ 2.)

The Government further attacks Mr. Bezy's opinion about the significance of Mr. Sandoval possessing a weapon. It dismisses this significance by asserting (without submission of evidence) that weapons are commonplace at the prison. (ECF No. 791 at 32.) Even if true, this fact does not negate Mr. Bezy's opinion and the fact that the BOP has a duty to insure a safe prison environment.

Second, the Government argues that "there is nothing to connect Sandoval's earlier possession of a shank and his death at the hands of Caro." (ECF No. 791 at 32.) Mr. Sandoval's possession of a deadly weapon is relevant for several reasons. Consistent with other evidence presented in Mr. Caro's 2255 Motion, it demonstrates potential gang

---

[24] A susbsequent BOP internal investigation report similarly recommended that as a result of the Benavidez assault, Mr. Caro should be separated from all members of his gang. (ECF No. 782, Sealed Ex. 51 at 12.)

tension, which the BOP should have investigated. (*See* ECF No. 790-1 ¶ 18.) Moreover, it is possible that Mr. Sandoval deliberately allowed himself to be caught with a weapon, with the hope that he would be placed in the SHU with the other Texas Syndicate members.

Finally, the Government argues that Mr. Caro's claim fails because he never said that the killing was gang related or that he feared for his safety. This fact, however, is irrelevant. The Government's own FBI agent stated that gang members are "tightlipped" and "won't say anything." (ECF No. 782, Sealed Ex. 28 at 27.) The truth of this statement is shown by the refusal of Mr. Benavidez to say anything about his attackers (ECF No. 782, Sealed Ex. 51 at 4), as well as Mr. Caro's termination of his interview as soon as FBI Agent Fender attempted to speak with him about gang involvement in the killing of Mr. Sandoval (Tr. 01/31/07 at 25-26).

The Government disputes Mr. Caro's allegations and the opinions of his expert and discounts reasonable inferences that should be drawn in Mr. Caro's favor. These disputes reveal that the issue cannot be summarily resolved in this Motion to Dismiss.

**D.** **Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence In Support of Self-Defense, Second-Degree Murder, or Manslaughter.**

Mr. Caro has alleged specific facts supporting a case of self-defense or lesser form of murder in his 2255 Motion (ECF No. 790 at 57-61) and in Claim Four (A), *supra*, of this opposition. The Government argues that these facts are unconnected, that his argument is specious, and that to accept it, one would have to conclude that "ALL murders at USP-Lee are arguably self-defense." (ECF No. 791 at 34-35.) The

Government's arguments cannot be resolved in a motion to dismiss, and highlight the need for further proceedings to resolve these disputes.

Mr. Caro's claim is not only not "palpably incredible" or "patently frivolous or false," *see Blackledge v. Allison*, 431 U.S. 63, 76-78 (1977), but is supported by the opinions of the Government's own investigators and agent. That there had been a struggle for leadership within the Texas Syndicate, that Mr. Caro had assaulted the gang leader, and that he might be facing a "cold dose of revenge," are all conclusions reached by BOP investigators. The Government itself even connected many of these facts in its grand jury proceeding that was generally titled, "In the Matter of: Texas Syndicate." (ECF No. 782, Sealed Ex. 28.)[25] There is nothing specious about these facts and analyzing them together does not lead to the conclusion that all prison murders are self-defense.

The Government also claims that this defense is at odds with Mr. Caro's statement that he killed over a "breakfast dispute." Again, the Government ignores the fact that gang members are forbidden from discussing gang matters with non-members, even when they are assaulted by another gang member. (*See* Claim Four (C), *supra*.) The fact that Mr. Caro did not blame the gang for what happened or inform the investigating officers that the attack was related to the Texas Syndicate is entirely consistent with the circumstances of this case.

---

[25] The Government did not disclose this document to trial counsel, and it is part of Mr. Caro's *Brady* claim in Claim Seven (B), *infra*. (*See also* ECF No. 790 at 153-55.)

**E.** **The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Mr. Caro's Claim of Ineffective Assistance of Counsel at the Guilt/Innocence Phase of Trial Improper for Summary Dismissal.**

As the law requires, this Court must conduct a cumulative review of trial counsel's deficient performance to determine whether it undermined confidence in the outcome of Mr. Caro's trial. *See* Introduction (B), *supra*. The Government ignores this requirement in its Motion to Dismiss, perhaps because this review makes it difficult for summary dismissal. *See, e.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 198-206 (2d Cir. 2001) ("*Strickland* directs us to look at the totality of the evidence before the judge or jury, keeping in mind that some errors have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. We therefore consider these errors in the aggregate.") (citations and internal quotation marks omitted).

Here, Mr. Caro has alleged that his counsel, by failing to adequately investigate, not only lacked a cohesive defense, but also fell short in undermining the Government's only purported eyewitness. What is more, counsel also failed to explain to the jury that the Mr. Sandoval's placement in Mr. Caro's cell was a result of both BOP negligence and an aggressive move by Mr. Sandoval. Had the jury been presented with a more complete and truthful portrait of the circumstances surrounding Mr. Sandoval's death, there is a reasonable probability that Mr. Caro could have been convicted of something less than premeditated murder. Moreover, trial counsel's failures at the guilt/innocence phase of trial set the stage for and impacted the outcome of the penalty phase as well. The ineffective-assistance-of-trial-counsel claims must be reviewed cumulatively.

46

Summary dismissal on Claim Four is improper at this stage of Mr. Caro's habeas proceedings. This 2255 proceeding is the only opportunity that Mr. Caro will have for court review of the facts that he is alleging in support of his claim that his Sixth Amendment right was violated at his capital trial. This Court, therefore, should deny the Government's Motion to Dismiss on Claim Four and allow further evidentiary development through discovery and a hearing.

**CLAIM FIVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING TRIAL COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

A *Brady* claim lies when the requested evidence is (1) favorable to the defense; (2) material; and (3) within the possession or control of the Government or its agents, and was not disclosed. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Evidence is deemed "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence.'" *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (internal quotation and

citation omitted) (holding that suppression of witness statement was material where witness's testimony was the only evidence linking the petitioner to the crime).

The Government does not dispute that it withheld exculpatory evidence from Mr. Caro. Rather, the Government argues (1) that this *Brady* claim is procedurally defaulted because it could have been raised on appeal, (2) that the evidence at issue was disclosed in a timely fashion and was otherwise available to Mr. Caro, and (3) that the suppressed evidence was not material.

In light of the trial counsel's specific request for a list of inmates on the SHU at the time of the offense, the Government's subsequent misrepresentations, trial counsel's reasonable reliance of these misrepresentations, and the untimely disclosure by the Government on the eve of trial and in the middle of more misleading statements and documents, this claim cannot be summarily resolved in the context of a motion to dismiss. The Court should not reward the Government's misconduct by precluding further inquiry, but rather should make an informed decision after an evidentiary hearing.

**A.** **Mr. Caro's Claim is Not Procedurally Defaulted Because it Relies on Evidence Outside of the Record and Thus Could Not Have Been Raised on Appeal.**

The Government argues that Mr. Caro's claim is procedurally defaulted because he did not raise it on appeal, and Mr. Caro has not shown cause for this default. Mr. Caro's claim is not procedurally defaulted because it relies on new evidence that was not available to appellate counsel. If the Court finds that it is procedurally defaulted, however, the Government's withholding of evidence, misrepresentations, and trial

counsel's reasonable reliance on the Government's misrepresentations constitutes cause to overcome this default.

As alleged in his 2255 Motion, the Government withheld documents and misrepresented the fact that Mr. Bullock had a cellmate, Joseph Bland. (ECF No. 790 at 62-64.) Mr. Caro's habeas counsel subsequently found and interviewed Joseph Bland, who contradicts the Government's only purported eyewitness to the offense. (ECF No. 790 at 46-47; 62-64, ECF No. 790-2.) Mr. Bland's exculpatory declaration is newly discovered, extra-record evidence that was developed in the instant proceedings and did not exist at the time of the appeal. As a result, this *Brady* claim falls within the "exception to the procedural default rule" because it could not have been presented on appeal "without further factual development." *See Bousley v. United States*, 523 U.S. 614, 621 (1998) (acknowledging that a claim that a guilty plea was coerced falls within this exception to the procedural default rule); *see also Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam) (holding that an issue was appropriately raised in a habeas petition where "[t]he facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal"). Should the Court find that the claim is procedurally defaulted, the Government's misrepresentations and suppression of evidence constitute cause. *See Strickler v. Greene*, 527 U.S. 263, 283-88 (1999) (holding that documents suppressed by the government and claims of "open file" policy impeded "trial counsel's access to the factual basis for making a *Brady* claim" and establish cause for a procedural default).

49

Finally, the Government's argument must fail, as it would preclude any court from ever considering the merits of a *Brady* claim that relies, as virtually all *Brady* claims do, on evidence outside of the record. For this reason, *Brady* claims are typically developed in habeas or post-conviction proceedings. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 421(1995) (raising Brady claim in habeas corpus proceedings); *Strickler*, 527 U.S. at 265 (same); *Jean v. Rice*, 945 F.2d 82, 83 (4th Cir. 1991) (same).[26]

**B.    The Government Did Not Disclose the Exculpatory Information in a Timely Manner.**

Almost three years before trial, the Government knew that at the time of the offense its sole eyewitness, inmate Sean Bullock, had a cellmate, Joseph Bland. The Government did not reveal this fact to the defense until December 29, 2006, less than one month before the start of trial.[27] The Government appears to dispute Mr. Caro's allegation that its disclosures and statements misrepresented the fact that Mr. Bullock had a cellmate. (*Compare* ECF No. 790 at 62-64 *with* ECF No. 791 at 33-34.) The Government, however, does not and cannot dispute that counsel for Mr. Caro overlooked

---

[26] Had Mr. Caro raised a factually unsupported *Brady* claim on appeal, he would have lost and the Government now would be arguing that the claim was procedurally defaulted because it already had been presented on appeal. (*See* Claim 7, *infra*.) In the alternative and should the Court find that appellate counsel should have raised this claim, appellate counsel's ineffective conduct in failing to do so constitutes cause for the procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 754 (1991) (recognizing ineffective assistance of counsel as cause for procedural default.); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (noting that appellate counsel's performance will constitute cause where counsel is "constitutionally ineffective under the standard established in *Strickland v. Washington*").

[27] Jury selection began on January 22, 2007 (ECF No. 517), and the parties gave opening statements on January 29, 2007 (ECF No. 556).

the existence of the cellmate, and that this failure was not due to strategy. (ECF No. 790-5 ¶ 21.)

There is no black-and-white rule that establishes when a disclosure is timely. The Supreme Court has cited ABA Standards for the prosposition that a "prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused." *Kyles*, 514 U.S. at 437 (*quoting* the ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993).) Rather, a court must make this determination of the timeliness of the disclosure in light of all of the relevant circumstances. Here, the Government knew for almost three years that Mr. Bullock had a cellmate. When the Government finally disclosed this evidence, it was less than one month before trial, and was tucked away in grand jury testimony that was produced simultaneously with statements and other documents that strongly implied that Mr. Bullock had no cellmate.[28]

This "needle in the haystack" manner of disclosure, along with the Government's misrepresentations and disclosures that indicated that Mr. Bullock did not have a cellmate, must be considered when determining the timeliness of the Government's disclosure. The Government has not alleged any security concerns or other motive for

---

[28] On December 29, 2006, when it produced Mr. Bullock's grand jury testimony, the Government also stated that it had interviewed "all the inmates on the SHU" and was providing their interview forms as well. (Letter from A. Giorno to S. Kalista, dated Dec. 29, 2006 (hereinafter "Disclosure Letter"), attached as Ex. 64.) This group of interview forms did not include Mr. Bland's interview form.

withholding the evidence until the eve of trial. It would be premature for the Court to summarily rule on this fact-driven inquiry in the context of this Motion to Dismiss.[29]

## C. In Light of the Government's Knowing Misrepresentations, the Evidence Was Not Otherwise Available to Mr. Caro.

Early in this case, Mr. Caro's trial counsel specifically requested a list of all inmates on the SHU at the time of the offense; the Court also ordered the Government to provide such a list. The Government responded by providing a list that indicated that Mr. Bullock did not have a cellmate. (*See* ECF 790 at 63.)

The Government's misrepresentations and defense counsel's detrimental reliance on these misrepresentations necessarily alter the analysis of whether the evidence was otherwise available. *Cf. United States v. Bagley*, 473 U.S. 667, 682 (1985) (noting that "the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process" by causing the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued"). The consequences of the Government's misleading response to this specific request, as well as subsequent misleading communications, should be borne by the Government, and the Court should not find that the evidence was "otherwise available." *See id.* at 682 ("[T]he more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist . . . ."); *also Banks v. Dretke*, 540 U.S. 668, 694 (2004)

---

[29] Mr. Caro's trial counsel overlooked the fact that Mr. Bullock had a cellmate. (ECF No. 790-5 ¶ 21, ECF No. 790-9 ¶ 4.) This oversight by counsel, as well as counsel's failure to seek a continuance from the Court in order to interview the cellmate when Mr. Bullock testified at trial that he had a cellmate, is addressed in Claim Four(B), *supra*.

(stating that a defendant may "assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction").

The Supreme Court has rejected the proposition that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence, . . . so long as the potential existence of a prosecutorial misconduct claim might have been detected." 540 U.S. *at* 696 (internal quotation marks and citation omitted) (rejecting the State's claim that the petitioner's *Brady* claim was procedurally defaulted). A "rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.*

To resolve this claim, the Court must determine whether trial counsel's reliance on the Government's repeated misrepresentations was reliable and thus the evidence was not "otherwise available." This analysis is inappropriate in the context of this Motion to Dismiss and summary dismissal is premature.

**D.      The Suppressed Evidence Contradicted the Government's Sole Purported Eyewitness and Is Material.**

The importance of Mr. Bullock's testimony to the Government's premeditation case cannot be underestimated. The issue at trial was whether the murder was premeditated or conducted in the heat of the moment. Mr. Bullock was the Government's sole purported eyewitness regarding premeditation. The Government even took the unusual step of calling a character witness, BOP employee Gregory Bondurant, who testified to his opinion that Mr. Bullock was truthful. (Tr. 01/31/07 at 34-36.) The Government relied on Mr. Bullock's statements on at least thirteen separate occasions

during trial to argue that Mr. Caro ambushed or "snuck up" on Mr. Sandoval from behind. (ECF No. 790 at 52.)[30] Two of the jurors stated that Mr. Bullock's testimony was essential to their decisions. (ECF No. 790 at 62.)[31] Mr. Bullock's testimony was vital to the Government's case and the Government's failure to disclose this exculpatory evidence prejudiced Mr. Caro. *See Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (holding that suppression of witness statement was material where witness's testimony was the only evidence linking the petitioner to the crime).[32]

In light of defense counsel's specific request for a list of inmates in the SHU at the time of the offense, it is reasonable to assume that they intended to interview these inmates, especially the inmates who, like Mr. Bland, were housed in cells near Mr. Caro's cell. Had counsel interviewed Mr. Bland, it also is reasonable to assume that he

---

[30] (Tr. 01/29/2007 at 15 ("snuck up behind"); *id.* at 15 (waited until he turned his back and "snuck up behind"); *id.* at 16 (this was a "sneak attack"); *id.* at 21 ("sneaks up behind"); *id.* at 26 ("sneaking up behind"); Tr. 02/1/2007 at 13 (saw Caro behind Sandoval); *id.* at 18 ("ambushed" Mr. Sandoval and "came up from behind"); *id.* at 45 ("from behind with a towel"); *id.* at 49 ("comes up behind him"); *id.* at 49 (had his back turned to him and "came up behind him"); Tr. 02/05/2007 at 19 ("snuck up behind him"); *id.* at 46 ("ambushed him from behind"); Tr. 02/13/07 at 88 ("snuck up behind him").)

[31] *See* ECF No. 790-31 (Juror #37 declaring that it would have made a difference if another inmate testified that Bullock "didn't see what happened" and if "Sandoval was sent to the SHU because he had a shank"); ECF No. 790-33 (Juror #79 stating that "inmate eye witness account of the murder was essential to my decision").

[32] Mr. Caro has briefed the materiality/prejudice of the suppressed evidence in Claim Four(B), *supra*, within the context of an ineffective-assistance-of-trial counsel claim. The standard for materiality is the same for both *Brady* and *Strickland* claims. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of "prejudice" in Strickland). Mr. Caro therefore incorporates by reference all of the facts and arguments presented in Claim Four(B). As discussed earlier, the Court must consider the cumulative impact of both the Government's *Brady* and *Strickland* violations when determining materiality.

would then have contradicted Mr. Bullock's testimony, the same as he has done now. (ECF No. 790-2.)

The Government nevertheless claims that its failure to disclose this evidence did not prejudice Mr. Caro because Mr. Caro's callous post-offenses statements, together with the fact that Mr. Sandoval was found dead and strangled in in the cell, "constitute overwhelming evidence proving that Caro murdered Sandoval." (ECF No. 791 at 38.) This argument fails for a number of reasons. First, the issue at trial was not whether Mr. Caro killed Mr. Sandoval; in fact, counsel conceded this fact. The issue was whether the killing occurred with premeditation, and Mr. Bullock was the Government's only eye-witness regarding this assertion. The Government conveniently ignores its own reliance on Mr. Bullock at trial, which can be objectively measured by the Government's repeated references to Mr. Bullock's testimony in both the guilt and penalty phases of trial and its use of a character witness.

Second, the Government fails to analyze the materiality of Mr. Bullock's testimony in light of the entire record, which includes not only the trial record but also the facts alleged in Mr. Caro's 2255 Motion. This matters because Mr. Caro has alleged that his post-offense statements were for the purpose of self-preservation and to ward off future attacks on him by gang members or other inmates.[33] These allegations mitigate the purportedly "overwhelming evidence" of his post-offense statements. (*See* Claim Four (A) & (C), *supra*, and Claim Six (E) *infra*.) The Government also ignores the facts and

---

[33] In other sections, the Government has disputed these factual allegations, which perhaps explains its failure to address them in this section. For purposes of the Motion to Dismiss, however, the Court must assume the truth of Mr. Caro's allegations.

allegations supporting a "cold dose of revenge" defense that similarly mitigate the impact of Mr. Caro's post-offense statements. (*See id*.) To accept the Government's argument, the Court would have to reject Mr. Caro's facts and allegations, which it cannot do in a motion to dismiss.

Finally, the Government fails to address the impact of defense counsel's specific request for this information. While the test for materiality remains whether there is a reasonable probability that with the disclosure the result would have been different, the existence of a specific request provides additional force to the conclusion that the suppression undermined confidence in the result. *See, e.g.*, *Lindsey v. King*, 769 F.2d 1034,1041 (5th Cir. 1985) (stating that "all of the participating Justices [in *Bagley*] agreed on one thing at least: that reversal for suppression of evidence by the Government is most likely where the request for it was specific"); *Jean v. Rice*, 945 F.2d 82, 87 (4th Cir. 1991) (finding *Brady* violation where "audio recordings and accompanying reports— twice requested—should have been disclosed to defense counsel").

Resolution of Mr. Caro's *Brady* claim involves the consideration of evidence outside the record, as well as an assessment of the cumulative materiality of all of the withheld evidence. As such, this claim is not conducive to resolution in the context of a motion to dismiss.

**GROUNDS FOR RELIEF: PENALTY PHASE**

**CLAIM SIX: MR. CARO HAS SUFFICIENTLY ALLEGED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY PHASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

**A.      Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Challenge the Government's Deliberate and Tactical Delay of Mr. Caro's Indictment.**

The Government argues that for the reasons set forth in its Motion to Dismiss Claim One, there was no basis to challenge Mr. Caro's conviction or sentence in the Benavidez case, that any such challenge would have been futile, and therefore trial counsel were not ineffective in failing to raise such a challenge. (ECF No. 791 at 39.) Mr. Caro disagrees for the reasons presented in Claim One of his Opposition, *supra*, and herein incorporates those arguments by reference.

The Government further argues that Mr. Caro has not demonstrated prejudice, in that if the Benavidez case was still pending at the time of his capital penalty proceedings, the Government still would have been able to introduce evidence of the facts and circumstances surrounding the Benavidez assault as an aggravating factor. (ECF No. 791 at 39.) Mr. Caro disagrees. First, it is doubtful that the Benavidez case would not have been resolved by this time. *See United States v. Caro*, 2:03-cr-10115 (W.D. Va.), ECF No. 107 (resetting the jury trial to August 3 and 4, 2004). If Mr. Caro had gone to trial, an acquittal on the murder charge was likely in light of the fact that the victim was not

going to testify and the videotape was of poor quality. (ECF No. 790-55 at 6.) What is more, the victim, Ricardo Benavidez, suffered only superficial wounds (ECF No. 790-60 (doctor's report noting "no evidence of deeply penetrating injury"), indicating that his assailants were not, in fact, attempting to kill him. In fact, Mr. Benavidez was only in the hospital overnight for observation. Had Mr. Caro received an acquittal on the conspiracy to commit murder count, the Government could not have used the acquitted conduct as an aggravating factor. *See United States v. Stitt*, 760 F. Supp. 2d 570, 584 (E.D. Va. 2010) (holding that "acquitted conduct cannot be used as an aggravating factor in a capital case").

Even if the Benavidez case had not been resolved prior to Mr. Caro's capital trial, evidence of the circumstances of that assault would not have been nearly as condemning as a conviction for conspiracy to commit murder. Without a conspiracy-to-commit murder conviction, counsel could have argued that the Sandoval murder conviction was Mr. Caro's first conviction for a crime of violence, and therefore he was not "the worst of the worst" deserving of death. For these reasons, Mr. Caro has sufficiently alleged prejudice to survive this Motion to Dismiss.

