*United States v. Carlos David Caro*
Case No. 06-CR-00001-JPJ

**Exhibits to Mr. Caro's Opposition to the Government's Motion to Dismiss**

Ex. 61 — Letter from A. Giorno to Carlos David Caro, dated Dec. 30, 2004

Ex. 62 — Supplemental Declaration of Mark Bezy, dated Oct.8, 2013

Ex. 63 — Letter from James W. Marquart to Stephen Kalista, dated Dec. 6, 2006

Ex. 64 — Letter from A. Giorno to S. Kalista, dated Dec. 29, 2006

Ex. 65 — Letter from D. Malcolm Spica, Ph.D. to Robin Konrad, dated Sept. 10, 2013

Ex. 66 — Email from H. Selvog to S. Kalista (with Selvog CV attached), dated Mar. 15, 2006

Ex. 67 — Email from A. Giorno to S. Kalista, dated Sept. 28, 2006

Ex. 68 — Supplemental Declaration of Donna Marie Schwartz-Watts, M.D., dated Oct. 7, 2013

Ex. 69 — Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons, dated May 15, 2006, re: Witnesses/Records by Location

Ex. 70 — Memorandum from W. Johnson re: Special Handling Instructions for Carlos David Caro, dated Dec. 19, 2003

Ex. 71 — Declaration of Juror #33, dated Sept. 26, 2013

Ex. 72 — Declaration of Susan Richardson, dated Oct. 9, 2013

Ex. 73 — Federal Bureau of Prisons Transfer Order for Carlos David Caro, dated Oct. 11, 2005

Exs. 74-76 — Filed under seal

Ex. 77 — Declaration of Petra Herrera, dated Oct. 2, 2013

# EXHIBIT 61

# EXHIBIT 61

**U.S. Department of Justice**

*United States Attorney*
*Western District of Virginia*

*John L. Brownlee*

*United States Attorney*

United States Courthouse and Federal Building
255 West Main Street, Room 104
Charlottesville, Virginia 22901
Telephone: 434/293-4283   Fax: 434/293-4910

December 30, 2004

Carlos David Caro
Inmate No. 37786-079
United States Penitentiary - Lee County
P.O. Box 305
Jonesville, Virginia 24263-0305

      Re:  Grand Jury Investigation

Dear Mr. Caro:

      This office is currently investigating possible violations of federal law involving, but not necessarily limited to the murder of Roberto Sandoval.  A federal grand jury has been empaneled in Abingdon, Virginia and is investigating that matter.

      This letter is to notify you that you may be designated a target of this grand jury investigation. If you have any evidence of an exculpatory nature in the form of either documents or witnesses which would be relevant to the Grand Jury's determination of your culpability, please bring such evidence to my attention so that the Grand Jury may be apprised of such evidence.  If you have an attorney in connection with this investigation please have him contact me as soon as possible.

                        Very truly yours,

                        JOHN L. BROWNLEE
                        United States Attorney

                        Anthony P. Giorno
                        Assistant United States Attorney

# EXHIBIT 62

EXHIBIT 62

<u>SUPPLEMENTAL DECLARATION OF MARK A. BEZY</u>

I, MARK A. BEZY, declare as follows:

1. I have read the Motion to Dismiss filed by the government in *United States v. Carlos Caro* (ECF 791) and stand by my previous declaration and the opinions stated therein.

2. I did not misunderstand the circumstances regarding the placement of Mr. Sandoval into Mr. Caro's cell. (ECF 791 at 31.) I understood that prison officers initially assigned Mr. Sandoval to the same cell as Mr. Caro and that when an officer attempted to place Mr. Sandoval in Mr. Caro's cell, Mr. Caro refused. After this refusal, Mr. Sandoval asked to be placed in Mr. Caro's cell.

3. Prison inmates must abide by two different sets of rules, the prison rules and the inmate rules, or face consequences. If an inmate is a member of a prison gang, there also is a third set of rules that he must follow—the rules of the gang. For prison gangs like the Texas Syndicate, failure to abide by the rules will result in punishment, and depending on the perceived seriousness of the infraction, can result in the death of the offending inmate. A common rule of gangs, including the Texas Syndicate, is that gang members are forbidden from talking about gang matters outside of the gang, and should never "snitch" on another member.

4. Prior to the opening of the United States Penitentiary, Administrative Maximum Facility near Florence, Colorado (ADX-Florence) in late 1994, the United States Penitentiary at Marion, Illinois (USP-Marion) was the Bureau of Prisons' most secure and restrictive institution. The mission of USP-Marion was to house the most dangerous, violent and escape-prone inmates in the Bureau of Prisons system. Once ADX-Florence opened, this mission was transferred to ADX-Florence. As a result, many of the inmates who had been housed under the most restrictive

1

and controlled conditions at USP-Marion were transferred to ADX-Florence to continue serving their sentences under similar restrictive conditions. I am familiar with these transfers because of my positions within the Bureau of Prisons at that time. Between January 1992 and May 1995, I was a Captain at USP-Marion and was involved in the transfer of high security inmates from USP-Marion to ADX-Florence. I then was promoted to the position of Correctional Services Administrator for the North Central Region, and wrote the plan for the last transfer of inmates from USP-Marion to ADX-Florence. While these transfers occurred about 18 years ago, some of the inmates who were transferred from USP-Marion to ADX-Florence are still housed at ADX-Florence.

I declare under penalty of perjury that the foregoing is true and correct.

10-8-13
Date

Mark A. Bezy

2

# EXHIBIT 63

# EXHIBIT 63

December 6, 2006

Stephen Kalista
Attorney at Law
Suite 1, Mutual Pharmacy Building
Big Stone Gap, VA 24219

Dear Mr. Kalista:

This letter represents my preliminary opinion concerning the future dangerousness of Mr. Carlos D. Caro in the case 1:06CR001. Currently I am a Professor of Criminology and Chair of the Criminology Program at the University of Texas at Dallas. I have been in this position since August 2005. Prior to this appointment I was a Professor of Criminal Justice at Sam Houston State University (1986-2005). Both of my academic and research careers have centered on examining inmate and guard subcultures, and the effects of policy changes and shifts on prison organizations. Currently I am examining inmate attitudes towards sexual assault in Texas prisons. My research activity throughout my career has allowed me to talk to and interview 1,000s of prisoners and security officers. I have also conducted research on the issue of future dangerousness.

Mr. Caro is a 39 year old Hispanic male inmate serving a 378 month (roughly 32 years) sentence of incarceration for possession with the intent to deliver cocaine. He is from Falfurrias, Texas. He has been classified as a high security inmate within the Federal Bureau of Prisons due to his membership in the Texas Syndicate (or TS), a designated "Security Threat Group" within the FBOP. Between 1994 and 2001 Mr. Caro was in and out of federal prisons serving time for drug-related offenses. His behavior while in the free community was marked by several arrests for the possession of marijuana. He has limited formal education experience and can best be described as a manual laborer. While in prison, Mr. Caro has been involved in several gang-related incidents and was found to be in possession of a weapon and morphine. He has no known history of escape activity, assaults on security staff, or premeditated attacks on security staff. He is currently alleged to have murdered another inmate in his administrative segregation cell at USP-Lee in December 2003.

In my opinion, which is based on my reading of court documents and legal materials and FBOP records of Mr. Caro provided by Mr. Stephen Kalista, Mr. Caro is an older but dangerous offender to other inmates, especially rival prison gang members. He is not a threat to the security staff. However dangerousness in a prison environment is intensified by proximity to other inmates and if Mr. Caro were to be removed from the general population and placed in an administrative segregation housing area where his contact

DB-4262

with other inmates were eliminated, Mr. Caro would pose a limited threat to institutional security and operations. I believe that the FBOP has the security housing resources to adequately house, confine, and manage Mr. Caro for many years. Also Mr. Caro is an "older" inmate and older inmates typically pose little threat to other inmates and staff.

In sum, an administrative segregation setting with the advantages of a single cell would virtually eliminate any future threat from Mr. Caro. If other information about Mr. Caro comes to my attention, I reserve the opportunity to alter or change my present opinion.

Sincerely

James W. Marquart
84 Elkins Lake
Huntsville, Texas 77340

# EXHIBIT 64

# EXHIBIT 64



U.S. Department of Justice

*United States Attorney*
*Western District of Virginia*

*John L. Brownlee*
*United States Attorney*

*BB&T Building*
*310 First Street, S.W., Room 906*
*P. O. Box 1709*
*Roanoke, Virginia 24008-1709*
*Telephone: 540/857-2250*
*Fax: 540/857-2614*

December 29, 2006

Stephen Kalista, Esq.
P.O. Box 1186
Big Stone Gap, Virginia 24219

  Re: United States v. Carlos Caro

Dear Steve:

  Enclosed herewith please find a copy of the grand jury testimony of the government's inmate witness as well as a report of interview he gave at the time of the incident. The latter was done as part of a mass interview of all the inmates on the SHU. Copies of all the interviews conducted at that time are attached.

  If you have any questions, please feel free to call me. I will be in the Abingdon office January 2nd through the 4th. The number at that office is (276) 628-4161.

        Very truly yours,

        JOHN L. BROWNLEE
        United States Attorney

        Anthony P. Giorno
        Assistant United States Attorney

DB-9656

# EXHIBIT 65

# EXHIBIT 65

D. MALCOLM SPICA, PH. D.
Licensed Clinical Psychologist
Neuropsychologist

September 10, 2013

Robin C. Konrad
Assistant Federal Public Defender
Capital Habeas Unit
Federal Public Defender for the District of Arizona
850 West Adams Street, Suite 201, Phoenix, AZ 85007

v. (602) 382.2734
f. (602) 889.3960
e. robin_konrad@fd.org

RE: Response to government motion to dismiss - Carlos Caro

Dear Ms. Konrad:

As you requested, I have reviewed the excerpt from the Government Motion to Dismiss (Document 791 - page ID 7404-7407), and Government Exhibit 3 (page ID 7499-7500). As we discussed via telephone on 9/03/13, I wish to clarify the following points raised in the motion:

1) The authors of the motion stated that I made no mention of "brain damage" in my evaluation. I wish to clarify that the term brain damage denotes a compromise from previous function. That is, brain damage assumes a normally functioning brain that was then injured or compromised and exhibited subsequent decrements in functioning from a previous state. I prefer (and utilized) the term 'dysfunction,' as it better conveys an abnormally functioning brain exhibiting processing deficits.

This is especially relevant in Mr. Caro's case, as it appears his brain dysfunction is due to a *developmental* condition rather than *acquired* "damage." As noted in my report, Mr. Caro's results suggested frontal lobe dysfunction that was likely lifelong in nature, and he reportedly failed to thrive as an infant, exhibited delays in developmental milestones difficulties, and had no clear cerebral insults later in life. Nonetheless, the examination results speak for themselves in that Mr. Caro demonstrated severe deficits in functions known to be mediated by the cerebral frontal lobes.

2) The authors of the motion to dismiss stated in a footnote that my description of frontal lobe dysfunction in the neuropsychological report was contrary to my 6/20/06 e-mail to attorney Stephen Kalista and mitigation specialist Hans Selvog presented in Government Exhibit 3, where I stated:

"Mr. C demonstrates converging although somewhat inconsistent signs of frontal lobe dysfunction. He performed as low as the 1st percentile on tasks requiring:
Management of information
Maintaining cognitive set
Concept formation"

I strongly disagree that the statements in my neuropsychological report are contrary to my 6/20/06 e-mail. In fact the inconsistent signs of frontal lobe dysfunction further raise the probability that Mr. Caro's brain condition is developmental in nature rather than acquired. We frequently observe that people who have lived with development deficits throughout the lifespan learn personal strategies that accommodate their

problems, allowing them to enlist preserved functions to compensate for deficits. For example, whereas Mr. Caro demonstrated cognitive disorganization, he performed adequately on the Trail Making Test-B due to his ability to complete hand-eye speed tasks very rapidly. However, when provided a task requiring mental organization where rapid hand-eye performance is not factored into the score, his performance fell to the impaired range: E.g., Wisconsin Card Sorting Test-Failure to Maintain Set, <1st percentile. Mr. Caro's pattern of performance suggested that his problems with mental organization are long-standing in nature rather than acquired through injury after his childhood development.

