**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case Number 1:06CR00001-JPJ |
| Plaintiff/Respondent, | ) | (Hon. James P. Jones) |
| | ) | |
| v. | ) | |
| | ) | |
| CARLOS DAVID CARO, | ) | DEATH-PENALTY CASE |
| Defendant/Petitioner. | ) | (Oral Argument Requested) |

**DEFENDANT'S FIRST MOTION FOR LEAVE TO CONDUCT DISCOVERY**

**AND**

**PRELIMINARY REQUEST FOR AN EVIDENTIARY HEARING AND EXPANSION OF THE RECORD**

Petitioner/Defendant Carlos David Caro, pursuant to 28 U.S.C. § 2255(b) and Rules 6 (Discovery), 7 (Expanding the Record) and 8 (Evidentiary Hearing) of the Rules Governing Section 2255 Proceedings for the United States District Courts ("2255 Rules"), moves this Court for an order granting the specific discovery requests set forth in this motion, expansion of the record to include the evidence presented by Mr. Caro to date, and Mr. Caro's request for an evidentiary hearing, at the appropriate time, to resolve the factual disputes presented in Mr. Caro's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 ("2255 Motion") (ECF No. 790); the Government's Motion to Dismiss in Response to Petitioner's Motion for Relief Pursuant to title 28, United States Code, Section 2255 ("Motion to Dismiss") (ECF No. 791); and Mr. Caro's Opposition to United States' Motion to Dismiss in Response to Petitioner's Motion

1

for Relief Pursuant to title 28, United States Code, Section 2255 ("Opposition to Motion to Dismiss") (ECF No. 797).

This motion is supported by Mr. Caro's 2255 Motion and his Opposition to Motion to Dismiss, as well as the record in this case and the following memorandum. Counsel has consulted with the Assistant United States Attorney on this case, Anthony Giorno, who opposes the motion. Mr. Caro requests oral argument on this motion.

**DEFENDANT'S FIRST MOTION FOR LEAVE TO CONDUCT DISCOVERY**

Mr. Caro, through counsel, requests leave to conduct discovery pursuant to Rule 6 of the 2255 Rules. Mr. Caro has established good cause for his requests, in that he has shown that if the facts are developed as requested, he may be able to demonstrate that he is entitled to relief. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (*quoting Harris v. Nelson*, 394 U.S. 286, 299 (1969)).

**MEMORANDUM IN SUPPORT OF MOTION**

**I.      Procedural Background.**

Mr. Caro was sentenced to death on February 13, 2007. (ECF No. 639.) On January 8, 2013, Mr. Caro filed his 2255 Motion under seal. (ECF 781.) Mr. Caro later filed a redacted 2255 Motion. (ECF 790.) On June 11, 2013, instead of answering Mr. Caro's 2255 Motion, the Government filed a Motion to Dismiss Mr. Caro's 2255 Motion. (ECF 791.) Mr. Caro has filed an opposition to the Government's Motion to Dismiss. (ECF 797.) Mr. Caro has unsuccessfully attempted to acquire much of the discovery requested in this First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record ("Discovery Motion") through Freedom of Information Act ("FOIA") requests, as well as an informal discovery request to the Government. The Government has been unwilling to produce

any discovery until after the Court rules on its Motion to Dismiss. This is Mr. Caro's first formal request for discovery in connection with his 2255 Motion.

## II. Standard Governing Discovery in Section 2255 Proceedings.

Mr. Caro's discovery requests are governed by Rule 6 of the 2255 Rules. This rule was promulgated in 1976 and was intended to be consistent with the United States Supreme Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969), which held that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.* at 300. One category of procedures which may be necessary for an adequate inquiry is "discovery procedures . . . reasonably fashioned to elicit facts necessary to help the court to 'dispose of the matter as law and justice require.'" *Id.* at 290 (*quoting* 28 U.S.C. § 2243).

Rule 6 states that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." 2255 Rule 6(a). Good cause will be established whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09 (*quoting Harris*, 394 U.S. at 299). When a petitioner establishes good cause, discovery must be allowed.

The Supreme Court has explained that "[t]he very nature of the writ demands that [habeas proceedings] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291; *accord McDaniel v. United States District Court*, 127 F.3d 886, 888 (9th Cir. 1997) (where

petitioner "presented specific allegations . . . [he was] entitled to discovery"); *Johnston v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996) ("[I]t is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief."); *Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery is permitted only by leave of the court, the court should not hesitate to allow discovery, where it will help illuminate the issues underlying the applicant's claim."). The policy of maintaining flexibility to protect against miscarriages of justice is particularly crucial here, as a court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (*citing Burger v. Kemp*, 483 U.S. 776, 785 (1987)).

**III.     Mr. Caro has Shown Good Cause for the Following Discovery.**

Mr. Caro seeks discovery relating to Claims One, Four, Five, Six, and Seven of his 2255 Motion. (ECF No. 790 at 20-38, 43-64, 65-157; ECF No. 797 at 11-15, 29-47, 47-56, 57-106, 106-122.) In these claims, Mr. Caro has alleged specific facts that once fully developed will demonstrate that he is entitled to relief.

In the following sections, Mr. Caro identifies his specific discovery requests and the alleged claims to which they relate. In some instances, a request is related to more than one claim. Accordingly, Mr. Caro incorporates into each section all of the arguments presented in the other sections. Mr. Caro has generally presented the substance of each claim, and has also specifically referred to his 2255 Motion and Opposition to Motion to Dismiss, both of which provide more detailed information regarding each claim and which are incorporated now by reference.

As used in Mr. Caro's discovery requests, the term "communication" means any oral, written, or electronic utterance, notation, or statement of any nature whatsoever, draft or final, by and to whomever, made or attempted to be made, including but not limited to correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings between two or more persons.

The term "document" means any medium upon which intelligence or information can be recorded or retrieved and can be handwritten, typewritten, or electronically stored. The term "document" includes but is not limited to any record, note, email, memorandum, contract, draft, chart, report, drawing, sketch, graph, index, list, tape recording, or photograph.

A.     **Discovery Relating to Mr. Caro's Claim that the Government Unconstitutionally Delayed Prosecuting Mr. Caro in this Capital Case in Order to Gain a Tactical Advantage (Claim One).**

In Claim One of Mr. Caro's 2255 Motion, Mr. Caro alleges that the Government delayed its prosecution of Mr. Caro in this case so that the Court would not appoint capital counsel until after the Government had secured a grossly disproportionate plea agreement for him in another case, Case No. 03-cr-10115 (the "Benavidez Case"). (ECF No. 790 at 20-38; ECF No. 797 at 11-15.) As described in his 2255 Motion and Opposition to Motion to Dismiss, but for this delay, it is highly unlikely that Mr. Caro would have been convicted for Conspiracy to Commit Murder. This prior conviction prejudiced Mr. Caro during his penalty phase, providing the Government with the argument that a life sentence would be no sentence at all, as Mr. Caro already was serving a de facto life sentence. The conviction also precluded Mr. Caro's trial counsel from arguing that Mr. Caro did not have a single prior conviction for a crime of violence, or indeed any prior conviction that involved guns or violence, and that he thus was not the "worst of the worst."

