```
       IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF VIRGINIA
                   Abingdon Division

--------------------------x
                          :
UNITED STATES OF AMERICA,  :
                          :
       Plaintiff,          :
                          :
v.                         :   1:06CR1/2:03CR10115
                          :
CARLOS D. CARO,            :
                          :
       Defendant.          :   Abingdon, Virginia
                          :   November 25, 2013
--------------------------x   1:30 p.m.


             TRANSCRIPT OF ORAL ARGUMENT
         BEFORE THE HONORABLE JAMES P. JONES
            UNITED STATES DISTRICT JUDGE.
```

APPEARANCES:

        ANTHONY P. GIORNO, Esquire
        RICK A. MOUNTCASTLE, Esquire
        Asst. United States Attorneys
        P.O. Box 1709
        Roanoke, VA 24008
            For the United States of America.

        KAREN A. WILKINSON, Esquire
        ROBIN KONRAD, Esquire
        Assistant Federal Public Defenders
        850 West Adams, Suite 2012
        Phoenix, Arizona
            Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.


**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

APPEARANCES (Cont.)

    FAY F. SPENCE, Esquire
Assistant Federal Public Defender
210 First Street, S.W.
Roanoke, Virginia  24011
and
BRIAN J. BECK, Esquire
Assistant Federal Public Defender
201 Abingdon Place
Abingdon, Virginia  24211
      Counsel for the Defendant

(Proceedings commenced at 1:30 p.m.)

THE COURT: Good afternoon, ladies and gentlemen. The clerk will call the cases.

THE CLERK: *United States of America* v. *Carlos Caro*, Criminal Action Numbers 1:06CR10 and 2:03CR10115.

THE COURT: We're here today for oral argument in the Government's motions to dismiss in these 2255 cases. I'd be grateful if counsel would enter their appearances so I know who's here, and indicate who is going to be arguing. First, from the Government.

MR. GIORNO: Your Honor, for the United States Tony Giorno. I will be arguing the substantive motions to dismiss, the 2255s, with the exception of the one that was filed by Mr. Mountcastle in which I believe he's responding He'll be arguing that.

MS. WILKINSON: Good afternoon, Your Honor. Karen Wilkinson on behalf of Carlos Caro who is not present but is in custody. With me is Fay Spence, Brian Beck and Susan Richardson, and on video is Robin Konrad appearing from Phoenix. I will be arguing the two, the responses to the Government's motions to dismiss both of them. I guess if the court is having oral argument also on our discovery motion --

THE COURT: Yes, ma'am, I am, and I neglected to mention that, but that's true.

MS. WILKINSON: Then Ms. Spence will be arguing that motion.

THE COURT: All right. Well, thank you. We, we have, in terms of time for argument, until 4:00. I'm going to allow the Government to open, and give them 45 minutes, and then the defendant 90 minutes, and then the Government 45 minutes to respond.

Now, obviously, counsel does not need to take all of that time if they don't wish to, but that's our outside limitation. And in terms of, of the issues, and there are the two cases, of course, plus the motion seeking, a motion seeking an order of discovery, I'll allow counsel to divide that time up and argument within these time limits as indicated.

I understand that the defendant has moved to, for discovery, but I want to include their time in the response time of 90 minutes. So, is that clear to everyone?

MR. GIORNO: Yes, sir.

THE COURT: Very well. We can proceed.

MR. MOUNTCASTLE: Good afternoon, Your Honor. Rick Mountcastle. I'll be arguing the motion to dismiss in case number 2:03CR10115 which, I think at times, has been referred to as the Benavidez case, and basically I think the pleadings set forth the essence of our argument.

The 2255 motion comes way out of time, some seven or

eight years, eight years or so past the judgment date, and there is no showing of any basis for an equitable, inequitable tolling in this case.

I think the primary thing since 2007, Mr. Caro, regardless of his mental condition, his ability to understand legal proceedings, and, and not withstanding an allegation that he was represented by ineffective or incompetent counsel up to that point has continuously been represented by counsel in this particular case, the Public Defender's Office in one capacity or another since 2007, and there does not appear to be any basis for him not taking advantage of a perceived issue with Mr. Dene's representation in this case prior to 2012 when the motion was filed.

So, I'm happy to answer any question the court may have with respect to our arguments, but I think they are fairly clearly set forth in the pleadings.

THE COURT: All right. I have no questions. Thank you. Mr. Giorno?

MR. GIORNO: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. GIORNO: Your Honor, there are, of course, in regard to the pleadings in connection with the capital case, the Sandoval case, I count 16 separate claims governing every possible phase of the proceedings beginning with

pretrial, in connection with the Benavidez case. We have filed a fairly lengthy reply to the petition citing facts as well as the law in the Government's motions to dismiss. I don't know if the court has any particular issues that you have concerns about, or questions about. I'm happy to, to begin to discuss those cases.

Obviously, ones that are, I have most concerns about are the ones in which they claim the Government did something wrong. I have a vested interest in those. And I have outlined those first.

If the court feels like there's something else, if you would rather pose questions to me as we go along, however the court wants to do it, I'm certainly willing to do, but I do have an outline and am prepared to proceed as the court wishes.

THE COURT: I don't mean to place any particular emphasis on one ground over another. But I think there are some things that I'm certainly interested in, in the Government speaking to, and certainly the Government has filed a lengthy and complete response.

But just in terms of jumping in at someplace, what about the argument that the, the Sandoval case was delayed so the Government could obtain a lengthy sentence in the Benavidez case?

MR. GIORNO: That's claim number one, Your Honor.

I believe it comes up later on in claim 6A concerning the penalty phase in the case. Essentially, our response is we recognize the case law is in certain cases pre-indictment delay where the Government does gain some tactical advantage with reckless disregard to the impact on the defendant can state a due process claim. We don't have that here, Your Honor.

The first point we'd make is that the delay between the time of the murder and the request for appointment of counsel was 13 months which, in the context of a capital case, is not a disproportionately long delay.

We have, of course, this was a capital case, there is a duty to investigate, there's a duty to make certain threshold determinations concerning whether to seek the death penalty, or not. My concern is, my belief is if we had tried to move quicker we'd certainly be open to a claim that the Government made a rush to judgment in this case.

In this case there were certain things that had to be done to determine whether to proceed with the Sandoval case. In addition to that there is no proof, nothing that would suggest that that delay was done because the Government had some, some reason to try to gain a tactical advantage.

Other than the delay, itself, and the fact that Mr. Caro was given a rather lengthy sentence in the Benavidez case, with regard to the lengthy sentence in the

Benavidez case what the defense has submitted is the affidavit that was part of the pleadings in this case. In paragraphs five and six of Mr. Dene's affidavit he makes it very clear that the decision to plead out Mr. Caro in the Benavidez case had nothing to do with the Government. The Government didn't insist on this plea, or anything like that. According to Mr. Dene, Mr. Dene said that the plea agreement in that particular Benavidez case was proposed by Mr. Moreno-Marquez. As the court will recall from the Moreno-Marquez case, Mr. Moreno-Marquez was the TS member who, along with Caro, actually made it into the room where Benavidez was stabbed. He was the one, along with Mr. Caro, who committed the, physically committed the assault on Mr. Benavidez. It would have been of benefit to Mr. Moreno-Marquez, and lesser benefit to Mr. Caro, and was proposed by Mr. Marquez. According to Mr. Dene, he said, "I advised Mr. Caro the plea agreement would mean he would receive a very long sentence. Mr. Caro stated he wasn't going anywhere so the long sentence didn't matter to him."

So, what you have here is a plea agreement that was proposed in the first instance not by the Government, but by Moreno-Marquez, and Mr. Caro coming along saying, just as he did in Louisiana in Oakdale, "I'm already serving a very long sentence. I'm going to be in here for a long, long time, so it doesn't matter to me." That's how the plea

agreement came to be.

On that particular set of facts, Your Honor, there is absolutely no indication that the Government was somehow complicit in setting this up, or that somehow Mr. Caro would be set up to have a long sentence in connection with the Sandoval prosecution. In any event, Your Honor, let's --

THE COURT: Well, the Government, I guess, knew, understood that a conviction of Mr. Caro in that case would assist it in the capital case in obtaining not the ultimate penalty, but some significant penalty.

MR. GIORNO: Correct.

THE COURT: I guess the question is what, what, what did the Government do wrong, if anything?

MR. GIORNO: Well, that's, nothing, Your Honor. The, if you look at the -- I mean, this is a plea with Mr. Mountcastle, a separate Assistant U.S. Attorney. I understand it's the Government, but there's no evidence that Mr. Mountcastle sat down with the Sandoval prosecution team and said, "Hey, look, we need to make sure we delay the Benavidez case."

THE COURT: Except the defendant would like, in his motion for discovery, for you to disclose any e-mails, communications, as I understand, about that decision, the decisions in those cases.

MR. GIORNO: They have to provide a basis for it,

Your Honor. They can't just go fishing around and think there might be something out there. I notice in their discovery request they asked for e-mails asking for, about his prior deal, and there's simply nothing. They can't even make a threshold showing.

In addition to that we have the prejudice part of it. Let's suppose, hypothetically, there had never been a plea deal in the Benavidez case. The Government's argument, which we made, is he's a violent guy, in which case we've brought in the evidence of him going into a room with, along with Moreno-Marquez, and stabbing Benavidez, which certainly goes to show he's a future danger, and he was serving the functional equivalent of life.

