# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:06CR00001 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CARLOS DAVID CARO,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

*Anthony P. Giorno, Acting United States Attorney, and Jean B. Hudson, Assistant United States Attorney, Roanoke and Charlottesville, Virginia, for United States; Dale A. Baich and Robin C. Konrad, Assistant Federal Public Defenders, Office of the Federal Public Defender, Phoenix, Arizona, and Fay F. Spence and Brian J. Beck, Assistant Federal Public Defenders, Roanoke and Abingdon, Virginia, for Defendant.*

## TABLE OF CONTENTS

I.    BACKGROUND ................................................................. 5

II.   STANDARDS OF REVIEW ..................................................17

III.  ANALYSIS   ....................................................................21

      A.    CLAIM I: STRATEGIC DELAY OF THE INDICTMENT ..............................21

      B.    CLAIM II: DEPRIVATION OF EFFECTIVE ASSISTANCE
            OF COUNSEL AT THE DEATH CERTIFICATION STAGE ..........................24

      C.    CLAIM III: JUROR MISCONDUCT ........................................26

D.     CLAIM IV: INEFFECTIVE ASSISTANCE OF
COUNSEL DURING GUILT/INNOCENCE PHASE .....................................31

       1.     *Cohesive Theory of Defense*....................................32

       2.     *Impeachment of Sean Bullock*...................................34

       3.     *Prison Culture and Cell Placement* ..........................36

       4.     *Self Defense, Second-Degree Murder, or
Manslaughter* ................................................................37

       5.     *Cumulative Error* ......................................................39

E.     CLAIM V: *BRADY* VIOLATIONS CONCERNING BULLOCK......................40

F.     CLAIM VI: INEFFECTIVE ASSISTANCE
OF COUNSEL DURING PENALTY PHASE .................................41

       1.     *Failure to Challenge Delay of Indictment* ...............41

       *2.*     *Failure to Develop A Compelling Mitigation Story* ...............42

       3.     *Failure to Challenge Government's
Evidence that Caro was a Gang Leader* ..................47

       4.     *Failure to Challenge Government's Evidence
Regarding BOP's Ability to Control Improper
Inmate Communications* ..........................................49

       5.     *Failure to Present Evidence on Prison
Culture and Statements of Remorse*..........................51

       6.     *Failure to Challenge Conviction for Conspiracy
to Commit Murder Related to Benavidez Assault*....................52

       7.     *Failure to Present <u>Skipper</u> Evidence* .........................54

       8.     *Failure to Present Evidence of BOP Negligence
Regarding Decision to Place Sandoval in Caro's Cell* ...........55

9.     *Failure to Object to Government's Evidence on Specific Instances of Violence by Persons Other than Caro* ....................................................................57

10.    *Failure to Object to Improper Arguments During Government's Closing* .................................58

11.    *Failure to Move to Strike Sleeping Juror* ...............60

12.    *Cumulative Error* .................................................62

G.    CLAIM VII: *BRADY* VIOLATIONS CONCERNING FUTURE DANGEROUSNESS ..................................................................62

1.     *BOP Housing Information* ...................................62

2.     *Information on Caro's Status as a Gang Leader*.....................73

3.     *Cumulative Violation* .........................................76

4.     *Eighth Amendment Violation* ..............................76

H.    CLAIM VIII: MINIMIZATION OF JURY'S RESPONSIBILITY ...................77

I.    CLAIM IX: INEFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL ........................................79

1.     *Failure to Challenge Refused Instruction* ...............80

2.     *Failure to Challenge Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty* ........................................................83

3.     *Failure to Challenge Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Caro* ...............86

4.     *Failure to Raise Claim That Government Improperly Minimized Jury's Responsibility* ..........................90

-3-

     5.     *Failure to Raise Systemic*
            *Challenges to the Death Penalty* ...............................................90

   J.     CLAIMS X-XV: SYSTEMIC
         CHALLENGES TO DEATH PENALTY .....................................................91

   K.    CLAIM XVI: CUMULATIVE ERROR .....................................................94

IV.  CONCLUSION.....................................................................................................95

A jury in this court convicted Carlos David Caro of the 2003 pre-meditated murder of his federal prison cellmate, Roberto Sandoval, and fixed his punishment at death. After an unsuccessful direct appeal, Caro now seeks relief from his conviction and sentence pursuant to 28 U.S.C. § 2255.

Caro's § 2255 motion raises 16 claims asserting that his conviction and sentence were unconstitutionally obtained. Among these claims, Caro contends that his trial counsel was ineffective at both the guilt and penalty phases, that his appellate counsel was ineffective on direct appeal, and that the government violated his Fifth Amendment due process rights by delaying indictment in this case until after it had negotiated a plea agreement in a separate case involving a conspiracy to murder another inmate. Caro also brings claims of juror and government misconduct, asserts systemic challenges to the death penalty, and asserts cumulative error. The United States has filed a Motion to Dismiss. Following briefing and oral argument, and after careful review of the record, I find

that Caro's claims are without legal merit. I accordingly find that the United States' Motion to Dismiss must be granted.

## I. BACKGROUND.

Carlos David Caro was born into poverty in the south Texas town of Falfurrias in 1967. He grew up with three brothers, a mother, and a violent, alcoholic father. His maternal uncles introduced him at a young age to the illegal drug trade, eventually resulting in a series of federal drug convictions. He was convicted of possession of marijuana with intent to distribute and sentenced to 24 months custody in 1988, at age 21, when he and his brother were caught near the border transporting 66 pounds of marijuana. In 1992 he was found to have violated the terms of his post-imprisonment supervision and sentenced to an additional six months incarceration.

In 1994 Caro was convicted of conspiracy to possess marijuana with intent to distribute after he was found with 185 pounds of marijuana. He was sentenced to 71 months of imprisonment. Finally, in 2001 at age 34, he was convicted of possession of five kilograms of cocaine with intent to distribute and sentenced to 360 months custody, to run consecutively to a previously imposed 18-month supervised release revocation sentence.

While incarcerated, Caro became a member of a violent prison gang called the Texas Syndicate. In 2002, at the Federal Correctional Institution in Oakdale,

Louisiana, Caro participated in an attack on newly arriving inmates who were members of a rival gang. Prison official John Gordon had talked to Caro about avoiding conflict with the new inmates about three weeks before the incident occurred, but Caro "responded that the Texas Syndicate were going to do what they had to do." (Trial Tr. 168, Feb. 05, 2007, ECF No. 678.) After the incident, Caro admitted his involvement and stated, "I don't give a fuck if they send me to the United States Penitentiary. My brothers follow orders. They know what they're getting into. It doesn't even matter if we're prosecuted. I have 30 years to do. I certainly don't care about myself." (*Id.* at 171.)

Caro was subsequently transferred by the Bureau of Prisons ("BOP") from FCI Oakdale to the United States Penitentiary Lee County ("USP Lee"), a high security prison located in this judicial district. On August 29, 2003, he participated in another violent attack by members of the Texas Syndicate. Caro and Juan Moreno-Marquez, a fellow inmate and gang member, ambushed inmate Ricardo Benavidez in a recreation area of the prison and stabbed him multiple times with shanks before officers could intervene. Five other Texas Syndicate members were nearby and also armed with shanks, but had been denied admittance to the recreation area where the attack took place. Caro pleaded guilty in this court to conspiracy to commit murder and was sentenced on November 1, 2004, to 327 months imprisonment, to run consecutively to his other sentences.

The murder that is the subject of this case occurred only a few months after the attempted murder of Benavidez. After the Benavidez incident, Caro was placed in USP Lee's Special Housing Unit ("SHU"), the segregation area of the prison.[1] On December 16, 2003, inmate Roberto Sandoval was assigned to Caro's cell in the SHU.

Caro initially stated that he was "not accepting a cellmate." (Trial Tr. 101, Jan. 29, 2007, ECF No. 668.) However, he approved Sandoval as a cellmate later in the evening on December 16, 2003, stating, "That's fine. We're brothers. Done some time together." (*Id.* at 116.) Sandoval was placed in Caro's cell at approximately 9:00 p.m.

On December 17, 2003, Caro and Sandoval were served breakfast in their cell at approximately 6:10 a.m. They took recreation outside that evening, and were last observed in their cell by prison staff during rounds at approximately 6:17 p.m. No problems between the two were reported.

Shortly thereafter, at 6:40 p.m., a correctional officer came by on rounds. Caro called out, "[G]et this piece of shit out of here." (Trial Tr. 19, Jan. 30, 2007,

---

[1] "Special Housing Units (SHUs) are housing units in Bureau institutions where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates. Special housing units help ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population." 28 C.F.R. § 541.21.

Case 1:06-cr-00001-JPJ   Document 808   Filed 05/04/15   Page 7 of 95   Pageid#: 8182

ECF No. 670.)  Caro pointed at Sandoval, who was lying next to the cell door motionless, with blood visible and a towel tied with one overhand knot around his neck.  Other officers arrived and handcuffed Caro.  When asked whether Sandoval was still breathing, Caro replied, "No.  At this time he's stinking up the room, get him out."  (*Id.* at 47.)

Caro later was interviewed by FBI Special Agent Douglas Fender, after having been advised of his *Miranda* rights.  Caro stated that he had killed Sandoval because he had eaten Sandoval's breakfast that morning, and Sandoval had cursed him and threatened to eat his breakfast the following day.  Agent Fender asked Caro whether Sandoval's murder had something to do with the Texas Syndicate.  Caro denied that it did, and when Agent Fender continued this line of questioning, Caro stated to the guards, "Get me out of here."  (Trial Tr.  26, Jan. 31, 2007, ECF No. 674.)

Caro later made multiple statements about Sandoval's death.  The day after Sandoval's death, Caro smiled and asked when an officer was "going to assign him a new cellie."  (Trial Tr. 75, Jan. 29, 2007, ECF No. 668.)   In a letter, Caro wrote, "You know, I killed a guy two weeks ago." At the end of this sentence, he used a Spanish word that when translated suggests that he killed Sandoval "[f]or being a fool."  (Trial Tr. 58, Jan. 31, 2007, ECF No. 674.)   He also stated to his wife in a telephone call that "[Sandoval] called me a mother fucker, that whore, that's why I

fucked him up." (*Id.* at 49.)  He later reassured her, "But I'm all right."  (*Id.* at 51.)

Finally, Caro discussed the murder with Roel Rivas, another member of the Texas

Syndicate.  He told Rivas on the phone, "And I also have a death," explaining, "It's

because they gave me a cell mate and he disrespected me, so I took him down."

(*Id.* at 53.)  When Rivas proposed claiming self-defense, Caro said, "That is what

I'm going to do."  (*Id.* at 54.)

On December 30, 2004, the United States Attorney for this district sent a

target letter to Caro related to Sandoval's murder, and contemporaneously

requested that the court appoint counsel for him.  On January 27, 2005, the court

appointed James Simmons of Nashville, Tennessee, as lead counsel and Stephen J.

Kalista, a member of the bar of this court, as co-counsel.  In preparation for a

meeting with the Attorney General's Capital Case Review Committee ("CCRC"),

the court authorized counsel to retain a mitigation specialist, a private investigator,

a neuropsychologist, and a psychiatrist.  The meeting with the CCRC took place on

June 6, 2005.

Following the CCRC meeting, the Attorney General authorized the United

States Attorney for this district to seek the death penalty against Caro.  On January

3, 2006, an Indictment was returned in this court charging Caro with first-degree

murder within the territorial jurisdiction of the United States for the killing of

Sandoval, in violation of 18 U.S.C. §§ 7, 1111. Shortly thereafter, pursuant to 18 U.S.C. § 3593, the government filed its notice of intent to seek the death penalty.

Caro was tried in this court in Abingdon, Virginia, beginning January 22, 2007. Jury selection lasted five days. The guilt/innocence phase of the trial began on January 29. The government presented evidence suggesting that Caro had strangled Sandoval from behind with a towel. Inmate Sean Bullock, who had been in the cell across from Caro's, testified that he had seen Caro behind Sandoval, and watched them fall to the floor. The defense did not call any witnesses, conceding that Caro had killed Sandoval, but arguing that the killing had not been premeditated. In a verdict returned on February 1, 2007, the jury found Caro guilty of first degree murder.

The separate sentencing phase of the trial began on February 5, and lasted for six days. The jury was first asked to determine whether Caro was eligible for the death penalty. In addition to finding that Caro had committed a capital offense covered under 18 U.S.C. § 3591, the jury found that the government had established the existence of two statutory aggravating factors beyond a reasonable doubt: (1) that Caro had been previously convicted of two offenses punishable by a term of imprisonment of more than one year, committed on different occasions, and involving the distribution of a controlled substance, 18 U.S.C. § 3592(c)(10), and (2) that Caro had been previously convicted of a federal drug offense

-10-

punishable by a term of imprisonment of five or more years, 18 U.S.C. § 3592(c)(12).

Following the death penalty eligibility verdict came the final phase of the trial, where the jury heard evidence on mitigating factors and non-statutory aggravating factors to determine whether to select a sentence of either death or life imprisonment. The government presented 12 witnesses and alleged three non-statutory aggravating factors: (1) the impact on Sandoval's friends and family, (2) Caro's future dangerousness, and (3) Caro's lack of remorse. The defense presented eight witnesses, including six individuals from Caro's past, and two experts who opined that the BOP had the ability to safely house Caro if he received a life sentence. The defense asserted 22 mitigating factors.

In its verdict returned on February 13, 2007, the jury unanimously found that 12 mitigating factors proposed by the defense had been proved. It determined that Caro was (1) exposed to repeated instances of domestic violence growing up, (2) raised in a home where education was not valued, (3) raised in an impoverished community, (4) well-behaved growing up, (5) a special education recipient who did not complete the ninth grade, (6) shy and respectful compared to his brothers, (7) brought into illegal drug trafficking by his maternal uncles, (8) not physically abusive toward his wife or daughter, (9) not violent or aggressive until he received his 30-year sentence for drug trafficking, (10) not violent toward prison staff, (11)

not an inmate who attempted escape from any correctional officer or from any correctional facility, and (12) securely housed throughout his incarceration. Some jurors found that four additional mitigating factors had been proved. The jury also found that the government's three non-statutory factors had been proved beyond a reasonable doubt. After assessing whether the aggravating factors sufficiently outweighed the mitigating factors, the jury unanimously determined that Caro should be sentenced to death for the murder of Sandoval.