Summary dismissal also is inappropriate at this juncture because the Court has not yet had an opportunity to consider the totality of all of counsel's unprofessional errors. A "court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland v. Washington*, 466 U.S. 668, 695 (1984). According to the Fourth Circuit, the "totality-of-the-evidence standard" requires the Court to "consider *all* of the trial and PCR evidence favoring [Mr. Caro's] acquittal and then to reweigh that

evidence against the [Government's] evidence of guilt." *See Elmore v. Ozmint*, 661 F.3d 783, 868 (2011). This type of analysis cannot occur in the isolated manner urged by the Government in this Motion to Dismiss.

**B.** **Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance was Deficient When They Failed to Adequately Investigate, Develop, and Present a Compelling Mitigation Story About Mr. Caro's Life.**

Mr. Caro has sufficiently alleged that trial counsel failed to investigate, develop, and present a compelling story about Mr. Caro's life. (ECF No. 790 at 66-113.) The Government urges this Court to summarily dismiss this claim. (ECF No. 791 at 39-50.) For reasons stated herein, summary dismissal is inappropriate on Claim Six (B).

The Government initially claims that the "record" does not support Mr. Caro's claim. (*Id.* at 39.) That statement, in and of itself, demonstrates the fatal flaw in the Government's argument and its request for summary dismissal: a claim of ineffective assistance of counsel necessarily involves information developed *outside* the record. *See, e.g.*, *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) (recognizing that "the evidentiary basis for a claim of ineffective assistance . . . often turns on evidence outside the trial record"). Indeed, "[c]laims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." *Id.*; *see also Massaro v. United States*, 538 U.S. 500, 505 (2003) (evaluating claims of trial counsel's ineffectiveness not generally done on appeal because "trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them"). "Without additional factual development, . . . [this] court may not be able to ascertain whether the alleged error was prejudicial." *Massaro*, 538 U.S. at 505. Because of that, Mr. Caro's detailed and fact-

specific claim that trial counsel failed to adequately investigate, develop, and present mitigating evidence is inappropriate for summary dismissal.

The bulk of the Government's argument attacks the merits of Mr. Caro's claim arguing only that trial counsel's performance was not deficient. The Government states that "Caro concedes, that despite these difficult circumstances, trial counsel made reasonable and diligent efforts to build a mitigation defense." (ECF No. 791 at 40.) Mr. Caro, however, never conceded that trial counsel's efforts were "reasonable and diligent." In fact, Mr. Caro's entire claim was based on the fact that counsel's performance regarding the mitigation case was *unreasonable*. (*See* ECF No. 790 at 88 ("[Counsel] failed to take the reasonable and necessary steps to present a compelling mitigation case that would convince at least one juror to vote for life."); *id.* at 94 ("counsel's decision not to present evidence of brain damage was inherently unreasonable because their inadequate development of a mental health defense before trial was unreasonable"); *id.* at 95 ("Any decision that counsel made based on purported concerns about Dr. Phillips's opinion were also unreasonable and uninformed."); *id.* at 96 ("Compounding the unreasonableness of counsel's decision is that it was based on a "feeling" that Dr. Phillip's anticipated testimony could not be rebutted."); *id.* at 98 ("Counsel's decision to prevent the jury from hearing this evidence was unreasonable and their performance was deficient."); *id.* at 100 ("failure to retain an expert to present testimony regarding the impact of these factors was unreasonable"); *id.* at 103 ("Counsel's failure to call these available witnesses to the stand was unreasonable.").) Perhaps the Government's

60

inaccurate statement is why the Government believes summary dismissal is appropriate for this claim. It is not.

Mr. Caro alleged five main factors in support of his claim that trial counsel failed to adequately investigate, develop, and present a compelling mitigation story about his life: (a) that counsel never developed a reasoned and cohesive mitigation theme; (b) that counsel failed to appropriately request, adequately develop, and present testimony of mental-health experts; (c) that counsel failed to obtain an expert to explain the effects Mr. Caro's traumatic childhood; (d) that counsel failed to present testimony of Mr. Caro's brothers; and (e) that the limited mitigation case was undermined by (1) counsel's argument to the jury and (2) counsel's introduction of an unhelpful witness.[34] Rather than directly address several of Mr. Caro's factors supporting this claim of ineffective assistance of counsel, the Government generally attacks the evidence that Mr. Caro has presented to support his claim—refuting the diagnosis of brain dysfunction, criticizing the experts Mr. Caro retained to support the allegations in his 2255 Motion, and relying on purported strategic decisions of counsel—all without any evidentiary support. These arguments are fact-specific and highlight the need for an evidentiary hearing, rather than support the appropriateness of summary dismissal. What is more, the Government only refutes Mr. Caro's claims regarding counsel's performance; the Government makes no argument regarding prejudice. As such, summary dismissed is improper regarding Mr. Caro's allegations of prejudice.

---

[34] The Government fails to directly address subsection (a) or subsection (c), and it never even mentions subsection (e)(1).

The Government would have this Court believe that Mr. Caro's counsel exercised diligence by investigating and hiring appropriate experts and that any failure in presenting a mitigation defense was not due to counsel's deficiencies but was simply because Mr. Caro lacks "any humanizing characteristics." (ECF No. 791 at 50.)  This could only be true if the Government ignores the allegations and declarations that Mr. Caro has put forth in his 2255 Motion, all of which "humanize" Mr. Caro and the struggles he has faced since birth.  For purposes of a motion to dismiss, the Government cannot do that.

### 1. Whether Counsel's Failure to Present Mental Health Evidence Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.[35]

The Government spends much of its argument speculating why counsel's decision not to introduce mental-health evidence was reasonable.  The Government's argument undermines its request for summary dismissal; rather, it supports the need for a hearing.  The Government's attorney provides this Court with no rebuttal evidence from a mental-health expert, but instead makes broad allegations that are refuted by Mr. Caro's mental-health experts as well as the law.  Mr. Caro's claim regarding counsel's ineffective assistance as it related to mental health evidence is quite straightforward:  counsel's performance fell below the capital defense standards because they did present testimony from the neuropsychological expert that they hired nor did they retain other appropriate experts who could offer a valid mental-health defense at the penalty phase of trial.  Once

---

[35] Because Mr. Caro is responding to the Government's motion, he is organizing his response in a similar fashion.

counsel learned that Mr. Caro had brain dysfunction and a history of trauma, it was imperative for them to explain this to the jury at the penalty phase. They never did.

The Government rewrites Mr. Caro's claim by saying that trial counsel were not deficient by failing to find the "right" psychiatrist and that Mr. Caro's "claim that trial counsel erred in failing to find a substitute for Caruso has no support in the law." (ECF No. 791 at 46.) But Mr. Caro did not allege that counsel failed to find the right psychiatrist; rather he alleged that counsel fell short by failing to retain appropriate and available experts who could have presented a compelling mitigation case. This is a critical difference and one that the Government never refuted. As Mr. Caro explained in his 2255 Motion, Dr. Caruso was not an appropriate mitigation witness because he was retained to assess Mr. Caro's mental state at the time of the crime (for purposes of a guilt-phase defense), and consequently he learned information that would have been unhelpful during the penalty phase. (ECF No. 790 at 93.)[36] To determine whether counsel's strategy in abandoning the presentation of *all* mental health testimony was reasonable, this Court needs to hold a hearing.

Rather than address counsel's failure to present evidence of Mr. Caro's brain dysfunction, the Government attempts to attack Dr. Spica's neuropsychological findings that Mr. Caro, in fact, suffers from brain dysfunction. The Government's response, however, underscores the need for evidentiary development. Counsel for the United

---

[36]The Government suggests that it is unknown when trial counsel learned that Dr. Caruso had unhelpful information. (ECF No. 791 at 43.) But Mr. Caro alleged that counsel knew "nearly five months before trial" that they would not use Dr. Caruso. (ECF No. 790 at 75.) This allegation must be taken as true for purposes of summary dismissal.

States is not a neuropsychologist or a psychiatrist. Yet in the Motion to Dismiss, counsel argues—without supporting documentation—that Dr. Spica's email is inconsistent with his report. (*See* ECF No. 791 at 42 at n.9 (noting that the phrase "converging although somewhat inconsistent signs of frontal lobe dysfunction" is inconsistent with the conclusion that Mr. Caro has frontal lobe dysfunction).) Dr. Spica "strongly disagree[s]" that the statement in his email is inconsistent with his report. (*See* Letter from D. Malcolm Spica, Ph.D., to Robin Konrad, dated Sept. 10, 2013 (herein after "Spica Letter"), attached as Ex. 65 at 1.) This factual dispute should be properly resolved in a hearing.

The Government further attempts to discredit Dr. Spica's conclusion—and psychiatrist Donna Schwartz-Watts, M.D.'s diagnosis—that Mr. Caro has brain impairment because there is no mention in his report of "brain damage." (ECF No. 791 at 42.) In his 2255 Motion, in explaining the diagnosis, counsel stated: "*In lay terms*, this means that Mr. Caro has brain damage." (ECF No. 790 at 93) (emphasis added). But the lay use of the phrase "brain damage" does not undermine the existence of Mr. Caro's brain impairment, but rather supports the need for experts to explain the information in the proper terms. There is an explanation why Dr. Spica, who is a mental-health expert, does not use the term "damage." As Dr. Spica notes, "the term brain damage denotes a compromise from previous function." (Spica Letter, Ex. 65 at 1.) Dr. Spica uses the term brain dysfunction rather than brain damage because Mr. Caro's "brain dysfunction" is due to a *developmental* condition rather than *acquired* 'damage.'" (*Id.*) Regardless of

64

the term used, the Government has presented no evidence to refute Mr. Caro's supported allegation that his brain is impaired.

The Government also attempts to support its statement that "the absence of brain damage is supported by Dr. Swerdlow's reports" after reviewing Mr. Caro's EEG and MRI. (ECF No. 791 at 42, n.8.) Despite record evidence to the contrary, the Government assumes that the absence of an indication of brain impairment on an MRI means that Mr. Caro does not have brain damage. As Dr. Schwartz-Watts indicated in her declaration, "Having a normal MRI means that Mr. Caro's *brain structure* is intact, but it is not a study of *brain function*." (ECF No. 790-8, ¶ 13 (emphasis added).) The Government has not presented any expert declarations to support its argument. This fact, therefore, is contested and a hearing is the appropriate manner to resolve the dispute.

The Government also demonstrates a lack of understanding regarding the term "mental health" when it asserts that Dr. Selvog is a "licensed clinical social worker [LCSW], *not* a mental health expert." (ECF No. 791 at 42 (emphasis added).) This statement is factually inaccurate. An LCSW can diagnose and treat mental illness.[37]

---

[37] *See* National Ass'n of Social Workers, Standards for Clinical Social Work in Social Work Practice, at 7, *available at* http://www.socialworkers.org/practice/ standards/naswclinicalswstandards.pdf (last visited October 8, 2013) ("Clinical social workers represent the largest group of behavioral health practitioners in the nation. They are often the first to diagnose and treat people with mental disorders and various emotional and behavioral disturbances."); Clinical Social Work Association, Mission Statement, *available at* www.clinicalsocialworkassociation.org (last visited October 8, 2013) ("Clinical social workers are the most recognized practitioners of mental health services in the nation."); American Board of Examiners in Clinical Social Work, Clinical Social Workers, *available at* http://abecsw.org/csw-marketplace.html (last visited October 8, 2013) ("The nation's 200,000 Clinical Social Workers provide more mental healthcare, of more types and in more settings, than any other profession. . . . Recognized

Often LCSWs are qualified as "mental health experts" for purposes of testifying.[38] More specifically, Dr. Selvog—who, in addition to being an LCSW in Virginia and Washington, D.C., at the time of Mr. Caro's trial, holds a Ph.D. in Social Work—had been qualified as an expert in many capital cases, in both state and federal courts. (*See* Email from H. Selvog to S. Kalista (with Selvog CV attached), dated Mar. 15, 2006, attached as Ex. 66; *see also supra*, n.37.) Had the Government looked at the definition of LCSW under Virginia law (one of the two jurisdictions where Dr. Selvog was licensed), it would have learned that "'Clinical social worker' means a social worker who, by education and experience, is professionally qualified at the autonomous practice level to provide direct diagnostic, preventive and treatment services where functioning is threatened or affected by social and psychological stress or health impairment." Va. Code Ann. Chapter § 54.1-3700 (2012).[39] This Court should not grant summary dismissal on Mr. Caro's claim related to mental-health evidence where the Government has no factual basis to support its statement.

---

with their own title, Clinical Social Worker, and their own level of licensure (to protect the public) in every state in the union, Clinical Social Workers are mental healthcare professionals similar to clinical psychologists.").

[38] *See Wiggins v. Smith*, 539 U.S. 510, 516 (2003) (granting habeas relief and noting that petitioner supported his claim in post-conviction proceedings with the expert testimony of licensed social worker Hans Selvog); *see also People v. R.R.*, 807 N.Y.S. 2d 516, 544 (N.Y. Sup. Ct. 2005) ("Clinical social workers are uniquely suited to assist the courts as forensic experts because they have particular competence in assessing the impact of a person's mental and physical condition on his or her social functioning, a key element in rendering forensic mental health assessments and opinions.").

[39] The language in the current statute was identical to the language in 2006, when Dr. Selvog was retained by Mr. Caro's trial counsel.

The Government's rebuttal to Mr. Caro's assertion that had counsel conducted a complete mental-health investigation, they could have discredited both of the Government's experts—Drs. Phillips and Montalbano—is speculative at best. The Government asserts that Rule 12.2 prevented counsel from reviewing Dr. Phillips's report before the penalty phase. (ECF No. 791 at 47.)[40] This rule, however, does not prevent counsel from making reasoned informed decisions. In fact, that the rule limited review of the report until after a guilty verdict further emphasizes the unreasonableness of counsel's investigation and preparation for the penalty phase. Unlike other jurisdictions where counsel may have the benefit of learning the Government's expert's opinion well in advance of trial, here counsel needed to prepare in anticipation of learning that information within a day of having to go forward with the penalty phase.

The Government claims that neither of Mr. Caro's assertions regarding challenging Dr. Phillips or Dr. Montalbano is reasonable. According to the Government, trial counsel were reasonable in abandoning the presentation of any mental-health evidence because, based on Dr. Caruso's examination, counsel could conclude that Dr. Phillips would provide information that was "extremely damaging." (ECF No. 791 at 47.) This is not supported by the record and is inappropriate speculation for purposes of a motion to dismiss. As Mr. Caro alleged, counsel had informed the Government that Mr. Caro would not discuss with Dr. Phillips the circumstances related to his current charges

---

[40] While this may be true under the rule, the Government offered to disclose Dr.Phillip's report prior to trial and pursuant to a reciprocal disclosure agreement between counsel. (Email from A. Giorno to S. Kalista, dated Sept. 28, 2006 (hereinafter "Reciprocal Disclosure Offer"), attached as Ex. 67.) Mr. Caro's trial counsel did not agree to this.

or his previous convictions. (ECF No. 790 at 77.)[41] Counsel had also withdrawn their notice that expert mental-health testimony would be presented in the merits phase of the trial. (ECF No. 292, Withdrawal of Notice to Government's Attorneys of Intent to Present Evidence Pursuant to Rule 12.2(b)(1) on the Issue of Guilt, 09/21/2006.) Therefore, counsel could not reasonably assume that Dr. Phillip's report would have been extremely damaging.

The Government's assertion that Dr. Phillips's report itself supports the decision of counsel not to call a mental-health expert is contested and without merit. (ECF No. 791 at 47 n.12.) As an initial matter, counsel never reviewed Dr. Phillips's report, so the Government cannot argue that any allegedly damaging information contained therein supports counsel's reason for not presenting a mental health expert. What is more, the information in Dr. Phillips's report upon which the Government relies would have been easily refuted by a defense expert and even his report itself. The Government highlights the fact that Dr. Phillips's reported that Mr. Caro said he had a happy childhood with no abuse. (ECF No. 791 at 47 n.12.) But this statement fails to reconcile the fact that Dr. Phillips also wrote that Mr. Caro's father "was an alcoholic," would "get drunk and beat [Mr. Caro's mother] up" and that Mr. Caro's older brother always picked on him. (ECF No. 561 at 14.) As Dr. Schwartz-Watts explained in her declaration, Dr. Phillips's report "fail[ed] to discuss a complete trauma history." (ECF No. 790-8, ¶ 20.) An appropriate

---

[41] *See* Reciprocal Disclosure Offer, Ex. 67 (memorializing a conversation between the Government and Mr. Caro's trial counsel in which trial counsel explained that Mr. Caro would make no statements to Dr. Phillips about the Sandoval killing, the Benavidez stabbing, or the incident at Oakdale).

and properly prepared defense expert could have easily attacked Dr. Phillips's report and any assertion by the Government that Mr. Caro had a happy, abuse-free childhood. (See Supplemental Declaration of Donna Marie Schwartz-Watts, M.D., dated October 7, 2013(hereinafter "Schwartz-Watts Supp. Decl."), attached as Ex. 68 ¶ 2.)

The Government also relies on Dr. Phillips's statement that Mr. Caro has no deficits in adaptive functioning, and on prison psychologists finding that Mr. Caro's mental status is within normal limits. (ECF No. 791 at 47 n.12.) Had counsel retained an appropriate expert for purposes of testifying at the penalty phase, he or she could have explained that measurements of adaptive functioning generally refer to a diagnosis of intellectual and development disability (formerly called mental retardation). (Schwartz-Watts Supp. Decl., Ex. 68 ¶ 3.) Mr. Caro has not been diagnosed as having intellectual and development disability, and therefore that statement is irrelevant to his brain dysfunction and anxiety disorder. (*Id.*) Further, a defense expert familiar with prison evaluations could have explained that prison psychologists conduct cursory evaluations that are completed generally within a few minutes. (Schwartz-Watts Supp. Decl, Ex. 68 Attachments A-L.) What is more, the prison psychologist's findings are not inconsistent with Mr. Caro's personality and do not contradict the opinions of Dr. Spica and Dr. Schwartz-Watts. (Schwartz-Watts Supp. Decl., Ex. 68 ¶ 5.) [42]

The Government claims that Mr. Caro's assertion that counsel could have discredited Dr. Montalbano was speculative. (ECF No. 791 at 47 n.11.) On the one hand,

---

[42] The Government fails to even rebut Mr. Caro's allegation in subsection (c) that counsel failed to obtain an expert to explain the effects of his traumatic childhood.

the Government bolsters the reasonableness of counsel's decision to forgo presentation of mental-health evidence based upon anecdotal evidence about Dr. Phillips's reputation (ECF No. 791 at 47), and on the other hand, discounts anecdotal evidence that Dr. Montalbano had used inadequate testing procedures (*id.*). Counsel would have been able to cross-examine Dr. Montalbano about his testing procedures in this case and potentially could have asked relevant questions about his inadequate testing in other cases. But, more importantly, the Government fails to mention Dr. Spica's declaration asserting that Dr. Montalbano did not administer multiple tests for executive functioning. (ECF No. 790-10, Spica Decl. ¶ 11.) This information is relevant because it means that the Government's expert testimony would have been compromised at the penalty phase.

Finally, the Government asserts that Mr. Caro lacked expert testimony to effectively rebut Dr. Phillips and that "the lack of rebuttal testimony was not due to counsel's failure to exercise due diligence in investigating and identifying appropriate mental health experts, but rather to the inability of their selected experts to assist them." (ECF No. 791 at 48.) This statement is refuted by Mr. Caro's allegations otherwise (ECF No. 790 at 90-98), which this Court must accept as true when reviewing the Government's Motion to Dismiss. Mr. Caro asserted that counsel did *not* identify appropriate experts. This is yet another reason why summary dismissal is improper at this stage of litigation.

**2.** **Whether Counsel's Failure to Present Testimony of Mr. Caro's Brothers Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.**

As to subsection (d)—that counsel failed to present testimony of Mr. Caro's brothers—the Government asserts several uncompelling reasons why this claim should be dismissed. First, the Government asks this Court to dismiss the claim because Mr. Caro did not submit affidavits or other documents from either brother regarding their wiliness to testify. (ECF No. 791 at 48.) But Mr. Caro is not required to provide documentary evidence supporting his allegations at the pleading stage. *See* Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings for the U.S. District Courts (noting that motion for relief requires petitioner to allege the "facts supporting each ground" for relief); *United States v. Witherspoon*, 231 F.3d 923, 927 (4th Cir. 2000) (reversing district court's dismissal of motion where petitioner's "facts if true would entitle him to relief"). Mr. Caro alleged that both Jose and Noe were "available witnesses" (ECF No. 790 at 100), and provided a detailed description of the testimony that the brothers could have given (ECF No. 790 at 101-03). Under the governing rules and this Circuit's precedent, these allegations are sufficient to defeat the Government's Motion to Dismiss.