3) Finally, the authors of the motion to dismiss recounted that I recommended psychiatrist Keith Caruso, M.D. for further analysis of Mr. Caro, but I did not recommend a neonatologist or expert in any other medical specialty. As I had experience with Dr. Caruso in a previous forensic case, I thought he would be effective in describing how Mr. Caro's neurocognitive deficits might have contributed to his alleged illegal actions. I deferred to Dr. Caruso to determine if any other medical specialty experts were indicated.

I hope these clarifications are helpful. As always, please feel free to contact me if I can be of any more assistance in this matter.


Sincerely,

D. Malcolm Spica, Ph.D.
Licensed Clinical Psychologist

[Transcribed by speech recognition software]

# EXHIBIT 66

# EXHIBIT 66

**Stephen J. Kalista**

From:     Hans Selvog [HSELVOG@NCIANET.org]
Sent:     Wednesday, March 15, 2006 3:28 PM
To:       skalista@mounet.com
Subject:  C.V.

Steve:  Attached please find my C.V. that I assume you will submit to the Court under seal.  Also, for your information, I've attached a generic affidavit that details most of the cases in which I've been involved over the past 20 years.  My C.V.  reflects my 20 years of experience in providing death penalty mitigation, forensic mental health evaluation, and clinical intervention, and my doctoral education.

Thank you for your attention to this information.  Should you have any other questions or requests, please feel free to contact me.

Respectfully,

Hans H. Selvog, Ph.D., L.C.S.W.

3/15/2006

**KS-286**

COMMONWEALTH OF VIRGINIA
CITY OF ALEXANDRIA

## AFFIDAVIT OF HANS H. SELVOG

Personally appeared before the undersigned officer duly authorized to administer oaths, HANS H. SELVOG, who, after having been duly sworn, deposes and says on oath, that the facts set forth below are true and correct.

1.      My name is Hans H. Selvog.  I am the Clinical Director of the Augustus Institute, an outpatient mental health clinic of the National Center on Institutions and Alternatives.  Formerly, from September 1986 to June 1989, I was the Director of the Southeast Regional Office of the National Center on Institutions and Alternatives in Atlanta, Georgia.  My background is in Clinical and Forensic Social Work and, since 1973, includes case management services to the juvenile justice system in Illinois, Minnesota and Virginia, and direct sentencing services in adult and juvenile courts to attorneys and their clients throughout the Midwestern, Northeastern and Southeastern regions of the United States.  I also have clinical experience treating the chronically mentally ill, the chronic substance abuser, and the victims and perpetrators of sexual abuse, which includes juvenile, adult and developmentally handicapped populations.  I have provided therapeutic services to juveniles, adults, couples and families.  I have a Doctoral Degree in Social Work and I am certified as a Licensed Clinical Social Worker in both Virginia and the District of Columbia.  I have conducted hundreds of comprehensive social histories for use in the courts.  I have spent hundreds of hours per case investigating social backgrounds of capital case defendants in over 150 cases.  In most of these cases, I have provided testimony in court on the information I have gathered.  I have been qualified as an expert witness in six capital cases in Maryland, one capital case in Tennessee, one capital case in Louisiana, one capital case in Indiana, two federal capital cases in the Eastern District of Virginia, Richmond Division and Norfolk Division, a federal habeas corpus hearing before a

**KS-287**

magistrate in the Western District of Virginia in Roanoke, and in the United States Marine Corps' general court-martial proceedings involving two capital offenses in North Carolina and one in California. As Director of NCIA's Southeast Regional Office, I received a grant to utilize my office as a national clearinghouse on expert mitigation development and assistance to attorneys representing capital defendants. In 1988, I conducted a training seminar on mitigation development and social history investigation for the annual NAACP Legal Defense Fund Death Penalty Conference at Airlie House in Warrenton, Virginia. Subsequently, I have been an invited lecturer on capital case mitigation to continuing legal education seminars for defense attorneys in Louisiana and Virginia. Finally, I recently taught at the Naval Justice School in Newport, Rhode Island, on death penalty mitigation preparation.

2.      The National Center on Institutions and Alternatives is a private, non-profit criminal justice and mental health organization with 20 years experience providing penalty phase services to defense counsel and their clients. Services in capital cases include a comprehensive compilation of the defendant's psychosocial background, a clinical assessment of this data, and expert testimony during the penalty phase.

3.      Capital defense experts unanimously agree that preparation of each and every death penalty trial should include a realistic expectation that the case will progress to the penalty phase. Therefore, it is imperative from the very beginning that the defense team aggressively search out and put together a complete economic, educational, medical, mental health, and psychosocial history of the client from several generations prior to the defendant's birth to the present day. Otherwise, mitigating circumstances may go undiscovered or misunderstood. The United States Supreme Court has clearly stated the purpose of presenting mitigation information which I have an expertise in gathering and presenting. With the defendant's life in the balance, it is incumbent upon trial counsel to conduct an adequate mitigation investigation which trial counsel is obligated by law to do.

**KS-288**

4.      Defense counsel asked me in my capacity as an expert mitigation specialist to estimate the cost and time of conducting a social history for the consideration of the court. Conducting a thorough investigation requires a minimum range of 250 to 300 hours and an expertise quite different in scope from that of most defense attorneys. My rate for providing this service is $150 an hour plus expenses. Expert testimony at sentencing is in addition to this estimate.

5.      First and foremost will be to interview the defendant. The initial interview will take two full days. At least two or more follow-up interviews will be conducted following the different phases of the investigation: interviewing witnesses and examining retrieved records.

6.      The defendant's formative and developmental years are critical and it will be required to interview family, friends and other witnesses who knew the defendant. These witnesses include but are not limited to medical doctors, school teachers, and neighbors. Documents such as medical, educational, social service, mental health, etc. pertaining to the defendant, which includes relevant records of family members, will be reviewed and attempts will be made to interview those who, as noted in the records, had direct contact with the defendant or his family. In the course of an investigation, many new leads are discovered that were not anticipated prior to the investigation's embarkment. Time must be allowed to follow-up on additional and potentially effective newly discovered witnesses.

7.      Once this information is obtained, an equal and usually greater amount of time is required to analyze it and to write a corroborated, comprehensive chronological narrative addressing the defendant's psychosocial development as well as the pertinent legal issues raised by defense counsel. All time and tasks will be carefully documented for the Court and filed on a regular and timely basis for payment.

8.     A completed psychosocial history is foremost and critical to defense counsel by informing them of the issues in the defendant's background which point to other experts who will be needed to further investigate the effects of particular areas of mitigation specific to the defendant.  A thoroughly investigated background report takes a minimum range of four to six months to complete.

9.     Drawing on my clinical background in assessing symptoms of substance abuse, mental illness, mental retardation, learning disorders, domestic violence, physical/sexual abuse, and other emotional/psychological disorders and environmental/developmental stressors, the information derived from an investigation would be used to corroborate pertinent mitigating factors of the defendant's psychosocial background and developmental history.  The facts obtained would be presented during the sentencing phase of the trial and do most certainly shape defense counsel's approach to the guilt/innocence phase.

10.     A complete capital case social history investigation will include the following:

a)     Interview Defendant.

b)     Interview nuclear and extended family members, significant others, employers, co-workers, neighbors, friends, school teachers, classmates, co-defendants; if applicable, interview probation officers, foster parents, foster siblings, social workers, institutional staff: mental health, jails, prisons, medical.

c)     Compile records of social service, mental health, criminal justice, educational, and medical documents to complete a psychosocial history and interview practitioners directly involved with defendant in each record.

d)     Travel will be required for interviews and many interviews may need to be conducted several times.  Also gather physical evidence (i.e., photographs, video tapes) to recreate background of defendant for jury.

e)     Identify witnesses, prepare affidavits, identify custodian of records, obtain certified records to be used as evidence.  Obtain

**KS-290**

court order when defendant was raised in a different state than the state where the individual is being tried to have records released or when juvenile records are present.

f)      Assess symptoms of psychosocial/medical problems and alert defense attorneys of additional experts necessary to establish presence of mental handicap, learning disorder, substance abuse/addiction, physical/sexual abuse, neurological condition (i.e., temporal lobe disorder), mental illness, and other conditions or trauma significant to mitigation.

g)      Development of mitigation for presentation to jury.

h)      Investigate institutions:    Gather reports which describe conditions and practices of the treatment facilities in which the defendant was committed.

11.     In many cases, in order to provide assistance to indigent capital defendants, the Court has authorized funds for counsel to hire the Augustus Institue/National Center on Institutions and Alternatives for expert assistance in preparation of the penalty phase of a capital trial.  Funds have been authorized in the following capital cases  (the cases in bold face type are those in which I personally conducted the investigation): State of Georgia v. Carl Isaacs, Perry, 1987; State of Georgia v. Wayne Coleman, Atlanta, 1987; State of Georgia v. Larry Ragus, Gwinnett County, 1989; State of Georgia v. Danny Rucker, Royston, 1989; State of Georgia v. Johnnie Dee Jones, Lincoln County, 1992; Commonwealth of Virginia v. Frank Weston, City of Alexandria, 1986; Commonwealth of Virginia v. Ronald Henderson, Winchester, 1991; Commonwealth of Virginia v. Virgil Fox, Jr., Nelson County, 1991; Commonwealth of Virginia v. Joseph Wise, 1993;  Commonwealth of Virginia v. Russell Tross, Rockingham County, Harrisonburg, 1993; Commonwealth of Virginia v. Carlson Robinson, 1994; Commonwealth of Virginia v. Bruce Kenney, 1995; Commonwealth of Virginia v. Gregory Murphy, 2001; State of Tennessee v. Jay Cameron, Nashville, 1987; State of Tennessee v. David Scott Poe, Montgomery County, 1991; State of Tennessee v. Joe T. Baker Jr., Clarksville, 1992; State of Tennessee v. Courtney Mathews, 1995; State of New Hampshire v. Kenneth Johnson, Hillsborough County Superior Court, 1990; State of

Oklahoma v. Alfred Brian Mitchell, 1992; State of Indiana v. Rufus Averhart, Allen County, 1995, State of Ohio v. Rosalie Grant, Johnston, Ohio, 1985; and State of Indiana v. Rufus Averhart, 1995. In the federal courts, I have been appointed in the following cases: United States of America v. Private Ronnie Curtis, U. S. Court of Military Appeals, 1991; United States of America v. L.Cpl. Kenneth G. Parker, Onslow County, North Carolina, 1992; United States v. LCDR Michael W. Fricke, SC, USN, Naval Base Norfolk, Virginia, 1994; United States v. L.Cpl. Shannon Schlamer, Camp Lejeune, 1994; United States of America v. Srgt. Jesse Quintanilla, Camp Pendleton, 1996; United States of America v. Richard Tipton and United States of America v. Marvin Damon, Eastern District of Virginia - Richmond Division, 1992; United States of America v. Jean Claude Oscar, Eastern District of Virginia - Norfolk Division, 1994; United States of America, District of Columbia, v. Wayne Perry, 1994, United States of America, District of Columbia, v. Donzell McCauley, 1994; United States of America, Northern District Court of New York, v. Tyrone Walker, 1995; United States of America v. Terrance Boyd, Rhode Island, 1995; United States of America v. Cory Gist, Eastern District of North Carolina, 1996; United Stated of America v. Denis Rivera, Eastern District of Virginia – Alexandria Division, 2005; United States of America v. John Richard Mayhew Jr., Southern District of Ohio, 2005; United Stated of America v. Tommie Dorsey, Washington, D.C., 2005; and United States of America v. Donald York, Eastern District of Michigan, 2005.