Mr. Caro has presented strong circumstantial evidence supporting this claim, including (1) the grossly disproportionate plea agreements in the Benavidez Case;[1] (2) the Government's inconsistent representations to the Court asserted to convince the Court that these unjustly disparate agreements were somehow justified;[2] (3) the Government's failure to accurately inform the Court of the involvement of the codefendants in the offense; (4) the fact that the Government waited until after it had secured Mr. Caro's conviction and sentence in the Benavidez Case before notifying the Court that Mr. Caro needed the appointment of capital counsel; [3] and (5) the fact that the Government already had been investigating Mr. Caro for ten months before contacting the Court, and had acquired much of the evidence used to prosecute Mr. Caro months before it requested capital counsel for Mr. Caro. (*See, e.g.,* ECF No. 782, Sealed Ex. 26 at 42.) This evidence supports Mr. Caro's claim that the Government delayed the prosecution of Mr.

---

[1] Mr. Caro was the only defendant out of seven codefendants who was required to plead to Conspiracy to Commit Murder. The Government offered deals to the other defendants allowing them to plead to possession of a weapon. Codefendant Moreno-Marquez, whose conduct was virtually identical to Mr. Caro, and who had 28 criminal history points as opposed to Mr. Caro's 12 criminal history points, received a sentence of 57 months, while Mr. Caro was sentenced to 327 months. (ECF No. 797 at 13-14.) The codefendant who the Government believed planned the assault, Francisco Tijerina, received a sentence of only 30 months. (ECF No. 790 at 21-22.)

[2] During codefendant Moreno-Marquez's change of plea hearing, the Government represented that it had a strong case against both Mr. Moreno-Marquez and Mr. Caro, stating that it had witnesses, DNA evidence, and a videotape. (ECF 790 at 22-23.) By the time of Mr. Moreno-Marquez's sentencing, the video was of "poor quality," the victim unwilling to testify, and there was no mention of the DNA evidence. (*Id.*) The Government also contended that Mr. Caro "appeared to be the most culpable of all of the defendants" (ECF 790-55 at 6), but the evidence does not support this assertion. Rather, the Government knew that codefendant Tijerina planned the assault, and the evidence showed that Mr. Moreno-Marquez and Mr. Caro participated equally in carrying out the assault.

[3] The assault on Mr. Benavidez occurred on August 29, 2003. The death of Mr. Sandoval occurred shortly thereafter on December 17, 2003. Mr. Caro was sentenced in the Benavidez case on Nov. 1, 2004, and the Government sought capital counsel for Mr. Caro on December 30, 2004.

Caro either intentionally to seek a tactical advantage by delaying the appointment of capital counsel or acted with reckless disregard for the consequences of its delay on Mr. Caro's ability to defend in the capital case. The right to counsel is a fundamental right within our adversary system. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) ("The right to the effective assistance of counsel at trial is a bedrock principle in our justice system. . . . Indeed, the right to counsel is the foundation of our adversary system.") The Government's conduct deprived Mr. Caro of his right to counsel at a critical time in his capital case and thus violates fundamental concepts of justice.

In support of this claim, Mr. Caro requests the following documents:

1.      All communications and documents relating to the Government's decision to notify the Court on December 30, 2004, as opposed to any other date, that it was investigating Mr. Caro for murder, and that the Court should appoint counsel for him. *See United States v. Caro*, No. 2:05-mc-00001, W.D. Va., ECF No. 3.

2.      All communications and documents between the attorneys responsible for prosecuting Mr. Caro for the death of Roberto Sandoval, including but not limited to Anthony Paul Giorno and John Leslie Brownlee, and the attorneys responsible for prosecuting Mr. Caro for Conspiracy to Commit Murder in Case No. 03-cr-10115 (the "Benavidez Assault"), including but not limited to Rick A. Mountcastle, Robert Lucas Hobbs, and Zachary T. Lee, regarding (1) the plea agreements ultimately negotiated in the Benavidez Case for Mr. Caro, Juan Moreno-Marquez, and Francisco Tijerina; and (2) the timing of the Government's decision to notify the Court that it was investigating Mr. Caro for the death of Mr. Sandoval. [4]

Mr. Caro also seeks the deposition of Rick Mountcastle, the Assistant United States Attorney who made the inconsistent representations to the Court in the Benavidez Case.

---

[4]  If the Court finds it necessary, Mr. Caro is willing to submit documents legitimately covered by a privilege to the Court for an *in camera* review.

There is reason to believe that, if these facts are developed, Mr. Caro may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**B.** **Discovery Relating to the Government's Misrepresentations and Failure to Produce Material Exculpatory and Impeachment Evidence Regarding its Only Purported Eyewitness, Inmate Sean Bullock (Claim Five).**

Mr. Caro has alleged that the Government misrepresented to trial counsel the fact that Mr. Bullock had a cellmate, and withheld relevant documents. (ECF 790 at 62-64; ECF 797 at 47-56.) The withheld evidence was materially exculpatory and prejudiced Mr. Caro in both his guilt/innocence and penalty phases at trial.[5]

At trial, Mr. Bullock testified that he saw Mr. Caro standing behind his cellmate, choking him with a towel. (Tr. 01/30/07 at 74-75.) This testimony was the sole support for the Government's repeated argument that Mr. Caro "snuck up" on Mr. Sandoval from behind and ambushed him. (ECF 790 at 52.)[6] These statements were vital to the Government's case. (ECF No. 790 at 52-53; ECF No. 797 at 39-41.) These statements also prejudiced Mr. Caro. (*See, e.g.* ECF No. 790-31 (Juror #37 declaring that it would have made a difference if another inmate testified that Bullock "didn't see what happened"); ECF No. 790-33 (Juror #79 stating that "inmate eye witness account of the murder was essential to my decision"). After his trial, Mr.

---

[5] Mr. Caro alleges in Claim Four (B) that trial counsel failed to adequately investigate and impeach Sean Bullock, in violation of *Strickland*. (ECF No. 790 at 46-53; ECF No. 797 at 39-42.) The discovery requests asserted for Claim Five also relate to Claim Four (B).

[6] (Tr. 01/29/2007 at 15 ("snuck up behind"); *id.* at 15 (waited until he turned his back and "snuck up behind"); *id.* at 16 (this was a "sneak attack"); *id.* at 21 ("sneaks up behind"); *id.* at 26 ("sneaking up behind"); Tr. 02/1/2007 at 13 (saw Caro behind Sandoval); *id.* at 18 ("ambushed" Mr. Sandoval and "came up from behind"); *id.* at 45 ("from behind with a towel"); *id.* at 49 ("comes up behind him"); *id.* at 49 (had his back turned to him and "came up behind him"); Tr. 02/05/2007 at 19 ("snuck up behind him"); *id.* at 46 ("ambushed him from behind"); Tr. 02/13/07 at 88 ("snuck up behind him").)