When you look at the sentence he had coming out of FCI Oakdale, he had well over 30 years of time to serve. He already -- it would not have materially changed the Government's argument to future danger or basically he had nothing to lose, and there would be no effective punishment if he didn't get the death penalty which were the two main prongs of the Government's case.

Even assuming the Government did something wrong, which we do not concede, and assuming we would have been successful in getting a lesser sentence on that evidence in Benavidez, there still would have been no prejudice.

THE COURT: Or going to trial.

MR. GIORNO: Or even going to trial. I mean, you know, what's his defense? He's on tape stabbing this guy violently. I just don't see where that would have made a material difference.

From our standpoint, the case against Mr. Caro, capital case, much like the Benavidez case, you didn't have to be Clarence Darrow from a prosecution standpoint to prosecute those cases. The evidence was very clear cut, and it didn't require some trickery or gamesmanship by the Government to try to gain an advantage when the advantages were already there.

So, we would submit that there is, that particular claim of Government misconduct is a non starter. If the court doesn't have further questions about it, I can turn to some other claims in which there is, the court might have some concerns about.

THE COURT: Let me ask you, and again I'm, I'm hopping around a little bit, and I apologize if I've thrown you off your notes, but, and obviously I'm going to let you say whatever you'd like within the time permitted, what about the, there is another claim directed at Government, the Government, the Government's argument, of course, which was very powerful in the capital case that, of future dangerousness, and the fact that there couldn't be any clear assurance that Mr. Caro wouldn't murder again in prison, and

the whole evidence about what would happen to him in the maximum security, and the defendant has now presented some allegations that, in fact, the Government's testimony was incorrect about the length of time that people stay in the maximum security facility. What about that?

MR. GIORNO: Your Honor, that is, if my notes serve me correctly, claim seven. There was a Brady violation by withholding ADX information showing inmates were there for more than three years.

THE COURT: Yes, sir.

MR. GIORNO: In that regard I looked at the testimony of Hershberger. Hershberger was a former warden at ADX in Florence, and he testified about the step down procedure, who goes to AdMax, and what they did there. He talked about how they step you down from the control unit to ultimately the general population, and he talked about how less than one percent of the inmates actually stay at ADX. And in his testimony, although he described in general terms the step down procedure, had said it was the goal of BOP to matriculate out of ADX back into BOP. He never once testified, "Oh, after three to five years they'll be gone for sure." In fact, his testimony on cross examination, one of the last things he said, and this was a question by Mr. Simmons, and just for reference of the court, this is Mr. Hershberger's testimony at page 203 of the trial

transcript -- pardon me -- 206 of the trial transcript, question by Mr. Simmons, "If he, Mr. Caro, doesn't meet the criteria to where the Bureau of Prisons believes that there's another appropriate placement other than ADX he will remain there?" Mr. Hershberger's answer was, "That's correct, yes."

The Government has never said that, "Oh, no one stays in ADX for more than three to five years." In fact, Cunningham testified when he did his visit to ADX he met an inmate who had been there since 1994, since the place opened. There was never a representation by the Government, evidence from the Government, "Oh, if you put Mr. Caro there, guarantee he'll be there." Everyone agreed that the placement at ADX is temporary, and as a general rule that's what happens. You can't keep everybody there. That was the gist of the Government's testimony.

So, the fact that there is evidence from ADX, "Oh, there have been inmates there more than three years, more than five years, more than nine years," the Government never disputed that. We didn't claim, "Oh, everyone is there and gets matriculated out." That's not the case. Some people are, a very select few are there longer. We never disputed that.

So, we do not feel that, in and of itself, would have been dispositive or otherwise rebuttal to the Government's

evidence in the case.

THE COURT: Let me ask you about the issue of Mr. Bland, Joseph Bland. That's the cellmate, allegedly, of Mr. Bullock who has filed a declaration in the case. And again, the defendant points a finger at the Government here and claims that the Government hid the ball on whether Mr. Bullock had a cellmate, although of course it did come out at trial. Mr. Bullock testified that he had a cellmate, but that the, the information that he had one was not provided to defense counsel adequately and/or in time for them to make, make an investigation of that person, who it is alleged now was Mr. Bland, who has made a declaration that, it is argued it is contrary to Mr. Bullock's testimony. So, what's the Government's response there?

MR. GIORNO: Let me start, first of all, with the allegation that we somehow hid the ball, lulled them, led them down the primrose path on that. That's claim five. From my notes it looks like Mr. Caro made discovery requests on March 27, 2006. He asked for a list of the inmates in the SHU with cell assignments for December 16th and 17th of 2003. At the time when he made this request, the Government checked and there was no such list, per se. There wasn't anything showing that the list, the inmates in the SHU for those dates. But we did have a roster for December 20th, which at that time didn't show that Bullock had any

cellmate. That's as of December 20th. We did, however, turn over the SHU logs which, according to Mr. Kalista's affidavit, he said he had those, but those SHU logs from the 17th to 20th show that Mr. Bland was moved from cell 146, which was, in fact, Mr. Bullock's cell, on December 19, 2003. So, if you look at those, that information, you could determine that he was moved out of the cell on 12/19 to another range or cell. They could assume that Mr. Bland was, in fact, in there with Mr. Bullock on 12/17.

In addition, I also want to address the fact that there was no mass interview form for Mr. Bland. The reason for that is, at least from what I can tell, if you look at Mr. Bullock's mass interview form that was conducted on December 22, 2003, at that particular time Mr. Bland would not have been even in the SHU as far as we could tell. That's why there was no mass interview form.

But more importantly, as Mr. Kalista's affidavit says, paragraph 21, at the time that Mr. Kalista received grand jury testimony of Mr. Bullock he was certainly aware at that particular time that Mr. Bullock had a cellmate. Mr. Kalista says this. He says, "I was aware that the Government was going to introduce testimony from Sean Bullock who was housed across from Mr. Caro at the time Sandoval was killed. I received a copy of the grand jury transcript where Mr. Bullock testified, and I reviewed the

housing logs from USP Lee. I overlooked the fact that Mr. Bullock had a cellmate at the time of Mr. Sandoval's death."

It wasn't a matter of the Government failing to disclose this. I think the defense attorney, for whatever reason, did not, was not able to surmise at that time that, that, in fact, Mr. Bland was his cellmate.

THE COURT: Is that ineffective assistance of counsel?

MR. GIORNO: I don't think it is for the reasons we stated in response to their claim that it was. Certainly Mr. Bland's declaration is far from clear about whether he would have been able to impeach Mr. Bullock. In addition to that, if you look at Mr. Bullock's testimony, I mean, we put on Mr. Bullock because he observed something, but his observation, according to his testimony, was like a second. And to say that his, he was all of a sudden the reason why that Mr. Caro was convicted in this case, which does go to the guilt phase of it, that that was the basis of the conviction, that split second observation, ignoring all the other evidence in this case, somehow Bullock's testimony was prejudicial I think would be an overstate.

Mr. Caro, as the court heard the evidence, he confessed. There was no denial he did it. He gave a reason. He said, "I did it because it was over breakfast,"

and I don't think Mr. Bullock, I think even if Mr. Bullock had been thoroughly impeached I don't think he would have made a difference in the case. I don't think Mr. Caro suffered any prejudice as a result of it.

THE COURT: Well, why don't you go ahead with your list, Mr. Giorno.

MR. GIORNO: One of the things that they argue is, again, this is pointing a finger at the Government, that somehow we, we failed to disclose evidence of Mr. Caro's status as a leader of the Texas Syndicate.

And again, I think that misstates the Government's position as it relates to Mr. Caro's leadership status. The evidence that came in from the Government as far as leadership status related to his role in the 2002 incident at FCI Oakdale. If the court would recall, a warden from down at FCI Oakdale came in and testified that happened when the Paisas and Border Brothers were coming into the facility. They sent out the word they wanted to talk to somebody from the leadership of the Texas Syndicate. Mr. Caro showed up. He made very clear that he was a leader in the Texas Syndicate at that particular time. That was the Government's evidence. We never purported to show that Mr. Caro was the leader of the Texas Syndicate or the leader of the Texas Syndicate at USP Lee. Certainly he, he had been in an altercation with another TS member there, so it

would certainly suggest there was some friction between the groups. But as far as his leadership, the evidence was uncontradicted that Mr. Caro did, in fact, have a leadership role in the Texas Syndicate at some point as recently as 2002 at FCI Oakdale. It wasn't like we had to hide information. I believe there was perhaps some testimony from Mr. Mrad, in maybe the Benavidez case, saying that Mr. Caro was not in good standing.

Your Honor, where he gets that from, it's an opinion. I don't know that it would be admissible if Mr. Mrad would be called to testify, certainly not at the guilt phase. Certainly there was no effort on the part of the Government to hide the ball concerning his status as a leader of the Texas Syndicate.

There is an argument concerning ineffective assistance of counsel during the capital review process, which we have addressed, and basically what we're saying is that's essentially a discretionary function of the executive branch; it's not a judicial proceeding. There's no constitutional right to a hearing, there's no statutory right to a hearing before the Attorney General's Capital Case Review Unit, and more importantly there's no standards.

What is effective assistance of counsel in the Capital Case Review Unit? Even their expert, Mr. Hammond, says it's a legitimate approach at these reviews not to put on

anything. Why? Because if you have a case like this, according to Mr. Kalista, I think realistically he said, "We knew this was going to be a penalty phase case," and you know, their best hope was to get him life in prison instead of the death sentence.