No post verdict motions were filed, and the mandated sentence of death was imposed by the court on March 30, 2007.

A Notice of Appeal was timely filed. Nearly three years later, on March 17, 2010, after briefing and argument, the court of appeals issued a detailed opinion that addressed each of Caro's challenges and affirmed the conviction and sentence. *United States v. Caro*, 597 F.3d 608, *reh'g denied*, 614 F.3d 101 (4th Cir. 2010). The court of appeals held that this court's refusal to offer certain voir dire questions proposed by Caro was not an abuse of discretion. It also affirmed the denial of discovery motions under *Brady v. Maryland*, 373 U.S. 83 (1963), and Federal Rules of Criminal Procedure 16(a)(1)(E) and 17(c). It held that (1) denial of a *Brady* motion was appropriate as Caro failed to establish that the requested information would be favorable to him, (2) denial of a motion under Rule 17(c) was not an abuse of discretion since Caro could only speculate as to the contents of

the requested information, and (3) denial of a motion under Rule 16(a)(1)(E) was not an abuse of discretion since Caro did not present facts indicating whether the requested information would have actually helped prove his defense.

The court of appeals addressed several additional challenges. It held that the government's closing argument did not cause prejudice warranting reversal. It determined that the jury instruction and the government's argument concerning lack of remorse did not violate Caro's Fifth Amendment privilege against self-incrimination, since given this court's cautionary instruction and evidence showing Caro's lack of remorse, any error would have been harmless under 18 U.S.C. § 3595(c)(2). It held that the statutory aggravating factors in § 3592(c)(10) and (12) did not violate the Eighth Amendment. It ruled that the decision not to give Caro's proposed mercy instruction was not an abuse of discretion given that the proposed instruction was legally incorrect. Finally, it held that various decisions by this court concerning the admissibility of testimony were not abuses of discretion.

On May 11, 2011, following the Fourth Circuit's affirmance, this court granted a motion to appoint the Federal Public Defenders for the District of Arizona and the Western District of Virginia to represent Caro in connection with post-conviction remedies, conditioned upon a denial of certiorari.[2] On January 9,

---

[2] The Federal Public Defender for the District of Arizona has a Capital Habeas Unit, with extensive experience in federal capital habeas cases. *See, e.g.*, *Ryan v. Gonzales*, 133 S. Ct. 696 (2013) (representing habeas petitioner).

2012, the Supreme Court denied Caro's petition for a writ of certiorari. *Caro v. United States*, 132 S. Ct. 996 (2012).

Through his appointed counsel, Caro filed a Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 on January 8, 2013.[3]  In response, the United States filed a Motion to Dismiss.  Caro subsequently filed a Response in Opposition to the United States' Motion to Dismiss.  Caro also filed a First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record.  On November 25, 2013, oral arguments were held on

---

[3] I find that Caro's § 2255 motion was timely filed.  A person convicted of a federal offense has one year to file a § 2255 motion, starting from the latest of the following dates:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).  Where a federal prisoner has filed a petition for a writ of certiorari with the Supreme Court, the date on which the judgment of conviction becomes final is the day that the Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003).

the discovery motion and on the United States' Motion to Dismiss. The issues have been fully briefed and are now ripe for disposition.

Through present counsel, Caro also filed a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 in Case No. 2:03CR10115, related to the stabbing of Ricardo Benavidez. In that motion, Caro challenged the validity of his guilty plea to conspiracy to commit murder under 18 U.S.C. § 1117, alleging ineffective assistance of counsel. The United States filed a Motion to Dismiss, asserting that the § 2255 motion was untimely filed. I have addressed and denied this § 2255 motion in a separate Opinion and Order entered this day, but I will recount the relevant underlying facts here as follows.

In Case No. 2:03CR10115, a Superseding Indictment was returned on December 11, 2003, charging Caro and six other inmates with conspiracy to commit murder and unlawful possession of a weapon, arising from the August 29, 2003, stabbing of Benavidez. Caro and his codefendant Juan Moreno-Marquez, the only inmates who actually stabbed Benavidez, were also charged with assault with the intent to commit murder.

Pursuant to a plea agreement, Caro pleaded guilty to conspiracy to commit murder, while his codefendants, including Moreno-Marquez, pleaded guilty to possession of a weapon, also pursuant to plea agreements. Caro's Plea Agreement provided that the other charges against Moreno-Marquez would be dismissed, and

-15-

Moreno-Marquez was thereafter sentenced to 57 months imprisonment. On November 1, 2004, Caro was sentenced to 327 months imprisonment, to run consecutively to his current sentence. Caro did not appeal.

Caro's attorney in the Benavidez matter, Louis Dene, has submitted a declaration stating that he had advised Caro that the Plea Agreement provided him no real benefit. (Mot. Collateral Relief Ex. 3 ¶ 5, ECF No. 790-3.) Caro responded that "'he wasn't going anywhere,' so the long sentence did not matter to him." (*Id.* at ¶ 6.) Dene then went forward with the Plea Agreement, which benefited Moreno-Marquez and which Dene understood to have been proposed by Moreno-Marquez, Caro's fellow Texas Syndicate member. Dene did not advise Caro to reject the Plea Agreement. Dene was aware that the government intended to proceed with a death penalty case against Caro for Sandoval's murder, but did not advise Caro that any conviction and sentence in the Benavidez assault could be used against him in the death penalty case. (*Id.*)

The government listed Caro's conspiracy to murder Benavidez as an aggravating factor in its Notice of Intent to Seek the Death Penalty. In addition, the government pointed out during the penalty phase of the trial that Caro's prior federal prison sentences, totaling more than 57 years, constituted a life sentence for him. Based on that fact, the government argued, Caro would receive no punishment in the capital case unless death was imposed.

-16-

## II.    STANDARDS OF REVIEW.

In his present Motion for Collateral Relief, Caro asserts 16 claims, the majority of which incorporate multiple subclaims. In support of these claims, Caro relies on the trial record and an appendix of additional evidence. Before addressing these claims, I will outline the legal principles governing his petition.

My review of Caro's application is largely governed by 28 U.S.C. § 2255, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Section 2255 provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

*Id.* § 2255(a). Rule 4(b) of the Rules Governing § 2255 Proceedings provides that the courts must promptly review the § 2255 petition along with "any attached exhibits, and the record of prior proceedings" to determine if the petitioner is entitled to any relief. If the court concludes that the petitioner is not entitled to relief, it must dismiss the petition. Otherwise, it must direct the United States Attorney to file a response. An evidentiary hearing is required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief." 28 U.S.C. § 2255(b). In the case at hand, I have considered the record and relevant authority to determine whether an evidentiary hearing is necessary. I find that the record clearly shows that the petitioner is not entitled to relief, and that an evidentiary hearing is not needed.

An issue already considered and decided on direct appeal cannot be relitigated in a § 2255 motion. *See United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009) ("Linder may not circumvent a proper ruling on his *Booker* challenge on direct appeal by re-raising the same challenge in a § 2255 motion."); *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976) (holding that issues previously decided on direct appeal may not be raised on collateral review).

A collateral attack under § 2255 is also not a substitute for direct appeal. Claims regarding trial or sentencing errors that could have been, but were not, raised on direct appeal are barred from review under § 2255, unless the petitioner shows both cause for the default and actual prejudice, or demonstrates actual innocence. *Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." (internal citations and quotation marks omitted)).

Cause for procedural default "requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Grounds for cause include "government interference or the reasonable unavailability of the factual basis for the claim." *McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Attorney error can also serve as cause for default, but only if it amounts to a violation of the right to effective assistance of counsel. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Prejudice requires a showing that "there is a reasonable probability that his conviction or sentence would have been different." *Strickler v. Greene*, 527 U.S. 263, 296 (1999).

Procedural default does not apply to claims of ineffective assistance of counsel or claims that rely on extra-record evidence. *See Massaro v. United States*, 538 U.S. 500, 503 (2003) ("[T]here is no procedural default for failure to raise an ineffective-assistance claim on direct appeal."); *Bousley*, 523 U.S. at 622 (recognizing an exception to procedural default for claims that cannot be presented without further factual development). Extra-record evidence is narrowly defined; not every piece of evidence introduced by the petitioner constitutes extra-record evidence. *Id.* (holding that there was no proper extra-record evidence because the factual basis for the claim could have been developed "fully and completely addressed on direct review based on the record created."). Procedural default is an

affirmative defense in the habeas context. *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999) ("[T]he issue of procedural default generally is an affirmative defense that the [government] must plead in order to press the defense thereafter."). Under some circumstances, however, a district court may raise the issue of procedural default sua sponte, despite the government's failure to present the defense. *See id.* at 261-62. Before deciding whether to exercise its discretion, "'the court should consider whether justice requires that the habeas petitioner be afforded with notice and a reasonable opportunity to present briefing and argument opposing dismissal.'" *Id.* at 262 (quoting *Magouirk v. Phillips*, 144 F.3d 348, 360 (5th Cir. 1998)).

Several of Caro's claims assert ineffective assistance of counsel. To prove that counsel's representation was constitutionally defective, a petitioner must show both (1) deficient performance and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, the petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation. *Id.* at 688. The petitioner must overcome a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. *Id.* at 688-89.

-20-

To show prejudice, the petitioner must demonstrate a "reasonable probability" that but for counsel's errors, the outcome would have been different. *Id.* at 694-95. If it is clear that the petitioner has not satisfied one prong of the *Strickland* test, the court need not inquire whether he has satisfied the other prong. *Id.* at 697. In a § 2255 motion, the petitioner bears the burden of proving his claims by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

### III.   ANALYSIS.

### A.   CLAIM I:  STRATEGIC DELAY OF THE INDICTMENT.

In his first claim, Caro alleges that the government violated his Fifth Amendment due process rights by "deliberately and tactically delaying the indictment of the capital case until after the government had negotiated a disproportionate plea agreement in the Benavidez assault." (Mot. Collateral Relief 20, ECF No. 790.) He argues that the delay impaired his defense and enabled the government to argue that death would be the only effective punishment since he was already serving a de facto life sentence.

This claim is procedurally defaulted, because its factual basis was available to counsel at the time of direct appeal. *Bousley*, 523 U.S. at 622. The terms of Caro's and his codefendants' guilty pleas in the Benavidez assault, the date of Sandoval's murder, and the dates the United States Attorney sent the target letter

and obtained the Indictment for Sandoval's murder were all available to counsel. I find no cause preventing counsel from raising this claim and must dismiss it.[4]

Even assuming Caro could establish cause and prejudice to overcome the procedural default, he still would not be entitled to relief. To establish a due process violation due to a pre-indictment delay, a petitioner must prove that the delay caused him actual prejudice. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). If actual prejudice is proved, the court must balance that prejudice against the government's justification for the delay. *Id.* In conducting this balancing test, the court must determine whether the government's actions violate "fundamental conceptions of justice or the community's sense of fair play and decency."[5] *Id.* (internal quotation marks and citations omitted).

In *United States v. Lovasco*, 431 U.S. 783 (1977), the respondent was indicted more than 18 months after the offenses were alleged to have occurred. *Id.* at 784. The respondent argued that he had suffered prejudice because he had lost the testimony of two material witnesses due to the delay. *Id.* at 785-86. The Court

---

[4] Because this claim, like all of Caro's claims, is the subject of the government's Motion to Dismiss, Caro has had an opportunity to respond and assert arguments opposing dismissal.

[5] While many circuits require the defendant to prove improper prosecutorial motive in pre-indictment delay due process analysis, the Fourth Circuit does not. *See Howell,* 904 F.2d at 895. The Fourth Circuit has recognized that it has adopted a minority position in this regard, but nonetheless has not overruled *Howell. See Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir. 1996).

-22-

held that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796. The government asserted that the delay was due to efforts to identify additional defendants, and the Court reasoned, "We must assume that these statements by counsel have been made in good faith. In light of this explanation, it follows that compelling respondent to stand trial would not be fundamentally unfair." *Id.* at 796.

The situation at hand is similar. Sandoval was murdered on December 17, 2003. The government sent a target letter to Caro on December 30, 2004, and obtained the Indictment on January 3, 2006. While Caro argues that the pre-indictment delay was due to the government's desire to obtain a strategic advantage through an ability to argue that Caro was already serving a life sentence due to previous convictions, it is clear that as the government contends, the time between the offense and the Indictment was due to the need to investigate and adhere to the death-penalty guidelines of the Department of Justice. Any delay in the Indictment against Caro does not offend "fundamental conceptions of justice or the community's sense of fair play and decency." *See Howell*, 904 F.2d at 895 (internal quotation marks and citations omitted). "Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a

Case 1:06-cr-00001-JPJ   Document 808   Filed 05/04/15   Page 23 of 95   Pageid#: 8198

criminal prosecution." *United States v. Marion*, 404 U.S. 307, 324-25 (1971). Neither the year that passed between Sandoval's murder and the target letter nor the two years that passed between Sandoval's murder and the return of the Indictment justify vacating or setting aside Caro's conviction and sentence.

## B. CLAIM II: DEPRIVATION OF EFFECTIVE ASSISTANCE OF COUNSEL AT THE DEATH CERTIFICATION STAGE.

In his second claim, Caro argues that his Sixth Amendment rights were violated because he was deprived of effective assistance of counsel at the "death-certification stage of the case." (Mot. Collateral Relief 26, ECF No. 790.)

Under the Sixth Amendment, a defendant has the right to the presence of counsel at all "critical stages" of the proceedings. *United States v. Wade*, 388 U.S. 218, 227 (1967). A court is required to

> scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself.

*Id.* The "death-certification stage" to which Caro refers concerns the pre-indictment period during which the Department of Justice conducted internal proceedings in order to determine whether to seek the death penalty. Although Caro had counsel during this period, he had no constitutional right to counsel.

The process by which the Department of Justice decides to seek the death penalty is a confidential administrative process, and the final decision is made by

-24-

the Attorney General.  U.S. Dep't of Justice, *U.S. Attorneys' Manual* § 9-10.050,

1998 WL 1745001 (2014).  The Department normally affords defense counsel "an

opportunity to present evidence and argument in mitigation" before making a final

decision.  *United States v. Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL

1453527, at *1 n.5 (W.D. Tenn. Apr. 14, 2014).  In Caro's case, this internal

process was conducted after he received a target letter, but before the Indictment

was issued against him.