Second, the Government believes it is relevant that there was no indication that Dr. Selvog recommended the brothers as crucial witnesses to counsel before his declaration of December 31, 2012, submitted to this Court in support of Mr. Caro's 2255 Motion. (ECF No. 791 at 48.) This assertion is contrary to Mr. Caro's allegations and the trial court record. Counsel were aware well in advance of trial that brothers Jose and Noe could provide a portrait of the Caro family household that no other witness could

71

provide. As Mr. Caro alleged in his 2255 Motion, Dr. Selvog submitted a declaration to this Court supporting counsel's request for writs of habeas corpus ad testificandum over one month before trial; that declaration explained why Jose and Noe were important witnesses. (ECF No. 790 at 80.) The Government supports its conclusion that trial counsel were unaware that these witnesses were important by citing two of Dr. Selvog's memoranda, which the Government contends, did not include reference to Jose and Noe. (ECF No. 791 at 48.) The first memorandum dated May 15, 2006, is heavily redacted.[43] (ECF No. 791-6 (Memorandum from H. Selvog to D. Mullikan, S. Kalista and J. Simmons, dated May 15, 2006.) One of the redacted parts does, in fact, list both Noe and Jose as witnesses. (Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons, dated     May 15, 2006, re: Witnesses/Records by Location, attached as Ex. 69.) The second memorandum, dated June 13, 2006, outlines a list of witnesses for travel to Falfurrias, Texas. (ECF No. 791-4.) Noe and Jose were not in Falfurrias because they were incarcerated. The Government's factual inaccuracies further highlight the need to have an evidentiary hearing on Claim Six (B).

Third, the Government deems it relevant that Noe and Jose were portrayed as "criminal miscreants and ne'er-do-wells" in Dr. Selvog's timeline narrative. (ECF No. 791 at 49.) Mr. Caro does not dispute that both Noe and Jose have been involved in

---

[43] The Government requested a copy of this memorandum and referenced Mr. Caro's 2255 Motion at page 78, footnote 16. The allegation made in footnote 16 related to counsel's request for funding to travel to Chicago and interview Mr. Caro's family, which never occurred. In support of that statement, Mr. Caro cited to Dr. Selvog's memorandum dated May 15, 2006. When Mr. Caro's current counsel provided a copy of the memorandum, they redacted any information that was not relevant to support that allegation.

criminal activity and have served time in prison.  But that fact does not discount their testimony.[44]  While the Government relies on a few pages of Dr. Selvog's timeline narrative to support its position, it ignores the relevant portions of the timeline that support Mr. Caro's allegations in this section.  In particular, under the section of the narrative titled "Traumatic Childhood Environment," Dr. Selvog summarizes information provided by both Jose and Noe.  (ECF No. 791-7 at 7-8, 9-11.)  This information supports Mr. Caro's allegation that the testimony of the brothers was critical and either they should have been called to testify to provide the jury with first-hand accounts of the abusive and traumatic environment in which they were raised, or an expert should have presented this information.

Finally, the Government argues that any testimony that the brothers gave would have "added nothing to the story" and "may well have been detrimental," and therefore the Government thinks it is "pure speculation" to claim Jose's and Noe's testimony would have "materially added to mitigation case."  (ECF No. 791 at 49.)  While the Government accuses Mr. Caro of speculating, it is the Government itself who is speculating by claiming that Jose's and Noe's testimony "may well have been detrimental" without pointing to any fact in the record to support that accusation.  Mr.

---

[44] A mental health expert could have explained not only Mr. Caro's trauma history, but also that it was not unexpected for his brothers to also have a criminal history as a result of growing up in the same environment.  As alleged, Mr. Caro's attorney's failed to hire such an expert.  What is more, this expert could have also interviewed Mr. Caro's brothers and provided testimony based on their accounts of their childhood.  Therefore, even if counsel decided not to present the testimony of the brothers, the jury would have still been informed of the information to which the brothers would have testified by way of an expert.

Caro described generally the information that Jose and Noe would have provided had they been called to testify. (ECF No. 790 at 100-03.) This information was based on notes from pretrial interviews with these potential witnesses and Dr. Selvog's timeline narrative. It is a contested conclusion that such information—not presented by any other witness—would have "added nothing to the story." To the contrary, Mr. Caro asserts that this information, coupled with mental health experts, would have made a difference in the outcome of the penalty phase.

### 3. Whether Counsel's Presentation of a Harmful Witness Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.

The Government only briefly addresses part of subsection (e), completely ignoring Mr. Caro's claim that his counsel were ineffective during opening statements and closing arguments. The Government has waived any argument regarding dismissal as to subsection (e)(1). As to subsection (e)(2), which explains the unreasonableness of counsel's decision to present testimony of Laura Perez and consequently allow the introduction of questions related to her damaging videotaped statement, the Government makes only a brief argument. "Trial counsel did not have the luxury of choosing witnesses who could portray Caro as a saint." (ECF No. 791 at 49.) The Government, once again, misses the point of Mr. Caro's allegations by ignoring his claim in its entirety. Mr. Caro did not fault counsel for failing to present more witnesses to demonstrate him as a "saint." Mr. Caro alleged that his counsel should have presented

74

testimony to humanize him and explain—through the testimony of both expert and lay witnesses—how he ended up in the situation which resulted in his current conviction.[45]

### 4. Mr. Caro Has Asserted Facts That, If True, Would Entitle Him to Relief; Summary Dismissal of Claim Six (B) Is Improper.

Mr. Caro agrees with one of the Government's assertion: "As trial approached, Spica was the only witness known to trial counsel could proffer mental health evidence at the sentencing phase." (ECF No. 791 at 46.) This was true because counsel failed from the beginning to request funding for appropriate experts, adequately investigate a mental health defense, and develop a cohesive mitigation theme. Counsel limited the scope of their mental health investigation so narrowly that they were forced to make untenable and unreasonable decisions. While Dr. Spica's testing resulted in evidence of brain dysfunction—information that would have been important to present to the jury—counsel abandoned this defense without a reasoned strategy. Rather than obtain a psychiatrist or other mental health expert to focus solely on developing a mental health defense

---

[45] Counsel could have also presented testimony from other helpful witnesses, such as Mr. Caro's maternal cousin Petra Herrera, who could have provided information about the traumatic childhood that was more descriptive than those witnesses who did testify. (*See* Declaration of Petra Herrera, dated Oct. 2, 2013, attached as Ex. 77.) Ms. Herrera could have provided imagery for the jury of the abusive household where Mr. Caro grew up. (*See, e.g., id.* ¶ 4 ("Carlos's mother ran out of her home screaming while Carlos's father chased her. When Jose caught up to Virginia, he grabbed her by the hair and pulled her back into their home where he would proceed to beat her."); *id.* ¶ 5 ("When Carlos's mother was being beaten in her home by Carlos's father, the kids would run out of the house crying and screaming for someone to help their mother, but none of us would help because we knew Carlos's mom would never leave her husband."); *id.* ¶ 7 ("When Carlos and his brothers tried to stop their father from beathing their mother, then they would get the brunt of the beating."); *id.* ¶ 10 ("Carlos often helped his mother, which often caused his brothers to bully him and beat him up. I saw Noe and Jose gang up on Carlos in the middle of the street. Carlos did not seem to fight back.").

(something that was beyond the scope of Dr. Spica's expertise as stated in his engagement letter), counsel hired Dr. Caruso to examine Mr. Caro's mental state at the time of the crime. When counsel learned that Dr. Caruso obtained unhelpful information related to the issue of guilt, they did nothing more to develop the mental health evidence for the penalty phase. As such, when they reached the time of trial, counsel determined that they had no viable mental health defense. That is so because they failed to develop one. This was unreasonable.

Counsel abandoned their investigation of Mr. Caro's mental-health background "after having acquired only rudimentary knowledge" from Dr. Caruso. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Similar to the circumstances in *Wiggins*, where the Court found counsel ineffective, counsel here moved closer toward trial with the potential of presenting a mental health defense. Because of that, Mr. Caro's counsel "had every reason to develop the most powerful [mental health] case possible." *Id.* at 526. But they did not. The Government's contention that counsel's decisions were strategic "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id.* at 526-527. Moreover, this case was not like *Strickland* where the court found that counsel could "reasonably surmise . . . that character and psychological evidence would be of little help." 466 U.S. 668, 699 (1984). Here, presenting character and psychological evidence was critical. Because Mr. Caro has alleged, and provided a supporting declaration, that counsel's performance was unreasonable "under prevailing professional norms," *id*. at 688; ECF

76

No. 790-4 (Declaration of Larry Hammond) ¶¶ 27-32, 46-48, this Court should deny the Government's Motion to Dismiss on Claim Six (B).

In addition to alleging that his counsel's performance fell below prevailing norms, Mr. Caro has also alleged, and provided supporting declarations, that information regarding his brain impairment would have made a difference in sentencing. ECF Nos. 790-29 (Declaration of Juror #24); 790-31 (Declaration of Juror #47); 790-33 (Declaration of Juror #79). Mr. Caro's 2255 Motion laid out specific details related to expert and lay testimony that could have painted an entirely different picture at sentencing. (ECF No. 790 at 109-13.) The Government has not moved to dismiss Claim Six (B) based on Mr. Caro's failure to allege prejudice. As such, this Court should not dismiss the claim for lack of prejudice.

**C.    Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful Adversarial Testing.**

The Government attempts to defeat this claim summarily by attacking the credibility of Mr. Caro's prison culture-and-gang expert, Mark Bezy, upon which this portion of Mr. Caro's ineffective-assistance-of-counsel claim rests. (ECF No. 791 at 50 (Bezy's opinion is "based entirely on conjecture"; "Bezy's conjecture is belied by the evidence")).

Not only does Mr. Caro disagree with the Government's conclusion that Mr. Caro was a gang leader at FCI-Oakdale, but a motion to dismiss is the improper vehicle for resolving this dispute and assessing the truth of Mr. Caro's facts or credibility of his

supporting witness. Again, the Government improperly urges this Court to adopt its version of the facts and conclusions to be drawn from these facts, to discount Mr. Caro's facts, and to summarily rule against Mr. Caro without independently assessing the credibility and weight of this new evidence. This is contrary to the law. *See Machibroda v. United States*, 368 U.S. 487, 496 (1962) ("The Government's contention that [the petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence."). The Court must accept all of Mr. Caro's allegations as true unless conclusively refuted by the record; any factual disputes and all credibility determinations must be resolved on the merits, after full evidentiary development. *See* 28 U.S.C. 2255(b); *United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000) (accepting petitioner's facts as true); *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970) ("There will remain, however, a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court.").

Mr. Bezy's opinion is not conclusively refuted by the record. Mr. Bezy's opinion is not only not improbable, but comports with common sense and a basic understanding of organizational dynamics. His opinion also carries with it the length and breadth of his experience regarding prison-gang matters, both within the BOP for 28 years, and afterwards as the principal of a consulting firm. (ECF No. 790-1 ¶¶ 1-10.)

The government's witness, Officer John Gordon, testified at trial that he had generally reached out to the leadership of the prison gangs to try to open up a dialogue between the prison and its gangs, and in response to this reaching out, Mr. Caro showed up for a meeting. (Tr. 02/05/07 at 166-69.) At that meeting, Mr. Caro stated that the

Texas Syndiacate was going to do what it had to do and that Mr. Gordon had to do what he had to do. (*Id.*) Based on this meeting, Mr. Gordon concluded that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale. (*Id.*) Mr. Bezy's opinion that, under the circumstances to which Officer Gordon testified, a Disruptive Group like the Texas Syndicate would never blindly send in its leader into an initial meeting, is believable and directly contradicts that of Mr. Gordon. (ECF No. 790 at 115, ECF No. 790-1 ¶¶ 20-22.)

The Government appears to argue that trial counsel's conduct was not deficient because they (1) anticipated the argument; (2) took efforts to exclude the evidence; and (3) hired a "gang expert" to assist them. (ECF No. 791 at 50.) The Government is correct that counsel was aware of this issue before trial, as they filed two motions in limine to preclude Officer Gordon's *report* (ECF Nos. 589, 590), but those undisputed facts only highlight counsel's deficient conduct in failing to investigate Officer Gordon's conclusion. The motions in limine sought to preclude the actual report, and argued the report was inadmissible based on hearsay, the potential unreliability of a "summarized statement," and a possible *Crawford* violation. (*Id.*) These motions were irrelevant to the live testimony of Officer Gordon at trial. Once counsel knew that Officer Gordon's testimony would be admissible, they had a duty to investigate and refute his conclusion that Mr. Caro was a leader. The Government's assertion that counsel's performance was not deficient because they consulted with a gang expert is inaccurate. Trial counsel retained a "gang expert," but he only prepared to opine only about the future dangerousness of Mr. Caro. (*See* Marquart Letter, Ex. 63.)

79

Mr. Caro's attorneys failed to adequately investigate prison and gang culture, and in doing so they failed to rebut Officer Gordon's conclusion. As a result, to the great detriment of Mr. Caro, counsel merely accepted the Government's conclusion at face value, allowing the Government to argue for death because Mr. Caro was "not just a member [of the Texas Syndicate], but he's a leader." (ECF No. 790 at 153.)

Finally, the Government briefly argues that there is "no reason to believe" that Mr. Bezy's opinion would have been sufficient to impeach Mr. Gordon's conclusions and that, even if it had been presented to the jury, there is "no reasonable probability that the result of the penalty hearing would have been different." (ECF No. 791 at 51.) Again, Mr. Caro disagrees. The Government's penalty-phase case hinged on Mr. Caro being either a leader or active member of a gang. As discussed more fully in Claim Seven (B)(1), *infra*, 11 of the Government's 13 penalty-phase witnesses discussed gang-related matters to support the future-dangerousness aggravating factor. If Mr. Caro was not a leader of the Texas Syndicate, and if, as claimed by the BOP in one of the documents withheld by the Government (ECF No. 782, Sealed Ex. 59), Mr. Caro was in "bad standing" with the gang, he posed little or none of the dangers attributed to him by the Government.

**D.** **Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's Ability to Control Improper Inmate Communications, and Failed to Subject the Government's Evidence to Meaningful Adversarial Testing.**

The Government argues that trial counsel was not deficient because the evidence presented at trial regarding the "inmates' ability to communicate with individuals outside

80

of the facility was not inaccurate or misleading." (ECF No. 791 at 51.) Mr. Caro disputes this contention.

For example, Mr. Hershberger, the Government's expert, testified that "[e]very federal inmate in the system has the opportunity for visits, they have the opportunity for correspondence out, receiving correspondence, magazines, so forth." (Tr. 02/12/07 at 185.) Mr. Hershberger also testified that the BOP could not completely prevent an inmate from "using the mail, or abusing the telephone to communicate to other gang members or family members on the outside." (Tr. 02/12/2007 at 191-92.)

These assertions are not supported by the BOP regulations, and could have been challenged at trial had trial counsel adequately investigated the law and BOP regulations. For example, the BOP can and does completely prevent some inmates from using the mail or telephone. (*See* ECF No. 790 at 117-18 (discussing BOP Program Statements), ECF No. 790-1 ¶ 26; 28 C.F.R. § 501.3, Special Administrative Measures (SAM) include "limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone").[46] An example of the BOP's ability to limit an inmate's correspondence is shown in the Dvorak affidavit, which reveals that of the 129 survey letters mailed to inmates at ADX-Florence, the BOP returned 14 of them, indicating that these inmates were under SAM, and thus could not accept the correspondence. (ECF No. 790-48 ¶ 3.)

---

[46] The regulations refer to "correspondence, visiting, . . . and use of the telephone" as inmate "privileges" not inmate "rights." *See* 28 C.F.R. § 501.3.

Mr. Caro's counsel was deficient in failing to inform the jury of these regulations and policies that would have revealed that, contrary to Mr. Hershberger's testimony, the BOP had the authority to completely limit phone and mail privileges, thus greatly reducing the risk of improper inmate communications. (ECF No. 790 at 116-18.) Without knowing the existence of and specific nature of BOP tools for preventing improper communications, the jury was left to believe, as the Government argued in its closing, that the BOP could not control Mr. Caro's future communications in any meaningful way. (Tr. 02/13/2007 at 34 ("[Caro] can probably still communicate with his gang buddies," "[h]e can use the telephone," "[h]e can have visitation with his buddies.").

The Government argues that even if Mr. Caro's counsel had presented evidence of the BOP's "prophylactic measures," there is no reasonable probability that the outcome would have been different. (ECF No. 791 at 52.) The Government ignores the objective fact that eight of its 13 penalty-phase witnesses testified about inmate communications. The ability of Mr. Caro to communicate with other gang members in the future was a substantive portion of the Government's penalty-phase testimony. Mr. Caro has sufficiently alleged prejudice regarding this claim. Moreover, the Court must consider the materiality of this error in light of "*all* of the trial and PCR evidence favoring [Mr. Caro's position] and then [] reweigh that evidence against the State's evidence." *Elmore v. Ozmint*, 661 F.3d 783, 868 (2011). *Strickland* also makes clear that before ruling on prejudice, the Court is required to review *all errors. Strickland v. Washington*, 466 U.S. 668, 649 (1984). This type of comprehensive analysis is not amenable to a motion to dismiss.

**E.     Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning Prison Culture and Statements of Remorse.**

The Government argues that this portion of Mr. Caro's ineffective-assistance-of-counsel claim fails because Mr. Caro cannot show that there is a reasonable probability that the "results of penalty proceeding or the jury's findings with regard to lack of remorse would have been different had Caro introduced the proffered testimony." (ECF No. 791 at 52.)  Again, the Government improperly limits its focus to only one portion of Mr. Caro's *Strickland* claim and fails to analyze the issue of materiality in the context of all of the alleged errors, as well as the totality of the evidence, including that presented by Mr. Caro in these post-conviction proceedings.

Mr. Caro has alleged in his 2255 Motion that counsel presented a defense based on a "breakfast dispute" that was neither cohesive nor viable.  (*See* Claim Four (A), *supra.*)  The evidence, however, supported a viable and cohesive defense theory based on the fact that Mr. Caro could be facing a "cold dose of revenge" from other Texas Syndicate gang members as a result of his assault on the leader of the Texas Syndicate, Ricardo Benavidez, less than four months before the Sandoval killing.  The evidence also supported the theory that Mr. Sandoval, a prospect of the Texas Syndicate who need to commit an act of violence in support of the gang to become a member, deliberately went into Mr. Caro's cell to "hit" him.  All of the subsequent statements by Mr. Caro could then be viewed as not only inmate bravado critical for the survival of any inmate (ECF No. 790-1 ¶ 19), but also a specific attempt at self-preservation by warning other Texas Syndicate members—both inside and outside of the SHU—not to attempt similar "hits"

in the future. According to gang rules (Bezy Supp. Decl., Ex. 62 ¶ 3), Mr. Caro would have been forbidden to talk about any gang implications related to the killing, whether verbally, on the phone, or in writing. He also would have been aware of the intense scrutiny by inmates as well as increased prison surveillance after Mr. Sandoval's death, which included monitoring his every word, reading his letters, and recording his calls. (*See, e.g.*, Memorandum from W. Johnson re: Special Handling Instructions for Carlos David Caro, dated Dec. 19, 2003 (hereinafter "Special Handling Instructions"), attached as Ex 70.)

This new evidence places Mr. Caro's actions and statements in a completely different light and significantly weakens the Government's case. The failure to present this evidence undermines confidence in Mr. Caro's sentencing proceedings. Had the jury heard this evidence, there is a reasonable probability that at least one juror would have viewed Mr. Caro's post-offense statements much differently. (*See* ECF No. 790 at 118-19.)

The Government's argument also must fail for procedural reasons, as this portion of Mr. Caro's ineffective-assistance-of-counsel claim relies on new evidence presented by Mr. Caro in his 2255 Motion, which the Government has ignored or disputed. *See Elmore,* 661 F.3d at 868 (holding that the state PCR court "unreasonably broke from *Strickland*" by failing to consider the totality of the evidence and unreasonably discounting evidence favorable to the defendant by evaluating it piecemeal and unduly minimizing its import). Finally, the Government fails to address the impact of this error, together with all of the trial errors, further precluding summary dismissal. (See ECF No.

790 at 52-53.) Mr. Caro's claim is not frivolous, and further proceedings are necessary to resolve this issue.

**F.      Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to File a Motion to Set Aside the Benavidez Conviction.**

In its motion, the Government concedes that there are circumstances when counsel's failure to advise a client of the collateral consequences of a plea results in ineffective assistance of counsel. (ECF No. 791 at 53.) The Government also concedes that Mr. Caro's attorney Lou Dene failed to advise his client of the collateral consequence that his guilty plea in the Benavidez assault would be used as an aggravating factor in the Government's case against him in the Sandoval murder. (ECF No. 791 at 54.) Despite these concessions, the Government urges this Court to summarily dismiss Mr. Caro's claim that his capital counsel were ineffective by failing to challenge his underlying conviction. Mr. Caro has pled specific facts—supported by declarations— that his trial counsel had no strategic reason for failing to pursue an ineffective-assistance-of-counsel claim against Dene and that counsel's performance in this regard was deficient. (ECF No. 790 at 119-27; ECF No. 790-4, ¶¶ 37, 44-45; ECF No. 790-5, ¶ 22.)