12. The State of Maryland through the Public Defender's Service has authorized expenditure of public funds for our services in the following cases: State of Maryland v. Derrick White, 1988; State of Maryland v. Michael Moore; State of Maryland v. James Bailey, Prince Georges County, 1984; State of Maryland v. James Calhoun El, Montgomery County, 1990; State of Maryland v. Timothy Deadrick, 1991; State of Maryland v. Marselle Bowers, 1991; State of Maryland v. Richard Tichnell, 1991; State of Maryland v. Ronald Scoates, Queen Anne County, 1991; State of Maryland v. Tyrone Gilliam, Towson, 1992; State of Maryland

v. Kenneth Collins, Somerset County, 1992; State of Maryland v. Damon Bowie, Prince George's County, 1992; State of Maryland v. Michael Warren, Montgomery County, 1992; State of Maryland v. Kevin Wiggins, 1993; State of Maryland v. Michael Whittlesey, Caroline County, 1993; State of Maryland v. Michael Bryson, Anne Arundel County, 1993; State of Maryland v. Alan Newman, Montgomery County, 1993; State of Maryland v. Rodney Solomon, Howard County, 1993; State of Maryland v. Scotland Williams, 1994; State of Maryland v. Wallace Ball, Towson, 1995; State of Maryland v. John Johnson, Cumberland, 1995; and State of Maryland v. Alexander Watson, 2005. The State of Louisiana, through the indigent defender offices has authorized expenditure of public funds for our services in the following cases: State of Louisiana v. Stanley Lay, New Orleans, 1986; State of Louisiana v. Willie Watson; State of Louisiana v. Floyd Carmouche, Lafayette, 1988; State of Louisiana v. Chad Lukas Young, Opelousas, 1990; State of Louisiana v. Andra Coleman, Opelousas, 1990; State of Louisiana v. Jeffrey William Simpson, Lafayette, 1989; State of Louisiana v. Gerald Wilson, Metarie, 1989; State of Louisiana v. Jimmy Charles, Opelousas, 1991; State of Louisiana v. Darrell Aucoin, Lafayette, 1991; State of Louisiana v. Kevin Touchet, Lafayette, 1991; State of Louisiana v. Tyjuane Williams, Baton Rouge, 1992; State of Louisiana v. Bartholomew Cross, Lake Charles, 1993; State of Louisiana v. Rickey Langley, Lake Charles, 1993; State of Louisiana v. James Christopher Hudson, Opelousas, 1993; State of Louisiana v. Albert Earl Lavalais, Opelousas, 1993; State of Louisiana v. Sidney Robinson, 1995; and State of Louisiana v. Eric Proctor, Lafayette, 1996.

13.    In the western region of the United States, NCIA has been appointed in the following cases: State of California v. Peter Fan, 1986; State of California v. Robert Massie, 1986; State of California v. Ernest Kirkwood, 1987; State of California v. Brian L. Marquess, 1988; State of California v. James O'Malley, 1988; State of California v. Fermin Ledesma, 1989;

State of California v. Carlos Avena, 1989; State of California v. Peter Edelbacher, 1989; State of California v. Edward Wilson, 1991.

14.     In addition, we have provided services through funding by the Louisiana Indigent Defense Board, the Florida Office of the Capital Collateral Representative, and the Virginia Capital Representation Resource Center.

15.     Finally, NCIA has been appointed in several cases at the federal habeas corpus level of appeal: Commonwealth of Virginia v. Herman Barnes, Oklahoma v. Wayne Thompson, several cases in Florida, Commonwealth of Virginia v. Roy Bruce Smith, 1994; Commonwealth of Virginia v. Larry Stout, 1994; Commonwealth of Virginia v. Ronald Watkins, 1994; and Commonwealth of Virginia v. Johnile Dubois, 1995.

# EXHIBIT 67

# EXHIBIT 67

## Stephen J. Kalista

| | |
|---|---|
| From: | Giorno, Anthony (USAVAW) [Anthony.Giorno@usdoj.gov] |
| Sent: | Thursday, September 28, 2006 9:21 AM |
| To: | Stephen J. Kalista |
| Cc: | Brownlee, John (USAVAW) |

Subject: Caro mental health exam

Steve

This email will confirm our conversation of this morning concerning Dr. Phillips' request to question Mr. Caro about his role in the murder of Sandoval, the stabbing of Benevidez and the incident at Oakdale. Dr. Phillips informed me that when he attempted to question Mr. Caro on these matters, Mr. Caro, on advice of counsel, refused to answer any of Dr. Phillips' inquiries.

When I spoke with you and Jim this morning, you advised that your mental condition expert has based his opinion solely on diagnostic tests given to Mr. Caro and he did not question Caro about his role in the Sandoval murder, Benevidez stabbing or Oakdale, and Caro made no statements to the expert pertaining to those matters. You advised me that because Caro was not questioned on these matters by your expert and did not volunteer any statements on these matters, Dr. Phillips should be precluded from making inquiries, and you would not permit your client to answer questions pertaining to those matters.

I have passed this information to Dr. Phillips. If Dr. Phillips tells us that, in the absence of such inquiries, he cannot conduct a meaningful examination sufficient to allow him to opine on issues relating to penalty, it may be necessary for us to ask the court either to order Caro to answer the questions or, in the alternative, to bar the defense from introducing evidence as to Caro's mental condition at the penalty phase. Time is of the essence on this issue.

I have also asked you to consider reciprocal disclosure of the results of both defense and prosecution mental health examinations prior to trial. This will allow both sides to prepare to address any mental health issues that may arise in the penalty phase. Because your expert did not ask and Caro did not volunteer information about the Sandoval murder, the Benevidez stabbing or the Oakdale incident, there would be no statements in your expert's report which we could use to his detriment at the guilt phase. You said that you and Jim would further discuss the disclosure issue and get back to me. I further stated that if we could not agree on early disclosure, we would simply follow the provisions of the Rule.

If I have misstated anything about our conversation of this morning, please let me know.

Thanks.

Tony

# EXHIBIT 68

# EXHIBIT 68

## Supplemental Declaration of Donna Marie Schwartz-Watts, M.D.

I, Donna Marie Schwartz-Watts, M.D., declare under penalty of perjury:

1. I have reviewed pages 47 and 48 of Document 791, filed 06/11/13, which Mr. Caro's counsel informed me was an excerpt from the Government's Motion to Dismiss in Mr. Caro's case. I offer the following opinions regarding footnote 12.

2. That Dr. Phillips stated Mr. Caro reported a happy childhood and denied a history of abuse is inconsistent with other parts of Dr. Phillips's report discussing Mr. Caro's father's abusive behavior toward Mr. Caro's mother and the mistreatment Mr. Caro suffered from his older brother. (Phillips's Report at page 14.) Moreover, Dr. Phillips's report fails to relate a thorough trauma history of Mr. Caro's childhood.

3. That Dr. Phillips opined that Mr. Caro does not demonstrate any deficits in adaptive functioning is not inconsistent with Mr. Caro's brain dysfunction. Review of adaptive functioning is frequently used to assess whether an individual can be diagnosed as having intellectual disability (intellectual developmental disorder), which is the diagnosis formerly referred to as mental retardation. Mr. Caro displayed developmental deficits as a child. That he may not currently exhibit deficits in adaptive functioning does not negate a finding of brain dysfunction.

4. That reports from prison psychologists have determined Mr. Caro's mental status to be within normal limits also does not preclude a finding of brain dysfunction. I have reviewed the twelve reports listed as psychological reviews in Dr. Phillips's report, which are attached as exhibits to my declaration:
   Exhibit A – Psychological Review by Dr. Paul A. Kern, Chief Psychologist, dated 2/26/97 (listed in Phillips Report, at page 5 [IV.5.t])
   Exhibit B – Psychological Review by Dr. Paul A. Kern, Chief Psychologist, dated 7/25/97 (listed in Phillips Report, at page 5 [IV.5.t])
   Exhibit C – Psychological Review by M.T. Plasay, Ph.D., dated 10/28/97 (listed in Phillips Report, at page 6 [IV.6.h])
   Exhibit D – Psychological Review by M.T. Plasay, Ph.D., dated 5/1/98 (listed in Phillips Report, at page 6 [IV.6.h])

Exhibit E – Psychological Review by Tamara L. Mischel, Ph.D., dated 2/12/98 (listed in Phillips Report, at page 6 [IV.6.j])
Exhibit F – Psychological Review by Tamara L. Mischel, Ph.D., dated 3/8/98 (listed in Phillips Report, at page 6 [IV.6.j])
Exhibit G – Psychology Services Intake Screening by C. Scott Eckholdt, Ph.D., dated 1/24/02 (listed in Phillips Report, at page 8 [IV.9.o])
Exhibit H – Psychological Review by M. Geyer, Psy. D., dated 5/22/03 (listed in Phillips Report, at page 8 [IV.10.1])
Exhibit I – Psychological Review by M. Geyer, Psy. D., dated 10/8/03 (listed in Phillips Report, at page 8 [IV.10.1])
Exhibit J – Psychological Review by M. Geyer, Psy. D., dated 11/5/03 (listed in Phillips Report, at page 8 [IV.10.1])
Exhibit K – Psychological Review by S. Henn, Psy. D., dated 9/12/03 (listed in Phillips Report, at page 9 [IV.10.cc])
Exhibit L – Intake Screening (Psychological Data System) by Marie L. Bailey, Staff Psychologist, dated 11/16/05 (listed in Phillips Report, at page 10 [IV.11.h])

5. Exhibits A through L are one-page, standard forms that do not assess Mr. Caro's neuropsychological functioning. No neuropsychological testing was reported in these forms and none of the report writers are psychiatrists. The fact that Mr. Caro's mental status was within normal limits in these several forms does not undercut a finding that he has brain impairment as evidenced by Dr. Spica's neuropsychological testing and his performance on the mental status exam I performed.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 7th day of October 2013, in the State of Arizona.

Donna Marie Schwartz-Watts, M.D.

# Attachment A

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**\*\*LIMITED OFFICIAL USE\*\***

## SHU REVIEW

```
Date.........: Wednesday, February 26, 1997
Inmate.......: CARO, CARLOS DAVID
Reg. No......: 37786-079

Author.......: DR. PAUL A. KERN
Title........: CHIEF PSYCHOLOGIST
Institution.: TRV
```

---

Inmate CARO was placed in the Special Housing Unit on 1/28/1997. In accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing Unit with a quarters assignment of DISC. SEGREGATION.

Inmate CARO was interviewed. Other staff members and/or available records were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current potential for harm to others is judged to be LOW.

COMMENTS:

# Attachment B

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

## SHU REVIEW

Date.........: Friday, July 25, 1997
Inmate......: CARO, CARLOS DAVID
Reg. No.....: 37786-079

Author......: DR. PAUL A. KERN
Title.......: CHIEF PSYCHOLOGIST
Institution.: TRV

---

Inmate CARO was placed in the Special Housing Unit on 6/24/1997. In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change. Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Reports no problems.