Caro's habeas counsel discovered that these statements could have been impeached by Mr. Bullock's cellmate, Joseph Bland, who has provided a declaration that contradicts Mr. Bullock's trial testimony. (ECF 790-2 (Joseph Bland Declaration).)

The Government knew, almost three years before Mr. Caro's trial, that Mr. Bullock had a cellmate at the time of the offense. (ECF 797 at 50.) Regardless of this knowledge, the Government provided documents to trial counsel and made statements that indicated that Mr. Bullock was single-celled at the time of the offense. (ECF No. 790 at 62-64, ECF No. 797 at 50-52.) The Government represented to trial counsel in a letter that it had interviewed all of the inmates on the SHU and that "copies of all the interviews conducted at that time are attached." (Letter to Kalista from Giorno, 12/28/2006.) The Government never produced any interview report for Mr. Bland. *Id.* In fact, the Government did not even disclose the fact that Mr. Bullock had a cellmate until December 29, 2006, less than one month before the start of the trial, and when it did, that fact was presented with other statements that were misleading and there was no attempt to highlight the fact that this new evidence contradicted its previous representations. (ECF No. 797 at 50-51.)

Mr. Sandoval's motivation for wanting to get into Mr. Caro's cell is also disputed by the parties and is a key issue in this case. Mr. Bullock testified that the officers said they placed Mr. Sandoval in Mr. Caro's cell because they needed space to make room for inmates coming in on a bus. (Tr. 01/30/07 at 70-71.) Mr. Caro's habeas counsel have gathered evidence showing that this statement is not supported by the facts. (ECF 790 at 49.)

The Government interviewed Mr. Bullock on numerous occasions. Mr. Bullock testified at trial that he spoke with government officers "at the dentist's office" shortly after the offense on his birthday. (Tr. 01/30/07 at 66-67.) Mr. Caro, however, never received any reports or notes

9

regarding this interview. In light of the inconsistencies among Mr. Bullock's various statements and testimony, it is believed these notes and reports also contain *Brady* information.

Finally, Mr. Bullock testified that he was going to spend the rest of his natural life in prison (Tr. 01/30/07 at 57, 81) and that he would receive nothing for his trial testimony (i*d.* at 80-81). Mr. Caro's habeas counsel discovered that, contrary to Mr. Bullock's trial testimony, he has received a reduction to his statutorily mandated life sentence, such that he now will be released from prison in October 2017. (ECF 790 at 51.)

To resolve these factual disputes, Mr. Caro requests the following documents:

3. All documents contained in Sean Bullock's current inmate file maintained by the BOP.

4. All sealed documents in the case in which Mr. Bullock's mandatory life sentence was reduced.

5. All documents and communications relating to the fact that Mr. Bullock had a cellmate on December 16 and December 17, 2003.

6. All documents and communications relating to the Government's interviews of Sean Bullock and attempts to interview him, including the interview at the dentist's office.

7. All documents and communications to, from, or within the BOP, any United States Attorney's Office, the Department of Justice, and Mr. Bullock's defense attorneys, regarding Mr. Bullock's cooperation with the Government in this case and his subsequent reduction in sentence.

8. All documents and communications relating to Mr. Bullock's reduction in sentence or any other special benefits received by him after he testified in Mr. Caro's case, including but not limited to housing transfers or other forms of special consideration or privileges.

9. All documents referring to special benefits or special treatment provided by the Government to Mr. Bullock as a result of cooperation in any case.

10. All documents relating to government interviews of Joseph Bland, attempts to interview Mr. Bland, or discussions regarding whether the Government should interview Mr. Bland.

11.     All documents relating to BOP policies regarding the placement of inmates within the Special Housing Unit at USP-Lee ("SHU").

12.     All documents showing the inmate population in the SHU, as well as the SHU capacity, on December 16, 17, and 18, 2003.[7]

Finally, Mr. Caro requests permission to depose Mr. Bullock regarding his cellmate, his interviews with the Government, and the privileges and preferential treatment he received from the Government after Mr. Caro's trial, including but not limited to his drastically reduced life sentence.

There is reason to believe that, if these facts are developed, Mr. Caro may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**C.     Discovery Relating to the Bureau of Prison's Negligence in Placing Mr. Sandoval into Mr. Caro's Cell (Claims Four (C) and Six (H)).**

Mr. Caro has alleged that his trial counsel was deficient in failing to adequately investigate and present evidence of the Bureau of Prison's ("BOP") negligence regarding placement of Mr. Sandoval in Mr. Caro's cell, and that this failure prejudiced him in both the innocence/guilt and penalty phases of his trial. (ECF 790 No. at 53-57, 132; ECF 797 at 42-44, 94.)[8]

The Government and Mr. Caro disagree on whether the BOP acted negligently. (*See* ECF 797 at 42-44.) Mr. Caro has alleged that the BOP officers in charge of gang activities knew

---

[7] Much of this requested information is relevant not only as impeachment evidence, but also as substantive evidence relevant to Claim Four (C), in which Mr. Caro alleges that the BOP was negligent in placing Mr. Sandoval in Mr. Caro's cell. (*See* Section C, *infra*.)

[8] The BOP's alleged negligence also relates to Claim Four (A) (trial counsel's failure to develop a cohesive theory to defense); and Claim Four (D) (trial counsel's failure to adequately investigate and present evidence of self-defense, second-degree murder, or manslaughter).

that Mr. Caro had assaulted the leader of the Texas Syndicate and that he might be facing revenge as a result of this assault. (ECF No. 782, Sealed Ex. 28.) As a result, these officers knew or should have known that members of the Texas Syndicate should not be placed in the same cell as Mr. Caro. (*See* ECF No. 782, Sealed Ex. 51 at 12.) The officer in charge of cell assignments in the SHU at USP-Lee, however, apparently was never advised of these circumstances, and indeed testified that he assigned Mr. Sandoval to Mr. Caro's cell *because* they both belonged to the Texas Syndicate. (Tr. 01/29/07 at 63.)

Mr. Caro also has alleged that the BOP was negligent in not communicating Mr. Caro's refusal to take a cellmate to the SHU officers on the next shift, when Mr. Sandoval asked to be placed in Mr. Caro's cell. The parties disagree about the implications to be drawn from *Mr. Sandoval's* request to be placed in Mr. Caro's cell. (ECF No. 797 at 43-44.) The parties also disagree about the BOP's negligent failure to investigate Mr. Sandoval's prior possession of a weapon that caused him to be placed in the SHU. (*Id.*)

In support of this claim, Mr. Caro requests the following documents:

13. All documents and communications regarding the BOP's attempts to discern the reasons why Mr. Sandoval possessed a weapon on December 16, 2003, the day before he asked to be placed in Mr. Caro's cell.