As Mr. Hammond recognizes, in a case like that it's a perfectly valid strategy to not go in and show your hand to the Government because the Government goes, "I see they're going to call Dr. So and So to come in and testify, let's see what they can find out about Dr. So and So." So, in essence you're giving the Government a snap shot of what is your only defense. It was their decision to forgo any evidence as to his mental health and his background, I think was not ineffective assistance of counsel, even if we assume the Sixth Amendment right attaches during the capital case review process.

There are a number of guilt, innocence claims. The first one relates to juror misconduct on the part of jurors 32 and 62. I found those to be, to be interesting. With regard to, with regard to juror number 32, there is, they rely on the juror questionnaire, and there is no declaration from juror 32. But there is, with regard to juror 62, they submit a declaration of, in which juror 62 supposedly said, "Once I found him guilty nothing the defense could have offered would have changed my mind with regard to the

penalty."  And in that regard the courts have pretty much said that, that a consideration of a juror's statement after the trial is not reasonably probative over whether they could consider the evidence with an open mind, and follow the law.  That was *Neil* v. *Gibson*.  There's no statement on the affidavit they lied in the questionnaire.  There's no statement that the juror number 62 lied to the court on voir dire.  The court heard the voir dire of that juror, and if we compare that to the statement that the Fourth Circuit found insufficient in the *Jones* v. *Cooper* case, that's 311 F.3d 306, in that case there was an investigator's affidavit, and the investigator's affidavit recounts the jurors believed -- this is from *Jones* -- that the Bible mandates imposition of the death penalty in every case of first degree murder, and represents when the investigator asked her whether she could imagine any first degree murder case where the death penalty would not be appropriate, other than if the defendant grew up in the jungle with no contact with humanity.  The affidavit we have in this case would be likewise insufficient.

Claim number four, and there are numerous subparts to claim number four that go into the guilt/innocence phase, as well, essentially the defense failed to develop a cohesive theory, the defense, and we would disagree with that.

The court has already asked me about the, about the

cross examination of Bullock, and we've addressed that. There is, with regard to the theory of the case, you have to remember what the defense had in this case. More than likely, didn't have. They walk in and they have a fellow who has admittedly, there's no doubt that Mr. Caro killed Mr. Sandoval. The way he notifies the authorities of what he had done is, "Hey, come and get this piece of shit out of my cell." He taunts the guards later on --

THE COURT: Well, of course, the defendant says that, that counsel should have explained that that was just bravado, that was prison bravado, that that's how he had to portray it to keep his, his status.

MR. GIORNO: Who is going to testify to that? I mean, Mr. Caro's going to say, "I was just doing bragging."

THE COURT: A prison expert, is what the defendant contends, an expert in prison culture would have said any person in Mr. Caro's position has to show that he's the toughest hombre around, and is cold and unfeeling, and that's the only way you survive in a maximum security situation.

MR. GIORNO: Is this during the guilt/innocence phase, Your Honor, or penalty, or both?

THE COURT: Both. Well, yes, both.

MR. GIORNO: Let me address the, first of all the guilt/innocence phase. We've all done a lot of cases out of

prison, people do things for a lot of different reasons. In this particular case there's no indication that Caro killed Sandoval, or that the statements he made later on were bravado. Let's, assuming hypothetically that his statements to the guards, or in the presence of the guards was bravado, that he had to show that he was, in the court's words, the biggest, baddest hombre on the block. The court, the jury still had the evidence of Caro's conversations with his family members, his correspondence with TS members, in which it's the same thing. "I killed him because he disrespected me. He was, I needed to do it. He, the guy disrespected me." There was no remorse at all in any phase. Had nothing to do with bravado.

What is the explanation for the letters to his family members, or his conversations with his family members? "I killed a guy." That was not bravado. And given the facts of the case, the, the statements Mr. Caro made, his admissions to Agent Fender, I think it would be easy to talk about the prison culture. I'm not sure the expert's testimony would be admissible at the guilt/innocence phase because there's no factual predicate for it, and even assuming it would be admissible in the penalty phase, which it probably would be, maybe, it's still that bravado argument carries very little weight in the light of the circumstances of this case.

I mean, Caro, no witness has ever said that there's bravado. People do things in prison for a lot of reasons, but there's never been any indication that his statements were bravado. So, we would submit to the court that prison culture would not be sufficient to rebut that.

I would point out to the court that as far as the evidence in this case, there is zero evidence of any motive other than articulated by counsel in the briefing, there's no gang motive, no evidence of self-defense, no evidence of provocation, no evidence of mutual combat --

THE COURT: He, well, I mean, the argument was made at trial, at the guilt and innocence phase, I mean, as you say, this is what they were left with, but the argument was that this was bound to be a second degree murder situation. It was, it was bound to be a spur of the moment deal because there were two people placed in a small cell, you know, counsel showed us how small the cell was, and that there was this disrespect, and so it likely was a flare up between the two of them. That was the argument that was made.

MR. GIORNO: That's correct, Your Honor. If the, as the court points out, the defense went through a very elaborate thing, sometimes people snap, and the court, as I recall, over the Government's objection, I think, the court wisely chose to instruct on second degree murder, and the

jury received that information. You can find him guilty of second degree murder if you want. And the jury rejected that. But it wasn't like they, I mean that was what they had. I don't think that prison culture on the issue of guilt or innocence, say, yeah, if you're in prison it's somehow okay to murder someone over breakfast? I don't think that would have been, that would have carried the day.

The defense did, in fact, put on evidence, and the court instructed the jury on second degree murder. The jury just rejected it. And so I think they have a cohesive theory of defense based on what they had to work with.

THE COURT: Their claim 4C is that the defense, in the guilt/innocence phase, was negligent because they failed to put on evidence of Bureau of Prison's negligence. This relates to claim 6H, as well, regarding the penalty phase.

MR. GIORNO: The theory there, as I understand it, is that somehow the fact that the Bureau of Prisons put Sandoval and Caro together would have been somehow relevant to the issue of guilt or innocence, and I'll state to the court that there was no evidence to support such an argument or such evidence in this case. In this particular case what you had was, and I went back and looked at the transcript, the initial request was, the decision to put Sandoval in Caro's cell wasn't because Sandoval asked to do it; it was done at the request of Bureau of Prisons. They had people

come in on a bus, they tried to figure out who to put together, they said, "Okay, Sandoval and Caro are in the same gang. Let's put them in here." There's no evidence of animosity or prior bad blood between them, so they put them in the same cell together, or wanted to. Mr. Caro said, "I don't want a cellmate. Not Sandoval. I just don't care for a cellmate." Later on Sandoval is going to be placed, and Sandoval says, "Can you put me in with Caro?" They go back to Caro and Caro says, "Yeah, I'll take him. We're brothers. We've done time together." He goes in the cell with him. Okay.

According to the testimony of Watts, Gilley and Laster, I mean, they, they did everything they could to make sure it wasn't going to be a problem. There was no reason to think that putting these two together would end up the way it did, particularly when you look at Caro's stated reason for the killing, it had nothing to do with the fact that they were enemies, or I think they used the term a cold dose of revenge that Sandoval was going to mete out. There's no evidence of that. Things just went horribly wrong in that cell. From others that the court heard, it was over something trivial, like breakfast. I don't understand it, but that appears to be what it was, and nothing more.

There was no evidence of BOP negligence. So, I don't think defense counsel could have been ineffective of failing

to put on evidence of something that did not exist.

There are a number of penalty phase arguments, Your Honor. The only one I think that perhaps might require a little bit of elaboration is the evidence concerning mental health. Because when we were looking at that we thought, okay, well, where is the, where is the mental health defense? Why isn't it here? And the, if you look at, again, starting with Mr. Kalista's affidavit, Mr. Kalista talks about the fact that, I mean, they knew at the outset that mental health would be something they wanted to look at. According to the affidavit they had, and the information we have, they right out of the box started getting mental health experts, mitigation specialists, things like that. And they have, they retain Mr., Dr. Spica in January of 2006. He's a licensed clinical psychologist and neuropsychologist. His examinations don't suggest any brain impairment or abnormality. Spica does ultimately report something called a frontal lobe dysfunction, but his report's inconsistent, some say it's inconsistent with frontal lobe dysfunction; some say it's consist testimony.

If you look at Dr. Spica's testimony, Dr. Caruso (phonetic), who said, "I can't help you in this case," the other defense expert, they were really left with not much of anything at the end of the day.

As I understand it in January of 2007, Dr. Spica comes

along and tells him for the first time right before the trial starts, "I can't help you on the issue of mens rea." So, at that particular point the defense had very little in the way of mental health evidence that would have made a difference. That's all they had.

The flip side of that was they knew the Government had retained Dr. Phillips. I mean, all indication is the defense lawyers did their homework on Phillips, and knew he would have done his homework and done a good job. They did not have the benefit of his report when they made the decision to forego the presentation of mental health evidence because under the rulings of court, as I understand, they could not get it, just as we couldn't get theirs unless and until they notified the court they were going to make that an issue at trial.

What they were left with at the time they made the decision not to put on any mental health evidence was they really didn't have the experts to be in a position to rebut Phillip's testimony, and they thought, they believed and surmised, and tactically, so when you looked at Phillips' record that, Dr. Phillips would have made a compelling case, there were no issues of mental health, no mental health issues in this case that would help the defense in this case. Particularly when Phillips reports -- I noted this -- Phillips' report cites 12 psychological reviews from seven

different psychologists and five different correctional facilities which found that Caro's mental status to be within normal limits.