The government has the prosecutorial discretion to seek the death penalty.

*See* 18 U.S.C. § 3593(a) (discussing notice requirements for government attorneys

seeking the death penalty); *United States v. Armstrong*, 517 U.S. 456, 464 (1996)

("In the ordinary case, 'so long as the prosecutor has probable cause to believe that

the accused committed an offense defined by statute, the decision whether or not to

prosecute, and what charge to file or bring before a grand jury, generally rests

entirely in his discretion.'" (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364

(1978))).  A defendant has no right to counsel during the stage where the

government decides what charges to file and what sentence to seek, as the process

is internal and administrative.  *See United States v. Craveiro*, 907 F.2d 260, 264

(1st Cir. 1990) ("[T]he internal guidelines of a federal agency, that are not

mandated by statute or the constitution, do not confer substantive rights on any

party."); *United States v. Le*, 306 F. Supp. 2d 589, 592 (E.D. Va. 2004) ("[I]nternal

DOJ guidelines do not create any substantive or procedural rights for a defendant.").[6]   This process is precursory, when the defendant has yet to be confronted.   As the court explained in *United States v. McVeigh*, 944 F. Supp. 1478, 1483-84 (D. Colo. 1996):

> [T]he decision to seek the death penalty under the Act is a matter of prosecutorial discretion. The Protocol did not create any individual right or entitlement subject to the due process protections applicable to an adjudicative or quasi-adjudicative governmental action.
>
> . . . .
>
> The constitutional protections of the life and liberty of a defendant are provided by the sentencing hearing following trial of the charges in the indictment.

Because Caro had no right to counsel during the death-certification phase, he is not entitled to relief on this claim.

## C.   CLAIM III: JUROR MISCONDUCT.

Caro asserts in his third claim that juror misconduct violated his Fifth Amendment right to due process and his Sixth Amendment right to an impartial jury.  He asserts that Juror No. 62 and Juror No. 32 provided factually inaccurate

---

[6] The defendant cites *United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358 (D.P.R. 1999), for the proposition that the right to counsel attaches at the death certification stage. *Id.* at 363-64.  The court in *Pena-Gonzalez* reached its decision by analogizing the death certification process to an adult certification hearing, which is presided over by a judge. *Id.* at 363.  However, the death certification process is not presided over by a judge and is a completely internal procedure of the Department of Justice. *See United States v. Shakir*, 113 F. Supp. 2d 1182, 1188 (M.D. Tenn. 2000) (criticizing rationale of *Pena-Gonzalez*); *United States v. Torres Gomez*, 62 F. Supp. 2d 402, 405-06 (D.P.R 1999) (same).

-26-

answers about their attitudes toward the death penalty during voir dire. He contends that Juror No. 32 also lied about his ability to follow the instructions of the court during the penalty phase, because the juror allegedly stated after the conclusion of the trial that he decided to vote for the death penalty as soon as he decided that Caro was guilty.

The government argues that this claim is procedurally defaulted, but Caro contends that it relies on evidence outside the record. He includes an affidavit from Juror No. 62. It states:

> 2. It was obvious from the evidence that Carlos Caro was guilty of first-degree murder. I am now, and was at the time of the trial, strongly in favor of the death penalty in cases where evidence of guilt is obvious.

> 3. There is nothing that the defense offered, or could have offered, that would have changed my mind about the sentence because Caro committed the crime.

(Mot. Collateral Relief Ex. 32, ECF No. 790-32.) Caro also includes a summary of statements allegedly made by Juror No. 32:

> After trial, however, [Juror No. 32] stated that the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and once he reached that conclusion, he had made up his mind about the death penalty, noting that the Bible states "An eye for an eye." After trial he also said nothing the defense could have offered would have changed his mind.

(Mot. Collateral Relief 42, ECF No. 790.) These two sources constitute Caro's extra-record evidence.

After careful consideration of the record and the party's arguments, I find that this claim is without merit. Both the juror affidavit and the alleged juror statements concern internal mental processes, and are inappropriate for this court to consider.

Unless in conflict with the Rules Governing § 2255 Proceedings, the Federal Rules of Evidence apply to § 2255 proceedings. *See* Fed. R. Evid. 1101(a) ("These rules apply to proceedings before . . . United States district courts"), 1101(b) ("These rules apply in . . . civil cases and proceedings"), and 1101(e) ("A federal statute or a rule prescribed by the Supreme Court may provide for admitting or excluding evidence independently from these rules."). Accordingly, Rule 606(b) applies to the situation at hand. *See Fullwood v. Lee*, 290 F.3d 663, 679-80 (4th Cir. 2002) (applying Rule 606(b) to capital habeas proceedings); *Bacon v. Lee*, 225 F.3d 470, 485 (same); *Stockton v. Virginia*, 852 F.2d 740, 743-44 (same). Rule 606(b) states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). Caro does not assert that any exception to Rule 606(b) applies. *See* Fed. R. Evid. 606(b)(2) (listing extraneous prejudicial information,

outside influence, or a mistake in entering the verdict on the verdict form as exceptions).

Though a criminal defendant enjoys the right to trial by an impartial jury, "the Sixth Amendment does not require that all evidence introduced by the defendant tending to impeach the jury's verdict be considered by the courts." *Robinson v. Polk*, 438 F.3d 350, 358-60 (4th Cir. 2006) (citing *Tanner v. United States*, 483 U.S. 107, 117 (1987)). "In order to protect the finality and integrity of verdicts and to guard against the harassment of jurors, a party seeking to invalidate a verdict may not rely upon evidence of 'a juror's mental process in connection with the verdict.'" *Fullwood*, 290 F.3d at 679-80 (quoting *United States v. Cheek*, 94 F.3d 136, 143 (4th Cir. 1996)). I cannot consider the affidavit or alleged statements which Caro puts forth in support of this claim.

To the extent that Caro seeks to assert a claim of juror deceit under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), his claim fails. Under *McDonough*, in order to receive federal habeas corpus relief on a claim of juror deceit on jury questionnaires or during voir dire, the petitioner "must first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. However, *McDonough* applies to instances of deceit that can be proved through objective facts that can be obtained through

-29-

sources other than the juror.[7]  *See United States v. Fulks*, 454 F.3d 410, 431 (4th

Cir. 2006) (applying test where juror failed to disclose her husband's murder in a

timely manner); *Conaway v. Polk*, 453 F.3d 567, 585 (4th Cir. 2006) (applying test

where juror failed to disclose that he was double first cousins with the petitioner's

codefendant); *Conner v. Polk*, 407 F.3d 198, 204-05 (4th Cir. 2005) (applying test

where juror who had covered petitioner's first trial for a newspaper denied that she

---

[7] Although the Fourth Circuit did address a juror's belief in *Jones v. Cooper*, 311 F.3d. 306, 310 (4th Cir. 2002), that does not necessitate consideration of the juror statements asserted here. *Jones v. Cooper* concerned a multipart *McDonough* claim based on an affidavit prepared by an investigator.

> [The] investigator reported that the challenged juror stated that several of her relatives had been subjected to arrests or jury trials; that she had gone to the Fast Fare the day after the murder and robbery; that she had strong, religiously-motived views in favor of the death penalty; and that she knew that appellant had previously received a death sentence.

*Id.* at 311 (citation and alternation omitted).  The third part of the affidavit concerned the juror's belief "'that the Bible mandates imposition of the death penalty in every case of first degree murder.'"  *Id.* at 312 (citation omitted).  With regard to this belief, the court held: "It cannot be inferred from any statement in the affidavit that the juror could not disregard her personal feelings about the death penalty or apply the law as written, or that the juror lied when she stated that she could be a fair juror."  *Id.*  This alleged belief obviously could not have been verified by objective facts that did not depend on the juror's own assessment of her beliefs and mental processes.  However, this one basis for the *McDonough* claim in *Jones v. Cooper* does not mean that courts should consider similar arguments about jurors' internal thought processes in subsequent cases.  In *McNeill v. Polk*, 476 F.3d 206 (4th Cir. 2007), the court suggested that this portion of the opinion was dicta, stating that because the state court quashed the juror affidavit based on an unspecified state rule of evidence, it "implicitly accepted the affidavit and rejected the petitioner's claims on the merits."  *Id.* at 213.  The court "did not question whether the state court's [evidentiary] ruling was proper."  *Id.*  Thus, *Jones v. Cooper* does not preclude use of Rule 606(b) when analyzing claims of juror deceit.

had firsthand knowledge of the facts of the crime). In contrast, Caro seeks to prove that the jurors were deceitful through their own statements.

Finally, to the extent that Caro seeks to assert a violation of *Morgan v. Illinois*, 504 U.S. 719 (1992), his claim also fails. *Morgan* held that "If even one such juror [who would automatically vote for the death penalty in every case] is empaneled and the death sentence is imposed, the [government] is disentitled to execute the sentence." *Id.* at 729. *Morgan* concerned the adequacy of voir dire, and held that "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id.* In the case at hand, Caro was afforded extensive opportunity to investigate all prospective jurors during voir dire. Juror No. 62 and Juror No. 32 were questioned about their beliefs regarding the death penalty in juror questionnaires and during voir dire before being selected for the jury. Caro has not alleged inadequate voir dire proceedings, and his reliance on *Morgan* does not salvage his juror misconduct claim.

### D.    Claim IV:  Ineffective Assistance of Counsel During Guilt/Innocence Phase.

Caro asserts five grounds for ineffective assistance of counsel during the guilt/innocence phase of the trial. He argues that prejudicial error resulted from trial counsel's failure to (1) develop a cohesive theory of defense, (2) adequately investigate and impeach government witness Sean Bullock, (3) adequately investigate and present evidence of the BOP's negligence regarding the decision to

-31-

place Sandoval in Caro's cell, and (4) adequately investigate and present evidence in support of self defense, second-degree murder, or manslaughter. Finally, he argues that even if these deficiencies are individually insufficient to demonstrate prejudice, they do so when considered cumulatively. For the reasons stated below, I will deny relief on Caro's claim of ineffective assistance of counsel during the guilt/innocence phase.

### 1. *Cohesive Theory of Defense.*

At trial, Caro's counsel argued that he killed Sandoval "in hot blood." (Trial Tr. 43, Jan. 29, 2007, ECF No. 668.) They argued that first-degree murder was not appropriate because there was conflict between the two men at breakfast, they were confined in a small cell, and "this was a case of a pot boiling over." (*Id.*)

Caro now claims that his trial counsel was ineffective for failing to develop a cohesive theory of defense to be presented during the guilt/innocence phase and brought out during the penalty phase. He argues that trial counsel could have claimed that he killed Sandoval, a Texas Syndicate member, because he feared retribution for assaulting Benavidez, a Texas Syndicate leader. He also argues that trial counsel could have presented evidence that he suffers from a brain impairment and anxiety disorder, that their theory of a hot-blooded killing failed to account for the time between Sandoval's death and the breakfast dispute, and that their theory

did nothing to mitigate his post-offense statements or the government's positions on his gang leadership and future dangerousness.

It is clear that Caro's trial counsel was faced with the difficult task of developing a theory around a conceded killing and recorded statements that did not suggest remorse. Caro stated that his impetus for killing Sandoval was that Sandoval disrespected him. (*See* Trial Tr. 49, 53, Jan. 31, 2007, ECF No. 674 (stating that he killed Sandoval because Sandoval tried to call him a "mother fucker" and "disrespected" him).) Trial counsel had to consider how a jury might interpret these statements, and develop a theory of the case that they felt would be most convincing in light of the evidence they could present and the evidence they could expect from the government. Considering the circumstances of the case, trial counsel's theory was not unreasonable.

Caro, with the benefit of hindsight, suggests alternative arguments and points to perceived weaknesses. His critiques do not overcome the presumption that trial counsel's decisions fell within the bounds of reasonable professional judgment. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. Caro has not demonstrated that trial counsel's theory of a hot-blooded killing was an unreasonable strategic decision.

-33-

## 2. *Impeachment of Sean Bullock.*

Caro claims that trial counsel was ineffective for failing to adequately investigate and impeach the government's eyewitness, Sean Bullock, and failing to present the testimony of Bullock's cellmate, Joseph Bland. He argues that trial counsel overlooked Bland as a potential witness after Bullock stated in his grand jury testimony that he had a cellmate. Caro contends that trial counsel failed to pursue the issue after Bullock testified at trial that he had a cellmate, but could not recall his cellmate's name on cross examination. He also argues that trial counsel failed to adequately cross-examine Bullock on inconsistencies between his trial testimony and previous statements. Caro claims that trial counsel's failure to impeach Bullock prejudiced him because Bullock's testimony was the only evidence that supported the government's proposition that he had ambushed Sandoval from behind.[8]

With regard to Caro's claim that trial counsel was ineffective for failing to impeach Bullock, I find that Caro has failed to show that counsel's representation fell below an objective standard of reasonableness. "Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel." *Tucker v.*

---

[8] Caro also seeks to support this subclaim with two juror affidavits. These affidavits will not be considered pursuant to Federal Rule of Evidence 606(b). *See Fullwood*, 290 F.3d at 679-80.

*Ozmint,* 350 F.3d 433, 444 (4th Cir. 2003). However, there remains "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In this situation, trial counsel did investigate and pursue several methods of impeachment. They sought to impeach Bullock with inconsistencies in his testimony at trial, his grand jury testimony, and his mass interview form. They questioned him about facets of his background, including his use of false identities. They tried to elicit a hope that he would receive benefits for his testimony, and they questioned him about why he did not tell his cellmate what he saw. There is no indication that trial counsel's efforts to impeach Bullock were unreasonable.