The Government argues that Mr. Caro has not provided evidence that Dene would have recommended that Mr. Caro proceed to trial if he knew that his guilty plea would have been used against him. This is an issue of material fact. Mr. Caro submitted a declaration from Dene stating that Mr. Caro would have followed his advice and would have gone to trial if he so recommended. (ECF No. 790-3, ¶ 8.) This statement is

85

sufficient to present a dispute as to whether Dene would have recommended that his client exercise his right to trial. What is more, Mr. Caro alleged that he would have gone to trial, and that fact is sufficient for establishing prejudice as to the Benavidez conviction. (ECF No. 790 at 121.) Under the Supreme Court's decisions in *Missouri v. Frye*, 132 S. Ct. 1399, 1409-10 (2012); *Padilla v. Kentucky,* 130 S. Ct. 1473 (2010); *Hill v. Lockhart,* 474 U.S. 52, 58-59 (1985); and this Circuit's decision in *United States v. Akinsade*, 686 F.3d 248, 253-54 (4th Cir. 2012), prejudice is presumed when the consequence of ineffective legal advice would have been a decision to go to trial.[47]

As to the prejudice Mr. Caro suffered from his trial counsel's failure to challenge this conviction, the Government contends that "[e]ven if the evidence of [Mr. Caro's] plea and sentence in the Benavidez case had been excluded, there is no reasonable probability that the outcome of the penalty proceeding would have been different." (ECF No. 791 at 55.) The Government's assertion is contested (*see* Claim One, *supra*) and is inconsistent with the declarations submitted in support of Mr. Caro's 2255 Motion. One juror stated, "If Caro had not already been serving that lengthy sentence, then it is possible I would not have voted for the death penalty." (ECF No. 790-30, ¶ 3.) What is more, the underlying conviction allowed the Government to argue that because of Mr. Caro's lengthy sentence, he deserved the death penalty or else he would receive zero punishment. (ECF No. 790 at 127.) This argument was effective, as another juror indicated that one of the influential factors in voting for death was that Mr. Caro already

---

[47] Even if prejudice is not presumed, Mr. Caro has sufficiently alleged prejudice. (*See* Claim One, *supra*.)

had "essentially, a life sentence, so giving him another life sentence would not be any punishment for his crime." (ECF No. 790-29, ¶ 2.)

Moreover, as noted *supra*, this Court must conduct a cumulative review of prejudice and cannot look at this instance of deficient performance alone to determine prejudice (S*ee* Introduction (B).) The Government overlooks this fact. Mr. Caro's allegations of prejudice in this claim have satisfied the pleading requirement and thus the Court should not summarily dismiss it before considering it in the context of his other claims.

Finally, the Government's argument that Mr. Caro's *actions* in the Benavidez case would have still been admissible against him is not relevant to the issue of prejudice for two reasons. First, as noted in the previous paragraph, it was not simply Mr. Caro's actions in the Benavidez matter that bothered the jurors; it was the fact that a death sentence would not have been punishment because he was already serving a life sentence. Second, while actions related to the offense may have been introduced, an acquittal or a conviction for a lesser-included offense would certainly have had a different impact than a guilty conviction for conspiracy to commit murder. Mr. Caro's allegations of prejudice have satisfied the pleading requirement, and this Court should not summarily dismiss Claim Six (F).[48]

---

[48] Trial counsel's failure also has prejudiced Mr. Caro in another way. Had counsel investigated and challenged the Benavidez conviction and sentence upon appointment, Mr. Caro would not have faced the procedural hurdle facing him now in his related Motion to Vacate, Set Aside or Correct Sentence filed in the Benavidez case. *United States v. Caro*, 2:03-cr-10115 (W.D. Va.). As a result of trial counsel's failure to

**G. Mr. Caro has Sufficiently Alleged that Trial Counsel Were Ineffective in Failing to Present Additional *Skipper* Evidence To Rebut Aggravating Evidence.**

When a petitioner alleges that counsel should have put forth additional evidence in mitigation, the Court assesses the prejudice by reweighing the aggravation evidence against the "*totality* of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (emphasis added). In opposing this claim, the Government correctly states the legal standard, but ignores the disputed facts alleged that must be developed in order for the Court to conduct the appropriate re-weighing. Nothing in the Government's motion refutes the evidence in support of Mr. Caro's allegations; its disagreement with the import of those facts cannot serve as the basis for summary dismissal.

Mr. Caro alleged three miscellaneous items of *Skipper* mitigation that counsel should have introduced: (1) the circumstances surrounding the Benavidez plea, (2) Dr. Geyer's observation that Mr. Caro was a "good inmate" suitable for housing at ADX-Florence; and (3) Mr. Caro's demonstration of concern for the psychological well-being of another inmate. These mitigating items should have been introduced *in addition* to all of the other areas of mitigation ineffectively omitted, as discussed elsewhere in Mr. Caro's 2255 Motion, such as the severity of his developmental brain dysfunction and the effect of gang culture on his actions. All of that missing mitigation evidence should be considered in its *totality*, not piecemeal, as the Government has tried to do. The Government seeks to gloss over the undeveloped factual disputes and suggests that this

_____

challenge that conviction, Mr. Caro must prove to the Court that his motion in that case is either timely or should be allowed under the doctrine of equitable tolling.

claim should be dismissed because each of these three items of evidence, individually, could not outweigh the aggravating circumstances. In so doing, the Government does not apply the "totality of the evidence" standard required and fails to recognize that Mr. Caro is entitled to develop the extent of the mitigating evidence that is missing from the record (and noticeably is not contradicted by the Government).

(1)     Regarding the circumstances surrounding the Benavidez guilty plea, the Government does not dispute that the plea agreement benefitted Moreno-Marquez, but argues that the motivation for the plea was the "overwhelming" evidence against Mr. Caro (ECF No. 791 at 58) and suggests that there is no prejudice because he could have received an even worse sentence if convicted on a "not guilty" plea (*id.* at 57). These arguments ignore the well-pled factual allegations in the 2255 Motion, which if proven, would entitle Mr. Caro to relief.

The first alleged fact that Mr. Caro is entitled to develop on the record is his motivation for entering the plea agreement, which on its face gave Moreno-Marquez a clear benefit, while giving Mr. Caro nothing more than what he could have received by pleading guilty straight up without an agreement. Mr. Caro's 2255 Motion alleges that his motivation was to give Moreno-Marquez a chance to get out of prison while still a young man. The Government suggests that this evidence should be dismissed because his motivation was never mentioned in Court during his guilty plea or during Moreno-Marquez's plea hearing. Of course, there is no record evidence of this at the time it happened. Had the Court been advised of the reasons for Mr. Caro's plea, the Court likely would not have accepted the agreements that were conditioned on one another, as

indicated by the Court's concern over the disparate agreements during the Moreno-Marquez hearing. (ECF No. 782, Sealed Ex. 55 at 4-6.) That is why Mr. Caro is entitled to a hearing to develop the facts alleged. Even though the Government suggests that Mr. Caro is unlikely to successfully prove this allegation, Mr. Caro is still entitled to develop the factual record on his well-pled claim. *Machibroda v. United States*, 368 U.S. 487, 496 (1962) (summary dismissal inappropriate where claim, while improbable, not clearly bereft of merit).

Further, the facts alleged show that Mr. Caro is likely to be able to prove his claim. The agreement on its face benefitted Moreno-Marquez. Mr. Caro has alleged in his motion that this was his intent when he entered the agreement. His counsel in that case, Lou Dene, corroborates this fact. Contrary to the Government's assertion, Dene's testimony on this issue would not be speculative; it would be based on his personal knowledge of the plea negotiations and his conversations with Mr. Caro during those negotiations. Such testimony would be relevant and admissible as evidence of Mr. Caro's state of mind. *See* Fed R. Evid. Rule 803 (allowing admission of statements "of the declarant's then-existing state of mind (such as motive, intent, or plan)").

The second disputed factual issue is that the case against Mr. Caro for conspiracy to commit murder was "overwhelming" in the Benavidez case. As previously asserted in Claim Six (F), if Mr. Caro had proceeded to trial in the Benavidez case, there is a good chance the jury would have found him *not* guilty on the conspiracy to commit murder charge. As asserted by the Government at the sentencing of co-defendant Moreno-Marquez, the evidence in that case was not particularly strong. In answering the Court's

90

question as to why the Government negotiated such a plea agreement with Mr. Moreno-Marquez, Assistant U.S. Attorney Mountcastle explained that it was "because of the problems of going forward with proof in a jury trial with a totally uncooperative victim." (ECF No. 782, Sealed Ex. 55 at 4-6.) The difficulty with that case applied equally to Mr. Caro.

Not only was the proof of the case difficult, as admitted by the Government at Moreno-Marquez's plea hearing, but the case was strikingly similar to another USP-Lee prison assault case, *United States v. Edgar Garcia,* Case No. 2:03-CR-10110-JPJ (W.D. Va.), which was tried shortly before the guilty pleas were taken in this case. In that case, the Government charged two defendants with a videotaped shank assault at USP Lee. Like Mr. Caro, the defendants in *Garcia* were charged with conspiracy to commit murder, assault with intent to commit murder, and weapons possession. (Case No. 2:03-CR-10110-JPJ, Indictment, 10/22/2003, Dkt. 1.) The victim in that case had many superficial shank cuts. (ECF No. 790-6 at ¶ 4.) Rather than plead guilty, the defendants in *Garcia* went to trial. The jury's verdict acquitted each of the defendants of the serious charges, convicting them only on the weapons possession charges. (Case No. 2:03-CR-10110-JPJ, ECF No. 26.) The rationale for the acquittal, even though the defendants were admitted knife men, was that because the wounds were all superficial, no serious injury or death had been intended. (ECF No. 790-6 at ¶ 6.) That same argument was available to Mr. Caro, given the superficial nature of the wounds to Mr. Benavidez. (ECF No. 782, Sealed Ex. 60 at 1) (noting that there was "no evidence of deeply penetrating injury").

There is a reasonable likelihood that Mr. Caro also would have been convicted only of the lesser offense.

At the very least, Mr. Caro has demonstrated a factual dispute about the circumstances surrounding his entry of a guilty plea to a crime that he reasonably could have challenged. Had the jury known Mr. Caro's motivation for entering the guilty plea to a charge he could have won, and subjecting himself to a prison sentence greater than 27 years, so that another young man would have the chance to leave prison and return to his family, members of the jury well may have seen Mr. Caro in a different light.

(2)     The Government next argues that there was *no prejudice* caused by the failure to introduce the opinion of Dr. Geyer, that Mr. Caro was a "good inmate" who was not normally disruptive or violent unless involved in gang activities. (ECF No. 790-56 at 2.)  The Government suggests that these positive statements about Mr. Caro would be outweighed by the doctor's note that Caro's violence was "planned and instrumental," rather than "impulsive," supporting the Government's argument that Mr. Caro was a cold, calculating killer. Of course, since Dr. Geyer never testified, the jury never got the benefit of any of his opinions. The fallaciousness of the Government's argument is that the Government had already introduced evidence that Mr. Caro was a cold, calculating killer and that he was a violent, dangerous person who could not be safely housed in the Bureau of Prisons.  What the jury did not ever get to hear was that prison staff considered Mr. Caro to be a good inmate and that the prison's own psychologist did not consider him *ordinarily* violent.    This evidence totally contradicts the image portrayed by the Government at trial, and Mr. Caro is entitled to develop this evidence fully before one

92

dismisses it as insufficient to "alter the balance of mitigating and aggravating evidence." (ECF No. 791 at 61.)

(3) The Government dismisses Mr. Caro's concern about the psychological well-being of another inmate with a single sentence, saying that this "would not have offset the aggravating factors in this case." (ECF No. 791 at 62.) As noted previously, this item of mitigation is just one of several omissions by counsel, but when they are all taken together, they present a vastly different picture of Mr. Caro than the one painted by the Government at trial.

There was no valid strategic reason for trial counsel's failure to present any of the evidence identified as miscellaneous *Skipper* evidence. The failure to present the evidence was attributable solely to counsel's failure to obtain, review, and understand the importance of the information available. The information was readily available from attorney Dene's file and in the discovery provided by the Government to trial counsel. The failure to appreciate the significance of and follow up on the available information constituted deficient performance under the controlling legal standards. Counsel's failure to present mitigating evidence allowed the Government to mischaracterize Mr. Caro as a violent person who killed over breakfast, when in fact, Mr. Caro was a caring person, not ordinarily violent, who was willing to spend the rest of his life in prison so that a younger man, Moreno-Marquez, could go home to his family while still a young man. There is a reasonable probability that "at least one juror would have struck a different balance" at the penalty phase if this evidence had been presented. *Wiggins*, 539 U.S. 510, 537 (2003).

**H.** **Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell.**

The Government contends that trial counsel was not deficient and disputes Mr. Caro's contention that the BOP was negligent in placing Mr. Sandoval in Mr. Caro's cell. The Government further argues that in light of Mr. Caro's statements that he murdered Mr. Sandoval over a breakfast dispute, there is no basis to claim that the murder was connected to the placement of Mr. Sandoval, as opposed to any other inmate, in Mr. Caro's cell. (ECF No. 791 at 62-63.) The Government's disagreement with the conclusion of Mr. Caro's expert, Mr. Bezy, reveals why this issue cannot be resolved in the context of a motion to dismiss.

Mr. Caro disagrees with all of the Government's contentions for the reasons asserted in Claim Four, *supra*, generally, and Claim Four (C), *supra*, specifically. As already argued, in light of the Benavidez assault, the history of internal violence among Texas Syndicate members at USP-Lee, and the potential for retribution, all of which was known to the BOP, the placement of Mr. Sandoval in Mr. Caro's cell was not only negligent, but reckless. The BOP's own report on the Benavidez assault, which recommended that Mr. Caro be celled separately from all Texas Syndicate members, confirms this conclusion. (ECF No. 782, Sealed Ex. 51 at 12.) Mr. Caro's statements, for the reasons previously discussed in Claim Four, *supra*, do not alter the reckless nature of this placement.

**I.** **Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instances of Violence by Persons Other than Mr. Caro.**

The Government urges this Court to summarily dismiss Claim Six (I) for several reasons, all of which fail at this stage of the proceedings. First, the Government argues that because the specific-act evidence was presented in rebuttal rather than in its case-in-chief, it did not violate the Court's order and such evidence was proper. (ECF No. 791 at 69.) Regardless of whether the Government was in technical compliance with the Court's order, the information that was elicited from witnesses in "rebuttal" was highly prejudicial to Mr. Caro's defense. Mr. Caro's counsel had a duty to object to the introduction of this improper evidence. Their failure to do so constituted deficient performance.

Second, in an attempt to undermine Mr. Caro's claim, the Government asserts that Mr. Caro's counsel objected to the introduction of this evidence so he has not presented a factually valid claim. (ECF No. 790 at 71.) The fact that counsel objected to some of this improper testimony does not negate the claim. Mr. Caro agrees that his counsel objected to the Government's questioning of defense witness Mark Cunningham, Ph.D., but the objection came too late and only after the Government had brought out irrelevant and prejudicial information about an al Qaeda terrorist. (Tr. 02/12/07 at 87-89.) There was no reason for the Government to ask Dr. Cunningham whether he testified in a case against a terrorist in 2001, only "75 days before 9/11," other to inflame the passion of the jury. (*Id.* at 87.) Without objection, the Government pursued this improper line of questioning; it was only after the Government began asking questions about another

95

defendant that counsel objected. After discussion with counsel outside the presence of the jury, the Court ruled that it would not allow the Government to introduce facts of another prisoner's crime because not only was it irrelevant but it was also inflammatory and unfairly prejudicial. (Tr. 02/12/07 at 95.) This ruling contradicts the Government's assertion that "counsel has no obligation to raise a futile objection." (ECF No. 791 at 63.) Given the Court's ultimate ruling, if counsel objected sooner, they could have prevented the jury from hearing the prejudicial information.

The Government also suggests that Mr. Caro somehow invited the prejudicial testimony through expert Dr. Cunningham's opinion that ADX-Florence had the capacity to prevent any future violence by Mr. Caro. (ECF No. 791 at 63.) Consideration of Dr. Cunningham's testimony and the grounds for fair rebuttal, however, show that this argument fails on its face. The use of the Aryan Brotherhood evidence (with whom Mr. Caro had no association) was irrelevant to whether Mr. Caro could, in fact, be a future danger. Similarly, evidence of two murders at USP-Marion twenty years earlier, as well as additional murders at USP-Marion and USP-Leavenworth, also decades old, was irrelevant to whether Mr. Caro would be a future danger at ADX-Florence and unfairly prejudicial. This information improperly influenced the jury and violated Mr. Caro's right to an "individualized determination" at sentencing under *Zant v. Stephens*, 462 U.S. 862, 879 (1983).

Counsel's failure to object to the Government's reference to inmates Bruce Pierce and Trinity Ingle similarly constitutes deficient conduct. During cross-examination of Dr. Cunningham, the Government introduced evidence, through its question, that

96

indicated that inmate Bruce Pierce had killed in prison and was no longer at ADX-Florence. (Tr. 02/12/07 at 134.) Defense counsel never objected, so the underlying circumstances of his situation were never presented to the jury. The BOP-locator website now indicates that Mr. Pierce is deceased. Whether or not his health was relevant to his transfer from ADX-Florence, the jury never heard because counsel failed to object and the Government has refused to produce this data.

Counsel also failed to object to the Government's questions to Dr. Cunningham regarding inmate Trinity Ingle. (Tr. 02/12/07 at 117.) When the Government initially asked a question about Mr. Ingle, counsel properly objected. (Tr. 02/12/07 at 89.) As a result of this objection and other prior improper testimony, the Court held that the Government could not pursue a line of questioning with specific facts "unless the Government can tie the facts of a particular crime to, similar to Mr. Caro's, that is, an in prison murder." (Tr. 02/12/07 at 89-95). The Government moved on to more general questions, but later returned to its question about Trinity Ingle. (Tr. 02/12/07 at 117.) This time trial counsel inexplicably did not object. With no objection, the Government was not pressed to show the Court how the facts of Mr. Ingle's case were relevant to Mr. Caro's case. In fact, they were not. Trinity Ingle was never convicted of an "in-prison" murder. *See United States v. Ingle*, 157 F.3d 1147, 1149 (8th Cir. 1998). The future violence also occurred at a state prison, not ADX-Florence. Thus, the jury heard irrelevant and highly inflammatory evidence concerning future acts of violence in a state prison by an inmate who had not committed an in-prison murder.

Finally, this evidence was not proper rebuttal evidence. Dr. Cunningham had not testified about Trinity Ingle or Bruce Pierce. Nor would he have relied on such anecdotal evidence. His testimony on future dangerousness, had he been allowed to review the relevant data that was in the sole possession of the BOP, would have been based on group statistical data, not misleading anecdotal stories. (ECF No. 316 ¶¶ 9-20.)

The Government claims that any potential prejudice from counsel's failure to object was cured by the Court's instruction to the jury. (ECF No. 791 at 71.) But the instruction was limited only to the initial testimony concerning al Qaeda and 9/11 (Tr. 02/12/07 at 163) and did not address the prejudicial impact of other equally irrelevant and inflammatory evidence, such as evidence regarding the Aryan Brotherhood, murders that occurred twenty or more years before Mr. Caro's trial, and other murders that occurred at BOP facilities other than ADX-Florence. Therefore, any impact of the curative instruction was limited.

The prejudice to Mr. Caro from counsel's failure to object to specific instances of violence, including that committed by members of other gangs, must also be considered in light of Mr. Caro's allegations that he was not a gang leader and that the BOP believed he was in "bad standing" with the gang at the time of his trial.

Mr. Caro has adequately pled a claim that counsel's repeated failure to object to this irrelevant, inflammatory, and highly prejudicial evidence constituted deficient conduct. He also has pled sufficient facts to show prejudice. There is a reasonable probability that had defense counsel objected to this testimony, the Court would have sustained the objections because the Government would not have been able to lay the

proper foundation, and at least one juror would not have found the aggravator that Mr. Caro was likely to commit acts of future violence within the federal prison system if sentenced to life instead of death. The Government's arguments do not warrant summary dismissal.

For all of these reasons, the allegations are sufficient to defeat the Government's Motion to Dismiss and require further factual development, hearing, and relief. *See Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978) (reaffirming the trial court's authority in a capital sentencing hearing "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"); *cf. Rupe v. Wood*, 863 F. Supp. 1315, 1324-26, 1331 (W.D. Wash. 1994) (holding that a failure of trial counsel to object to irrelevant evidence concerning the size of the defendant's gun collection—as opposed to the weapon actually used in a homicide—violated the Sixth Amendment *Strickland* guarantee of effective representation since the evidence was inadmissible under *Zant*, but not finding prejudice based on the very brief nature of the improper testimony).

**J.      Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Object to The Government's Improper Closing Argument.**

Claim Six (J) involves three separate sets of statements: (1) the prosecution's improper arguments that the sentencing jury should "do [their] duty" by imposing the death penalty to "control" Mr. Caro; (2) the prosecution's improper arguments that Mr. Caro would receive "zero punishment" if the death penalty were not imposed; and (3) the prosecution's improper arguments to the jury that diminished the jury's responsibility for

99

the death verdict, in violation of the rule in *Caldwell v. Mississippi*. (ECF No. 790 at 136-40.) As to subsections J(1) and J(2), the Fourth Circuit has already found error but no prejudice. Accordingly, the Government asserts that Mr. Caro cannot show prejudice. (ECF No. 791 at 73 & n.17.) The Government's argument, however, ignores the fact that this Court's review, unlike the appellate court, is not confined to the trial-court record. Instead, this Court must "reweigh" the record in light of the totality of the evidence— which includes new facts presented in the instant habeas proceedings. *See Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (holding that a "prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation."); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (holding that in the federal court's habeas analysis "we reweigh the evidence in aggravation against the totality of available mitigating evidence. . . . our review is not circumscribed by a state court conclusion with respect to prejudice . . . .").

Moreover, the Government fails to address the juror declarations submitted in support of prejudice. (*See* ECF No. 790-30, ¶ 2 (Juror #33 declaring that the "single most important factor" in deciding the penalty was the fact that Mr. Caro was already serving a *de facto* life sentence); ECF No. 790-29, ¶ 2 (Juror #24 declaring that "giving him another life sentence would not be any punishment for his crime"). The jurors' statements indicate that the Government's improper "zero punishment" argument could have influenced the decision for the death verdict. Thus, this new record shows that the

improper arguments were extremely prejudicial. For these reasons, the Government's Motion to Dismiss subsections J(1) and J(2) should be denied.