# Attachment C

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

PSYCHOLOGY SERVICES INTAKE SCREENING

Date.........: Tuesday, October 28, 1997
Inmate.......: CARO, CARLOS
Reg. No.....: 37786-079

Author.......: M.T. PLASAY, PH.D.
Title........: CHIEF PSYCHOLOGIST
Institution.: BMP

---

TREATMENT/MENTAL HEALTH HISTORY:

Inmate CARO reported no treamtment/mental health history.

MENTAL STATUS:

During the screening interview no mental status items were noteworthy.
The inmate's psychological stability for custody is judged to be
FAVORABLE.

DRUG ABUSE HISTORY:

Inmate CARO does not report a history of substance abuse.

PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported no interest in participating in programs/treatment.

COMMENTS:

S: Inmate denied any mental health problems either current or in
the past.

O: o x 4, well groomed, denied suicidal/homicidal
ideations/intentions, denied hallucinations/delusions/illusions,
reported mood ok, appeared euthymic with full range of affect
noted, intelligence estimated within the average range,
insight/judgement fair.

A: Deferred

P: No other problems noted at this time. Inmate instructed on how
to contact psychology in the future.

# Attachment D

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

## SHU REVIEW

```
Date.........: Friday, May 01, 1998
Inmate.......: CARO, CARLOS
Reg. No......: 37786-079

Author.......: M.T. PLASAY, PH.D.
Title........: CHIEF PSYCHOLOGIST
Institution.: BMP
```

Inmate CARO was placed in the Special Housing Unit on 4/15/1998. In accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current potential for harm to others is judged to be LOW.

COMMENTS:

Inmate reported no difficulties adjusting to the SHU. Officers interviewed also reported no problems with inmate at present. Routine follow-up in 30 days. Inmate knows pscyhology makes rounds on weekly basis and also knows to contact SHU officers if he requests psychology services.

# Attachment E

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

SHU REVIEW

Date.........: Thursday, February 12, 1998
Inmate.......: CARO, CARLOS
Reg. No......: 37786-079

Author.......: TAMARA L. MISCHEL, PH.D.
Title........: CLINICAL PSYCHOLOGIST
Institution.: BMP

---

Inmate CARO was placed in the Special Housing Unit on 1/23/1998. In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
and should be modified over time as individual circumstances
change. Based on the inmate's history, exisiting conditions,
and other information available at the time of the review,
the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
be modified over time as individual circumstances change.
Based on the inmate's history, exisiting conditions, and other
information available at the time of the review, the current
potential for harm to others is judged to be LOW.

COMMENTS:

Inmate presented with appropriate affect and congruent mood. Inmate
denied any current suicidal or homicidal ideations. Inmate does not appear
to be in any psychological distress at this time. Inmate reported that he
knew how to contact this department if he were to experience any problems.
Inmate was seen in SHU on 02-09-98.

# Attachment F

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

### SHU REVIEW

Date.........: Sunday, March 08, 1998
Inmate.......: CARO, CARLOS
Reg. No......: 37786-079

Author.......: TAMARA L. MISCHEL, PH.D.
Title........: CLINICAL PSYCHOLOGIST
Institution.: BMP

---

Inmate CARO was placed in the Special Housing Unit on 1/23/1998. In accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current potential for harm to others is judged to be LOW.

COMMENTS:

Inmate was seen in SHU on 03-06-98. Inmate presented with appropriate affect and congruent mood. Inmate denied any current suicidal or homicidal ideations. Inmate does not appear to be in any psychological distress at this time. Inmate reported that he knew how to contact this department if he were to experience any problems.

# Attachment G

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**\*\*LIMITED OFFICIAL USE\*\***

### PSYCHOLOGY SERVICES INTAKE SCREENING

```
Date........: Thursday, January 24, 2002
Inmate......: CARO, CARLOS
Reg. No.....: 37786-079

Author......: C. SCOTT ECKHOLDT, PH.D.
Title.......: STAFF PSYCHOLOGIST
Institution.: OAK
```

---

### TREATMENT/MENTAL HEALTH HISTORY:

        Violence: two fights at USP Beaumont

### MENTAL STATUS:

During the screening interview no mental status items were noteworthy.
The inmate's psychological stability for custody is judged to be
FAVORABLE.

### DRUG ABUSE HISTORY:

Inmate CARO reports a history of substance abuse. More than on substance
was reported as the primary drug of choice. The inmate is not interested in drug
abuse treatment.

### PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported no interest in participating in programs/treatment.

### COMMENTS:

Mr. CARO returned from court where he was given an addditional 18 months for
violating the conditions of his supervised release program. He reports that
he is re-adjusting well to general population. He denied any mental health
crises while away and denies suicidal/homicidal ideation, plans, or intent.
He states that he did not use any drugs or have any incident reports while
away. His sleeping and eating is undisturbed. Also, he denied being the
victim or perpetrator of any sexual assault while away. He stated that he
would contact psychology if he desired services in the future.

# Attachment H

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

## PSYCHOLOGY SERVICES INTAKE SCREENING

Date.........: Thursday, May 22, 2003
Inmate.......: CARO, CARLOS DAVID
Reg. No......: 37786-079

Author.......: M. GEYER, PSY.D.
Title........: CODE COORDINATOR
Institution.: LEE

---

TREATMENT/MENTAL HEALTH HISTORY:

Violence: History of inmate assaults while incarcerated; TS gang

MENTAL STATUS:

During the screening interview no mental status items were noteworthy.
The inmate's psychological stability for custody is judged to be
FAVORABLE.

DRUG ABUSE HISTORY:

Inmate CARO does not report a history of substance abuse.

PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported no interest in participating in programs/treatment.

COMMENTS:

Inmate Caro completed the Psychology Services Intake Questionnaire
and intake interview this date at U.S.P. Lee. He voiced no
mental health concerns and stated that he does not have a history
of psychiatric treatment. He denied all symptoms associated with
a major mood or psychotic disorder. During this interview, no
symptoms appeared that would indicate further psychological
attention is necessary. He denied suicidal and homicidal
ideation. He denied being the victim or perpetrator of a sexual
assault while incarcerated. He was provided verbal information
concerning psychology services at U.S.P. Lee and was aware of how
to solicit services, if necessary. In addition, this inmate read
and signed the confidentiality statement relating to psychology
services. At this time, no M.D.S. code is warranted.

M.D.S. = 0

# Attachment I

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

## SHU REVIEW

Date.........: Wednesday, October 08, 2003
Inmate.......: CARO, CARLOS DAVID
Reg. No......: 37786-079

Author.......: M. GEYER, PSY.D.
Title........: CODE COORDINATOR
Institution.: LEE

---

Inmate CARO was placed in the Special Housing Unit on 8/29/2003. In accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current potential for harm to others is judged to be LOW.

COMMENTS:

This inmate was seen on this date to complete the 30 day SHU review. During his contact, he denied any symptoms suggestive of a major mental illness. Specifically, he denied all mood disturbances or symptoms of psychosis. He denied suicidal and homicidal ideation. He denied the need for psychological services. No other concerns were voiced. No follow up necessary.

# Attachment J

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**LIMITED OFFICIAL USE**

## SHU REVIEW

Date.........: Wednesday, November 05, 2003
Inmate.......: CARO, CARLOS DAVID
Reg..No......: 37786-079

Author.......: M. GEYER, PSY.D.
Title........: CODE COORDINATOR
Institution.: LEE

---

Inmate CARO was placed in the Special Housing Unit on 8/29/2003. In accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, exisiting conditions, and other information available at the time of the review, the current potential for harm to others is judged to be LOW.

COMMENTS:

Inmate Caro was seen this date for the 30-day psychology SHU reviews. During this contact, he denied any mental health issues that required attention. He denied suicidal and homicidal ideation. There is no evidence suggestive of psychosis or a mood disorder. At this time, only routine psychology rounds are indicated for this individual. If this individual remains in SHU for thirty days past this date, he will be re-evaluated as per BOP policy.

# Attachment K

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**\*\*LIMITED OFFICIAL USE\*\***

SHU REVIEW


Date.........: Friday, September 12, 2003
Inmate.......: CARO, CARLOS DAVID
Reg. No.....: 37786-079

Author.......: S. HENN, PSY.D.
Title........: STAFF PSYCHOLOGIST
Institution.: LEE

---

Inmate CARO was placed in the Special Housing Unit on 8/29/2003. In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.


ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.


THREAT TO SELF...... : Precise prediction of self-injurious behavior is difficult
                       and should be modified over time as individual circumstances
                       change. Based on the inmate's history, exisiting conditions,
                       and other information available at the time of the review,
                       the current risk of self-harm is judged to be LOW.


THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Inmate Caro was briefly interviewed and observed in SHU. Based on this
interview, the inmate does not appear to be experiencing significant
psychological distress at this time. The inmate's current level of
adjustment appears satisfactory. He presented no psychological symptoms of
distress. He does not appear to be a threat to self or others. In addition,
SHU staff noted no significant changes in his behavior. He had no complaints
or concerns at this time. He was instructed to contact psychology services
if the need arose.

# Attachment L

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**SENSITIVE BUT UNCLASSIFIED**



# Federal Bureau of Prisons
# Psychology Data System

**Date-Title:** 11-16-2005 - Intake Screening
**Reg Number-Name:** 37786-079 - CARO, CARLOS D.
**Author:** MARIE L. BAILEY, STAFF PSYCH
**Institution:** FLM - FLORENCE ADMAX USP

## TREATMENT/MENTAL HEALTH HISTORY:

Inmate **CARO** reported no treatment/mental health history

## ABUSE HISTORY:

Inmate CARO reported no abuse history

## MENTAL STATUS:

During the screening interview no mental status items were noteworthy.

His psychological stability for custody is judged to be **FAVORABLE** .

## DRUG ABUSE HISTORY:

Inmate CARO does not report a history of substance abuse.

## PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported NO interest in participating programs/treatment.

## COMMENTS:

Inmate Caro was assessed for an initial Psychology Services Intake screening. Inmate has no significant history of receiving psychiatric tx and currently no signs of acute distress nor psychopathology appear present. MSE=WNL. He denied a history of suicide attempts or ideation. He currently denies SI, intent or plan and does not appear to be a danger to self or others at this time. He denied a hx of substance abuse and reported that he does not desire drug abuse tx. He indicated he does not desire Psychological Services at this time. He denied ever being a victim or perpetrator of sexual assault. No apparent disabilities, no MDS required at this time.

**SENSITIVE BUT UNCLASSIFIED**

# EXHIBIT 69

# EXHIBIT 69

*Privileged and Confidential*
*Attorney/Client Work Product*
    *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

1

## MEMORANDUM

To:         Danny Mullikin, Steve Kalista, Jim Simmons

From:       Hans Selvog

Date:       May 15, 2006

**RE:**     **Carlos Caro**
            **Witnesses/Records by Location**



Chicago Illinois
- Rosa Garza (Carlos' maternal aunt) lives in Chicago, Illinois, 708-753-0268.
- Marguerita Silguero (Carlos' maternal aunt) lives in Chicago, Illinois. (Temporarily living with Rosa Garza, her sister.) She has several children: Joe, Anni, another daughter, and another son who is a school teacher in Kingsville, TX.



**HS-189**

*Privileged and Confidential*
*Attorney/Client Work Product*
    *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

2



**HS-190**

*Privileged and Confidential*
*Attorney/Client Work Product*
     *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

3



*Privileged and Confidential*
*Attorney/Client Work Product*
  *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

4

Gatesville Texas
- Jose Maria "Joe" Caro III (DOB: 6-16-65) (inmate #649423, Rt. 2, P.O. Box 4400, A. Hughes Unit, Gatesville, TX, 76597).