14. All documents and communications regarding the BOP's attempts to discern the reasons for Mr. Caro's refusal to take a cellmate on December 16, 2003.

15. All documents and communications regarding BOP policies and other directive statements issued for or applicable to USP-Lee between 2003 and 2007, regarding procedures to be followed by prison officers and other BOP personnel when an inmate refuses to take a new cellmate.

16. All documents and communications regarding BOP policies and other directive statements issued for or applicable to USP-Lee between 2003 and 2007, regarding the preparation of investigation reports of incidents occurring within

12

BOP facilities, including but not limited to any recommended time frame for completing the report.

17.     All documents and communications regarding BOP policies and other directive statements issued for or applicable to USP-Lee between 2003 and 2007, regarding procedures to be followed by prison officers and other BOP personnel when an inmate is found with a weapon in his possession.

18.     All documents and communication between the BOP employees working in the Special Housing Unit at USP-Lee and any other individual or entity, including but not limited to officers or agents within the Special Investigative Department, regarding the appropriate housing of Mr. Caro after the assault on Ricardo Benavidez on August 29, 2003, and prior to the death of Roberto Sandoval on December 17, 2003.

19.     All documents and communication between the BOP employees working in the Special Housing Unit at USP-Lee and any other individual or entity, including but not limited to officers or agents within the Special Investigative Department, regarding the monitoring and handling of all Texas Syndicate members after the assault on Ricardo Benavidez on August 29, 2003, and prior to the death of Roberto Sandoval on December 17, 2003.[9]

In support of this claim, Mr. Caro also seeks to depose Brian Laster, the correctional officer at USP-Lee who placed Mr. Sandoval in the cell with Mr. Caro on December 16, 2003.[10] Mr. Laster will be able to provide testimony regarding directives given to him regarding the placement of Mr. Sandoval in Mr. Caro's cell.

Mr. Caro has alleged sufficient facts in support of this claim. Because there is reason to believe that if these facts are developed Mr. Caro may be able to prove that he is entitled to relief, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

---

[9] Some of the document requests in this section are also relevant to Claim Seven (B), discussed in Section F, *infra*.

[10] Mr. Caro's current investigator attempted to interview Mr. Laster, and he refused to speak with her.

**D.** **Discovery Relating to the Government's Expert Psychiatrist and Psychologist (Claim Six (B)).**

In Claim Six of his 2255 Motion, Mr. Caro alleged that he is entitled to relief because his counsel's deficiencies during the penalty phase of his trial prejudiced him. (ECF No. 790 at 65-146.) Mr. Caro has specifically alleged, in a sub-claim, that counsel failed to adequately investigate, develop, and present a compelling mitigation story. (*Id.* at 66-113 (Claim Six (B).) A factual component of this sub-claim involves counsel's failure to appropriately request, adequately develop, and present mental-health experts and evidence. (*Id.* at 90-100.) Counsel's purported reason for failing to present *any* evidence from a mental health expert despite knowing that Mr. Caro is brain damaged was a "feeling" that the testimony of the Government's selected expert could not be rebutted. (*See* ECF No. 791-5 (Declaration of Stephen J. Kalista) ¶ 18.)

Mr. Caro asserted that the decision by his trial counsel to forego presentation of evidence of brain damage during the penalty phase of trial was neither informed nor reasonable and violated his right to the effective assistance of counsel. In support of this claim, Mr. Caro requests the following documents:

> 20. All documents provided to Dr. Robert Phillips and Dr. Paul Montalbano by the Government in this case.
>
> 21. All documents generated by Dr. Phillips and Dr. Montalbano in conducting their evaluations of Mr. Caro and in preparing their reports, including but not limited to handwritten notes, raw data, and test scoring, and documents related to communications with David A. Griesemer, M.D.; Elizabeth Quillen; Roger Mullins, Senior Officer Specialist, Bureau of Prisons; and Anthony Davis, Sacramento Intelligence Unit, Bureau of Prisons.
>
> 22. All receipts, including supporting documents, for services rendered in the case by Dr. Phillips and Dr. Montalbano.

Had trial counsel presented a mental health defense at trial, the Government would have been required to produce these documents. As such, they are relevant to Mr. Caro's claim of

14

ineffective assistance of counsel based on counsel's decision to forego mental health evidence. As explained in Mr. Caro's 2255 Motion, counsel's failure to present expert testimony left the jury without an accurate portrait of their client and his mental functioning. (ECF No. 790 at 109-13.) At least two jurors have said that had expert evidence been presented about Mr. Caro's brain damage, it could have made a difference in their sentencing decision. (*See* ECF No. 782, Sealed Ex. 33 (Declaration of Juror #79); ECF No. 782, Sealed Ex. 29 (Declaration of Juror #24).

To fully develop this claim, Mr. Caro needs the information that would have been available had trial counsel performed competently and presented a mental health defense. Because there is reason to believe that if the facts are developed Mr. Caro may be able to show that he is entitled to relief, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**E.** **Discovery Relating to the Government's Failure to Provide Material Exculpatory Evidence Regarding Its Ability to House Dangerous Inmates (Claim Seven (A)).**

The Government presented expert evidence and argued during the penalty phase of trial that the BOP could house an inmate like Mr. Caro at its most secure facility, ADX-Florence, for only a few years and then would have no choice but to release him to a USP where he would harm other inmates. (ECF No. 790 at 148-53; ECF No. 797 at 106-16.) The Government argued, "Everyone agrees, every witness agrees he's getting out of ADX, that in some time within three to five years he will be back at a USP." (Tr. 2/13/2007 at 90.)[11]

---

[11] When trial counsel attempted to impeach the Government's expert by referring to an inmate, Thomas Silverstein, who had been at ADX-Florence for a long period of time, the expert

Trial counsel had anticipated this argument and requested discovery on the length of inmate stay at ADX-Florence, but the request was opposed by the Government and denied by the Court, and the Government never produced any evidence regarding how long the BOP kept inmates at ADX-Florence. (ECF No. 790 at 148-49.) Trial counsel's attempts to otherwise secure this evidence, which was not public information, failed. As a result, the defense had no hard evidence to support their argument that the Government could securely house Mr. Caro at ADX-Florence for more than three years, and the Government's arguments were largely un-rebutted by trial counsel. As explained in Mr. Caro's 2255 Motion and Opposition to Motion to Dismiss, the Government's evidence prejudiced Mr. Caro (ECF No. 790 at 155-56; ECF No. 797 at 109-116), and the jury found that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release" (ECF No. 639). On appeal, the Fourth Circuit upheld the Court's denial of the discovery requests. With respect to Mr. Caro's *Brady* claim, the court denied the claim because Mr. Caro "failed to establish that the information requested would be favorable to him." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

As alleged in Claim Seven of his 2255 Motion, Mr. Caro now has evidence showing not only that the requested evidence would have been favorable to him, but that it was materially exculpatory and that its suppression violated *Brady*. (ECF No. 790 at 147-57.) Since Mr. Caro's trial, Mr. Caro's 2255 counsel have discovered new information that confirms trial counsel's suspicions that the Government withheld materially exculpatory information and misled the jury at trial. For example, counsel acquired information from a 2010-2011 informal survey of a

_____

discounted the experience of Mr. Silverstein by stating that his was a "very special case." (ECF No. 790 at 150.)