Now, through Caro's brief, he talks about brain damage. And perhaps I've just overlooked it in the volume of documents, but I didn't see any mental health expert who said that Mr. Caro had brain damage. The, the defense really made a pretty compelling case. They introduced teachers, they introduced family members, they introduced his wife, they introduced Dr. Cunningham, they introduced Mr. Aiken to talk about the prison things, they did an effective job of cross-examining the Government's experts, but at the end of the day there really wasn't a lot that could have been offered in mitigation that wasn't offered.

They also mentioned calling the two brothers, Noe and Jose. Noe and Jose, according to some of the family members, were the bad apples in the family, so to speak, whereas Carlos Caro was quiet and shy and grew up in a tumultuous household. The brothers were ripping and snorting and tearing up the roads. Their testimony, I would submit to the court, they could not have added anything to the testimony about his upbringing and background that the family members couldn't testify to. It would have, it could have been counter-productive given who they are. So, the decision not to call them, I think, was a strategic decision

which was certainly well supported by the record in this case.

THE COURT: I think your initial time is just about up.

MR. GIORNO: Thank you, Your Honor.

THE COURT: Thank you. All right. Ms. Wilkinson?

MS. WILKINSON: Thank you, Your Honor. I think that I'd like to structure my argument first by addressing the capital case, motion to dismiss, and then the Benavidez, what we call the Benavidez case, and then Ms. Spence will address the evidentiary motion.

THE COURT: If you wouldn't mind pulling that mic closer to you just to make sure. That way your colleague in Arizona can also hear you better, too.

MS. WILKINSON: Okay. Your Honor, as we have argued in our response, the Government's motion is contrary to the law and is not supported by the existing record or the record that we have presented to the court; the factual allegations which, for purpose of this motion, must be accepted as true.

We ask the court to deny the motion for the reasons that we stated. There's three sort of bigger picture reasons why we believe that the motion's contrary to the law. First, the Government applied the wrong standard of review and continues to do so today in this hearing. Two,

the Government's motion, and its argument today, actually highlights factual disputes and supports the need for further discovery, and an evidentiary hearing. And the Government also improperly analyzed the issues in a piecemeal fashion which is inappropriate. And I'll address each of these in a little bit more detail.

The test before the court on these two motions is not who wins on the merits. That's not the court's job right now. But whether, accepting as true all of Mr. Caro's allegations and drawing inferences in his favor, whether his claims are patently frivolous, I think the word is palpably incredible or conclusively without merit.

The Government doesn't address this standard in its motion. In fact, doesn't present any standard to guide this court. And instead, they improperly, they dispute Mr. Caro's factual allegations, they draw inferences against Mr. Caro, they criticize his experts and other evidence, they ask the court to make credibility determinations, and they ignore the new factual, the new record that we have put before this court --

THE COURT: Well, it would be true, though, if on a particular ground that if everything that was alleged was true, it still would not have amounted to a deprivation of rights, or violation of law, then you could not prevail, that is, the Government's motion would be good.

MS. WILKINSON: Correct, Judge. I guess the one caveat I would put to that is at this point we have only alleged facts; we have not yet had an opportunity to present evidence supporting those facts. But that is a correct statement.

THE COURT: Well, certainly you haven't presented evidence except through the declarations, I suppose, but, again, isn't the question whether, assuming that everything, every fact that you allege is correct, is true, or it would be found true after an evidentiary hearing, if it still would not result in a sufficient ground to set aside the judgment, then the Government's motion would be good?

MS. WILKINSON: That's correct, Your Honor. What makes it a little more complicated in this case is that many of the factual issues that we have raised are not discrete; they actually are pervasive throughout the whole trial.

I think actually there was some discussion on whether an issue went to the guilt and innocence phase or penalty, and I think both the judge and Mr. Giorno agreed that actually it went to both phases, so it makes it more difficult when the court is trying to resolve an issue of prejudice because you can't just look at that isolated issue within that isolated framework. The court has to consider, for example, the totality of the mitigation that has been presented and how that specific allegation, you know,

changes that totality.

So, for example, some of the factual disputes here, one of them, in fact, the Government just ended on is the parties dispute strongly whether Mr. Caro suffers from a brain impairment. The parties dispute whether the Bureau of Prisons could house Mr. Caro at ADX for more than three to five years. I think I'll address this in a little more detail, but I think it's disingenuous for the Government now to say their only testimony was that this was a goal, and that it wasn't what happened at ADX. And I'll get into that in more detail.

The parties dispute the reasonableness of counsel's decisions. The Government has conceded in its motion that, that without an evidentiary hearing this court doesn't know what trial counsel's reasons were. We have alleged that counsel's decisions were unreasonable, but not strategic. This court has no way to determine that now without further evidence.

And then finally, again, this piecemeal approach is contrary to the law in *Strickland*, it's contrary to the law in *Brady*, it's contrary to the law in *Williams*, it's, it's also contrary to the law of the Fourth Circuit case of *Elmore* v. *Osmond* which is a 2011 case addressing *Strickland's* claims.

And under the law, we believe that the correct approach

for any sort of analysis here has to be, the court has to consider, as I said, all of the mitigation, and all of the errors in looking at the prejudice. And that cannot be determined in isolation until the court has identified all of the errors, and the court can't, it's our position, the court can't identify all these errors until the evidentiary hearing has been completed and further factual development has been concluded.

And as always, I think the guiding principle is did the errors infect the trial such that Mr. Caro was denied his due process right to a fair trial. So that's the guiding principle for all, all of the alleged errors regarding the type of error.

I guess I'd like to briefly address the points raised by both the court and the Government in its time. The first claim that the court asked about was claim one which had to do with tactical delay. And I guess the test for that, as we've set out, Your Honor, is whether or not Mr. Caro has shown actual prejudice. At this stage has he alleged prejudice from that? We believe we have alleged sufficient prejudice on that. And I would just rely on our papers for that.

THE COURT: Tell me, though, about, what was done wrong? What was the problem? I mean, what should the Government have done in relation to the prosecution of

Mr. Benavidez?

MS. WILKINSON: Several things, Your Honor --

THE COURT: The prosecution involving that case.

MS. WILKINSON: Correct. First of all, Your Honor, they shouldn't have misrepresented the case to the court.

THE COURT: Wait, wait, wait. Misrepresented what to the court?

MS. WILKINSON: In one hearing before the court, I believe that it was in the change of plea hearing for Mr. Moreno-Marquez, the Government represented that it had a very strong case, that it had video, taped videos, it had DNA evidence, it had witnesses, it was a very strong evidence.

At the time of Mr. Moreno-Marquez's sentencing, which was, I believe, a day or two after Mr. Caro's sentencing, this court sentenced Mr. Caro to 327 months, and then when it came time to sentence the co-defendant, who had participated equally in the assault, the court was concerned and said, "Well, why should I allow this man to plead to possession of weapons and to a much shorter sentence when the co-defendant, I gave him just the other day 327 months," and that was an appropriate question, especially assuming the fact that Mr. Caro had 12 criminal history points, Mr. Moreno-Marquez had as many. I believe he had 26

criminal history points. There was nothing in the record to indicate that there was a difference in culpability, although the Government alleged Mr. Caro was more culpable. But there's no evidence to support that claim.

And the other, the other part of that is the Government also did not inform the court that another co-defendant, Mr. Tijerina, actually was the one who planned the assault, and ordered the assault because he wanted to become leader. Benavidez, at that time, was the current leader of the Texas Syndicate at USP Lee. And this is all according to the Government's witnesses, Your Honor --

THE COURT: How would any of that prejudice Mr. Caro? I mean, suppose, suppose I had, I had given his co-defendants more time or Mr. Caro less time, what difference would that have made, or could have made?

MS. WILKINSON: For example, if you allowed Mr. Caro to plead possession of a weapon similar to Mr. Moreno-Marquez, then he would have had no other prior crime of violence other than possession, which I guess in some circuits can be considered that --

THE COURT: I don't get to decide who gets to plead to what. The Government is in charge of placing the charges against the defendant.

MS. WILKINSON: That's exactly right, Your Honor, but Mr. Moreno-Marquez and the others also had been charged

with conspiracy to commit murder. However, at the end we had a one person conspiracy, Mr. Caro, because the Government allowed everyone else to plead to possession of weapons. They now say, "Oh, well, it wasn't their fault because Mr. Moreno-Marquez proposed the deal." I think that's disingenuous, Your Honor. The Government always controls what the offers are in these cases.

THE COURT: Again, I'm having a problem -- I'm sorry, maybe I, I'm not communicating very well. How did it harm Mr. Caro, what his co-defendants, co-conspirators in that case were allowed to plead to or got?

MS. WILKINSON: What harmed Mr. Caro was his sentence, Your Honor, and maybe this is the point that you're getting to. And he was harmed because the Government delayed in notifying this court that it was proceeding with a capital case, and that, and that the court should secure counsel for Mr. Caro. It did not make that request until after it had secured this disproportional sentence for Mr. Caro. Had the Government come forward to this court before that and said, "Your Honor, we have this case, but there's another case that's out there, too, that we plan to pursue; in fact, we've already impaneled a grand jury on this and we're collecting evidence as it is now."

THE COURT: What difference would that have made?

MS. WILKINSON: I think if he had capital counsel,

there's no capital counsel that would have allowed Mr. Caro to plead to conspiracy to commit murder that would have been an aggravator --

THE COURT: So, he would have gone to trial on this, that charge?