With regard to Caro's claim that trial counsel was ineffective for overlooking Bland as a potential witness and failing to introduce his testimony, I find that Caro has not established prejudice. It is not clear that Bland's testimony would have changed the jury's assessment of Bullock's credibility. Bland's affidavit states that he and Bullock had been playing cards on the bed for at least 30 minutes before officers opened the door to Sandoval's cell. (Mot. Collateral Relief Ex. 2, ¶ 5, ECF No. 790-2.) He states that he and Bullock were unaware of what happened until Sandoval was removed from the cell, and that Bullock "was not standing by the door prior to inmate Sandoval being removed from cell 123." (*Id.* ¶ 6.) However, Bullock testified that did not tell his cellmate about what he

-35-

Case 1:06-cr-00001-JPJ   Document 808   Filed 05/04/15   Page 35 of 95   Pageid#: 8210

saw. Bullock did not say he was standing at the door when Sandoval was removed from his cell. Rather, he stated that he was at that location earlier when he observed Caro with an orange towel around Sandoval's neck. The jury would have had to assess the credibility of both men, and there is nothing to suggest that they would have believed Bland over Bullock. Caro has not demonstrated a reasonable probability that the outcome of the guilt/innocence phase would have been different but for this alleged deficiency.

### 3. *Prison Culture and Cell Placement.*

Caro argues that trial counsel was ineffective for failing to adequately investigate and present evidence of prison culture in order to demonstrate that the BOP was negligent in placing Sandoval in his cell. He contends that a prison culture expert might have testified that the refusal of Sandoval as a cellmate could have been a sign that he feared retribution from the Texas Syndicate. Caro argues that such an expert could have opined that the BOP should have housed him separately from other Texas Syndicate members, and that Sandoval's request to be placed in the same cell could have been a challenge to him. It is asserted that a prison culture expert could have laid a foundation for the fact that Sandoval was placed in the SHU for possession of a weapon, and explained the significance of that. Caro contends that the prison's gang intelligence officers should have been consulted before he was given a cellmate. He also argues that the officer who

witnessed his refusal to take a cellmate violated standard operating procedures by failing to record it in the SHU log book.

None of these arguments undermine confidence in the jury's verdict of first-degree murder. Caro has not established prejudice. As Caro admitted to killing Sandoval and was the only possible perpetrator, the primary issue during the guilt/innocence phase was that of premeditation. The government introduced significant evidence in support of premeditation, including Bullock's testimony, Caro's proffered reasons for killing Sandoval, and the time that passed between their dispute and Sandoval's death. Caro must demonstrate a reasonable probability that counsel's deficiencies undermined the outcome of the trial, and he has not done so. Even if trial counsel had provided testimony from a prison culture expert, there was extensive alternative evidence to support a finding of premeditation.

#### 4. *Self Defense, Second-Degree Murder, or Manslaughter.*

Caro argues that trial counsel was ineffective for failing to adequately investigate and present evidence in support of self defense, second-degree murder, or manslaughter. He asserts that trial counsel should have presented a theory of self defense based on fear of retribution. He argues that trial counsel should have utilized a prison culture expert to explain the context of his post-offense statements and the impropriety of Sandoval's request to be placed in the same cell. Caro

argues that trial counsel was ineffective for raising the question of why Sandoval wanted in the cell, but failing to answer it. He claims that these deficiencies present a reasonable probability that a juror would have concluded that he acted in response to a real or perceived threat, and not with premeditation.

While Caro argues that trial counsel should have presented a fear of retribution theory which might have supported a conviction for a lesser crime, such a theory does not easily accord with Caro's post-offense statements regarding Sandoval's killing. (*See, e.g.*, Trial Tr. 53, Jan. 31, 2007, ECF No. 674 ("[T]hey gave me a cell mate and he disrespected me, so I took him down.").) Caro stated that he killed Sandoval because Sandoval disrespected him; he never stated that he was in fear of Sandoval.

Even if trial counsel had presented testimony from a prison culture expert that Caro's post-offense statements were due to a need for bravado but his actions were in self defense, a reasonable juror still could have concluded from Caro's statements that the killing was premeditated. Reading Caro's post-offense statements as a guise of bravado "is quite strained . . . and is not supported by the [post-offense statements] as a whole." *Pruett v. Thompson*, 996 F.2d 1560, 1571 (4th Cir. 1993). For example, Caro stated on the phone to his wife, "[Sandoval] tried to call me mother fucker, that whore, that's why I fucked him up." (Trial Tr. 49, Jan. 31, 2007, ECF No. 674.) A need to maintain a facade of toughness around

-38-

prison inmates and correctional officers would not explain this statement to his wife.

Additionally, the fact that trial counsel alluded to Sandoval's motivation for wanting to be in Caro's cell, but did not introduce evidence to answer that question, does not establish ineffective assistance of counsel. *See Turner v. Williams*, 35 F.3d 872, 904 (4th Cir. 1994) ("In our view, assuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is virtually unchallengeable.") (internal quotation marks and citation omitted)), *overruled on other grounds by O'Dell v. Netherland,* 95 F.3d 1214 (1996).

### 5. *Cumulative Error.*

Caro argues that "[e]ven if a single deficiency in counsel's performance does not result in prejudice, the cumulative impact of all failures resulted in . . . an unfair trial." (Mot. Collateral Relief 61, ECF No. 790.) This contention must fail. I have found each of Caro's subclaims of ineffective assistance of counsel during the guilt/innocence phase without merit. Counsel's acts or omissions "'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" *Fisher v. Angelone*, 163 F.3d 835, 853 (4th Cir. 1998) (quoting *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)). These claims do not collectively establish a right to collateral relief.

-39-

### E.    CLAIM V: *BRADY* VIOLATIONS CONCERNING BULLOCK.

In his fifth claim, Caro argues that the government violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by withholding material exculpatory and impeachment evidence and misleading defense counsel.  He argues that the government misrepresented the fact that Bullock had a cellmate at the time of the offense, and failed to provide a mass interview report for Bland even though it asserted that all SHU inmates had been interviewed.

While the government argues that this claim is procedurally barred, Caro asserts that it relies on extra-record evidence — Bland's declaration.  Assuming that Bland's declaration constitutes appropriate extra-record evidence to overcome procedural default, this claim still must be dismissed.

In order to prove a *Brady* violation, a defendant must demonstrate that the government failed to provide the defendant with material exculpatory evidence. Specifically, the defendant must prove: (1) there was evidence favorable to the accused, (2) the government suppressed it, and (3) the defendant suffered prejudice.  *Strickler*, 527 U.S. at 281-82.  Additionally, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."  *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990).

Trial counsel had information from which to infer that Bullock had a cellmate. The government disclosed the SHU daily logs for December 17-20, 2003, and a SHU roster for December 20, 2003. The daily log for December 19, 2003, showed that Bland was moved from cell 146 (Bullock's cell) that day. Additionally, the government produced Bullock's grand jury testimony, which referenced his cellmate, one month before trial. Whether the government "never overtly corrected [trial counsel's] misconception," (Mot. Collateral Relief 64, ECF No. 790), is irrelevant. The government is not required to illuminate facts in this manner for the defense. Caro has failed to establish a *Brady* violation.

### F.   CLAIM VI: INEFFECTIVE ASSISTANCE OF COUNSEL DURING PENALTY PHASE.

In his sixth claim, Caro argues that he was deprived of effective assistance of counsel during the penalty phase of the trial in violation of his Sixth Amendment rights. He asserts 12 grounds for ineffective assistance of counsel, which are addressed individually below.

### 1.   *Failure to Challenge Delay of Indictment.*

Caro alleges that trial counsel was ineffective for failing to challenge the government's delay in obtaining the Indictment for Sandoval's murder until after a conviction had been obtained for the Benavidez assault. This subclaim builds on Caro's allegations in Claim I. He now argues that trial counsel should have

pursued a pretrial remedy that would have prevented the government from arguing that the Benavidez assault was an aggravating factor in support of death.

## 2. Failure to Develop A Compelling Mitigation Story.

Caro contends that his trial counsel failed to adequately investigate, develop, and present a compelling mitigation story about his life. It is well settled that defense counsel must conduct a reasonable investigation into mitigating evidence to be presented during the penalty phase, and that failure to present mitigating evidence cannot be justified as a tactical decision unless the duty to investigate has been fulfilled. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). In this case, there is no indication that trial counsel failed to conduct a reasonable investigation into Caro's background.

Trial counsel hired many experts to investigate Caro's background, and received mixed results. They hired a mitigation specialist whom they eventually had to replace. They hired a fact investigator, two experts to opine on future dangerousness, a neuropsychologist, a neurologist, and a psychiatrist.

Trial counsel also presented mitigating evidence during the penalty phase. They alleged 22 mitigating factors, and put on eight witnesses over the course of three days. In addition to hearing from two future dangerousness experts, the jury also heard testimony from three of Caro's aunts, Caro's wife, a former teacher, and a cousin.

As a result of trial counsel's efforts, the jury unanimously found that 12 mitigating factors had been proved. Caro argues that his trial counsel should have done more to develop a compelling mitigation story, but he has failed to demonstrate how their conduct fell below prevailing professional norms. Due to trial counsel's efforts, many elements of Caro's past were given weight as mitigating factors. While Caro asserts numerous deficiencies of trial counsel, their overall efforts during the penalty phase were not objectively unreasonable. Caro's subclaim is without merit, and his specific allegations of deficiency, addressed below, are without merit.

Caro argues that trial counsel should have obtained more than two mental health experts, and points to the fact that a child psychiatrist and neonatologist were not retained despite the mitigation specialist's recommendation to do so.

Caro has not demonstrated that his trial counsel acted unreasonably in the number and type of experts they obtained. Trial counsel developed mitigation evidence under time and financial constraints. They could not investigate every possible lead, and had to make professional judgments about what leads were likely to be the most fruitful. Caro has not established that helpful testimony could have been elicited from the additional experts he mentions. *See Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir. 1990) ("He claims that his counsel conducted an inadequate investigation to discover persons who would testify in his

favor, but he does not advise us of what an adequate investigation would have revealed or what these witnesses might have said, if they had been called to testify.").

Caro next challenges trial counsel's reliance on Keith Caruso, M.D. First, he argues that trial counsel should have sought another psychiatrist after Dr. Caruso opined that his testimony would not be helpful to the defense. Second, he argues that trial counsel should have obtained another psychiatrist after they discovered that Dr. Caruso's research work in medical school would likely compromise his credibility as an expert witness.

Trial counsel did not provide ineffective assistance because they failed to find a psychiatrist whose testimony was favorable to Caro. Trial counsel's performance should not be evaluated based on a qualified expert's unfavorable conclusions or testimony. *See Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998) (rejecting an inmate's claim that trial counsel should have pursued mental health defenses where a mental health report indicated that the inmate was competent to stand trial); *Roach v. Martin*, 757 F.2d 1463, 1477 (4th Cir. 1985) (holding that trial counsel was not ineffective for failing to explore an insanity defense after a psychiatrist found him sane). Trial counsel was also not ineffective in failing to obtain another psychiatrist less susceptible to impeachment than Dr. Caruso. Caro

has not shown prejudice on this argument, considering that trial counsel chose a strategy where no evidence from a psychiatrist was presented.

Caro argues that his trial counsel was ineffective in failing to call mental health experts during the penalty phase. He argues that his trial counsel should have reviewed the report of the government's experts before making such a decision. He claims that even if the government's experts had presented testimony harmful to Caro, at least one of the government's experts could have been impeached. He also argues that trial counsel should have presented the neuropsychologist's diagnosis that he had Cognitive Disorder NOS.

The decision to forego mental health evidence was not unreasonable. Trial counsel was not permitted to view the government's experts' report until after they gave notice of intent to present mental health evidence, and trial counsel had reason to believe that the testimony of the government's expert might be unfavorable to Caro. In contrast, only one expert available to testify for the defense, neuropsychologist D. Malcolm Spica, Ph.D., had a professional opinion favorable to Caro. Trial counsel could have decided that Dr. Spica's testimony would not be beneficial enough to overcome harmful testimony from the government's testifying expert. *See Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) (finding reasonable a decision not to call a psychiatrist when damaging findings could have been brought out on cross-examination).

Caro argues that trial counsel was ineffective for failing to obtain a mental health expert to explain the effects of Caro's childhood trauma. Several mitigating factors concerning Caro's childhood were found by the jury. Additionally, several relatives testified about negative aspects of Caro's childhood, such as the violent nature of his father. There is not a reasonable likelihood that the testimony of a mental health expert on Caro's childhood trauma would have changed the outcome of the penalty phase.

Caro argues that trial counsel was ineffective in failing to call his brothers, Jose and Noe, to testify during the penalty phase. However, both brothers have criminal histories, and trial counsel's decision was not unreasonable. Whether to call a witness "necessitate[s] the weighing of risks and returns that is an intrinsic part of defense counsel's choice of strategy." *Goins v. Angelone*, 52 F. Supp. 2d 638, 661 (E.D. Va. 1999). While Caro's brothers could have presented mitigating evidence about their troubled childhood and their abusive father, trial counsel might have felt that their testimony would be undermined by their previous convictions.

Caro argues that trial counsel was ineffective in presenting the testimony of his cousin, Laura Perez, who testified about a positive aspect of Caro's childhood, his loving grandparents. Caro has not established ineffective assistance of counsel merely because he points to a witness who gave testimony that was damaging as

well as helpful. Trial counsel made a strategic decision regarding the value of Perez's testimony, and no evidence suggests that the decision was unreasonable.

Finally, Caro argues that trial counsel was ineffective in making prejudicial remarks during their opening and closing statements, including stating that Caro took the easy way out by choosing the drug trade and admitting that Caro was not a good father. These statements cannot be construed as objectively unreasonable. Both are grounded in fact — Caro joined the drug trade at a young age, and was frequently apart from his wife and child. Trial counsel could have made a strategic decision to address these topics in an attempt to reduce the sting of their impact on the jury.

Caro asserts many arguments in support of his claim that his trial counsel failed to develop a compelling mitigation story. However, for each argument he has failed to demonstrate prejudice or objectively unreasonable professional conduct.

### 3. *Failure to Challenge Government's Evidence that Caro was a Gang Leader.*

Caro argues that trial counsel was ineffective for failing to investigate prison culture, and failing to subject the government's evidence concerning Caro's leadership position in the Texas Syndicate to meaningful adversarial testing. He specifically points to trial counsel's failure to challenge the testimony of John Gordon.