As to subsection J(3), the *Caldwell* error,[49] the Government urges this Court to dismiss the claim because Mr. Caro misstated the Government's closing argument. Mr. Caro's counsel made an unintentional error by omitting the word "not" from the sentence "It's not the law." (Tr. 2/13/2007 at 98.) The typographical error, however, does not negate Mr. Caro's claim in its entirety. Mr. Caro also argued that Government's closing argument downplayed the jury's responsibility by stating that other juries have done this. (Tr. 02/13/2007 at 17) ("If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done. You would not be alone in that regard."). These comments suggest one of two things: either that Mr. Caro had been sentenced to death previously by another jury or that other juries have sentenced people to death. Both are improper and both arguments relieve the jury of their ultimate responsibility in deciding whether death is the appropriate punishment.

What is more, these arguments were directed toward the "passion and prejudice" of the jury, as opposed to the proper Eighth Amendment considerations. *See Zant v. Stephens*, 462 U.S. 862, 879 (1983); *United States v. Wilson*, 135 F.3d 291, 297-98 (4th Cir. 1998) (*citing Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Because "the

---

[49] In *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), the Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Mr. Caro incorporates by reference here all arguments made *infra* as to Claim Eight.

decision whether to impose the death penalty should involve 'an individualized determination on the basis of the character of the individual and the circumstances of the crime,'" *United States v. Caro*, 597 F.3d 608, 625 n.17 (4th Cir. 2010) (*citing Zant*, 462 U.S. at 879 (emphasis omitted)), the Government's argument here was improper. Mr. Caro has sufficiently alleged a claim that trial counsel performed deficiently by failing to make these objections. The prejudice underlying this claim must be viewed cumulatively. [50] This Court, therefore, should not dismiss this claim.

**K.     Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Seek Removal of a Sleeping Juror.**

The Government urges this Court to summarily dismiss Claim Six (K) by making, yet again, factually specific arguments that are inappropriate at this stage of the proceedings. First, the Government argues that the record does not "conclusively" show that Juror #33 was sleeping. (ECF No. 791 at 79.) Mr. Caro, however, has alleged that there was sufficient information, including the Court bringing attention to the matter not once but twice, to raise flags to alert defense counsel to the problem. (ECF No. 790 at

---

[50] The Government asserts that because the Fourth Circuit determined that the error related to the prosecutor's comment on Mr. Caro's silence regarding lack of remorse was harmless, "Mr. Caro's argument that his attorney was ineffective for failing to object fails under the *Strickland* standard." (ECF No. 791 at 76.) Mr. Caro, however, did not argue that his counsel was ineffective for failing to object on these grounds because, as the Fourth Circuit noted, counsel did object. *See United States v. Caro*, 597 F.3d 608, 627 (4th Cir. 2010) (noting that counsel moved to strike the Government's allegation). Mr. Caro only mentioned this particular error in a parenthetical in his 2255 Motion to support the argument that all errors should be reviewed cumulatively to determine prejudice. (*See* ECF No. 790 at 140.) The only claim involving Mr. Caro's alleged lack of remorse is one of ineffective assistance of trial counsel in failing to explain to the jury why the circumstances in this case were not conclusive of no remorse. (*See* Claim Six (E), *supra*.)

141-42.) The Court informed counsel on two different days during the penalty phase that Juror #33 was "nodding off" (Tr. 02/05/2007 at 105) and that he "appears to continue to sleep" (Tr. 02/07/2007 at 66). It was at that point that counsel should have, but did not, seek to remove the juror for cause. In fact, the Court indicated that it was "inclined to. . . discharge that juror." (Tr. 02/07/2007 at 66.) Therefore, the record rebuts the Government's assertion that even if counsel had moved to replace juror, the court would not have granted it. (ECF No. 791 at 80.)

What is more, the Government fails to mention the declaration Mr. Caro submitted supporting his claim that trial counsel were deficient by failing to seek removal of Juror #33. As Mr. Caro's *Strickland* expert Larry Hammond opined, trial counsel "should have moved and strongly advocated for the dismissal of that juror" because "the defendant's entitlement to a unanimous jury required that all jurors were engaged in the hard job of receiving testimony." (ECF No. 790-4, ¶ 51.) There is an issue of fact regarding counsel's failure to have Juror #33 removed and for that reason alone Claim Six (J) should not be summarily dismissed.

In addition to seeking the removal of Juror #33 for apparently sleeping during trial, once Juror #33 was questioned and admitted that he was having an "anxiety problem" (Tr. 02/07/2007 at 67), counsel had reason to seek to remove him from serving on the jury. While the Court did not inquire as to the cause of his anxiety, a reasonable defense attorney could assume that it was the trial itself. Mr. Caro's counsel should have, at minimum, asked the Court to inquire further regarding the root of Juror #33's anxiety. Had they asked follow-up questions regarding Juror #33's anxiety, they would have

learned that the trial triggered his anxiety and one day after court he went to the emergency room because of the anxiety. (*See* Declaration of Juror #33, dated Sept. 26, 2013 (hereinafter "Supp. Decl. of Juror #33"), attached as Ex. 71.)[51]

The Government also argues that Mr. Caro cannot meet his burden in showing prejudice under *Strickland*. (ECF No. 791 at 82.) In making its point, the Government relies upon two unpublished decisions from this Circuit: *United States v. Aguilar*, 409 Fed. App'x, 688, 2011 WL 288611 (4th Cir. Jan. 31, 2011); *United States v. Postell*, 891 F.2d 287, 1989 WL 141697 (4th Cir. Nov. 17, 1989) (Table) (unpublished).[52] Those cases, however, should not guide this Court's review of Mr. Caro's ineffective-assistance-of-counsel claim. Both of those cases discuss the plain-error review of appellate claims of a sleeping juror. In those cases, the Fourth Circuit held that absent a showing that the juror failed to fairly consider the case, there was no plain error. *See Aguilar*, 2011 WL 288611, at *3, and *Postell*, 1989 WL 141697, at *3. But that is not the relevant test here, as Mr. Caro has already indicated that the record in this case demonstrated that the Court was inclined to remove the juror. Further, as Mr. Caro has argued, counsel's deficiencies must be viewed for cumulative error. The fact that counsel failed to remove this juror, who was sleeping at best and "nodding off" at worst, and who was ridden with anxiety from the trial, must be considered in light of all the

---

[51] They would have also learned that Juror #33's close friend was shot while the trial was in progress (Supp. Decl. of Juror #33, Ex.71) This act of violence against a loved one would have given counsel further reason to seek removal of Juror #33. Juror #33's declaration is also filed under seal as Sealed Ex. 76.

[52] The Fourth Circuit local rules discourage citing unpublished decisions issued before January 1, 2007, because they were not intended as precedential authority. *See* Fourth Circuit Local Rule 32.1.

circumstances surrounding the claim of ineffective assistance of counsel. For these reasons, this Court should not dismiss Claim Six (K).

**L.      The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Summary Dismissal of Mr. Caro's Claim of Ineffective Assistance of Counsel at the Penalty Phase of Trial Improper.**

As the law requires, this Court must conduct a cumulative review of trial counsel's deficient performance to determine whether it undermined confidence in the outcome of Mr. Caro's trial and sentencing. *See* Introduction (B), *supra*. As it did in the previous claim related to trial counsel's performance at the guilt/innocence phase, the Government ignores the cumulative analysis requirement related to the penalty phase.

Mr. Caro has set forth specific and detailed allegations supporting the claim that his counsel was ineffective at the penalty-phase claim of his trial. Counsel failed to challenge not only the Government's tactical delay in bringing this case until after it had secured a guilty plea in the Benavidez case, but they also failed to collaterally challenge the plea in that case, which supported one of the Government's most harmful aggravating circumstances. Counsel also failed to present an adequate mitigation case for life through their inadequate development of mental-health evidence and their lack of presenting helpful lay witnesses and instead presenting harmful ones. Counsel's others deficiencies—such as failing to address the gang issues, inadequately responding to BOP's allegations of future dangerousness, and failing to object to improper questioning or a sleeping juror—must all be considered together. Certainly this information would

have changed the story that the jury would have heard and could have "struck a difference balance" in favor of a life sentence. *See Wiggins*, 539 U.S. at 537.

Summary dismissal on Claim Six is improper at this stage of Mr. Caro's habeas proceedings. This 2255 proceeding is the only opportunity that Mr. Caro will have for court review of the facts that he is alleging in support of his claim that his Sixth Amendment right was violated at his capital trial. This Court, therefore, should deny the Government's Motion to Dismiss on Claim Six and allow further evidentiary development through discovery and a hearing.

**CLAIM SEVEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND PRESENTING MISLEADING PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

The majority of the Government's penalty-phase case rested on its argument that Mr. Caro would be dangerous in the future. *See, e.g.*, Tr. 11/13/2006 at 27-28 (Government agreeing with the Court that "a large portion of the Government's argument at the sentencing phase in this case will be future dangerousness, presented by the defendant, and the inability of the BOP to adequately secure the defendant to protect

against that threat of future dangerousness.") In fact, 11 of the Government's 13 penalty-phase witnesses testified about the future dangerousness of Mr. Caro.

The Government does not dispute that it withheld exculpatory information regarding future dangerousness. Instead, it argues that Mr. Caro is procedurally defaulted from raising this claim and/or that the withheld information was not material. Both arguments are unavailing, and this *Brady* claim, which relies on facts not found in the existing record, cannot be resolved summarily and survives this Motion to Dismiss.

## A. The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and its Precedessor Prison, USP-Marion, for More than Three Years.

The Government argues that Claim Seven (A) is procedurally defaulted and also fails because the withheld evidence was not material under the *Brady* standard. Both arguments fail.

### 1. Mr. Caro's *Brady* Claim is Not Procedurally Defaulted Because it Rests on Evidence Outside the Record.

The Government argues that this claim is procedurally defaulted because Mr. Caro is "re-litigating an issue that was raised on appeal." (ECF No. 791 at 85.) Contrary to the Government's argument, Mr. Caro did not raise, and could not have raised, this claim on appeal because it rests on facts outside the appellate record.[53] *See Bousley v. United*

---

[53] On appeal, in a short footnote and in the context of different discovery-related claims, Mr. Caro briefly referenced a *Brady* claim and requested a hearing "to determine whether the information requested from BOP was *Brady* material." *United States v. Caro*, No. 07-5, Opening Br. at 69 n.45 (4th Cir. Feb. 12, 2009.) The Government similarly responded in a footnote. *Id.*, Answering Br. at 46, n. 14 (4th Cir. Sept. 18, 2009.) Mr. Caro attempted to expand the record on appeal through an evidentiary hearing, but the

*States*, 523 U.S. 614, 621-22 (1998) (recognizing an exception to the procedural default rule when the claim relied on facts outside the record).

The Government cites two cases in support of its argument. Neither case involves a *Brady* claim, and both involve procedural postures vastly different from Mr. Caro. In *United States v. Linder*, 552 F.3d 391 (4th Cir. 2009), the defendant had knowingly and voluntarily waived his right to appeal. After the court dismissed the defendant's appeal based on this waiver, he raised the same sentencing claims in a motion for post-conviction relief. In denying his motion, the court held that the defendant could not avoid the consequences of a valid appeal waiver by re-raising his *Booker* claim on collateral review. *Id.* at 392.

The Government's reliance on *Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir.) *cert. denied,* 429 U.S. 863 (1976), similarly is misplaced. In *Boeckenhaupt,* the defendant claimed in his post-conviction motion that (1) his arrest was without probable cause; (2) the Air Force had no jurisdiction to detain him; and (3) his consecutive sentences were unlawful. In one paragraph, the Fourth Circuit held that these legal issues had previously been decided on direct appeal, and they were no different in substance from the allegations he lost on appeal. *Id.* at 1183. Neither of these cases involved *Brady* claims where the appellate record was devoid of facts due to the Government's withholding of evidence.

---

Fourth Circuit never gave Mr. Caro a hearing and quickly disposed of the claim, finding that Mr. Caro could only speculate on the exculpatory nature of the requested evidence. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

By raising this claim in his 2255 Motion, Mr. Caro is not asking this Court to circumvent the Fourth Circuit's decision; he is merely asking the Court, for the first time ever, to meaningfully consider the claim.

**2. The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence.**

As Mr. Caro explained in his 2255 Motion, the Government presented expert evidence and argued at trial that the BOP could house an inmate like Mr. Caro at its most secure facility, ADX-Florence, for only a few years and then would have no choice but to release him to a USP where he would harm other inmates. (ECF No. 790 at 149-50.) In its penalty-phase closing, the Government argued, "Everyone agrees, every witness agrees he's getting out of ADX, that in some time within three to five years he will be back at a USP." (Tr. 2/13/2007 at 90.) Before trial, Mr. Caro had suspected this was not true, and sought discovery relevant to this matter pursuant to Rules 16 and 17 of the Federal Rules of Civil Procedure and *Brady*. At a court hearing, the Government admitted that it intended to argue that an inmate's stay at ADX was temporary and conceded that the defense was entitled to documents that would refute this assertion. (ECF No. 790 at 149; Tr. 11/03/2006 at 29-30.) The Government told the Court and defense counsel that if the evidence existed it would be "considered material under Rule 16 and exculpatory" and should be produced (Tr. 11/03/2006 at 28) and generally agreed that the defense was entitled to data that refuted the Government expert's opinion (Tr. 11/03/2006 at 37). The Government was aware of this issue, the importance of this issue to the defense, and its related discovery obligations before trial.

The Government, however, never produced the evidence. Moreover, the evidence was not otherwise available, so when the Government refused to disclose the requested data, Mr. Caro had no other means to acquire it.[54] Since that time, Mr. Caro has discovered selective information not available at the time of trial in the form of an informal survey and evidence released in other cases. This new information includes the affidavit prepared by Jeanne Dvorak and supporting documents (ECF No. 790-48), documents produced by the Government in response to a 2010 subpoena issued to the Bureau of Prisons in another case, *United States v. Vincent Basciano*, 1:05-cr-060 (E.D.N.Y.), and documents received pursuant to a FOIA request in this case. (Declaration of Susan Richardson, dated Oct. 8, 2013 (hereinafter "Richardson Decl."), attached as Ex. 72 ¶ 3.) This evidence shows that the Government possessed material exculpatory evidence at the time of Mr. Caro's trial and violated Mr. Caro's constitutional rights under *Brady* by failing to disclose it. (Richardson Decl., Ex. 72 ¶¶ 6-11.)

The Government does not dispute that the evidence was in its possession or that it was favorable to Mr. Caro. (ECF No. 791 at 86-87.) Similarly, the Government does not dispute the factual accuracy of the informal survey cited by Mr. Caro in his 2255 Motion that impeaches Mr. Hershberger's testimony that an inmate who killed another inmate would be in the three-year step-down program (Tr. 02/12/07 at 200-03) and that step-

---

[54] There is no publicly available list of inmates housed at ADX-Florence. Even if one somehow were able to discover the name of an inmate housed at ADX-Florence, the information still would be not publicly available under the Freedom of Information Act because the BOP will not release the information without a signed consent form from the inmate. *See, e.g.*, 28 C.F.R. §§ 16.3(a), 513.63.

down was automatic if there was no misbehavior and inmate showed responsibility (*id.* at 202); Nor does the Government dispute that the survey contradicts the Government's argument that Mr. Caro would get out of ADX within three to five years. (Tr. 2/13/2007 at 90.)

Rather, the Government argues that "there is no reasonable probability that the suppressed evidence would have produced a different sentence," and thus the withheld evidence was not material and there is no *Brady* violation. (ECF No. 791 at 85.) The Government's support for this proposition is weak. The Government first attempts to support its argument by noting that the jury unanimously found 12 of 22 mitigating factors, and that some of the jurors found (by a preponderance of the evidence) that Mr. Caro would be housed in a secure federal institution. (ECF No. 791 at 87.) These findings are largely irrelevant, and they pale in light of the jury's unanimous finding beyond a reasonable doubt that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release." (ECF No. 639.)

The Government next attempts to support its argument by referencing Dr. Cunningham's hearsay testimony that "illustrated that inmates could remain" at ADX-Florence for more than three years. (ECF No. 791 at 87.) Dr. Cunningham's testimony does not ameliorate the Government's failure to produce this evidence. First, Dr. Cunningham readily admitted to the jury that he had no personal knowledge or data upon which to formulate any opinions. (Tr. 2/12/07 at 40 ("I have limited information on

111

average length of stay at ADX."), *id.* at 76 ("I have asked for average length of stay on the Control Unit . . . I haven't gotten it.).

Dr. Cunningham then testified that he had heard that the average prisoner takes five years to work through the step-down program (*id.* at 41), that at least five individuals have been housed at ADX-Florence since 1994 (*id.*), and that inmates who killed other inmates were typically housed in ADX's Control Unit for six years (*id.* at 76). The problem with this hearsay evidence was that it was incorrect and grossly understated the length of time spent at ADX by many inmates. The Government's assertion that this hearsay evidence somehow corrects the problem not only defies common sense, but further perpetuates the inaccurate evidence presented at trial.[55]

Based on the informal survey and additional data Mr. Caro has gathered, Dr. Cunningham's hearsay numbers were wrong and underestimated the typical inmate's length of stay at ADX-Florence. The informal survey cited in Mr. Caro's 2255 Motion was based on responses received by 69 inmates, about 15% of the inmates at ADX-Florence. The results revealed that two-thirds of them had been housed at ADX-Florence/USP-Marion for more than five years, and that almost one-third of them had been there for at least 10 or more years. (ECF No. 790 at 152.)

Since that informal survey, Mr. Caro has been able to gather additional data regarding the length of time that inmates are housed at ADX-Florence. (*See* Richardson Decl., Ex. 72 ¶ 3.) These results further reveal that the Government withheld *Brady*

---

[55] Dr. Cunningham's hearsay testimony, which pales in comparison with the data Mr. Caro has been able to gather since his trial, also was improperly impeached by the introduction of irrelevant and specific acts of violence by other inmates.

information regarding the number of inmates housed at ADX for more than three or five years.  This new data however, likely still under-represent the number of inmates who have been continuously housed at ADX-Florence for more than three or five years, as Mr. Caro still does not have access to all of the relevant data.  The numbers also under-represent the length of time an inmate has been continuously housed under maximum security because they do not include an inmate's incarceration time at USP-Marion, BOP's maximum security facility before the opening of ADX-Florence in late 1994. Some of the inmates currently housed at ADX-Florence had previously been housed at USP-Marion under extremely restrictive conditions.  (*See* Bezy Supp. Decl., Ex. 62 ¶ 4.) Even this limited data, however, further reveals that the Government withheld *Brady* information from Mr. Caro at trial.

The additional information now shows that at least 126 inmates have been incarcerated at ADX-Florence for more than five years and at least 155 inmates have been incarcerated there for more than three years.  (Richardson Decl., Ex. 72 ¶ 7.)  Of these 155 inmates, 125 are still designated to ADX-Florence, comprising almost 30% of the current ADX-Florence population.  (*Id*.)

Mr. Caro is now aware of at least 79 inmates who, at the time of Mr. Caro's trial in 2007, had been designated to ADX-Florence for more than three years and at least 63 inmates who had been designated for more than five years.  (*Id*. ¶ 8.)  Twenty-five of these inmates had been housed at ADX-Florence continuously for at least ten years.  (*Id*. ¶.)  This data shows that, contrary to Mr. Hershberger's testimony, Mr. Silverstein was

not a "special case,"[56] and that a significant number of inmates have been continuously designated to ADX-Florence for more than five years. This data also shows that while the three-year step-down transfer program may have been a goal of the BOP, in practice it appears to have been the exception, not the rule. This new data is not cumulative of Dr. Cunningham's testimony or any other evidence presented at trial.

Mr. Caro also has analyzed the available data with an eye towards inmates whose circumstances more closely resemble Mr. Caro's circumstances. Mr. Caro separated out inmates who have been accused or convicted of committing a homicide within a BOP facility. Mr. Caro is aware of at least 54 such inmates who currently have been designated to ADX-Florence.[57] (*Id.* ¶ 9.) All 54 of these inmates have been continuously designated to ADX-Forence since their initial placement, including 22 inmates who entered ADX-Florence in 2007 or earlier. (*Id.*) In 2007, at least 14 of these inmates had been incarcerated at ADX-Florence for more than three years. Those 14 inmates are still designated to ADX-Florence. (*Id.*)[58]

Finally, Mr. Caro was able to locate ten cases nationwide where the Government sought the death penalty for a homicide committed at a BOP facility, but where the

---

[56] Defense counsel attempted to impeach Mr. Hershberger by referring to an inmate, Thomas Silverstein, who had been at ADX for a long period of time. Mr. Hershberger discounted the experience of Mr. Silverstein by stating that his was a "very special case." (ECF No. 790 at 150.)

[57] These numbers also under-represent the number of continuous years that inmates have spent in the BOP's maximum security facility as they do not include the years that these inmates may have spent at ADX-Florence's predecessor, USP-Marion.

[58] With the exception of the two ADX-Florence murders discussed at trial (Tr. 02/12/07 at 108), none of these 54 inmates have been indicted for a subsequent homicide since their designation to ADX-Florence. (Richardson Decl., Ex. 72 ¶ 10.)

defendant ended up with a life sentence. (*Id.* ¶ 11.) Nine of these ten defendants have been continuously designated to ADX-Forence since imposition of their life sentences. (*Id.*) The one inmate who was not designated to ADX-Florence had been diagnosed with schizophrenia, and thus, according to BOP policy, could not be placed at ADX-Florence. (*Id.* at 11, Table 3 n.3.) With the exception of the one inmate who entered ADX in 2012, all of these inmates have been designated to ADX-Florence for more than three years. (*Id.*)

The evidence Mr. Caro has been able to accumulate shows that an inmate, like Mr. Caro, who was convicted of a homicide within the BOP, but received a sentence of life, likely would not have been processed through the BOP's three-year step down program, but would have been continuously housed at ADX-Florence. Such evidence would have been extremely helpful in impeaching the Government's witness, Mr. Hershberger, and the Government's subsequent argument.