Lovelady Texas
- Noe Caro (DOB: 3-16-68) (inmate #: 644150, Eastham Unit, D 315, P.O. Box 16, Lovelady, TX, 7581).



*Privileged and Confidential*
*Attorney/Client Work Product*
    *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

5



**HS-193**

# EXHIBIT 70

# EXHIBIT 70

P.O. Box 900, Jonesville, Virginia 24263-0900

December 19, 2003

MEMORANDUM FOR ALL SPECIAL HOUSING UNIT STAFF

FROM:       William R. Johnson, Special Investigative Agent

SUBJECT:    Special Handling Instructions for
            Carlos David Caro, #37786-079

As you are all aware, an incident recently transpired in the Special Housing Unit involving inmate Carlos David Caro, #37786-079. I would like to express the importance of ensuring he is handled appropriately.

1.    Staff should never engage in conversations with inmate Caro.

2.    Staff must always ensure the highest level of professionalism exists when handling or dealing with inmate Caro.

3.    Anytime inmate Caro makes a spontaneous statement in the presence of staff, the staff member will immediately document that comment in the provided log book.

4.    In that leg entry the staff member will write the comment verbatim, write their printed name, signature, and the time and date of the comment. It is imperative this procedure is followed exactly as described.

5.    These log entries should also contain any comments made to other inmates that are overheard by staff.

6.    This log book is to be neat and free of any un-professional or un-appropriate markings. This log book will become a legal document introduced in court.

7.    Inmate Caro will receive recreation alone. This means no other inmates will be in any other recreation cage while he is receiving recreation. Additionally, he is to be celled alone. Staff should ensure he has minimal if any contact with other inmates particularly inmates belonging to or associated with the Texas Syndicate.

8.    Anytime inmate Caro is removed from his cell, a Lieutenant will he present, at the cell.

Any questions associated with this memorandum or inmate Caro should be directed to me personally.

# EXHIBIT 71

# EXHIBIT 71

**DECLARATION OF** ████████████

**PURSUANT TO 28 U.S.C. § 1746**

I, ███████████, do make oath and swear:

I was a member of the jury for the criminal trial United States of America v. Carlos Caro,

Western District of Virginia Case Number 2:06cr1. I was juror number 33.

I was treated for anxiety problems as a child. My last treatment for anxiety issues prior to the trial was when I was approximatley 14 years old. Symptoms related to the anxiety issue came back during the trial. I had chest tightness and tingling in my hands during the trial. I also had trouble sleeping at night. My anxiety during the trial was caused by watching the videos of the medical treatment and because it was a death penalty case. Once I knew that Caro was guilty my anxiety increased because I knew how I would have to vote on the death penalty.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9/26/15 ████████████.

████████████████

pg 1 of 2

1

DECLARATION OF ██████████
PURSUANT TO 28 U.S.C. § 1746

I, ██████████, do make oath and swear:

I was a member of the jury for the criminal trial United States of America v. Carlos Caro,

Western District of Virginia Case Number 2:06cr1. I was juror number 33.

In addition to the trial, my anxiety was caused by a personal issue. A close friend of mine was shot during the trial and almost died. The friend was like a brother to me and I was unable to be with him or his family because I had to serve on the jury. I also had anxiety because I felt I was pushed onto being on the jury. I told everyone that I did not want to be on the jury because I was needed at my family business. Being on the jury resulted in a loss of income because I could not work. One day after court I went to the Abingdon hospital because my anxiety symptoms became severe. KM

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9-26-13 .

██████████████████████

pg. 2 of 2

Since the trial I have remained on anti-anxiety medication. ██

I ~~was~~ don't believe that I took any anti-anxiety medication during trial.

# EXHIBIT 72

# EXHIBIT 72

DECLARATION OF SUSAN RICHARDSON
PURSUANT TO 28 U.S.C. § 1746


I, Susan Richardson, declare as follows:

1. I am employed as an Investigator with the Federal Public Defender's Office for the Western District of Virginia. I have been assigned to work on the case of *United States v. Carlos Caro*, 1:06cr00001 (W.D. Va.).

2. One of my assignments has been to collect as much data as possible on the length of stay of inmates designated to the Bureau of Prison's Administrative Maximum facility in Florence, Colorado ("ADX-Florence") and on violent conduct committed by certain inmates while housed at ADX-Florence. Based on my research, I have prepared the attached tables:

   - Table 1: Inmates Known to be Designated to ADX-Florence For More Than Three Years;

   - Table 2: Inmates Currently Designated to ADX-Florence Who Have Been Convicted or Accused of Committing a Homicide Within a Bureau of Prisons (BOP) Facility; and

   - Table 3: Inmates Convicted of Committing a Homicide in the Bureau of Prisons Following a Jury Trial In Which the Government Sought the Death Penalty.

3. I obtained the information presented in these tables from various sources, including the Affidavit prepared by Jeanne Dvorak (ECF 790-48); documents produced by the

1

Government in response to a 2010 subpoena issued to the Bureau of Prisons in *United States v. Vincent Basciano*, 1:05-cr-060 (E.D.N.Y.); the Bureau of Prisons Inmate Locator and federal court PACER websites; the Federal Death Penalty Resource Counsel website; documents received pursuant to a FOIA request in this case; and internet searches for articles containing names of inmates known to be housed at ADX-Florence.

4. Information regarding the population at ADX-Florence was obtained from the Bureau of Prisons' web site and a population report supplied as a result of a 2010 subpoena issued to the Bureau of Prisons in *United States v. Vincent Basciano*, 1:05-cr-060 (E.D.N.Y.). This information revealed that as of October 3, 2013, 434 inmates were designated to ADX-Florence. In January 2007, at the time of Carlos Caro's criminal trial, the average daily population was 470 inmates.

5. The numbers presented in Tables 1, 2, and 3 are based only on the limited public data I have been able to gather. The numbers are necessarily incomplete and are believed to under-represent the total number of inmates who have been designated to ADX-Florence for more than three years.

6. The numbers presented in the attached tables also do not include years that the inmate may have been assigned to the Control Unit at USP-Marion, the Bureau of Prisons' most secure facility prior to opening ADX-Florence in 1994. For this additional reason, the numbers under-represent the number of years that an inmate has been continuously designated to the Bureau of Prisons' most secure facility, either USP-Marion or ADX-Florence.

7. My research estimates that at least 126 inmates have been incarcerated at ADX-Florence for more than five years, and at least 155 inmates have been incarcerated for more than

three years at ADX-Florence. (*See* Table 1.) Of these 155 inmates who have been incarcerated for more than three years, 125 are still designated to ADX-Florence, comprising almost 30% of the current ADX-Florence population. (*Id.*)

8. In January 2007, at the time of Carlos Caro's criminal trial, there were at least 79 inmates who had been incarcerated for more than three years at ADX-Florence; at least 63 inmates who had been incarcerated for more than five years at ADX-Florence; and at least 25 inmates who had been incarcerated for at least 10 years at ADX-Florence. (*See* Table 1.) In January 2007, ADX-Florence had been in operation for only about 12 years.

9. I also created a table specifically listing inmates who had been convicted or accused of committing a homicide within a Bureau of Prisons facility, and who are designated to ADX-Florence. There currently are at least 54 such inmates who have been designated to ADX-Florence. (*See* Table 2.) All 54 of these inmates have been continuously designated to ADX-Florence since their initial designation to ADX-Florence, including 22 inmates who entered ADX-Florence in 2007 or earlier. (*Id.*) Thirty-six inmates who have been convicted or accused of committing a homicide within a Bureau of Prisons facility have served more than three years at ADX-Florence. (*Id.*) In 2007, at least 14 inmates who had been convicted or accused of a BOP homicide had been incarcerated at ADX-Florence for more than three years. Those 14 inmates are still designated to ADX. (*Id.*)

10. I also checked the PACER website for the District of Colorado to find out if any of these 54 inmates who have been continuously designated to ADX-Florence have been indicted with any new crimes of violence after their homicide convictions. Not counting the two murders that occurred at ADX-Florence in 2005 that were discussed in Mr. Caro's trial

3

(Tr. 02/12/07 at 108), none of these inmates have been indicted for a subsequent homicide since their designation to ADX-Florence.

11. Through my research, I was also able to locate ten cases nationwide where the Government sought the death penalty for a defendant who committed a homicide within a Bureau of Prisons facility, but where the defendant received a life sentence following a jury trial. (*See* Table 3.) Nine of these ten defendants have been continuously designated to ADX-Florence since imposition of their life sentences. One defendant was sent to USP-Hazelton instead of ADX-Florence. (*Id.*) Based upon my research, I believe that this defendant was not eligible for placement at ADX-Florence due to a significant mental disorder. (*See id.* n.3.)

12. In another case, the defendant received a death sentence, but for an unknown reason, has remained designated to ADX-Florence for the four years following his trial, and he has never been transported to USP-Terre Haute's Death Row.

13. I have attempted to verify the data in these tables to the best of my ability based on the limited information available to me, and upon information and belief, I believe the data to be accurate.

I declare under penalty for perjury that the foregoing is true and correct.

Executed on ___10-9-13___ .

Susan Richardson

4

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|------|-----------|-----------|--------------------------------|-------------------------|--------------|
| 1 | Gometz, Randy | 35556-118 | 1994 | 13 | 19 | |
| 2 | Mason, Howard | 24651-053 | 1994 | 13 | 19 | |
| 3 | Bradshaw, Wayman | 07109-018 | 1995 | 12 | 17 | |
| 4 | Bruscino, Ronnie | 20168-148 | 1995 | 12 | 18 | |
| 5 | Edwards, Delroy | 25109-053 | 1995 | 12 | 18 | |
| 6 | Filkins, Glen | 84015-012 | 1995 | 12 | 18 | |
| 7 | Gambina, Ralph | 12508-116 | 1995 | 12 | 18 | |
| 8 | Gibson, Christopher | 81372-011 | 1995 | 12 | 18 | Yes |
| 9 | Hicklin, Steven | 01242-097 | 1995 | 12 | 18 | Yes |
| 10 | Kikumura, Yu | 09008-050 | 1995 | 12 | 12 | |
| 11 | Lynn, Richard | 09748-004 | 1995 | 12 | 16* | |
| 12 | Matthews, Norman | 88752-132 | 1995 | 12 | 16* | |
| 13 | Presley, James | 41368-019 | 1995 | 12 | 14 | |
| 14 | Scott, Steve | 55341-065 | 1995 | 12 | 18 | |
| 15 | Simas, Russell | 23188-086 | 1995 | 12 | 18 | |
| 16 | Young, Timothy | 60012-001 | 1995 | 12 | 18 | |
| 17 | Black, Clifford | 55458-097 | 1996 | 11 | 17 | |
| 18 | Harrelson, Charles | 02582-016 | 1996 | 11 | 11 | |
| 19 | Kolb, Mitchell | 02689-081 | 1996 | 11 | 15* | |
| 20 | Masters, Henry | 01413-046 | 1996 | 11 | 17 | Yes |
| 21 | Stallings, Larry | 14534-057 | 1996 | 11 | 17 | |
| 22 | Abrego, Juan | 09935-000 | 1997 | 10 | 16 | |
| 23 | Eusi, Maulana | 02218-045 | 1997 | 10 | 14* | |
| 24 | Hevle, Edgar | 13950-116 | 1997 | 10 | 16 | Yes |