16

limited number of inmates housed at ADX-Florence. The survey was sent to 129 inmates at ADX-Florence, and 69 inmates responded. Of these 69 inmates, 43 (almost 2/3 of the inmates) claimed that they had been at ADX-Florence, or ADX-Florence and its predecessor USP-Marion, for eight or more consecutive years, which means that at the time of Mr. Caro's trial, they would have been there for five years or more. (ECF No. 790 at 151-53; ECF No. 791-48.) In fact, 22 of these inmates had been at ADX-Florence/USP-Marion, the highest security facilities available within the BOP, for over 13 years, which means that at the time of Mr. Caro's trial, they would have been there at least 10 years. (*Id.* at 152.)[12] This evidence also is supported by the anecdotal evidence presented in the declaration of Mark Bezy, a retired BOP warden. Mr. Bezy recalled eight inmates who had been housed for more than three years under very strict conditions of confinement and who were still at ADX-Florence as of January 2013. (ECF No. 790 at 152; ECF No. 790-1 (Declaration of Mark A. Bezy) ¶ 28.)

Since filing the 2255 Motion, Mr. Caro's 2255 counsel have discovered additional evidence that is consistent with the results of the informal survey and further shows that the Government withheld Brady information. Counsel now is aware of at least 155 inmates who have been incarcerated at ADX for more than three years, and 125 of those inmates are still designated to ADX-Florence, comprising almost 30% of the current population. (ECF No. 797 at 12-14; ECF No. 799-1 (Declaration of Susan Richardson).) At the time of Mr. Caro's trial in 2007, at least 79 inmates had been designated to ADX-Florence for more than three years and at least 63 had been designated there for more than five years. (ECF No. 799-1.) The numbers are

---

[12] These numbers do not include the 14 inmates under Special Administrative Measures (SAM), whose mail was returned unopened because the BOP had denied them the privilege of receiving this mail. Thus, the number of inmates continuously housed at ADX-Florence for more than three years is likely even higher.

even more startling for inmates who, like Mr. Caro, have been accused of or committed homicides within BOP facilities. The limited evidence available to the public reveals that 54 such inmates have been continuously designated to ADX since their initial placement, including 22 inmates who entered ADX in 2007 or earlier. (*Id*.) In 2007, at least 14 of these inmates had been incarcerated at ADX-Florence for more than three years. Those 14 inmates are still designated to ADX-Florence. (*Id*.)

The Government's evidence is completely contradicted when one looks only at cases where the Government sought the death penalty for a homicide committed at a BOP facility, but where the defendant ended up receiving a life sentence. Mr. Caro was able to locate ten such cases nationwide. (*Id*. ¶ 11.) Nine of these ten defendants have been continuously designated to ADX-Florence since imposition of their life sentences. (*Id*.) The only inmate who was not designated to ADX-Florence had been diagnosed with schizophrenia, and thus, according to BOP policy, could not be placed at ADX-Florence. (*Id*. ¶ 11, Table 3 n.3.) With the exception of the one inmate who entered ADX in 2012, and for whom three years has not yet elapsed, all of these inmates have been designated to ADX-Florence for more than three years. (*Id*.)

Mr. Caro's efforts to secure additional data through FOIA requests have been extremely time consuming and largely unsuccessful. (See Ex. 78 (Declaration of Christine Oliver).) Moreover, even if Mr. Caro is fortunate enough to glean some additional information through a FOIA request, it will necessarily be incomplete. Without cooperation from the Government or a court order, the only source for the data is the inmate himself. There is no publicly available list of inmates housed at ADX-Florence. Even if one somehow were able to discover the name of an inmate who was or had been housed at ADX-Florence, the BOP still will not release the information without a signed consent form from the inmate. *See, e.g.*, 28 C.F.R. §§ 16.3(a),

18

513.63.[13] Mr. Caro has no control over whether an inmate or deceased inmate's family member will agree to sign a release of information form. Mr. Caro also has no access to inmates designated to ADX-Florence (or elsewhere) whose communication privileges have been limited by the BOP because of Special Administrative Measures (SAM) or for other disciplinary reasons. (*See, e.g.*, Ex. 78 ¶ 9.)

At the time of Mr. Caro's trial, the Government not only possessed this *Brady* information, but had exclusive control over it. It refused to produce the information in response to trial counsel's specific *Brady* pretrial requests. Knowing that Mr. Caro's counsel lacked the evidence they needed to impeach its expert, the Government then provided inaccurate and misleading testimony and argument, deliberately misleading the jury on a crucial issue regarding future dangerousness.[14]

In support of this claim, Mr. Caro now requests the following discovery:

23.     For all inmates currently housed at ADX-Florence, the Inmate History, the Institutional Assignment and Movement History form, the Inmate Quarters History, and the Control Unit Classification Summary.

24.     For the inmates listed in Appendix A, the Inmate History, the Institutional Assignment and Movement History form, the Inmate Quarters History, and the Control Unit Classification Summary.

25.     All documents memorializing the dates of an inmate's admission to, and, if applicable, discharge from ADX-Florence between its opening in 1994 and January 2007.

---

[13] For deceased inmates, the BOP will not release any information without a release of information form signed by a member of the deceased inmate's family. (*See* Ex. 78 ¶ 12.)

[14] *See, e.g.*, Tr. 11/13/2006 at 27-28 (Government agreeing with the Court that "a large portion of the Government's argument at the sentencing phase in this case will be future dangerousness, presented by the defendant, and the inability of the BOP to adequately secure the defendant to protect against that threat of future dangerousness.") In fact, 11 of the Government's 13 penalty-phase witnesses testified about the future dangerousness of Mr. Caro.

26.     For inmates who were transferred from USP-Marion to ADX-Florence in 1994, 1995 or 1996, all documents memorializing the dates of the inmate's admission to USP-Marion and the inmate's transfer to ADX-Florence.

27.     All documents relating to the ability of ADX-Florence to safely and securely house BOP inmates who have been convicted of committing a murder in prison.

28.     All documents referencing BOP staff opinions or conclusions that certain inmates will never be accepted into or will never successfully complete the step-down program at ADX-Florence.

29.     Notices of Intent to Seek the Death Penalty (including amended notices) for all federal capital-authorized cases between 1994 and 2007.

30.     For each BOP inmate who has been convicted of committing a homicide in prison, all documents memorializing the inmate's institutional history within the BOP.