MS. WILKINSON: He would have gone to trial, that's correct, Your Honor.

THE COURT: And the evidence is he likely would have been convicted.

MS. WILKINSON: Well, Your Honor, we believe if he was convicted, similar to another case before this court, the Garcia case, I think Alcantaro was the name of the alleged victim, very similar, supposedly videotape, stabbing, but that case did go to trial and the defendants were acquitted of the more serious conspiracy to commit murder charge. I think they were found guilty of possession of weapons, and it was the same sort of thing with superficial wounds. Mr. Benavidez had a lot of wounds, none of which were that serious. He was taken to the hospital, he was kept there overnight for observation, and then released. I think the same sort of case could and would have been presented in Mr. Caro's case had capital counsel said this is ridiculous; you're setting him up for a death sentence in this case --

THE COURT: So, your contention is that the

Government should not have, should have obtained the appointment of capital counsel for Mr. Caro before it proceeded with the Benavidez case?

MS. WILKINSON: That is one of the claims, yes, Your Honor. And again, the, at this point I believe that we have the claim that's not patently frivolous, and we have sufficiently pled it, such that the claim should survive to move forward.

THE COURT: What evidence would there be, though? I mean, isn't that the facts? What more would we know after an evidentiary hearing?

MS. WILKINSON: Well, I think we would hear the testimony of Mr. Hammond that would say that it was unreasonable of Mr. Dene to allow this to go forward. Mr. Hammond, the *Strickland* expert, would testify that a capital attorney would never have, would have advised Mr. Caro against going forward with this plea agreement.

We have requested in our discovery some of the e-mails which the court discussed earlier. We attempted to very narrowly tailor that request. We don't want to invade on all of the work product; we just want anything that goes to the timing. For example, if the Government had an e-mail saying early on in the year, "We plan to prosecute Mr. Caro for the capital case, but I don't think we should go forward with that now because it just, let's go ahead and get this

sentence done and we'll have a great aggravator, and we can proceed like that." I think that sort of evidence, and that's what we requested in our discovery, evidence there goes toward the timing, not why, but the timing of their decision.

THE COURT: All right. Go ahead.

MS. WILKINSON: Judge, moving on to the claim about ADX, again, it's disingenuous for the Government not to say Hershberger said it was only a goal. As the Government said at the very end, you know, there was no prejudice because it came out at trial that a select few inmates were there longer than three to five years, but that's, that misses the point, Your Honor. We're not saying there was one or two exceptions, that came out at trial, Mr. Silverstein was an unusual case who was there longer. What we are finding now is that, I think, our latest numbers, we have found that there were, we've discovered, and this, again, we don't have all of the available information, this is what we've been able to glean from various public sources that have recently become available, we know of 155 inmates that were incarcerated more than three years. That's not one or two, or a select few; that's a substantial amount. And 126 of these are still at ADX. At the time of Mr. Caro's trial we presented evidence that 79 inmates had been incarcerated more than three years.

Sixty-three had been incarcerated more than five years. So, the evidence is not that one or two people were there more than three to five years. The evidence is that many inmates were there more than that. And the fact that ADX had a goal was very misleading because they never followed that goal. And that didn't come out. And, in fact, we cited statements by Hershberger in our pleadings, and we also cited the Government's argument at the end that says, where they argue that everyone agrees, everyone's experts agree that this man is getting out in three to five years. That was the intent of the testimony. That was the argument. And that was flat out false, Your Honor. And we've now been able to present evidence showing that that was false.

And as I said, we've even narrowed it down to BOP homicide cases. And again, we have found that 54 inmates have been continuously designated to ADX since their initial placement there, and these are inmates who have, for the most part, been convicted of BOP homicides. And that includes 22 that were there at the time of Mr. Caro's arrival.

If you narrow it down to cases where the Government sought death but eventually got life, we found ten cases nationwide. Nine of those ten have been continuously housed at ADX, not three to five years and moved, and the only inmate that hasn't suffers from schizophrenia. And

according to the rules at ADX he was ineligible.

As far as the situation with Mr. Bland, we do contend, and we do allege that the Government hid the ball and misrepresented the situation. It's, the Government knew that Mr. Bullock had a cellmate three years before trial, they knew that when Mr. Bullock testified in his grand jury, yet there was no interview form, nothing to indicate -- the Government, when they produced the list of SHU inmates, they didn't say, "Well, this is what we have on the 19, but we also know there was somebody who wasn't on the list who wasn't there, too, because we, we know Mr. Bullock had a cellmate. He's not on the list because we don't have the exact date, but here it is." Later on, when they produced the grand jury testimony it was attached to a letter that said, "Oh, we've also, we also interviewed all of the SHU inmates and we've attached their mass interview forms." Again, they're saying, "Here it is; we're giving it all to you," and they don't give anything from Mr. Bland, and they don't say, "Oh, by the way, we haven't included Mr. Bland's, but he was there." It's very misleading.

THE COURT: Well, I mean, isn't it true, though, that defense counsel knew that, or should have known that he did have a cellmate?

MS. WILKINSON: We allege that also, Your Honor. One month before, there were records there that, had they

scoured through the records with a fine tooth comb, they would have discovered it in the SHU logs.

THE COURT: They knew it when they got his grand jury.

MS. WILKINSON: They knew it at that point, and we allege at that point they should have said, "Oh, Your Honor, wait, wait, wait. There's new evidence here. Move to continue the trial." And do whatever they did. They just missed it. There's no strategic reason.

THE COURT: What was the prejudice to Mr. Caro? You know, your *Strickland* expert says that this was the most important thing that led to Mr. Caro's death penalty, that this was it, that Mr. Bland had, if Mr. Bland testified Mr. Caro would not have received the death penalty. Isn't that right? Isn't that what he says?

MS. WILKINSON: He says something similar to that. I don't have the quote in front of me, but you are correct.

THE COURT: I think he said it pretty close to what I said. Isn't that extravagant, at the least?

MS. WILKINSON: It's your decision, but if you look at the facts that he alleges, the only purported eye witness to this offense, the Government cited his testimony repeatedly, and we put that in, we've cited all, I don't know how many there are, 12, 15, I don't know how many, repeatedly, he snuck up behind him, this wasn't a fair

fight, he ambushed him from behind, from behind, snuck up, snuck up, and the Government took the unusual step to having a character witness to say this man is very truthful, and that's not very typical --

THE COURT:  All Bullock said was, in fact as he was cross examined about it, he thought they were tussling. He said for a second or half a second he saw Mr. Sandoval, Mr. Caro behind Mr. Sandoval, and he saw this orange towel around his neck, and that disappeared from view in a second or half second.  That's essentially what he said.  How would you strangle someone if you didn't ambush them?  How would that happen?  I mean, I guess my point is, again, I'm just struck by your expert's opinion that this was the most significant thing in the whole trial.

MS. WILKINSON:  Well, I guess my answer --

THE COURT:  I guess my point is, didn't the Government have, I mean, there's no question that he, Mr. Sandoval, was strangled with a towel, with a hard knot.

MS. WILKINSON:  Correct.

THE COURT:  And obviously, Mr. Caro did it.  There wasn't anybody else in the cell.  And, I mean, what other inference is there?  I mean, nobody likely would let -- they weren't playing.

MS. WILKINSON:  They weren't playing.

THE COURT:  He had to surprise him to get the

towel around his neck and strangle him for two, three or four minutes is what the medical examiner said it would take.

MS. WILKINSON: To be honest, I haven't thought about the various ways you could strangle someone, but what I do know is that the tussling was in the first interview of Mr. Bullock. Later that story changed. I mean, initially he says he had his hands, and then the changed to the towel. It's like at various different stages his story changed. And I guess that Mr. Bland goes not only to what happened, but also would have been evidence that would have impeached Mr. Bullock.

We believe that we have sufficiently pled prejudice, Judge. And again, the other thing that I would make note of is that the prejudice has to be analyzed in light of the other prejudice, the other errors.

THE COURT: All right. Go ahead.

MS. WILKINSON: As far as the, there was discussion on Carlos' status as a gang leader. And again, Your Honor, our claim is not patently frivolous, which is the standard before this court. I'm typically a trial attorney, so I want to get in and fight all the facts, Your Honor, but I'm trying to hold back because that is not the question before this court. The question before this court is whether it has been sufficiently pled. Having stated

that, there are many factual disputes in this claim that preclude resolution on a motion to dismiss. We agreed that the evidence at trial that was presented was that Carlos was a leader at FCI Oakdale. Our expert, Mark Beazy (phonetic) disputes that for the reasons stated in the pleadings.

As far as the Government's claim, the Government denies that it withheld that it, well, that the Government believes, didn't believe Carlos was the leader of TS at USP Lee ever. The Government never believed that. They believed it had been Mr. Benavidez and Tijerina. Mr. Caro never contended to be the leader. The Government argued at one point he's not just a member of this dangerous, disruptive group; he's a leader. That's what they say in the, in the argument. One of them goes as far, I believe just weeks or a month before trial, in a transport document, the Government said, "Be careful. He's in bad standing with the gang."