At trial, the government presented testimony from John Gordon, a Special Investigative Service Lieutenant at FCI Oakdale in 2002, during the time when Caro was involved in assaults on newly arriving inmates who were members of a rival gang. Gordon testified that he had told known Texas Syndicate members that he wanted to meet with their leader, and that in response to this request, Caro showed up and told Gordon that the "Texas Syndicate were going to do what they had to do." (Trial Tr. 168, Feb. 05, 2007, ECF No. 678.) The assaults occurred shortly thereafter, and Caro later told Gordon that the Texas Syndicate was responsible for the assaults and that his brothers follow orders. (*Id.* at 171-72.) Based on these interactions, Gordon concluded that Caro was a leader of the Texas Syndicate. (*See id.* at 171-174.)

Caro argues that trial counsel was ineffective for failing to present rebuttal evidence that Caro was not a gang leader at the time of the 2002 assault at FCI-Oakdale. He claims that trial counsel could have discredited Gordon by introducing evidence that he relied on the erroneous assumption that the Texas Syndicate would have sent their actual leader to the meeting, and by introducing evidence that his request of Caro during their initial meeting to reveal the identity of other gang members was naïve.

Trial counsel's performance was not objectively unreasonable. Trial counsel properly anticipated that the government would argue that Caro was a gang leader,

-48-

and made efforts to exclude that evidence through motions in limine. The government's evidence was that when Gordon requested to meet with a Texas Syndicate leader, Caro showed up, and that after the assault occurred, Caro took responsibility for it. Even if trial counsel had presented expert testimony in line with Caro's arguments, the jury still had plenty of evidence from which to reasonably conclude that Caro was a leader of the Texas Syndicate. The impeachment methods now suggested by Caro do not necessarily undermine Gordon's testimony. There is not a reasonable probability that the result of the penalty hearing would have been different had such evidence been introduced.

### 4. *Failure to Challenge Government's Evidence Regarding BOP's Ability to Control Improper Inmate Communications.*

Caro argues that trial counsel failed to adequately investigate relevant facts and law regarding the BOP's ability to control improper inmate communications, and failed to subject the government's evidence to meaningful adversary testing.

At trial, the government presented testimony from a former BOP warden, Gregory Hershberger, that Caro would likely have future access to telephone, visitors, and mail services. (Trial Tr. 185-86, 191-92, Feb. 12, 2007, ECF No. 686.) Hershberger also testified that Caro might be able to communicate with gang members through phone and letters, although the BOP would try to prevent it. (*Id.*)

Caro argues that trial counsel was ineffective for not establishing that the

BOP does have the authority and ability to control his communications. He argues that trial counsel could have introduced evidence about Special Administrative Measures, which allow the government to construct individualized conditions of confinement, or BOP program statements, which describe the authority of prison officials to curb inmate communication methods. *See, e.g.*, 28 C.F.R. § 501.3 (Prevention of acts of violence and terrorism); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement No. P5264.08 (1/24/2008), *available at* http://www.bop.gov/policy/progstat/5264_008.pdf (telephone restrictions), *id.* at 5267.08 (5/11/2006), *available at* http://www.bop.gov/policy/progstat/5267_008 .pdf (visitors). Caro argues that without knowing about BOP tools for preventing improper communications, the jury was left to believe that the BOP could not control his future communications.

At trial, Hershberger testified that Caro's visitation, telephone, and commissary rights "can't just arbitrarily be taken from him." (Trial Tr. 202-03, Feb. 12, 2007, ECF No. 686.) He also testified that while the BOP staff would try to prevent inmates like Caro from sending out coded messages, he did not think they could guarantee it. (*Id.* at 191.) A jury could reasonably conclude from Hershberger's testimony that while BOP officials may make efforts to curb an inmate's communications, they cannot do so without reason, nor can they guarantee success. Caro has not established that but for trial counsel's failure to

-50-

present evidence on the BOP's mechanisms for controlling inmate communications, the result of the penalty phase would have been different. I find that Caro has not suffered prejudice, and is not entitled to relief on this subclaim.

### 5. *Failure to Present Evidence on Prison Culture and Statements of Remorse.*

Caro argues that trial counsel failed to adequately investigate and present mitigating evidence on prison culture and statements of remorse.

At trial, the government argued that Caro lacked remorse, and presented as evidence Caro's several post-offense statements previously described. Caro argues that trial counsel should have presented evidence on prison culture in order to mitigate the effects of these statements. He contends that these statements could have been due to a desire to present an image of strength in order to prevent attacks on his person, and that remorse could have been viewed by other inmates as a sign of weakness. Because the jury found beyond a reasonable doubt that Caro had not expressed remorse for killing Sandoval, Caro argues that trial counsel's failure to present evidence on his statements in the context of prison culture was prejudicial.

 I find that Caro has not established prejudice. Even if trial counsel had presented evidence that Caro's statements were due to a need for bravado, the jury had enough evidence from which to conclude that Caro did not demonstrate remorse. Additionally, evidence on prison culture would have been irrelevant to some of Caro's post-offense statements. As previously noted, an inmate's need to

-51-

maintain an air of bravado in prison would not account for Caro's statement to his wife that, "[Sandoval] tried to call me mother fucker, that whore, that's why I fucked him up." (Trial Tr. 49, Jan. 31, 2007, ECF No. 674.)

### 6. *Failure to Challenge Conviction for Conspiracy to Commit Murder Related to Benavidez Assault.*

Caro argues that trial counsel was ineffective for failing to adequately investigate his prior conviction for conspiracy to commit murder, and for failing to file a collateral challenge to that conviction. He argues that the attorney who represented him in the separate Benavidez assault prosecution was ineffective for failing to advise him that a guilty plea for conspiracy to murder likely would be used against him as an aggravating factor in the Sandoval case. He argues that had he gone to trial instead of accepting a guilty plea, a jury might have found him not guilty because the victim was uncooperative and the video footage of the stabbing was of low quality.

Building on these assertions, Caro next claims that his trial counsel in this matter was ineffective for failing to file a collateral challenge to the Benavidez conviction and sentence. He argues that trial counsel should have known that the Benavidez conviction was prejudicial because it was his only conviction for a significant crime of violence. He points out that his three previous drug trafficking convictions did not involve violence. He contends that because the conviction for conspiracy to commit murder was used as an aggravating factor, the government

-52-

was able to present him as a violent inmate already facing prison for the rest of his life, who, without the death penalty, would receive no punishment for his crime. He argues that trial counsel also failed in their duty to investigate. He claims that they did not interview his prior attorney or obtain copies of the discovery in the Benavidez matter.

At issue is the performance of trial counsel in this matter, not the performance of Caro's prior attorney. Caro has failed to show that his trial counsel acted unreasonably in failing to challenge the prior conviction, interview prior counsel, and obtain discovery for the prior matter. "[A] petitioner has no Sixth Amendment right to counsel in order to mount a collateral challenge to his conviction." *United States v. Williamson*, 706 F.3d 405, 416 (4th Cir. 2013). It follows that trial counsel was not ineffective for failing to file a collateral challenge to an earlier conviction. It certainly is within the bounds of professional norms to focus on the case at hand rather than attempting to challenge and reinvestigate prior convictions. Furthermore, trial counsel was not ignorant of the Benavidez assault. Trial counsel contacted Caro's prior counsel, talked to him, and collected a portion of his files to review. Caro's prior conviction for conspiracy to commit murder was only one element of a complex murder trial. Trial counsel acted reasonably in researching this prior conviction, but devoting the majority of their attention to the case at hand.

## 7. *Failure to Present <u>Skipper</u> Evidence.*

Caro argues that trial counsel was ineffective for failing to present mitigating evidence in accordance with *Skipper v. South Carolina*, 476 U.S. 1 (1986), which held that "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Id.* at 4 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).

Caro presents three arguments. He first argues that trial counsel was ineffective for failing to introduce evidence that his plea in the Benavidez assault was a "selfless act" done to benefit Moreno-Marquez, a fellow inmate who was able to plead guilty to a lesser charge and went from facing 27 years to facing a maximum of five years imprisonment. (Mot. Collateral Relief 129, ECF No. 790.) He next contends that trial counsel was ineffective for failing to introduce evidence from a prison psychologist who reported that Caro was primarily violent with other members of the Texas Syndicate, and that some prison staff members had described him as a good inmate. Finally, he argues that trial counsel was ineffective for failing to introduce evidence of Caro's concern for the well-being of others, referring to a time when Caro reported that another inmate was experiencing psychological distress.

That trial counsel did not present evidence on these three topics does not render their assistance ineffective. Caro's claim does not concern evidence that the

court determined was irrelevant and inadmissible, as in *Skipper*, but rather concerns evidence that trial counsel chose not to present. *See* 476 U.S. at 3. Trial counsel may have made a strategic decision to exclude this evidence. They may have thought that a jury might not consider the circumstances of Caro's plea to be a mitigating factor. While trial counsel could have argued that Caro's plea was a selfless act that enabled Moreno-Marquez to leave prison sooner, the government could have highlighted the gang connection between the two men. The government could have pointed out that Caro's plea was designed to benefit a violent inmate who was videotaped stabbing an unarmed man. Similarly, trial counsel may have decided not to present evidence from the prison psychologist's report because it addressed both positive and negative aspects of Caro's behavior. The reason for deciding not to introduce Caro's comment about another inmate's psychological distress is less obvious, but the decision was not unreasonable or in violation of professional norms. Caro has not demonstrated that his right to effective assistance of counsel was violated.

### 8. *Failure to Present Evidence of BOP Negligence Regarding Decision to Place Sandoval in Caro's Cell.*

Caro argues that trial counsel was ineffective for failing to argue and present evidence during the penalty phase that the BOP was negligent in placing Sandoval in Caro's cell. He relies on the same assertions that he made in Claim IV(C). He asserts that the BOP should have housed Caro separately from other Texas

-55-

Syndicate members after the Benavidez assault, that the BOP should have recognized that Caro might face retribution from the Texas Syndicate for the Benavidez assault, that Sandoval's request to be placed in the same cell as Caro might have been a challenge to Caro, that the BOP should have recognized the significance of Sandoval being placed in the SHU because he was caught with a weapon, that gang intelligence officers should have been consulted before Caro was given a cellmate, and that Caro's initial refusal to take a cellmate should have been documented in a log book.

Caro has not established that trial counsel's failure to argue that the BOP was negligent in placing Sandoval in his cell constituted ineffective assistance of counsel. Even if his trial counsel had introduced evidence supporting all of the arguments he proposes, the jury still could have decided that the death penalty was appropriate. The jury could have rejected the arguments that the BOP was negligent and that Caro feared retribution, and instead decided, based on the government's case and Caro's own statements, that Caro killed Sandoval due to their dispute over breakfast. Or, the jury could have concluded that the BOP was negligent in placing Sandoval in Caro's cell, but that the balance of aggravating and mitigating factors still warranted the death penalty. Because there is not a reasonable probability that this evidence would have changed the outcome of the penalty phase, this claim fails.

### 9. *Failure to Object to Government's Evidence on Specific Instances of Violence by Persons Other than Caro.*

Prior to trial, I directed that "absent proper disclosure, the government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness." *United States v. Caro,* 461 F. Supp. 2d 478, 482 (W.D. Va. 2006). Caro claims that his trial counsel was ineffective for failing to adequately object to the government's evidence on specific acts of violence from inmates other than Caro.

Caro first argues that his trial counsel was ineffective for failing to adequately object to government witness Daniel Olson's testimony that inmates in the Aryan Brotherhood used a coded letter to order the deaths of two African-American inmates. Caro's trial counsel made a hearsay objection, but did not argue that this was "specific instances" evidence that violated the court's order. (Trial Tr. 34-37, Feb. 06, 2007, ECF No. 683.)

Caro next argues that trial counsel failed to adequately object when the government asked defense expert Mark Cunningham on cross examination about the facts of other defendants' cases. He asserts that the government asked irrelevant and prejudicial questions about whether Dr. Cunningham had testified in the trial of a defendant who was a member of al-Qaeda. (Trial Tr. 87-88, Feb. 12, 2007, ECF No. 686.) Caro also argues that trial counsel failed to object when the

-57-

government questioned Dr. Cunningham during cross-examination about three terrorists who managed to send coded letters from ADX-Florence.

Finally, Caro argues that trial counsel failed to object when government witness Mark Hershberger testified that 20 years earlier, an inmate at USP Marion had murdered two correctional officers and wounded two others.

Caro has failed to establish prejudice. First, some of this evidence might have been admitted even if trial counsel had objected as Caro suggests. Dr. Cunningham's answers during cross-examination might have been admissible as bearing on his credibility and bias. Similarly, Hershberger and Olsen, the other two witnesses whose testimony is in question, were offered as rebuttal witnesses to Dr. Cunningham. Second, even without the specific-acts evidence in question, the jury had an abundance of evidence from which to conclude that Caro would be a future danger, most notably Caro's own statements and past violence.

### 10. *Failure to Object to Improper Arguments During Government's Closing.*

Caro argues that his trial counsel was ineffective for failing to object to the government's improper arguments during closing.

He argues that trial counsel should have objected to the government's argument that the jury should control Caro by imposing the death penalty and that if Caro did not receive the death penalty then there would be no punishment for Sandoval's death. The Fourth Circuit addressed these arguments on appeal and

-58-

concluded that while they were improper, they did not prejudice Caro. Because no prejudice resulted, these arguments fail to establish ineffective assistance of counsel.[9]

Caro also asserts that his trial counsel should have objected to the government's minimization of the jury's responsibility in the capital sentencing process. However, this claim is based on a misreading of the trial transcript. Caro argues that the government minimized the act of putting a defendant to death by arguing that "it's the law." (Mot. Collateral Relief 158, ECF No. 790.) However, the prosecutor actually said, "It's not the law." The prosecutor stated:

> The last thing I would like to talk about is the law. Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term. The job is not to kill anyone. It's not the law. You'll be asked to make one judgment, and it's this: Is the death penalty for Carlos Caro justified?

(Trial Tr. 98, Feb. 13, 2007, ECF No. 687.) In rebuttal, Caro asserts that his claim stands despite his initial misreading of the transcript, because the government also downplayed the jury's responsibility by arguing that other juries have sentenced people to death. He refers to an earlier portion of the government's closing, where the government stated, "If it is your decision that Carlos David Caro should be

---

[9] Caro argues that he has presented additional facts and arguments, and that accordingly, the Fourth Circuit's conclusion must be reweighed. Caro's additional facts and arguments for this claim consist of his briefs and a supporting juror affidavit. The juror affidavit will not be considered pursuant to Federal Rule of Evidence 606(b). *See Fullwood*, 290 F.3d at 679-80.