Mr. Caro has not only alleged but presented evidence that the Government provided false and misleading testimony about the average length of stay of inmates at ADX-Florence, that it withheld this critical evidence that would have revealed the truth, and that the suppression of this evidence prejudiced Mr. Caro during the penalty phase of his trial.[59] Had that evidence been provided to Mr. Caro, he would have been able to

---

[59] The prejudice to Mr. Caro from this withheld evidence was exacerbated by the Government's vouching in closing argument: "We know if, if Carlos Caro goes to [ADX-Florence], he's not going to stay there. . . . he eventually . . . will graduate out, be stepped down out of that facility" back into a USP. (ECF No. 790 at 150.) Mr. Caro disputes the Government's argument (ECF No. 791 at 92-94) that this statement was neither vouching nor prejudicial. When combined with the Government's *Brady* errors

115

effectively argue that, while ADX-Florence may have been designed as a temporary housing (ECF No. 791 at 70), it is the practice of the BOP to continuously house inmates it considers dangerous for many years at ADX-Florence. Therefore, consistent with this practice, the BOP would not have moved Mr. Caro out of ADX-Florence unless and until it believed that it was safe to do so. Had the evidence been disclosed, there is a reasonable probability that a jury would not have found that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release" and would not have voted for a death sentence.

**B. The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro Was Not a Gang Leader at USP-Lee.**

The Government concedes that it withheld the three documents referenced in Mr. Caro's 2255 Motion. (ECF No. 791 at 89 n.20) As alleged in the 2255 Motion, those documents revealed (1) the BOP's belief that while Mr. Caro was at USP-Lee, inmate Ricardo Benavidez was initially the leader of the Texas Syndicate until he was assaulted, and then another inmate, Francisco Tijerina, became the leader; (2) that an inmate reported to the BOP that unnamed inmates had met and made a decision that whoever killed Mr. Sandoval was "gonna be in trouble," and (3) that the BOP believed that Mr. Caro was in "'bad standing' with the [redacted] gang." (ECF No. 790 at 153-54.)

---

and misrepresentations to the jury regarding the ability of the BOP to house an inmate at ADX-Florence as long as necessary, the Government's vouching was highly prejudicial to Mr. Caro.

The Government argues, however, that it did not violate *Brady* because this information was not material. The Government also argues that this information was already known or should have been known to Mr. Caro, and thus it did not violate *Brady* in failing to disclose the evidence. Again, it would be premature for the Court to resolve these factual disputes in the context of a motion to dismiss.

### 1. The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence.

The Government's claim that information regarding the fact that Mr. Caro's position and standing in the gang is not material loses credence when one looks at the evidence presented by the Government in its penalty-phase case. Eleven of the Government's thirteen penalty-phase witnesses discussed gang-related matters.[60] The Government and its witnesses said the words "gang" or "Texas Syndicate" at least 129 different times during the penalty phase.[61] Mr. Caro's membership and alleged position in the gang was a key issue during the penalty phase of trial.

The Government now claims that it never said that Mr. Caro was "*the* leader of Texas Syndicate" and that the withheld documents "are of questionable utility to rebut evidence of Caro's statements and actions at FCI-Oakdale concerning his leadership role." (ECF No. 791 at 90-91.) The Government's assertions ignore the statements it

---

[60] The two witnesses who did not discuss gang matters were Kristin Sandoval, the daughter of Mr. Sandoval, and Thomas O'Neill, one of Mr. Caro's prior probation officers, whose testimony was presented by stipulation.

[61] The Government's reliance on gang activity is further revealed by the fact that it also mentioned the Aryan Brotherhood gang on at least seven occasions during the penalty phase of the trial. Mr. Caro argues the prejudicial impact of this irrelevant and inflammatory evidence in Claim Six (I), *supra*.

made to both the jury and Court during trial. During its closing argument, the Government argued the following:

> What do we know about the Texas Syndicate? It's not just any group that we see on the street corners in our cities; the Texas syndicate is labeled and classified by the Bureau of Prisons as a disruptive group, one of the five most violent, difficult gangs in the Bureau of Prisons system.
>
> The Bloods, the Crips, the gangs we hear about, they don't make the disruptive group; the Texas Syndicate is one of the five disruptive groups classified by the Bureau of Prisons, and this man is not just a member, but he's a leader in that.

(Tr. 2/13/2007 at 21.) The Government directly stated that Mr. Caro was still a leader, and at other times implied that he might still be the leader. (Tr. 02/13/07 at 21-22, 96.) It made these statements in the face of its own undisclosed evidence that clearly stated that Mr. Caro, in fact, was *not* the leader, and that the BOP believed he was in bad standing with the gang.

Not surprisingly, the Government also led the Court to believe that it asserted that Mr. Caro was a leader of the Texas Syndicate. When ruling on an evidentiary matter, the Court made the following statement, which the Government did not correct:

> For example, someone who was in the position that the Government contends that the defendant is in, that is a gang leader . . . .

(Tr. 2/12/2007 at 94.)

An inmate who is in "bad standing" and does not have the force of a gang behind him, and may even have the gang focused against him, poses less of a future danger than a gang leader. If Mr. Caro no longer had the support of the gang and its affiliates, then all of the Government's testimony about the danger of potential future gang communications would have been irrelevant. While the Government believed that inmates other than Mr.

118

Caro were the gang leaders at USP-Lee and that Mr. Caro was in bad standing with the gang, it never once mentioned this to defense counsel, the Court, or the jury, but instead argued that he "is a leader" or might still be a leader. Failure to provide this evidence to the defense undermined confidence in the jury's death verdict.

> **2.** **The Government's Contention That Mr. Caro Knew or Should Have Known About the Existence of This Evidence is Mere Conjecture.**

The Government alternatively argues that it has not violated Mr. Caro's *Brady* rights because "it appears that Caro knew his own standing within the gang; or, at the very least, knew Texas syndicate members who could have informed him of his standing." (ECF No. 791 at 92.) To support this assertion, the Government refers to a letter that Mr. Caro sent in January 2004 to a purported gang member outside of the prison, asking that "he remain in good standing with the gang." (ECF No. 791 at 92.) The Government, however, does not refer to any evidence answering Mr. Caro's question. Thus, this letter actually disproves the Government's contention and shows that Mr. Caro was questioning his own standing in the gang. The Government provides no further evidence in support of its speculation.

Moreover, after the death of Mr. Sandoval, the BOP placed Mr. Caro under extremely strict and isolated housing conditions, ordering that "Inmate Caro will receive recreation alone. This means no other inmates will be in any other recreation cage while he is receiving recreation. Additionally, he is to be celled alone. Staff should ensure he has minimal if any contact with other inmates particularly inmates belonging to or associated with the Texas Syndicate." (Special Handling Instructions, Ex. 70 ¶ 7.) After

119

Mr. Sandoval's death, the BOP also moved Mr. Caro from USP-Lee to ADX-Florence before trial. (Federal Bureau of Prisons Transfer Order for Carlos David Caro, dated Oct. 11, 2005, attached as Ex. 73.) All of these facts would have made it much more difficult for Mr. Caro to receive communication about gang matters, including his own standing within the gang. The Government's unsupported arguments are contrary to existing facts and are not sufficient to warrant summary dismissal.

The cases cited by the Government do not address the situation at hand and do not support the proposition that the Court should summarily dispose of this issue. Rather, the cases involve completely different and irrelevant situations involving evidence regarding the defendant's physical whereabouts,[62] unspecified evidence that allegedly would have shown that the defendant's confession was fabricated,[63] and the statement of a witness whom any reasonable defense counsel would have interviewed.[64]

The Government's attempt to resolve this factual dispute in its favor does not support summary dismissal, but warrants further consideration outside of a motion to dismiss.

**C.     The Government's Argument Fails to Address the Cumulative Impact of the Withheld Evidenc, Thereby Making Summary Dismissal Improper.**

The Government's motion regarding this claim also fails because it does not address the cumulative impacts of all of its *Brady* errors. The Government's failure to

---

[62] *See United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990).
[63] *See West v. Johnson*, 92 F.3d 1385, 1398-99 (5th Cir. 1996).
[64] *See United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990).

address this issue in a cumulative manner renders its analysis inadequate, precluding summary dismissal.

As discussed in the introductory section, *Brady* errors must be reviewed cumulatively. (*See* Introduction, Section (B), *supra*.) The Government presented two main arguments at the penalty phase regarding Mr. Caro's future dangerousness. First, it argued that Mr. Caro would be dangerous in the future in large part due to his gang association. Second, the BOP could not safely house him for more than three years, especially in light of his gang associations. The Government withheld evidence regarding both of these issues. It withheld evidence indicating that Mr. Caro was never a leader of the Texas Syndicate at USP-Lee; it withheld evidence indicating the BOP's belief that Mr. Caro was in "bad standing" with the gang; it withheld evidence that it had received word from an inmate that a "decision" had been made and that "whoever did this to Sandoval, if they come out, there's going to be trouble"; and it withheld evidence regarding the BOP's ability to securely hold Mr. Caro at ADX-Florence for as long as necessary.

Finally, the Government withheld evidence relevant during the merits phase of the trial that would have impeached Sean Bullock, its only purported eyewitness, who provided the only direct evidence regarding premeditation. (*See* Claim Five, *supra*; ECF No. 790 at 62-64.) Mr. Bullock, who was not adequately investigated and subjected to meaningful cross-examination in part due to the government's *Brady* error, provided a false image to the jury of Mr. Caro "sneaking" up behind a helpless and defenseless Mr. Sandoval. That false image was relied upon by the Government in its penalty-phase

closing argument. (Tr. 02/13/07 at 88 ("He snuck up behind him with a wet towel, tightened it up, put a knot in it and for four minutes strangled the life out of him. This was not a fight. It was an assault. That's a significant difference.").) The prejudice from this guilt/innocence phase *Brady* error also contributed to Mr. Caro's prejudice in the penalty phase.

The cumulative impact of all of these *Brady* violations had a significant impact on Mr. Caro's trial. These errors denied Mr. Caro's trial attorneys the evidence they needed to meaningfully challenge the most important issues of the trial—premeditation, future dangerousness, gang involvement, and the BOP's ability to securely house Mr. Caro at ADX-Florence as long as necessary. These alleged errors, which rely on evidence outside of the record, reveal that there can be no confidence in the integrity of Mr. Caro's trial. They also reveal why this issue cannot be resolved in this Motion to Dismiss.

**D.     Mr. Caro's Death Sentence, Which Relied on Incomplete, Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment.**

The Government did not move to dismiss this particular subsection. This subsection, which is based on the evidence and arguments presented in other claims, including Claim Six, Claim Seven, and Claim Ten, cannot be summarily dismissed before the underlying issues raised in these three claims are resolved. As resolution of those underlying issues cannot occur in the context of a motion to dismiss, the summary dismissal of this claim also is inappropriate.

**CLAIM EIGHT: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED THE EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, 472 U.S. 320 (1985), BY MAKING COMMENTS THAT MINIMIZED THE JURY'S RESPONSIBILITY AT THE PENALTY PHASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

While the Government argues that this claim is procedurally defaulted (ECF No. No. 791 at 99), it spends the bulk of time responding to the merits of the claim. If this Court finds that this claim is defaulted, then Mr. Caro can show cause to overcome the default because appellate counsel was ineffective in failing to raise this claim. (*See* Claim Nine D, *infra*.) The Court should not summarily dismiss this claim on procedural grounds.

The Government also argues that Mr. Caro's claim fails on the merits. Mr. Caro concedes that counsel made an unintentional error by omitting the word "not" from the sentence "It's not the law." (Tr. 2/13/2007 at 98.) The typographical error, however, does not negate Mr. Caro's claim in its entirety. The Supreme Court's decision in *Caldwell v. Missisippi* disapproved of the argument made by the State's attorney because he "sought to minimize the jury's sense of responsibility for determining the appropriateness of death." 472 U.S. 320, 341 (1985). As the Government notes, the Supreme Court has since described *Caldwell* as holding that "the jury must not be misled

regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8 (1994); *see* ECF No. 791 at 97.

In closing argument, the Government downplayed the jury's responsibility in sentencing Mr. Caro by stating that other juries have done this. (Tr. 02/13/2007 at 17) ("If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done. You would not be alone in that regard."). The Government asserts that there is "no reasonable possibility that the jury was confused into thinking that some other jury could be partly responsible for causing the death of Caro." (ECF No. 791 at 96.) But the Government misses the point. Mr. Caro does not argue that another jury would later be responsible for Mr. Caro's death sentence. Rather, the prosecutor's comments at closing suggest one of two things: either that Mr. Caro had been sentenced to death previously by another jury or that other juries have sentenced people to death. Both are improper and both arguments relieve the jury of their ultimate responsibility in deciding whether death is the appropriate punishment in this case.

If the jury believed the former, then it would be relieved of its responsibility because another jury already sentenced Mr. Caro to death and where others have already made that finding, the pressure is removed from the current jurors. If the jury believed the latter, then the prosecutor's comment also diminished the jury's responsibility because it downplays the seriousness of imposing a death sentence. Contrary to the Government's argument in its motion that the prosecutor was just making a factual

observation, the fact that other juries have sentenced people to death "is not linked to any arguably valid sentencing consideration." *Caldwell*, 472 U.S. at 336. This irrelevant comment improperly relieved the jury of "the gravity of its task" and "awareness of its 'truly awesome responsibility.'" *Id.* at 341. Thus, the Government's argument must fail at this stage of the proceedings.

Compounding the error here, trial counsel failed to object and therefore there were no curative instructions given. *Cf. Caldwell*, 472 U.S. at 339 (emphasizing that no curative instructions were given and distinguishing another case where court "had in fact given the jury a strong curative instruction"). Mr. Caro has sufficiently alleged that the prosecutor violated *Caldwell* and therefore this Court should not dismiss Claim Eight.

**GROUNDS FOR RELIEF: DIRECT APPEAL**

**CLAIM NINE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT APPELLATE COUNSEL HAS PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE NON-FRIVOLOUS APPELLATE ISSUES DURING MR. CARO'S DIRECT APPEAL.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

The Government seeks summary dismissal on all but one of Mr. Caro's appellate counsel claims.[65] As the Government concedes, Mr. Caro's appellate counsel claims

---

[65] The Government failed to address Claim Nine (B), which alleged that appellate counsel failed to challenge the exclusion for cause of qualified jurors with misgivings as to the

require evidentiary development to determine whether appellate counsel had a strategic reason for failing to raise these claims. (*See* ECF No. 791 at 100 (noting that "without the benefit of additional evidence, this Court cannot know or discern counsel's reasoning in deciding what issues to present on appeal").) This is consistent with law governing claims of ineffective assistance of appellate counsel. *See generally Bell v. Jarvis*, 236 F.3d 149, 164-65 (4th Cir. 2000) (discussing standard for appellate ineffectiveness claim and citing case law for the proposition that counsel may make an "acceptable strategic decision" to raise certain claims); *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013) (noting that if appellate counsel "abandoned a nonfrivolous claim that was both 'obvious' and 'clearly stronger' than the claim that he actually presented, his performance was deficient, unless his choice had a strategic justification"); *Eagle v. Linahan*, 279 F.3d 926, 939 (11th Cir. 2001) (noting that "whether a decision by [appellate] counsel was a tactical one is a question of fact") (citation omitted).

The standard of care for capital appellate attorneys requires counsel "to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules." ABA Guideline 10.15.1(C); *see also* ECF No. 790-4, ¶ 52 (*Strickland* expert Larry Hammond stating that capital appellate attorneys "have special duties not always encountered by defense counsel in noncapital cases" and that "[t]he duty to advocate for reversal of the death sentence is especially important

---

death penalty. (ECF No. 790 at 162-68.) For that reason alone, that claim should not be dismissed.

when the case is on direct appeal"). As the ABA Guidelines explain, "'[w]innowing" issues in a capital appeal can have fatal consequences. . . .When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited." ABA Guideline 10.15.1, cmt. at 1083. This Court must make the factual determination whether Mr. Caro's direct appeal attorneys fell below that standard of care.

Despite its concession that factual development is needed on this claim, the Government urges this Court to summarily dismiss these claims based on Mr. Caro's inability to show prejudice. For the reasons discussed below, Mr. Caro can demonstrate prejudice, and this Court should not dismiss this claim. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (noting that, in appellate counsel claim, prejudice is shown where there is "a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal").

**A.      Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Beyond a Resonable Doubt.**

At the time of Mr. Caro's appeal, there was not only Supreme Court law but also other persuasive circuit precedent supporting the argument that the court erred in failing to instruct the jury that the Government must prove beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating circumstances. (*See* ECF No. 790 at 159-62 (setting forth supporting law).)[66] Appellate counsel, however, failed to

---

[66] Since Mr. Caro filed his 2255 Motion, the Fourth Circuit has issued an opinion rejecting this argument. *See United States v. Runyon*, 707 F.3d 475, 515-16 (4th Cir. 2013); *see also United States v. Hager*, 721 F.3d 167, 206-07 (4th Cir. 2013) (same).

127

raise this claim on appeal.  The Government contends that Mr. Caro loses on the merits of the claim.

Although this Court instructed the jury that it must determine whether the Government had proven the aggravating factors beyond a reasonable doubt, the Court failed to given the requested instruction to the jury that this reasonable-doubt standard must *also* apply to the weighing of the aggravating and mitigating factors.[67]  The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). It is, therefore, reversible error and would have entitled Mr. Caro to relief on appeal. *Id.* at 281-82.  For that reason, contrary to the Government's assertion, Mr. Caro has alleged prejudice.

The Government attacks the merits of Mr. Caro's claim in two ways, both of which must fail.  First, the Government argues that the Supreme Court decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), are "unhelpful" because "[n]othing in the record . . . implicates th[ose] holdings."  (ECF No. 791 at 103-04.)[68]  Mr. Caro disagrees.  Reviewing *Apprendi* and the relevant cases

---

Had Fourth Circuit law been against appellate counsel *at the time of Mr. Caro's direct appeal*, Mr. Caro would have a more difficult time arguing that appellate counsel was ineffective for failing to raise this claim.  When Mr. Caro was on direct appeal, however, the issue was not decided and there was persuasive authority supporting the claim.

[67]The fact that trial counsel requested, but were denied, a constitutionally adequate jury instruction on this issue further supports appellate counsel's deficient performance. *See Shaw v. Wilson*, 721 F.3d 908, 916 (2013) ("Trial counsel's preservation of a claim can make [raising a claim on appeal] obvious.").

[68] The government's citation, without explanation, to *Tuilaepa v. California*, 512 U.S. 967 (1994), is unpersuasive.  First, *Tuilaepa* was decided before *Apprendi* or *Ring*, and

following that holding, coupled with *United States v. Gaudin*, 515 U.S. 506 (1995), gives rise to a meritorious and winning argument that could have been raised, and resulted in relief, on appeal.

*Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The Supreme Court has consistently applied the holding in *Apprendi* to *any* determination that increases the maximum statutorily-permissible sentence and found that such determination must be proven beyond a reasonable doubt and made by a jury. *See Cunningham v. California*, 549 U.S. 270, 278-79, 288-89 (2007); *United States v. Booker*, 543 U.S. 220, 230 (2005); *Blakely v. Washington*, 542 U.S. 296, 306-07 (2004); *Ring v. Arizona*, 536 U.S. 584, 602 (2002); *Jones v. United States*, 526 U.S. 227, 232 (1999).[69] Recently, the Supreme Court applied the holding in *Apprendi* to any fact that increases a mandatory minimum sentence. *See Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013) In *Ring*, the Supreme Court applied *Apprendi* to capital sentencing. "Capital defendants, no less than noncapital

---

before *Gaudin*. Second, the Court in *Tuilaepa* determined that California's death-penalty statute did not require a "mandatory sentencing scheme" that would require death if a jury found "a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors." 512 U.S. at 980. Mr. Caro, however, does not make that argument. Rather, he asserts that the jurors should have been instructed that they must find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors.

[69] The Court linked the Sixth Amendment jury trial right with the due-process reasonable-doubt requirement back in *Apprendi* itself. 530 U.S. at 477-78 (*citing In re Winship*, 397 U.S. 358 (1970)).

defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589.

In Mr. Caro's case, the Court refused to instruct the jury that it must find that the Government has proven "beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors in order to justify the death penalty." (ECF No. 611 at 1.) Instead, the Court only instructed the jury that after it determined whether "the Government has proved beyond a reasonable any additional aggravating factors" (Tr. 02/13/2007 at 100), it then "must decide whether the proved aggravating factors outweigh the mitigating factors sufficiently to justify the death sentence" (Tr. 02/13/2007 at 101). The Court went on and explained, "If you determine that the weighing process does justify a death sentence, then you should impose that sentence." (*Id.*) In its instruction, the Court violated the Supreme Court's rule in *Apprendi* that any determination that increases a defendant's punishment—in this case, it was increased from life to death—must be found beyond a reasonable doubt. It is the "outweighing" determination that violated Supreme Court law.