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|---|---|---|---|---|---|
| 25 | Moreno, Jesse | 03326-112 | 1997 | 10 | 16 | |
| 26 | Aguirre, Alex | 03334-112 | 1998 | 9 | 15 | |
| 27 | Bridgewater, Wayne | 20220-148 | 1998 | 9 | 15 | Yes |
| 28 | Casso, Anthony | 16802-050 | 1998 | 9 | 13* | |
| 29 | Hoover, Larry | 86063-024 | 1998 | 9 | 15 | |
| 30 | Houston, Henry | 94434-012 | 1998 | 9 | 15 | Yes |
| 31 | Ismoil, Eyad | 37802-054 | 1998 | 9 | 15 | |
| 32 | Jones, Anthony | 32124-037 | 1998 | 9 | 15 | |
| 33 | Kaczynski, Theodore | 04475-046 | 1998 | 9 | 15 | |
| 34 | McMahan, Jamie | 05327-030 | 1998 | 9 | 15 | |
| 35 | Mendez, Raymond | 03329-112 | 1998 | 9 | 15 | |
| 36 | Nicholson, Harold | 49535-083 | 1998 | 9 | 15 | |
| 37 | Salameh, Mohammad | 34338-054 | 1998 | 9 | 15 | |
| 38 | Yousef, Ramzi | 03911-000 | 1998 | 9 | 15 | |
| 39 | Akers, Montgomery | 02866-081 | 2000 | 7 | 10 | |
| 40 | Colon, Gustavo | 07984-424 | 2000 | 7 | 13 | |
| 41 | Farrakhan-Muhammad, Q Ili-Yass a/k/a Christopher Mitchell | 02791-088 | 2000 | 7 | 13 | |
| 42 | Felipe, Luis | 14067-074 | 2000 | 7 | 13 | |
| 43 | McIntosh, Richard | 02012-028 | 2000 | 7 | 13 | Yes |
| 44 | Rowe, Joseph | 02218-112 | 2000 | 7 | 13 | |
| 45 | Sablan, Rudy | 00074-005 | 2000 | 7 | 13 | Yes |
| 46 | Sablan, William | 00232-005 | 2000 | 7 | 13 | Yes |

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|------|-----------|-----------|-------------------------------|------------------------|--------------|
| 47 | Santiago, Richard | 53961-097 | 2000 | 7 | 13 | Yes |
| 48 | Shelby, David | 05374-081 | 2000 | 7 | 12 | |
| 49 | Von Moos, Jon | 79328-012 | 2000 | 7 | 13 | |
| 50 | Cunningham, Harold | 04685-000 | 2001 | 6 | 12 | |
| 51 | Doughterty, Joseph | 01924-135 | 2001 | 6 | 12 | |
| 52 | El-Hage, Wadih | 42393-054 | 2001 | 6 | 12 | |
| 53 | Ghailani, Ahmed | 02476-748 | 2001 | 6 | 12 | |
| 54 | Oecsle, Raymond | 44776-066 | 2001 | 6 | 12 | |
| 55 | Ressam, Ahmed | 29638-086 | 2001 | 6 | 12 | |
| 56 | Shepard, Robert | 04574-088 | 2001 | 6 | 12 | |
| 57 | Swango, Michael | 08352-424 | 2001 | 6 | 12 | |
| 58 | Odeh, Mohamed | 42375-054 | 2001 | 6 | 12 | |
| 59 | Al-Owhali, Mohamed | 42371-054 | 2001 | 6 | 12 | |
| 60 | Mohamed, Khalfan | 44623-054 | 2001 | 6 | 12 | |
| 61 | Palazzola, Dominic | 53757-097 | 2001 | 6 | 12 | Yes |
| 62 | Powers, John Jay | 03220-028 | 2001 | 6 | 11 | |
| 63 | Stewart, Dominic | 10819-007 | 2001 | 6 | 12 | Yes |
| 64 | Bruhl, Leroy | 40114-066 | 2002 | 5 | 11 | |
| 65 | Hanssen, Robert | 48551-083 | 2002 | 5 | 11 | |
| 66 | Leggett, Jaison | 09411-077 | 2002 | 5 | 10 | |
| 67 | Johnson, Damion | 14980-047 | 2002 | 5 | 11 | Yes |
| 68 | Nosair, El-Sayyid | 35074-054 | 2002 | 5 | 9* | |
| 69 | Petty, Ishmael | 10738-042 | 2002 | 5 | 11 | Yes |
| 70 | Saleh, Mohammed | 34853-054 | 2002 | 5 | 9* | |

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|---|---|---|---|---|---|
| 71 | Shaifer, Ernest | 30674-048 | 2002 | 5 | 11 | |
| 72 | Duckett, James | 19214-083 | 2002 | 5 | 8* | Yes |
| 73 | Barron, Percy | 04710-00 | 2003 | 4 | 10 | |
| 74 | Custard, Bob | 02728-031 | 2003 | 4 | 10 | |
| 75 | Deberry, Frederick | 09303-042 | 2003 | 4 | 10 | |
| 76 | Georgeacarakos, Peter | 03029-036 | 2003 | 4 | 8* | |
| 77 | O'Driscoll, Michael | 03029-037 | 2003 | 4 | 10 | Yes |
| 78 | Reid, Richard | 03029-038 | 2003 | 4 | 10 | |
| 79 | Abouhalima, Mahud | 03029-039 | 2003 | 4 | 10 | |
| 80 | Heisler, Donald | 03029-040 | 2004 | 3 | 9 | |
| 81 | Nichols, Terry | 03029-041 | 2004 | 3 | 9 | |
| 82 | Portee, Omar | 03029-042 | 2004 | 3 | 9 | |
| 83 | Salim, Mamdough | 03029-043 | 2004 | 3 | 9 | |
| 84 | Faris, Iyman | 03029-044 | 2004 | 3 | 9 | |
| 85 | Vega, Jose | 03029-045 | 2004 | 3 | 6 (suicide 2010) | |
| 86 | Hernadez, Joseph | 03029-046 | 2004 | 3 | 9 | |
| 87 | Hernandez, Tex | 03029-047 | 2004 | 3 | 9 | |
| 88 | Morado, James | 03029-048 | 2004 | 3 | 9 | |
| 89 | Rubalcaba, Gerald | 03029-049 | 2004 | 3 | 9 | |
| 90 | Rizzuto, Vito | 03029-050 | 2004 | 3 | 8 (deported 2012) | |
| 91 | Scott, Bernard | 03029-051 | 2005 | 2 | 8 | |
| 92 | Silverstein, Thomas | 03029-052 | 2005 | 2 | 8 | Yes |
| 93 | Rivera, Silvestre | 03029-053 | 2005 | 2 | 8 | Yes |
| 94 | Tristan, Cornelio | 03029-054 | 2005 | 2 | 8 | |
| 95 | Tuttamore, Timothy | 03029-055 | 2005 | 2 | 8 | |

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|------|-----------|-----------|-------------------------------|-------------------------|--------------|
| 96 | Rudolph, Eric | 03029-056 | 2005 | 2 | 8 | |
| 97 | McKinney, Aaron | 03029-057 | 2005 | 2 | 6* | |
| 98 | Hale, Matthew | 03029-058 | 2005 | 2 | 8 | |
| 99 | Crawford, John | 03029-059 | 2005 | 2 | 8 | |
| 100 | Ayyad, Nidal | 03029-060 | 2005 | 2 | 6* | |
| 101 | Alvarez, Victor | 03029-061 | 2005 | 2 | 8 | |
| 102 | Bingham, Tyler | 03029-062 | 2006 | 1 | 7 | Yes |
| 103 | Bond, Erving | 03029-063 | 2006 | 1 | 7 | |
| 104 | Bornman, Gary | 03029-064 | 2006 | 1 | 7 | |
| 105 | Kitchen, Brandon | 03029-065 | 2006 | 1 | 5* | |
| 106 | Martin, Roy | 03029-066 | 2006 | 1 | 7 | |
| 107 | Martinez, Francisco | 03029-067 | 2006 | 1 | 7 | Yes |
| 108 | Mills, Barry | 03029-068 | 2006 | 1 | 7 | Yes |
| 109 | Moussaoui, Zacarias | 03029-069 | 2006 | 1 | 7 | |
| 110 | Sattar, Ahmed | 03029-070 | 2006 | 1 | 7 | |
| 111 | Segura, Phillip | 03029-071 | 2006 | 1 | 7 | |
| 112 | Shryock, Raymond | 03029-072 | 2006 | 1 | 7 | |
| 113 | Tokash, Joe | 03029-073 | 2006 | 1 | 7 | |
| 114 | Usher, John | 03029-074 | 2006 | 1 | 5* | |
| 115 | Al Shaaban, Shaaban | 03029-075 | 2006 | 1 | 7 | |
| 116 | Abu Ali, Ahmed | 03029-076 | 2006 | 1 | 7 | |
| 117 | Folts, Shaun | 03029-077 | 2006 | 1 | 7 | |
| 118 | McNair, Richard | 03029-078 | 2006 | 1 | 7 | |
| 119 | Fort, Jeff | 03029-079 | 2006 | 1 | 7 | |
| 120 | York, Dwight | 03029-080 | 2006 | 1 | 7 | |

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|---|---|---|---|---|---|
| 121 | Al-Amin, Jamil | 03029-081 | 2007 | - | 6 | |
| 122 | McMillan, Shane | 03029-082 | 2007 | - | 6 | |
| 123 | McCallister, Timothy | 03029-083 | 2007 | - | 6 | Yes |
| 124 | Narducci, John | 03029-084 | 2007 | - | 5* | |
| 125 | Ozsusamlar, Osman | 03029-085 | 2007 | - | 4* | |
| 126 | Rodriguez, Osiel | 03029-086 | 2007 | - | 4* | |
| 127 | Yarbrough, Gary | 03029-087 | 2007 | - | 6 | |
| 128 | Temple, Eric | 03029-088 | 2007 | - | 6 | Yes |
| 129 | Murray, Greg | 03029-089 | 2007 | - | 6 | |
| 130 | Pinson, Jeremy | 03029-090 | 2007 | - | 6 | |
| 131 | Guillen, Osiel | 03029-091 | 2007 | - | 6 | |
| 132 | Duka, Dritan | 03029-092 | 2008 | - | 5 | |
| 133 | Watland, Gary | 03029-093 | 2008 | - | 5 | |
| 134 | Perkins, Herbert | 03029-094 | 2008 | - | 5 | |
| 135 | Clark, Willie | 03029-095 | 2008 | - | 5 | Yes |
| 136 | Murillo, Jose | 03029-096 | 2008 | - | 5 | Yes |
| 137 | Rodriguez, Oscar | 03029-097 | 2008 | - | 5 | Yes |
| 138 | Gulley, Arzell | 03029-098 | 2008 | - | 5 | Yes |
| 139 | Jennings, David | 03029-099 | 2008 | - | 5 | Yes |
| 140 | Slocum, Ronald | 03029-100 | 2008 | - | 5 | Yes |
| 141 | Mosher, Ellis | 03029-101 | 2008 | - | 5 | Yes |
| 142 | Pineda, Juvenal | 03029-102 | 2008 | - | 5 | |
| 143 | Padilla, Jose | 03029-103 | 2008 | - | 4* | |
| 144 | McElhiney, Michael | 03029-104 | 2008 | - | 5 | Yes |
| 145 | Castro, Ruben | 03029-105 | 2008 | - | 5 | |
| 146 | Knorr, Carl | 03029-106 | 2009 | - | 4 | Yes |

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE FOR MORE THAN THREE YEARS[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|------|-----------|-----------|-------------------------------|-------------------------|--------------|
| 147 | Leon, Raul | 03029-107 | 2009 | - | 4 | |
| 148 | Sahakian, David | 03029-108 | 2009 | - | 4 | Yes |
| 149 | Ebron, Joseph | 03029-109 | 2009 | - | 4 | Yes |
| 150 | Meeks, Tommy | 03029-110 | 2009 | - | 4 | Yes |
| 151 | Bacote, Michael | 03029-111 | 2009 | - | 4 | Yes |
| 152 | Johnson, Terrell | 03029-112 | 2009 | - | 4 | Yes |
| 153 | Ferguson, Juwan | 03029-113 | 2009 | - | 4 | Yes |
| 154 | Branch, Edgar | 03029-114 | 2009 | - | 4 | Yes |
| 155 | Myers, Walter | 03029-115 | 2009 | - | 4 | |

[1]The data in this table is compiled only from publically available information and thus likely does not include all of the inmates who have been housed at ADX for more than 3 years.