31.     All versions of ADX Institutional Supplement 5321.06K(1), a BOP policy document that governs placement into, advancement through, and transfer out of the ADX-Florence step-down program.

The requested data is necessary to fully develop Mr. Caro's claim. Mr. Caro has alleged sufficient facts showing that, at the time of Mr. Caro's trial and to the present, numerous inmates have been housed at ADX-Florence for more than three or five years and that the Government's evidence and arguments to the contrary prejudiced him. If permitted to fully develop the facts, Mr. Caro will be able to demonstrate that he is entitled to relief. This Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

F.     **Discovery Relating to Mr. Caro's Claim that the Government Withheld Evidence Indicating that Mr. Caro Was Not a Leader of the Texas Syndicate (Claim Seven (B)).**

The Government concedes that it withheld three documents referenced in Mr. Caro's 2255 Motion. (ECF No. 791 at 89 n.20) As alleged in the 2255 Motion, those documents revealed (1) the BOP's belief that while Mr. Caro was at USP-Lee, inmate Ricardo Benavidez

20

was initially the leader of the Texas Syndicate until he was assaulted, and then another inmate, Francisco Tijerina, became the leader; (2) that an inmate reported to the BOP that unnamed inmates had met and made a decision that whoever killed Mr. Sandoval was "gonna be in trouble," and (3) that just before Mr. Caro's trial, the BOP believed that Mr. Caro was in "'bad standing' with the [redacted] gang." (ECF No. 790 at 153-54; ECF 782, Sealed Exs. 28, 58. 59.) Mr. Caro has alleged that the Government's failure to produce these documents violated his rights under *Brady*. (ECF No. 790 at 153-57; ECF No. 797 at 116-20.)

At the time of trial, the Government believed that Mr. Caro was not the leader of the Texas Syndicate at USP-Lee, and indeed was in bad standing with the gang. (ECF No. 790 at 153-54; ECF No. 782, Sealed Ex. 28 at 15 (Grand Jury testimony), *id.*, Sealed Ex. 58 (Internal BOP memo).) The BOP's belief that Mr. Caro was in bad standing is consistent with the evidence revealing that the "hit" on Ricardo Benavidez had not been a "sanctioned" hit (ECF No. 782, Sealed Ex. 51 at 10), and with BOP Intelligence Officer David Mrad's belief that Mr. Caro might be facing a "cold dose of revenge" for his participation in this assault (ECF No. 782, Sealed Ex. 28 at 27).

The Government, however, failed to disclose these documents that revealed its belief that Mr. Caro was not a leader of the Texas Syndicate at USP-Lee and that he was in bad standing with the gang. To make matters worse, the Government argued the opposite at trial; alternately contending that Mr. Caro was a gang leader of "one of the five most violent, difficult gangs in the [BOP] system," might be a gang leader, might be an enforcer, and is a "player" in the gang.[15]

---

[15] *See, e.g.*, Tr. 02/13/2007 at 21-22 (arguing that the Texas Syndicate is "one of the five most violent, difficult gangs" in the BOP and Mr. Caro, "is not just a member [of the Texas

The Government's penalty phase argument assumed that Mr. Caro was a dangerous gang member and would remain so in the future. Eleven of its 13 penalty-phase witnesses discussed gang-related matters. (ECF No. 797 at 117.) If Mr. Caro was not in good standing with the Texas Syndicate, the testimony of 11 of its 13 penalty phase witnesses was irrelevant.

Mr. Caro believes the BOP possesses other exculpatory documents never produced to Mr. Caro, including investigative reports on the death of Mr. Sandoval, which will reveal further information that the BOP knew that Mr. Caro was not a leader of the gang. These documents, requested below, will show that during the months surrounding the Benavidez assault and the Sandoval killing, the BOP believed that there was a leadership struggle going on between two other gang members (not Mr. Caro) and that Mr. Caro was not the leader. These documents also will show the Government's belief that the death of Mr. Sandoval was gang-related. The requested documents will support Mr. Caro's claim that the Government withheld evidence and misrepresented facts at trial regarding his purported role in the Texas Syndicate.

Mr. Caro has good reason to believe the documents exist and will be supportive of his claim. Mr. Caro's expert, Mark Bezy, reviewed the BOP documents produced in this case. Mr. Bezy found it remarkable that the Government had not produced any investigation reports concerning the death of Mr. Sandoval. (ECF No. 790-1 ¶¶ 40-43.) After a suspected homicide, the BOP normally conducts an extensive review of the incident to determine what happened and why, and make necessary recommendations to prevent a recurrence of such incidents in the future. (*Id*. ¶ 41.) One such local investigation report, the SIS Report, is required by national BOP policy. (*Id*.) According to Mr. Bezy, it also is common for the BOP to conduct a regional

---

Syndicate], but he's a leader"); *id.* at 96 (arguing that Mr. Caro "becomes a player" in the Texas Syndicate . . . "[w]hether he's a leader, whether he's an enforcer, don't know").

investigation, which results in an "After-Action Report." (*Id*. ¶ 42.) While Mr. Caro has received investigative reports concerning other assaults at BOP facilities, no such reports were ever produced by the Government regarding the death of Mr. Sandoval, and the BOP produced only one investigative report on the assault on Ricardo Benavidez.

The BOP form that indicates that as of November 14, 2006, the Government believed that Mr. Caro was in "bad standing" with the gang was prepared in anticipation of a transport of Mr. Caro outside of USP-Lee for medical reasons, and was signed by a Unit Manager, not a BOP gang intelligence officer. (ECF 782, Sealed Ex. 59.) Thus, it is likely that the Unit Manager was relying on other documents prepared by a BOP Intelligence Officer from the BOP's Special Investigative Department to conclude that Mr. Caro was in "bad standing." The Government has never produced those documents.

Mr. Caro also has reason to believe that the Government has not produced all relevant grand jury testimony. Mr. Caro's 2255 counsel, through their investigation, discovered the existence of grand jury testimony by one of the Government's trial witnesses, Officer David Mrad. (ECF No. 782, Sealed Ex. 28.) That testimony is captioned "In the Matter of: Texas Syndicate," and occurred on October 22, 2003, shortly before the death of Mr. Sandoval. During Officer Mrad's testimony, it was revealed that Ricardo Benavidez also had testified before the same Grand Jury. (Mrad Testimony at 17.) The Government failed to produce these transcripts to Mr. Caro. Based on the Government's failure to produce these two grand jury transcripts, Mr. Caro has cause to believe that the Government has failed to produce other exculpatory grand jury evidence regarding the Texas Syndicate.

In support of these claims, Mr. Caro requests the following documents:

32.     An un-redacted copy of the BOP transportation document indicating the Government's belief that Mr. Caro was in bad standing with the gang.  (Redacted copy at ECF No. 782, Sealed Ex. 59.

33.     All documents that indicate that Mr. Caro was not or might not be in good standing within the Texas Syndicate while housed at USP-Lee.