Now, Mr. Kalista never saw he was in bad standing. There's a similar one which the, one of the officers said, "Whoever did this to Mr. Sandoval is in trouble. We've taken a vote and he's in trouble." None of that came to light to trial counsel. If Mr. Caro was not a leader at USP Lee, but actually was in bad standing, then the vast majority of the Government's penalty phase witnesses, their testimony was irrelevant because it focused on gang

communication, it focused on how dangerous gangs were, how you couldn't securely house gang members. If Mr. Caro was in bad standing not only didn't he have the force of the gang behind him, he probably was a target of the gang. I think 11 of their penalty phase witnesses talked in some manner about gang matters.

Regarding the IAC claim regarding DOJ death certification, the argument that the Government makes shows that it's a very fact intensive issue. What we do know is that there was very little investigation that was done before that. We claim there was an inadequate investigation. Again, there's an issue of fact, that they submitted nothing in writing. We do have testimony saying that that was unreasonable for them to do that, and contrary to what the Government says, nowhere does it say it was reasonable for them not to show their cards at this hearing. Again, we've sufficiently alleged a claim.

I'm sorry, Judge --

THE COURT: Let's see, you used an hour.

MS. WILKINSON: I don't have much more. I have 30 minutes?

THE COURT: Yes, ma'am.

MS. WILKINSON: There's a couple of minutes that I would like to address --

THE COURT: I'm sorry, you haven't used an hour;

you've used half an hour. I think it was 2:15 when you started. Tell you what, I'll give you time to get your thoughts in order, and give us all a break. We'll be in short recess.

(Recess from 2:47 p.m. to 3:00 p.m.)

THE COURT: All right. You may proceed.

MS. WILKINSON: I'm not very good with math, especially under pressure. Is it correct I have an hour left?

THE COURT: Why don't you give it 45 minutes. We also need to hear the discovery issue. That will give the Government an opportunity to respond, stay within our time limits. I'm not sure if I calculated it accurately when we started, but in any event, that would be great. I'm not going to hold you to the exact minute. But if you could try to do it that way, we'll finish in time.

MS. WILKINSON: The next issue that was raised by the Government has to do with claim three, juror misconduct. The only point I'd like to make with that is the basis for our juror misconduct claim which we have alleged is that the jurors made statements in their voir dire that are inconsistent with what they say now, and it is that inconsistency that we have alleged that gives rise to the misconduct. Again, we believe that we have sufficiently alleged the claim that's not patently frivolous.

For example, juror number 62 said in voir dire that she neither favored nor disfavored the death penalty. Now what she says is, "Oh, no, I'm strongly in favor of the death penalty where the evidence of guilt is obvious." Had she said that during voir dire, that would have been a basis for striking her. Similarly, juror 32 in voir dire said he would not automatically vote for death if he found the defendant guilty.

THE COURT: Let me ask you this. I've had a number of habeas cases, of course, and I guess in every capital case it's procedure for capital habeas counsel to go to the jurors and interview them. But I'm always interested in how that's presented. Do you, have you told these jurors what you're doing? I mean, how is that produced? How are their affidavits produced? I don't think I've had a capital habeas case, and I've had many, that hasn't had a juror declaration on a particular point. "If I had known this," or, "If this had happened," "If," and so on.

MS. WILKINSON: Procedurally how that happens, Your Honor, is our investigator goes out and talks to the juror and identifies herself and the fact that she's representing Mr. Caro --

THE COURT: I don't doubt that. I guess my bigger point is it just seems to me that it's, it's very tough for these jurors, of course, to sit in a capital case, but seems

to me that it's really tough for them after the fact to be presented by counsel, it's like polling, it depends on the question you ask, you know, "Did you know, Madam Juror, that if we had gotten evidence in, now that would have made a difference to you, wouldn't it?"  And what do you say as a juror?  Be cold hearted and say, "No it wouldn't have made any difference to me."  Or what do you say?

MS. WILKINSON:  Actually we've had jurors that say that.

THE COURT:  You don't file those.

MS. WILKINSON:  No, we don't file those, Your Honor.

THE COURT:  I don't know that you can answer that question, but it's always interesting to me.

MS. WILKINSON:  Judge, I guess those type of, of affidavits, they go to prejudice, would it have made a difference, we give them a hypothetical, knowing what you know would that have made a difference?  In our case I just want to make clear that that is not the only evidence of prejudice that we have put forward in our claims, that is just one portion of it, and it is just intended to show that a reasonable person could have reached a different result if they had known this.  It's not all of our prejudice, Your Honor; it's just one piece of it.

Regarding the, the claim about, that we have alleged

that the defense counsel did not provide a cohesive theory of defense, Your Honor, we believe that we've alleged a sufficient claim here.

The, at trial what you heard was what we call the breakfast dispute defense, which was basically two men in a small cell get in a heated argument over breakfast, and one man kills the other man. Not a very pretty story, Your Honor.

THE COURT: Well, what is the alternative story?

MS. WILKINSON: The alternative story is what we call the cold dose of revenge story, and the, quote, "cold dose of revenge" actually comes from one of the Government employees, Mr. Mrad, a gang investigator, and it was from his grand jury testimony when he is talking about the Benavidez case, and also a previous Texas Syndicate case that occurred before that, too. The grand jury is basically In Re: Texas Syndicate, and what he says at the very end, the jurors are saying, "Well, why if he was a leader, why did they hit him," and that's where he says, "No, Mr. Benavidez had been the leader," and then he says, "And it wouldn't be surprising for the people who hit him to be facing a cold dose of revenge as a result of this assault."

There was then also evidence at trial, I believe, Ms. Guzman, or whatever, there was basically some testimony that the Benavidez assault had not been a sanctioned hit.

Meaning that the gang had not approved it. Mr. Tijerina ordered it because he wanted to take over the gang, but there was a lot of internal tension. So, the cold dose of revenge story, Your Honor, is based on the fact that Mr. Caro, along with Mr. Moreno-Marquez, had hit, had assaulted the leader of the gang, and the gang was in turmoil, it was expected that there would be more -- in fact, the Government's SIS people in their report on Benavidez had recommended that Caro be isolated from all other TS members for that reason.

Now, that apparently was never communicated to the officers on the SHU because they did the exact opposite. They said, "Oh, yeah, they're in the same gang. Let's put them in the same cell."

THE COURT: But Caro accepted Sandoval, he said, "We're brothers. We've done time together."

MS. WILKINSON: At first he said no, and --

THE COURT: But he didn't know, he was just asked, as I recall he was asked, "Will you take a cellie?"

MS. WILKINSON: Your Honor, we don't know all of the facts. It was not established at trial whether he knew, or not --

THE COURT: We don't have another trial in this case.

MS. WILKINSON: No, Your Honor, but that's

evidence, I think, that would be pretty easy to get from Mr. Laster, or from the previous officer because, as I understand, standard procedure is for the inmate to gather up their belongings, walk beside the guard, go to the door, knock, knock, will you take this inmate, they can see, they know what's going on. I don't know the answer, but --

THE COURT: I think the facts here were that they had an influx of people, a bus had come, as I understood the testimony, he was seeing where there were cells that he could put these inmates. You may be right, I don't know.

MS. WILKINSON: We dispute that, and we dispute that for a couple of reasons. There was no testimony at trial that that was the reason that the BOP attempted to place Mr. Sandoval in that cell. There was no testimony about that, whatsoever, from the guards. The only person who said that was Mr. Bullock who said, "Oh, yeah they wanted to put them in there because a bus was coming in." So, we dispute that.

But getting back to the theory, the cold dose of revenge --

THE COURT: That's a speculation, I mean, maybe so Sandoval got into the cell in order to kill Caro. But what is the evidence of that? I mean, what, what could, could counsel, even with everything that we know now, have argued that in any way more than they could have argued the, this

was just a simple flare up, disrespect, and thus no premeditation?

MS. WILKINSON:  Well, Your Honor, I guess the other facts are we know Mr. Sandoval was not a full member at that time; he was a prospective member.  In order to become a full member he had to commit an act of violence.  This would have been the perfect opportunity for that.  We know the testimony at trial could have been from a gang expert, or from some of the Government's gang people, they would tell you this is a blood in/blood out gang.  In order to do that you have to commit an act of violence, and yes, he was a prospective member.

The other evidence would have been -- well, I guess the point is I think there would have been as much evidence or more of a cold dose of revenge than heat of passion over a breakfast dispute that happened nine hours after breakfast.

THE COURT:  Half dozen of one, six of the other.  If they argued that wouldn't we be right here with you saying they made a terrible mistake, they argued somehow Sandoval was put in there to kill Caro, and there was no evidence of that, and they should have, in fact, argued that, you know, this just came up out of a sudden dispute in hot blood, and no premeditation?

MS. WILKINSON:  I disagree, Your Honor.  The reason I disagree is that as you go through, and you start

to put together the puzzle pieces here, the puzzle pieces fit the cold dose of revenge. Like I said, just the things I've talked about, plus the things in our pleading, the pieces didn't fit a breakfast dispute. The timing was off. There was no evidence of that. There was no motivation why, you know -- one point, the second point, Your Honor, is that the cold dose --

THE COURT: What do you mean the timing didn't fit?

MS. WILKINSON: Breakfast is in the morning, and if you're going to have a heat of passion it would seem that that would occur when the person wakes up and finds out that you ate my breakfast. Their position was that it boiled, it boiled, boiled, throughout the day. The Government's argument was premeditation, premeditation, premeditation throughout the day. So, it was a difficult argument.