-59-

sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done." (*Id.* at 17-18.)

Caro's argument does not create a reasonable probability that the outcome of the trial would have been different. The fact that some juries have voted for the death penalty is common knowledge, and trial counsel's failure to object to either of the government's statements did not constitute an unreasonable professional decision. More egregious conduct is required before counsel's failure to object will constitute ineffective assistance. *See Hodge v. Hurley*, 426 F.3d 368, 386-87 (6th Cir. 2005) (finding ineffective assistance where counsel failed to object to prosecutor's false, unsupported, and misleading statements during closing); *Driscoll v. Delo*, 71 F.3d 701, 711 (8th Cir. 1995) (finding ineffective assistance where counsel failed to object when prosecutor referred to judge as 13th juror and stated that the jury's sentence of death would be a mere recommendation to the judge).

## 11. *Failure to Move to Strike Sleeping Juror.*

Caro argues that his trial counsel was ineffective for failing to move to strike Juror No. 33 after discussions occurred about whether the juror was sleeping, and after the juror informed a court security officer that he was experiencing anxiety problems. Caro asserts that this was not a reasonable strategy decision since trial

counsel had rated the first alternate more favorably than Juror No. 33. Caro also argues that the continued presence of Juror No. 33 infringed his right to a fair trial.

Caro cannot show that trial counsel's decision not to move to remove the juror was unreasonable. A juror is properly dismissed where the juror's sleeping "makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial." *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000). "However, a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how to handle a sleeping juror." *United States v. Johnson*, 409 F. App'x 688, 692 (4th Cir. 2011) (unpublished) (quoting *Freitag*, 230 F.3d at 1023 (citations omitted).) There is no clear evidence that Juror No. 33 was sleeping. Neither the lawyers nor I thought that the juror was inattentive to the degree that he needed to be removed. When Juror No. 33 was questioned by me, he stated that he was staying awake and paying attention. (Trial Tr. 66-68, Feb. 7, 2007, ECF No. 684.) I find that Caro has failed to show that his attorneys were ineffective for failing to seek Juror No. 33's removal, or that his right to a fair trial was compromised.

Even if trial counsel had moved to replace this juror, Caro cannot show prejudice on this claim. I likely would not have granted the motion because the evidence supporting removal was weak in light of my first-hand knowledge of the

circumstances.  Caro has not demonstrated either prong of the *Strickland* test, and his claim fails.

### 12.  *Cumulative Error*.

Finally, Caro argues that deficiencies of counsel during the penalty phase prejudiced him cumulatively.  None of these claims individually warrant granting Caro's Motion for Collateral Relief, nor do they do so collectively.  *Fisher*, 163 F.3d at 852-53.

### G.  CLAIM VII: *BRADY* VIOLATIONS CONCERNING FUTURE DANGEROUSNESS.

During the penalty phase, the government alleged future dangerousness as a non-statutory aggravating factor.  The government presented evidence that Caro held a leadership position in a violent gang, and that Caro would only temporarily be at the BOP's most secure facility.  In his seventh claim, Caro argues that the government violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by withholding material exculpatory and impeachment evidence on these topics.  He also argues that the government misled the jury regarding his future dangerousness.  His claims are individually addressed below.

### 1.  *BOP Housing Information*.

In this *Brady* claim, Caro argues that the government withheld material, exculpatory, and impeachment evidence that the BOP had often housed inmates in its most secure prison, Administrative Maximum United States Penitentiary in

-62-

Florence, Colorado ("Florence ADMAX"), for more than three years. Caro moves to engage in discovery to obtain BOP data, expand the record, and conduct a hearing on this evidence and its potential impact on his sentence. I find, however, that because Caro raised this same *Brady* claim on direct appeal, he is barred from relitigating it under § 2255. *Linder*, 552 F.3d at 396 (finding that defendant "may not circumvent a proper ruling on his [claim] on direct appeal by re-raising the same challenge in a § 2255 motion."). I also find that the BOP information Caro claims the government should have disclosed does not qualify as *Brady* evidence. *See Strickler*, 527 U.S. at 281 ("[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

Prior to trial, Caro filed four separate discovery motions for BOP data and records on inmates housed at Florence ADMAX. The motions sought the same information on different grounds, including data showing inmates' length of stay since the prison opened in 1994. Two of the motions sought subpoenas duces tecum directed to the director of the BOP and the warden of Florence ADMAX pursuant to Rule 17 of the Federal Rules of Criminal Procedure (ECF Nos. 273 & 274). Another motion sought an order from the court requiring the government to produce the information under Federal Rule of Criminal Procedure 16(a)(1)(E) (ECF No. 308), and the final motion sought an order from the court to produce the

-63-

information as exculpatory within the meaning of *Brady* (ECF No. 307). The motions were referred to the magistrate judge, who granted the motion based on *Brady* and denied the other motions. *See United States v. Caro*, No. 1:06cr00001, 2006 WL 3251738, at *4-*5 (W.D. Va. Nov. 8, 2006) (Sargent, J.). The parties filed objections to the magistrate judge's order. I sustained the government's objections on the ground that the defense had not demonstrated that the requested evidence was material as defined under *Brady*. *Caro*, 461 F. Supp. 2d at 481. The Fourth Circuit affirmed this ruling on Caro's direct appeal. *Caro*, 597 F.3d at 619.

Some time after Caro murdered Sandoval, he was transferred from USP Lee to Florence ADMAX. Caro presented evidence about Florence ADMAX from Mark Cunningham, Ph.D., a psychologist and expert in prison violence and security measures within the BOP.[10] He explained that at Florence ADMAX, inmates, even in so-called "general population," are confined in single cells, 23 hours per day, with shackled movement and single-person exercise. Dr. Cunningham described in great detail the intense security restrictions imposed upon inmates in this prison. He testified that in his opinion, the BOP had an available level of security that could house Caro so that "the likelihood of serious violence is very low." (Trial Tr. 82, Feb. 12, 2007, ECF No. 686.)

---

[10] Dr. Cunningham is a frequent defense future-dangerousness expert in capital cases. *See, e.g, United States v. Umana*, 750 F.3d 320, 354 (4th Cir. 2014); *United States v. Hager*, 721 F.3d 167, 196 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1936 (2014).

Importantly, Cunningham also testified that "for most of the inmates that are there . . . it's not intended to be a permanent placement," the idea being that "you could modify this person sufficiently, or get their attention sufficiently that they could be returned to a lower level of security at some point." (Trial Tr. 39-40, Feb. 12, 2007, ECF No. 686.) He explained that the prison has a so-called step-down program that has a minimum period of three years before an inmate can be reassigned to another facility, with an average transfer period of five years. On the other hand, he pointed that there are inmates at Florence ADMAX for whom there is no foreseeable plan of a lower level of security, such as "Al Qaeda terrorists," the Unabomber Ted Kaczynski, and prison gang leaders. (*Id.* at 40.)

In rebuttal, the government presented testimony from Gregory Hershberger, a retired former warden at Florence ADMAX and long-time BOP employee. He also described the three-year step-down program. Hershberger testified that Caro would always present a danger within the BOP system. He agreed with the prosecutor's assertion that "no system that the Bureau of Prisons has been able to devise to control the inmates is completely failsafe." (*Id.* at 190.)

Relying on the testimony of these experts, the government argued to the jury that Caro would likely leave Florence ADMAX as soon as three years after he entered the facility. (Trial Tr. 35, Feb. 13, 2007, ECF No. 687 ("[H]e may initially go to ADMAX, but he will be moved out to the USP on a three year program.").)

-65-

In his § 2255 motion, Caro asserts that at the time of his trial, the government had exclusive access to data showing that in actuality, the BOP often did not meet its goal of moving inmates out of Florence ADMAX in three years through the step-down program. He claims that the government committed a *Brady* violation by failing to disclose BOP data on this topic and misrepresenting to the jury that if sentenced to life in prison, BOP officials could not protect staff and other inmates from Caro's violence for more than three to five years.

Even without the requested access to BOP data about inmates' terms at Florence ADMAX, Caro has developed evidence on the topic that he presents in support of his § 2255 motion. Caro has submitted an informal survey conducted by a law firm in New Mexico in November 2010. (Mot. Collateral Relief Ex. 48, ECF No. 790-48.) The survey sought information on the number of consecutive years that each inmate at Florence ADMAX had spent there. Of the 129 questionnaires sent, 14 were returned unanswered with indications that the prisoners were under special administrative measures and could not respond. Sixty-nine were returned. (*Id.* at 1, ¶ 3.) The survey suggests that in 2007, at least 30 inmates had been housed at Florence ADMAX for five or more years. (*Id.* at Ex. A, 1-4.) The survey also suggests that 43 inmates had been at Florence ADMAX, or United States Penitentiary Marion, the most secure BOP institution before Florence ADMAX was built, for eight or more consecutive years. (*Id.* at 1,

¶ 4.)

Caro has also presented new evidence in his response to the government's Motion to Dismiss.[11] The evidence is a collection of data from various sources, some of which were not available at the time of Caro's trial. This rough compilation of data suggests that at least 126 inmates have been at Florence ADMAX for more than five years, and at least 155 inmates have been at Florence ADMAX for more than three years. (Pet'r's Opp'n Mot. Dismiss Ex. 72 ¶ 7, ECF No. 797-1.) It also suggests that inmates who have been at Florence ADMAX for more than three years comprise almost thirty percent of the current population. (*Id.*) Caro argues that this data likely does not fully represent the number of inmates who have been continuously housed at Florence ADMAX for more than three years.

The new evidence also suggests that there are at least 54 inmates who have been accused or convicted of committing a homicide within a BOP facility who have been designated to Florence ADMAX. (*Id.* at ¶ 9.) Allegedly, these 54 inmates have continuously remained at Florence ADMAX since their initial

---

[11] The evidence presented is a collection of various sources. It includes the Dvorak Affidavit (*Id.* Ex. 48); documents produced by the government in response to a 2010 subpoena issued to the BOP in *United States v. Vincent Basciano*, 1:05-CR-060 (E.D.N.Y.); the Bureau of Prisons Inmate Locator and federal court PACER websites; the Federal Death Penalty Resource Counsel website; documents received pursuant to a FOIA request in this case; and internet searches for articles containing names of inmates known to be housed at Florence ADMAX. (Pet'r's Opp'n Mot. Dismiss Ex. 72 ¶ 3, ECF No. 797-1.)

placement there.  (*Id.*)  The new evidence suggests that in 2007, at least 14 of these inmates had been incarcerated at Florence ADMAX for more than three years. (*Id.*)

Finally, Caro has located 10 cases where a defendant committed a homicide within a BOP facility, but ended up with a life sentence.  (*Id.* at ¶ 11.)  Allegedly, nine of these defendants have been at Florence ADMAX since the imposition of their life sentences.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  Failure to disclose because the evidence is in possession of another government department is no defense.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "[S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more."  *Id.* at 437. The government's constitutional duty to disclose is triggered only when a "reasonable probability" arises that the undisclosed evidence would result in a different outcome—or in other words, when the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  *Id.* at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

I must first decide whether Caro is attempting to relitigate the *Brady* claim that was raised on appeal and rejected by the Fourth Circuit. It is well established that a § 2255 motion is not a vehicle for relitigating claims already decided by the appellate court. *See Linder*, 552 F.3d at 396; *Boeckenhaupt*, 537 F.2d at 1183 (holding that issues previously decided on direct appeal may not be raised on collateral review).

The record is clear that Caro raised this same *Brady* claim at trial and again on appeal. Now, as he did then, Caro is seeking access to BOP data on inmates from which he can build statistics about how long inmates are confined at Florence ADMAX. His current version of the claim presents some newly developed, sample statistics extrapolated from raw data he has located on his own since the appeal, that are favorable to his position on future dangerousness. Nevertheless, this recast version of the claim is still seeking the same data for the same reasons. Caro makes no showing that he could not have collected and presented similar evidence when he raised his original *Brady* claim. Had he done so, such evidence would have been a part of the record — for me to consider in reviewing the

-69-

magistrate judge's ruling and for the court of appeals to consider.[12]  Caro's legal

claim here is no different in substance from the claim that he lost on appeal, and

therefore, it is barred.  *Boeckenhaupt*,  537 F.2d at 1183.

In any event, Caro's new statistics do not meet the materiality standard

under *Brady*.  The same element that was missing at trial and on appeal is still

missing now — a likelihood that additional BOP data would boil down into

statistics that undermine confidence in the jury's verdict on future dangerousness.

*See United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that

an item of undisclosed information might have helped the defense, or might have

affected the outcome of the trial, does not establish 'materiality' in the

constitutional sense.").

When deciding the appropriate punishment for a defendant who has been

convicted of capital murder, jurors are directed to weigh the aggravating and

---

[12] Caro asserts that his § 2255 *Brady* claim falls within an exception to the procedural default rule because it relies on evidence that could not have been presented on appeal without further factual development.  *See Bousley*, 523 U.S. at 622 (quoting *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam) (holding that an issue was appropriately raised in a habeas where "the facts [relied on are] '*dehors* the record and their effect on the judgment was not open to consideration and review on appeal'")).  I cannot find that Caro's claim falls within this exception.  Rather, I find it clear that Caro is now raising the same *Brady* claim that he raised in earlier proceedings.  He is, in effect, asking me to reverse the Fourth Circuit's ruling on that claim, based on a type of evidence that was not made part of the trial record only because Caro did not then make the effort to do so.  Such relitigation of an already decided claim, using newly acquired ammunition, is barred.  *Boeckenhaupt*,  537 F.2d at 1183.

mitigating circumstances presented in the case. *See* 18 U.S.C. §3593(d). In Caro's

case, jurors unanimously found each alleged aggravating factor, including Caro's

lack of remorse and his record of violence against other inmates. They also found

12 of the 22 mitigating factors that Caro had proposed, including the fact that the

BOP had securely confined Caro since Sandoval's death in December of 2003. In

addition, some jurors found that four other mitigating factors had been established

beyond a reasonable doubt, including the mitigating factor that, if not sentenced to

death, Caro would be incarcerated in a secure federal institution for the rest of his

life.