The Supreme Court has often referred to these types of determinations as "fact" findings and has never suggested that *Apprendi* covers only determinations of historical fact. On the contrary, in *United States v. Gaudin*, 515 U.S. 506 (1995), the Court rejected such an argument. In *Gaudin*, the government argued that the Constitution permits a judge, rather than a jury, to find an element when it involves applying a "legal standard" to certain "historical facts" found by the jury. The Court rejected this argument on two grounds. First, "the application-of-legal-standard-to-fact sort of question . . . , commonly

130

called a 'mixed question of law and fact,' has typically been resolved by juries." *Id.* at 512. This description applies fully to the "outweighing" determination in a federal capital case, in which the jury needs to draw inferences from aggravating and mitigating factors and determine the significance of those inferences. Second, the Court found that the government's argument "has absolutely no historical support." *Id.* Indeed, if the government's argument were true, then juries would only make "findings of fact" pertaining to mixed-law-and-fact issues and the judge would then apply the facts to make a determination of guilt. *Id.* at 512-13. Applying these principles to Mr. Caro's case, the requirement that the jury reach an "outweighing" determination without instruction that such finding was to be made beyond a reasonable doubt violates the Constitution.

Further support for the "outweighing" determination is found in the statute itself. Before a jury can decide to impose a death sentence, it must make a finding that aggravating factors outweigh mitigating factors. *See* 18 U.S.C. § 3593(e). A death verdict returned without such a finding would be statutorily invalid. The maximum eligible sentence for *Apprendi* purposes is the sentence authorized by statute based only on the findings made by the jury beyond a reasonable doubt. If an additional finding is needed to impose the greater sentence, then the Constitution is violated. While the determination that aggravating factors do or do not outweigh the mitigating factors may be subjective, it nevertheless qualifies as a fact finding under the Sixth Amendment.

Second, the Government argues that the Federal Death Penalty Act (FDPA) "does not set out a reasonable doubt standard" regarding the instruction on weighing aggravating and mitigating factors. (ECF No. 791 at 102.) According to the

Government, this signals that "Congress did not intend the reasonable doubt standard to apply to the weighing process." (*Id.*) The FDPA, 18 U.S.C. § 3591 *et. seq.*, was enacted in 1994 before the Supreme Court announced its decisions in *Apprendi* and *Ring*. As such, the Government's argument that there is not statutory language mandating that the "outweighing" determination be made beyond a reasonable doubt is irrelevant. Regardless, the Supreme Court's interpretation of constitutional law trumps the statutory provision otherwise. *Cf. United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) (finding that even though Congress has "great authority to design laws," it cannot deny constitutional rights in doing so).

For these reasons, Mr. Caro has sufficiently alleged that appellate counsel's failure to raise this claim prejudiced him, and Mr. Caro is entitled to a hearing and ultimately relief.

**B.      Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty.**

As noted, the Government did not move to dismiss this claim. For that reason, Mr. Caro stands on the facts alleged and arguments advanced in his 2255 Motion.

**C.      Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Appeal the Government's Use of Specific Acts of Violence by Person's Other Than Mr. Caro.**

The Government argues that Mr. Caro cannot demonstrate deficient performance or prejudice on this claim. (ECF No. 791 at 105.) As stated *supra*, a determination of deficient performance cannot be made from the record alone. Mr. Caro alleged in his 2255 Motion that appellate counsel did not have a tactical reason for failing to raise this

132

claim. (ECF No. 790 at 169.) Contrary to the Government's argument that "counsel understandably" omitted this claim (ECF No. 791 at 107), this Court must take Mr. Caro's allegations as true. The Government's motion cites law that appellate counsel need not raise every nonfrivolous issue (ECF No. 791 at 105), but this claim has merit and should have been raised in this capital case. Therefore, evidentiary development is required to prove deficient performance on this claim.

The Government's argument that Mr. Caro cannot demonstrate prejudice also fails at this stage of the proceedings. Mr. Caro incorporates here by reference his argument made in related Claim Six (I), *supra*. Claim Six (I) alleges ineffective assistance of trial counsel because counsel failed to challenge the Government's improper introduction of highly prejudicial testimony during trial. Because trial counsel failed to preserve this claim, the Government relies on the notion that had the claim been raised on appeal it would have been subject to plain-error review and therefore not winnable. (ECF No. 791 at 107-08.) Even applying the plain-error test, the Fourth Circuit could have granted relief because the error affected Mr. Caro's substantial rights and seriously affected the fairness and integrity of the proceedings. *See United States v. Olano*, 507 U.S. 725, 732 (1993).

As explained in Claim Six (I), the testimony was highly prejudicial and impacted the fairness of Mr. Caro's sentencing proceedings. The damaging testimony had no relevance to Mr. Caro's alleged future dangerousness and improperly inflamed the passion of the jury. The Government continues to defend its introduction of this improper evidence because it was "in rebuttal to the defense testimony." (ECF No. 791

133

at 107.)[70] But when sustaining one of trial counsel's objections to the Government's attempted introduction of specific acts of violence of other individuals, the Court found "it's inflammatory and may unfairly prejudice the defendant." (Tr. 2/12/07 at 95.) The Court's statement, therefore, defeats the Government's argument that the introduction of this testimony was "proper" rebuttal evidence.

Finally, the Government argues that even if the Fourth Circuit concluded that the introduction of the specific-act evidence was error, Mr. Caro cannot show prejudice. (ECF No. 791 at 108.) It recites the appellate court's opinion, which found that the errors it did find were not prejudicial enough to have infected the trial or sentencing. (ECF No. 791 at 108-09.) These conclusions by the appeals court, however, do not preclude Mr. Caro from obtaining relief on his appellate ineffectiveness claim but rather lend further support for relief. Had Mr. Caro's appellate counsel raised additional claims and been able to show additional errors, then such errors may have tipped the balance and resulted in a finding that the penalty phase was in fact unfair. *Cf. Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (noting that if additional information was considered, "there is a reasonable probability that at least one juror would have struck a different balance").

---

[70] As Mr. Caro already argued in Claim Six (I), regardless of whether the Government did or did not technically comply with the Court's order, the Government did not comply with the Constitution, and its introduction of other prisoners' specific acts of violence violated Mr. Caro's right to an individualized sentencing. *See Zant v. Stephens*, 456 U.S. 410 (1982).

134

**D. Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Argue that the Rule in *Caldwell v. Mississippi* Was Violated by the Government's Minimization of the Jury's Responsibility for a Death Verdict.**

In its motion, the Government cross-references Claim Eight and makes no additional argument in support of summary dismissal on this claim. (ECF No. 791 at 109.) Mr. Caro incorporates here by reference the argument he made in response to the merits of Claim Eight, *supra*. Because the Government has not offered any additional support for the dismissal of Claim Nine (D), Mr. Caro asserts that for the reasons stated in Claim Eight, his claim has merit and appellate counsel was ineffective by failing to raise it on appeal.

**E. Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Assert Systemic Death Penalty Challenges.**

The Government cross-references Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen and makes no additional argument in support of summary dismissal on this claim. (ECF No. 791 at 109.) Mr. Caro incorporates here by reference the arguments he makes in response to the merits of Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen, *infra*. Because the Government has not offered any additional support for the dismissal of Claim Nine (E), Mr. Caro asserts that for the reasons stated in Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen, his claims have merit and appellate counsel was ineffective by failing to raise them on appeal.

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES**

**CLAIM TEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A).**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the sentencing jury's consideration of the future-dangerousness aggravating factor violated his right to a non-arbitrary sentencing process under the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(A). (ECF No. 790 at 170–79.) Mr. Caro supported his assertion with case law, *e.g.*, *United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004), and contemporary studies, *e.g.*, Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & 223 (2009), all of which serve to illustrate the radical decline in the confidence of courts and academics in the reliability of the future-dangerousness factor over the past three decades. As the district court mused in *Sampson*, "the evolution of the law, and of scientific research, presents the question of whether it can now be said that future dangerousness can generally be predicted with sufficient reliability to assure that the

death penalty is not being imposed arbitrarily and capriciously." *Sampson*, 335 F. Supp. 2d at 222–23. The answer is no.

The Government argues that "the future dangerousness factor meets Constitutional standards of reliability and is not arbitrary." (ECF 791 at 110.) In the absence of any studies to support its position, it relies primarily on *Jurek v. Texas*, 428 U.S. 262 (1976). In *Jurek*, the Supreme Court held that a jury considering whether to impose a death sentence can predict and consider as an aggravating factor a convicted person's probable future conduct. *Id.* at 275–76. In so holding, the Court acknowledged that "[i]t is, of course, not easy to predict future behavior." *Id.* at 275. Furthermore, the Court did not explicitly consider the fundamental question of whether the Eighth Amendment permits consideration of future dangerousness.

As Mr. Caro explained in his 2255 Motion, the Eighth Amendment strictly regulates the procedures by which death sentences are imposed, paying particular attention to their reliability. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."). And as study after study has shown, the utilization of the future-dangerousness factor could hardly be a less reliable means of determining whether a person should live or die.[71] All of the cited studies reach roughly

---

[71] *See, e.g.*, Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223 (2009); Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46 (2008); Thomas Regnier, *Barefoot in Quicksand: The Future of "Future Dangerousness"*

the same conclusion: "Predicting future dangerousness appears to depart little from gazing in a crystal ball when it comes to determining the fate of capital murderers." Marquart et al., *supra*, at 464. The error rate of such clairvoyance unquestionably exceeds that which the Eighth Amendment allows. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (explaining that the Eighth Amendment demands an exceptionally high degree of reliability when a death sentence is imposed).

Drawing a parallel between *Jurek* and this case, the Government contends that "the capital sentencing jury's task in answering the question of future dangerousness [in *Jurek*] was 'no different from the task performed countless times each day throughout the American system of criminal justice.'" (ECF No. 791 at 110 (*quoting Jurek*, 428 U.S. at 276).) But this is untrue. Tasks such as setting bail, considering eligibility for parole, and determining the terms of incarceration are in no way comparable to the task of determining whether to sentence a defendant to death. None of those tasks is as consequential or irreversible as the task of a capital sentencing jury in answering the

---

*Predictions in Death Penalty Sentencing in the World of* Daubert *and* Kumho, 37 Akron L. Rev. 469 (2004); Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness* (2004), http://www.texasdefender.org/images/publications/DEADLYSP.pdf; Erica Beecher-Monas, *The Epistemology of Prediction: Future Dangerousness Testimony and Intellectual Due Process*, 60 Wash. & Lee L. Rev. 353 (2003); Erica Beecher-Monasa & Edgar Garcia-Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post-*Daubert *World*, 24 Cardozo L. Rev. 1845 (2003); Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendant*, 90 J. Crim. L. & Criminology 1251 (2000); William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605 (1999); James W. Marquart et al., *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 Law & Soc'y Rev. 449 (1989).

question of future dangerousness. Accordingly, the degree of reliability required to undertake those non-capital tasks in a manner that comports with the requirements of due process is less than the degree of reliability required to establish a fact that will determine whether a person will live or die. *See Woodson v. N. Carolina*, 428 U.S. 280, 305 (1976) ("Because of that qualitative difference [between a death sentence and a sentence of imprisonment, however long], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.").

The Government criticizes Mr. Caro for "repeat[ing] the argument reviewed and refuted by the Supreme Court in *Barefoot* [*v. Estelle*, 463 U.S. 880 (1983)]." (ECF No. 791 at 112.) The Government is particularly bothered by the fact that Mr. Caro relies on studies even though, in *Barefoot*, the Court itself observed "that many mental health professionals have questioned the usefulness of psychiatric predictions of future dangerousness in light of studies indicating that such predictions are often inaccurate." *Id.* at 901 n.7. Moreover, the Court decided *Barefoot* in 1983, while all of the studies cited by Mr. Caro were published between 1989 and 2009, well after the publication of any study considered by the Court.

Lastly, the Government takes issue with the fact that Dr. Mark D. Cunningham both authored the statistical studies cited in Mr. Caro's 2255 Motion and testified in Mr. Caro's behalf at trial. (ECF No. 791 at 114.) According to the Government, Mr. Caro "cannot have it both ways" with Dr. Cunningham "opin[ing] on the unlikelihood of a capital defendant being a future danger" and Mr. Caro "claim[ing] that neither jurors nor

experts can reliably determine which such offenders pose a danger." *Id.* First, and most significantly, Dr. Cunningham testified at Mr. Caro's trial prior to the publication of the statistical studies. As far as Mr. Caro knew, Dr. Cunningham had complete faith in the reliability of the future-dangerousness factor. Nothing in Dr. Cunningham's declaration and affidavit (ECF No. 316–1 at 1–17) or his curriculum vitae (*id.* at 18–25) at the time of the trial would have led one to believe Dr. Cunningham held a view at odds with his testimony.

Second, Mr. Caro had no choice but to put on a witness to testify about future dangerousness. That his expert witness, Dr. Cunningham has now published articles suggesting the inability to predict future dangerousness does not defeat this claim.[72] Ours is an adversarial system, and the Government alleged future dangerousness as a nonstatutory aggravating factor. (ECF No. 119 at 8 (Government's Motion in Limine).) By the same token, Mr. Caro made several pre-trial motions aimed at diminishing or eliminating the significance of the future-dangerousness factor, all of which the district

---

[72] It is not extraordinary for one's conclusion to change once more information is gathered. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35, 78-79 (2008) (Stevens, J., concurring) (determining based on, inter alia, sociological evidence and empirical evidence over the past 30 years that the death penalty is unconstitutional); *Callins v. Collins*, 510 U.S. 1141 (1994) (mem.) (Blackmun, J., dissenting from denial of cert.) ("For more than 20 years I have endeavored-indeed, I have struggled-along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor.[]Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed."); *Moore v. Parker*, 425 F.3d 250, 268-69 (6th Cir. 2005) (Martin, J., dissenting) (concluding that, after reviewing cases as a federal appellate judge for over twenty-five years, "the death penalty in this country is arbitrary, biased, and so fundamentally flawed at its very core that it is beyond repair").

court denied.  (*See, e.g.*, ECF No. 474 (Motion for Daubert Hearing) ("It is Defendant's position that the [Government's witnesses'] opinions regarding future dangerousness are not based upon sufficient facts or data or reliable principles and methods and are therefore unreliable and should be excluded."); ECF No. 423 (Motion in Limine Regarding Evidentiary Matters) (seeking to prevent the Government from eliciting "[a]ny expression of opinion by a witness as to the 'dangerousness' or similar description of the Defendant").)  Indeed, the Government anticipated such a response.  *See* ECF No. 119 at 8 (Government's Motion in Limine) ("The United States has alleged as a nonstatutory aggravating factor in this case 'future dangerousness.'  We anticipate that the defendant, in response to our evidence of future dangerousness, will call a prison expert to testify about security arrangements in a prison's control unit . . . .").)

Finally, the Government briefly argues that this claim is procedurally defaulted (ECF No. 791 at 110).  If this Court finds that this claim is defaulted, then Mr. Caro can show cause to overcome the default because appellate counsel was ineffective in failing to raise this claim.  (*See* Claim Nine D, *supra*.)  Additionally, "[o]bjective factors that constitute cause include . . . a showing that the factual or legal basis for a claim was not reasonably available to counsel."  *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  Inasmuch as one of the two statistical studies at the heart of Mr. Caro's future-dangerousness claim was published in November 2009, approximately two months after the filing of the opening brief on direct appeal, much of the factual basis for the claim was unavailable to appellate counsel.  *See* ECF 790 at 174, 176–78 (citing Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The*

141

*Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223 (Nov. 2009)).  The then-unpublished study shed new light on the question of the predictive accuracy of violence risk determinations made by capital juries.  For instance, it was the first study to test the accuracy of jury predictions for the future violence of federal, as opposed to state, capital offenders.  Essentially, absent this study, appellate counsel could not have made the claim Mr. Caro now makes.  The Court should not summarily dismiss this claim on procedural grounds.

Mr. Caro has sufficiently alleged that the use of the future-dangerousness aggravating factor at sentencing, which resulted in an unreliable prediction of his future dangerousness, violated his right to a non-arbitrary sentencing process under the Eighth Amendment and 18 U.S.C. 3595(c)(2)(A).  This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

**CLAIM ELEVEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING THOSE CASES IN WHICH THE FEDERAL DEATH PENALTY IS IMPOSED FROM THOSE CASES IN WHICH IT IS NOT IMPOSED RENDER THE FEDERAL DEATH-PENALTY ACT UNCONSTITUTIONAL.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false."  He has met this burden.  Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate.  *See Machibroda v. United States*, 368 U.S. 487 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the federal death penalty is imposed without a principled basis and therefore must be abolished.  (ECF No. 790 at 179–84.)  Guided by the Supreme Court's precept that "capital punishment be imposed fairly, and

with reasonable consistency, or not all," *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982),

Mr. Caro supported his claim with 73 pages of meticulously organized case summaries,

each containing the facts and the status of every authorized federal death-penalty case

between 1988 and 2003. (*See* ECF No. 790-12 through 790-22.) These summaries were

further condensed for inclusion in Mr. Caro's 2255 Motion, where they formed a list

devised to preemptively defeat any argument that comparing cases is inherently

impossible. (ECF No. 790 at 180–84.) Nevertheless, the Government's principle

argument against this claim is that the summaries are "too-brief statements of no value to

an assessment of his claim." (ECF No. 791 at 116.)

Mr. Caro contends that the case-by-case summaries do in fact "disclose sufficient

individual detail" to demonstrate inconsistencies in the imposition of the federal death

penalty. (*Id.* at 116.) For example, following are two summaries of average length and

detail:

> **Rollack, Peter** Eight racketeering murders between 1994 and 1997 by
> a gang headed by Rollack called "Sex, Money, and Murder," which later
> affiliated itself with the "Bloods." Rollack approved a Thanksgiving 1997
> double killing and personally killed four others, including a witness to
> another homicide. One victim in the Thanksgiving shooting was thought to
> be a witness in a North Carolina drug enterprise prosecution against
> Rollack, but actually was not. Only Rollack was targeted, and authorized
> for, a federal capital prosecution. All involved were African-American or
> Hispanic. On January 3, 2000, just before jury selection was about to
> begin, the defendant entered a guilty plea in exchange for a life sentence.
> He was sent to "super-max" with severe restrictions on who he may
> communicate with.

(ECF No. 790-16 at 10.)

> **Robinson, Julius & Britt, L.J.** A Forth Worth drug trafficking
> prosecution of the leaders of an Arlington-based drug ring responsible for

> multiple (three) murders. The first killing involved a 1998 shooting of an African-American, mistaken for the intended victim, in a car traveling on Central Expressway. A second 1999 killing was of an Hispanic person, mistaken for the intended victim, his brother, who allegedly sold a fake kilo of cocaine to Robinson. Britt was the triggerman in the third 1999 killing of another drug dealer, a Mexican national, who had stolen 20 kilos from a Laredo drug kingpin. Robinson was following in another car. Britt and Robinson, African-American, both allegedly fired weapons in the first and second incidents. The Court set, then extended a deadline for the approval of a capital prosecution. Attorney General Ashcroft rejected a plea agreement involving a life sentence. [Robinson was sentenced to death.] Co-defendant Britt was sentenced to life in prison at a separate trial.

(ECF No. 790-19 at 2; ECF No. 790-21 at 3.)

There is more than enough detail to perceive the arbitrariness in the treatment of these three defendants. Moreover, it is impossible to discern a principled basis for distinguishing between the imposition of a death sentence in Robinson's case and the imposition of a life sentence in Rollack's case and Britt's case. If there is any basis, it is race, geography, or both, as Mr. Caro argued in Claim Twelve.

The arbitrariness in the treatment of Robinson, Rollack, and Britt is typical of the capital defendants described in the case-by-case summaries. Mr. Robinson, like Mr. Caro and dozens of others, is "among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring). Contrary to the Government's critique, Mr. Caro has provided the Court with ample evidence to make a showing of arbitrariness, and, in doing so, has sufficiently alleged that the federal death penalty is imposed without a principled basis and therefore must be abolished. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

144

**CLAIM TWELVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the federal death penalty has been invidiously sought against minority-group defendants in violation of the Fifth and Eighth Amendments, and irrationally sought on a regional basis in violation of the Eighth Amendment. The statistics submitted by Mr. Caro demonstrate precisely the type of risk of invidiousness and irrationality in sentencing that the United States Supreme Court has condemned in its Fifth and Eighth Amendment jurisprudence. *See, e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972). The Government, however, urges this Court to reject Mr. Caro's claims, contending that those statistics "are no more probative of whether the statistical discrepancies should be attributed to discriminatory motive or the plethora of other possible factors." (ECF No. 791 at 118 (*citing McClesky v. Kemp*, 481 U.S. 279 (1987).)

The factual showing made by Mr. Caro was materially different from the showing made in *McCleskey*. In *McCleskey,* the United States Supreme Court reviewed the claim of a Georgia prisoner who alleged that the Georgia capital sentencing statute violated the Equal Protection Clause because it was administered in a racially discriminatory manner.

145

481 U.S. at 286. In support of his claim, Mr. McCleskey offered a sophisticated statistical study that demonstrated that Georgia defendants whose victims were white were 4.3 times as likely to receive a death sentence as those whose victims were black. *Id.* The Court nonetheless denied his claim, holding that Mr. McCleskey's statewide statistics did not meet his burden of proving that the imposition of the death penalty in his particular case was the product of purposeful discrimination. *Id.* at 293.

Unlike Mr. McCleskey, however, Mr. Caro offered statistics that provide information limited to the charging entity—the United States Attorney General—and its death penalty charging practices over time. Thus he provided what the statistics in *McCleskey* lacked: information specific to the decisionmaker in his case. Statistics relating to the charging entity, such as those presented by Mr. Caro, are materially more probative of discrimination in capital charging than those considered by the Supreme Court in *McCleskey*. *See United States v. Bass*, 536 U.S. 862 (2002) (endorsing "a showing regarding the record of the decisionmakers in respondent's case"). Thus, Mr. Caro's proffered statistics are not barred by *McCleskey* and support a prima facie showing of unlawful charging discrimination.