* These inmates left ADX at some time between 2011 and the present, but the exact date is not known. The number listed is a conservate estimate that assumes the inmate left in 2011.

Years printed in RED are estimates based on the date of conviction and pleadings reviewed on the PACER website.

The limited data available shows that at least 155 inmates have been designated to ADX for more than 3 years; at least 126 inmates have been designated to ADX for more than 5 years; and at least 125 are still housed at ADX.

The limited data available shows that in 2007, at least 79 inmates had been designated to ADX for more than 3 years; at least 63 inmates had been designated to ADX for more than 5 years; and at least 25 inmates had been designated to ADX for at least 10 years.

# United States v Caro

## Table 2
### INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
### WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
### A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 1 | Gibson, Christopher | 81372-011 | 1995 | No | 18 | Aryan Brotherhood gang member charged in RICO indictment alleging 17 BOP murders. Case No. 02CR938 (C.D. Cal.) |
| 2 | Hicklin, Steven | 01242-097 | 1995 | No | 18 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. Case No. 02CR938 (C.D. Cal.) |
| 3 | Masters, Henry | 01413-046 | 1996 | No | 17 | USP Atlanta inmate murder. Case No. 1:95CR503 (N.D. Ga.) |
| 4 | Hevle, Edgar | 13950-116 | 1997 | No | 15 | Aryan Brotherhood gang member charged in RICO indictment alleging 17 BOP murders. Case No. 02CR938 (C.D. Cal.) |
| 5 | Bridgewater, Wayne | 20220-148 | 1998 | No | 15 | RICO indictment of members of Aryan Brotherhood . 17 BOP murders were alleged. Bridgewater was a member of the federal council for AB and accused of personally killing two black inmates. Case No. 02CR938 (C.D. Cal.) |
| 6 | Houston, Henry | 94434-012 | 1998 | No | 15 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. Houston was alleged to be personally involved in 4 inmate deaths.  Case No. 02CR938 (C.D. Cal.) |
| 7 | McIntosh, Richard | 02012-028 | 2000 | No | 13 | USP Marion inmate stabbing death.  Defendant was a member of the Aryan Brotherhood. Case Nos. 99CR40044 (S.D. Ill.);  02CR938 (C.D. Cal.) |
| 8 | Sablan, Rudy | 00074-005 | 2000 | No | 13 | USP Florence inmate strangulation and evisceration stabbing death. Case No. 00CR531 (D. Colo.) |
| 9 | Sablan, William | 00232-005 | 2000 | No | 13 | USP Florence inmate strangulation and evisceration stabbing death. Sablan removed organs and taunted officers. Case No. 00CR531 (D. Colo.) |
| 10 | Santiago, Richard | 53961-097 | 2000 | No | 13 | ADX inmate beating death. Case No. 1:10CR164 (D. Colo.) |
| 11 | Palazzola, Dominic | 53757-097 | 2001 | No | 12 | FMC Lexington inmate beating death.  Case No. 00CR132 (E.D. Ky.) |

## Table 2
### INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
### WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
### A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|-------------------|---------|
| 12 | Stewart, Dominic | 10819-007 | 2001 | No | 12 | ADX inmate beating death. Case No. 1:10CR129 (D. Colo.) |
| 13 | Petty, Ishmael | 10783-042 | 2002 | No | 11 | USP Pollock inmate murder. Case No. 1:02CR10006 (W.D. La.) |
| 14 | O'Driscoll, Michael | 04221-016 | 2003 | No | 10 | USP Allenwood inmate stabbing death. Case No. 4CR01-227 (M.D. Pa.) |
| 15 | Rivera, Silvestre | 26147-008 | 2005 | No | 8 | ADX inmate beating death. Case No. 1:10cr164 (D. Colo.) |
| 16 | Silverstein, Thomas | 14634-116 | 2005 | No | 8 | USP Marion inmate and officer death. |
| 17 | Bingham, Tyler | 03325-091 | 2006 | No | 7 | RICO indictment of members of Aryan Brotherhood . 17 BOP murders were alleged. Bingham and another AB leader (Mills) were alleged to have made all of the decisions involving crimes in federal prison. Case No. 02CR938 (C.D. Cal.) |
| 18 | Folts, Shaun | 84197-198 | 2006 | No | 7 | USP Marion stabbing and beating death. The victim's eyes were removed by a homemade prison weapon. Case Nos. 11MC42 (S.D. Ill.); 4:12CR40015 (S.D. Ill.) |
| 19 | Gulley, Arzell | 18249-039 | 2006 | No | 7 | USP Beaumont inmate stabbing death. Case No. 1:05CR51 (E.D. Tex.) |
| 20 | Mills, Barry | 14559-116 | 2006 | No | 7 | RICO indictment of members of Aryan Brotherhood . 17 BOP murders were alleged. Mills and another AB leader (Bingham) were alleged to have made all of the decisions involving crimes in federal prison. Mills was also charged with personally committing one murder. Case No. 02CR938 (C.D. Cal.) |
| 21 | McCallister, Timothy | 02659-087 | 2007 | No | 6 | USP Terre Haute inmate killing. Case No. 2:07CR07 (S.D. Ind.) |
| 22 | Temple, Eric | 33039-018 | 2007 | No | 6 | USP Atwater inmate death by strangulation and disfigurement (removal of eye) of cellmate. Case No. 1:06CR309 (E.D. Cal.) |

## Table 2
### INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
### WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
### A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 23 | Clark, Willie | 97815-024 | 2008 | No | 5 | FCI Edgefield inmate stabbing. Defendant was an enforcer for the Gangster Disciples gang.  Case No. 04CR1123 (D.S.C.) |
| 24 | McElhiney, Michael | 04198-097 | 2008 | No | 5 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. McElhiney was alleged to be responsible for day to day operations at USP Marion, including disciplining AB members. Case No. 02CR938 (C.D. Cal.) |
| 25 | Mosher, Ellis | 02875-087 | 2008 | No | 5 | USP Beaumont inmate murder.  Case No. 06CR101 (E.D. Tex.) |
| 26 | Murillo, Jose | 04354-112 | 2008 | No | 5 | USP Victorville inmate stabbing death. Case No. 5:05CR69 (C.D. |
| 27 | Rodriguez, Oscar | 35945-048 | 2008 | No | 5 | USP Victorville inmate stabbing death. Case No. 5:05CR69 (C.D. Cal.) |
| 28 | Watland, Gary | 99901-555 | 2008 | No | 5 | USP Forence inmate murder.  Case No.1:11CR38 (D. Colo.) |
| 29 | Bacote, Michael | 05835-007 | 2009 | No | 4 | USP Beaumont inmate stabbing of a previous government witness. Victim was stabbed more than 100 times.  Case No. 1:08CR36 (E.D. Tex.) |
| 30 | Branch, Edgar | 14916-031 | 2009 | No | 4 | USP Pollock inmate stabbing.  Branch strapped a "shank" to each hand and stabbed victim. Case No. 07CR10029 (W.D. La.) |
| 31 | Ebron, Joseph | 08655-007 | 2009 | No | 4 | USP Beaumont inmate stabbing of a previous government witness. Defendant was a member of DC Crew prison gang and victim previously testified against other DC inmates.  The victim was stabbed more than 100 times.  Case No. 1:08CR36 (E.D. Tex.) |
| 32 | Ferguson, Juwan | 97034-011 | 2009 | No | 4 | USP Atwater inmate beating death.  Case No. 08CR116 (E.D. Cal.) |

# United States v Caro

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 33 | Johnson, Terrell | 16390-047 | 2009 | No | 4 | USP Big Sandy inmate stabbing death. Defendant was a member of the Crips gang and stabbed a member of the DC Crew gang with a homemade weapon. Case No. 7:07CR18 (E.D. Ky.) |
| 34 | Knorr, Carl | 13161-075 | 2009 | No | 4 | USP Marion inmate stabbing death. Defendant was a member of the Aryan Brotherhood. Case Nos. 99CR40044 (S.D. Ill.); 02-938 (C.D. Cal.) |
| 35 | Meeks, Tommy | 39492-018 | 2009 | No | 4 | USP Allenwood inmate beating death using a 3 pound rock wrapped in a shirt. Case No. 4:07CR196 (M.D. Pa.) |
| 36 | Sahakian, David | 54744-097 | 2009 | No | 4 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. Ordered other AB members to murder a black inmate at USP Marion. Sahakian was also alleged to be responsible for the day to day operations at USP Marion, including disciplining AB members. Case Nos. 99CR40044 (S.D. Ill.); 02-938 (C.D. Cal.) |
| 37 | Farias, Osbaldo | 90662-079 | 2010 | No | 3 | USP Coleman inmate stabbing and beating. Attack lasted 30 minutes and was captured on video. Case No. 5:08CR43 (M.D. Fla.) |
| 38 | Martinez, Gerardo | 16249-085 | 2010 | No | 3 | USP Coleman inmate stabbing and beating. Attack lasted 30 minutes and was captured on video. Case No. 5:08CR43 (M.D. Fla.) |
| 39 | Delaney, Daniel | 09416-112 | 2011 | No | 2 | USP Terre Haute inmate murder by strangulation. Case No. 2:11CR5 (S.D. Ind.) |
| 40 | Francisco, Jonathan | 17439-075 | 2011 | No | 2 | USP Pollock inmate stabbing involving Crips gang members. Case No. 10CR123 (W.D. La.) |
| 41 | Gravely, Dwaune | 12867-050 | 2011 | No | 2 | USP Big Sandy inmate beating death. Defendant was a Blood gang member and the victim was a mentally ill DC Crew inmate. Case No. 7:09CR13 (E.D. Ky.) |

# United States v Caro

## Table 2
### INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
### WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
### A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|-------------------|---------|
| 42 | Hernandez, Justin | 30123-013 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 43 | Hurley, Allen | 28652-037 | 2011 | No | 2 | USP Canaan inmate stabbing. Victim was stabbed 90 times. Case No. 3:11CR360 (M.D. Pa.) |
| 44 | Johnson, Damion | 80124-038 | 2011 | No | 2 | USP Leavenworth inmate beating death. Case No. 2:99CR20060 (D. Kan.) |
| 45 | Milburne, Darryl | 58478-066 | 2011 | No | 2 | USP Big Sandy inmate beating death. Defendant was a Blood gang member and the victim was a mentally ill DC Crew inmate. Case No. 7:09CR13 (E.D. Ky.) |
| 46 | Morones, Daniel | 39448-048 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 47 | Napper, Harry | 32403-037 | 2011 | No | 2 | USP Beaumont inmate beating and strangulation death. Case No. 1:11CR62 (E.D. Tex.) |
| 48 | Pluma, Jose | 34104-013 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 49 | Rosalez, Mark | 08961-091 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 50 | Ruelas, Juan | 04298-280 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 51 | Villanueva, Sheldon | 02539-748 | 2011 | No | 2 | USP Pollock inmate stabbing death involving the Nortenos gang. Villanueva previously pled guilty to a stabbing in 2007 at USP Pollock. Case No. 08CR386 (W.D. La.) |

# United States v Caro

## Table 2
### INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
### WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
### A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 52 | Bush, Willie | 41756-074 | 2012 | No | 1 | USP Lee inmate stabbing death of one Blood gang member by another Blood gang member. Case No. 2:11CR15 (W.D. Va.) |
| 53 | Johnson, Antonio | 35987-007 | 2012 | No | 1 | USP Lee inmate stabbing death. Victim was stabbed numerous times. Case No. 2:12CR7 (W.D. Va.) |
| 54 | Richardson, Brian | 91507-011 | 2012 | No | 1 | USP Atlanta inmate stabbing and strangulation death. Case No. 1:08CR139 (N.D. Ga.) |

[1]The data in this table is compiled from publically available information and likely does not include all of the inmates who are currently designated to ADX and who have been accused or convicted of a homicide within a BOP facility.