34.     All documents prepared by or for the BOP regarding the death of Roberto Sandoval, including but not limited to SIS Reports, After-Action Reports, Board of Inquiry Reports, and any other investigative report, corrective action plans or recommendations.  This request also includes but is not limited to all documents relating to the preparation of these reports.

35.     All documents prepared by or for the BOP regarding the assault on Ricardo Benavidez on August 29, 2003, at USP-Lee, including but not limited to SIS Reports, After-Action Reports, Board of Inquiry Reports, and any other investigative report, corrective action plans or recommendations.  This request also includes but is not limited to all documents relating to the preparation of these reports.

36.     All documents prepared by or for the BOP regarding the assault on July 15, 2003, at USP-Lee, that was prosecuted in *United States v. Garcia*, Case No. 2:03cr00110 (W.D. Va.), including but not limited to SIS Reports, After-Action Reports, Board of Inquiry Reports, and any other investigative report, corrective action plans or recommendations.  This request also includes but is not limited to all documents relating to the preparation of these reports.

37.     All documents that were considered or relied upon by the BOP in rendering its recommendations in the October 8, 2004, SIS report, filed in this case at ECF 782-51 at 12-13, Sealed Exhibit 51.

38.     All documents regarding the organizational structure of the Texas Syndicate at USP-Lee, including the identification of its leaders, between 2003 and 2007.

39.     All Grand Jury testimony given at any time between 2003 and 2007 regarding the Texas Syndicate gang, with the exception of the testimony of David C. Mrad provided on October 22, 2003, at 1:43 P.M.

40.     All Grand Jury testimony regarding the assault on Ricardo Benavidez on August 29, 2003.

41.     All Grand Jury testimony from the assault case of *United States v. Garcia*, Case No. 2:03cr10110 (W.D. Va.), which involved a within-gang Texas Syndicate assault as USP-Lee in July 2003.

42.     All Grand Jury testimony regarding the death of Roberto Sandoval on December 17, 2003, with the exception of the testimony of William Johnson on February 17, 2004, Douglas Fender on January 3, 2006, and four inmates who testified on February 19, 2004 or July 20, 2005.[16]

Finally, based on the information Mr. Caro currently has and the information he anticipates receiving as a result of this Discovery Motion, he anticipates that he will need to depose FBI Agent Douglas Fender, BOP Intelligence Officer David Mrad, BOP Intelligence Officer William Johnson, and BOP Special Investigative Supervisor's Office Technician Jacoba Guzman. All of these witnesses have intimate knowledge of the Texas Syndicate at USP-Lee during the relevant time. All but William Johnson testified at Mr. Caro's trial. Mr. Johnson had been identified as a Government expert during the Benavidez case, and he was prepared to testify about the Texas Syndicate at USP-Lee, including the identity of the Texas Syndicate leader. (Expert Disclosure, Sealed Ex. 75 at JR-157.) It is possible that additional discovery will reveal the need for Mr. Caro to depose additional persons or to amend the 2255 Motion.

Mr. Caro has alleged sufficient facts showing that the Government withheld documents indicating that Mr. Caro was not the leader of the Texas Syndicate at either USP-Lee or FCI-Oakdale, and that the Government believed he was in bad standing with the gang at the time of his trial. Mr. Caro also has alleged prejudice resulting from this misconduct. If the facts alleged in this claim are developed, Mr. Caro may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

---

[16] Based on a review of trial counsel's files, it appears that transcripts of these grand jury witnesses were produced by the Government.

## DEFENDANT'S PRELIMINARY REQUEST FOR AN EVIDENTIARY HEARING AND EXPANSION OF THE RECORD[17]

In addition to discovery, Mr. Caro also requests that this Court expand the record and grant him an evidentiary hearing. *See* 2255 Rules 7 and 8. The Court may expand the record with materials including affidavits, letters, or exhibits. 2255 Rule 7(b). In determining whether a hearing is appropriate, the Court should review not only the trial record but also all exhibits submitted in these proceedings. 2255 Rule 8(a). A hearing must be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) ("A federal court in a [2255] habeas proceeding must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle her to relief."). Moreover, "the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held." 2255 Rule 5, Advisory Committee Notes (citing cases). In the instant case, Mr. Caro has alleged facts, which have been contested by the Government, that would entitle him to relief.

Mr. Caro asks this Court to expand the record with Exhibits 1-78 submitted in support of his 2255 Motion, his Opposition to Motion to Dismiss, and this Discovery Motion. (*See* ECF Nos. 782, 790-1-60, 797-1, 799-1.) These exhibits include declarations, reports, case summaries, grand jury testimony, juror questionnaires, BOP documents, letters and emails, and transcripts from a related case. All of these documents are appropriate for consideration under

---

[17] To preserve the issue, Mr. Caro is requesting an evidentiary hearing and expansion of the record based on the allegations made and documents presented at this point in the proceedings. He recognizes, however, that this request will likely be supplemented after he is provided the materials requested in discovery. For that reason, a hearing set before discovery is complete is premature.

2255 Rule 7(b).  The Court should consider these exhibits when determining whether to grant an evidentiary hearing.  2255 Rule 8(a).[18]

Mr. Caro also requests an evidentiary hearing on his 2255 Motion.  This case is similar to *Machibroda v. United States*, where the Supreme Court determined that a hearing was appropriate because that "was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court." 368 U.S. 487, 494 (1962).  The factual assertions in Mr. Caro's 2255 Motion "relate[] primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light." *Id.* at 494.  Much like Mr. Machibroda's motion, Mr. Caro's "motion and affidavit[s] contain charges which are detailed and specific." *Id.* at 495.  The fact that the Government has contested the information "cannot serve to deny [Mr. Caro] an opportunity to support them by evidence." *Id.* (citation omitted).

Mr. Caro has raised many claims that cannot be resolved on the trial court record.[19]  As the Fourth Circuit has explained, "[w]hen a colorable Sixth Amendment claim is presented, and where material facts are in dispute involving inconsistencies beyond the record, a hearing is necessary." *Magini*, 973 F.2d at 264.  Mr. Caro has raised colorable claims that he was denied his constitutional right to trial counsel at the death-certification stage, at the guilt/innocence stage, and at the penalty phase.  (*See* ECF 790 (2255 Motion), Claims Two, Four, and Six.)  The

---

[18] While the Court must give the opposing party the "opportunity to admit or deny" the correctness of the exhibits before expanding the record, *see* 2255 Rule 7(c),  the Government has already had an opportunity to respond to Exhibits 1-60.

[19] Because this is a capital case, this Court should refrain from dismissing any claims outright before a hearing.  *Cf. Telaguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012) (recognizing the heightened need for fairness in death penalty cases) (citation omitted). Evidence that is presented at a hearing could shed light upon the entire 2255 Motion and indirectly impact claims that may, on their face, appear to be record based.