The other thing, Your Honor, the cold dose of revenge would have explained Mr. Caro's statements, because if you're a gang member, as he was, you don't disclose gang issues so he's not going to tell anybody that this was a gang matter, "He attacked me because of my hit on, my assault on Mr. Benavidez." He can't say that. That would have been to violate the gang rules. He comes up with this story that says, about disrespect. And the Government's own agent, Agent Fender, when he was interviewing Carlos, he

tells him, he says, "You've told me this breakfast story. I don't believe you. I don't believe this story. I think it had something to do with the gang." What does Mr. Caro do? He says, "This interview is over. I'm not talking to you anymore." Those pieces all fit, Your Honor. And we've alleged them in our papers.

But the bravado, the court asked about the bravado, the statements, again, it wasn't just I'm the biggest, baddest hombre on the cell block, Mr. Sandoval went in there to assault Mr. Caro, whether he went in to kill, whatever. Our story is he went in there to get retribution for Benavidez because Mr. Caro had the audacity to try to hit the leader of TS. He went in there to try assault him. After it's done he needs to send a message out to other members of the gang, don't you try this, too, because it isn't going to work.

THE COURT: Why would he tell his wife and his girlfriend, I mean, why would he give them the same, you know, no remorse story, which he did?

MS. WILKINSON: Well, possibly several different reasons, Your Honor. One is that he's aware everything is being monitored by the BOP, so he knows every letter he writes is going to get opened, every phone call is going to be recorded. He doesn't have private space to do that.

The second reason would be, and I'm just totally

speculating here, Judge, but when you're, when you're acting and you have to walk the straight and narrow you don't change your story because you might slip up. You get that story, you're in character, and you keep that story. So, that fits the cold dose of revenge. It explains the statements. The impulsive breakfast doesn't fit with Mr. Caro's records. He doesn't have the history of being involved in impulsive fights in prison. He doesn't blow up. That's not his personality. So, the story fit with all the other facts that are out there and we have alleged. They may not have been part of the trial record, but we have alleged them before this court and this needs to be considered.

Quickly, on BOP negligence, I think I've already talked about that. The Government is ignoring the new evidence we presented as far as why that's negligence, including the Government's own report that says they shouldn't have been housed together.

The evidence regarding the mental health, there are several issues there, Your Honor. We do dispute that Dr. Spica's exam says it doesn't show brain impairment, doesn't report it. We think it clearly does, and the supplemental letter that we provided also helps explain that.

I think there was some confusion about the words brain

damage or brain dysfunction. Damage means that you had a good brain and that it was damaged because you hit your head against a tree, or something, whereas dysfunction or impairment refers to a life long problem which is what Caro's history shows. It shows in sixth grade he was placed in special ed. As a child he had learning delayed development. He couldn't tie his shoes at the age of seven. He's getting non-satisfactory in kindergarten.

But the Government raises the opinions of the prison officials. We've submitted the supplemental declaration of Dr. Schwartz-Watts who disputes that, Your Honor. Is that based on a ten minute discussion with Mr. Caro? It doesn't appear that there were tests. We believe that we have submitted more than sufficient evidence of brain impairment. And the Government says that when they came to the penalty phase they weren't, trial counsel wasn't left with much to work with, and we agree with that. And the reason, though, is because they had not done an adequate investigation up front. And the fact that they didn't even review Dr. Phillips' report until the penalty phase just enhances their negligence. If they knew they couldn't look at that report until the end, it behooved them to do even more up front investigation so once they got the report they would have someone in place, someone who knew the situation, Mr. Caro, who could then apply that to Dr. Phillips' report.

They hadn't done any of that.

Dr. Caruso they had hired initially for the guilt phase, for competency, for mens rea, as far as for the offense. He wasn't prepared to do a penalty phase. He wasn't prepared to put together the evidence of the childhood trauma, the evidence that Dr. Spica had. He just did strictly tests. They needed someone to put together Spica's results with the trauma history of his childhood, with all of the background evidence that they had, whatever mental health testimony they had to explain to the jury during the penalty phase, none of that ever occurred, and it's our contention that, Your Honor, that they were deficient in that, and it did prejudice Mr. Caro.

Again, if you think of it, the mental health issue becomes more relevant when you consider that in light of the fact that Dr. Spica said he's very suggestible, and then you put someone with the reasoning ability of a ten year old under the best of situations, he's in prison and gets involved in a gang, how he responds to that and how he reacts, we believe, lessens his culpability.

All right, Your Honor. Quickly moving on, two other points that I wanted to address, the claims we feel could be resolved by the court in a motion to dismiss are claims that are record based, and there are some totally record based claims, Your Honor. Claims eight, 9A, 9B, 9D and 15, we

believe all of those are just record based. We have nothing to add to those claims.

So, if you conclude, based on the record before you, that Mr. Caro has, if the files and the records conclusively show that he's entitled to no relief, then that's appropriate, but the other claims, Your Honor, they either involve disputed facts, which precludes summary dismissal, they involve the introduction of new facts, allegations, which similarly preclude summary dismissal, and even some of the systemic challenges, we have attached new evidence and we would like the opportunity to present evidence in support of these new factual allegations.

Finally, I wanted to briefly talk about this issue of the court's analysis of prejudice because it's, it's, there's a dispute on that between parties, Your Honor, and whether the court should impose or analyze this with a cumulative analysis, or whether it's an isolated analysis, our position is -- let me start first, the proof necessary for this court for reversible error, *Strickland* requires a showing of prejudice, *Brady* errors require a showing of prejudice, and all other errors, trial court errors. In, as to the *Strickland* errors, we believe that actually the *Strickland* case directs this court to do a cumulative analysis of all errors. It's, *Strickland* speaks in terms of errors, plural. It doesn't say one error in *Strickland*,

there are six different IAC claims, the court analyze those errors, and similarly the Fourth Circuit in *Elmore* v. *Osmond* applies a cumulative analysis. *Brady* does not dispute that a cumulative analysis is appropriate, and as to all other others, there's the case of *U.S.* v. *Woods*, a recent Fourth Circuit case that, again, talks about the cumulative error analysis in the context of court errors.

So, if the court has any more questions on the capital case --

THE COURT: I don't believe so.

MS. WILKINSON: I'd like to quickly move to the Benavidez case and the discovery motion. Our position in the Benavidez case was that it was timely filed, and if it was, was timely filed we would ask the court to delay its ruling on that unless it resolves the similar issues in the 2255.

There are two factual positions that overlap, and it's our position will require an evidentiary hearing. The first is Caro's mental impairment and capital counsel's ineffective assistance, both of which constitute --

THE COURT: Let me ask you, what could capital counsel have done with respect to the Benavidez case?

MS. WILKINSON: They could have done what we've done, Your Honor, only they could have done it a lot sooner than we did.

THE COURT: Well, I mean, in other words, argued that the Government set this up, and so, I mean, what would that have meant? I don't understand, you know, practically speaking, what anybody would have done to have set aside the guilty plea and judgment in that case.

MS. WILKINSON: Actually, the main focus here is on Lou Dene's failure to properly advise Mr. Caro.

THE COURT: Well, I understand, but that's a problem where the statute of limitations is, and I understand you have an argument there, but what would, what was wrong, what did capital counsel in the capital case do wrong?

MS. WILKINSON: They should have challenged, they should have challenged in a timely manner this conviction based on Lou Dene's ineffective assistance of counsel. Had they done that, and had they been successful, then that would have removed that aggravator from the capital case.

THE COURT: And what would the grounds of ineffective assistance of counsel been?

MS. WILKINSON: Failure to adequately advise Mr. Caro of the collateral consequences of the plea, and basically he, he did not advise him that this plea was really ill advised because it was setting Mr. Caro up for the death penalty, essentially. And we figure, we, that, I can't imagine a more serious collateral consequence, Your

Honor.

THE COURT: So, they would have filed a 2255, they should have filed a 2255, and that is an independent ground that allows escape from the statute of limitations?

MS. WILKINSON: They might have been able to do it within the one year, depending on how the court defines the one year.

THE COURT: No, no, it gets around the statute of limitations in the present Benavidez case, the 2003 case.

MS. WILKINSON: Correct. Our argument is that there's two extraordinary circumstances for equitable tolling, Your Honor. You have to have diligence, prove diligence, and that there's some extraordinary circumstance that stood in Mr. Caro's way and prevented him from filing timely, or counsel. Our position is the first extraordinary circumstance is his mental or brain impairment. The Government does not dispute that he has a serious mental disorder, or at least I didn't think they did, and they don't dispute that that can constitute extraordinary circumstances. But they argue, they apparently, without presenting any expert evidence, they apparently say, "Well, it wasn't severe enough because he wasn't incapacitated."

Your Honor, I'm not a mental health expert, and I have no evidence that the Government prosecution, prosecutors are mental health experts. This is an issue that the court

needs expert testimony on. We've provided evidence that Mr. Caro has the reasoning ability of a ten year old, so I suppose the court would have to conclude that the ten year old has the ability to file a 2255, and that's a ten year old with serious limitations. The other --

THE COURT: Is the law to the effect that if you don't, if you don't understand your right to file a 2255 that the statute of limitations doesn't apply? Wouldn't that apply to about 90 percent of our prison population?

MS. WILKINSON: You're right, Your Honor. The test isn't a misunderstanding of the law or failure to appreciate the law. That is not the test. There has to be something above and beyond that. Here our argument is that Mr. Caro's brain impairment, and the reasoning ability of a ten year old, made it impossible for him to file a 2255.

THE COURT: So, he was incompetent to be tried?

MS. WILKINSON: No, we're not making that allegation, Your Honor.