Both Caro and the government presented expert testimony about BOP

mechanisms to maintain security over dangerous inmates like Caro which

indicated that inmates could remain at Florence ADMAX for more than three

years. Caro's expert witness, Dr. Cunningham, testified that senior staff at

Florence ADMAX had estimated that it takes an average of five years for any

inmate to complete the step-down program. He also testified that staff had told

him about several inmates who had been incarcerated there continuously since the

facility opened in 1994. (Trial Tr. 40-41, Feb. 12, 2007, ECF No. 686.)

Cunningham further testified that, based on his research, a federal inmate who had

killed another inmate would be maintained at Florence ADMAX for six years

before BOP officials even considered an alternate placement. The government's

expert witness, Dr. Hershberger, also conceded that in special cases, inmates sometimes remained at Florence ADMAX for years.

The new facts that Caro presents with his § 2255 claim merely reiterate these facts adduced at trial, indicating that inmates often take more than three years to complete the step-down program to earn transfer to a less restrictive placement. Caro's new evidence does not contradict the government's central argument on this issue, which was that Caro could not be permanently assigned to the ADMAX facility. As Cunningham admitted, Florence ADMAX is not intended to be a permanent placement for any inmate, because the goal of the BOP is that exposure to the restrictive environment at Florence ADMAX and its rehabilitative programs would modify an inmate sufficiently to allow his safe transfer to less restrictive housing.

After review of the evidence that the jury heard on this one mitigating factor, I find no plausible reason to believe that the additional, undisclosed BOP data now presented would have persuaded jurors that the mitigating factors outweighed the aggravating factors, such that Caro should not be sentenced to death. Thus, I conclude that the government did not commit a *Brady* violation by failing to disclose the BOP data Caro seeks. For the same reason, I cannot find that the interests of justice require discovery, expansion of the record, or an evidentiary hearing on this matter, and will deny Caro's requests in this regard.

## 2. *Information on Caro's Status as a Gang Leader.*

Caro next argues that the government withheld material exculpatory evidence that Caro was not the leader of the Texas Syndicate at USP Lee and that he might be in bad standing with the Texas Syndicate.

Caro argues that the government should have disclosed three pieces of evidence. The first piece of evidence is the grand jury testimony of a gang intelligence officer at USP Lee. The officer testified that intelligence information had suggested that Benavidez was the leader of the Texas Syndicate at USP Lee before he was assaulted, and that Francisco Tijerina was the leader of the Texas Syndicate at USP Lee at the time of the officer's testimony in 2003. (Mot. Collateral Relief Ex. 28, 14-15, ECF No. 790-28.) The second piece of evidence is an internal BOP memo dated one week after Sandoval's death. The memo states that an inmate told a prison official that a group had decided that whoever had killed Sandoval would face trouble. (*Id.* at Ex. 58.) The third piece of evidence is an internal BOP transportation report from 2006. The report states that Caro "is believed to be in 'bad standing'" with the Texas Syndicate. (*Id.* at Ex. 59.)

Caro argues that these three documents are material because the government argued that he was, or might still be, a leader of the Texas Syndicate. (Pet'r's Opp'n Mot. Dismiss 126.) During the sentencing phase of the trial, the prosecutor stated several times that Caro was a leader of the Texas Syndicate. (*See, e.g.,* Trial

Tr. 21-22, Feb. 13, 2007, ECF No. 687.) The prosecutor also specifically referenced Caro's role in the Benavidez assault at USP Lee, stating, "Whether he's a leader, whether he's an enforcer, don't know. But he was a player." (*Id.* at 96.)

As discussed above, to demonstrate a *Brady* violation, Caro must prove that the undisclosed evidence was "(1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.,* prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them." *United States v. Bartko*, 728 F.3d 327, 338 (4th Cir. 2013) (internal quotation marks and citation omitted).

The government argues that there is not a reasonable probability that the disclosure of these three documents would have changed the sentencing outcome. (Gov.'s Mot. Dismiss 89, ECF No. 791.) I agree. Caro has failed to demonstrate prejudice, or that this evidence is exculpatory or impeaching.

These three pieces of evidence primarily concern BOP assessments of Caro's position in the Texas Syndicate, and are not authoritative assessments of Caro's gang standing. Additionally, evidence was presented on the uncertain nature of Caro's status in the Texas Syndicate after the assault on Benavidez at USP Lee.

Jacoba Guzman, a technician in the Special Investigative Supervisor's Office of the Bureau of Prisons, translated a letter concerning the Benavidez

assault that law enforcement had intercepted. (Trial Tr. 16, Feb. 6, 2007, ECF No. 683.) The letter was addressed to a Mr. Gomez. Guzman testified that the letter was likely intended for Nick Gomez, the leader of the Texas Syndicate outside of prison. (*Id.* at 17.) The letter was signed by several inmates, including Caro, whose name was signed first. (*Id.* at 18-19.) The letter stated in part:

> With all respect and moving to the purpose of the present it's necessary sincerely to clear without a doubt the matter that's been placed on the procedure in respect to blank Benavidez . . . . At this moment it's asked and let be clear [sic] that everything is good or clear with this person. Therefore, there is no or doesn't exist any testification against one or any brothers of ours Texas Syndicate [sic].

(*Id.* at 21.)

In addition to introducing this letter, the government referred to the uncertainty of Caro's status in the Texas Syndicate during their closing arguments:

> And after the Benavidez stabbing, what does he do? He sends out letters to this Mr. Gomez who, according to Jackie Guzman, was like the godfather of the Texas Syndicate. . . . [He said] [w]e didn't know we weren't supposed to take orders from Tijerina, and please let me back in good standing with the gang.

(Trial Tr. 28, Feb. 13, 2007, ECF No. 687.) It thus appears that evidence and argument that Caro might be in bad standing with the Texas Syndicate were presented during the penalty phase, and that Caro had personal knowledge that he might be in bad standing with the Texas Syndicate. *See United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) ("[I]nformation actually known by the defendant falls outside the ambit of the *Brady* rule.").

-75-

In light of all evidence presented during the penalty phase, there is not a reasonable probability that this evidence was material, exculpatory or impeachment evidence that would have changed the outcome.

### 3. *Cumulative Violation.*

Caro argues that the government's cumulative failures to produce exculpatory and impeachment evidence violated his constitutional rights. He argues that the government misled the jury with regard to his gang association and the BOP's ability to safely house him for more than three years, and that the government's cumulative errors prejudiced him.

However, I find that the items of evidence that Caro claims were withheld in violation of *Brady* are not material when considered cumulatively. "[T]his evidence, even viewed cumulatively, does not place [the petitioner's] trial in such a different light that confidence in the verdict is undermined." *Richardson v. Branker*, 668 F.3d 128, 149 (4th Cir. 2012).

### 4. *Eighth Amendment Violation.*

Caro argues that his death sentence violates the Eighth Amendment because misleading evidence led to the finding that he presented a future danger. He states that his claim relies on the evidence and arguments presented in other claims, specifically Claims VI, VII, and X. Insofar as these claims have been found to be without merit, this claim is also without merit.

## H.    CLAIM VIII: MINIMIZATION OF JURY'S RESPONSIBILITY.

Caro argues that the government violated the Eighth Amendment by minimizing the jury's responsibility.

*Caldwell v. Mississippi*, 472 U.S. 320, 333 (1985), states in relevant part: "The uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." A *Caldwell* violation occurs when a sentencer "has been led to the false belief that the responsibility for determining the appropriateness of the defendant's capital sentence rests elsewhere." *Sawyer v. Smith*, 497 U.S. 227, 233 (1990).

Caro argues that the government made two statements during its closing argument that diminished the jury's responsibility. First, the government stated:

> If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done.

(Trial Tr. 17, Feb. 13, 2007, ECF No. 687.) Second, the government stated:

> The last thing I would like to talk about is the law. Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term. The job is not to kill anyone. It's not the law.

(*Id.* at 98.)

As the government points out, this claim is procedurally defaulted. It rests on facts and law that were available to counsel at the time of appeal. A sentencing

-77-

error that could have been raised on direct appeal, but was not, is barred from review under § 2255 unless the petitioner shows both cause for the default and actual prejudice. *Bousley*, 523 U.S. at 622. Prejudice requires a showing that "there is a reasonable probability that his conviction or sentence would have been different . . . ." *Strickler*, 527 U.S. at 264. In this instance, prejudice has not been demonstrated.

Caro's first argument is that the government sent a message to the jury that it did not need to feel responsible for causing the death of Caro because other juries have done so. (Mot. Collateral Relief 159, ECF No. 790.) I do not find that the government's statements created the perception that the responsibility for determining the appropriateness of a death sentence rested elsewhere. The reasonable interpretation of the government's remarks was that other juries have imposed the death sentence in other capital cases. Additionally, this statement was preceded by a discussion of the jury's responsibility to weigh aggravating and mitigating factors. (Trial Tr. 16-17, Feb. 13, 2007, ECF No. 687.)

Caro's second argument is based upon a typographical error. He incorrectly quoted the transcript as stating, "The job is not to kill anyone. It's the law." (Mot. Collateral Relief 158, ECF No. 790.) I do not find that the government's actual statement, quoted above, created the perception that the responsibility for determining the appropriateness of a death sentence rested elsewhere. This

statement was followed by a discussion of the jury's responsibility to weigh aggravating and mitigating factors. (Trial Tr. 98, Feb. 13, 2007, ECF No. 687.)

This claim has been procedurally defaulted, and because prejudice has not been demonstrated, Caro cannot overcome the procedural default.[13]

## I.   CLAIM IX:  INEFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL

In his ninth claim, Caro argues that he was deprived of his constitutional right to effective assistance of counsel on direct appeal.  He argues that appellate counsel was ineffective in failing to raise five claims.  First, he argues that appellate counsel failed to challenge the court's refusal to instruct the jury that aggravating factors must outweigh mitigating factors sufficiently and beyond a reasonable doubt.  Second, he argues that appellate counsel failed to challenge the exclusion for cause of qualified jurors with misgivings as to the death penalty. Third, he argues that appellate counsel failed to raise an argument regarding trial counsel's failure to object to the introduction of specific instances of violence committed by persons other than Caro.  Fourth, he argues that appellate counsel failed to raise the claim that the government violated Caro's constitutional rights by minimizing the jury's responsibility.   Fifth and finally, Caro argues that

---

[13]   Caro asserts that he can overcome this claim's procedural default by establishing ineffective assistance of counsel.  However, this argument is without merit because establishing ineffective assistance of counsel also requires a showing of prejudice. *See infra* Claim IX.D.

appellate counsel failed to raise systemic challenges to the death penalty. These arguments are individually addressed below.

### 1. *Failure to Challenge Refused Instruction.*

Caro argues that appellate counsel was ineffective in failing to challenge the court's refusal to instruct the jury that aggravating factors must outweigh mitigating factors sufficiently and beyond a reasonable doubt. He asserts that this violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

At trial, Caro requested an instruction stating that "the government must prove beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors in order to justify the death penalty." (Def.'s Resp. Regarding Proposed Jury Instructions 1, ECF No. 611.) I declined to give that proposed instruction. (*See* Final Jury Instructions Sentencing Hr'g. Part 2, ECF No. 640.)

At trial, the court instructed the jury to consider the aggravating factors separately, and to decide for each if they unanimously agreed that the government had proved it beyond a reasonable doubt. (*Id.* Instruction No. 6, 9.) The court also told the jurors to determine whether the aggravating factors that they unanimously found to exist sufficiently outweighed any mitigating factors that they individually found to exist. (*Id.* Instruction No. 8, 13.)

Caro argues that although the court instructed the jury to determine whether the government had proved the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that the reasonable doubt standard must also apply to the weighing of aggravating and mitigating factors. Caro points to two out-of-circuit cases that were decided after trial, but before appellate counsel filed their opening brief. He argues that these two cases, *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008), and *United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007), approved the "beyond a reasonable doubt" language as applied by his proposed instruction.

As Caro concedes, after the filing of the 2255 motion, the Fourth Circuit rejected his argument. *United States v. Runyon*, 707 F.3d 475, 515-16 (4th Cir. 2013), *cert. denied*, 135 S. Ct. 46 (2104); *United States v. Hager*, 721 F.3d 167, 206-07 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1936 (2014). In any event, appellate counsel was not ineffective in failing to raise this claim. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding that appellate counsel has no duty to raise every colorable claim and is entitled to exercise professional judgment). The FDPA does not set forth a reasonable doubt standard in the portion of the statute that deals with weighing aggravating and mitigating factors. (*See* 18 U.S.C. § 3593(e).) *Fell* and *Sampson* are persuasive authority only, and do not hold that juries must be instructed that aggravating factors outweigh mitigating factors

-81-

beyond a reasonable doubt. *See Fell*, 531 F.3d at 233-34 (finding no constitutional error where three of the non-statutory aggravating factors had some overlapping factual predicate, especially where the jury was charged with making a qualitative assessment of the aggravating and mitigating evidence as a whole).

Indeed, in *Sampson*, the First Circuit addressed a district court instruction that said jurors could impose the death penalty if the aggravating factors "slightly outweigh[ed]" the mitigating factors, but then later said that the prosecution had to convince them "beyond a reasonable doubt that the aggravating factor or factors sufficiently outweigh the mitigating factors to make death the appropriate penalty in [the] case." 486 F.3d at 33. The court reasoned:

> There are only two possibilities: either the jurors eschewed the reasonable doubt standard vis-à-vis the weighing process (which, as we have held, would have comported fully with the law) or they applied the reasonable doubt standard (which would have *benefitted* Sampson by imposing a more onerous burden on the government).

*Id.* This case does not hold that an instruction such as the one proposed by Caro is required under the law, but rather states that such an instruction imposes a higher standard than that required by law. *See also Tuilaepa v. California*, 512 U.S. 967, 979 (1994) ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.").

Additionally, the other cases cited by Caro do not address this issue and thus do not support his argument. *See Apprendi v. New Jersey*, 530 U.S. 466, 490

-82-

(2000) (holding that any fact other than a prior conviction that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt); *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (holding that a sentencing judge, sitting without a jury, cannot find an aggravating circumstance necessary for imposition of the death penalty).

That appellate counsel did not present this argument does not render their assistance ineffective.    To show deficient performance under *Strickland*, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation.  466 U.S. at 688.  Appellate counsel's conduct did not fall below an objective standard of reasonableness, which is clearly demonstrated by the lack of case law supporting Caro's argument.