Mr. Caro has sufficiently alleged that the federal capital punishment system, in which capital-punishment is imposed on both the invidious basis of race and the irrational basis of geography, should not be enforced. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

**CLAIM THIRTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

The Government argues that this claim is foreclosed by existing precedent in the Supreme Court and Fourth Circuit. (ECF 791 at 120.) Despite the existence of unfavorable precedent,[73] the validity and the force of Mr. Caro's arguments are undiminished. In the years since *Gregg*, a steady stream of empirical evidence has eroded the legal justifications for the death penalty. *See, e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics:* Furman*, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227 (2013); Radha Iyengara, *Who's the Fairest in the Land? Analysis of Judge and Jury Death Penalty Decisions*, 54 J.L. & Econ. 693 (2011). Accordingly, the death penalty should be abolished in conformance with the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).

---

[73] Mr. Caro concedes, as he did in his 2255 Motion, that the United States Supreme Court has held that "the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). He concedes as well that this Court has previously dismissed claims such as this one on the basis of Supreme Court precedent. *See United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010) (*citing Gregg*, 428 U.S. at 187).

Mr. Caro has sufficiently alleged that his death sentence is categorically cruel and unusual punishment in violation of the Eighth Amendment. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

**CLAIM FOURTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF HIS TRIAL VIOLATED INTERNATIONAL LAW.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he sufficiently alleged that the biased and disparate federal capital-punishment system in place at the time of his trial violated international law. (ECF No. 790 at 189-91.) In doing so, he established that, under both the Convention on the Elimination of All Forms of Racial Discrimination ("CERD"), *adopted* Dec. 21, 1965, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights ("ICCPR"), *adopted* Dec. 16, 1966, 999 U.N.T.S. 171, statistical evidence of racial disparity is enough to warrant—and require—corrective action by the United States. The Government in its Motion to Dismiss argues that the ICCPR is a "non-self-executing" treaty and therefore its ratification by the United States did not create individual rights that are enforceable in federal court. (ECF No. 791 122–23 (citing unpublished and extra-circuit dispositions in support of the proposition that the ICCPR is not self-executing).) The Government also argues that the United States, by

way of reservations, "made clear that it is bound only by the Constitution in its application of capital punishment, and not by any contrary interpretation of the ICCPR." (*Id.*) The Government does, however, acknowledge that relief under § 2255 extends to treaty violations. (*Id.* at 122 (citing *Davis v. United States*, 417 U.S. 333, 344 (1974)).)

## A. The ICCPR Is a Self-Executing Treaty.

### 1. The Doctrine of Self-Execution of Treaties.

Under the doctrine of self-execution of treaties, "a self-executing treaty may be defined as a treaty that may be enforced in the courts without prior legislation by Congress, and a non-self-executing treaty, conversely, as a treaty that may not be enforced in the courts without prior legislative 'implementation.'" Carlos Manuel Vazquez, *The Four Doctrines of Self-Executing Treaties*, 89 Am. J. Int'l L. 695 (1995). Unfortunately, this doctrine sometimes promotes a rule whereby treaties are presumed to be non-self-executing, when in fact the text and history of the Supremacy Clause counsel exactly the opposite. *Cf. Safety Nat'l Cas. Corp. v. Certain Underwriters,* 587 F.3d 714, 737 (5th Cir. 2009) (en banc) (Clement, J., concurring in the judgment) (explaining that, while "there may be a growing judicial consensus that multilateral treaties are presumptively non-self-executing," such "consensus" does not override the Supreme Court's plain-text approach to questions of self-execution). In the United States, as evidenced by the unambiguous language of the Supremacy Clause, as well as by the intent of its framers, treaties are presumed to be self-executing. *See* U.S. Const. art. VI, cl. 2 ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land").

149

The historical record sustaining this proposition is unquestionable. During the Constitutional Convention, a proposal to the effect that treaties be sanctioned by the legislature before they had "the operation of law" was specifically rejected. *See* James Madison, *Notes of Debates in the Federal Convention of 1787*, 597 (W.W. Norton 1987) (1840). An alternative proposal, which was also rejected, would have established two types of treaties: one requiring only action by the President and the Senate, and a second requiring additional action by the House of Representatives. 2 *The Records of the Federal Convention of 1787*, 538 (Max Farrand ed., rev. ed. 1966). In a similar vein, the Committee on Style removed from the final version of the Supremacy Clause language that would have given the national Government the power to "enforce treaties." The Committee struck this language because it was redundant, considering the clear language of the Supremacy Clause. *Id.* at 389–90. The rejection of these proposals illustrates that the language of the Supremacy Clause was not coincidental, but rather chosen after due deliberation, and deliberately, to mean what it says.

The expectation that treaties would become operative as domestic law upon ratification is also expressed in the Federalist Papers and the ratification debates within the States. In *The Federalist No. 22,* for example, Alexander Hamilton explained that "[t]he treaties of the United States, to have any force at all, must be considered as part of the law of the land. Their true import, as far as respects individuals, must, like all other laws, be ascertained by judicial determinations." *The Federalist No. 22*, at 150 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

In *Foster v. Neilson*, decided by Chief Justice Marshall in 1829, the Court concluded that the treaty in question was not self-executing because, *by its terms, it did not establish a right in the individual claimant,* but rather placed an obligation on the legislative branch to act. 27 U.S. (2 Pet.) 253, 314–15 (1829), *overruled in part by United States v. Percheman,* 32 U.S. (7 Pet.) 51. Properly applied, the *Foster* rule makes sense. A treaty is what amounts to a contract between nations, and as such, what needs to be done at the outset, as in the case of a contract between private parties, is to inquire into the content of the agreement to determine the obligations established thereunder, and to establish the scope of the various rights and duties within its purview. *See, e.g., Sea Hunt v. Unidentified Shipwrecked Vessel,* 221 F.3d 634, 646 (4th Cir. 2000) ("Treaties are contracts between sovereigns, and as such, should be construed to give effect to the intent of the signatories." (citation omitted)). Plainly put, what determines whether a treaty is self-executing, or not, is the language of the treaty *as interpreted by the courts,* not the nature of the rights established therein *as opined by the Senate that ratifies the treaty.*

Thus, when placed within its proper perspective, the *Foster* rule simply requires courts to examine the treaty in question to determine from its text (or when not apparent, from the history of the treaty), whether the treaty has created individual rights or whether it is non-self-executing, and therefore requires further legislative action to put it into effect domestically. *See, e.g., Abbott v. Abbott,* 130 S. Ct. 1983, 1990 (2010) ("The interpretation of a treaty . . . begins with its text." (citation omitted)); *United States v. Stuart*, 489 U.S. 353, 365–66 (1989) ("The clear import of treaty language controls unless application of the words of the treaty according to its obvious meaning effects a

151

result inconsistent with the intent or expectations of the signatories." (citation and internal quotation marks omitted)).

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the United States Supreme Court stated without analysis or elaboration that "the United States ratified the [ICCPR] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts," *id.* at 734–35. But this dictum—the question of self-execution was never presented to the Court—ignores the *Foster* rule, as the Court engaged in no interpretation whatsoever. If it had, the Court would have found that the text of the ICCPR unequivocally spells out self-executing, individual rights and clearly establishes the obligations of the contracting parties regarding the enforcement of those rights. *Sosa* is therefore wrongly decided. Contrary to the Government's assertions, the ICCPR is a self-executing treaty.[74]

## 2.    The Legal Import of the Senate's Declaration Regarding the ICCPR.

Notwithstanding these established rules, the Government contends that the Senate's declaration, purporting to establish that the substantive provisions of the ICCPR would not be self-executing, *ipso facto* results in making the treaty non-self-executing. The Government is wrong for several reasons.

First of all, a "declaration" is a statement of position by the Senate that "is not presented to the other international signatories as a request for a modification of the

---

[74] The Fourth Circuit has not discussed this issue except in an unpublished opinion, *Dutton v. Warden, FCI Estill*, 37 Fed. App'x 51, 53 (4th Cir. 2002). Because this unpublished opinion predates 2007, the Fourth Circuit disfavors citation of it except for purposes of res judicata, estoppel, or law of the case, none of which apply here. 4th Cir. R. 32.1 (Citing Judicial Dispositions).

treaty's terms." *Igartúa-De La Rosa v. United States*, 417 F.3d 145, 190 (1st Cir. 2005) (Howard, J., dissenting). Thus a declaration is not part of the treaty, but instead "is directed primarily toward United States courts to express 'the sense of the Senate' that the treaty should . . . be interpreted [in the manner proposed by the Senate]." *Id.*

In the case of the ICCPR, the Senate also made several reservations, which were specifically directed at Articles 6, 7, 10, 14, 15 and 20 of the treaty. A "reservation" is a "unilateral statement . . . whereby . . . [a State] purports to exclude or to modify the legal effect of certain provisions of the treaty in their application to that State." Vienna Convention on the Law of Treaties, art. 2(1)(d) (May 23, 1969), 1155 U.N.T.S. 331. In contradistinction with a declaration, a reservation has an actual effect on the terms of the treaty. *See Haver v. Yaker,* 76 U.S. (9 Wall.) 32, 35 (1869); *see also* Restatement (Third) of Foreign Relations Law of the United States § 314 cmt. d (1986) (noting that, when the United States accedes to a treaty with reservations, this statement has domestic legal effect, whereas other indications that the President or Senate assigned a distinct meaning to the treaty, such as declarations, are only pertinent to treaty interpretation in "the same way that the legislative history of a statute is relevant").

The Senate's declaration that the ICCPR is non-self-executing is *ultra vires* with respect to the ratification process and as such that declaration is not binding on the courts, who are required to exercise their independent judicial power under the Supremacy Clause in interpreting the meaning and import of all treaties entered into by the United States.

> [T]he Senate lacks the constitutional authority to declare the non-self-executing character of a treaty with binding effect on U.S. courts. The Senate has the unicameral power only to consent to the ratification of treaties, not to pass domestic legislation. A declaration is not a part of a treaty in the sense of modifying the legal obligations created by it. A declaration is merely an expression of an interpretation or of a policy or position. U.S. courts are . . . not bound to apply expressions of opinion adopted by the Senate (and concurred in by the President). The courts must undertake their own examination of the terms and context of each provision in a treaty to which the United States is a party and decide whether it is self-executing. The treaty is law. The Senate's declaration is not law. The Senate does not have the power to make law outside the treaty instrument.

Stephan A. Riesenfeld & Frederick M. Abbott, *Foreword: Symposium on Parliamentary Participation in the Making and Operation of Treaties*, 67 Chi.–Kent L. Rev. 293. 296–97 (1991).

In *Medellín v. Texas*, 552 U.S. 491 (2008), the Supreme Court affirmed the separate and distinct roles assigned to the Senate and Executive by the Constitution under Article II. There, the Court held that an executive memorandum purporting to grant individuals rights under a non-self-executing agreement was invalid because, while "[t]he President has an array of political and diplomatic means available to enforce international obligations . . . unilaterally converting a non-self-executing treaty into a self-executing one is not among them. The responsibility for transforming an international obligation arising from a non-self-executing treaty into domestic law falls to Congress," through, for example, the enactment of implementing legislation. 552 U.S. at 525–26. The Court explained:

> The requirement that Congress, rather than the President, implement a non-self-executing treaty derives from the text of the Constitution, which divides the treaty-making power between the President and the Senate. The Constitution vests the President with the authority to "make" a treaty. *If the*

*Executive determines that a treaty should have domestic effect of its own force, that determination may be implemented in "mak[ing]" the treaty, by ensuring that it contains language plainly providing for domestic enforceability.* If the treaty is to be self-executing in this respect, the Senate must consent to the treaty by the requisite two-thirds vote, consistent with all other constitutional restraints.

*Id.* at 526 (emphasis added) (internal citations omitted). Thus, as the Supreme Court has reinforced, the constitutional prerogative to "make" treaties, and to set their domestic legal effect, falls in the first instance to the executive. While the Senate's views regarding self-execution may be relevant to the interpretation of an ambiguous treaty, *see* Restatement (Third) of Foreign Relations Law of the United States § 314, cmt. d (1987) ("[I]ndication that . . . the Senate ascribed a particular meaning to the treaty is relevant to the interpretation of the treaty by a United States court in much the same way that the legislative history of a statute is relevant to its interpretation."), those views are not capable of supplanting the plain language of an agreement. *United States v. Stuart,* 489 U.S. 353, 373 (1989) (Scalia, J., concurring) ("Only when a treaty provision is ambiguous have we found it appropriate to give authoritative effect to extratextual materials.").

In conclusion, the declaration by the Senate to the effect that the ICCPR is non-self-executing is not binding on the courts. Courts are required by the Supremacy Clause to make an independent judgment of that issue, based on the language of the treaty and, if that is not clear, on the negotiating history of the treaty in question.

**B.** **The Plain Language of the ICCPR Indicates That Individual Rights Were Created and That the United States Agreed to Provide a Forum and Remedies for the Vindication of Those Rights to Those of Its Citizens Who Claim a Violation of Those Rights.**

The text of the ICCPR unequivocally spells out individual rights and establishes the obligations of the contracting parties regarding their enforcement by individual citizens who claim violations of these rights. A straightforward reading of this language should leave little doubt that the United States entered into an international agreement creating individual rights. At a minimum, the United States agreed that "[e]very human being has the inherent right to life." ICCPR, pt. 3, art. 6, para. 1. Upon ratification of the ICCPR by the Senate, this right became the supreme law of the land. *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 257 (2d Cir. 2003) ("Self-executing treaties are those that 'immediate[ly] creat[e] rights and duties of private individuals which are enforceable and [are] to be enforced by domestic tribunals.'" (citation omitted)). Furthermore, the United States agreed to provide "an effective remedy" for the violation of these rights, ICCPR, pt. 2, art. 2, para. 3(a), and it agreed "that any person claiming such a remedy *shall have* the right thereto determined by competent, judicial, administrative, or legislative authorities, or by any other competent authority provided for by the legal system of the State, *and to develop possibilities of judicial remedies*," *id.* para. 3(b) (emphasis added).

There is nothing "aspirational" or "precatory" in the language of the ICCPR. *See Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 881 (D.C. Cir. 2006) (explaining that one way courts may find a treaty non-self-executing is if its "provisions are precatory, aspirational, or otherwise too vague to be judicially enforceable"). Rather, it

speaks to the establishment of specific individual rights. *Compare* ICCPR, pt. 3, art. 6, para. 1 ("Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life."), *with Jogi v. Voges,* 480 F.3d 822, 833–34 (7th Cir. 2007) (holding that Article 36.1(b) of the Vienna Convention, which "states, plainly enough, that authorities '*shall* inform the person concerned without delay of *his rights* under this sub-paragraph'" confers "individual rights," notwithstanding general language of preamble providing that "the purpose of [the Convention's] privileges and immunities is not to benefit individuals"). It is as precise and as mandatory as any law on the subject would be, had it been enacted directly by Congress. *Cf. Medellín v. Dretke,* 544 U.S. 660, 687 (2005) (O'Connor, J., dissenting from dismissal of writ of certiorari) ("[I]f [like Article 36 of the Vienna Convention] a statute were to provide, for example, that arresting authorities 'shall inform a detained person without delay of his right to counsel,' I question whether more would be required before a defendant could invoke that statute to complain in court if he had not been so informed.").

Thus, the plain language of the ICCPR establishes individual, enforceable rights on behalf of persons situated as is Mr. Caro, and obligates the United States to provide a judicial remedy in its courts to vindicate their violation. To conclude otherwise is to ignore the clear import of the treaty as well as our basic constitutional duty to interpret international agreements as the law of the land.

**C.** **The Biased and Disparate Federal Capital Punishment System in Place at the Time of Mr. Caro's Trial Violated the International Covenant on Civil and Political Rights.**

Article 6 of the ICCPR enshrines the right to life, providing in part: "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." ICCPR, pt. 3, art. 6, para. 1. Article 7 provides: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." *Id.* art. 7. When the United States Senate ratified the ICCPR in 1992, it did so subject to the following reservations:

> [T]he United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.

> [T]he United States considers itself bound by Article 7 to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States.

138 Cong. Rec. S4783 (April 2, 1992) (statement of presiding officer).

Mr. Caro does not dispute the validity of the ratification reservations. *See* Restatement (Third) of Foreign Relations Law of the United States § 314 cmt. d (1986) (noting that, when the United States accedes to a treaty with reservations, this statement has domestic legal effect). None of the reservations, however, has any effect upon the arbitrary-deprivation clause of Article 6. The United States may have reserved the right to impose capital punishment subject to certain restraints, but it did not reserve the right to arbitrarily deprive anyone of his or her life. Yet, as Mr. Caro demonstrates in Claims

Ten, Eleven, and Twelve, the federal death penalty system has operated and continues to operate in an arbitrary manner. It was operating in an arbitrary manner when Mr. Caro was sentenced to death, and it was doing so in violation of the ICCPR.

Furthermore, the ICCPR and the Constitution are coincident with regard to capital punishment. *See United States v. Duarte-Acero*, 208 F.3d 1282, 1284 (11th Cir. 2000). In ratifying the ICCPR, the United States reserved the right to impose capital punishment "subject to its Constitutional constraints" and foreswore "cruel, inhuman or degrading treatment or punishment" to the extent that "cruel and unusual treatment or punishment [is] prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution." 138 Cong. Rec. S4783 (April 2, 1992) (statement of presiding officer). Thus, the United States violates the ICCPR whenever the federal death-penalty system violates the Constitution. Because Mr. Caro's death sentence is the product of multiple constitutional violations, as these systemic challenges show, his death sentence is also the product of multiple violations of the ICCPR.

Mr. Caro has sufficiently alleged that the federal capital punishment system in place at the time of his trial violated international law. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

**CLAIM FIFTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE ACT UNCONSTITUTIONAL.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court

159

finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the Federal Death Penalty Act ("FDPA") does not provide for constitutionally adequate appellate review. (ECF No. 790 at 191–93.) Specifically, Mr. Caro asserted that the FDPA deprives the courts of appeals of their usual power to review and reverse or remand for plain error. *See* Fed. R. Crim. P. 52(b) (providing for plain-error review); *see also United States v. Olano*, 507 U.S. 725, 731–37 (1993) (discussing the standards for plain-error review by the courts of appeal under Rule 52(b)); *United States v. Frady* 456 U.S. 152, 163 & n.13 (1982) ("Rule 52(b) was intended to afford a means for the prompt redress of miscarriages of justice."). The FDPA imposes this deprivation by the inclusion of the following provision:

Whenever the court of appeals finds that—

(A)     The sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(B)     the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C)     the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

18 U.S.C. § 3595(c)(2) (emphasis added). Mr. Caro submits that the FDPA, by limiting appellate review to legal error "that was properly preserved for appeal under the rules of criminal procedure" and thereby curtailing plain-error review, is unconstitutional. *See Parker v. Dugger*, 498 U.S. 308, 321 (1991) (emphasizing "the crucial role of meaningful

appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally" in contravention of the Constitution).

The Government in its Motion to Dismiss points to *Jones v. United States*, 527 U.S. 373 (1999), as an all-encompassing rebuke of Mr. Caro's argument that the FDPA does not provide for constitutionally adequate appellate review. In *Jones*, however, the Supreme Court was focused on a challenge to jury instructions, not the constitutionality of the FDPA. *Id.* at 388–89. Thus, the Court stated in cursory fashion: "The statute does not explicitly announce an exception to plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme." *Id.* The observation that the "statute does not explicitly announce an exception to plain-error review" cannot be equated with a conclusion that the FDPA, in all contexts, does not deprive courts of appeals of their usual power to review and reverse or remand for plain error. The Supreme Court has yet to reach that conclusion.

Finally, the Government briefly argues that this claim is procedurally defaulted. (ECF No. 791 at 123). If this Court finds that the claim is defaulted, then Mr. Caro can show cause to overcome the default because appellate counsel was ineffective in failing to raise this claim. (*See* Claim Nine D, *supra*.) The Court should not summarily dismiss this claim on procedural grounds.

Mr. Caro has sufficiently alleged that the preclusion of plain-error review by the FPDA renders the act unconstitutional. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

161

**GROUND FOR RELIEF: CUMULATIVE ERROR**

**CLAIM SIXTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

Mr. Caro has alleged numerous errors in both the guilt/innocence and penalty phases of his trial. As discussed in the introductory section of this opposition, *supra*, the law requires the Court to analyze the combined impact of all of these errors when assessing whether Mr. Caro's due process right to a fair trial has been violated. This type of analysis cannot occur in the context of a motion to dismiss in the piecemeal fashion urged by the Government.

**CONCLUSION**

For the reasons discussed above, this Court should deny the Government's Motion to Dismiss, and allow further development of Mr. Caro's claims.

Respectfully submitted this 9th day of October, 2013.

s/Karen M. Wilkinson_____
Jon M. Sands
Federal Public Defender
Karen M. Wilkinson (Arizona Bar No. 014095)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201

162

Phoenix, Arizona  85007
karen_wilkinson@fd.org
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

Fay F. Spence, Esquire (Virginia State Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276- 619-6080

Attorneys for Defendant/Petitioner
Carlos David Caro

# CERTIFICATE OF SERVICE

I hereby certify that on October 9th, 2013, I filed the foregoing document with the Clerk of the Court using the CM/ECF System which will send notice of such filing to the parties listed below:

Anthony Giorno, AUSA.
Email: anthony.giorno@usdoj.gov


s/Stephanie Bame_____
Legal Assistant
Capital Habeas Unit