Years printed in RED are estimates based on the date of conviction and pleadings reviewed on the PACER website.

At least 54 inmates currently housed at ADX have been accused or convicted of a BOP homicide.

# United States v Caro

## Table 3

### INMATES CONVICTED OF COMMITTING A HOMICIDE IN THE BUREAU OF PRISONS FOLLOWING A JURY TRIAL IN WHICH THE GOVERNMENT SOUGHT THE DEATH PENALTY[1]
October 3, 2013

| # | Name | Register # | Case Number | Details | Result | Location | Enter ADX | Leave ADX | Years at ADX |
|---|------|-----------|-------------|---------|--------|----------|-----------|-----------|--------------|
| 1 | Houston, Henry | 94434-012 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders; 4 committed by Houston. | Life Sentence | ADX | 1998 | No | 15 |
| 2 | Bridgewater, Wayne | 20220-148 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders; 2 committed by Bridgewater. | Life Sentence | ADX | 1998 | No | 15 |
| 3 | Sablan, William | 00232-005 | No. 00CR531 (D. Colo.) | USP Florence inmate death by evisceration stabbing. | Life Sentence | ADX | 2000 | No | 13 |
| 4 | Sablan, Rudy | 00074-005 | No. 00CR528 (D. Colo.) | USP Florence inmate death by evisceration stabbing. | Life Sentence | ADX | 2000 | No | 13 |
| 5 | O'Driscoll, Michael | 04421-016 | No. 4-CR-01-277 (M.D. Pa.) | USP Allenwood inmate death by stabbing. | Life Sentence | ADX | 2003 | No | 10 |
| 6 | Mills, Barry | 14559-116 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders. | Life Sentence | ADX | 2006 | No | 7 |
| 7 | Bingham, Tyler | 03325-091 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders. | Life Sentence | ADX | 2006 | No | 7 |
| 8 | Mosher, Ellis | 02875-087 | No. 1:06CR00101 (E.D. Tex.) | USP Beaumont inmate murder. | Life Sentence | ADX | 2008 | No | 5 |
| 9 | Ebron, Joseph | 08655-007 | No. 1:07CR142 (E.D. Tex.) | USP Beaumont inmate stabbing death. Victim stabbed more than 100 times. | Death Sentence | ADX[2] | 2009 | No | 4 |
| 10 | Richardson, Brian | 91507-011 | No. 1:08CR139 (N.D. Ga.) | USP Atlanta inmate stabbing and strangulation death. | Life Sentence | ADX | 2012 | No | 1 |
| 11 | Jackson, David | 13567-039 | No. 1:06CR51 (E.D. Tex.) | USP Beaumont inmate stabbing death. | Death Sentence  Vacated / Re-sentenced to Life | Held at ADX pre-trial; then to USP Terre Haute on Death Row; then to USP Hazelton[3] | - | - | - |
| 12 | Snarr, Mark | 11093-081 | No. 1:09CR15 (E.D. Tex.) | USP Beaumont inmate stabbing death. Two correctional officers stabbed but survived. | Death Sentence | USP Terre Haute Death Row | - | - | - |
| 13 | Garcia, Edgar | 28132-177 | No. 1:09CR15 (E.D. Tex.) | USP Beaumont inmate stabbing death. Two correctional officers stabbed but survived. | Death Sentence | USP Terre Haute Death Row | - | - | - |

# United States v Caro

## Table 3

### INMATES CONVICTED OF COMMITTING A HOMICIDE IN THE BUREAU OF PRISONS
### FOLLOWING A JURY TRIAL IN WHICH THE GOVERNMENT SOUGHT THE DEATH PENALTY[1]
### October 3, 2013

| # | Name | Register # | Case Number | Details | Result | Location | Enter ADX | Leave ADX | Years at ADX |
|---|------|-----------|-------------|---------|--------|----------|-----------|-----------|--------------|
| 14 | Caro, Carlos | 37786-079 | No.1:06CR00001 (W.D. Va.) | Current Case | Death Sentence | USP Terre Haute Death Row | - | - | - |
| 15 | Battle, Anthony | 11451-056 | No. 1:95CR528 (N.D. Ga.) | USP Atlanta murder of a corrections officer | Death Sentence | USP Terre Haute Death Row | - | - | - |
| 16 | Agofsky, Shannon | 06267-045 | No. 1:0CR173 (E.D. Tex.) | USP Beaumont inmate beating death. | Death Sentence | USP Terre Haute Death Row | - | - | - |

[1] The data in this table is compiled from publically available information and thus may not include all of the inmates who have been convicted of committing a homicide in the Bureau of Prisons and for whom the government sought the death penalty.

[2] Joseph Ebron was sentenced to death, but has never been transported to USP Terre Haute's death row. He has been continuously housed at ADX since the completion of his jury trial.

[3] David Jackson has been diagnosed as being schizophrenic and therefore cannot be referred to ADX as a matter of policy. *See* BOP Program Statement 5212.07 at 6 ("The Warden may not refer an inmate for placement in a control unit: 1) if the inmate shows evidence of significant mental disorder.")

Years printed in RED are estimates based on the date of conviction and pleadings reviewed on the PACER website.

# EXHIBIT 73

# EXHIBIT 73

BP-S199.035  **TRANSFER ORDER**  CDPDH
MAY 94
**U.S. DEPARTMENT OF JUSTICE**               **FEDERAL BUREAU OF PRISONS**

In accordance with the authority provided in Title 18, U.S. Code, Section 3621, and the authority delegated to me by the Director of the Bureau of Prisons, I hereby order transfer of:

| Name of inmate: <br> CARO, Carlos David | | Register No. <br> 37786-079 | |
|---|---|---|---|
| From: <br> USP Lee County, P.O. Box 900, Jonesville, Virginia 24263 | | | |
| To: <br> USP, ADX, Florence, P.O. Box 8500, Florence, Colorado 81226-8500 | | | |
| Reason for Transfer: <br> Disciplinary | | Transfer Code: <br> 309 | |
| Parole Status: <br> N/A | | Custody Classification: <br> High/MAX | |
| Health Status: <br><br> Suitable for Transfer | | Central Inmate Monitoring Case: <br> __ No <br> XX Yes - CMC Assignment __DG TEX SYN. SEPARATION__ | |
| Signature of Transferring Authority: <br><br> B. A. Bledsoe | Title of Transferring Authority: <br><br> Warden | Date: <br><br> 10·11·05 | |

CSW _____
UM _____
CMC _____
AWP _____

RETURN OF SERVICE - Pursuant hereto, I have this __16th__ Day of __November__, 20_05_, executed the above order and committed the inmate to the institution indicated.

| Signature: <br><br> M. H. SOSA | Name: <br><br> M. N. A_____ |
|---|---|
| Title: <br><br> Asst IBM | Agency: <br><br> BOP |

For Transfer to CCC's, complete the following:

| Projected release date: | Type of release: |
|---|---|
| Scheduled date and time of departure and transportation information: | Scheduled date and time of arrival: |

Record Copy - J & C; Copy - Central File
(This form may be replicated via WP)

Replaces BP-399(58) of OCT 86

**DM-755**

CARO--535

# EXHIBIT 77

# EXHIBIT 77

# Declaration of Petra Herrera

I, Petra Herrera, declare under penalty of perjury the following to be true to the best of my information and belief:

1. I am Carlos Caro's maternal cousin. My mother, Leonor, and Carlos's mother, Virginia, were sisters. My mother is the oldest sibling. I am 52 years old. I am 6 years older than Carlos.

2. Ever since I can remember, Carlos's family resided in the same neighborhood as my family in Falfurrias, Texas. Carlos's parents moved homes a few times during Carlos's childhood; all of the homes Carlos's family rented were less than one minute walking distance from my family home. Our neighborhood was very small. At one point Carlos and his family lived across the street from my childhood home.

3. Carlos's father, Jose Maria Caro Jr., was an alcoholic. Carlos's father rarely worked, but when he did, he would hold a job long enough to get some money to get drunk. Carlos's mother, Virginia, earned money by cleaning houses or working at a local food shack. Carlos's father would take the money Virginia had earned for the family and go get drunk at the local bar. After Carlos's father was drunk, he would come home and beat Virginia. This happened a lot throughout Carlos's childhood.

4. On several occasions, Carlos's mother ran out of her home screaming while Carlos's father chased her. When Jose caught up to Virginia, he grabbed her by the hair and pulled her back into their home where he would proceed to beat her. I saw this situation happen many times during my childhood.

5. When Carlos's mother was being beaten in her home by Carlos's father, the kids would run out of the house crying and screaming for someone to help their mother, but none of us would help because we knew Carlos's mom would never leave her husband. My family would just try to calm the boys down outside until the beating was over.

6. My family, neighbors, and I would hear Carlos's mother screaming from inside the Caro home. We knew what was going on inside the home but chose not to get involved because we were afraid of Carlos's father. We also did not get involved because we did not think it would make a difference; Carlos's mother would return to her abusive, violent husband. Things in Falfurrias, Texas were different when Carlos and I were young, and the police did not respond to domestic violence as they may do now.

7. Carlos's father also beat Carlos and his brothers. I saw Carlos's father come home drunk and chase all the kids out of the house because he did not want them in the home. When Carlos and his brothers tried to stop their father from beating their mother, then they would get the brunt of the beating.

8. Carlos's paternal grandparents lived in the neighborhood too, and they did not try and stop their son from beating his family.

9. Carlos's mother would come over to visit my family, but I do not recall her talking to me or hearing her talk about her problems or the physical abuse at home. She never asked our family to help her leave her abusive, violent, alcoholic husband.

10. Carlos was a skinny, quiet boy who loved his mother very much. Carlos often helped his mother, which often caused his brothers to bully him and beat him up. I saw Noe and Jose gang up on Carlos in the middle of the street. Carlos did not seem to fight back. Carlos was the only son who did not talk back to his mother. His brothers were bad because they would talk back to their mother, they never listened to anyone, they would frequently get into trouble, and they were mean and abusive to their mother. When Carlos's oldest brother, Jose, was older he followed in his father's footsteps and beat his mother. Jose was violent like his father.

11. I was not contacted by Carlos's legal team before his capital murder trial. Had his defense team contacted me before trial, I would have met with them and provided the information that I provided in this declaration. I would have also been willing to testify at trial.

Signed this __2__ day of _Oct._, 2013.

_Petra Herrera_
Name (Printed)

_Petra Herrera_
Signature

_Fremont, Tx_
City, State

Witnessed by:

_Erica Rodriguez_
Name (Printed)

_Erica Rodriguez_
Signature