Government has contested the factual assertions made in Mr. Caro's 2255 Motion. (*See* Motion to Dismiss at 13-16, 27-33, 38-50.) Summary dismissal on this "hotly disputed" record would be inappropriate. *See United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). As such, Mr. Caro is entitled to a hearing to prove his claims of ineffective assistance of trial counsel.

Mr. Caro also raised extra-record claims related to the jurors' and the Government's misconduct. (*See* ECF 790 (2255 Motion), Claims One, Three, Five, and Seven.) The allegations supporting these claims involve facts that were not before this Court during Mr. Caro's trial. Mr. Caro has supported these claims with declarations from jurors and experts, as well as other data and documents that he has gathered during these proceedings. (*See generally* ECF 790 (2255 Motion) Exs. 1, 2, 3, 25-55; ECF 797 (Opposition to Motion to Dismiss) Exs. 62, 70-77.) The Government has moved to dismiss Mr. Caro's claims by asserting that no evidence exists to support his claim (*see* ECF 791 at 9-12); by challenging declarations (*id.* at 16-21); and by refuting the timing, disclosure, and substance of *Brady* material (*id.* at 35-37, 86-92). But where Mr. Caro has presented information outside the record and "where the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted." *White*, 366 F.3d at 302 (*citing Raines v. United States,* 423 F.2d 526, 530 (4th Cir.1970)). These claims provide further example why an evidentiary hearing is appropriate before dismissing Mr. Caro's 2255 Motion.

Here, because the record does not conclusively show that Mr. Caro is not entitled to relief, an evidentiary hearing is warranted. *See* 28 U.S.C. § 2255(b); *Machibroda*, 368 U.S. at 494; *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (remanding for hearing where "we cannot conclude with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255");

28

*United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000) (holding that district court erred in dismissing the 2255 motion where the motion, files, and records "failed to conclusively show that Witherspoon was entitled to no relief").

## IV.    <u>Conclusion</u>

Mr. Caro respectfully asks the Court to grant this motion for the reasons provided.

Respectfully submitted this 25th day of October, 2013.

s/Karen M. Wilkinson
Jon M. Sands
Federal Public Defender
Dale A. Baich (Ohio Bar No. 0025070)
Karen M. Wilkinson (Arizona Bar No. 014095)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender,
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona  85007
dale_baich@fd.org
karen_wilkinson@fd.org
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

Fay F. Spence (Virginia Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276-619-6080

Attorneys for Petitioner/Defendant
Carlos David Caro

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2013, I filed the foregoing First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record using the CM/ECF system, which will send notification of such filing to Anthony Giorno, First Assistant United States Attorney, counsel for the United States.


s/Stephanie Bame
Legal Assistant
Capital Habeas Unit

# APPENDIX A

# APPENDIX A

Attachment A
Inmate Register Numbers

| |
|---|
| 00074-005 |
| 0334-112 |
| 00232-005 |
| 01192-087 |
| 01242-097 |
| 02476-748 |
| 02536-748 |
| 01924-135 |
| 02539-748 |
| 02550-748 |
| 02552-748 |
| 02012-028 |
| 02158-090 |
| 02837-748 |
| 02846-748 |
| 02218-045 |
| 02582-016 |
| 02659-087 |
| 02689-081 |
| 02728-031 |
| 02866-081 |
| 02875-087 |
| 03029-036 |
| 03220-028 |
| 03326-112 |
| 03328-112 |
| 03329-112 |
| 03332-112 |
| 03325-091 |
| 04307-748 |
| 03911-000 |
| 04298-280 |
| 04198-097 |
| 04221-016 |
| 04354-112 |
| 05151-748 |
| 04475-046 |
| 04574-088 |
| 04685-000 |
| 04764-067 |
| 04710-000 |
| 05374-081 |
| 05680-089 |
| 05835-007 |
| 06373-097 |
| 07145-062 |
| 07318-045 |
| 07580-091 |
| 07984-424 |
| 07797-028 |

| |
|---|
| 08352-424 |
| 08157-031 |
| 08655-007 |
| 08961-091 |
| 09008-050 |
| 09219-014 |
| 09303-042 |
| 09416-112 |
| 09411-077 |
| 09748-004 |
| 09883-016 |
| 09935-000 |
| 10783-042 |
| 10788-026 |
| 10819-007 |
| 12508-116 |
| 12873-057 |
| 12867-050 |
| 13161-075 |
| 13680-014 |
| 13829-045 |
| 13950-116 |
| 14067-074 |
| 14559-116 |
| 14534-057 |
| 14634-116 |
| 14801-116 |
| 15177-424 |
| 14916-031 |
| 16203-083 |
| 16249-085 |
| 16267-064 |
| 16390-047 |
| 16802-050 |
| 16917-050 |
| 17133-014 |
| 17439-075 |
| 17911-054 |
| 18249-039 |
| 18282-058 |
| 19015-050 |
| 19214-083 |
| 20168-148 |
| 20220-148 |
| 20486-148 |
| 20796-424 |
| 21136-018 |
| 22806-009 |
| 23188-086 |
| 24079-038 |
| 24651-053 |
| 25109-053 |
| 26147-008 |

| |
|---|
| 26370-077 |
| 27896-016 |
| 28064-054 |
| 28652-037 |
| 29638-086 |
| 29796-016 |
| 29820-016 |
| 30063-037 |
| 30123-013 |
| 30674-048 |
| 30694-054 |
| 30793-053 |
| 30906-004 |
| 32124-037 |
| 32403-037 |
| 33039-018 |
| 34104-013 |
| 34338-054 |
| 34848-054 |
| 34853-054 |
| 35074-054 |
| 35556-118 |
| 35945-048 |
| 35987-007 |
| 37802-054 |
| 38267-048 |
| 39448-048 |
| 39574-133 |
| 39492-018 |
| 40114-066 |
| 40172-051 |
| 40581-079 |
| 41756-074 |
| 42371-054 |
| 42375-054 |
| 42393-054 |
| 42426-054 |
| 43018-060 |
| 44107-039 |
| 44623-054 |
| 44776-066 |
| 45189-053 |
| 46680-083 |
| 48551-083 |
| 49535-083 |
| 51427-054 |
| 53271-054 |
| 53506-054 |
| 53757-097 |
| 53961-097 |
| 54744-097 |
| 55341-065 |
| 55458-097 |

| |
|---|
| 55891-097 |
| 58146-054 |
| 58478-066 |
| 58478-066 |
| 60012-001 |
| 61285-066 |
| 62604-079 |
| 63510-054 |
| 65114-053 |
| 70250-083 |
| 73629-012 |
| 79328-012 |
| 80882-280 |
| 81372-011 |
| 84197-198 |
| 84015-012 |
| 85114-020 |
| 86063-024 |
| 88752-132 |
| 90662-079 |
| 91147-011 |
| 92298-024 |
| 94434-012 |
| 95335-198 |
| 95518-022 |
| 97034-011 |
| 97815-024 |
| 99974-555 |
| 99898-011 |