THE COURT: All right. Go ahead, ma'am.

MS. WILKINSON: And again, we've submitted evidence showing brain impairment, cognitive dysfunction from both a neuropsychologist and psychiatrist, and we've also submitted his school records showing he was in special education in sixth grade, and had obviously developmental problems and difficult in school until tenth grade when he

dropped out.

We reject the Government's contention that somehow the plea agreement in Benavidez shows he was not mentally impaired. In fact, we contend the exact opposite. That plea agreement was completely against Mr. Caro's self interest. There was nothing for him to be gained in it, and everything to be lost. And it does not show an ability to show a reasoned judgment, but the opposite.

The last point there is that the Government argues that the IAC of Mr. Caro, capital counsel is not an extraordinary circumstance because he had appellate counsel. He had a federal public defender appointed to represent him in the appellate case. This involves facts outside the -- the appellate counsel are not authorized or equipped to investigate facts outside the record, and the appeal would not have been an appropriate forum to raise this claim. In fact, I believe they asked the court for an evidentiary hearing on one of his discovery issues, and they said no, of course you can't have an evidentiary hearing here. This claim involves facts outside the record, and it would not have been appropriate in the appeal.

Your Honor, I'm going to try to leave 15 minutes for Ms. Spence.

MS. SPENCE: May it please the court, I'm happy to start with one area that we agree on. We're not asking the

court to rule on this discovery motion before ruling on the merits of the motions to dismiss. We are just getting it in now so that we're ready to go forward quickly and expeditiously once the issues have been --

THE COURT: Tell me your understanding of the standard for granting discovery in a 2255 case.

MS. SPENCE: The standard is you have to show good cause, and that has been specifically defined by the Supreme Court as where there are specific allegations before the court that show reason to believe the petitioner may be entitled to relief if he can prove those facts, then he's entitled to discovery with those facts.

THE COURT: Will, it's not the same as discovery in a normal civil case. Don't you have to have some reasonable grounds to believe that you will find the information that is helpful?

MS. SPENCE: Exactly. And that's why, as the court noted earlier, on issues where even if all the facts are accepted as true, if there's no legal grounds for relief, there's no, then you can rule that the, at the motion to dismiss, and there's no evidentiary hearing and no discovery. But certainly on any issue where there's a factual dispute and a credibility issue, then under the language of 2255(b) the court shall grant an evidentiary hearing to resolve those issues, and the Supreme Court has

said that if there's going to be an evidentiary hearing that is strong evidence that discovery is also appropriate on those issues.

THE COURT: Well, I again, I guess it depends, doesn't it, on a 2255 case depending on what it is you want to discover. It's certainly true that discovery is possible, but there has to be good cause to believe that you can find something that will be relevant to the issues --

MS. SPENCE: Absolutely. That's why in the motion we've endeavored to make it very clear what specific issues we're directing our discovery requests to.

THE COURT: Get back to a topic we discussed earlier, you want to find and see if there are any e-mails or memoranda that Government counsel has in this case as to the sequencing for the capital case vis-a-vis the Benavidez case, but you don't know that there are any such memoranda, or have any idea, any reason to believe there are any such memoranda, right?

MS. SPENCE: We don't know what memoranda do or do not exist. We don't know what discussions were or were not had. We do have the very strong circumstantial evidence that led to the factual allegation. When the court asked the prosecutor at the sentencing hearing of Moreno, you know, why should I accept this agreement and give them 58 months when we just gave Mr. Caro, for the same conduct, 327

months? And at that point, well, you were told the video wasn't a very good quality, we have an uncooperative victim that doesn't want to testify, and all those reasons that they couldn't really make a good case on this, and that's not disclosed until after Mr. Caro has already been sentenced. It's only then a month after he's sentenced for the Benavidez case it's brought to the court's attention we're ready to proceed on this capital case and we'd like to appoint him counsel now.

So, we have raised a legal theory. There might be evidence to support it. If the facts that we allege to be true can be supported we're entitled to the opportunity to make that presentation, and that's what good cause amounts to in a 2255 case, recognize it's got to be a little bit flexible to prevent a miscarriage of justice where someone's life it as stake.

THE COURT: All right.

MS. SPENCE: I would next note that the Government, with the exception of the arguments they raised, that they filed, they don't appear to oppose the request for discovery, if the issues that the discovery targets are allowed to proceed past the motion to dismiss. I would respond to the items they did object to. First they said that the request to depose Mr. Mountcastle was a fishing expedition. We respectfully disagree. A fishing expedition

is when you hope you will find some facts that will help you figure out a claim to make. We've made the claim. We know what facts we're looking for. That's a request for discovery that's narrowly tailored to the issue we have already raised.

There's also the issue of discovery might be premature. Again, we're not asking for the court to approve discovery before it's ruled on whether or not the claim is sufficient to proceed beyond this point.

And then the last one that they objected to was the underlying Dr. Phillips' opinion in the case, and say because our theory is that defense counsel should have presented a mental defense and didn't, they weren't entitled to those reports because they didn't present the defense.

But at this stage we not only have to prove that what they did was unreasonable, we also have to prove that they were prejudiced by it, and that includes being able to consider what evidence they would have introduced and what evidence was underlying that opinion.

We've already filed, in some of our affidavits, reasons that our experts would say now Dr. Phillips' opinion wasn't addressing the right issue, and therefore wasn't really rebutting what Dr. Spica said in the first place. But if the evidence, he relied on evidence we need to get that in our case to present a mental health defense and the

circumstances that were present.

Unless the court has any questions, that's all I have to say.

THE COURT: Thank you, Ms. Spence. Yes, ma'am?

MS. WILKINSON: Can I have five minutes, Your Honor?

THE COURT: Sure.

MS. WILKINSON: I just want to remind the court this is an early stage in this 2255 proceeding. The Government has not yet answered, no discovery, there's been no evidentiary hearing, and this is a capital case.

As the Supreme Court said in *Kyles*, the court's duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case. The Government seeks to end this capital case through summary dismissal precluding Mr. Caro from any opportunity to actually prove his claims. As stated earlier, the law in effect did not support summary dismissal and we would ask the court to deny the Government's motion. Thank you, Your Honor.

MR. MOUNTCASTLE: On the non-capital matter, Your Honor, just one item I wanted to raise with the court. This case is appropriate for a motion to dismiss because it's untimely, and it's untimely on the face of the pleadings, and even accepting, for purposes of the motion, the issue or

the fact that Mr. Caro might have some mental issues, and the fact that capital counsel may have, or Mr. Dene, his attorney, may have erred in some form or fashion, there's still a five and a half year hole in the case from August 22, 2007 when new counsel was appointed relieving both Mr. Dene and Mr., and his capital counsel of their responsibilities, to January 13, 2013 when the 2255 was filed in this case, there's a five year hole, and Mr. Caro was represented throughout that entire time by counsel. And there's no explanation for why he was not advised to file a 2255, or one was not filed on his behalf during that time frame.

And so the, there's no equitable tolling appropriate in this case, and we'd ask the court to dismiss the 2255 in this matter.

THE COURT: All right. Thank you. Mr. Giorno?

MR. GIORNO: Your Honor, I only have two brief points with regard to the capital case, and one with regard to discovery. The first one is defense counsel --

THE COURT: If you wouldn't mind moving your mic.

MR. GIORNO: Your Honor, the first point I have related to the capital case relates to a statement that Ms. Wilkinson said, that the Government somehow miscomprehended a standard of review at this stage. I understand exactly what the standard of review is. We have

to accept what they say as being factually accurate. What I disagree with is their assertion that somehow the mere statement by an expert concerning what should have been done or could have been done, that that creates a legitimate issue about whether trial counsel was effective. I don't agree with that.

I also don't agree with counsel's speculation about what Mr. Sandoval went in the cell for, what he was going to do. I don't think that creates a legitimate factual issue. That's what my disagreement is. But I do not disagree on the standard to be applied in assessing their claims.

The second issue I have concerns about, they are asking for an evidentiary hearing based on this new evidence, as they call it. And you know that loses sight of the fact that we're assessing the performance and competence of trial counsel with the information that they have, and what they did in connection with this case, and we would submit to the court defense counsel did everything they could or should have done. They got mental health experts, they talked to them, they got mitigation experts, they chased down all those leads. In fact, the fact that they didn't find the right one that was going to say what they were going to do isn't necessarily dispositive in the, an ineffective assistance of counsel claim. I'd ask the court to look at what counsel did as to whether or not this is ineffective

assistance of counsel. Of course, the court can make its own assessment. They have to satisfy both prongs. And if you take everything they say as true, they still don't satisfy the prongs. And I think the court can make that decision without an evidentiary hearing.

One point I want to make on discovery, Ms. Spence said the Government doesn't oppose the discovery request. If I said that, it was not what I intended. What I meant to say was that until the court articulates what, if any, issues remain, the rule does contemplate limited discovery. It's tailored to those specific issues identified by the court. I can't know whether these requests are valid or invalid until I have a ruling from the court. I don't mean to say every claim in this case is okay except for that one point. Thank you, Your Honor.

THE COURT: All right. Well, thank you, counsel, for your arguments. They've been helpful to me, and I will, of course, take the motions under advisement and issue a decision just as soon as I'm able. And if there's nothing further, then, we will adjourn court.

(Proceedings concluded at 3:43 p.m.)

CERTIFICATE


I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.


5/30/14                          /s/ Bridget A. Dickert
Date                                U.S. Court Reporter