### 2.   *Failure to Challenge Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty.*

Caro next argues that appellate counsel was ineffective for failing to challenge the exclusion for cause of qualified jurors with misgivings as to the death penalty.  He argues that he ended up with a death-leaning jury because Jurors #40 and #57, who had concerns about the death penalty, were questioned in a manner that resulted in their disqualification, even though they had indicated that they were willing to follow the law.  He argues that while appellate counsel made general

-83-

arguments regarding the overall voir dire process, they were ineffective in failing to also challenge the particular voir dire and exclusion of Jurors #40 and #57.

As to this claim, Caro has failed to demonstrate deficient performance.

Because they are tasked with identifying relevant prejudices, district courts have discretion concerning what questions are asked during voir dire. *Rosales-Lopez v. United States*, 451 U.S. 182, 188-89 (1981); *United States v. Barber*, 80 F.3d 964, 967 (4th Cir. 1996). "[A] juror should be excluded for cause if his 'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Fulks*, 454 F.3d at 427 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).

During voir dire, Juror #40 expressed an inability to impose the death penalty,[14] as did Juror #57.[15] The exclusion for cause of jurors who indicate an

---

[14] During voir dire, Juror #40 answered as follows:

THE COURT: Well, I know, and again, there's no right or wrong answer here. I just need to know what you believe, and so you need to tell me honestly. I mean, either way is, is fine. People have beliefs both ways. Some people believe that they could vote to impose the death penalty, some people believe that they could not. And I just need to know what your position is.

JUROR NUMBER FORTY: I guess if it all come down to it - -

THE COURT: That you could not.

JUROR NUMBER FORTY: No, if it all come down to it.

(Trial Tr. 136-37, Jan. 22, 2007, ECF No. 693.)

-84-

unwillingness to consider the death penalty as a potential punishment has been routinely upheld.  *See, e.g.*, *United States v. Jackson*, 327 F.3d 273, 296 (4th Cir. 2003) (finding that the district court did not act improperly in excluding a juror who indicated that he could not sign his name to a verdict sheet which would require the court to impose the death penalty).  The exclusion of Jurors #40 and #57 based on the answers that they provided during voir dire was not unusual, and appellate counsel was not ineffective in failing to challenge this on appeal.  The law affords a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. *Strickland*, 466

---

[15] During voir dire, Juror #57 answered as follows:

THE COURT: Well, are you telling me that if you were a juror in this case and the defendant were found guilty that you could not vote for the death penalty?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Is that what you're saying?

PROSPECTIVE JUROR: I could not vote for it.

THE COURT: All right.  No matter what the circumstances?

PROSPECTIVE JUROR: No.

THE COURT: Your mind would be in essence closed to the death penalty, is that what you're saying? Is that right?

PROSPECTIVE JUROR: Yes, sir.

(Trial Tr. 57-58, Jan. 23, 2007, ECF No. 672.)

U.S. at 688-89.  In the case at hand, there is no indication that appellate counsel's performance fell below an objective standard of reasonableness, or even departed from usual practice.

### 3. *Failure to Challenge Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Caro*.

Caro argues that appellate counsel rendered ineffective assistance of counsel for failing to raise a claim regarding trial counsel's failure to object to specific instances of violence committed by inmates other than Caro, in violation of the trial court's order.  He notes that the Fourth Circuit stated that it could not grant relief as to the use of specific instances of violence by persons other than Caro when that claim was never raised on appeal.  *See Caro*, 597 F.3d at 621 n.14.  He argues that the Fourth Circuit's opinion establishes the prejudicial impact of appellate counsel's failure to raise this claim, and establishes that the government's use of evidence of specific instances of violence by persons other than Caro was error because it violated the district court's ruling.   He also argues that the government's use of this evidence violated the Eighth Amendment because it constituted aggravation evidence that was not "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983).

Caro has failed to prove prejudice under *Strickland*, because he has failed to demonstrate a "reasonable probability" that but for counsel's errors, the outcome of the penalty phase would have been different. 466 U.S. at 694-95.

At trial, the government presented evidence of specific instances of violence committed by other inmates. Witness Olson testified that an inmate at Florence ADMAX who was a member of the Aryan Brotherhood had sent a coded message that had resulted in the death of two other inmates. (Trial Tr. 27-30, Feb. 6, 2007, ECF No. 683.) Former warden Hershberger testified that an inmate had killed two guards at USP Marion, the predecessor to Florence ADMAX. (Trial Tr. 188, Feb. 12, 2007, ECF No. 686.)

The Fourth Circuit's discussion of this evidence does not establish prejudice. The Fourth Circuit mentioned trial counsel's failure to challenge this evidence in its opinion:

> When asked during oral argument whether Caro asserted any claim arising from the government having violated the district court's order that it "may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness," counsel for Caro stated that she noted the government's misconduct merely to bolster her argument about subsection (i). Regardless of whether subsection (ii) would apply, we cannot grant relief that Caro plainly failed to request.

*Caro*, 597 F.3d at 621 n. 14 (internal citation omitted). The Fourth Circuit discussed this evidence in the context of Federal Rule of Criminal Procedure 16, which concerns documents and objects that (i) are "material to preparing the

-87-

defense;" or (ii) "the government intends to use . . . in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E)(i)-(ii). The rule does not address rebuttal evidence.

Similarly, the order banning use of evidence of specific instances of violence by inmates other than Caro did not address rebuttal evidence, but rather concerned evidence that the government intended to use in its case in chief. *See Caro*, 461 F. Supp. 2d at 481-82 ("For these reasons, I will sustain the government's objection to the magistrate judge's order and deny the defendant's objection . . . . I do so in light of the government's representation that it does not intend to introduce any of the requested data in its own case." (internal citations omitted).) Hershberger and Olsen were offered as rebuttal witnesses to defendant's expert Cunningham.[16] The Fourth Circuit's discussion of their testimony and Rule 16(a)(1)(E) does not establish prejudice sufficient to prove Caro's ineffective assistance of counsel claim.

Caro premises his ineffective assistance of counsel claim on appellate counsel's failure to challenge trial counsel's failure to challenge the introduction of specific acts evidence in violation of the court's order, but Caro has not demonstrated a violation of the court's order. Furthermore, Caro has failed in his attempts to establish prejudice. There is not a reasonable likelihood that the

---

[16] Although Olson's testimony preceded Cunningham's, it still was presented as rebuttal testimony. See discussion concerning the admission of Olson's testimony on the matter of the coded letter at Trial Tr. at 27-31, Feb. 6, 2007, ECF No. 683.

outcome of the penalty phase would have been different but for the introduction of this evidence. The government offered other evidence that could have served as a basis for the jury's finding that Caro constituted a future danger — for example, Caro's record of gang involvement and violence against other inmates. There is no indication that the totality of the evidence presented on Caro's future dangerousness "was merely speculative or that it was constitutionally infirm." *United States v. Hager*, 721 F.3d 167, 200 (4th Cir. 2013). Accordingly, this claim is without merit.

To the extent that Caro asserts a claim under the Eighth Amendment, this claim also fails. The evidence in question was introduced in rebuttal, and extensive evidence specific to Caro was presented to the jury. The jury found that the parties had proved three non-statutory aggravating factors and twelve mitigating factors. The jury weighed the aggravating and mitigating factors before delivering a death verdict, and made "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879. That specific acts evidence was introduced in rebuttal at trial does not mean that the jury failed to make an individualized determination.

#### 4. *Failure to Raise Claim That Government Improperly Minimized Jury's Responsibility.*

Caro argues that appellate counsel was ineffective in failing to claim that the government violated the Eighth Amendment by minimizing the jury's responsibility.

The underlying claim that the government violated the Eighth Amendment by minimizing the jury's responsibility (Claim VIII) has been procedurally defaulted and is without merit. As discussed above, Caro has not shown that the government's challenged statements misrepresented or minimized the jurors' role in determining the appropriateness of a death sentence. Accordingly, Caro cannot establish that counsel's representation was deficient or prejudicial, and this claim fails under *Strickland*.

#### 5. *Failure to Raise Systemic Challenges to the Death Penalty.*

Caro argues that appellate counsel was ineffective in failing to raise systemic challenges to the death penalty. He argues that appellate counsel should have raised the arguments that he asserts in Claims X through XV, which are discussed hereafter.

Caro cannot establish that appellate counsel was ineffective for failing to raise these arguments. To show prejudice under *Strickland*, the petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." 466 U.S. at 694. As discussed below, Claims X through XV seek to overturn clearly established law concerning the death penalty. Accordingly, these claims are without merit, and no prejudice occurred from appellate counsel's failure to raise them.

## J. CLAIMS X-XV: SYSTEMIC CHALLENGES TO DEATH PENALTY.

In Claims X through XV, Caro asserts systemic challenges to the death penalty. In Claim X, he argues that the use of future dangerousness as an aggravating factor violated his right to a non-arbitrary sentencing process under the Eighth Amendment and 18 U.S.C. § 3595(C)(2)(A). In Claim XI, he argues that the FDPA is unconstitutional due to the absence of a principled basis for distinguishing between cases where the death penalty is imposed and cases where it is not. In Claim XII, he asserts that his sentence should be vacated because the death penalty was imposed "on both the invidious basis of race and the irrational basis of geography ." (Mot. Collateral Relief 186, ECF No. 790.) In Claim XIII, he asserts that the death sentence is a categorically cruel and unusual punishment that violates the Eighth Amendment. In Claim XIV, he claims that the death sentence violates international law, namely the Convention on the Elimination of All Forms of Racial Discrimination and the International Covenant on Civil and Political Rights ("ICCPR"). Finally, in Claim XV, he argues that the FDPA precludes plain error review, and is thus unconstitutional.

Claims X through XV have been procedurally defaulted, because they concern alleged errors which could have been raised on direct review, but were not.[17] *See Bousley*, 523 U.S. at 622. Caro has not shown any "external impediment preventing counsel from constructing or raising" these claims on direct appeal," *Murray*, 477 U.S. at 492, or "a reasonable probability that his conviction or sentence would have been different" if counsel had raised any of these claims. *Strickler*, 527 U.S. at 264.

Caro has not demonstrated cause and prejudice for failing to raise any of these claims on direct appeal. It is clear from the record that these claims rely on facts and law that were available to counsel at the time of appeal. The case summaries and statistical studies that Caro has put forth are not new evidence and do not constitute "exceptionally clear proof" of discriminatory purpose.

---

[17] The government explicitly argues that Claim X and Claim XV are procedurally defaulted. Caro argues that he can overcome the procedural default due to ineffective assistance of appellate counsel in failing to raise these claims. As discussed in Claim IX E, this argument is without merit, because Caro has failed to establish prejudice.

The government moved to dismiss Claims XI through XIV, but did not explicitly argue that they were procedurally defaulted. However, these claims are appropriate for sua sponte application of procedural default. *See, e.g.*, *Yeatts*, 166 F.3d at 261. A finding that these claims are procedurally defaulted furthers interests in the finality of the judgment, judicial efficiency, and conservation of judicial resources. *See Hines v. United States*, 971 F.2d 506, 509 (10th Cir. 1992). These interests are particularly furthered due to the fact that Caro is raising systemic challenges to the death penalty, a punishment which has been repeatedly upheld under federal law. Caro received notice that the government had moved to dismiss these claims, and had opportunity to respond. Thus, I find that sua sponte application of procedural default is warranted under the circumstances of this case.

*McCleskey v. Kemp*, 481 U.S. 279, 292-97 (1987) (discussing problems with using statistical studies to challenge the imposition of a death sentence). *See also Bell v. Ozmint*, 332 F.3d 229, 239 (4th Cir. 2003) (discussing "very exacting standards for entitlement to constitutional relief based on statistical evidence" (internal quotation marks and citation omitted)). Furthermore, these claims can be fully and completely addressed based on the existing record in this case. *See Bousley*, 523 U.S. at 622.

Additionally, Claims X through XV seek to overturn well-established case law, and are without merit. *See, e.g.*, *Jones v. United States*, 527 U.S. 373, 389 (1999) (reviewing claims challenging a sentence imposed under the FDPA for plain error); *McCleskey*, 481 U.S. at 292 (rejecting use of statistical study as sufficient proof of discrimination in equal protection claim challenging capital sentencing decision); *United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010) (affirming that death penalty is not per se cruel and unusual punishment under the Eighth Amendment); *United States v. Caro*, 614 F.3d 101, 101-02 (4th Cir. 2010) (affirming constitutionality of FDPA and recognizing its purpose of eliminating arbitrariness in capital sentencing); *United States v. Basham*, 561 F.3d 302, 331 (4th Cir. 2009) (recognizing future dangerousness as a legitimate non-statutory aggravating factor in capital proceedings); *Sampson*, 486 F.3d at 25 (rejecting Fifth and Eighth Amendment claims that the FDPA is unconstitutional due to racial and

geographical discrimination); *Dutton v. Warden, FCI Estill*, 37 F. App'x 51, 53 (4th Cir. 2002) (unpublished) (holding that treaties such as the ICCPR that are not self-executing and have not had implementing legislation passed by Congress do not create private causes of action in U.S. courts). Caro has failed to establish that he is entitled to relief on these claims.

## K. CLAIM XVI: CUMULATIVE ERROR.

In his final claim, Caro asserts that his claims establish prejudicial error when considered cumulatively. This claim is without merit. Cumulative error seldom supports reversal:

> Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. Generally, however, if a court determines that none of a defendant's claims warrant reversal individually, it will decline to employ the unusual remedy of reversing for cumulative error. To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness. When none of the individual rulings work any cognizable harm, it necessarily follows that the cumulative error doctrine finds no foothold.

*Basham*, 561 F.3d at 330 (internal alterations, citations, and quotation marks omitted). Insofar as I have found Caro's claims meritless individually, I also find that Caro's claims, when considered cumulatively, do not violate his trial's fundamental fairness.

# IV. CONCLUSION.

For the reasons stated above, the government's Motion to Dismiss (ECF No. 791) will be GRANTED and the defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 (ECF No. 781) and the defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (ECF No. 800) will be DENIED.   A separate Final Order will be entered herewith.

DATED:  May 4, 2015

/s/  James P. Jones
United States District Judge